E-Filed: **5/29/09**

NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALFRED E. MANN FOUNDATION,** | **CASE NO. CV 07-8108-GHK (CTx)** |
| Plaintiff, | **MEMORANDUM AND ORDER** |
| v. | |
| **COCHLEAR CORP., et al.,** | |
| Defendants. | |

This matter is before the Court on Defendants Cochlear Corporation, n/k/a Cochlear Americas, and Cochlear Ltd.'s (collectively "Defendants") Motion to Dismiss for Lack of Standing and Defendants' Motion for Rule 11 Sanctions. We have considered the papers filed in support of and opposition to these Motions, as well as counsel's oral arguments on April 20, 2009. As the Parties are familiar with the facts, they will be repeated only as necessary. Accordingly, we rule as follows.

//

## I. Motion to Dismiss for Lack of Standing

The dispositive question presented by this Motion is whether the 2004 License Agreement ("Agreement") between Plaintiff Alfred E. Mann Foundation ("Plaintiff") and Advanced Bionics Corporation ("ABC") is an exclusive license, as the Agreement's title suggests, or an assignment. If Plaintiff licensed the relevant patents to ABC, Plaintiff retains standing to bring the instant action for alleged infringement. *See Abbott Lab. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995); *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1250 (Fed. Cir. 2000). However, if Plaintiff assigned the patents to ABC, Plaintiff lacks standing to bring this action. *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008); *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1338 (Fed. Cir. 2006).

Although Plaintiff and ABC titled the Agreement a "license," "[a] party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights." *Speedplay*, 211 F.3d at 1250. Thus, we must determine whether all substantial rights were transferred to ABC, in which case the Agreement is an assignment, or whether Plaintiff retained substantial rights, in which case the Agreement is an exclusive license. *See id.* "In making such a determination, it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1342 (Fed. Cir. 2001).

Party intent determines what rights were granted to ABC and what rights were retained by Plaintiff.[1] When a contract is ambiguous,[2] extrinsic evidence is admissible to

---

[1] The reasoning of the Federal Circuit cases is not uniform as to why party intent controls the interpretation of contracts granting patent rights. Most cases simply state that party intent controls and cite Federal Circuit precedent, usually *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 874 (Fed. Cir. 1991). *See, e.g., Aspex*, 434 F.3d at 1339; *Intellectual Prop.*, 248 F.3d at 1342; *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1378 (Fed. Cir. 2000). The better reasoned cases acknowledge that state law controls interpretation of such contracts, and the relevant state law usually leads to party intent. *See, e.g., Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009); *Mars*, 527 F.3d at

interpret the ambiguous terms. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008). Here, the only relevant extrinsic evidence submitted by the parties is the 1999 License Agreements between Plaintiff and ABC which were superseded by the Agreement at issue.

Although we consider all granted and retained rights, Federal Circuit precedent indicates that three rights are emphasized: the exclusive rights to make, use, and sell products covered by the patents ("exclusive rights"), sublicensing rights, and the right to sue alleged infringers. *See Aspex*, 434 F.3d 1336; *Abbott*, 47 F.3d 1128; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (Fed. Cir. 1991).

### A. Exclusive Rights

Plaintiff transferred to ABC the exclusive rights to make, use, and sell products covered by the patents. (Fraser Decl. Ex. 1091 at 128.) This grant of exclusive rights does not terminate before the expiration of the patents. (*Id.*) This is clearly consistent with an assignment. *See Speedplay*, 211 F.3d at 1250; *Vaupel*, 944 F.2d at 874. Plaintiff's grant of exclusive rights to ABC is unlike the grant of exclusive rights in *Aspex*, 434 F.3d at 1336, where the court concluded that the contract was a license. There, unlike the instant Agreement, the contract provided that the exclusive rights were to revert to the grantor before the expiration of the patent term. *Id.* at 1342. Plaintiff's grant of exclusive rights is also unlike the grant of rights in *Abbott*, 47 F.3d 1128, where the court concluded that the contract was a license. There, unlike the instant Agreement, the contract provided that the grantor retained the right to make, use, and sell products

---

1370.

