1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4    THE HONORABLE GEORGE H. KING, UNITED STATES DISTRICT JUDGE

5

6    ALFRED E. MANN FOUNDATION FOR        )
     SCIENTIFIC RESEARCH,                 )
7                                         )
                          PLAINTIFF,      )
8             vs.                         ) NO. CV 07-8108-GHK (CTX)
                                          )
9    COCHLEAR CORPORATION and COCHLEAR    )
     LTD.,                                )
10                                        )
                          DEFENDANT.      )
11   _____ )
                                          )
12   AND RELATED ACTIONS.                 )
                                          )
13   _____

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                LOS ANGELES, CALIFORNIA

17           MONDAY, APRIL 20, 2009; 9:40 A.M.

18                 HEARING RE MOTION

19

20

21

22

23                        MARY RIORDAN RICKEY, CSR 11252
24                        OFFICIAL COURT REPORTER
                          255 EAST TEMPLE STREET ROOM 181-G
25                        LOS ANGELES, CALIFORNIA  90012
                          MARY.USDC@YAHOO.COM

```
1    APPEARANCES OF COUNSEL:

2         FOR ALFRED E. MANN FOUNDATION:

3              MERCHANT & GOULD, P.C.
               BY:  BRIAN G. BODINE, ESQ.
4              701 FIFTH AVENUE
               SUITE 4100
5              SEATTLE, WASHINGTON  98104-7073
               (206) 342-6200
6

7              MORRISON & FOERSTER, LLP
               BY:  CHARLES S. BARQUIST, ESQ.
8              555 WEST FIFTH STREET
               LOS ANGELES, CALIFORNIA 90013-1024
9              (213) 892-5400

10

11        FOR COCHLEAR CORPORATION, ET AL.:

              CONNOLLY, BOVE, LODGE & HUTZ, LLP
12            BY:  BRUCE G. CHAPMAN, ESQ.
              333 SOUTH GRAND AVENUE
13            SUITE 2300
              LOS ANGELES, CALIFORNIA  90071-1504
14            (213) 787-2502

15

16        ALSO PRESENT:

              MALCOLM ROMANO, ESQ.
17            GENERAL COUNSEL, MANN FOUNDATION

18            RAY JARMAN, ESQ.
              GROUP GENERAL COUNSEL, COCHLEAR LTD.
19

20

21

22

23

24

25
```

1          LOS ANGELES, CALIFORNIA; MONDAY, APRIL 20, 2009

2                          9:40 A.M.

3                          --oOo--

4          THE CLERK:  Calling item 1 on the Court's calendar,

5     civil 07-8108, Alfred E. Mann Foundation versus Cochlear

6     Corporation, et al.

7          Counsel, would you please state your appearances for

8     the record.

9          MR. BARQUIST:  Good morning, Your Honor,

10    Charles Barquist, Morrison and Foerster, for the plaintiff.

11         THE COURT:  Yes, good morning.

12         MR. BODINE:  Brian Bodine of Merchant and Gould,

13    also for the plaintiff.

14         THE COURT:  Yes, good morning, Counsel.

15         MR. CHAPMAN:  Good morning, Your Honor.

16    Bruce Chapman from Connolly, Bove, Lodge and Hutz for the

17    defendant.

18         THE COURT:  Yes, good morning.

19         All right.  Counsel, this matter's on the Court's

20    calendar to consider the motion of the defendant to dismiss

21    for lack of standing in this case.

22         I have carefully considered the papers filed in

23    support and opposition to this motion.  I have given it some

24    thought, and I think I would benefit from oral argument from

25    counsel.  That's why I decided to put it back on calendar for

1   that purpose.

2            Let me start with the plaintiffs first, Mr. Barquist

3   or Mr. Bodine, who will be addressing the Court?

4            MR. BODINE:  I will be, Your Honor.

5            THE COURT:  All right.  Would you approach the

6   lecturn for that purpose.

7               *(Mr. Bodine proceeds to the lecturn.)*

8            THE COURT:  All right.  On this motion, it appears

9   to me that the ultimate issue that I have to decide is whether

10  or not there has been a sufficient grant of all substantial

11  rights to the patent or patents in this case such that what we

12  really have is an assignment notwithstanding the label that

13  the parties have put upon the 2004 Agreement.

14           So in order to do that, I have, of course, to

15  decipher from the agreement what the intent of the parties

16  was, what rights were given, what rights were retained and

17  then, guided by the principles set forth in a variety of cases

18  for the Federal Circuit, which you folks have been kind enough

19  to cite to me -- some of which, of course, I've also looked up

20  myself -- and having read all those cases, I want you folks to

21  help me in that process today.

22           But before I do that, and I want to put this

23  question to you --

24           Is it Mr. "Bodine" or Mr. "Bodeen"?

25           MR. BODINE:  "Bodeen."

1          THE COURT:  Now, Mr. Bodine, if, at the end of the

2     day, I were to conclude that this was an assignment because

3     there had been a transfer of all the substantial rights to a

4     patent, if that's the case -- I'm sure that you want to make

5     sure that I don't come to that conclusion.

6          But if I came to that conclusion, at the end of the

7     day, hypothetically, in your judgment, then would that be the

8     end of the matter?

9          MR. BODINE:  Your Honor, if you come to the

10    conclusion that this was an assignment, then there would be an

11    assignment required back for A.M.F. to have standing, yes.

12    That's correct.

13          (Brief interruption in the proceedings.)

14          MR. BODINE:  And, Your Honor, I have one preliminary

15    matter that I wanted to raise with you before we got into the

16    substance; and that is, these agreements are confidential

17    between A.M.F. and Advanced Bionics, and I don't know that we

18    can discuss them in open court.

19          The terms of the agreements -- the existence of the

20    agreements are not confidential, but the terms of the

21    agreements are, pursuant to the agreement.

22          In fact, the exhibits that have been marked are

23    marked by Advanced Bionics as "attorney's eyes only" pursuant

24    to the protective order.  And I just wanted to make sure that

25    none of those terms were disclosed publicly, that that would

1    make the terms of the agreement public.

2            I can't disclose Advanced Bionics' confidential

3    information.  I don't have any permission from them.

4            THE COURT:  Well, first of all, if there will be

5    limits on the certain disclosures about certain terms, you're

6    going to have to make a showing of good cause as to each and

7    every one of those terms that you believe ought not to be

8    disclosed, which you haven't done yet.

9            What I will do is I will provisionally put what we

10   have here under seal.

11           Now, I see there are two gentlemen sitting in the

12   audience.  I don't know who they are.  I don't know whether

13   this will impact our ability to speak freely during this

14   process.

15           Do you know who these gentlemen are?

16           MR. BODINE:  I know that this is Mr. Malcolm Romano.

17   He is the General Counsel for patents for the Mann Foundation.

18           THE COURT:  So he's a party, effectively.

19           MR. BODINE:  He's a party, effectively.  And

20   pursuant to the terms of the protective order, each party was

21   to designate one person that could review confidential and

22   attorney's eyes only.  Mr. Romano has signed an undertaking

23   pursuant to the protective order.

24           THE COURT:  That's fine.

25           Now, Mr. Chapman, is this somebody on the other side

1    of the courtroom associated with your side of this case?

2              MR. CHAPMAN:  Yes.  He's the Group General Counsel

3    for Cochlear Limited.

4              THE COURT:  And his name is?

5              MR. CHAPMAN:  Ray Jarman, J-a-r-m-a-n.

6              THE COURT:  And he's otherwise permitted to have

7    access to these agreements?

8              MR. CHAPMAN:  No, Your Honor.  He's only permitted

9    to have access to confidential information, not

10   outside-counsel-only information.

11             There are particular provisions he might not be

12   allowed to hear.  Although it would be our preference that he

13   be able to sit in.

14             THE COURT:  Do you have a problem with general

15   counsel being able to sit here and listen to our discussion?

16             MR. BODINE:  I do on two grounds, and I don't

17   presume to speak for Advanced Bionics.  But Advanced Bionics,

18   when they produced the agreements, marked the agreements as

19   attorney's eyes only, and there's no one here to argue on

20   Advanced Bionics' behalf.

21             THE COURT:  First of all, let me tell you this:  The

22   fact that Advanced Bionics -- any party purports to mark

23   anything is of no moment to me.

24             We are now in a court of law, which has a strong

25   presumption in favor of open proceedings.  You or Advanced

1   Bionics or anybody will have to come up with sufficient

2   reasons to overcome that strong presumption of open courtroom.

3          I take that very seriously.  And I certainly do not

4   let the mere desire of private parties, who choose to use the

5   public court forum, to say:  Well, you can't hear about that.

6          So you've got a mountain to climb to convince me.

7          I was going say we're going to go ahead and

8   provisionally put this under seal and allow you a certain

9   amount of time to tell me -- in light of what we've said, the

10  provisions that we may talk about -- why that presumption of

11  open proceedings is overcome.

12         If I determine that you have made that showing, I

13  will retain it under seal.  If I find that you have not made

14  it, then I will vacate the seal and everything will be open to

15  the public.  Okay.

