1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   BRUCE G. CHAPMAN, Cal. Bar No. 164258
3  bchapman@sheppardmullin.com
   SCOTT R. MILLER (Cal. Bar No. 112656)
4  smiller@sheppardmullin.com
   LAURA M. BURSON (Cal. Bar No. 204459)
5  lburson@sheppardmullin.com
   MANUEL C. NELSON, Cal. Bar No. 229590
6  mnelson@sheppardmullin.com
   DENNIS J. SMITH, Cal. Bar No. 233842
7  dsmith2@sheppardmullin.com
   333 South Hope Street, 43rd Floor
8  Los Angeles, California 90071-1422
   Telephone:  213.620.1780
9  Facsimile:  213.620.1398

10 Attorneys for Defendants and
   Counterclaimants COCHLEAR LTD. and
11 COCHLEAR AMERICAS

12             UNITED STATES DISTRICT COURT

13    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

15 ALFRED E. MANN FOUNDATION          Case No. CV 07-08108 FMO (SHx)
   FOR SCIENTIFIC RESEARCH,
16                                     **VOLUME 2 OF EXHIBITS (K,
                 Plaintiff,            PART 1) TO OMNIBUS
17                                     DECLARATION OF SCOTT R.
                 v.                    MILLER RE PARTIES' JOINT
18                                     MOTIONS *IN LIMINE***
   COCHLEAR CORPORATION (n/k/a
19 COCHLEAR AMERICAS),                 [Joint Motions *in Limine,* Declaration of
   COCHLEAR LTD., and ADVANCED         Jerry Schloffman and [Proposed] Orders
20 BIONICS, LLC,                       filed/lodged concurrently herewith]

21               Defendants.           Pre-Trial Conference and Hearing on
                                       Motions *in Limine*: Dec. 17, 2013
22                                     Time: 10:00 a.m.
                                       Ctrm: 22
23
                                       Trial Date: January 13, 2014
24 ─────────────────────────           **Hon. Fernando M. Olguin**

25 AND RELATED COUNTERCLAIMS.

26

27

28
                                       EXHIBITS TO OMNIBUS DECLARATION OF
                                                         SCOTT R. MILLER
   SMRH:413050655.3

# EXHIBIT K
# Part 1

OCEAN TOMO



**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

---------------------------------------------------------------------------------------------------------------

**ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,
Plaintiff and Counterdefendant,**

**v.**

**COCHLEAR CORPORATION (N/K/A COCHLEAR AMERICAS) AND COCHLEAR LTD. ET AL.,
Defendants and Counterclaimants.**

---------------------------------------------------------------------------------------------------------------

**Supplemental Expert Report of Cate M. Elsten**

**30 November 2012**

*Confidential: Attorneys' Eyes Only*

*Attorneys' Eyes Only*

EXHIBIT K



**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 1 |
| II. | | BACKGROUND | 2 |
| | A. | Hearing Loss | 2 |
| | B. | Functionality of Cochlear Implant Systems | 3 |
| | C. | Development of Cochlear Implant Systems | 5 |
| | D. | The Cochlear Implant Industry | 7 |
| | E. | Programming CISs and the Role of Telemetry | 9 |
| | | 1. Impedance Telemetry | 10 |
| | | 2. Neural Response Telemetry ("NRT") | 11 |
| | | 3. Compliance Telemetry | 12 |
| | F. | The Parties at Issue | 12 |
| | | 1. Alfred E. Mann Foundation for Scientific Research | 12 |
| | | 2. Advanced Bionics | 12 |
| | | 3. Cochlear Limited and Cochlear Americas | 13 |
| | G. | The Patents at Issue | 14 |
| | H. | Products at Issue | 16 |
| | | 1. The Nucleus 22 | 16 |
| | | 2. The Nucleus 24 | 17 |
| | | 3. The Nucleus Freedom | 17 |
| | | 4. The SPrint | 17 |
| | | 5. The ESPrit | 18 |
| | | 6. The ESPrit 3G | 18 |
| | | 7. The Freedom | 18 |
| | | 8. The Nucleus 5 | 18 |
| | | 9. The Nucleus CI422 | 19 |
| | I. | Timeline of Relevant Events | 21 |
| III. | | OPINIONS EXPRESSED, WITH THE BASES AND REASONS THEREFOR | 25 |
| | A. | Based on financial records and testimony provided to date, I have calculated Cochlear revenue of between $1.539 billion and $1.582 billion on sales of allegedly infringing Cochlear Implant Systems ("CISs") between December 2001 and June 2012 | 27 |
| | | 1. Cochlear has generated revenue of $667.2 million from infringing sales of the CI24 in the Americas between December 2001 and June 2012 and $254.3 million from infringing sales of the CI500 and CI422 series from September 2009 to June 2012 | 27 |
| | | 2. Cochlear has generated revenue of $361.2 million from infringing sales of the SPrint and SP12 in the Americas between December 2001 and June 2012 as | |

i

*Attorneys' Eyes Only*

EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

well as $246.8 million from sales of the CP800 series from September 2009 to June 2012. ..................................................................................................... 29

    3.   Cochlear has generated revenues of approximately $42.2 million from allegedly infringing sales of the ESPrit 3G used in conjunction with the CI24 in the Americas between December 2001 and June 2012. .............................. 29

B.   Consideration of conventional valuation methodologies produces a number of quantitative royalty indicators useful in the determination of a starting range for a reasonable royalty in this case. ...................................................................... 30

    1.   Based on information currently available to me, in particular the license between AMF and Advanced Bionics that includes the patents-in-suit, the Market Approach indicates royalty rates in the range of approximately 4.8% to 9.8% have been paid by or to parties relevant to this suit for hearing-related and other medical device technologies. ..................................................... 30

    2.   Based on information currently available to me, the Income Approach provides quantitative royalty indicators in the range of 16.1% to 33.5% of sales. ........................................................................................................... 42

    3.   Based on information currently available to me, there does not appear to be either sufficient data or an appropriate factual or conceptual basis for application of the Cost Approach in this case. ............................................. 47

    4.   Quantitative royalty indicators provide useful benchmarks for my reasonable royalty analysis. ........................................................................................ 47

C.   Reference to the fifteen factors and "hypothetical negotiation" construct defined in *Georgia-Pacific v. United States Plywood Corp.* indicates a reasonable royalty for Cochlear's use of the AMF Patents would be 7.5% of sales. ............................. 48

D.   Absent additional information from Cochlear or its experts, it is my opinion that a royalty of 7.5% would be reasonable for both of the AMF Patents or either individually, although the period for which damages are calculated may be abbreviated if only the '691 patent is found valid and infringed. ............................. 66

IV.   PREJUDGMENT INTEREST ........................................................................... 67

V.   DATA AND INFORMATION CONSIDERED IN FORMING THESE OPINIONS ....... 67

VI.   EXHIBITS TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS ...... 67

VII.   QUALIFICATIONS INCLUDING PUBLICATIONS AND TESTIMONY ................... 67

VIII.   COMPENSATION PAID FOR SERVICES ........................................................ 68

*Attorneys' Eyes Only*

EXHIBIT K

 INTELLECTUAL CAPITAL EQUITY

## I.  INTRODUCTION

I have been asked to provide opinions regarding damages the Alfred E. Mann Foundation for
Scientific Research and Advanced Bionics LLC[1] ("AMF" and "Advanced Bionics" respectively or,
collectively, "Plaintiffs") may claim if there is a finding of liability against Cochlear Limited and
Cochlear Corporation (n/k/a Cochlear Americas; collectively, "Cochlear" or "Defendant")[2] for
alleged infringement of U.S. Patent No. 5,609,616 ("the '616 Patent") and/or U.S. Patent No.
5,938,691 ("the '691 Patent"; collectively "the AMF Patents" or the "patents-in-suit" ).  I previously
filed a Preliminary Damages Report for this matter on 19 January 2009 and a Surrebuttal Report on
30 March 2009, the latter in response to a Rebuttal Report authored by Mr. Russell Parr and filed 11
March 2009 on behalf of the Defendants ("the Parr Report").

The opinions found in my Preliminary and Surrebuttal Reports are incorporated in this Supplemental
Report in their entirety and remain unchanged except as modified herein.  Since the time of my
Surrebuttal Report, I have had further conversations with AMF personnel and reviewed certain
additional production and publically available documents. As in all cases, the passage of time has also
introduced additional potentially relevant case law.  This report sets forth my current opinions at this
time.