In this case, either line of reasoning will lead to party intent, as party intent controls under California law. See Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."); *California v. Allstate Ins. Co.*, 45 Cal. 4th 1008, 1018 (2009).

[2]*See Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006) ("An ambiguity arises when language is reasonably susceptible of more than one application to material facts.").

//

covered by the relevant patents, and the grantee's license was subject to prior licenses. *Id.* at 1132.

Thus, Plaintiff granted ABC broad exclusive rights, which favors the conclusion that the Agreement is an assignment.

## B.  Sublicensing Rights

The extent of sublicensing rights granted by Plaintiff to ABC is hotly contested by Plaintiff and Defendants.  Section 2.1 of the Agreement grants ABC a "worldwide license throughout the Term, with a right to sublicense (subject to the provisions in Section 2.6(a) through (e))[3] . . . ."  (Fraser Decl. Ex. 1091 at 128.)  Section 2.6(a) through (d) require any sublicensing agreements to contain the following:

```
a.    [confidentiality requirements];
b.    [reporting, inspection, and audit rights];
c.    [termination provision];
d.    [royalties provision].
```

(*Id*. at 128–29.).  On its face, the Agreement granted ABC virtually unfettered right to sublicense to anyone it chooses, provided that it includes in the sublicense the requirements of Subsections (a)–(d).

Plaintiff asserts that notwithstanding the plain language of the Agreement, all of Section 2.6 must be imported into Section 2.1, including the language preceding the Subsections.  This language states, in relevant part, that "[Plaintiff] hereby grants to [ABC] the exclusive worldwide right and license to grant sublicenses to Affiliates of [ABC]."

We believe the interpretation consistent with the intent of Plaintiff and ABC is that only the requirements of Subsections (a)–(d) of Section 2.6 are imported into Section 2.1.  First and foremost, the plain language of Section 2.1 refers to only Section 2.6(a)–(d).

---

[3]The Agreement contains no Section 2.6(e).  Henceforth, we will refer to Section 2.6(a)–(d).

4

1  Moreover, other portions of the Agreement, Sections 11.2.2 and 11.3.2, state that if any
2  patent infringement action is settled for a sublicense, the sublicense "will be subject to
3  Section 2.6." (Fraser Decl. Ex. 1091 at 138.) The fact that Sections 11.2.2 and 11.3.2
4  refer to "Section 2.6," whereas Section 2.1 refers to "Section 2.6(a) through (d),"
5  indicates that Plaintiff and ABC understood the difference between importing the entirety
6  of Section 2.6 and importing only the Subsections. This supports the conclusion that
7  Section 2.1 does not contain a mere drafting error.

8        Moreover, even if we were to import all of Section 2.6 into Section 2.1, we believe
9  Section 2.6 is a redundant grant of the right to sublicense to Affiliates, and not a
10 restriction of sublicenses to only Affiliates. The plain language of the provision says that
11 Plaintiff grants ABC "the exclusive worldwide right and license to grant sublicenses to
12 Affiliates of [ABC]." It does not say that ABC has the exclusive worldwide right and
13 license to grant sublicenses **ONLY** to its Affiliates. Once again, Plaintiff's proffered
14 interpretation conflicts squarely with the plain language of the Agreement. While the
15 face of the Agreement renders grant of sublicense rights in Section 2.6 redundant of such
16 grant in Section 2.1, other considerations, discussed below, outweigh our concerns about
17 redundancy.

18       Section 11.2.2 allows ABC "to enter into any settlement or judgment that involves
19 any outcome other [sic] whether or not involving the payment of money without the prior
20 written approval of [Plaintiff,]" but "[a]ny license, sublicense, or cross-license of any
21 [relevant patent] that results from a settlement or judgment will be subject to Section
22 2.6." (Fraser Decl. Ex. 1091 at 137–38.)[4] Plaintiff's suggested interpretation that 2.6
23 restricts sublicenses to Affiliates leads to the absurd result that ABC is given the right to
24 settle lawsuits for a license only in the highly unlikely situation that ABC is suing its own
25 Affiliates. This is a tortured reading of the Agreement, as compared with the more
26 logical interpretation that Plaintiff granted ABC virtually unfettered sublicensing rights

---

28     [4]Section 11.3.2 contains a similar provision when Plaintiff controls the litigation.

provided that it includes the restrictions of Subsections 2.6(a)–(d), and the language of Section 2.6 that precedes Subsections (a)–(d) merely reaffirms ABC's right to sublicense to Affiliates.