16         But because you haven't made that argument to me in

17  the papers and you have not made that showing on an

18  item-by-item basis, I'm going to let general counsel remain.

19         Otherwise, it will be under seal provisionally; and

20  you may have 14 days after today to tell me specifically why

21  any provisions that we may have talked about here in court

22  should not be subject to being open to the public.

23         MR. BODINE:  Your Honor, if I may, Advanced Bionics

24  and Cochlear Corporation are direct competitors in the

25  marketplace; and allowing access of someone very high up in

1    Cochlear Corporation to have access to terms that Advanced

2    Bionics believes would be kept confidential pursuant to its

3    marking under the protective order -- it doesn't seem fair to

4    Advanced Bionics.

5              THE COURT:  Sir, sir.  Okay.  First of all, I don't

6    think anything that we're talking about is going to be that

7    controversial, in terms of right to sue, in terms of licenses

8    and sublicenses.

9              I'm not going to get into things about how much

10   you're supposed to get, how you calculate what it is you're

11   supposed to get and so forth.  So I'm not going get into those

12   details.

13             But my ruling stands.  It's time to either move on,

14   or you can sit down if you don't want to address me anymore.

15   It's your choice.

16             MR. BODINE:  I will address you, Your Honor.  Thank

17   you.

18             THE COURT:  Go ahead.

19             Do you agree that, at this point, if the Court were

20   to conclude that there is an assignment, that there has been

21   no assignment back from A.B. to A.M.F. sufficient to allow

22   A.M.F. to proceed with this case?

23             MR. BODINE:  I'm not sure that I agree with that,

24   Your Honor, because the terms of the agreement say that A.M.F.

25   has -- or that A.B. has the first right to control the case

1   and. . . .

2          THE COURT:  But I'm having you assume.  I'm not

3   saying that that's what I've concluded because, if I did

4   conclude, I wouldn't need you folks to come in and address me.

5          I'm just trying to understand the procedural posture

6   going forward.

7          If I were to say that this agreement constitutes the

8   transfer of all substantial rights of the patents such that it

9   is a assignment and, that therefore, you're not the owner but

10  A.B. is the owner of the patents -- in that case, wouldn't

11  A.B. have to either, one, transfer everything, all substantial

12  rights back to you so that you are now the owner of the patent

13  again so that you can bring this lawsuit or permit you to

14  bring the lawsuit but join as the patent owner?

15         MR. BODINE:  Your Honor, I think, if you were to

16  find this were an assignment, this agreement were an

17  assignment -- that is, all substantial rights have been

18  transferred from A.M.F. to A.B., which we don't believe is the

19  case -- then I still think you have to look at 11.2 and 11.3

20  of the agreement because there is a retained right there.

21         THE COURT:  But the retained right, in and of

22  itself, does not constitute the return assignment of all

23  substantial rights.

24         Are you saying that, even if I find that there is an

25  assignment and there is no assignment back of all substantial

1    rights by A.B., if we look at section 11, that is sufficient

2    for A.M.F. to prosecute this case without A.B.?

3              MR. BODINE:  I think that section 11.3 is sufficient

4    based on my reading of the agreement, but that is premised on

5    the fact that the agreement is not an assignment.

6              THE COURT:  I understand, but if this is an

7    assignment, then what?

8              MR. BODINE:  If it is an assignment, then I think

9    there would have to be an assignment back.

10             THE COURT:  Which you do not have.

11             MR. BODINE:  Which we do not have, no written

12   assignment back.  That's right.

13             THE COURT:  All right.  Very good.  Let's put that

14   aside.

15             Let's get to whether or not this is or isn't an

16   assignment.

17             That, of course, requires us to, as I say, consider

18   what the intent of the parties is as reflected in the

19   agreement as well as what rights were given and what rights

20   were retained.

21             You have, in your papers, talked about various

22   things such as the right to sue, the limitation, and the right

23   to sublicense and a couple of smaller other things.

24             What I think I'd like to do is I'd like to begin, if

25   we could, with your assertion that there has been a limitation

1    on the right to sublicense.  Let's go to that because I think,

2    once we resolve that or we talk it through, that in some ways

3    can also inform us as to the significance of this retained

4    right to sue that A.M.F. has.

5            So rather than go with the right to sue provision

6    first, let's go with the sublicense agreement.

7            Now, if you take a look at the 2004 Agreement which

8    is attached to the Fraser Declaration at Exhibit 1091, I

9    believe, if you look at section 2.1, that is a broad grant of

10   rights.  And it says "*With a right to sublicense subject to*

11   *the provisions of section 2.6(A) through (E).*"

12           Well, we know that's a mistake because there's no

13   "E."

14           MR. BODINE:  That's correct, Your Honor.

15           THE COURT:  So, all right.  We'll call that a

16   scribner's error.  Let's say we assume that you meant (A)

17   through (D) because there's only 2.6(A) through (D).  Okay.

18           My question is:  Your argument is somehow "Well,

19   it's limited by 2.6 because 2.6 talks about sublicense to

20   affiliates."

21           I have two questions for you.  One is if it were

22   referring to 2.6, what I call the "Preamble," it would have

23   said 2.6.  But it didn't say 2.6.  It says 2.6(A) through (D)

24   which makes a lot of sense because those are the kinds of

25   things you would want to have in a sublicense agreement, such

```
 1   things as confidentiality requirements, reporting

 2   requirements, royalty rates, whatever.

 3           So on the face of it, it seems to not back what your

 4   argument is.  On the face of it, it doesn't say 2.6.  And

 5   we'll put that aside as to whether or not, even if it says

 6   2.6, it is a limitation.

 7           But clearly here, it doesn't even say 2.6.  It says

 8   2.6(A) through (D).

 9           So it seems to me that suggests that that there is a

10   broad grant of right to sublease -- sublicense, I should say,

11   subject only to the provision that those sublicense agreements

12   must have certain things in it, like confidentiality and so

13   forth, royalty rates, so forth and so on;

14           Moreover, if you take a look at sections 3.6 and

15   12.9 of your agreement, it refers to both affiliates and

16   sub-licensees.  If sub-licensees can only be affiliates, there

17   is no need, you would think, to have any reference to

18   sub-licensees and affiliates because there can be no

19   sub-licensee who is also not necessarily an affiliate,

20   according to your argument.

21           So I just want to know why it is that you believe

22   that the grant of -- the right to sublicense under section

23   2.1, given what I've noted, is nevertheless only limited to

24   that of an affiliate.

25           MR. BODINE:  Yes, Your Honor.
```

```
 1              And that is because -- for several reason.  First of

 2   all, if you read 2.6 -- if you read the reference in 2.1 to

 3   2.6(A) through (D), correcting for the scribner's error, then

 4   it doesn't really make sense because it says "With the right

 5   to sublicense subject to the provisions in sections 2.2(A)

 6   through (D)."

 7              Now, what you've said is:  We don't include the

 8   preamble.  So we don't include the preamble which says "In

 9   each sublicense agreement, A.B. will include the following

10   provisions."  And so you have to read at least part of the

11   preamble of 2.6 when you're reading 2.1.

12              But the other thing is --

13              THE COURT:  Why do you have to do that?

14              First of all, you know, if we start from the mere

15   language of the section, it doesn't say "2.6."  It says

16   "2.6(A) through (D)."

17              MR. BODINE:  That's correct.

18              THE COURT:  And 2.6(A) if you apply it to 2.1, would

19   say "With a right to sublicense subject to..."  You'd bring it

20   down "...confidentiality requirements on all sublicenses; B,

21   corresponding reporting," blah, blah, blah, "C, provision

22   terminating; D, negotiate."

23              I mean, what's wrong with that?  How does that not

24   make sense?

25              It makes perfect sense, when you say that, if you
```

1   have a right to sublicense, (A) through (D) are the provisions

2   you better have in your sublicense.

3          MR. BODINE:  A reference to 2.6 would include the

4   preamble.  I don't think you can read the preamble out of the

5   reference to 2.6(A) through (E).

6          THE COURT:  Okay.

7          MR. BODINE:  If then you say that, it says:  You

8   have the right to grant sublicenses to affiliates of A.B.

9   That which is not granted -- explicitly granted is retained.

10  There is no grant here to sublicense to anyone other than

11  affiliates of A.B.

12         THE COURT:  It doesn't say that you are granted the

13  right to sublicense only to affiliates of A.B.  It just says

14  you are granted this.  And if it were by itself, you might

15  say, okay, that which was not granted specifically is not

16  granted.

17         Okay.  But the problem is that, when you read 2.1,

18  there is a broad grant.  It says:  The right to sublicense

19  subject to this -- which is yet another grant.

20         So you have a grant upon a grant, even if we were to

21  look at 2.6.

22         But why didn't you call it "2.6" instead of "2.6(A)

23  through (D)"?  What's the point of that?