Section II of this report provides brief background information on the market for the patented
products, the patented technology, the parties in suit and other information used in my analyses.
Section III of this report outlines my affirmative opinions and includes responses to key conclusions
of the Parr Report.  I have utilized footnotes throughout the report in an effort to improve its flow and
readability.  The footnotes are an integral part of my report and are intended to carry the same weight
as if included in the main body of the report.  My opinions at this time are based on an independent
examination of documents and discovery produced in this case, conversations with AMF and
Advanced Bionics personnel[3] and certain third-party documents as disclosed in my report text and
appendices.

The disclosures in this report are based on discovery to date and currently available information.  To
the extent additional relevant information comes to light, including but not limited to supplemental
production from the parties, reports from either party's expert(s), rulings from the Court and any
additional materials produced through discovery or otherwise made available, I may amend or
supplement my opinions if necessary and if permitted by the Court.

As in all cases, whether engaged by counsel for a plaintiff or a defendant, an assumption that liability
will be found is necessary as a basis for my analysis.  It does not imply I have been engaged to

---

[1] Advanced Bionics, LLC became a wholly-owned subsidiary of Advanced Bionics Corporation on 8
November 2009 as part of the Agreement and Plan of Merger executed by Attempo 21 AG, Omega Merger Sub,
Inc., Advanced Bionics Corporation, Alfred E. Mann Living Trust, the 2004 Jeffrey Greiner Revocable Trust
and Alfred E. Mann as Seller Representative.
[2] Although I may refer to the defendants collectively as "Cochlear" in my report, this is not to be
construed as a legal conclusion or other assumption that Cochlear, Ltd. and Cochlear Americas are properly
regarded as a single entity for purposes of damage determination in this lawsuit.  When referencing either entity
individually, I will use its full corporate name.
[3] To date, I have had conversations with the following: Jerry Schloffman, Vice President of Global
Marketing at Advanced Bionics; Larry Fischer, former Chief Financial Officer of AMF; John Petrovich, Senior
Vice President and General Counsel of AMF; Mark Chamberlain, Chief Operating Officer of AMF; David
Hankin, Chief Executive Officer of AMF; Farah Boroomand, Chief Financial Officer of AMF, John Gord,
Electrical Engineering Consultant at AMF; Glenn Griffith, Principal RF Communications Engineer; and  Dr.
Ginger Stickney, audiologist.

1

*Attorneys' Eyes Only*

EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

provide opinions on issues relevant to a determination of liability or have determined such liability exists.

This report has been prepared in connection with the above referenced case.  The report is to be used for the specific purposes of this litigation and is not to be used for any other purpose without the express written consent of Ocean Tomo.

## II.  BACKGROUND

### A.  Hearing Loss

I understand that in a fully functioning ear, sound is perceived when movements of the basilar membrane are sensed by a line of hair cells in a part of the ear known as the cochlea.[4]  If the hair cells are damaged, a patient's auditory system cannot transform sound into neural impulses and hearing impairment or loss results.[5]  Individuals with hearing impairment may be categorized by the severity of their impairment as follows:[6]

| Level of Hearing Loss | Decibel Level (What can you hear?) | Sound Equivalent |
|---|---|---|
| Typical or Standard | Less than 20 dB | |
| Mild | 20-40 dB | Cannot hear whispered conversation in a quiet atmosphere at close range |
| Moderate | 40-60 dB | Cannot hear normal conversation in a quiet atmosphere at close range |
| Severe | 60-90 dB | Cannot hear speech; may only hear loud noises such as a vacuum cleaner or lawn mower at close range |
| Profound | Greater than 90 dB | Cannot hear speech; may only hear extremely loud noises such as a chain saw or the vibrating component of a loud sound |

While researchers have found it difficult to quantify the deaf population,[7] an estimated 48 million people in the United States suffer from some degree of hearing loss.[8]  An estimated 12,000

---

[4] http://www.americanscientist.org/issues/id.942,y.0,no.,content.true,page.1,css.print/issue.aspx
[5] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998
[6] http://www.agbell.org/DesktopDefault.aspx?p=Hearing_Loss_Chart; http://www.agbell.org/docs/soyourchild.pdf
[7] Mitchell, Ross E., "How Many Deaf People are There in the United States?  Estimates From the Survey of Income and Program Participation," Gallaudet Research Institute, Oxford University Press, 2005
[8] http://www hopkinsmedicine.org/news/media/releases/one_in_five_americans_has_hearing_loss

2

*Attorneys' Eyes Only*

EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

children born each year in the U.S. have some form of hearing impairment, making it the most common so-called "birth defect" in this country.[9]

Historically, mitigation of hearing loss has involved hearing aids, which may be useful for people with mild to moderate hearing loss.  Hearing aids are electronic devices which collect sound from the environment through a microphone, amplify it and transmit the amplified sound into the ear.[10]  However, hearing aids provide little or no benefit for many people, including those with severe to profound hearing loss.[11]

**B.   Functionality of Cochlear Implant Systems**

Cochlear implant systems ("CIS" or "CISs") may be used in people with severe to profound hearing loss who experience minimal or no benefit from hearing aids.[12]  Cochlear implants work by bypassing the damaged part of the ear.  The cochlear implant system collects sound from the environment, converts the sound into electrical signals and delivers those signals directly to the auditory nerve, where they are interpreted as sound by the part of the brain responsible for hearing.[13]

The Hearing Loss Association of America describes the functionality of a CIS as involving the following steps:[14]

1.   Sound is received by the microphone.

2.   Electrical pulses that represent the energy contained in the sound signals are sent from the microphone to the speech processor.

3.   The speech processor selects and codes the most useful portions of the sound signals.

4.   The code is sent to the transmitter.

5.   The transmitter sends the code across skin to the receiver/stimulator.

6.   The receiver/stimulator converts the code to electrical signals.

7.   The electrical signals are sent to an electrode array in the cochlea to stimulate hearing nerve fibers.

8.   The signals are recognized as sounds by the brain.

---

[9]  http://www.asha.org/aud/Facts-about-Pediatric-Hearing-Loss/

[10]  http://www.asha.org/public/hearing/treatment/child_aids htm

[11]  http://nc.agbell.org/page.aspx?pid=727

[12]  http://nc.agbell.org/page.aspx?pid=727

[13]  http://nc.agbell.org/page.aspx?pid=729

[14]  http://nc.agbell.org/page.aspx?pid=729 and http://www.hearinglosss.org/docs/CI%20Booklet.pdf

3

*Attorneys' Eyes Only*

EXHIBIT K





A CIS comprises an implant and a speech processor. The implant is placed inside the skull with wires running to the cochlea. A headset or headpiece is placed on the outside of the head and usually attached to the implant using magnets. The speech processor can be worn either behind the ear ("BTE")[15] or on the recipient's belt.[16]

In a BTE system, these components are positioned on a typical recipient as shown below:[17]



---

[15] http://products.cochlearamericas.com/cochlear-implants/our-cochlear-implants-products/nucleus-freedom-bte

[16] http://products.cochlearamericas.com/cochlear-implants/our-cochlear-implants-products/nucleus-freedom-bodyworn

[17] http://www.bionicear.com/Your_Journey_to_Hearing/Adults/Learning/Treatments_forHearing_Loss.cfm?langid=1

4

*Attorneys' Eyes Only*

EXHIBIT K



INTELLECTUAL CAPITAL EQUITY

## C. Development of Cochlear Implant Systems

The first CISs were implemented in humans in the early 1970s.[18] Early devices, such as the House/3M device,[19] were single channel implants capable of providing electrical stimulation at a single site in the cochlea using one electrode.[20] By current standards, these were relatively crude devices that allowed noise recognition sufficient to aid implant recipients in conjunction with lip reading skills.[21] At the time of their development it was still unknown whether similar devices would ever be able to replicate speech, or even whether electrical stimulation of the auditory nerve could produce anything other than undifferentiated noise. In 1984, the House/3M device became the first CIS approved by the FDA for use in the U.S.[22] Recipients experienced predictably limited hearing gains with these single-channel devices and few could actually recognize speech.[23]

Beginning in the 1980s, researchers began experimenting with multiple channel implants, which allowed multiple electrodes to be stimulated simultaneously. Cochlear Ltd. and its subsidiary Nucleus Limited began to manufacture a multi-electrode implant called the "Nucleus," which had been developed by a team of doctors and scientists at the University of Melbourne, Australia.[24] The Nucleus eventually became the "Nucleus 22," capable of stimulating 22 electrodes. The Nucleus was approved by the FDA in 1985 for use in the U.S.[25]

In 1986, the Alfred E. Mann Foundation for Scientific Research "took on the development of an implantable high-speed cochlear implant with two-way telemetry."[26] This work led to the development of a multi-channel CIS ultimately commercialized by Advanced Bionics as the "Clarion."[27] The Clarion received FDA approval in June 1997. For the next five years, competition for sales of CISs in the U.S. was limited to two competitors, Advanced Bionics and Cochlear.[28] In 1998 Cochlear responded to Advanced Bionics' entry into the U.S. market with the release of the "Nucleus 24" CIS.[29]

In 2001, Austrian device manufacturer MED-EL Corporation ("MED-EL") entered the U.S. market when it received FDA approval for its "COMBI 40+" CIS.[30] From 2001 until 2008, each manufacturer released several CISs. In 2003 released the "HiResolution Bionic Ear" system

---

[18] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[19] The House/3M implant was developed by Dr. William House and his associates in the 1970s.