At the hearing, Plaintiff argued that limiting settlement sublicenses to Affiliates of ABC is really not meant to be taken literally. Instead, this language is really a device to create an obstacle during settlements that would then force Plaintiff and ABC to come to an ad hoc mutually agreeable sublicensing scheme. When that is done, Plaintiff and ABC would simply agree to waive the literal provisions of Section 2.6. While we congratulate counsel on his creativity, the plain language of the Agreement simply is not susceptible to such a far-fetched interpretation. Had this been the intention of Plaintiff and ABC, they would have written the contract to state that a sublicense may be granted to settle a lawsuit only upon the approval of both Plaintiff and ABC. There was no need to use Section 2.6 as such an opaque and circuitous proxy.

Moreover, the Agreement, in Sections 3.6 and 12.9, mentions both "Affiliates" and "sublicensees." If Plaintiff were correct that only Affiliates can obtain sublicenses, the Agreement would not need to mention sublicensees separately from Affiliates. Plaintiff argued at the hearing that the Agreement mentions sublicensees separately in anticipation of the situation described above where Plaintiff and ABC agree to waive the sublicensing restriction and settle a lawsuit for a license. Again, we believe this to be a tortured reading of the contract that runs far afield from the intentions of Plaintiff and ABC at the time the Agreement was signed.

Finally, the 1999 License Agreements support our conclusion that the Agreement grants ABC the right to sublicense to virtually anyone it chooses. The 1999 License Agreements state that:

> [Plaintiff] hereby grants to [ABC] the sole and exclusive worldwide right and license to grant sublicenses to Affiliates of [ABC]. [ABC] may not grant sublicenses to persons or entities who or which do not qualify as an Affiliate of [ABC] unless [ABC] first obtains the express written consent of [Plaintiff], which consent will not be unreasonably withheld.

(Fraser Decl. Ex. 1086 at 91; Ex. 1087 at 107.) The Federal Circuit has stated that where

6

the grantee of patent rights may grant a sublicense subject to written consent from the grantor, the grantor merely retains a "veto right on sublicensing" which is only "a minor derogation from the grant of rights." *Vaupel*, 944 F.2d at 875. This is even more so when the agreement between the parties specifies that the grantor's consent shall not be unreasonably withheld. *Speedplay*, 211 F.3d at 1251. Because the 1999 License Agreements granted ABC the right to sublicense to Affiliates without Plaintiff's consent and the right to sublicense to non-Affiliates with Plaintiff's consent, which could not be unreasonably withheld, ABC received virtually unfettered sublicensing rights. Moreover, if Plaintiff and ABC meant to have more restrictions on sublicenses in the Agreement than stated in the 1999 License Agreements, they most certainly would have made it clear that *only* Affiliates can be sublicensees. The failure to do so, in conjunction with the background provided by the 1999 License Agreements, supports our conclusion that ABC's right to sublicense is not restricted to Affiliates.

Thus, Plaintiff granted ABC broad sublicensing rights, which favors the conclusion that the Agreement is an assignment.

### C. Right to Sue

Plaintiff argues that the Agreement does not transfer to ABC the right to sue, but only the right to control litigation, and that right must be affirmatively elected by ABC. (Opp'n, 4.) The Agreement does not support a difference between the right to control litigation and the right to sue. Section 11.2.1 provides ABC "the first right to control the proceedings relating to [i]nfringement." (Fraser Decl. Ex. 1091 at 137.) Section 11.3.1 provides Plaintiff the right to control the proceedings "[i]f [ABC] elects not to defend against an [i]nfringement."[5] (*Id.* at 138.) When read together, these two sections equate ABC's right to control the litigation with its right to sue.

We also disagree with Plaintiff that ABC must affirmatively elect to sue. Section

---

[5]When the Agreement speaks of "defending against an infringement," it is referring to Plaintiff or ABC bringing an action as a plaintiff against an alleged infringer to stop the infringement.