24         MR. BODINE:  Well, I wasn't involved in the drafting

25  of the agreement, Your Honor.

```
 1              THE COURT:  Okay.  But we're going to have to make
 2    some sense of it.
 3              MR. BODINE:  No, to me, those rights that are not
 4    granted are retained.  And therefore, the only right that's
 5    granted in 2.6 -- and the grant in 2.1, in my view, has to
 6    comply with 2.6.  And 2.6 says:  The only rights that can be
 7    sublicensed are those -- the only possible sub-licensees are
 8    affiliates.
 9              THE COURT:  Let's get back to that in a moment.
10    Let's go back one step.
11              If that is what you want, why didn't they just say:
12    Subject to section 2.6 and 2.1?
13              MR. BODINE:  Well, Your Honor, in the settlement --
14    and I think we need to read the sublicense of 2.1 and 2.6 in
15    the context of the right to sue and the right to settle the
16    agreement -- to settle any suits.
17              Now, Cochlear says that an unfettered right to
18    settle was granted by the agreement, and that's clearly not
19    the case.  If you look at section 11.2.2, recovery and
20    allocation.
21              THE COURT:  Exactly.
22              MR. BODINE:  The very last sentence.
23              THE COURT:  Exactly.  And that shows that you know
24    when to say 2.6 and when to say 2.6(A) through (D).
25              Why do you say 2.6 there and 2.6(A) through (D) if
```

```
1    you're telling me there's no difference?
2              MR. BODINE:  Because 2.6 includes both the 2.6(A)
3    through (D) -- includes both the preamble and the provisions
4    of  (A) through (D).
5              THE COURT:  And so 2.6 by itself does not include
6    2.6(A) through (D)?
7              MR. BODINE:  2.6 does include 2.6(A) through (D).
8              THE COURT:  So then what's the difference?  Why do
9    you say it differently?  That's my point.
10              MR. BODINE:  Well, as Your Honor pointed out, the
11    (A) through (E) was a scribner's error.
12              THE COURT:  Oh, you think this is another error?
13              MR. BODINE:  I'm not sure that it's a scribner's
14    error, Your Honor, but I'm not sure we can give it the effect
15    that says it's limited to 2.6(A) through (D) provision.
16              THE COURT:  I'm glad you brought up the settlement
17    provision because not only does it show that there is a
18    difference; but it seems to me in the totality of the
19    agreement, it tends, in my judgment at least tentatively, to
20    argue against your position because it seems like a somewhat
21    absurd result to say that in settlements all of those things
22    are limited to licenses to affiliates.
23              How often do you think A.B. would be suing its own
24    affiliates?
25              MR. BODINE:  I think it would be very unlikely
```

```
 1    they'd be suing their affiliates.

 2              THE COURT:  Well, then, just a minute.

 3              If they're not suing their own affiliates, then

 4    what's the purpose of saying:  You can go ahead and settle any

 5    of your lawsuits, not against your affiliates, including by

 6    reason of licenses but those licenses are limited to you

 7    giving something to your affiliates when the affiliates aren't

 8    part of the lawsuit?

 9              Isn't that nonsensical?

10              MR. BODINE:  Well, I think that 11.2.2, the section

11    we're talking about here, emphasizes the fact that A.M.F. was

12    going to be involved in any settlement as to non-affiliates.

13              The way I read the agreement, if there's a lawsuit

14    between a non-affiliate, A.B. sues a non-affiliate, it cannot

15    settle that agreement with a license agreement because it's to

16    a non-affiliate.

17              That feeds directly into the requirements of 11.2.1,

18    which, if A.B. controls the proceeding, A.M.F. has the right

19    to participate, the right to engage counsel of its choice, and

20    the right to be kept informed of the lawsuit.

21              What 11.2.2 does is it says:  A.M.F. also has to be

22    involved in any settlement negotiations that include a license

23    agreement because A.B. can only license its affiliates and

24    therefore -- and that shows that the right to sue was -- that

25    that was an important retained right, this right to
```

1    participate because the reading of the last sentence of 11.2.2

2    says that any license that results from settlement has to be

3    subject to section 2.6.

4              Section 2.6 says:  A.B. can grant sublicenses to

5    affiliates; those rights that are not granted expressly are

6    retained.

7              THE COURT:  Did you listen to what you just said?

8    Because I'm trying to very carefully listen to what you just

9    said, and with all due respect, what you just said makes zero

10   sense.

11             It is absurd because what you're telling me is when

12   A.B. chooses to sue somebody -- a third party -- A.B.,

13   according to 11.2, has broad power to settle for money or for

14   no money and that, while you are to keep A.M.F. advised,

15   A.M.F's consent is not required.

16             Then it says "Any license that's granted will be

17   subject to 2.6."

18             And if 2.6 is limited to granting a license to its

19   affiliates, its own affiliate, what possible application could

20   that sentence have in the context of a lawsuit against a third

21   party for infringement?

22             How would you possibly -- how would A.B. possibly

23   settle a lawsuit against a third-party infringer by granting a

24   license to its own affiliate?  Does that make sense to you?

25             MR. BODINE:  It's not granting the license to its

1    own affiliate.

2            What it's saying is that, unless the defendant is an

3    affiliate -- and that's someone 25-percent owned and, as in

4    this case, we have a party.  Let's say that the facts were

5    different.  Let's say --

6            THE COURT:  So what you're really telling me is that

7    last sentence of 11.2.2, which says:

8        "*Any license, sublicense, or cross-license of any*

9        *A.M.F./Cochlear Technology that results from a settlement*

10       *or judgment will be subject to 2.6*" --

11           Effectively, what you're saying is, in virtually

12   every case where there is an A.B. lawsuit against a

13   third-party infringement, license or sublicense is out.

14           MR. BODINE:  It's out unless A.M.F. is consulted and

15   there's some sort of an agreement worked out. . . .

16           THE COURT:  Where does it say they have to have that

17   agreement?  Where does it say that the settlement. . . .

18           In fact, if anything, 11.2.2 says quite the

19   contrary.

20           It says "*After consultation with A.M.F., A.B. is*

21       *authorized to enter into any settlement or judgment that*

22       *involves any outcome -- *"

23           The word "other" shouldn't be there.

24       " -- *whether or not involving the payment of money*

25       *without the prior written approval of A.M.F.*"

```
 1              A.M.F. doesn't get to say much if A.B. decides to
 2   prosecute an action.  A.M.F. gets to participate if it wishes
 3   to but is not required to.  A.M.F. gets to be consulted, but
 4   A.M.F. does not need to agree to anything.  A.B. has the right
 5   to do that.
 6              Now, in that context, what you're saying to me is:
 7   Forget about all of that very, very strong, absolutist type of
 8   language;
 9              Instead, what I want to say is:  This last sentence
10   of 11.2.2 is really nugatory because it cannot effectively
11   grant a license as part of settlement or judgment without our
12   consent because -- it doesn't even say you can't do it without
13   our consent.  We would like to do it indirectly, inferentially
14   by throwing in something that's got nothing to do with
15   anything, that in the greatest scheme of things in the real
16   world, doesn't exist;
17              And that is, we'll throw in something which says you
18   can only sublicense to your own affiliates, and that will be
19   our ability to get in the door and say:  Oh, well, so you see,
20   you really can't sublicense.  Oh, and this guy isn't your
21   affiliate because you didn't sue your own affiliate?  Well,
22   then let us get back into this and say "We'll let you
23   sublicense to somebody else."
24              That is a very, very tortured way of interpreting
25   this document.
```

1      MR. BODINE:  Your Honor, the first sentence that you

2   read into the record doesn't say anything about license

3   agreements and. . . .

4      THE COURT:  Well, it says "any outcome."

5      Don't you think a license agreement is certainly not

6   a farfetched way of resolving infringement lawsuits by

7   settlement or judgment?  It says:

8       *"A.B. can enter into any settlement or judgment that*

9       *involves any outcome whether or not involving the payment*

10      *of money."*

11      That's pretty all-inclusive, sir.  To me it is.

12      MR. BODINE:  Well, Your Honor, that sentence also

13   requires consultation with A.M.F.

14      THE COURT:  True.

15      MR. BODINE:  And it says "...*any settlement or*

16      *judgment that involves any outcome whether or not*

17      *involving the payment of money."*

18      THE COURT:  "*Without the prior written approval of*

19      *A.M.F.*"

20      You have to consult A.M.F., but you can reject

21   anything they say to you if that's what you want because their

22   consent is not required.