[20] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[21] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

[22] http://www.accessdata.fda.gov/ and Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

[23] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[24] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[25] http://www.accessdata.fda.gov/

[26] http://aemf.org/mission.asp

[27] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998 and http://web.archive.org/web/20020207090359/http://www.cochlearimplant.com/products/prod_ss.html

[28] Conversation with Mr. Schloffman

[29] http://www.accessdata.fda.gov/

[30] http://www.accessdata.fda.gov/ and http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/Recently-ApprovedDevices/ucm085394.htm

*Attorneys' Eyes Only*

EXHIBIT K



INTELLECTUAL CAPITAL EQUITY

comprising the "HiRes Auria" processor and "HiRes 90K" implant.[31]  In 2005, Cochlear released the "Nucleus Freedom" system with the "SP12" processor and "CI24RE" implants.[32]  In 2009, Cochlear released the "Nucleus 5" system comprising the "CI500 Series" implant and "CP800 Series" processor.[33]   Advanced Bionics released the "Harmony" system comprising the "HiRes 90K" implant and "Harmony" processor in 2010[34]; in 2011, MED-EL released the "MAESTRO" system comprising the "CONCERT" implant and "Opus Series" processor.[35]  More recently, Advanced Bionics released the "Neptune" processor (for use with the HiRes 90K implant), which it claims is the first and only "swimmable"[36] CIS (see chart of product systems below).  The CISs currently available from each of the three manufacturers differ in the way they process and encode sound and how they transmit it to the auditory nerve.  However, there does not appear to be a consensus in the market on whether any method is consistently superior to the others.[37]

---

[31] http://web.archive.org/web/20040115043818/http://cochlearimplant.com/products/products html and http://web.archive.org/web/20040206215543/http://www.advancedbionics.com/bionicnews/article.asp?ArticleID=117

[32] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=20579 and http://products.cochlearamericas.com/news/fda-approves-nucleus-freedom-us

[33] http://products.cochlearamericas.com/suspension and http://products.cochlearamericas.com/news/cochlear-americas-announces-fda-approval-nucleus%C2%AE-5-system

[34] http://www hearinglossweb.com/res/ci/ab/c1 htm and http://web.archive.org/web/20100330035038/http://www.advancedbionics.com/CMS/Products/Harmony-System.aspx

[35] http://www medel.com/data/editor/file/press_releases_US/MAESTRO-US-Press-Release-Revised-09-19-11.pdf?PHPSESSID=bbec8086ub1ufmou3ptp2uepg4

[36] http://www.advancedbionics.com/com/en/Neptune.html

[37] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004.  In conversations I had with David Hankin and Mark Chamberlain, AMF's CEO and COO respectively, I confirmed that the industry situation has remained the same since my last report.

6

*Attorneys' Eyes Only*

EXHIBIT K

INTELLECTUAL CAPITAL EQUITY

Cochlear Implant Systems[38]

| | Advanced Bionics | Cochlear | MED-EL |
|---|---|---|---|
| System Implant Processor | CLARION CLARION 1.0, 1.2 Platinum Series | Nucleus 22 CI22 ESPrit 22, Spectra | COMBI 40+ C40+, C40+S, C40+GB CIS-PRO+, TEMPO+ |
| System Implant Processor | CLARION CII Bionic Ear CII Bionic Ear CII BTE | Nucleus 24 CI24, CI24M (and variants) SPrint | MAESTRO CONCERT Opus, Opus 2 Series |
| System Implant Processor | HiResolution Bionic Ear HiResolution 90K Implant HiRes Auria | Nucleus 3 CI24M, CI24 Contour ESPrit 3G, SPrint | |
| System Implant Processor | Harmony HiResoltuion Bionic Ear HiRes 90K Implant Harmony BTE | Nucleus Freedom CI24RE (and variants) SP12 | |
| System Implant Processor | | Nucleus 5 CI500 Series CP800 Series | |

## D. The Cochlear Implant Industry

As noted previously, from 1996 to 2001, Cochlear and Advanced Bionics were the only companies with CISs approved by the FDA for sale in the U.S. The companies competed for sales principally by marketing to doctors and audiologists, with a focus on the fundamental performance of their respective devices. As the goal of any CIS is to enable a recipient to hear, doctors would select the product they believed had the best chance of achieving hearing restoration for a given recipient.

By the late 1990s, all commercialized CISs allowed recipients to achieve sentence recognition of 70% to 90%.[39] This does not imply they all were or are capable of producing the desired result in all cases. Rather, all devices may produce a wide range of ultimate hearing performance from patient to patient after implementation.[40] As a result of relative parity in basic functionality,

---

[38] http://web.archive.org/web/20021207212224/http://www.cochlearimplant.com/approved_FDA.html
http://web.archive.org/web/19981202235243/http://www.cochlear.com/nucleussystems/n24ci24m.html
http://web.archive.org/web/19981203031653/http://www.cochlear.com/nucleussystems/n24sprint.html
http://web.archive.org/web/19990225105807/http://www.cochlear.com/nucleussystems/
http://web.archive.org/web/20031125015355/http://www.cochlearamericas.com/Products/465.asp
http://www.cochlearamericas.com/Professional/1043.asp
http://www.audiologyonline.com/releases/fda-approves-nucleus-6069
[39] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004
[40] http://www.answers.com/topic/cochlear-implant

*Attorneys' Eyes Only*
EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

however, incremental improvements in basic device performance became less important from a marketing perspective and other functional features became relatively more important:

> "Since the devices have a similar range of outcomes, other criteria are often considered when choosing a cochlear implant: FM system compatibility, usability of external components, cosmetic factors, battery life, reliability of the internal and external components, MRI compatibility, mapping strategies, customer service from the manufacturer, the familiarity of the user's surgeon and audiologist with the particular device, and anatomical concerns."[41]

In addition to doctors and audiologists, CIS recipients[42] also have influence over the specific brand used.[43] A recipient may prefer either a BTE or a belt-worn speech processor, for example, or may prefer the styles, colors, monitoring or other features offered by a particular manufacturer. I understand from Advanced Bionics' VP of Global Marketing, Jerry Schloffman, that as the market has evolved, parity among manufacturers in basic device performance has resulted in a shift in marketing focus from a relatively greater emphasis on doctors and audiologists to a relatively greater emphasis on recipients. Consequently, CIS manufacturers also devote resources and materials to marketing their products directly to implant recipients.

Of the three companies with current FDA approval to sell CISs in the U.S., Cochlear was the first and essentially represented 100% of the relevant market from 1985 until Advanced Bionics' U.S. market entry in 1996. Cochlear has maintained the lead in U.S. market share since that time.[44] Advanced Bionics has been second in market share and MED-EL has been third.