11.3.1 allows Plaintiff to sue only "[i]f [ABC] elects not to defend against an [i]nfringement." (*Id.*) Contrary to Plaintiff's argument, the right lies with ABC and reverts to Plaintiff only if ABC elects not to sue an alleged infringer. We conclude the Agreement transferred to ABC the right to sue. Plaintiff retains a secondary right to sue if ABC elects not to sue an alleged infringer.

Defendants make much of Plaintiff's inability to sue until ABC elects not to sue. Defendants argue that this requirement renders Plaintiff's right to sue illusory, as ABC could simply ignore Plaintiff's requests for an election. Defendants contrast the instant Agreement with the contracts in cases where if the grantee failed to sue within a specified time period after learning of an infringement, the right to sue reverted to the grantor. *See, e.g., Speedplay*, 211 F.3d at 1251 (noting that the contract provided the grantor a right to sue alleged infringers if the grantee did not bring suit within three months); *Abbott*, 47 F.3d at 1129 (noting that the contract provided the grantor a right to sue alleged infringers if the grantee did not bring suit within six months of the grantor's request). We reject Defendants' argument. The Agreement implies a reasonable period for ABC to elect, beyond which ABC's failure to act is its election not to sue.

However, even if the secondary right to sue is not illusory, a grantor's secondary right to sue is of minimal significance if the grantee can grant sublicenses. *See Aspex*, 434 F.3d at 1342 ("[W]e agree with the district court that the agreement minimizes the significance of any right to sue that [the grantor] may have had since it retained 'no supervisory or veto power over [the grantee]'s grant of sublicenses.'"); *Speedplay*, 211 F.3d at 1251. As discussed above, we believe ABC has a largely unfettered right to sublicense. Thus, Plaintiff's secondary right to sue is of minimal importance.

Finally, Section 11.2.1 provides Plaintiff "the right, but not the obligation" to participate in an infringement action brought by ABC. Though not determinative, the fact that Plaintiff is not required to participate in ABC's lawsuits, even though licensees typically must join the licensor in order to sue, is some indication that Plaintiff intended to assign its rights to ABC.

8

Thus, Plaintiff granted ABC the first right to bring suit, in its own name and without joining Plaintiff, which favors the conclusion that the Agreement is an assignment.

**D.     Other Rights**

Plaintiff retains the right to receive a portion of any proceeds from an infringement action, whether brought by Plaintiff or ABC.  (Fraser Decl. Ex. 1091 at 138.)  The Federal Circuit has held that the right to receive a portion of litigation proceeds merely supplies some of the consideration for the contract; it does not dictate whether the Agreement is an assignment or a license.  *Intellectual Prop.*, 248 F.3d at 1344 n.11 ("[The grantor]'s right to receive infringement damages is merely a means of compensation under the agreement.  We consider [the grantor]'s right to receive infringement damages a neutral factor.") (internal quotation marks and citations omitted); *Vaupel*, 944 F.2d at 875 ("Finally, the right to receive infringement damages was merely a means of compensation under the agreement; this was not inconsistent with an assignment.").  *But see Propat Int'l Corp. v. RPost US, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007) ("To be sure, the fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent, as [the grantor] has done in this case, does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent.  Nonetheless, the fact that [the grantor] retains a substantial share of the proceeds is consistent with [the grantor] retaining ownership rights in the patent . . . .") (internal citations omitted).  Thus, we conclude that at best this right only slightly favors a finding that the Agreement is a license.

Plaintiff asserts that the Agreement requires Plaintiff to pay maintenance fees on the patents.  The grantor's obligation to pay maintenance fees is consistent with a license. *See Propat*, 473 F.3d at 1191; *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001).  Here, the Agreement is not clear whether Plaintiff is obligated to pay maintenance fees.  Section 10.1(a) requires Plaintiff "at [Plaintiff]'s sole cost [to] prosecute and maintain domestic and foreign patent applications" with respect to

9

1 the relevant technology.  Thus, by its plain language, Section 10.1(a) applies only to
2 patent applications, not to the already-issued patents relevant here.  At the hearing on this
3 Motion, Plaintiff asserted that this is another drafting error and Section 10.1(a) was
4 intended to apply to patents, not applications.  Plaintiff's argument is difficult to accept,
5 as the entire paragraph of Section 10.1(a) is directed at patent applications.