23      MR. BODINE:  Your Honor, I think that has to be

24   limited by the last sentence of the clause read in conjunction

25   and that says it's subject to 2.6 which says --

```
 1            THE COURT:  Right.

 2            MR. BODINE:  -- to affiliates.

 3            THE COURT:  Right.  And to me, the inclusion of that

 4    suggests that 2.6 is not a restriction other than (A) through

 5    (D).

 6            See, I come at it, I respond to it, I react to it a

 7    little different from you.

 8            You say:  Because it says 2.6 you've already

 9    presumed that 2.6 is a limitation to affiliates.

10            I'm looking at it without that sort of conclusory

11    approach.  I'm not question-begging.

12            I'm asking the question as to whether or not 2.6

13    really is a limitation or whether we read it, in the totality

14    of the document, does it make any sense to read it as only a

15    limitation to affiliates.  And in reading this in the context

16    of this, as well as 2.1, I seem to want to come to the

17    conclusion -- because I think perhaps it's the appropriate

18    conclusion -- that 2.6 does not limit it to affiliates.

19            Let me ask you one last question which I started to

20    ask and you didn't have a chance to address, and I want you to

21    address it as we talk about the sublicense.

22            If it is true that 2.6 limits the ability to

23    sublicense to only affiliates, as you argue, then why does

24    section 3.6 and section 12.9 refer to both affiliates and

25    sub-licensees?  Because by your definition, there can be no
```

1    sub-licensee who is not an affiliate, and so why would we have

2    both?

3              MR. BODINE:  It's 3.6 and 12. . . .

4              THE COURT:  It's 12.9.

5              MR. BODINE:  12.9.

6              THE COURT:  Let's look at 3.6.

7              MR. BODINE:  Okay.

8              THE COURT:  Starting with the third line there.

9         *"Reasonable notice to inspect and cause an audit to the*

10        *books and records of A.B., its affiliates and*

11        *sub-licensees."*  Blah, blah, blah.

12             Then if you look at 12.9, it has similar language,

13   albeit in a different context.

14        *"The parties recognize that A.B. may perform some or all*

15        *of its obligations under this agreement through*

16        *affiliates and sub-licensees."*

17             That's really my concluding question.  If you care

18   to address that in the context of us interpreting whether or

19   not there's a limitation of sublicensing to only affiliates,

20   and then we'll move on to the secondary right to sue.

21                   *(Pause in the proceedings.)*

22             THE COURT:  I'll give you a chance to think about it

23   when I'm talking with the other side, and let's see if we can

24   go ahead and talk about the right to sue provision now.

25             MR. BODINE:  The right to sue here, Your Honor, it's

1    not a right to sue; it's the right to control.  And the right

2    to control must mean something different than the right to sue

3    because the '99 Agreement explicitly gave A.B. the right to

4    sue in its own name.

5            With respect to the 2004 Agreement, the agreement

6    gave only the first right to control and then -- it's the

7    first election of a right to control.  And if A.B. elects not

8    to sue, then the right to control the litigation is A.M.F.'s

9    right to control.

10           THE COURT:  You notice that you've already,

11   yourself, gone from so-called right to control to sue.

12           So, you know, I think it's a hard argument for you

13   to make that somehow there is a difference between the right

14   to control the proceedings versus the right to sue to mitigate

15   any infringement or to vindicate any rights.

16           Because I'll tell you, I know that's your argument.

17   I'll tell you that argument doesn't hold much water for me

18   because, if for no other reason than if you take a look at

19   section 11.3.1, which talks about when A.M.F. has the ability

20   to control the proceedings, that ability to control the

21   proceedings is only if A.B. elects not to defend against an

22   infringement.

23           Now, true, that's sort of odd language because, you

24   know, you don't think of defending against the infringement,

25   you don't think of a prosecution against an infringer is a

1  defense against the infringement.  But be that as it may,

2  that's the language you have chosen.  Clearly, if A.B. elects

3  not to defend against infringement, that means if A.B. elects

4  to not sue.

5       How do you defend against an infringement if you

6  ultimately -- well, you don't have to sue.  You can cease and

7  desist; you can jawbone them, whatever it is.  But if they

8  tell you to go pound sand, what's your ultimate recourse?  You

9  bring a lawsuit.

10      So if A.B. elects not to defend against an

11 infringement, to me, means that if A.B. decides to tolerate,

12 indulge this infringement, then you may control the

13 proceedings.

14      So I don't really see this as a narrower grant to

15 A.B. than just the broad first right to elect to sue or to

16 resist or to defend against the infringement.

17      MR. BODINE:  The differences between the '99 and '04

18 agreements, to me, suggest that the right to sue and the right

19 to defend or the right to control are different.  And in fact,

20 the '99 Agreement specifically provides A.B. with the right to

21 sue in its own name.

22      THE COURT:  Well, if that is true, then why does

23 the 2004 Agreement at 11.3.1 say "*If A.B. elects not to defend*

24 *against an infringement*"?

25      Shouldn't it be saying "If A.B. elects not to

1    control the proceedings" if you're saying -- here it appears

2    it's being used interchangeably within the narrow confines of

3    this one document and in this one same section, section 11.

4              You folks drafted this.  I didn't draft it.

5              MR. BODINE:  They specifically used different

6    language in 11.2.1 that says "*A.B. only has the first right to*

7    *control proceedings relating to infringement.*"

8              THE COURT:  And what does that mean to you?

9              MR. BODINE:  Well, it could mean suing; it could

10   mean, as you suggest, contacting the other side; it could mean

11   suing and joining A.M.F. as a plaintiff because, I think, even

12   under Cochlear's reading of this, A.M.F. --

13             A.B. would not have the right to sue in its own

14   name, but would also have to bring A.M.F. into the lawsuit

15   through joinder, Rule 19.

16             THE COURT:  Well, it depends on whether or not we

17   ultimately determine that this is an assignment or not

18   because, if this is really an assignment of all substantial

19   rights from A.M.F. to A.B., A.B. can do it all on its own

20   without you.

21             But what I'm saying to you is:  Forget about what

22   right you grant because the Federal Circuit has said, "We not

23   only look at what you give, but what you retain."

24             MR. BODINE:  Yes.

25             THE COURT:  Right.  Let's look at what you retain.

1          You only retain the right to control the proceedings

2     if they elect not to sue.

3          MR. BODINE:  Yes.

4          THE COURT:  So doesn't that mean that they have the

5     first right to sue, and that you gave them that right to sue

6     because you subordinated your ability to control the

7     proceedings to them being able to make that election first?

8          MR. BODINE:  Again, Your Honor, not in my view.

9          In my view, it's a first right to elect to control

10    the proceedings, and it's no different for --

11         THE COURT:  What's the difference though?  What's

12    the difference between that and the first right to sue?

13         I'm not saying that you have no right to sue under

14    any circumstances.  I hope that's not the misunderstanding

15    that we have with each other.

16         I clearly do not believe that this is a case where

17    you have, wholesale, given the right to sue to A.B. and you

18    retain nothing.  Obviously, that's not the case.  You have two

19    paragraphs here saying to the contrary.

20         MR. BODINE:  Yes.

21         THE COURT:  Okay.  So I'm not saying that.

22         What I'm saying is:  Haven't you given the first

23    right to sue to A.B., retaining whatever it is that you do

24    retain, if they elect to not sue, but only if they elect to

25    not sue, according to 11.3.5?

```
 1        MR. BODINE:  And I don't think that's right because

 2   of the other provisions in 11.2-point -- I think it's 11.2.1

 3   that allows A.M.F. to participate in the action.

 4        THE COURT:  True.  You can participate, but you

 5   don't have to.  You have the right but not the obligation to.

 6        And I'm glad you brought that up because here's

 7   another indication, it seems to me, that's consistent with

 8   assignment and not a license; and that is, it is contemplated,

 9   11.2.1, by you that you may not participate.

10        You have the right but not an obligation to

11   participate which means that, if you chose not to participate,

12   this shows an intent on your part to allow A.B. to sue in its

13   own name without any participation by you.

14        Now, is that the end of the story in terms of

15   whether this is a proper assignment or license?  Of course,

16   not.  But it is another factor in terms of deciphering the

17   intention of the parties as to what this really was.

18        And this suggests to me that you -- while you may

19   have the right to participate, you also have no obligation to

20   participate.  And if you chose to not be obligated to

21   participate, then you have intended that A.B. would sue in its

22   own name; and that is another indicia of an assignment, not a

23   license.

24        MR. BODINE:  I will respectfully disagree with that

25   interpretation for the reasons I've stated.
```

```
 1              THE COURT:  You didn't say anything yet.  Tell me
 2   why that part of it is wrong.
 3              MR. BODINE:  It's wrong because A.B. -- regardless
 4   of what A.M.F. does, A.B. can join A.M.F. in any lawsuit.
 5              THE COURT:  Again, but doesn't have to and it can't
 6   be forced.
 7              A.B. cannot force the joinder of A.M.F.  Look at
 8   11.2.1.  It says "A.M.F. has the right but not the
 9   obligation."
10              If A.M.F. somehow took the position -- let's say
11   this was a lawsuit by A.B. not A.M.F. and let's say A.B. sues
12   A.B.C. Widget Machines.
13              A.M.F. says:  We don't want to get involved with all
14   that stuff.  We've got bigger fish to fry.  According to
15   11.2.1, A.B. cannot force A.M.F. to participate.
16              Can it?
17              MR. BODINE:  It cannot force A.B. to participate,
18   but the Court can order A.M.F. to participate as a necessary
19   party.
20              THE COURT:  Well, of course, but that's something
21   that's separate and apart from interpreting this contract.
22              We're not discussing Rule 19 of the Federal Rules of
23   Civil Procedure.  This is not a civil procedure class.  We're
24   not deciphering the intricacies of Federal Civil Procedure.
25   We're trying to decipher the intricacies of contract
```

1   interpretation.