James Findlay Patrick, Cochlear's Chief Scientist and Senior Vice President, estimated the U.S. market for CISs in 2008 at between 8,000 and 10,000 units per year.[45] In February 2008, investment bank JPMorgan estimated worldwide CIS unit sales growth had averaged approximately 15% per year between 2001 and 2007.[46] The worldwide market for CIs was expected to continue to grow by between 16% and 22% per annum, from 2008 to 2012[47] driven in part by the increasing number of recipients opting for bilateral implants (implants in both ears).[48] A review of Cochlear's financial statements indicates that its revenues actually grew at an average rate of 5.8% annually from 2008 to 2012.[49] A 2008 report by independent research firm Neurotech predicted the worldwide market would grow to $1.59 billion by 2012.[50] In February 2008, investment bank ABN-AMRO projected Cochlear's sales from the Americas region would grow from $197.3 million in fiscal year 2007 to $367.6 million by fiscal year

---

[41] http://www.answers.com/topic/cochlear-implant and http://www.hearingloss.org/docs/CI%20Booklet.pdf
[42] I will use the term "CIS recipient" for convenience, recognizing that when the child is the recipient, the person influencing the decision on which system to use will actually be a parent or guardian.
[43] *Cochlear Implants*, American Speech-Language Hearing Association Working Group on Cochlear Implants, 2004, p. 9
[44] COC-5000153 and COC-5000159, COC-5000335
[45] Deposition of James Findlay Patrick, 18 December 2008 (the "Patrick Deposition"), p. 60
[46] COC-3000894
[47] COC-3000903; www medtechinsight.com/ReportA577.html; www.neurotechreports.com/pages/marketprojections12 html
[48] COC-3000869
[49] See Exhibit 5.4. Compound annual growth rate calculated as such: $(698,525/578,845) \wedge (1/5) - 1 = 5.83\%$
[50] www.neurotechreports.com/pages/marketprojections12 html

*Attorneys' Eyes Only*

EXHIBIT K

 INTELLECTUAL CAPITAL EQUITY

2010.[51]  Based on data produced from Cochlear, Cochlear sales from the Americas region were $267.7 million for fiscal year 2010.[52]  Cochlear's lower-than-projected sales apparently reflected the worldwide economic downturn and a product recall.[53]

## E.  Programming CISs and the Role of Telemetry

I understand that in order to properly facilitate sound perception and speech recognition, a CIS must be programmed by an audiologist.  Each CIS recipient is individually "fitted" or "mapped" to ensure safe and effective electric stimulation.  Four to six weeks after the implant, the recipient returns to the hospital or audiologist's clinic and the CIS is "turned on."  An audiologist then attaches the patient's speech processor to a computer and performs a series of tests to attempt to maximize the recipient's hearing restoration.  Audiologists are concerned with determining the threshold level ("T-level") and the maximum or most comfortable loudness level ("C-level" or "M-level").[54]

Each manufacturer has its own approach to speech coding.  Cochlear's Nucleus system employs several processing strategies, including spectral peak ("SPEAK"), advanced combined encoder ("ACE") and continuous interleaved sampling .  The Advanced Bionics Clarion system uses continuous interleaved sampling and simultaneous analog stimulation ("SAS").  MED-EL also uses a continuous interleaved sampling in its device.[55]

I understand the fitting process is a time-consuming, labor-intensive one involving interaction between the audiologist and the recipient.  The process may be especially difficult when it involves small children or other recipients with limitations on their capability to provide reliable feedback:

> "[T]he process of selecting an optimal stimulation paradigm can be rather time-consuming. The fitting procedures will also become more complex as an increasing number of parameters (e.g. the rate of stimulation, the number of active channels) need to be optimized in order to achieve good individually fitted speech processor programs. The problems are further compounded for the ever-increasing number of very young children being implanted who are less likely to be able to provide accurate subjective feedback about the settings of the fitting parameters. Objective measures are therefore desirable to assist with the optimization process by narrowing down the initial choices of parameter settings for the individual user."[56]

---

[51] COC-3000861; this projection includes all of Cochlear's products, including products unrelated to CISs. Since the reported sales figures were in Australian dollars, I converted the sales into U.S. dollars using the 2007 foreign exchange rate of  one Australian dollar to 0.79 U.S. dollars (COC-5002700; $249.8*0.79=$197.3 and $465.3*0.79= $367.6)

[52] COC-5002692.  The projections for Cochlear's sales in the Americas region exceeded actual sales by just under $100 million.

[53] According to Cochlear's Financial Discussion and Analysis, Fiscal Year 2012 Annual Report, Cochlear incurred recall costs of AUD $138.8 million in fiscal 2012 for a CI500 recall occurring in September 2011.  Revenues for that fiscal year were down 4% and cochlear implant units were down 6% for the year but up 15% in the second half over the first half of the year.

[54] http://www hearingloss.org/magazine/2007MarApr/MarkRossMayJune07.pdf

[55] Cochlear Implants, UTMB Dept. of Otolaryngology, 5 February 2003

[56] *A Simple Two-Component Model of the Electrically Evoked Compound Action Potential in the Human Cochlea*, Wai Kong Lai and Norbert Dillier, Audiol Neurootol 2000; 5:333 – 345

9



INTELLECTUAL CAPITAL EQUITY

"Back telemetry" is used by audiologists to objectively measure the performance of a recipient's implant. Broadly defined, telemetry refers to the "electronic transmission of data between distant points."[57]  Back telemetry is used by doctors and audiologists to communicate with and measure the performance of the CIS.

> *"Most modern cochlear implants have already had or will soon have sophisticated telemetry functions that allow close, accurate monitoring and measurement of electrode impedance, electrical field distribution, and nerve activities.  The impedance monitoring can detect both open and shorted electrodes, while electrical field distribution and nerve activities allow objective measures of electrode interaction and nerve survival.  These measures are becoming increasingly important for the objective fitting of the cochlear implant, particularly in children who cannot provide reliable subjective responses."* [58]

Cochlear highlighted the inclusion of the telemetry feature in its Pre-Market Approval Application to the FDA for its Nucleus 24 CI product.

> *"Comprehensive telemetry allows assessment of internal device status through automated recording of electrode impedances and voltage compliance."* [59]

Three specific types of back telemetry, "impedance telemetry," "neural response telemetry" and "compliance telemetry," are described in detail below:

## 1.  Impedance Telemetry

Impedance telemetry is a specific type of back telemetry referring to the measurement of current and voltage in the electrodes to determine impedance, which allows an audiologist or surgeon to determine if a CIS is functioning properly.[60]

> *"There are two types of telemetry systems.  One is known as impedance telemetry.  This type of telemetry checks the internal receiver to determine if the electrodes are functioning according to specification.  Why is this type of telemetry necessary? Impedance telemetry permits the audiologist to monitor the internal device each time the child comes to the center after implantation.  All of the newer systems have this type of telemetry."* [61]

Impedance telemetry is particularly important in very young patients:

> *"Normal intraoperative findings provided immediate reassurance to the implant team and parents of young children that the implant was fully functioning and that electrical stimulation was activating the auditory pathways.  These objective measures also identified potentially challenging cases, such as those with low levels of sensitivity to electrical stimulation and susceptibility to facial nerve stimulation.  An audit showed that*

---

[57] http://medical-dictionary.thefreedictionary.com/telemetry

[58] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

[59] COC-2008647

[60] Deposition of Tony Nygard, 1 October 2008 (the "Nygard Deposition"), pp. 108 – 109.  I understand doctors and audiologists refer to the back telemetry relevant to the AMFs Patents as "voltage telemetry" or "impedance telemetry."

[61] The Parent's Guide to Cochlear Implants, Patricia M. Chute and Mary Ellen Nevins, p. 33-34

10

*Attorneys' Eyes Only*

EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

*intraoperative measures provided valuable assistance in the initial fitting of the device.*"[62]

I understand impedance telemetry is typically used by surgeons and audiologists to perform testing of an implant while the recipient is still in surgery, thereby avoiding the need for later adjustments or further procedures. Dr. David Kelsall, an ear surgeon at Rocky Mountain Ear Center, testified he performs impedance telemetry in all of his CIS surgeries[63] and would prefer a device with telemetry to a device without telemetry, all else equal.[64]

Impedance telemetry is also used post-operatively by audiologists to identify an improperly functioning device[65] and to give audiologists an objective measure of device performance, allowing for more consistent and accurate programming of speech processors. This may lead to reduced time required to map the device. In fact, the instructions for use of Cochlear's "CustomSound" software, the software program used to program its CISs, recommend the audiologist perform an impedance test every time the software is connected to a CIS.[66]

I understand impedance telemetry is used by all three CIS manufacturers selling in the U.S. As described in Section II.H, below, Cochlear's use of Nucleus 24 implants with certain speech processors provides the ability to perform impedance telemetry. I understand Advanced Bionics' CISs have been capable of impedance telemetry since its entry into the U.S. market, and product information available from MED-EL's website indicates its products include back telemetry capability.[67]

2.  **Neural Response Telemetry ("NRT")**

Neural response telemetry is used by doctors and audiologists to communicate with an implant via radio frequency. It is generally used to measure electrically evoked compound action potential ("ECAP") from the auditory nerve.[68] These measures are useful for the following:[69]

- *Objective verification of auditory nerve function in response to electrical stimulation*
- *Objective verification of device function*
- *Assistance in programming the speech processor for individuals who cannot provide reliable behavioral responses*
- *Verification or confirmation of the accuracy of questionable behavioral responses*