6      Alternatively, Plaintiff argues that it is required to pay maintenance fees on the
7 patents because of Section 10.2.  Again, Plaintiff's argument is strained.  Section 10.2 is
8 comprised of two Subsections, (a) and (b).  Subsection (a) requires ABC to reimburse
9 Plaintiff for the prosecution and maintenance of foreign patents necessary to protect
10 ABC's rights in the relevant technology.  Foreign patents do not affect our analysis of the
11 United States patents.  *See Vaupel*, 944 F.2d at 875 ("Nor did the right to obtain patents
12 in other countries affect [the grantee]'s rights arising from the '650 patent, which are
13 limited to the United States."); *Speedplay*, 211 F.3d at 1252 ("The right to dictate the
14 markings on products sold abroad may or may not be significant as a practical matter, but
15 the right is certainly not one that interferes with the rights in a U.S. patent, which are
16 limited in reach to the United States.").  Moreover, even were we to consider the foreign
17 patents in our analysis, Subsection (a) supports the conclusion that the Agreement is an
18 assignment because ABC is ultimately bearing the cost for those foreign patents.  *See*
19 *CytoLogix Corp. v. Ventana Med. Sys.*, No. 04-11783, 2007 U.S. Dist. LEXIS 77065 (D.
20 Mass. Oct. 17, 2007) (holding that where the grantor has an obligation to maintain the
21 patents under the grantee's direction and expense, the grantor acts merely as an agent for
22 the grantee, and the arrangement is consistent with an assignment).  Subsection (b)
23 addresses the prosecution of patent applications, and is therefore not relevant to Plaintiff's
24 alleged obligation to pay maintenance fees on the relevant patents.  Therefore, Section
25 10.2 does not support Plaintiff's claim that it is required to pay maintenance fees on the
26 patents.
27 //
28      Nevertheless, for the purposes of this analysis, we will give Plaintiff the benefit of

any uncertainties regarding Plaintiff's retained obligation to pay maintenance fees.

### E. Conclusion

Plaintiff granted ABC the exclusive right to make, use, and sell products covered by the patents without temporal limitation, reservation, or reversion. Plaintiff also granted virtually unfettered sublicensing rights to ABC. While Plaintiff retained a secondary right to sue for infringement, this right is a minimal intrusion into the broad rights granted to ABC especially in light of the unlimited sublicensing rights. Similarly, Plaintiff's retention of some of the proceeds from an infringement action and its arguable obligation to pay the patent maintenance fees do not substantially reduce the nature, extent, and comprehensiveness of the rights granted. Accordingly, we conclude that Plaintiff granted ABC all substantial rights under the patents such that ABC is considered the owner of those patents.

Plaintiff acknowledged at the hearing on this Motion that ABC has not assigned back to Plaintiff the right to sue. In light of our conclusion that Plaintiff assigned its patent rights to ABC, we now hold that Plaintiff lacks standing to bring this action. Accordingly, Defendants' Motion to Dismiss is **GRANTED**. This case is **DISMISSED** for lack of standing.

## II. Motion for Rule 11 Sanctions

Defendants request sanctions against Plaintiff under Federal Rule of Civil Procedure 11. Defendants assert that "even a cursory investigation" would have revealed that Plaintiff had no standing to sue. (Motion, 6.) We disagree. Given our discussion in this Order, Plaintiff's position is at least arguable. We decline to impose sanctions under Rule 11.

Defendants also base their request for Rule 11 sanctions on their allegation that Plaintiff did not produce the Agreement until nearly a year after the litigation

//

commenced. (Motion, 3.) We view this as a claim of discovery abuse, and it should have

1  been raised before the Magistrate Judge.

2  Accordingly, Defendants' Motion for Rule 11 Sanctions is **DENIED**.

4  **IT IS SO ORDERED**.

6  DATED: May 29, 2009

```
                                    _____
                                            GEORGE H. KING
                                       United States District Judge
```