2           So the fact that some Court, a judge may order

3   A.M.F.'s participation because of Rule 19 either voluntarily

4   or involuntarily as a defendant, if needed, that's neither

5   here nor there for our task today.

6           Our task today is to see whether or not the contents

7   of this contract suggests that we should conclude it is an

8   assignment; that is, a transfer of all substantial rights to

9   the patents or not.

10          What I'm saying here is:  You started to say A.B.

11  can get A.M.F. involved.  A.M.F. is under no obligation under

12  11.2.1 to do anything.  And if it's under no obligation to do

13  anything, then obviously that contemplates that A.B. could sue

14  in its own name.

15          And if it contemplates that A.B. can sue initially,

16  as a first right in its own name, that is a pretty good

17  indication it seems to me of. . . .

18          Well, it's not a total indication.  But it's one

19  factor in indication of whether or not this was intended to be

20  an assignment or transfer of all substantial rights.

21          That's all I'm saying.

22          MR. BODINE:  Your Honor, even if that interpretation

23  is correct, then the Abbott case -- we have almost the same

24  clauses in this license agreement as in the license agreement

25  at issue in Abbott.

```
 1              And in Abbott, Abbott had the first right to -- or

 2    the licensee had the first right to refuse to sue for

 3    infringement, and the licensor retained the right to sue if

 4    the licensee did not sue.  And the Court found that that was a

 5    substantial right.

 6              And the same thing occurs in this license agreement

 7    in 11.2 and 11.3.  If we accept the argument that 11.2 gives

 8    A.B. the right to sue in its own name which -- like I say, I

 9    would dispute based on the right to control language -- then

10    11.3 says:  If there's an election not to sue.  Just like in

11    Abbott, if there's an election not to sue.

12              THE COURT:  Actually, that's not right.

13              Let's not go too far before I disagree with you on

14    that because in Abbott it was not a provision which said if

15    you elect not to sue, then we would do this.

16              It is:  If you are on notice and for 6 months the

17    grantee has not taken action, then the grantor can step in and

18    sue.  That's what Abbott says.

19              MR. BODINE:  That's correct.

20              THE COURT:  There is no 6-month provision here.

21    There's no any provision.  There was a 30-day provision in the

22    Aspex case.  There's no provision here at all.

23              This is where it says:  You don't get to do

24    anything.  You don't come out of the starting block.  You

25    don't go toward first base unless and until A.B. has elected
```

1    to not defend against the infringement.

2            It doesn't say:  A.B., you got 6 months to do it.

3    After that, you're done.  You don't have 30 days, none of

4    that.

5            So that's one big difference between this and

6    Abbott.  And of course, let's not forget the fact that a very,

7    very substantial difference between this case and Abbott is

8    that the general grant of the rights of an owner of a patent

9    were limited because the grantor actually retained the right

10   to make and use products, practicing the patent, which it's

11   not here.

12           So there are substantial differences between this

13   and Abbott.  There are other differences as well.  But I just

14   want to note that these are substantial differences between

15   this case and Abbott.  And if you are going to rest your case

16   squarely on Abbott, I would say that that's probably not very

17   persuasive.

18           MR. BODINE:  Your Honor, I think that makes a good

19   point.  I think you have to look at the license agreement as a

20   whole.

21           THE COURT:  Indeed.

22           MR. BODINE:  Rather than piecemeal, piece by piece.

23   And so far we've been going through each of the pieces.

24           But if you look at the rights here, the right

25   retained, the right to sue -- it's also much greater than the

1    right retained in the Vaupel case, for example.

2              There, there was a sole right that was transferred,

3    and the only obligation that remained was the obligation to

4    inform the licensor of the lawsuit.

5              THE COURT:  I agree with you.  On that one point, I

6    do agree.  I do because I think Vaupel did have a virtually

7    unfettered right to sue by the grantee.  I'm not going to

8    dispute that with you.  I think that's right.  As to that

9    single element, you're right.

10             There's a difference here.

11             But now let's talk about, realistically, what's the

12   nature of the difference and the quality of the difference.

13   Clearly in Vaupel that's a very strong factor.  I don't

14   dispute that.

15             But in this case, depending upon how I rule and I

16   conclude or interpret the license, the sublicense provision --

17   if I interpret the sublicense provision to not being limited

18   to affiliates, and I think there's real strong evidence in the

19   totality of this document, this 2004 Agreement, for doing so.

20             And if I do that, it seems to me then that that

21   undercuts, to a great extent, whatever secondary retained

22   right to sue you may have because A.B. can just simply go out

23   there and undercut your ability to sue on that secondary basis

24   by granting a sublicense -- and I'm saying if I conclude that

25   way.

1      So they do dovetail together.  One, as I said at the

2  beginning of the proceedings, tends to potentially enform the

3  significance of other factors and, in this case, the factor of

4  your secondary right to sue.

5      Aside from that, your secondary right to sue doesn't

6  kick in until there's an election.  And if A.B. decided not to

7  elect to not sue, just do nothing, in essence, they're given

8  the power to indulge infringement because, until they elect to

9  not defend against the infringement, your secondary right is

10  stuck in neutral, going nowhere;

11      You, unlike Abbott and unlike Aspex don't have a

12  timeline to say click, here's the stopwatch; your time's

13  running.  You want to stay on a standstill, go ahead.  Have a

14  great time.  But when this stopwatch runs out, we're coming

15  in, and we're suing.

16      You can't even do that because you don't have a

17  stopwatch; you didn't give yourself a stopwatch.  You're

18  sitting on the sideline unless and until A.B. decides to elect

19  to not defend against the infringement.

20      And that, to me, is also significant.

21      MR. BODINE:  Your Honor, the agreement is silent

22  there.  It says that A.B. has the first right to elect.  It

23  has to exercise an election to sue; and in our view, that

24  means there's a retained right to sue.

25      THE COURT:  Exercise an election to sue or exercise

1   an election to not sue.

2          If you look at 11.3.1, your secondary right to bring

3   any action -- in fact "*to control the proceeding*" is what it

4   says -- does not kick in until A.B. has elected to not defend.

5          It's not that, you know, A.B. has a certain time to

6   elect to do it or not do it.  It says there's no time frame,

7   and it says if A.B. elects to not sue, then you can get in.

8   Until that time happens, you're on the sideline because,

9   pursuant to this conditional phrase of 11.3.1, you're not in

10  the ballgame.

11         MR. BODINE:  Your Honor, the elections in the '04

12  Agreement, as we pointed out in our papers, need not be in

13  writing.  The elections in the '99 Agreement were required to

14  be in writing.

15         So it suggests that elections can be made in a

16  manner other than in writing, which also suggests to me that

17  the performance of the parties under the agreement -- everyone

18  has the obligation under contract law to perform the agreement

19  in good faith.

20         I don't think that it's in good faith for a party to

21  say:  Well, I'm not going to tell you one way or another.  I'm

22  going to indulge the infringement.

23         I don't think that that's a principle under contract

24  law, that they can simply ignore the election and decide not

25  to sue people and leave A.M.F. hanging.

```
 1            THE COURT:  You don't think that an assignee, if it
 2    turns out he's an assignee, has the right to say "I decide to
 3    indulge"?
 4            MR. BODINE:  If he's an assignee, but that's the
 5    underlying question.
 6            THE COURT:  Okay.
 7            MR. BODINE:  The question is does this agreement
 8    grant all substantial rights?  And on the basis of that point,
 9    I would say no, it doesn't because the election can't be this
10    "I never have to make an election."
11            There's not a specific timetable in the agreement
12    for making it as there was in Abbott, as there was in the
13    Aspex case.
14            But I don't think that that means that A.B. can
15    just -- A.B. gets a written notice of an infringement.  I
16    don't think they can just ignore that and still not -- and not
17    be in breach of this agreement.
18            I think there would be some commercially reasonable
19    period of time, after which, inaction itself is the election.
20    Because there is a retained right here, then the retained
21    right to control the proceedings, then A.M.F. can elect --
22            THE COURT:  Okay.  Okay.
23            MR. BODINE:  -- to control the proceedings.
24            THE COURT:  I think there's some force in that
25    argument, actually.  I think there's some force to the
```

1    argument that perhaps we imply a commercially reasonable

2    period of time under which you have to elect.  Okay.

3            Let's say I agree with that and let's say whatever

4    that is -- you know, Abbott says 6 months.  So a 6-month

5    period of time in these kind of cases may not be commercially

6    unreasonable.  Who knows.  Maybe a year, maybe less, whatever

7    it is.