---

[62] http://www.ncbi.nlm.nih.gov/pubmed/15732380
[63] Deposition of David Kelsall, M.D., 10 December 2008, (the "Kelsall Deposition"), p. 13 – 14
[64] Kelsall Deposition, pp. 26 – 28
[65] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=239406
[66] COC-2008666 – COC-2008669 and COC-2008696
[67] http://www.medel.com/english/30_Products/01_MAESTRO/Cochlear_Implants/06_Comprehensive_Diagnostic_Toolkit.php; I understand AMF sent a letter to MED-EL in July 2003 notifying it of potential infringement of the '616 patent (see AB00344.)
[68] Deposition of Christopher van den Honert, 8 December 2008 (the "van den Honert Deposition"), pp. 58 – 59
[69] www.audiologyonline.com/articles/article_detail.asp?article_id=1569

*Attorneys' Eyes Only*

EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

Cochlear's Nucleus 24 and Freedom products offer NRT. Advanced Bionics' HiRes 90K product, which received FDA approval in 2003, offers "NRI," a similar functionality with respect to telemetry.[70]

### 3. Compliance Telemetry

Compliance telemetry relates to the ability to detect whether an implant is receiving enough power.[71]

## F. The Parties at Issue

### 1. Alfred E. Mann Foundation for Scientific Research

AMF is a non-profit "medical research foundation dedicated to bringing advanced medical technologies to the public to provide significant improvement to the health, security, and quality of life for people suffering from debilitating medical conditions."[72] AMF was established by entrepreneur and medical device development pioneer Alfred Mann in 1985 to develop and promulgate innovative medical technologies that might not otherwise be pursued by for-profit entities.[73]

In addition to CISs, AMF has developed technologies for glucose sensors and microstimulators. Its technologies are licensed to medical device manufacturers and sold worldwide.[74] In 1999, AMF exclusively licensed its cochlear technologies, including the patents-in-suit, twelve other U.S. patents, one U.S. patent application and know-how to Advanced Bionics.[75]

### 2. Advanced Bionics

Advanced Bionics was founded by Alfred Mann in 1993, to develop medical devices related to neurostimulation, including pain management and cochlear implants.[76] I understand Mr. Mann was motivated to found Advanced Bionics in part because earlier discussions with Cochlear failed to produce any license or cooperative agreement.[77] Advanced Bionics' CISs are sold under the "Clarion," "Clarion CII," "Auria" and "Harmony" trade names. Advanced Bionics is the second largest manufacturer of CISs in the world and directly competes with Cochlear for sales.[78]

In June 2004, Advanced Bionics was purchased by Boston Scientific Corporation ("BSC")

---

[70] http://web.archive.org/web/20000824072750/http://www.cochlear.com/whynucleus/, http://www.advancedbionics.com/us/en/products/hires_90k_implant.html and http://www.advancedbionics.com/content/dam/ab/Global/en_ce/documents/libraries/Professional%20Library/AB%20Technical%20Reports/Programming/NRI_Measuring_Auditory-Nerve_Responses_from_the_Cochlea_with_the_HiRes_BES.pdf

[71] van den Honert Deposition, p. 54

[72] http://www.aemf.org/about.asp

[73] http://www.aemf.org/about.asp

[74] http://www.aemf.org/about.asp

[75] AMF018352

[76] Capital IQ Private Company Profile, Advanced Bionics Corporation.

[77] Mann Deposition, pp. 26 – 27

[78] Deposition of Theresa Adkins, 30 December 2008, p. 26

12

*Attorneys' Eyes Only*

EXHIBIT K

 INTELLECTUAL CAPITAL EQUITY

for approximately $740 million in cash, plus earn-out payments.[79]  In settlement of subsequent litigation in 2008, BSC bought the earn-out payments and sold portions of Advanced Bionics, including the CIS product lines, back to Mr. Mann and other investors.[80]  In November 2009, in response to a District Court interpretation of the January 1, 2004 Cochlear Technology License and Royalty Agreement between AMF and Advanced Bionics, this agreement was amended to re-enforce the fact that the agreement was a license and not an assignment of the licensed patents and technology (including the patents-in-suit) from AMF to Advanced Bionics.  The agreement was then further amended by providing for an $8.5 million single, one-time royalty payment to AMF that eliminated Advanced Bionic's obligations to pay AMF ongoing future royalties.[81]

Advanced Bionics was joined to this case on 28 September 2010 pursuant to an unopposed motion filed by AMF and granted by the Court.[82]  This was subsequent to my previous reports and deposition in this case.  I understand the Agreement between AMF and Advanced Bionics provides either party with the right to bring suit and control the litigation and also to share in any of the proceeds of this or any other litigation pertaining to the licensed patents and technology.[83]  The proceeds derived from any successful litigation defending the patents-in-suit would be shared 60%/40% with the party initiating and controlling the negotiation earning 60% and the non-managing party in interest earning 40% after first reimbursing AMF and/or Advanced Bionics for all litigation fees and expenses in proportion to their actual expenses.[84]

### 3.  Cochlear Limited and Cochlear Americas

Cochlear, Ltd. engages in the development, manufacture and sale of implantable hearing solutions.[85]  Its current products include the "Nucleus Freedom," "Nucleus Hybrid," "Nucleus 5 System," "CI422," and "Baha" hearing systems.[86]  The company was founded in 1981 and is headquartered in Sydney, Australia.[87]  In its fiscal year ended 30 June 1999 Cochlear Ltd. reported a pre-tax profit of $AU 23 million in operating income on approximately $AU 127.2 million in net sales.[88]  Cochlear Americas, a subsidiary of Cochlear Ltd., was founded in 1984.  It markets and sells Cochlear's hearing solutions in the United States.[89]

---

[79] Boston Scientific Corporation, SEC Form 10-K for the fiscal year ended 31 December 2004, p. 52
[80] http://www.reuters.com/article/pressRelease/idUS225723+04-Jan-2008+PRN20080104 and conversations with David Hankin and John Petrovich
[81] AMF0508886-993; AMF050894-903; and AMF050904-918
[82] Order Granting Unopposed Motion to Join Advanced Bionics, LLC, executed 28 September 2010
[83] Cochlear Implant License Agreement, Section 9, dated 18 May 1999 (AMR018359); Cochlear Technology License and Royalty Agreement, Section 11, dated 1 January 2004 (AMF045267-268); and November 2009 Amendment to Cochlear Technology License and Royalty Agreement dated 7 November 2009 (AMF050889)
[84] Cochlear Technology License and Royalty Agreement, Section 11, dated 1 January 2004 (AMF045267-268) and November 2009 Amendment to Cochlear Technology License and Royalty Agreement dated 7 November 2009 (AMF050889)
[85] Capital IQ Public Company Profile, Cochlear, Ltd.
[86] Capital IQ Public Company Profile, Cochlear, Ltd., Cochlear Press Release, "Cochlear Americas Announces FDA Approval of the Nucleus® 5 System," 8 September 2009, and Cochlear Press Release, "Cochlear Americas Receives FDA Approval of the World's Thinnest, Full Length Electrode for Cochlear Implantation," 13 June 2012.  I understand the "Baha" is a bone-anchored hearing device and thus fundamentally dissimilar from CISs.
[87] COC-5002191
[88] COC-5002192
[89] Capital IQ Private Company Profile, Cochlear Americas

13

*Attorneys' Eyes Only*

EXHIBIT K



INTELLECTUAL CAPITAL EQUITY

As detailed below in Section II.H, AMF alleges that certain implant systems manufactured and sold by Cochlear and its subsidiaries infringe claims of the AMF Patents and are therefore subject to monetary damages.

## G. The Patents at Issue

The current dispute involves the alleged infringement by Cochlear of two patents owned by AMF and exclusively licensed to Advanced Bionics:

- U.S. Patent No. 5,609,616, entitled "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator," and issued 11 March 1997. The abstract of the '616 patent reads as follows:

> *A physician's tester provides for physician monitoring and control of an implantable human tissue stimulator system, such as an implantable cochlear stimulator (ICS) system. During normal operation, the tissue stimulator system includes an implantable stimulator and a wearable processor (WP). The physician's tester is designed around a microprocessor, and is basically a modification of the WP. The tester provides control over the selection of voltages and currents to be measured and the presetting of parameters in the implantable stimulator during testing of the implanted stimulator and/or a patient's response to data transmitted by the WP/tester to the implanted stimulator. The physician's testor is portable and utilizes telemetry coupling with the implanted stimulator to provide communication between the tester and stimulator for the monitoring, control and measurement of the stimulator parameters. The tester resides in a portable housing having a control panel and a visual display. The control panel allows the physician to manually set various parameter levels. The visual display provides alpha numeric data for viewing. Various devices, such as additional displays and/or a printer, may be coupled to the tester through a display port and/or an infrared serial output port in order to permit a print out of the displayed data or other information.*



14

*Attorneys' Eyes Only*

EXHIBIT K



INTELLECTUAL CAPITAL EQUITY

I understand that in order to practice the inventions of the patents, it is necessary to have both an "internal stimulator" (i.e., cochlear implant) and an "external transmitter" coupled with an "external receiver" (i.e., speech processor) as stated in Claim 10 of the '616 Patent:

10. A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes;

selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter;

receiving and processing the status-indicating signals to produce processed status-indicating signals which con-

vey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and

displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known.