8            Be that as it may, even if A.B. has to, within some

9    reasonable period of time, elect -- failing which, you say

10   A.M.F. then does get out of the starting block and does not

11   have to stand on the sideline anymore and has overcome the

12   contingency of 11.3.1's first phrase, then the question

13   becomes:

14           Do you have any case which says that because you

15   have this retained secondary right to bring a lawsuit within

16   the contours of this right that you have here in the 2004

17   Agreement, that that itself shows you have not granted the

18   full range or all substantial rights?

19           Do you have anything like that?

20           MR. BODINE:  I don't think there's a case that says

21   any one factor is paramount.

22           THE COURT:  I agree.

23           MR. BODINE:  I think you have to look at all of the

24   factors.  And so you have to look at not only the retained

25   right to control the proceeding, the retained right relating

1    to sublicenses, the retained obligation to pay maintenance

2    fees which we have here.

3            THE COURT:  Well, let's talk about that.  I'm glad

4    you brought that up.  That's 10.1.

5            Where does it say you have any right -- you have any

6    obligation or right to pay maintenance rights on existing

7    patents as opposed to do whatever it is on patent

8    applications?

9            These are no longer applications.  These are

10   patents.  I'm looking at 10.1(A).  It seems to me, clearly, in

11   the context and the language you're talking about

12   applications; and where does it say that you have the right or

13   duty to pay maintenance fees for existing patents?

14           Can you point that out to me?

15           MR. BODINE:  First of all, in the very first clause

16   of 10.1(A) "*A.M.F. at A.M.F.'s sole cost shall file,*

17   *prosecute, and maintain domestic and foreign patent*

18   *applications.*"

19           THE COURT:  Right.

20           MR. BODINE:  I'm not sure that maintenance fees are

21   required for patent applications.

22           So I would suggest that perhaps that's a

23   typographical error, and it meant to refer to foreign and

24   domestic patents.

25           But if we go on and read the second clause of ten

1    point -- or 10.1(A), it says:

2         "*A.M.F. shall take such other legal steps as A.M.F.*

3         *reasonably*" -- "*as A.M.F. shall reasonably determine to*

4         *be necessary or appropriate to protect the rights of*

5         *A.M.F. and A.B. in the A.M.F./Cochlear Technology.*"

6              If A.M.F. fails to make the payments, the

7    maintenance payments due on the licensed patents, they would

8    be in breach of that second clause of the license agreement

9    because rights would lapse upon failure to pay the maintenance

10   fees; and the evidence here is that A.M.F. has paid all of the

11   license fees that are due under the agreement or under the

12   patents ensued.

13             THE COURT:  I see how that particular sentence might

14   be susceptible to that reading.  Although, the context of this

15   entire paragraph seems to be more having to do with

16   applications than maintenance of existing patents because the

17   immediate previous sentence and the immediate following

18   sentence to that refer to applications.

19             Be that as it may, that's one factor.

20             Let's assume, if I were to resolve this ambiguity in

21   your favor -- and of course, nobody has submitted any

22   extrinsic evidence and so in the failure of extrinsic evidence

23   or the absence, I should say, of extrinsic evidence, then the

24   resolution of ambiguity under California state contract law is

25   still a matter of law for the Court to decide.

```
 1              And so even if I were to agree with you then what we
 2    really have is that, yes, you pay maintenance fees.  Okay.
 3    That may be a factor to consider in your favor.
 4              MR. BODINE:  It would be inconsistent, the
 5    obligation to pay maintenance fees would be inconsistent with
 6    an intent to assign all substantial rights.
 7              So if all substantial rights were assigned, then the
 8    duty to pay -- the obligation to pay maintenance fees would
 9    also be required.
10              THE COURT:  I think you are clearly overstating
11    that.
12              MR. BODINE:  I think taken together with the other
13    factors that we have pointed out, both in our briefs and in
14    argument this morning, then, I think that A.M.F. has retained
15    substantial rights sufficient to give it the ability to sue
16    for infringement.
17              THE COURT:  Okay.  Thank you very much.
18              Let me hear from Mr. Chapman on this.
19              And then, if you have anything further to add, I'll
20    give you one last shot at it.
21              Mr. Chapman, let's start at the end, where we were
22    talking about 10.1(A).
23              Counsel said maintenance, and there is that
24    paragraph in there that technically doesn't tie it to an
25    application.  And it seems conceivably broad enough to say
```

```
 1    that you're going to have to take all actions which are

 2    necessary in order to protect the viability, in effect, of the

 3    Cochlear Technology; and if that technology involves patents

 4    and you don't pay the maintenance fee for the patent and they

 5    expire, then you've destroyed the value of that.

 6               So what about that?  Why isn't that a reasonable

 7    reading of 10.1?

 8               MR. CHAPMAN:  Well, Your Honor, 10.1, as you've

 9    already said, its context seems to be patent applications.

10    There's patent applications before and patent applications

11    after.

12               As a matter of fact, the very next sentence refers

13    to all such applications suggesting that everything that went

14    before it in the paragraph is talking about patent

15    applications.

16               So my reading of 10.1(A) is that it relates to

17    patent applications, future applications.

18               THE COURT:  What if I construe it to, in fact,

19    contemplate that A.M.F. will pay the maintenance fees on

20    existing patents.

21               Do you agree with counsel when he says:  Well, if

22    that's it, then that's clearly an indication of failure or, at

23    least, no intention to grant all substantial rights?

24               MR. CHAPMAN:  No.  I believe that that would be an

25    allocation of the costs that -- you have an agreement between
```

1  A.M.F. and A.B. with certain revenue flowing.  And in that

2  case, there would be certain cost obligations imposed.  So

3  it's simply assigning the costs and the revenue as a result,

4  if that requirement were indeed part of this paragraph.

5          THE COURT:  Let's go back to my discussion with

6  counsel on the issue of sublicense.

7          Counsel says that 2.1 refers to 2.6; 2.6 has a

8  narrow grant and so 2.1 is narrowed by the narrow grant; and

9  the narrow grant only grants to affiliates; that which was not

10  granted, was not granted.

11          What about that argument?

12          MR. CHAPMAN:  Well, I'm going to step back a little

13  bit because I think that 2.6 -- the statement with the right

14  to grant to affiliates -- can only be consistent with the

15  other provisions in the license if it's read as a grant and

16  not a limitation.

17          For example, if you look at 11.2 where it says you

18  can settle with a sub-license, you're not likely suing your

19  affiliate.  So the only way that provision seems to make sense

20  is if 2.6 has a grant of right to affiliates but not a

21  restriction of right to affiliates.

22          THE COURT:  I want to hear your response to what

23  counsel said.

24          Counsel, in our discussion, says:  No, no.  What

25  that means is that if you want -- if you, A.B., want to settle

1    under terms that may include a sublicense, then this provision

2    effectively requires you to bring us back into the loop for us

3    to give you permission.

4            What do you think of that?

5            MR. CHAPMAN:  Well, I don't think it makes any sense

6    in view of the language that precedes it.

7            There's an absolute right to enter into any

8    sublicense agreement without written permission from A.M.F.

9    And then to take it back by implication seems inconsistent.

10           That's why I think if you read 2.6 as including a

11   grant rather than a limitation, it all falls together as

12   consistent.  If you read it as a limitation, then you end up

13   having implications that take back explicit overwhelming

14   grants of power.

15           THE COURT:  Do you think there's a difference

16   between 2.6 versus 2.6 (A) through (D)?

17           MR. CHAPMAN:  I do think there's a difference.  And

18   that's another example of how, by reading 2.6 (A) through (D),

19   as just limited to the lettered paragraphs, it's consistent.

20           It doesn't seem to make any sense for 2.6 to give a

21   grant --

22           I mean, there would be no reason for -- and I'm

23   losing the paragraph.  I think it's 2.2 -- 2.1.  There would

24   have been no reason to give this very broad grant.  And the

25   breadth of the grant can be seen in the language that ends the

1    grant in paragraph 2.1.

2         *"Otherwise commercially exploit products and*

3         *perform services in the cochlear stimulation*

4         *field."*

5              Seems like the grant in paragraph 2.1 was intended

6    to be very broad.  And there would have been no reason to

7    include within 2.1 the right to sub-license if the right to

8    sub-license is given solely in paragraph 2.6 below with a

9    restriction as to the right to only grant to affiliates of

10   A.B.

11            THE COURT:  Let's go to the right to sue.

12            Do you agree that in the absence of a specific

13   statement or term like 6 months in <u>Abbott</u> or 30 days in <u>Aspex</u>,

14   that, as a matter of contract interpretation, we import the

15   notion of a commercially reasonable period of time within

16   which to act so that A.B. cannot effectively thwart A.M.F. and

17   forever leave A.M.F. on the sideline by the simple expedient

18   of not communicating an election to not sue?

19            MR. CHAPMAN:  That strikes me as not an unreasonable

20   argument; however, it's different than the course of dealing

21   within the parties.

22            We saw a situation where in 2004, A.M.F. requested

23   an election from A.B. and it didn't get one for three years,

24   and there was no response to that request.

25            So the performance of the parties seems to be to

1    treat election as an absolute affirmative act that, without

2    that affirmative act, Advanced Bionics -- I mean A.M.F. is not

3    given any rights to sue.