- U.S. Patent No. 5,938,691, entitled "Multichannel Implantable Cochlear Stimulator," and issued 17 August 1999. The abstract of the '691 patent reads as follows:

*A cochlea stimulation system includes a patient wearable system comprising an externally wearable signal processor (WP) and a headpiece in electronic communication with an implanted cochlear stimulator (ICS). The ICS comprises eight output stages each having two electrically isolated capacitor-coupled electrodes, designated "A" and "B", circuits for monitoring the voltages on these electrodes, and circuits for both transmitting status information to and receiving control information from the WP. Based upon information received from the WP, a processor within the ICS can control both the frequency and the widths of the output stimulation pulses applied to the electrodes and may select which electrodes to monitor. The ICS receives power and data signals telemetrically through the skin from the WP. To save power, the ICS may be "powered down" by the WP based upon the absence of audio information or "powered up" if audio is present. The WP communicates with the headpiece over a co-axial cable using one frequency for transmitting signals and a second different frequency for receiving signals.*

15

*Attorneys' Eyes Only*

EXHIBIT K

INTELLECTUAL CAPITAL EQUITY



I understand the patents-in-suit relate to the testing and operation of an implant and a speech processor working as a system. An important and essential aspect of the patents is the back telemetry capability which provides the physician with the capability both (a) to fit the implant to the patient and (b) to monitor the integrity of the cochlear stimulating electrodes, enabling operational maintenance of the implant-speech processor combination as required. I also understand that the implementation of the patented features requires the use of the above components or their equivalents along with the implant and the speech processor.[90]

## H. Products at Issue

Cochlear's technology can be broadly categorized into four generations, as embodied in the Nucleus 22, Nucleus 24, Nucleus Freedom and Nucleus 5-based CISs. Speech processors incorporated in systems during the 2001 to 2012 time period can be categorized into five generations, as embodied in Cochlear's SPrint, ESPrit, ESPrit 3G, Freedom and Nucleus 5 products.

### 1. The Nucleus 22

The Nucleus 22 received FDA approval in 1985 and was Cochlear's first commercial CIS. It included a "CI22" implant with 22 independent channels, each programmed to provide a specific sound sensation from high to low pitch.[91] During the late 1990s the Nucleus 22 was sold with a "Spectra" speech processor.[92] Later generation speech processors compatible with the Nucleus 22 included the "ESPrit 22" released in 2000,[93] the "ESPrit 3G" for Nucleus 22 released in 2004[94] and the Freedom speech processor ("SP12") for Nucleus 22 released in 2008.[95] I understand the Nucleus 22 is not capable of back telemetry.

---

[90] Conversations with John Gord, AMF's Electrical Engineering Consultant and the opinions expressed in the expert report of Dr. John Choma in this matter.

[91] COC-5002021

[92] COC-5002021

[93] COC-5002326

[94] COC-5000159

[95] Cochlear 2008 Annual Report, p. 15

16

*Attorneys' Eyes Only*

EXHIBIT K


INTELLECTUAL CAPITAL EQUITY

### 2. The Nucleus 24

In June 1998, a little less than two years after Advanced Bionics received FDA approval for its first CIS, Cochlear released the Nucleus 24. The original Nucleus 24 design, the "CI24M," had a straight array of 22 intracochlear electrodes like the Nucleus 22, but introduced new stimulation capability with the addition of two extracochlear electrodes.[96] The CI24M allowed for increased available pulse rates and had a smaller implant bed than its predecessor, an impact resistant titanium casing, telemetry to facilitate maintenance and neural response telemetry to facilitate programming for young children.[97]

In 2000, the "CI24R" was released and essentially replaced the CI24M. The CI24R had an even smaller implant housing, allowing use in younger children. An enhanced version of the CI24R was released in 2003 with the "Contour Advance" electrode, which minimizes force on the cochlea during implantation.[98]

A Nucleus 24 recipient initially had the choice of two speech processors, the ESPrit or the SPrint.[99] The ESPrit 3G speech processor was made available for Nucleus 24 recipients in 2002[100] and the Freedom speech processor was made available for Nucleus 24 recipients in fiscal year 2007.[101]

### 3. The Nucleus Freedom

In the fourth quarter of Cochlear's 2005 fiscal year, or about a year after Advanced Bionics' acquisition by BSC, Cochlear launched its next-generation CIS, the Nucleus Freedom or CI24RE.[102] The Nucleus Freedom allows for more efficient asynchronous stimulation[103] and has a "Softip" to protect the cochlea during surgery, a self-curling array designed to place the electrodes as close as possible to the auditory nerve, and a SmartSound digital microchip designed to handle a broad range of possible future upgrades.[104] The Nucleus Freedom is shipped with the Freedom speech processor.

### 4. The SPrint

The SPrint, or SP5, was the belt-worn speech processor released with the Nucleus 24 implant. The SPrint featured digital signal processing, was programmable with multiple speech coding strategies including SPEAK, continuous interleaved sampling and ACE,[105] and included telemetry capability.[106] I understand some Nucleus 24 owners initially purchased the SPrint and later the ESPrit speech processor, while others purchased both a SPrint and ESPrit speech

---

[96] Nucleus Reliability Report, Vol. 5 June 08
[97] COC-5002079 – COC-5002080
[98] Nucleus Reliability Report, Vol. 5 June 08
[99] COC-5002079
[100] COC-5000016
[101] COC-5000439
[102] Cochlear's fiscal year begins on 1 July and ends on 30 June
[103] Nucleus Reliability Report, Vol. 5 June 08
[104] http://www.cochlearamericas.com/Products/23.asp
[105] COC-5002079
[106] Nygard Deposition pp. 103 – 105

17

EXHIBIT K



processor at the time of implantation in order to have the flexibility of using either a belt-worn or BTE speech processor.[107]

## 5. The ESPrit

The ESPrit speech processor was released with the Nucleus 24 implant and was the first commercially available BTE speech processor.  In keeping with the space and weight constraints inherent in a BTE processor, the primary features of the ESPrit were its low-power integrated circuit design and energy efficient speech coding strategies.[108]  In 2000 Cochlear released a version of the ESPrit speech processor for the Nucleus 22 under the name "ESPrit 22."[109]  The ESPrit speech processor was not capable of back telemetry.

## 6. The ESPrit 3G

In 2002, Cochlear released an ESPrit 3G speech processor for the Nucleus 24 which included the company's complete range of speech coding strategies (SPEAK, continuous interleaved sampling, ACE, etc.) and a whisper setting for listening to soft noises.[110]  In 2004 Cochlear released a version of the ESPrit 3G for use with the Nucleus 22.[111]  The ESPrit 3G speech processor was not capable of back telemetry.

## 7. The Freedom

The Freedom speech processor, or SP12, was originally sold with the Nucleus Freedom implant.[112]  In addition to the features included in previous speech processors, the Nucleus Freedom had two microphones allowing it to soften distracting background noise in loud environments and that could automatically adjust sound levels in dynamic environments.[113]  It was also water resistant[114] and allowed for the use of back telemetry.  Versions of the SP12 speech processor compatible with the Nucleus 24 and Nucleus 22 were released in 2006 and 2008, respectively.[115]

## 8. The Nucleus 5

Cochlear Americas announced the FDA approval of the Nucleus 5 CIS on 8 September 2009.[116]  The Nucleus 5 is promoted as the smallest, most water resistant sound processor, the thinnest titanium cochlear implant, two-way remote assistant, SmartSound™ 2 technology and AutoPhone™ capability.[117]  It is also claimed to include "fully integrated dual

---

[107] COC-5002205

[108] COC-5002079

[109] COC-5002326

[110] COC-5000016

[111] COC-5000159

[112] For purposes of this report, I will refer to the Freedom processor as "SP12" to avoid confusion with the Nucleus Freedom CI product.

[113] *Nucleus Freedom Launched in USA*, Cochlear Press Release, 14 March 2005.

[114] *Nucleus Freedom Launched in USA*, Cochlear Press Release, 14 March 2005.