4            THE COURT:  Even if we were to say that we do

5    incorporate this notion of commercially reasonable time and

6    let's say -- whatever the time is -- once it passes, then

7    A.M.F. can step in and exercise its rights as set forth in

8    11.3.1 and 2.

9            Does that, in your mind, tilt the balance in light

10   of all of the provisions of this agreement to rendering it not

11   an assignment but an exclusive license?

12           MR. CHAPMAN:  No, it doesn't, Your Honor.  And I

13   think we've cited several cases that address that type of

14   license provision.

15           There's the Speedplay case where they addressed a

16   very similar type of provision to Abbott but without all the

17   other retained rights in Abbott.  And the fact that there was

18   an automatic relation back of the right to sue did not

19   prohibit an assignment.  And likewise, the case that -- I

20   believe it involved Genentech.

21           THE COURT:  Sounds like the Apex case.

22           MR. CHAPMAN:  No.  I'm not talking about the Apex

23   case.

24           I'm talking about the District Court case from the

25   Northern District, Genentech v. Insmed.

 1          There they, again, addressed the type of provision

 2     that had a very specific time period.

 3          At the most you can say about the current license

 4     agreement is that it's some reasonable period.  It's not an

 5     absolute right to withhold an election, but there's no rigid

 6     timeframe for that to occur.

 7          And both the Genentech case and the Speedplay case,

 8     I believe, distinguish the situation from the Abbott case

 9     where it had that provision but also had other retained

10     rights.  The right to make, use, and sell, and subject to

11     other licenses.

12          THE COURT:  All right.  Anything else you want to

13     add, Mr. Chapman?

14          MR. CHAPMAN:  Just one thing to address a comment

15     that Your Honor made, and it's not clear to me -- I mean,

16     certainly in this license agreement, A.B. and A.M.F. tried to

17     give A.M.F. the secondary right to sue.  But if this is an

18     assignment or a virtual assignment, then the transfer back

19     would be only of the right to sue.

20          And if you look at the Morrow versus Microsoft case

21     where there were several bankruptcy trusts set up, one trust

22     was given the ownership of the patent and another trust was

23     given the right to sue.

24          The Federal Circuit ended up saying that the

25     bankruptcy trust with the right to sue didn't have the right

1    to sue in its own name or didn't have the right to sue at all

2    because the right to sue itself was not sufficient to confer

3    constitutional standing.

4            So I'm not sure that even under this agreement,

5    despite the intent of the parties to transfer the right to sue

6    back to A.M.F. under certain circumstances, that that is even

7    possible under the Federal Circuit's ruling in the <u>Morrow</u>

8    case.

9            THE COURT:  All right.  Thank you very much.

10           MR. BODINE:  I have just a couple of points,

11   Your Honor.

12           THE COURT:  All right.

13           MR. BODINE:  The first goes to section 2.6 of the

14   agreement.

15           THE COURT:  Yes.

16           MR. BODINE:  2.6, the heading is "A Right to

17   Sublicense."  And so I think, if you look at it in that light,

18   it is the right to sublicense.

19           If section 2.1, the grant of a license to A.B. were

20   as broad as Cochlear contends, then it would be unnecessary to

21   include 2.6.

22           THE COURT:  Well, it would be necessary to include

23   2.6 if you read 2.6 as also imposing the four requirements of

24   (A) through (D) which would be very reasonable to want to

25   include in any sublicense.

```
 1              You're fleshing out what are some of the

 2      requirements that you do want in a sublicense if you're going

 3      to sublicense; and that's confidentiality, royalty,

 4      accounting, reporting.  So obviously you do need 2.6.  You do

 5      need 2.6 in order to set forth what a sublicense should look

 6      like.

 7              MR. BODINE:  But my point being, Your Honor, the

 8      sentence "A.M.F. hereby grants to A.B. the exclusive worldwide

 9      right to license and grant sublicenses to affiliates of A.B."

10      would be unnecessary if you read the license grant -- that is:

11      A.M.F. hereby grants to A.B. an exclusive royalty bearing as

12      provided below, worldwide license throughout the term with the

13      right to sublicense subject to the sections of 2.6 (A) through

14      (E).

15              If that grant truly is broad, then there's no

16      necessity to then say you've got the right to grant licenses

17      to affiliates in 2.6.

18              THE COURT:  If you're pointing out to me, you're

19      telling me that this agreement is not the model of clarity, I

20      would agree with you 100 percent.

21              I just hope that your firm didn't draft it, and I

22      hope that Mr. Barquist's firm had nothing to do with it

23      because, with all due respect to the drafter, this wasn't a

24      very nice job.

25              It showed clearly that there were mistakes,
```

```
 1   carelessness, not only referring to (E) when there is no (E),
 2   but in other sections, referring to 3.1 and 3.6, when they
 3   really meant something else because it's pretty obvious they
 4   put in 3.1 which was the common stock grant.  And they forgot
 5   they stuck in 3.1, and now you got to change everything else
 6   because it's one off.
 7           And, also, that this section 1 "Definition Section"
 8   runs from "A" through "I" and then begins with "A" again.  You
 9   know, it's been a while since I learned the alphabet, but I do
10   believe "A" does not follow "I."
11           And so be that as it may, I guess what I'm saying is
12   we have to look at this in context.
13           MR. BODINE:  Yes.
14           THE COURT:  I'm trying to look at it in context.
15           This is not the kind of so clearly, carefully
16   drafted agreement that, in many ways, I think I can attach
17   overriding consideration to what you said -- which in a
18   different context may have more force; but in this context in
19   light of everything else, I'm not sure it does.
20           Now, let me point out another thing to you before we
21   conclude.
22           And that is:  Mr. Bodine, you said that, if you look
23   at 11.2.2, that reference to 2.6 according to your argument is
24   a limitation on the ability of A.B. to settle for sublicenses,
25   and that that was meant to mean that you're only allowed to
```

1    grant sublicenses -- A.B. -- to your affiliates.  And if

2    that's not the situation, it's an implicit, if not roundabout

3    way, of bringing A.M.F. back to the table so that you can

4    negotiate something else.  Right?

5           MR. BODINE:  That's correct.

6           THE COURT:  If that's the case, why is that same

7    sentence under 11.3.2, when we're talking about when A.M.F. is

8    controlling the proceedings?

9           MR. BODINE:  I think that's a good point Your Honor,

10   and the point is this is an exclusive license.  A.M.F. has

11   already given the exclusive right to make, use, sell, offer

12   for sale, and exploit the technology.  I don't know the exact

13   language.

14          But it's already granted that exclusive right to

15   A.B.  And so if A.M.F. were to, let's say, want to settle this

16   lawsuit, the license, if there were a license that A.M.F. --

17          THE COURT:  That license has to go to A.B.'s

18   affiliates?

19          MR. BODINE:  A.B. would have to -- either it would

20   have to be a license to an affiliate, or it would have to be

21   approved by A.B. which would bring in. . . .

22          THE COURT:  Does that truly make sense?  Honestly,

23   does that make sense?

24          MR. BODINE:  It would bring the parties in to

25   negotiate.

 1          THE COURT:  Why doesn't it just say then:  Bring the

 2   parties in to negotiate; you have to come and we have to talk

 3   about it?

 4          I mean, there are other cases -- I can't remember

 5   which case -- I just read recently where it says, that, you

 6   know, we're supposed to work it out.

 7          But instead you have this awkward thing so that, if

 8   A.M.F. controls the proceedings and is suing and it wants to

 9   settle by granting a license, it can only grant that license

10   to an A.B. affiliate who is not even a party.  Does that make

11   sense?

12          Because if I agree with you that 2.6 is, in fact, a

13   limitation to only sublicense to only affiliates of A.B., then

14   that's what I would have to come up with.  If I were to read

15   11.3.2 that way -- and forgive me, but that just seems really

16   odd, shall we say.

17          MR. BODINE:  Well, Your Honor, in the context of

18   patent litigation maybe it's not so odd because there are

19   times when -- I don't know that I've ever had a case in which

20   one of the parties purchased the other party.  But I have seen

21   that happen and I've seen reports of that.

22          And it's not so farfetched to think that it could

23   become an affiliate as part of the deal.  It could be A.M.F.

24   sues Party A, and by terms of the agreement, either A.B.

25   agrees to allow the license to be given to Party A or there's

1    some sort of a control issue, in which one of the affiliates

2    purchases the defendant or the defendant purchases A.B.

3              It's not beyond the pale that that would happen.

4              THE COURT:  But this is in the context where A.B.

5    has decided not to be part of this.  This is in the context

6    that A.B. has washed their hands of all of this.  Because

7    you're not even in it until they wash their hands of it; yet

8    you have this provision.

9              To me, that is pretty darn clear evidence that 2.6

10   really is not a limitation other than (A) through (D) because

11   that makes a lot of sense.  That means I don't care whether

12   it's A.B. settling or A.M.F. settling.  If you're going to

13   settle by way of a sublicense, both sides to protect each

14   other will have to have the requirements of (A) through (D).