[115] COC-5000439 and Cochlear 2008 Annual Report, p. 15

[116] Cochlear Americas press release, "Cochlear Americas Announces FDA Approval of the Nucleus® 5 System," 8 September 2009

[117] Cochlear Americas press release, "Cochlear Americas Announces FDA Approval of the Nucleus® 5 System," 8 September 2009

18



INTELLECTUAL CAPITAL EQUITY

microphones for directionality and better sound quality in noisy situations."[118]  The Nucleus 5 includes the Cochlear Nucleus CI500 series implants and the CP800 Series sound processors.[119]  I understand the Nucleus 5 employs back telemetry and therefore utilizes the inventions of the patents-in-suit.  In September 2011, Cochlear issued an announcement regarding the voluntary recall of the Cochlear Nucleus CI500 series implants.[120]

### 9.  The Nucleus CI422

Cochlear Americas received FDA approval for the CI422 with Slim Straight Electrode on 12 June 2012.[121]  The CI422 is the most recent addition to the Cochlear implant product line and also utilizes back telemetry.[122]  The CI422 has 22 active contacts designed to maximize hearing performance.[123]

Cochlear CISs that include impedance telemetry are accused of infringing the AMF patents.  I understand the accused CI24s were the primary product offered by Cochlear during the relevant period in this case.  There are several versions of the CI24 products, all allowing impedance telemetry and including the following:[124]

| Nucleus 24 | Nucleus Freedom |
|---|---|
| ▪ CI24M - Micro Implant | ▪ CI24RE (ST) |
| ▪ CI24M - Cochlear Implant | ▪ CI24R (ST) or CI24K |
| ▪ CI24 Contour [CI24 (CS)] | ▪ CI24RE (CA) [CI24RE (CA1)] |
| ▪ CI24 Contour CA [CI24R (CA)] | ▪ CI24RE Hybrid |
| ▪ MATCI24R (CA) [CI24R (CA2)] | |

As described above, the various versions of the CI24 fall into two distinct generations sold under the trade-names Nucleus 24, released in the fourth quarter of fiscal year 1998, and Nucleus Freedom, released in the fourth quarter of fiscal year 2005.[125]  Supplanting the previous generation of cochlear implant systems, the Nucleus 5 System (incorporating the CI500 implant) was introduced in the first quarter of fiscal year 2010.[126]

Both the CI24 implant and CI500 series are alleged to infringe the AMF patents.  However, the release of the CI500 series in 2009 drastically reduced the volume of CI24s sold, as consumers opted for the CI500 instead.  Sales records produced by Cochlear indicate it sold 50,877 CI24s between December 2001 and June 2012 and 15,990 CI500s during the shorter period from

---

[118] Cochlear Americas press release, "Cochlear Americas Announces FDA Approval of the Nucleus® 5 System," 8 September 2009

[119] Cochlear 2009 Annual Report, p. 4

[120] http://www.cochlearcares.com/sept-archive.html

[121] http://products.cochlearamericas.com/news/cochlear-americas-receives-fda-approval-world%25E2%2580%2599s-thinnest-full-length-electrode-for-cochlear-imp

[122] http://products.cochlearamericas.com/news/cochlear-americas-receives-fda-approval-world%25E2%2580%2599s-thinnest-full-length-electrode-for-cochlear-imp

[123] http://products.cochlearamericas.com/news/cochlear-americas-receives-fda-approval-world%25E2%2580%2599s-thinnest-full-length-electrode-for-cochlear-imp

[124] The product identification appearing in brackets for some products is the nomenclature used in more recent data production from Cochlear, if the product's name has changed.

[125] COC-5000326 – COC-5000327

[126] In fiscal year 2009, the year before the release of the Nucleus 5 System, the Nucleus Freedom System revenues were $184.6 million dropping to $53.1 million in fiscal year 2010, the year the Nucleus 5 System was released. See Exhibit 2.1 and 2.6.

19

*Attorneys' Eyes Only*

EXHIBIT K

INTELLECTUAL CAPITAL EQUITY

September 2009 to June 2012.[127]  As shown in Figure 1, below, unit sales in the Americas of the CI24 and CI500 series combined generally increased from December 2001 through June 2012:

**Figure 1**
**Unit Sales of CI24 and CI500[128]**



The CISs offered by Cochlear also include speech processors that are capable of contributing to back telemetry and are manufactured and sold by Cochlear in the U.S.  Cochlear Limited's Manager for the Department of Enabling Technologies, Tony Nygard, testified the SPrint and SP12 speech processors are capable of contributing to back telemetry, while the ESPrit and ESPrit 3G speech processors are not.[129]  I understand that the CP800 series is also accused of infringing the AMF Patents.  Unit sales of Cochlear's speech processors in the Americas are shown in Figure 2, below:

---

[127] See Exhibit 3.5 and Exhibit 3.6
[128] See Exhibit 6.7.  The first period on Figure 1 corresponds to December 2001 rather than a full quarter.
[129] Nygard Deposition, pp. 103-105

20

*Attorneys' Eyes Only*

EXHIBIT K



**Figure 2**
**Unit Sales of Speech Processors** [130]



As shown on Figure 2 above, sales of the ESPrit (in blue) were negative for most of the period for which data was produced.[131]  The SPrint (green) was sold in generally stable quantities between December 2001 and the release of the SP12 in the first quarter of 2005.  The ESPrit 3G (red) experienced a spike in sales after its release for commercial sale in the U.S. in 2002 and again in 2004 after the release of ESPrit 3G which was compatible with the Nucleus 22.  The ESPrit 3G was the highest selling speech processor during the time period prior to the release of the SP12.  The SP12 (purple) was released in the U.S. in the first quarter 2005.  It effectively replaced all earlier models and has been sold in generally increasing quantities since its introduction.  The same effect took place upon the release of the CP800 series (turquoise) used in the Nucleus 5 System in 2009, as this essentially replaced most of the earlier models made by Cochlear from the fourth quarter of 2009 until 2012.

**I.   Timeline of Relevant Events**

For purposes of understanding the current dispute, it may be useful to review the following timeline of relevant events:[132]

- 1981                    Cochlear Limited was founded in Australia.[133]

---

[130] See Exhibit 6.9.  The first period on Figure 2 corresponds to December 2001 rather than a full quarter.

[131] I understand Cochlear has refused to produce sales data prior to December 2001.

[132] All "Quarters" refer to calendar years (1 January through 31 December), not Fiscal Years.

[133] http://www.powerhousemuseum.com/collection/database/?irn=363656

21

*Attorneys' Eyes Only*

EXHIBIT K

INTELLECTUAL CAPITAL EQUITY

- 26 Feb 1984    The House/3M, a single channel system, became the first CIS to receive FDA approval in the U.S.[134]

- 31 Oct 1985   Cochlear received FDA Approval to sell the Nucleus 22 CIS in the U.S. for use in adults.[135]

- 22 Sep 1989   AMF filed an application for its first CIS patent, entitled "Cochlea Stimulating System for Improving the Hearing of the Hearing Impaired."

- 27 Jun 1990   The FDA approved the Nucleus 22 CIS for use in children aged two to seventeen.[136]

- 1993          Advanced Bionics was founded.  Testimony indicates a verbal agreement for use of any AMF patents related to CIS technology was reached at or around this time.[137]

- 25 May 1995   AMF filed the application for what would become the '616 Patent.[138]

- Aug 1996      Advanced Bionics received FDA approval to sell its "Clarion" CIS in the U.S.[139]

- 11 Mar 1997   The '616 Patent, entitled "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator," issued with AMF named as assignee.[140]  It will expire on 11 March 2014.

- FY 1997       Cochlear released the CI24 in international markets, along with the SPrint and ESPrit.[141]

- 23 Jun 1998   AMF filed the application for what would become the '691 Patent.[142]

- 25 Jun 1998   Cochlear received FDA approval for U.S. sales of the Nucleus 24, including the allegedly infringing telemetry feature.[143]

- 18 May 1999   Advanced Bionics and AMF reduced to writing the terms of their existing agreement in practice for uses of AMF patents related to the cochlear implant field.[144]

---

[134] http://www.accessdata.fda.gov/
[135] http://www.accessdata.fda.gov/
[136] http://www.accessdata.fda.gov/
[137] Deposition of David Lee Hankin, 17 December 2008, pp. 16 – 17
[138] The '616 Patent
[139] http://www.pslgroup.com/dg/9f3e.htm
[140] The '616 Patent
[141] COC-5002076
[142] The '691 Patent
[143] http://www.accessdata.fda.gov/
[144] AMF018352

22

*Attorneys' Eyes Only*

EXHIBIT K

INTELLECTUAL CAPITAL EQUITY

- 17 Aug 1999    The '691 Patent, entitled "Multichannel Implantable Cochlear Stimulator," issued with AMF named as assignee. [145]  It expired on 22 September 2009.