15             And if you put in there affiliate of A.B., it's not

16   affiliate of A.M.F.  It has to be affiliate of A.B. because

17   2.6 does not say:  Grant sublicenses to affiliates of  A.M.F.

18   That wouldn't make any sense either.  It's only affiliates of

19   A.B.

20             It is truly convoluted for a piece of litigation to

21   be controlled by A.M.F. against probably some third party in a

22   circumstance where A.B. has washed its hands of the

23   proceedings for A.B. now to come in and say:  Okay.  Now, you

24   third party infringer can become my affiliate so that now I

25   can sublicense to you.  "I" meaning A.B. when A.B.'s not even

1    part of the case.

2           And 11.3.2, A.M.F. is going into a sublicensing

3    agreement as part of the settlement.

4           It is so farfetched, with all due respect, that I

5    don't see how I can -- following the rules of construction and

6    interpretation of a contract, I don't know how I can torture

7    the words the way that I think I would have to torture them if

8    I were to agree with your position.

9           Let me -- one last thing, I don't know whether

10   you had a chance to look at it.  But do you want to address

11   why 3.6 and 12.9 talks about both affiliates and

12   sub-licensees?

13          You don't have to if you don't want to.  I was just

14   giving you that opportunity.

15          MR. BODINE:  Affiliates are specifically defined in

16   the definition section.  Sublicenses are not defined except

17   for in section 2.6.

18          THE COURT:  But my point is, if 2.6 says and you're

19   saying that the operative legal effect of 2.6 is that a

20   sub-licensee can only be an affiliate, then what's the point

21   of saying "affiliate" and "sub-licensee" because, by

22   definition, there can be no sub-licensee that is also not an

23   affiliate according to your definition.

24          But according to the opposite definition, if we were

25   to interpret it in a way that I'm inclined to, then it makes

1  sense because there could be sub-licensees and there could be

2  affiliates, and they don't necessarily have to be the same.

3          MR. BARQUIST:  Your Honor, could I try to address

4  that question?  Would you mind.

5          THE COURT:  No, not at all.

6          MR. BARQUIST:  Do you mind, Brian?

7          MR. BODINE:  Go ahead.

8          MR. BARQUIST:  Your Honor, I think the last two

9  questions are actually interrelated because, if you look at it

10 this way:  A.M.F. as the owner of the patent, the listed

11 assignee, has the right at the beginning to license the

12 patent.

13         What it did here is it granted an exclusive license

14 to A.B.  But it still retained -- to the extent there's any

15 right left, it can only license the patent.  It can't

16 sublicense the patent.

17         If it's going to do anything in terms of giving away

18 rights, it's going to be a license.

19         A.B., on the other hand, is the licensee.  So if

20 it's going to do anything in terms of giving away other rights

21 to the patent, it's going to be a sub-license.

22         So if there's a settlement, given that A.M.F. cannot

23 grant a license to a defendant with which it wants to

24 settle -- because it's already given exclusivity -- it can

25 only grant a license if it gets A.B.'s okay.

1          On the other hand, if A.B. were controlling the

2    litigation, it couldn't grant the license because it's a

3    licensee.  It can only grant a sub-license.  But it can only

4    do that, under our view of 2.1 and 2.6, to someone who's not

5    an affiliate if it gets A.M.F.'s permission.

6          So in that legal context, that's how section 11

7    works.  If there's going to be a settlement, it's got to

8    involve the agreement of both A.B. and A.M.F. because A.M.F.

9    can't grant a license without A.B.'s waiving exclusivity and

10   A.B. can't grant a sub-license without A.M.F. waiving the

11   limitation to affiliates.

12         And so therefore, Your Honor, that gets back to the

13   immediate question.  There could be a sub-licensee who is not

14   an affiliate pursuant to a settlement that A.M.F. signs off

15   on.

16         THE COURT:  Okay.  So now you're telling me that

17   that provision is there just so that we would cover the

18   situation which is not covered, in fact, in this license --

19   this agreement but might occur if the parties had to

20   renegotiate.

21         MR. BARQUIST:  Well, if they had to --

22         THE COURT:  Right?

23         MR. BARQUIST:  -- get together to deal with settling

24   a lawsuit if the settlement involved a forward-looking license

25   which, while it's not uncommon to do it that way, it's not

```
 1   mandatory.
 2              So, Your Honor, just in general to wrap things up, I
 3   think to understand the agreement as a whole and in the legal
 4   context, that's the best way to understand it.
 5              THE COURT:  All right.  Very good.  Thank you very
 6   much.
 7              Mr. Chapman, anything else?
 8              MR. CHAPMAN:  No, Your Honor.
 9              THE COURT:  All right.  Let me ask you folks what
10   was the last attempt by you folks to settle this case?
11              MR. BODINE:  We participated in mediation in
12   September or October of last year, 2008.
13              THE COURT:  Before whom?
14              MR. BODINE:  It was Judge Infante of JAMS in
15   San Francisco.
16              THE COURT:  Were you folks close?  Don't tell me
17   everything, obviously.  I don't know need to know the details
18   of your conversations especially any confidential
19   conversations with Judge Infante.  That's not what I want to
20   know.
21              Generally speaking, were you close?
22              MR. BODINE:  No.
23              THE COURT:  Was that before or after this issue of
24   standing came up?
25              MR. BODINE:  It was before.
```

```
 1            THE COURT:  Do you think it would behoove you folks

 2    to have a follow-up conversation with Judge Infante, who I

 3    know to be an excellent settlement Judge?  I'm not trying to

 4    bring him new business.  I don't think he needs anybody giving

 5    him new business; or for that matter, if you folks are not

 6    satisfied with Judge Infante and you want to try somebody

 7    else, that's perfectly fine with me.

 8            But now that we have this new issue that we've

 9    talked about, which I think may be a factor perhaps for the

10    parties to consider in the overall attempt to resolve this

11    case, do you think that it might -- if I were to delay the

12    issuance of my order, let's say, for 30 days, that that might

13    be a good opportunity for you folks to try to resolve it so

14    that there will be some resolution, closure to this case as

15    opposed to however I rule, that there will be likely

16    continuation of the process of litigation.

17            What do you think, Mr. Bodine?

18            MR. BODINE:  Obviously, any time the parties are

19    talking about settlement, it's a good thing.  I think that

20    would be helpful, Your Honor.

21            THE COURT:  As far as you're concerned, do you think

22    going back to see Judge Infante, in light of all the

23    circumstances now, is appropriate; or would you rather have a

24    different mediator because, for whatever reason, you think a

25    different mediator might be more helpful?
```

```
 1              (Counsel conferred off the record.)

 2              MR. BODINE:  One of Mr. Barquist's partners

 3   suggested to us Judge Wistrich.

 4              Am I saying that right?

 5              THE COURT:  Yes, Wistrich.  Wistrich.

 6              MR. BODINE:  That might be an appropriate choice.

 7              THE COURT:  And you would rather have Judge Wistrich

 8   in lieu of Judge Infante?

 9              I'm not suggesting one way or the other.  I'm just

10   trying to be clear.

11              MR. BODINE:  I think we could go either way.  I

12   would want to consult with my client, of course.

13              THE COURT:  Mr. Chapman, what's your view on all of

14   this?

15              MR. CHAPMAN:  We're certainly not opposed to the

16   idea, Your Honor.  I think it might even help for the parties

17   to talk before we took the step of going to mediation.

18              THE COURT:  Why don't we do this:  You folks give me

19   a joint status report in seven days after your initial

20   conversation.

21              In the joint report, report back to me, A,

22   whether -- the possibilities, I suppose, are that you

23   initially talked and you believe that further mediation would

24   be unnecessary or fruitless.  I certainly hope that's not how

25   you come out.  But if it is, tell me what it is, and I'll
```

 1    issue my order in due course;

 2           Or, B, that you folks think that in light of

 3    everything it would be helpful to go back to mediation and you

 4    folks would rather go to Judge X or Judge Y.  If it's Judge

 5    Infante or anybody else like that, you folks will have to set

 6    it up yourself.

 7           If you want to go see Judge Wistrich -- I don't

 8    believe he's the assigned Magistrate Judge in this case, but

 9    I'm sure I can talk to him and perhaps I can prevail upon him

10    to agree to discuss this matter with you.

11           But then I won't do anything until I see your joint

12    status report in seven days.

13           MR. BODINE:  Your Honor, one other point there, if

14    the parties are inclined to discuss settlement, there are

15    looming dates on summary judgment motions.  And it may make

16    sense to extend those days.  Would you be amenable to that?

17           THE COURT:  I would certainly be amenable to that.

18    I do not want to put you folks in an unnecessary bind.

19           MR. BODINE:  Thank you.

20           THE COURT:  Very good.  I'll look for your status

21    report in seven days.

22                       (Proceedings concluded.)

23                              --oOo--

24

25

CERTIFICATE


     I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


          s/ Mary Riordan Rickey
          OFFICIAL COURT REPORTER