- 20 Aug 2001    MED-EL received FDA approval to sell the "Combi 40+" CIS in the U.S.[146]

- 2002    Cochlear introduced ESPrit 3G BTE for use with the Nucleus 24.[147]

- 1 Jan 2004    AMF modified its Cochlear Technology License Agreement with Advanced Bionics as discussed in Section III.B.1.b of this report.[148]

- May 2004    Cochlear released the ESPrit 3G BTE  for use with the Nucleus 22 in the U.S.[149]

- 1 Jun 2004    BSC acquired Advanced Bionics for approximately $740 million plus earn-outs. [150]

- March 2005    Cochlear released the Nucleus Freedom CI and SP12.[151]

- 2006    Cochlear launched the Freedom processor for the Nucleus 24 in the U.S.[152]

- 13 Dec 2007    AMF filed suit against Cochlear alleging infringement of the AMF Patents.[153]

- 2007/2008    BSC modified the Advanced Bionics acquisition agreement and bought out future earn-out payments for 2009 through 2013, resulting in lump-sum buyout payments to AMF of $30,660,000 in 2008 and $24,360,000 in 2009.[154]

- 3 Jan 2008    Advanced Bionics Corporation was renamed Boston Scientific Neuromodulation Corporation and Advanced Bionics LLC was assigned Advanced Bionics Corporation's rights in CIS business and patents.[155]

- Q2 2008    The Cochlear SP12 was released for use with the Nucleus 22.[156]

---

[145] The '691 Patent

[146] http://www.accessdata fda.gov/

[147] COC-5000016

[148] AMF045254

[149] COC-5000159

[150] Boston Scientific Corporation, SEC Form 10-K for the fiscal year ended 31 December 2004, p. 52

[151] *Nucleus Freedom Launched in USA,* Cochlear Press Release, 14 March 2005

[152] COC-5000439

[153] Complaint, Alfred E. Mann Foundation For Scientific Research v. Cochlear Corporation and Cochlear Ltd., filed 13 December 2007

[154] AMF045663

[155] AMF050894-AMF050898

[156] Cochlear 2008 Annual Report, p. 15

23

*Attorneys' Eyes Only*

EXHIBIT K

INTELLECTUAL CAPITAL EQUITY

- September 2009  Cochlear introduced the Nucleus 5 System, which included the CI500 and CP800 series.[157]

- 7 Nov 2009  The license agreement for CIS technology between Advanced Bionics and AMF, previously amended 1 January 2004, was amended again to clarify the original transaction as a license agreement and not an assignment.  The amendments also resulted in an $8.5 million lump-sum royalty payment to AMF in lieu of Advanced Bionics' future royalty obligations.[158]

- 10 Nov 2009  Sonova Holding AG, through a subsidiary, bought Advanced Bionics, LLC for $489 million, resulting in a payment of $18,067,413 to AMF for sale of its interest.[159]

- 12 Jun 2012  Cochlear received FDA approval for the Nucleus CI422 with Slim Straight Electrode.[160]

---

[157] http://products.cochlearamericas.com/news/nucleus-news/apsept-2009
[158] AMF050886-AMF050918
[159] http://articles.latimes.com/2009/nov/10/business/fi-advanced-bionics10 and conversations with Farah Boroomand, AMF's CFO
[160] http://products.cochlearamericas.com/news/cochlear-americas-receives-fda-approval-world%25E2%2580%2599s-thinnest-full-length-electrode-for-cochlear-imp

*Attorneys' Eyes Only*

EXHIBIT K



INTELLECTUAL CAPITAL EQUITY

---

### III. Opinions Expressed, with the Bases and Reasons Therefor

I understand federal statute provides that damages awarded in a patent case shall be "adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." In practical terms, in order to assess potential damages in a patent infringement case a determination is typically made of whether and to what extent the plaintiff would have realized additional sales "but for" the defendant's alleged infringement. These sales may be quantified as the profits lost by the plaintiff. Additional sales, if any, made by the defendant are then subject to a reasonable royalty. Alternatively, the plaintiff may elect to claim damages in the form of a reasonable royalty on all sales made by the defendant.

My use of the term "reasonable royalty" in this matter is consistent with the following definition of the term in the case of *Georgia-Pacific v. United States Plywood Corp.*:[161]

> *"[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*

I previously calculated damages in this case by applying a reasonable royalty rate to a royalty base comprising the Defendants' sales accused of infringing the system and methods claimed in the AMF Patents. The joining of Advanced Bionics to the case introduced the potential for claiming lost profits. As discussed in Section III.B.3 of this report, it appears the patented features were significant enough to have resulted in higher sales and profits for Advanced Bionics but for Cochlear's infringement. However, after consideration of the current case schedule and status of discovery, I have elected to continue to address only reasonable royalty claims. My conclusions, including my assessment of relevant quantitative and qualitative factors, are discussed below.

My determination of a royalty base is predicated on several key assumptions and conclusions, including the following:

- Based on the nature of the asserted claims, the cochlear implant *system* (i.e., the implant plus the speech processor, which function together) is assumed to be covered by the patents-in-suit. I understand the cochlear implant and speech processor are both required to practice the inventions of the patents at issue.[162]

- The implants and speech processors function together to achieve the benefits anticipated by the patents and form the smallest patent-practicing unit.

- Implementation of the patented technology requires additional circuitry in both the implant and the speech processor. Consequently, both components are necessary to practice the claims of the patents-in-suit.[163]

- The implants and speech processors are typically marketed and sold together: Either both are sold at the same time or the speech processor is sold to upgrade the functionality of an existing compatible implant. While speech processors may be sold as replacements or

---

[161] *318 F. Supp.1116 (S.D.N.Y.1970), modified and affirmed, 446 F.2d 295 (2d Cir. 1971)*
[162] Reading of the patent claims and conversations with Glenn Griffith and John Gord
[163] Discussions with John Gord and opinions expressed in the Expert Report of Dr. John Choma

*Attorneys' Eyes Only*

EXHIBIT K

 INTELLECTUAL CAPITAL EQUITY

additions, they cannot function unless paired and calibrated to a compatible cochlear implant.[164]

▪ I understand that since the issuance of my Preliminary Report, all new CISs sold by both parties practice/infringe the patents-in-suit.  Furthermore, I understand all currently marketed CISs include the accused back telemetry feature.[165]

▪ The implant and speech processor(s) used by any given recipient will be produced by the same manufacturer.  Components from different manufacturers cannot be "mixed and matched."[166]

▪ The inventions of the patents-in-suit facilitate proper placement and custom fitting for each patient which is necessary for the system to work as intended.[167]  The patented features are a critical element of demand for the implants and speech processors as a functional system, as discussed in later sections of this report.[168]

▪ Royalties under AMF's existing license with Advanced Bionics are calculated on the system, including implants and processors.  Cochlear also evidently paid royalties on systems including both implants and speech processors under its license with the Commonwealth of Australia and the University of Melbourne.[169]

Based on the foregoing, the appropriate royalty base in this matter comprises infringing CISs with back telemetry which includes the cochlear implant and speech processor.  The Parr Report agreed with this conclusion.[170]  Consequently, I have calculated the royalty base in this case as including all accused CISs.[171]

---

[164] Conversations with AMF's Mark Chamberlain, COO
[165] Conversations with AMF's Mark Chamberlain, COO and John Gord; and review of product information available from Cochlear's, Advanced Bionics and Med-El's website
[166] Conversations with John Gord and Glenn Griffith
[167] Conversations with John Gord and Glenn Griffith
[168] Conversations with John Gord and opinions expressed in the Expert Report of Dr. John Choma.
[169] See Section III.B.1
[170] The royalty base presented in the Parr Report for the December 2001 to June 2008 time period was consistent with and essentially the same as the royalty base I presented in my Preliminary Report, except that the Parr Report excluded the ESPrit 3G.  If Mr. Parr alters his earlier opinions in any updated expert report, I respectfully reserve the right to supplement my report in response.
[171] Because sufficient data exists to do so, I have provided a breakdown of revenues for cochlear implants and speech processors by model (see Exhibits 2.1 – 2.4, 2.6, 2.7 and 6.3).  I have not, however, presented an alternative royalty base or rate, as I cannot at present guess as to any alternative that may be presented by the Defendants or endorsed by the trier of fact.  Hypothetically, some smaller royalty base might argue for an increased royalty rate to account for sales then properly regarded as convoyed rather than infringing (see *Georgia-Pacific* factor 6) and the total calculation of damages might remain approximately the same.

*Attorneys' Eyes Only*

EXHIBIT K