1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   BRUCE G. CHAPMAN, Cal. Bar No. 164258
3  bchapman@sheppardmullin.com
   SCOTT R. MILLER (Cal. Bar No. 112656)
4  smiller@sheppardmullin.com
   LAURA M. BURSON (Cal. Bar No. 204459)
5  lburson@sheppardmullin.com
   MANUEL C. NELSON, Cal. Bar No. 229590
6  mnelson@sheppardmullin.com
   DENNIS J. SMITH, Cal. Bar No. 233842
7  dsmith2@sheppardmullin.com
   333 South Hope Street, 43rd Floor
8  Los Angeles, California 90071-1422
   Telephone:  213.620.1780
9  Facsimile:  213.620.1398

10 Attorneys for Defendants and
   Counterclaimants COCHLEAR LTD. and
11 COCHLEAR AMERICAS

12            UNITED STATES DISTRICT COURT

13     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

15 | ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, | Case No. CV 07-08108 FMO (SHx) |
16 | | **VOLUME 4 OF EXHIBITS (L-X) TO OMNIBUS DECLARATION OF SCOTT R. MILLER RE PARTIES' JOINT MOTIONS *IN LIMINE*** |
   |           Plaintiff, | |
17 | | |
   |           v. | |
18 | | [Joint Motions *in Limine,* Declaration of Jerry Schloffman and [Proposed] Orders filed/lodged concurrently herewith] |
19 | COCHLEAR CORPORATION (n/k/a COCHLEAR AMERICAS), COCHLEAR LTD., and ADVANCED BIONICS, LLC, | |
20 | | Pre-Trial Conference and Hearing on Motions *in Limine*: Dec. 17, 2013 |
21 |           Defendants. | Time: 10:00 a.m. |
   | | Ctrm: 22 |
22 | | |
23 | | Trial Date: January 13, 2014 |
   | | **Hon. Fernando M. Olguin** |
24 | AND RELATED COUNTERCLAIMS. | |

25

26

27

28

SMRH:413050655.3

# EXHIBIT L



IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------------------------------------------------

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,
Plaintiff and Counterdefendant,

v.

COCHLEAR CORPORATION (N/K/A COCHLEAR AMERICAS) AND COCHLEAR LTD.,
Defendants and Counterclaimants.

-------------------------------------------------------------------------------------------

**Surrebuttal Report of Cate M. Elsten**

**30 March 2009**

*Confidential: Attorneys' Eyes Only*

*Attorneys' Eyes Only*

EXHIBIT L



<div align="center">

**TABLE OF CONTENTS**

</div>

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND ..................................................................................................... 2

III. SUPPLEMENTAL OPINIONS ................................................................................. 3

   A. Mr. Parr has failed to consider the full value of AMF's license with
      Advanced Bionics. ......................................................................................... 3

      1. Mr. Parr has argued that compensation in the form of stock is not part
         of the royalty paid by Advanced Bionics to AMF. His argument is not
         supported by the record evidence. Furthermore, when he does consider
         the stock compensation he has understated its value to AMF. ...................... 3

      2. Mr. Parr's argument for excluding consideration of earn-out payments
         made by BSC to AMF as a result of the license between AMF and
         Advanced Bionics is based on his own misinterpretation of the
         transaction between BSC and Advanced Bionics. ........................................ 4

      3. Mr. Parr fails to consider that AMF retained shares in Advanced
         Bionics and may receive future compensation related to this license. ........... 5

      4. Mr. Parr misrepresents the true range of his royalty rate calculations
         related to the AMF-Advanced Bionics license. ........................................... 6

      5. A discounted cash flow analysis of Mr. Parr's projected royalties
         implies an effective royalty of approximately 8.04%. ................................. 6

   B. Mr. Parr does not acknowledge that Cochlear depends on technological
      parity with competitive devices to maintain its market share. ............................. 7

   C. Mr. Parr relies on uncritical application of a "typical" exclusivity adjustment
      factor without considering the other relevant facts and circumstances of
      unrelated licenses that may be compared to a hypothetical license in this
      case. ........................................................................................................... 7

   D. Mr. Parr has used an inappropriate profit margin, which impacts both his
      "Rule of Thumb" and analytical approach calculations. .................................. 9

   E. Mr. Parr's proposed royalty rate is lower than over 90% of licenses for
      medical devices he has identified in Appendix C to his report. ........................ 11

   F. The license agreement between The Regents of the University of California
      San Francisco and Pacesetter Infusion, Ltd. was unavailable to me at the time
      of my Preliminary Report, but does not change my determination of a
      reasonable royalty in this case. ...................................................................... 11

IV. DATA AND INFORMATION CONSIDERED IN FORMING THESE OPINIONS ...................... 13

V. EXHIBITS TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS ................... 13

VI. QUALIFICATIONS INCLUDING PUBLICATIONS AND TESTIMONY ............................... 13

VII. COMPENSATION PAID FOR SERVICES ................................................................. 13

<div align="center">

i

</div>

*Attorneys' Eyes Only*

EXHIBIT L



INTELLECTUAL CAPITAL EQUITY

## I.   INTRODUCTION

I have been asked to provide opinions regarding damages the Alfred E. Mann Foundation for Scientific Research ("AMF" or "Plaintiff") may claim if there is a finding of liability against Cochlear Limited and Cochlear Corporation (n/k/a Cochlear Americas; collectively, "Cochlear" or "Defendant") [1] for alleged infringement of U.S. Patent No. 5,609,616 ("the '616 Patent") and U.S. Patent No. 5,938,691 ("the '691 Patent"; collectively, "the AMF Patents.")  I filed a Preliminary Report in this action on 19 January 2009.  Since that time, I have reviewed the Expert Damages Report of Russell L. Parr, dated 11 March 2009 and certain additional production documents.

Relevant background information and my preliminary opinions in this matter can be found in my Preliminary Report.  The opinions found in my Preliminary Report remain valid and this report is intended to supplement rather than supersede them.  Section II of this report provides a summary of damages found in my Preliminary Report and in Mr. Parr's Report.  Section III of this report outlines my responses to the methodologies and opinions contained in Mr. Parr's report.

The disclosures in this report are based on discovery to date and currently available information.  To the extent additional relevant information comes to light, including but not limited to supplemental production from the parties, reports from either party's expert(s), rulings from the Court and any additional materials produced through discovery or otherwise made available, I may amend or supplement my opinions as necessary and permitted by the Court.

As in all cases, whether engaged by counsel for a plaintiff or a defendant, an assumption that liability will be found is necessary as a basis for my analysis.  It does not imply I have been engaged to provide opinions on issues relevant to a determination of liability or have determined such liability exists.

This report has been prepared in connection with the above referenced case.  The report is to be used for the specific purposes of this litigation and is not to be used for any other purpose without the express written consent of Ocean Tomo.

---

[1] Although I may refer to the defendants collectively as "Cochlear" in my report, this is not to be construed as a legal conclusion or other assumption that Cochlear, Ltd. and Cochlear Americas are properly regarded as a single entity for purposes of damage determination in this lawsuit.  When referencing either entity individually, I will use its full corporate name.

1

*Attorneys' Eyes Only*

EXHIBIT L

 INTELLECTUAL CAPITAL EQUITY

## II.   BACKGROUND

Background information relevant to this matter can be found in my Preliminary Report.  I expressly incorporate and include all such information herein.  A summary of my conclusions related to a reasonable royalty in this matter as contained in my Preliminary Report is as follows:[2]

**Table 1**
**Summary of Damages**

|  | Royalty Base | Reasonable Royalty Rate | Damages |
|---|---|---|---|
| Royalty Base With ESPrit 3G | $720,349,267 | 7.5% | $54,026,195 |
| Royalty Base Without ESPrit 3G | $677,709,110 | 7.5% | $50,828,183 |

Mr. Parr has opined that a royalty rate of 1.2% would be appropriate in this matter, and has provided three alternative royalty bases.  His first royalty base includes all sales included in my "Royalty Base Without ESPrit 3G."[3]  His second scenario calculates royalties beginning in August 2003 and his third scenario calculates royalties beginning in December 2007.  These scenarios are intended to reflect potential reasonable royalty damages should Cochlear prevail in its marking and laches defenses, respectively.  A summary of Mr. Parr's damages as contained in his report is as follows:[4]

**Table 2**
**Summary of Mr. Parr's Damages Opinions**

|  | Royalty Base | Reasonable Royalty Rate | Damages |
|---|---|---|---|
| Royalty Base (Dec 2001 – Dec 2008) | $677,710,111 | 1.2% | $8,132,521 |
| Royalty Base (Aug 2003 – Dec 2008) | $575,976,623 | 1.2% | $6,911,719 |
| Royalty Base (Dec 2007 – Dec 2008) | $101,746,976 | 1.2% | $1,220,964 |

---

[2] Preliminary Report, p. 44
[3] Parr Report, Exhibit 3
[4] Parr Report, p. 27.  The $1,001 difference between my "Royalty Base Without ESPrit 3G" and Mr. Parr's "Royalty Base (Dec 2001 – Dec 2008)" results primarily from a transcription error in his report.

2

*Attorneys' Eyes Only*

EXHIBIT L

 INTELLECTUAL CAPITAL EQUITY

### III.    SUPPLEMENTAL OPINIONS

**A.  Mr. Parr has failed to consider the full value of AMF's license with Advanced Bionics.**

In my Preliminary Report, I considered a license agreement between AMF and Advanced Bionics under which AMF licensed several patents to Advanced Bionics in return for running royalties and stock compensation.  Mr. Parr has provided several calculations related to this license which purport to show an estimated effective royalty rate.  Several of Mr. Parr's assumptions regarding this license are flawed, including the following:

1.  **Mr. Parr has argued that compensation in the form of stock is not part of the royalty paid by Advanced Bionics to AMF.  His argument is not supported by the record evidence.  Furthermore, when he does consider the stock compensation he has understated its value to AMF.**

Mr. Parr's report states:

> *"In addition to licensing its cochlear implant technology to ABC, AEMF transferred its entire cochlear program, including employees, to ABC.  The 1 million shares of ABC valued at $2.8 million may be viewed as compensation for the transfer of AEMF's cochlear program to ABC, and not as an upfront payment for the license."*[5]

Mr. Parr identifies no support for his statement that the stock compensation "may" be viewed in such a manner and such an assumption is not supported by any evidence of which I am aware.  In fact, I understand from conversation with Lawrence Fischer, Chief Financial Officer of AMF, that Mr. Parr's assumption is incorrect.  Mr. Fischer's representation is consistent with the license between AMF and Advanced Bionics, which makes no mention of any payment for the transfer of the operating assets or employees from AMF to Advanced Bionics.  Rather, the grant of one million shares of Advanced Bionics stock appears in Section 2.1 of the Agreement, entitled "Royalties."[6]  My discussions with Mr. Fischer and with Jerry Schloffman, Vice President of Global Marketing at Advanced Bionics, confirm that the stock compensation was treated as a royalty obligation by both parties.

Later in his report, Mr. Parr does consider the possibility that the stock compensation should be considered when evaluating the terms of the license:

> *"If, however, the shares are viewed as an upfront payment, in order to properly reflect the $2.8 million upfront payment as part of the royalty rate structure, the payment must be amortized over the revenues that will be enjoyed during the life of the license."*[7]

Mr. Parr then concludes that this stock compensation, which he limits to the book value of $2.8 million assigned to shares transferred at the time of the agreement, amounts to an additional 0.16% effective running royalty by projecting Advanced Bionics' sales from the first half of 2008 through 2017 using straight-line projections of Advanced Bionics' sales.  As discussed in sections III.A.2 and III.A.3, below, I understand AMF may be entitled to additional future compensation under this license and Mr. Parr's projections of future revenue are inappropriate.

---

[5] Parr Report, p. 9
[6] AMF018354
[7] Parr Report, p. 9

3

*Attorneys' Eyes Only*

 INTELLECTUAL CAPITAL EQUITY

Furthermore, even though Mr. Parr calculates an effective royalty rate based on the shares granted to AMF, the $2.8 million initial book value on which he relies does not reflect the true value of the stock reasonably anticipated or eventually realized by AMF. I understand that when Boston Scientific purchased Advanced Bionics, it offered shareholders the choice of a cash payment of $11 per share plus their prorated share of the earn-out payments, or a cash payment of $21 per share.[8] Mr. Parr has not offered a calculation of the effective payment actually realized by AMF related to this stock-based compensation.

Additionally, as discussed in my Preliminary Report, in 2004 AMF received an additional 1.1 million shares which were ultimately sold for $11 cash plus earn-out rights.[9] Mr. Parr estimated the value of these shares plus the one million shares from the original 1999 license at $11 per share. Once again he ignores the fact that the agreement offered investors $21 per share or $11 cash plus the earn-out. At a minimum, Mr. Parr should have calculated the value of these shares at $21 per share, which would almost double the impact on his calculation of an effective royalty rate. However, by choosing the option of a lower cash price and earn-out payments, investors clearly anticipated the ultimate value of the transaction as being *greater than* a present value of $21 per share. My discussion of the actual realized value of the earn-out payments is discussed in section III.A.2, below.

For each of Mr. Parr's calculations related to upfront stock payments, there is no evidence or basis for assuming that the book value of the stock at the time of the original transfer represents the limit of the value AMF reasonably anticipated receiving from this component of the license agreement, as assumed by Mr. Parr. The best evidence of the anticipated value of the license agreement to AMF remains the actual amounts received.

2.   **Mr. Parr's argument for excluding consideration of earn-out payments made by BSC to AMF as a result of the license between AMF and Advanced Bionics is based on his own misinterpretation of the transaction between BSC and Advanced Bionics.**

Mr. Parr has argued that over $79 million in payments received by AMF related to Advanced Bionics' and BSC's use of the patents should not be considered part of the royalty compensation related to the license between Advanced Bionics and AMF:

> *"In the original 2004 purchase agreement, BSC agreed to make earn-out payments. As part of the break-up deal in 2008, BSC made equalizing payments described by Alfred E, Mann, '...they paid us what was the net excess value over those companies that would have been due under the earn-out arrangement'. I interpret the $79,149,231 payment received by AEMF as associated with the value of the neuro-stimulation business kept by BSC, and having nothing to do with the cochlear implant business or technology."[10]*
>
> ...
>
> ...
>
> *"However, I do not believe the earn-out payment has anything to do with the cochlear implant business or the telemetry invention. I believe the payment is associated with the future earn-outs associated with the neuro-stimulation business that BSC kept and would*

---

[8] AMF045615
[9] Preliminary Report, p. 25.
[10] Parr Report, p. 11

4

*Attorneys' Eyes Only*

EXHIBIT L

 INTELLECTUAL CAPITAL EQUITY

*commercialize in the future. It is unreasonable to think that BSC would make or that
AEMF would require BSC to make earn-out payments on a business it did not keep."* [11]

Again, Mr. Parr identifies no support for his "belief" that the earn-out payments were related
to the neuro-stimulation, rather than the cochlear implant, business. In fact, Mr. Fischer of
AMF has informed me that Mr. Parr's "belief" is entirely incorrect; there was no equity
payment from BSC for the neuro-stimulation business and all earn-outs related to the
cochlear business. Consistent with this, it should be noted that over $29 million of the
payments were made during the time when Advanced Bionics was still owned by BSC and
therefore could not possibly be "equalizing payments" as assumed by Mr. Parr These earn-
outs were based on BSC's actual sales of cochlear implant devices. The remaining earn-out
payments were based on a present value determination of future obligations owed by BSC to
AMF. These payments were also directly related to cochlear implant devices.

Later in his report, Mr. Parr seems to acknowledge that inclusion of these payments may in
fact be appropriate when calculating an effective royalty rate for the license between
Advanced Bionics and AMF:

> *"Even if the $79,149,231 earn-out payment received by AEMF is attributed to the
> cochlear implant business when amortized over the same $2,366,846,384 of revenues, the
> additional royalty rate is 3.34%."* [12]

However, Mr. Parr's calculation is still unreliable as discussed in the next section of my
current report.

3.  **Mr. Parr fails to consider that AMF retained shares in Advanced Bionics and may
    receive future compensation related to this license.**

All of Mr. Parr's analyses related to the compensation received by AMF from its license with
Advanced Bionics rely on his own projections of Advanced Bionics' future sales of cochlear
implant products. However, Mr. Parr has not recognized that AMF still owns shares of
Advanced Bionic stock that may realize significant additional value in the future. As stated
in my Preliminary Report:

> *"I understand Advanced Bionics continues to pay royalties to AMF on sales of CIs and
> AMF retains an interest in Advanced Bionics that entitles it to other forms of potential
> future compensation."* [13]

Mr. Parr's calculations of the purported "effective rates" of the license increase the
denominator to reflect some estimate of potential future sales but do not increase the
numerator to reflect potential future royalties based on AMF's equity position in, and
resulting from its license with, Advanced Bionics. Given the nature of the medical devices
industry as one experiencing ongoing consolidation and frequent acquisition of smaller
companies by larger ones, there is a reasonable possibility that Advanced Bionics could be
acquired in the future, resulting in additional payments to AMF based on the equity it
received from its license with Advanced Bionics. Additionally, Mr. Parr's estimate of future
revenue to be received by Advanced Bionics under the license for the remaining legal life

---

[11] Parr Report, p. 11
[12] Parr Report, p. 11
[13] Preliminary Report, p. 26

5

*Attorneys' Eyes Only*

EXHIBIT L

 INTELLECTUAL CAPITAL EQUITY

using a straight-line method fails to consider or address any potential changes in economic conditions or the introduction of any new technology which may alter future demand for the licensed product.

In summary, Mr. Parr's purported calculation of the "effective rate" of the AMF-Advanced Bionics license over the life of the patents is speculative and unreliable. Again, the best evidence of the effective value of this license to AMF is no-longer contingent, actual amounts received to date.

4.  **Mr. Parr misrepresents the true range of his royalty rate calculations related to the AMF-Advanced Bionics license.**

Mr. Parr has determined a range of effective rates he has calculated using the 1999 and 2004 agreements between AMF and Advanced Bionics.  On pages 9 through 11 of his report he has calculated numerous effective royalty rates between 1.16% and 3.98% of revenues.  In addition to the problems with his calculations discussed above, the lower bound of his range is formulated by adding the initial book value of the one million shares granted in the 1999 license ($2.8 million) to the reduced 1.0% royalty found in the modified 2004 license.  This "mixing and matching" of terms from different licenses is essentially meaningless mathematics that may be misleading to the trier of fact.  Furthermore, the upper bound of Mr. Parr's range fails to include the additional 3.34% in compensation he has calculated due related to earn-out payments made by BSC to AMF.  When added to the effective royalty determined by Mr. Parr, this figure increases the upper end of his range to 7.32%.[14]  While I do not agree with Mr. Parr's interpretation of the license between AMF and Advanced Bionics, an application of his own rationale produces a range of royalties of 1.98% to 7.32% rather than the 1.16% to 3.98% he presents.

5.  **A discounted cash flow analysis of Mr. Parr's projected royalties implies an effective royalty of approximately 8.04%.**

Mr. Parr's alternative calculations incorporate projections of future cash flows he assumes will be received by AMF and Advanced Bionics.  Introduction of future estimated cash flows are often used in conjunction with so-called "discounted cash flow" methods of evaluating effective license rates.  One method uses a discount rate to estimate the present value of cash inflows over the course of the license and express the result as a percent of licensed sales for the same time period.  Using Mr. Parr's assumptions of future sales and a discount rate of 12%,[15] I have estimated that a discounted cash flow model at the time of the hypothetical negotiation would have implied an effective royalty for the AMF/Advanced Bionics license approximately 8.04%.[16]

This method requires use of the assumptions employed by Mr. Parr with respect to future returns on the license.  Therefore I do not believe it is an appropriate reflection of the expected value of the AMF/Advanced Bionics license agreement.  Nonetheless, Mr. Parr's own numbers and assumptions employed with a commonly used financial model indicate

---

[14] 3.98% + 3.34% = 7.32%
[15] This reflects the weighted average cost of capital for the Small Composite companies in SIC Code 3841.  See Ibbotson Associates Cost of Capital Yearbook.
[16] See Exhibit 8.1

6

*Attorneys' Eyes Only*

EXHIBIT L


INTELLECTUAL CAPITAL EQUITY

AMF and Advanced Bionics would reasonably have anticipated an effective royalty much larger than the range of rates shown by Mr. Parr's analysis.

**B. Mr. Parr does not acknowledge that Cochlear depends on technological parity with competitive devices to maintain its market share.**

Mr. Parr makes several comments evidently intended to downplay the importance of telemetry relative to other features or technologies of cochlear implants:

> *"Cochlear's success is likely derived from the many other inventions and features introduced by Cochlear at the same time they introduced the telemetry invention. Just some of the significant inventions commercialized by Cochlear during the 2000s include:*
> - *First behind-the-ear speech processor, ESPrit,*
> - *First water resistant speech processor,*
> - *First speech processor that uses Beam™ technology,*
> - *First implant with self-curling electrode array that hugs the inner wall of the cochlea"[17]*

> *"As previously discussed, it is important to note that the introduction of the telemetry invention was not the only new technology developed during the period 1995 through 2008."[18]*

At a minimum, Mr. Parr ignores the fact that at the time of a hypothetical negotiation, competitors for cochlear implant sales had achieved relative parity in basic device performance. If a competitor lost access to any of the critical technologies used by its competitors, it could anticipate losing significant sales and market share. The relevant inquiry then becomes not which features are most important to the device's basic functionality, but which features are capable of distinguishing the competitor's product in a commercially meaningful way. Mr. Parr has not attempted to analyze or even acknowledge the potential impact on Cochlear's sales, market share, or profits of being forced to sell a product without the use of the patented telemetry capabilities.

**C. Mr. Parr relies on uncritical application of a "typical" exclusivity adjustment factor without considering the other relevant facts and circumstances of unrelated licenses that may be compared to a hypothetical license in this case.**

In my preliminary report, I discussed the impact of exclusivity on a negotiated royalty rate. Based on empirical evidence and my experience, the royalty for a non-exclusive license may be estimated at approximately 60% of an *otherwise similar* exclusive license. Mr. Parr's ultimate conclusion appears to be based on a 2.0% running royalty rate from Cochlear's license with the Commonwealth of Australia and the University of Melbourne, adjusted by this "typical" 60% factor.[19] As stated in my Preliminary Report:

> *"In this case, however, consideration of the impact of non-exclusivity on a hypothetical negotiation is complicated by the existence of AMF's actual, exclusive license with Advanced Bionics. Thus, with respect to the impact of non-exclusivity on a hypothetical license in this*

---

[17] Parr Report, pp. 16 – 17
[18] Parr Report, p. 21
[19] The license actually called for running royalties ranging from 2.0% to 5.0% of sales. Mr. Parr admits that the effective royalty rate is higher than 2.0% of sales (see Parr Report, p. 14.)

7

*Attorneys' Eyes Only*

EXHIBIT L

 INTELLECTUAL CAPITAL EQUITY

*case, 'all else' is not 'equal.' At a minimum, AMF as the hypothetical licensor would anticipate that Advanced Bionics would demand some reduction in the compensation terms of its own license should AMF wish to convert it to a non-exclusive basis (as would be necessitated by the hypothetical negotiation in this case.) AMF's only means of recompense for such a reduction would be to seek a premium from Cochlear, over and above what might otherwise be considered a reasonable royalty for a non-exclusive license. Given the fact that AMF's exclusive license included terms (such as stock compensation) which effectively allied its economic interests with those of Advanced Bionics to a greater extent than would be the case with a simple running royalty, this premium would be expected to be material. As such, I would not expect a 'typical/all-else-equal' adjustment for non-exclusivity to be appropriate in this case." [20]*

In the case of Cochlear's license with the Commonwealth of Australia and the University of Melbourne, Mr. Parr also failed to consider other known factors that would require adjustment of the 2.0% running royalty or call into question its applicability to a hypothetical negotiation in this case. Among others, these include the fact that (a) the license was entered into in 1982, over fifteen years before a hypothetical negotiation in this case and nearly three years prior to FDA approval for sales of multiple channel CIs in the U.S., (b) the license was apparently predicated on an earlier agreement that gave Nucleus Limited (the original named licensee) an effective monopoly on the sale of CIs in Australia,[21] and (c) the financial implications of requirements imposed by later amendments that Cochlear spent material amounts of money on research and development and maintain the preponderance of its staff in Australia.

Furthermore, Mr. Parr has adopted this 60% factor for all of his royalty indicators, without consideration of the previously-existing exclusive license between AMF and Advanced Bionics. Mr. Parr essentially assumes that AMF (and Advanced Bionics) would be willing to reduce their existing royalty terms by some unspecified amount to Advanced Bionics to convert it to a non-exclusive license. Mr. Parr then also assumes that the full exclusivity adjustment should be applied to his purportedly "comparable" license in order to arrive at a "reasonable" royalty for Cochlear. Mr. Parr gives no evident consideration to whether the reduced hypothetical rate he proposes would be sufficient to compensate AMF for the assumed reduction in its royalties from Advanced Bionics. More importantly, he makes no consideration of the alterations in running royalties *or other forms of compensation* Advanced Bionics would likely require in order to relinquish exclusivity. Rather, Mr. Parr simply assumes that AMF "would not be overly concerned" about any required reduction in the Advanced Bionics royalty because it would gain royalties on Cochlear's "material" 70% U.S. market share. Of course, Mr. Parr also completely ignores the fact that in the "but for" world, Advanced Bionics' market share would likely have been higher absent Cochlear's infringement of the patents in suit. For these reasons and others as discussed in my previous report, a 60% adjustment for exclusivity would not be appropriate in this case and would likely not be considered by the parties in a hypothetical negotiation.[22]

---

[20] Preliminary Report, p. 34

[21] "[Nucleus Limited] in a separate Agreement with the Commonwealth dated 23 June 1981 has the right at its option to receive the exclusive right and authority and licence to manufacture use and sell [Implantable Hearing Prosthesis Systems] in respect of proprietary rights vesting in the Commonwealth"; COC-5002608. Whereas any patent effectively grants its holder a monopoly on status as potential *licensor*, it appears this agreement also granted Nucleus/Cochlear a monopoly on its status as potential *licensee*, a material condition not present in the hypothetical negotiation.

[22] Preliminary Report, p. 34

8

*Attorneys' Eyes Only*

EXHIBIT L


INTELLECTUAL CAPITAL EQUITY

**D. Mr. Parr has used an inappropriate profit margin, which impacts both his "Rule of Thumb" and analytical approach calculations.**

Under Georgia Pacific Factors 12 and 13, Mr. Parr conducts a series of analyses including application of a "rule of thumb" and three permutations of the analytical approach ("Cochlear profit Margin Comparison during Different Time Periods," "Cochlear Profit Margin Comparison with Industry Average" and "Product Profit Margin Comparison.") Each of these analyses requires an estimation of the profit margin of the accused products. For the "rule of thumb" analysis and his first two analytical approaches, Mr. Parr relies on Cochlear's company-wide EBIT margin during the period 2001 to 2005 as the measure of profit for the accused products. This is inappropriate for the following reasons:

- Mr. Parr relied on total company profits when more detailed, product level data were available.
- Mr. Parr relied on total company profits, even though his own analysis shows it understates the accused products' profitability.
- Mr. Parr "cherry picks" the time period he considers, which artificially lowers the profit margin.

The documents Mr. Parr relies on are worldwide, company-wide financial statements which include international sales and products other than the accused cochlear implants and speech processors. In fact, for comparable periods, the revenue of the accused products constitutes only 21% of the revenue Mr. Parr uses to calculate the profit margins he considers.[23] Mr. Parr's own analytical approach analyses indicate the profitability of the accused products is higher than that of non-accused products; consequently, using total company data in preference to more relevant product-level data understates the profitability of the accused products and resulting indicators of a reasonable royalty. In this case, Cochlear produced data necessary to calculate the gross profitability of the accused products, to which Mr. Parr could have applied the company-wide operating costs to more closely approximate relevant operating profits. In fact, the case cited by Mr. Parr, *TWM Mfg. Co., Inc. v. Dura Corp.*, described an analytical approach based on just such a methodology, in which product-level profit margins were calculated by subtracting an allocation of company overhead costs from product-specific gross margins.

In addition to improperly using company-wide operating margins, Mr. Parr artificially limits his time period to Cochlear's 2001-2005 fiscal years, even though the accused products were sold through fiscal year 2008. On Exhibit 2 to his report, Mr. Parr has calculated Cochlear's EBIT margin between 2001 and 2008 of 23.2%.[24] Mr. Parr's explanation for his use of this truncated time period is that he wished to exclude revenue and profit from sales of the Baha bone anchored hearing device, which was "acquired" in 2005. However, his methodology excludes nearly two-thirds of the accused revenue from his analyses.[25] If Mr. Parr had simply used the product-specific profit information available to him, he would not have needed to make any further adjustment to exclude the Baha. In my preliminary report, I conduct an analysis of the operating

---

[23] This calculation was limited to the time periods for which Cochlear, Ltd. produced sales data. See Exhibit 7.1
[24] Mr. Parr has also used a simple average of EBIT margins. Cochlear's weighted-average EBIT margin between 2001 and 2008 is even higher, 24.1%.
[25] Exhibit 7.3. This percentage is for Mr. Parr's longest calculated damages period; the percentage is proportionately higher for his second calculation and includes no data at all for the period included in his third calculation.

9

*Attorneys' Eyes Only*

EXHIBIT L



INTELLECTUAL CAPITAL EQUITY

profits of the accused products by applying the company-wide operating costs to the gross profits of the accused products for the damages period.

Mr. Parr's report discusses (but does not endorse) a methodology which he refers to as "the 25% Rule." This "rule" is one of a number of "rules of thumb" by which royalty rates can be roughly estimated. It posits that an appropriate royalty may be based on 25% to 33% of an infringer's profits. The relative strengths and weakness of the "rule" have been much debated in the licensing community, and there is no consensus on its appropriate application. For example, a book co-authored by Mr. Parr and Gordon Smith, *Valuation of Intellectual Property and Intangible Assets, Third Edition*, notes:

> *"Rules of thumb cannot be dismissed summarily, but their use must be viewed with caution, especially in such a potentially complex and important activity as intellectual property licensing."*[26]

It is my opinion that evidence more probative of a reasonable royalty than that derived through use of a "rule of thumb" is available in this case.

In my Preliminary Report, I employed a methodology known as the Analytical Approach, which compares the profits earned from sales of products embodying or using a patented technology versus products that do not. Mr. Parr has recalculated royalty rates based on what he proposes as a more appropriate measure of profits. Specifically, Mr. Parr contends that the profit margin *percentage* from a non-accused product should be simply subtracted from the profit margin *percentage* of the accused products. This methodology may be valid and acceptable in some cases. However, in this case it ignores the material price premium generated by Cochlear from sales of products which use the telemetry feature.

I have prepared an illustrative example of the effect of Mr. Parr's approach. In my example (see Table 3), the hypothetical patented product sells for $1,000 and generates profits of $500, a 50% profit margin. The hypothetical non-patented product sells for $100 and generates profits of $45, a 45% profit margin. Application of Mr. Parr's methodology suggests a reasonable royalty for the patented product would be only $50, even thought it generates over *nine times* that amount ($455) in premium profits as compared to the non-patented product.

---

[26] *Valuation of Intellectual Property and Intangible Assets, Third Edition*, Gordon Smith and Russell Parr, p. 366

*Attorneys' Eyes Only*

EXHIBIT L

INTELLECTUAL CAPITAL EQUITY

**Table 3**
**Hypothetical Analytical Approach Example**

|  | Hypothetical Patented Product | Hypothetical Non-Patented Product | Additional profit earned by Use of Patent |
|---|---|---|---|
| Price | $1,000 | $100 |  |
| Profit | $500 | $45 | $455 |
| Margin | 50% | 45% |  |

Additionally, although Mr. Parr states that the premium profits calculated in my Preliminary Report *"might* be attributed to many company characteristics" other than the patents, he undertakes no actual analysis to demonstrate that this is the case or provide any reasonable and reliable apportionment of these premiums between infringing and non-infringing features or properties.

**E. Mr. Parr's proposed royalty rate is lower than over 90% of licenses for medical devices he has identified in Appendix C to his report.**

In Appendix C to Mr. Parr's report, he has presented information purporting to summarize 101 license agreements for medical device technologies. The summary states the underlying data are contained in a book published by Mr. Parr, Royalty Rates for Technology, 4th Edition. While Mr. Parr enumerates the percentage of royalty rates compared to several benchmark percentages, he has not examined his data in the context of his own proposed royalty rate. Based on Mr. Parr's chart, only nine out of 101 licenses contained a royalty rate lower than the 1.2% proposed by Mr. Parr while the remaining 92 out of 101 licenses contained royalty rates higher than Mr. Parr's proposed 1.2%. Also notable is the fact that over half the licenses (52 out of 101) shown on Mr. Parr's chart were between 5.0% and 10.0%.

Mr. Parr has also pointed out that 19 of the 101 agreements had upfront payments ranging between $50,000 and $7.5 million. Inclusion of these payments would increase the royalty rates analyzed by Mr. Parr. While I have not received the data underlying his chart, nor the terms of any of the licenses, the data he has presented serve as a useful reasonableness test for an appropriate royalty rate in this case and fail to support his conclusions.

**F. The license agreement between The Regents of the University of California San Francisco and Pacesetter Infusion, Ltd. was unavailable to me at the time of my Preliminary Report, but does not change my determination of a reasonable royalty in this case.**

Mr. Parr has included in his analysis a license agreement which I understand was inadvertently omitted from documents available to me at the time of my previous report:

*"I have been provided with a license agreement regarding cochlear implant technology between The Regents of the University of California San Francisco and Pacesetter Infusion Ltd. dated December 30, 1988. The agreement granted Pacesetter with exclusive rights to use the licensed technology for commercialization of cochlear implant products. Pacesetter agreed to pay The Regents a license fee of $50,000 plus running royalties of 4.25% of net revenues for cochlear electrodes, and 0.75% of net revenue on implantable components for a*

11

*Attorneys' Eyes Only*

EXHIBIT L

 > *cochlear product and 1.75% of net revenues on all wearable auditory processors. The agreement ran for a period of ten years.*"[27]

The license agreement indicates Pacesetter Infusion Ltd. was doing business as MiniMed Technologies, and the license agreement was signed by a representative of MiniMed. As discussed in my previous report, MiniMed was a company previously owned in part by Mr. Mann. Since the issuance of my previous report, I have reviewed this license and note the following:

- The license was signed 10 years before a hypothetical negotiation in this case, at a time when multiple channel cochlear implants of the type at issue in this suit were in their commercial infancy.
- The licensor was a public research institution that neither competed with, nor was known to be commercially allied with any competitor of, the licensee.
- The licensee agreed to pay royalties on all Cochlear Products whether or not they were covered by the licensed patents.
- Mr. Parr has not calculated the effective rate of the license considering the upfront payment of $50,000.
- The license was non-exclusive with respect to at least two patents and therefore a 60% adjustment factor may not be appropriate.
- Implants as sold by Cochlear and Advanced Bionics would require some royalty higher than 0.75%, contrary to Mr. Parr's apparent assumption.
- The license is within the range of royalty indicators I considered in formulating my opinion.
- The license exceeds the royalty rate proposed by Mr. Parr.

It is my opinion that this license may have been considered by the parties during a hypothetical negotiation, but would not have altered the bargaining position of either party nor impacted the resulting royalty rate.

[27] Parr Report, pp. 12 – 13

**INTELLECTUAL CAPITAL EQUITY**

## IV.  DATA AND INFORMATION CONSIDERED IN FORMING THESE OPINIONS

Since the issuance of my Preliminary Report, I have considered the following additional documents:

- "Expert Damages Report of Russell L. Parr, CFA, ASA," dated 11 March 2009
- AMF029301 – AMF029330
- Deposition of Joseph H. Schulman, Ph.D., 2 December 2008
- "Valuation of Intellectual property and Intangible Assets, Third Edition," Gordon Smith and Russell Parr, 2000.
- Ibbotson's 1998 "Cost of Capital Yearbook"
- Ibbotson's 2001 "Cost of Capital Yearbook"
- Ibbotson's 2004 "Cost of Capital Yearbook"

## V.  EXHIBITS TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS

Exhibits currently used as a summary of my opinions are included in Appendix B to my Preliminary Report and Appendix A to this report.  These exhibits do not include copies of original source documents produced by the parties to this litigation or demonstrative exhibits that may be used at trial.  I may supplement or amend these exhibits to the extent additional documents, exhibits or other materials are produced.  Additional demonstrative exhibits may also be prepared.

## VI.  QUALIFICATIONS INCLUDING PUBLICATIONS AND TESTIMONY

My qualifications can be found in my Preliminary Report.  My professional publications within the past ten years and my previous testimony in litigation are included in Appendix C to my Preliminary Report.  I have not testified in deposition or at trial, nor had any publications since the issuance of my Preliminary Report.

## VII.  COMPENSATION PAID FOR SERVICES

Fees for Ocean Tomo personnel's time and expenses have been charged at applicable market rates on this case.  My billing rate for this matter is $495 per hour.  My payment is not contingent on the outcome of this case.

Respectfully,

*[signature: Cate Elsten]*

Cate Elsten

13

*Attorneys' Eyes Only*

EXHIBIT L

# Appendix A

EXHIBIT L

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**PORTION OF REVENUE IN MR. PARR'S CALCULATION THAT REFLECTS ACCUSED PRODUCTS**
Exhibit 7.1

|  | Dec. 2001 - FY2005 |
|---|---|
| Revenue from Sales of Accused Products (1) | $229,927,519 |
| Revenue in Mr. Parr's Profit Margin Calculation (2) | $1,086,650,000 |
| Ratio | 21.2% |

Sources:
(1) Preliminary Report, Exhibit 5.1
(2) Exhibit 7.2

*Attorneys' Eyes Only*

EXHIBIT L

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (f/K/A Cochlear Americas) and Cochlear Ltd.*
REVENUE FROM MR. PARR'S MARGIN CALCULATION FOR THE PERIOD DECEMBER 2001 THROUGH JUNE 2005
Exhibit 7.2

| | FY2001 | FY2002 | FY2003 | FY2004 | FY2005 | Total |
|---|---|---|---|---|---|---|
| Revenue (1) | $220,100,000 | $255,000,000 | $306,100,000 | $282,800,000 | $349,000,000 | $1,413,000,000 |
| Proration Factors (2) | - | 0.58 | 1.00 | 1.00 | 1.00 | N/A |
| Ratio | - | $148,750,000 | $306,100,000 | $282,800,000 | $349,000,000 | $1,086,650,000 |

**Notes:**
(1) See Parr Report, Exhibit 2
(2) Cochlear's Fiscal Year 2002 (July 2001 - June 2002) was prorated to the period December 2001 - June 2002, using the factor 7/12.

*Attorneys' Eyes Only*

317

EXHIBIT L

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**PORTION OF MR. PARR'S ROYALTY BASE EXCLUDED FROM HIS PROFIT MARGIN ANALYSIS**
Exhibit 7.3

|  | Total |
|---|---|
| FY2006 - FY2008 Revenue | $447,781,592 |
| Total Revenue | $677,709,110 |
| Ratio | 66.1% |

Source:
(1) Preliminary Report, Exhibit 5.1

*Attorneys' Eyes Only*

318

EXHIBIT L

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**DEMONSTRATION OF EFFECTIVE ROYALTY RATE**
Exhibit 8.1

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Parr's Advanced Bionics Sales(1) | $21,751,967 | $40,273,133 | $56,995,100 | $38,127,133 | $64,513,131 | $66,622,080 | $61,958,320 | $86,810,080 | $107,645,040 | $130,153,600 | $130,153,600 | $130,153,600 |
| Effective Royalty Rate(2) | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% |
| Effective Royalty | $1,748,725 | $3,237,713 | $4,582,057 | $3,065,188 | $5,186,461 | $5,356,007 | $4,981,070 | $6,978,999 | $8,654,002 | $10,463,553 | $10,463,553 | $10,463,553 |
| Discount Factors (3) | 0.9652 | 0.8803 | 0.7860 | 0.7018 | 0.6266 | 0.5595 | 0.4995 | 0.4460 | 0.3982 | 0.3556 | 0.3175 | 0.2834 |
| Net Present Value of Effective Royalty | $1,687,910 | $2,850,263 | $3,601,547 | $2,151,135 | $3,249,852 | $2,996,509 | $2,488,164 | $3,112,659 | $3,446,176 | $3,720,331 | $3,321,724 | $2,965,825 |

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Parr's Advanced Bionics Sales(1) | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $2,366,846,384 |
| Effective Royalty Rate(2) | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | 8.04% | NA |
| Effective Royalty | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $10,463,553 | $190,279,961 |
| Discount Factors (3) | 0.2531 | 0.2260 | 0.2017 | 0.1801 | 0.1608 | 0.1436 | 0.1282 | 0.1145 | 0.1022 | 0.0913 | 0.0815 | N/A |
| Net Present Value of Effective Royalty | $2,648,058 | $2,364,338 | $2,111,016 | $1,884,835 | $1,682,889 | $1,502,579 | $1,341,589 | $1,197,847 | $1,069,506 | $954,916 | $852,604 | $53,202,273 |

Sources:
(1) Parr Report, Exhibit 1
(2) The effective royalty rate was calculated to make the "Net Present Value of the Effective Royalty" equal the Net Present Value in Exhibit 8.2.
(3) Exhibit 8.3

*Attorneys' Eyes Only*

EXHIBIT L

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd*
NET PRESENT VALUE OF AMF'S ACTUAL AND EXPECTED ROYALTIES FROM THE ADVANCED BIONICS LICENSE, USING MR. PARR'S SALES PROJECTIONS
Exhibit 8.2

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Parr's Projected Sales (1) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $130,153,600 | $130,153,600 | $130,153,600 |
| Royalty Rate (2) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1.0% | 1.0% | 1.0% |
| Projected Running Royalty Payments | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $1,301,536 | $1,301,536 | $1,301,536 |
| Actual Running Royalty Payments (3) | $652,559 | $1,208,194 | $1,709,853 | $1,409,910 | $1,681,703 | $832,776 | $774,479 | $1,085,126 | $1,345,563 | N/A | N/A | N/A |
| Combined Running Royalty Payments | $652,559 | $1,208,194 | $1,709,853 | $1,409,910 | $1,681,703 | $832,776 | $774,479 | $1,085,126 | $1,345,563 | $1,301,536 | $1,301,536 | $1,301,536 |
| Cash Payout From Purchase (4) | - | - | - | - | - | $23,100,000 | - | $12,915,000 | $1,050,000 | $30,660,000 | $24,360,000 | - |
| Earn-Out Payments (5) | - | - | - | - | - | - | $10,164,231 | - | - | - | - | - |
| Total | $652,559 | $1,208,194 | $1,709,853 | $1,409,910 | $1,681,703 | $23,932,776 | $10,938,710 | $14,000,126 | $2,395,563 | $31,961,536 | $25,661,536 | $1,301,536 |
| Discount Factors (6) | 0.9652 | 0.8803 | 0.7860 | 0.7018 | 0.6266 | 0.5595 | 0.4995 | 0.4460 | 0.3982 | 0.3556 | 0.3175 | 0.2834 |
| Net Present Value | $629,865 | $1,063,612 | $1,343,963 | $989,468 | $1,053,760 | $13,389,599 | $5,464,150 | $6,244,108 | $953,955 | $11,363,969 | $8,146,424 | $368,912 |

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Parr's Projected Sales (1) | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $130,153,600 | $1,822,150,400 |
| Royalty Rate (2) | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Projected Running Royalty Payments | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $18,221,504 |
| Actual Running Royalty Payments (3) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $10,700,163 |
| Combined Running Royalty Payments | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $28,921,667 |
| Cash Payout From Purchase (4) | - | - | - | - | - | - | - | - | - | - | - | $23,100,000 |
| Earn-Out Payments (5) | - | - | - | - | - | - | - | - | - | - | - | $79,149,231 |
| Total | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $1,301,536 | $131,170,898 |
| Discount Factors (6) | 0.2531 | 0.2260 | 0.2017 | 0.1801 | 0.1608 | 0.1436 | 0.1282 | 0.1145 | 0.1022 | 0.0913 | 0.0815 | N/A |
| Net Present Value | $329,386 | $294,094 | $262,584 | $234,450 | $209,330 | $186,902 | $166,877 | $148,997 | $133,033 | $118,780 | $106,053 | $53,202,273 |

Sources:
(1) Parr Report, Exhibit 1
(2) AMF04259
(3) Preliminary Report Exhibit 4.5
(4) Preliminary Report Exhibit 4.3
(5) Preliminary Report Exhibit 4.4. The date of the "Payment from Trust" is unknown. I have assumed it occurred in 2007, although it is small enough that its timing would not significantly affect the calculation.
(6) Exhibit 8.3

*Attorneys' Eyes Only*

320

EXHIBIT L

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**CALCULATION OF DISCOUNT FACTORS TO 18 MAY 1999**
Exhibit 8.3

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Years Discounted | 0.31 | 1.12 | 2.12 | 3.12 | 4.12 | 5.12 | 6.12 | 7.12 | 8.12 | 9.12 | 10.12 | 11.12 |
| Discount Rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount Factors | 0.9652 | 0.8803 | 0.7860 | 0.7018 | 0.6266 | 0.5595 | 0.4995 | 0.4460 | 0.3982 | 0.3556 | 0.3175 | 0.2834 |

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Years Discounted | 12.12 | 13.12 | 14.12 | 15.12 | 16.12 | 17.12 | 18.12 | 19.12 | 20.12 | 21.12 | 22.12 |
| Discount Rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount Factors | 0.2531 | 0.2260 | 0.2017 | 0.1801 | 0.1608 | 0.1436 | 0.1282 | 0.1145 | 0.1022 | 0.0913 | 0.0815 |

**Source:**
Ibbotson Associates, Cost of Capital Yearbook

*Attorneys' Eyes Only*

EXHIBIT L

1

<u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that I caused the following documents:

4

**SURREBUTTAL REPORT OF CATE ELSTEN;**

5

6

to be served via Federal Express and e-mail to the below-named counsel:

7   Bruce G. Chapman

8   Keith Douglas Fraser
    Manual C. Nelson

9   John L. Paik

10  Connolly Bove Lodge & Hutz LLP
    333 S Grand Avenue, Suite 2300

11  Los Angeles, CA  90071

12

13  Attorneys for Defendants
    Cochlear Corporation and Cochlear LTD.

14

15  Dated this March 31, 2009

16  _____
    Melanie Butler

17

18

19

20

21

22

23

24

25

26

27

28

1

EXHIBIT L

EXHIBIT M

## MEMORANDUM

JHG

TO:       **Jeff Greiner**

FROM:     Al Mann

DATE:     **February 19, 1999**

We need to resolve the license from AEMF. It bothers me that we are now
retrading the agreed deal. Jeff, very early on (i.e. around 1993 or 1994) you and
I discussed what would be fair consideration to AEMF for the license. We
agreed on royalties of 3% on both the cochlear program and the Bion (i.e.
Microstim) plus the 1,000,000 shares. You made a point at that time that if we
paid such consideration, AEMF would continue to support ABC without further
royalties on any of those programs. We then agreed on that. There was no time
limit ever suggested.

Whether or not you believe that AEMF did the bulk of the work to develop the
Clarion and whether or not it was a perfect device is not the issue. The fact is
that AEMF owns eight patents that we are using and did devote a great deal of
effort to develop both products --- far more than you would have gotten from a
university. Moreover, AEMF has certainly continued to perform work on both
programs until this very day.

As an example of what is comparable, Johns Hopkins wanted 7% of Second
Sight plus a 5% royalty for a program with enormous risk, very little proprietary
help from them and one patent of limited scope. True, I countered with a 2%
royalty and about 3% of the company going to the doctors. That license hasn't
been finalized, and if they do accept those terms it will be because they want me
to establish an AMI at Hopkins with a $100 million endowment.

Our Gough patent from UCSD called for 4½% in royalties with no help from UC.
We have been negotiating to reduce the rate to 3½% and in return offered to
give back the short term exclusivity so that Gough can use the patented
technology. The royalty goes to the last to expire patent.

Our UCSF license on the cochlear was deftly negotiated to keep the royalty low,
and I think we effectively pay something like 2% to 2½% --- and we use very little
of what we got from UCSF.

Finally, just yesterday you were prepared to value InSonus at $5 million at the
very early stage of their development and with very little, if any, intellectual
property.

Defendants EXHIBIT 1085
WITNESS: Greiner
PAGE  1  OF  2
RENEE D. ZEPEZAUER  0275
323  DATE:  12·16·08

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT M
AB00340

# MEMORANDUM

Where is the fairness?  Surely the AEMF program is worth far more than any of the above,  The deal we negotiated was fair.  However, to resolve this I suggest the following compromise in royalties in addition to the 1 million shares.:

1. The cash royalty should be forgiven until the Clarion program revenues exceed $30 million, which is about when such a business could begin to be profitable.  Royalties would thus begin in 1999.

2. Royalty of 3% of net revenues for 1999, 2000, 2001, 2002.

3. Royalty of 2½% for 2003, 2004, 2005, 2006.

4. Royalty of 2% for 2007, 2008, 2009, 2010.

In the meantime, AEMF will continue to develop the battery Bion and will develop the ISP in collaboration with ABC.  Naturally both products will require considerable final engineering as well as input along the way.  I might add that without AEMF help the former product would not be possible and the latter product would at best be 1 - 2 years later.

Please understand that whatever we agree on must meet my standard of fairness and also that of the Attorney General.

If we do not agree I suggest that we retain someone skilled in licensing of medical devices and have them propose a resolution.

EXHIBIT M

CONFIDENTIAL - ATTORNEYS EYES ONLY

AB00341

# EXHIBIT N

## LICENSE AGREEMENT
Cochlear Implant Field

This License Agreement (this "Agreement") is made and effective on the 18th day of May 1999 between the Alfred E. Mann Foundation for Scientific Research ("AEMF") and Advanced Bionics Corporation ("BIONICS"), a Delaware corporation.

### RECITALS:

AEMF owns certain United States patents and has licenses under certain United States patents owned by others relating to medical devices commonly known as cochlear implants and has developed and/or has rights to certain technology, scientific knowledge, trade secrets, ideas and other information and data relating thereto. The parties now desire that AEMF grant BIONICS a worldwide license with respect to such patents and other rights and certain patents and other rights which may be obtained or developed in the future, all on the terms and conditions set forth herein.

### AGREEMENT

In consideration of the mutual representations, warranties and covenants set forth below, the parties to this Agreement agree as follows:

Section 1.      Grant of License.

1.1      Rights Granted. AEMF hereby grants to BIONICS a license to practice under and use the Primary Patents and the Secondary Patents and the Know-how insofar as they relate to the Cochlear Implant Field (as those terms are defined in Section 1.2, 1.3, 1.4 and 1.6, respectively) and to make, have made, use, lease, sell and otherwise commercially exploit Licensed Devices and Licensed Methods (as defined in Section 1.5). The rights licensed under this Agreement shall be exclusive and worldwide except (a) to the extent that AEMF's rights with respect to Primary Patents, Secondary Patents and Know-how depend upon licenses from others listed in Exhibit A attached to this Agreement (the "Master Licenses") which do not give AEMF such exclusive and/or worldwide rights and (b) to the extent that the United States has rights with respect to the technology subject to the Master Licenses. With respect to rights Licensed under this Agreement which are licensed to AEMF under the Master Licenses, this Agreement shall constitute a sublicense. So long as this Agreement remains in effect, AEMF will not license or otherwise authorize any other person or entity to exercise any of the rights licensed to BIONICS pursuant to this Agreement.

1.2      Definition of "Primary Patents. "Primary Patents" shall mean the patents owned by or licensed to AEMF listed in Exhibit A attached to this Agreement, and all re-issues thereof, all patents issued with respect to patent applications listed in such Exhibit A and all continuations, continuations in part, divisions and substitutions with respect thereto.

Defendant EXHIBIT 1087
WITNESS: Greiner
PAGE____I____OF____I7
RENEE D. ZEPEZAUER, 6275
DATE: _____12·16·08

CONFIDENTIAL - ATTORNEY EYES ONLY
AB00049

EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 2

     1.3    Definition of "Secondary Patents." "Secondary Patents" shall mean (i) any foreign patent applications and patents issued thereon corresponding to the Primary Patents and (ii) any United States or foreign patent applications and patents issued thereon, whether or not relating to or dependent upon the Primary Patents, hereafter applied for or issued upon inventions, discoveries, improvements, modifications, further inventions or designs invented or developed by AEMF or any Affiliate of AEMF or to which either of them has any rights under the Master Licenses relating to the Cochlear Implant Field.

     1.4    Definition of "Know-how". "Know-how" shall mean any technology, trade secrets, scientific knowledge, ideas, techniques, models, diagrams, production plans, test reports, experimental results, processes, formulae and/or other information owned by AEMF or any Affiliate of AEMF or to which either of them has any rights under the Master Licenses or otherwise now or at any time during the term of this Agreement relating to the Cochlear Implant Field.

     1.5    Definition of "Licensed Devices" and "Licensed Methods." "Licensed Devices" shall mean any device, equipment, machinery or other property, and "Licensed Method" shall mean any process or method, that meets both of the following limitations: (1) is used in or relates to the Cochlear Implant Field; and utilizes or incorporates the Primary Patents, the Secondary Patents or the Know-how, or is covered by any issued claim of the Primary Patents or Secondary Patents.

     1.6    Definition of "Cochlear Implant Field." "Cochlear Implant Field" shall mean and include that field of knowledge relating to medical devices, processes and methods involving or relating to a system involving stimulators commonly known as cochlear implants used for the purpose of restoring hearing, including without limitation the technology incorporated into or related to BIONICS 's medical devices known as the Clarion 1.0 and 1.2.

     1.7    Definition of "Affiliate." For purposes of this Agreement, an "Affiliate" of a person or entity is a person or entity controlling, controlled by or under common control with the person or entity specified, directly or indirectly by any means whatsoever, except that, in the case of AEMF, "Affiliate" shall be limited to entities in which AEMF itself has 50% or more of the equity interest, either directly or indirectly through other entities in which it has such an interest.

     1.8    Right to Sublicense. AEMF hereby grants to BIONICS the sole and exclusive worldwide right and license to grant sublicenses to Affiliates of BIONICS. BIONICS may not grant sublicenses to persons or entities who or which do not qualify as an Affiliate of BIONICS unless BIONICS first obtains the express written consent of AEMF, which consent will not be unreasonably withheld.

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00050

EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 3

## Section 2.    Compensation for License.

2.1    Royalties.  BIONICS  will pay to AEMF: (1) one million shares of BIONICS
stock out of a total of 21,572,026 shares outstanding; and (2) a royalty as set forth in the Royalty
Rate Table below of the Net Revenues received by BIONICS  and/or its Affiliates for the term of
this Agreement, as defined in Section 4,  from the sale, lease, sublicensing or other commercial
exploitation of any Licensed Devices or Licensed Methods or from the sublicensing,
infringement recoveries or other commercial exploitation of the Primary Patents, the Secondary
Patents and/or the Know-how.  Said Royalty amounts shall be payable not later than sixty (60)
days after the end of each calendar quarter with respect to Net Revenues upon which royalties are
payable are received by BIONICS.  In the event a Licensed Device or Licensed Method of
BIONICS under this Agreement also constitutes a Licensed Device or Licensed Method
(however named or denominated) under one or more other license agreements between AEMF
and BIONICS, entered into substantially concurrently with this Agreement or Net Revenues
received from sublicensing, infringement recoveries or other commercial exploitation of the
Primary Patents, Secondary Patents and/or Know-How would result in payment of royalties
under more than one such license agreement, then the royalty payable by BIONICS to AEMF for
such Licensed Device or Licensed Method or other commercial exploitation under each license
agreement shall be divided by a number equal to the number of such license agreements.

<div align="center">Royalty Rate Table</div>

| Royalty Rate | Duration |
|---|---|
| 3% | for the 1st, 2nd, 3rd  and 4th years of this Agreement; |
| 2½% | for the 5th, 6th and 7th, and 8th  years of this Agreement; |
| 2% | for the 9th, 10th, 11th and 12th  years of this Agreement; and thereafter until the end of the term of the Agreement. |

2.2    Definition of Net Revenues.  For purposes of this Agreement "Net Revenues" is
defined as all cash, securities or other property (tangible or intangible) received by BIONICS  or
its Affiliates (determined on a cash basis) after deduction of the following items.

        (a)    all amounts collected for sales, use, value-added and other similar taxes,
import or export duties or surcharges, and

        (b)    all amounts refunded, allowed, credited or discounted with respect to any
such receipts.

In addition, Net Revenue shall include all amounts received from sublicensing, infringement
recoveries (net of legal and other costs of such recoveries) or other commercial exportation of the
Primary Patents, the Secondary Patents and/or the Know-How (net of costs comparable to those
in (b) above) within the Cochlear Implant Field.

<div align="center">CONFIDENTIAL - ATTORNEY EYES ONLY</div>

<div align="right">AB00051
EXHIBIT N</div>

Cochlear Implant License Agreement
AEMF-BIONICS
Page 4

Although the Net Revenues shall be determined on a cash basis, the determination
of whether Revenues are received for the Royalty Period shall be made on an accrual basis in
accordance with generally-accepted accounting principles then being applied by BIONICS.

2.3    Manner of Payment.  All amounts payable by BIONICS to AEMF as royalties
pursuant to this Agreement shall be payable in United States funds collectable at par in the city or
county where the principal executive office of AEMF is located.  When Net Revenues are paid
in a currency other than United States dollars, the amount of royalties payable with respect
thereto will first be determined in the foreign currency of the country in which the Net Revenues
are paid and will then be converted into equivalent United States dollars. The exchange rate will
be that established by Bank of America National Trust and Savings Association in New York
City on the last day of the calendar quarter for which the related royalties are payable.  In the
event Bank Of America is not establishing any such exchange rate, there shall be substituted
therefor another widely-used exchange rate selected by BIONICS and reasonably satisfactory to
AEMF. In the event Net Revenues are paid in the form of securities or property other than cash
pursuant to Section 2.1, the amount thereof shall be equal to the Fair Market Value of such
securities or property as reasonably determined by BIONICS and reasonably satisfactory to
AEMF, but in no event less than the highest amount recorded by BIONICS for financial
reporting or federal income or foreign tax purposes. "Fair Market Value" is defined as the
amount of cash a willing buyer would pay a willing seller, neither being under any compulsion to
buy or sell and each having access to all relevant information regarding valuation.  If "Fair
Market Value" is disputed by the parties, it shall be decided by a mutually acceptable
independent appraiser at the expense of whichever party's "Fair Market Value" estimate proves
wrong, or in the event both parties estimates prove to be wrong, as a shared expense.

2.4    Reports.  On the date specified in Section 2.1 for the payment of royalties,
BIONICS shall deliver to AEMF a report setting forth in reasonable detail the amount Of Net
Revenues of BIONICS and/or its Affiliates from the sale, lease, sublicensing or other
commercial exploitation of any Licensed Devices or Licensed Methods or from sublicensing or
other commercial exploitation of the Primary Patents, Secondary Patents and/or Know-how for
the prior calendar quarter. AEMF shall have the right at all reasonable times and upon reasonable
notice to inspect and cause an audit of the books and records of BIONICS , its Affiliates and
sublicensees relating to the subject matter of such reports. Any such inspection or audit shall be
at AEMF's sole expense unless the results thereof indicate a failure to pay royalties exceeding
five percent (5%) of the amount due for any period (which may exceed or be less than one
calendar quarter), in which event BIONICS shall pay the cost of the audit. BIONICS shall
provide in all sublicenses with respect to rights licensed under this Agreement for a
corresponding report to be delivered to BIONICS in sufficient time for BIONICS to issue the
report contemplated by this Section 2.4 and for corresponding inspection and audit rights, but
BIONICS shall be responsible for its report, for the payment of the royalties provided for herein

AB00052
EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 5

and for such inspection and audit rights whether or not their sublicensee honors its obligations
with respect thereto.

**Section 3.    Development Efforts of AEMF.**  AEMF has performed and will continue
to perform the research and development efforts with respect to the Primary Patents, the
Secondary Patents, the Know-how and potential Licensed Devices and Licensed Methods.
Results of all such research and development efforts by AEMF shall be included within the
definitions of Primary Patents, Secondary Patents, Know-how, Licensed Devices and Licensed
Methods as those terms are defined in this Agreement to the extent those results relate to the
Cochlear Implant Field.

**Section 4.    Term.**  The term of this Agreement shall commence on the date the
Agreement is effective, as set forth in the first paragraph on page 1,  and shall continue for so
long as BIONICS makes, sells, leases, sublicenses or otherwise commercially exploits any
Licensed Devices or Licensed Methods or otherwise continues commercial exploitation of the
Primary Patents, the Secondary Patents and/or the Know-how, in the Cochlear Implant Field,
until the last to expire of the Primary Patents or Secondary Patents or until the Know-how
becomes public information.  For purposes of the royalty rates set forth in the Royalty Rate Table
in Section 2.1, the 1st year of the Agreement shall end on the one-year anniversary of the
Agreement, the 2nd year of the Agreement shall end on the second-year anniversary of the
Agreement, and so on, with the *n*th year of the Agreement ending on the *n*th-year anniversary of
the Agreement.

**Section 5."    Regulatory Matters**

5.1    Good Manufacturing Practices.   All Licensed Devices shall be manufactured and
tested by BIONICS  or its sublicensees or contractors in accordance with all applicable laws,
including without limitation, to the extent applicable, the Good Manufacturing Practice
regulations of the U.S. Food and Drug Administration (the "FDA") in effect at the time of such
manufacturing and/or testing.  BIONICS  shall notify AEMF of any inspection of the production
facilities used to manufacture Licensed Devices or perform Licensed Methods by the FDA or any
other governmental authority and shall furnish AEMF with copies of any Form 483 or similar
report to the extent that such report applies to any Licensed Device.

5.2    Records and Traceability.   BIONICS  shall, and shall cause all of its sublicensees
and contractors to, maintain complete and accurate traceability records for all Licensed Devices
and all critical components thereof and comparable records for all Licensed Methods, including
pertinent data, research reports, test results and know-how data, all in compliance with all FDA
and other U.S. or other applicable laws or regulations. BIONICS  will also maintain adequate
business and sales records regarding the sales and distribution of Licensed Devices and the use of
Licensed Methods, including pertinent data, research reports, test results and know-bow data, all

Cochlear Implant License Agreement
AEMF-BIONICS
Page 6

in compliance with all applicable FDA and other U.S. or other applicable laws or regulations
then in effect. AEMF and BIONICS each agree to afford to the other reasonable access to all
such records upon reasonable request.

5 3     Compliance with Law. BIONICS shall, and shall cause all of its sublicensees
and contractors to, comply with all laws and regulations of all jurisdictions applicable to the
manufacture, sale, handling and disposal of Licensed Devices and the use of Licensed Methods.

5.4     Marking. BIONICS will, and will cause all sublicensees and contractors to, apply
to all Licensed Devices proper patent notice in accordance with U.S. and foreign statutes relating
to the marking of patented articles.

Section 6.  General Indemnity. BIONICS will indemnify AEMF and its trustees,
officers and employees against, and hold them harmless from, any and all losses, costs, liabilities,
obligations and claims (including court costs and reasonable attorneys' fees) arising out of or
relating to the sale, use or delivery of Licensed Devices or the use of Licensed Methods. In the
event of any claim covered by the foregoing indemnity, BIONICS shall have the right to control
the defense thereof using legal counsel reasonably satisfactory to AEMF unless there exist
defenses, counterclaims or cross-complaints available to AEMF which are not available to
BIONICS or if such counsel would otherwise have a conflict of interest in representing both
AEMF and BIONICS , in which event AEMF shall have the right to be represented by its own
counsel reasonably satisfactory to BIONICS and at the cost or expense of BIONICS . AEMF
will not settle or compromise any claim subject to indemnification pursuant to this Section 6
without the prior written consent of BIONICS unless BIONICS has failed to undertake the
defense thereof in compliance with this Section 6 or has failed, upon request of AEMF, to
demonstrate that it has the financial resources to satisfy any judgment reasonably possible with
respect to said claim. If AEMF settles or compromises any such claim without the prior written
consent of BIONICS as permitted by the preceding sentence, BIONICS shall not be obligated to
indemnify AEMF with respect to the settlement or compromise to the extent it is demonstrated
by BIONICS that the amount of such settlement or compromise was unreasonable under the
circumstances.

Section 7.     Filing, Prosecution and Maintenance of Patents.

7.1     Responsibility of AEMF. Except as provided in subparagraph (b) below,

(a)     AEMF agrees to confer with BIONICS regarding the advisability or filing
of additional United States and/or foreign patent applications, the countries in which
foreign patent applications should be filed, and the taking of other legal steps to protect
the rights of AEMF and BIONICS in the Primary Patents, Secondary Patents, Know-how,
Licensed Devices and Licensed Methods. AEMF will file, prosecute and maintain

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00054
EXHIBIT N

domestic and foreign patent applications with respect to the Primary Patents, Secondary
Patents, Know-how, Licensed Devices and Licensed Methods and shall take such other
legal steps as AEMF shall reasonably determine to be necessary or appropriate to protect
the rights of AEMF and BIONICS in the Primary Patents, Secondary Patents, Know-how,
Licensed Devices and Licensed Methods. All such applications shall be prosecuted in the
name of AEMF and subject to its control, and BIONICS shall cooperate with AEMF in
filing, prosecuting and maintaining such applications and taking such other legal steps
and will execute and deliver any document and instruments in connection therewith
which AEMF may reasonably request.

(b)    Notwithstanding (a) above, the parties acknowledge that under the terms
of the Master Licenses certain rights and responsibilities with respect to prosecuting and
maintaining patents is afforded to other parties, and the rights and obligations of the
parties set forth in subparagraph (a) above shall not apply to that extent.

7.2    Rights and Responsibilities of BIONICS.

(a)    BIONICS agrees to reimburse the reasonable out-of-pocket patent costs of
AEMF for the prosecution and maintenance of all foreign patents that BIONICS agrees
are necessary and appropriate to protect its rights in the Primary Patents, Secondary
Patents, Know-how, Licensed Devices and Licensed Methods.  BIONICS may elect not
to pay the patent prosecution and maintenance costs associated with any foreign patent
application or foreign patent, in which case AEMF has the option to pay such costs, and
BIONICS shall forfeit its right to an exclusive license within the jurisdiction covered by
such foreign patent application or foreign patent.

(b)    In the event AEMF fails to file or prosecute any United States or foreign
patent application pursuant to Section 7.1(a) after delivery of written request by BIONICS
to do so and BIONICS considers such filing or prosecution to be necessary or appropriate
to protect the rights of BIONICS in the Primary Patents, Secondary Patents, Know-how
or any Licensed Devices or Licensed Methods, BIONICS shall have the right to file and
prosecute at its own expense any such patent application, and the filing and prosecution
of any such application and the resulting patents shall be under the sole control of
BIONICS but shall nevertheless be subject to the provisions of this License Agreement.
AEMF will cooperate with BIONICS in prosecuting any such patent to the same extent
BIONICS is required to cooperate with AEMF pursuant to Section 7.1(a).

Section 8.  Improvements.   AEMF will communicate to BIONICS immediately any
inventions, discoveries, improvements, modifications, designs or other know-how relating to the
Cochlear Implant Field which it or its Affiliates may discover, make or develop as a result of the
work referred to in Section 3, or which are discovered, made or developed by one of the parties

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00055

EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 8

to any of the Master Licenses or any consulting agreement related thereto and as to which AEMF has the right to sublicense BIONICS.. Subject to the provisions of the Master Licenses and any rights of the United States with respect to the technology subject to the Master Licenses, BIONICS shall have the sole and exclusive worldwide right and license to use, sell or lease any such invention, discovery, improvement, modification, design or other know-how and to sublicense others to do so for the remaining term of this Agreement and without any change in the royalty or other compensation payable under this Agreement.

Section 9.   Defense of Patents and Release.  Except as provided below with respect to the Master Licenses,  during the term of this Agreement, and for so long as the license rights granted to BIONICS under this Agreement remain exclusive, BIONICS is empowered:

(a)     To bring suit against a third party in its own name or, if required by law, jointly with AEMF, at BIONICS' own expense and on BIONICS' own behalf, for infringement of the Primary Patents and Secondary Patents, or for any other cause of action related to the Primary Patents, Secondary Patents, Know-how, Licensed Devices and Licensed Methods.

(b)     In any such suit, to enjoin infringement and to collect for its use, damages, profits, and awards of whatever nature recoverable for such infringement or other cause of action; and

(c)     To settle any claim or suit for infringement or other cause of action by granting the infringing party a sublicense under the provisions of Section 1.8 of this Agreement.

(d)     Should BIONICS elect not to bring suit against a third party when a suit could be brought, AEMF may bring suit in its own name or, if required by law, jointly with BIONICS, against the third party at AEMF's own expense and on AEMF's own behalf,  for infringement of the Primary Patents and Secondary Patents, or for any other cause of action related to the Primary Patents, Secondary Patents, Know-how, Licensed Devices and Licensed Methods, with full rights to collect for AEMF's use, damages, profits, and awards of whatever nature recoverable from such suit.

AEMF hereby releases and discharges BIONICS of all claims, causes of action, obligations, damages, losses, liabilities and demands of whatsoever character to the date of this Agreement arising out of or relating to any infringement of any Primary or Secondary Patent or the use or exploitation of Know-how by BIONICS, whether or not known to or suspected to exist by AEMF and whether or not contingent or liquidated.  AEMF hereby waives all of its rights with respect to the foregoing release under Section 1542 of the California Civil Code which reads in full as follows:

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00056
EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 9

"A General Release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Nothing in this Section 9 is intended to, or shall be deemed to, be an admission by BIONICS of any such infringement of any Primary Patent or Secondary Patent or use or exploitation of such Know-how.

Section 10. Secrecy and Non-Disclosure. AEMF and BIONICS each agree that during the term of this Agreement they will hold secret and confidential and will not disclose in any manner to any person or entity Confidential Information obtained from the other party, except such disclosure as may be necessary for either of them to perform its obligations or exercise its rights under this Agreement or under any Master License and except as may otherwise be required by law. BIONICS will impose requirements of secrecy and non-disclosure on all of its sublicensees comparable to the requirements of this Section 10. Nothing in this Section 10 shall be construed to apply to any information which has been published or is otherwise in the public domain at the time of the disclosure.

Section 11. Termination of Agreement.

11.1 Termination by AEMF. This Agreement may be terminated by AEMF upon delivery to BIONICS of written notice of its election to do so if:

(a) BIONICS defaults in the performance of any of its obligations under this Agreement and, within sixty (60) days after delivery of written notice from AEMF of such default, BIONICS fails to cure the same or, if such default does not involve the payment of money and cannot be cured within said sixty (60) day period, BIONICS fails to commence or to diligently proceed with the curing of such default; or

(b) Any material representation or warranty of BIONICS set forth in this Agreement shall prove to be false or misleading in any material respect; or

(c) BIONICS fails to expeditiously exploit the technology related to the Primary Patents, Secondary Patents, Know-how or Licensed Devices or Licensed Methods as evidenced by Net Revenues (as defined in Section 2.2) that fail to exceed Thirty Million Dollars ($30,000,000) for two consecutive years; or

(d) BIONICS makes a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts as they become due; or shall file a petition in bankruptcy or shall be adjudicated a bankrupt or insolvent or shall file a petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or

AB00057
EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 10

similar relief under any present or future statute, law or regulation; or shall file an answer
admitting or shall fail reasonably to contest the material allegations of a petition filed
against it in any such proceeding; or shall seek or consent to or acquiesce in the
appointment of any trustee, receiver or liquidator of it of any material part of its assets
(the term "acquiesce" includes but is not limited to the failure to file a petition or motion
to vacate or discharge any order, judgment or decree within thirty (30) days after its entry;
or within ninety (90) days after the commencement of any proceedings against BIONICS
seeking any reorganization, arrangement, composition, readjustment, liquidation,
dissolution or similar relief under any present or future statute, law or regulation, such
proceeding shall not have been dismissed; or within ninety (90) days after the
appointment, without the consent or acquiescence of BIONICS, of any trustee, receiver or
liquidator of BIONICS or of any material part of its assets, such appointment shall not
have been vacated.

    11.2    Termination by BIONICS.  This Agreement may be terminated by BIONICS upon
delivery of written notice of its election to do so to AEMF if:

            (a)    AEMF defaults in the performance of any of its obligations under this
    Agreement and, within four months after delivery of written notice of BIONICS of such
    default, AEMF fails to cure the same, or if such default does not involve the payment of
    money and cannot be cured within such four month period, AEMF fails to commence or
    to diligently proceed with the curing of such default; or

            (b)    Any material representation or warranty of AEMF set forth in this
    Agreement shall prove to be false or misleading in any material respect.

    11.3    Effect of Termination.  Upon the termination of this Agreement under this Section
11, BIONICS will immediately cease exercising all rights hereunder with respect to the Primary
Patents, Secondary Patents, Know-how and any Licensed Devices and Licensed Methods except
to the extent necessary to meet its outstanding contractual obligations to sell Licensed Devices
and to sell any Licensed Devices manufactured by BIONICS or its sublicensees or contractors or
in the process of being manufactured.  BIONICS will include in all sublicenses a provision
terminating each sublicense in the event of termination of this Agreement subject to the
foregoing exceptions.  Upon termination of this Agreement, BIONICS will assign to AEMF all
interest it may have in the Primary Patents, Secondary Patents, Know-how and any Licensed
Devices and Licensed Methods (other than Licensed Devices already manufactured or in the
process of being manufactured, which may be sold by BIONICS or its sublicensees or
contractors) and will execute upon request any documents and instruments which may be
reasonably requested to transfer all of its interest therein to AEMF, and shall further grant AEMF
access to any improvement patents that BIONICS has filed in its own name relative to the
Cochlear Implant Field for the limited purpose of enabling AEMF to pursue new licensing of the

Cochlear Implant License Agreement
AEMF-BIONICS
Page 11

Primary Patents, Secondary Patents, Know-how, Licensed Devices and Licensed Methods. Upon
such termination, BIONICS shall no longer have any obligation to perform any obligation of
AEMF under any Master License which was assumed hereunder and is to be performed after the
date of such termination.

Section 12. Assignment. Neither party will sell, assign, mortgage, hypothecate or
otherwise transfer any interest in this Agreement, voluntarily or involuntarily, by operation of
law or otherwise, or enter into any agreement as a result of which any other person or entity shall
have any interest in this Agreement (other than as contemplated by Section 18 with respect to
sublicenses) without the prior written consent of the other parry, which consent will not be
unreasonably withheld, except that;

(a)     BIONICS will have the right to assign or otherwise transfer its rights under
this Agreement to its successor in connection with any sale or transfer of its business or
assets relating to the Cochlear Implant Field substantially as a whole, whether by merger,
consolidation, sale of assets or otherwise,

(b)     AEMF likewise will have the right to assign or otherwise transfer its
rights under this Agreement to its successor in connection with any transfer of its assets
relating to the Cochlear Implant Field substantially as a whole, whether by merger,
consolidation, sale of assets or otherwise; and

Section 13. Representations and Warranties of AEMF. AEMF warrants to
BIONICS as follows:

(a)     AEMF is a duly-organized, validly-existing California non-profit public
benefit corporation and has full power and authority to enter into this Agreement and to
perform its obligations hereunder.

(b)     Neither the execution and delivery of this Agreement nor the transactions
contemplated hereby will constitute a default under or be in conflict with any contract,
agreement, indenture or other instrument to which AEMF is a party or to which it or any
of its property is subject.

(c)     To the best of AEMF's knowledge, the Primary Patents and Know-how in
existence on the date of this Agreement and the exercise by BIONICS of the rights
granted hereunder will not infringe any patents or other proprietary rights of any third
party with respect to the Cochlear Implant Field.

(d)     Neither AEMF nor any Affiliate of AEMF has at any time filed or caused
to be filed or obtained in its or their names, or caused to be obtained in the names of

Cochlear Implant License Agreement
AEMF-BIONICS
Page 12

others, any applications for patents in the United States or of any foreign country which is
in any way related to the Cochlear Implant Field, except for the Primary Patents.

(e)     AEMF has kept secret and confidential any Know-how in existence on the
date of this Agreement and has not revealed the same, to any person or entity other than
the employees of BIONICS, any patent counsel of AEMF or BIONICS, employees of the
U.S. Patent Office and/or the National Institutes of Health and parties to the Master
Licenses.

(f)     AEMF is not aware of any person or entity other than Medical Research
Group LLC, BIONICS, the parties to the Master Licenses and the National Institutes of
Health who claims any ownership of or rights in or to the Primary Patents or any
Know-how, nor is AEMF aware of any basis for any such claim.

(g)     AEMF has not sold, assigned or transferred to any person or entity any
interest in the Primary Patents or the Know-how or purported to do so except as provided
in the Master Licenses or in AEMF's contracts with the National Institutes of Health
and/or Medical Research Group, LLC.

(h)     AEMF is not, and to AEMF's knowledge no other party is, in default of
any material obligation under any of the Master Licenses.

Section 14     Representations and Warranties of BIONICS. BIONICS represents
and warrants to AEMF as follows:

(a)     BIONICS is a corporation duly organized, validly existing and in good
standing under the laws of the State of Delaware, is qualified to do business and is in
good standing in the State of California and has full corporate power and authority to
enter into this Agreement and to perform its obligations hereunder.

(b)     Neither the execution and delivery of this Agreement nor the transactions
contemplated hereby will constitute a default under or be in conflict with any contract,
agreement, indenture or other instrument to which BIONICS is a party or to which any of
its property is subject.

Section 15.  Force Majeure. In the event of war, strike, national emergency, labor
dispute, shortage of materials or power, fire, flood, earthquake, failure of transportation or any
order, direction, law or the equivalent of, any governmental authority, or any act of God or other
cause beyond the reasonable control of either party (the specific illustrations above being cited as
examples and not constituting limitations) which delays the performance of such party of its
obligations under this Agreement, time for performance of such obligations shall be extended for.

CONFIDENTIAL - ATTORNEY EYES ONLY
AB00060
EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 13

the period of the delay and no liability for any such delay shall accrue. The foregoing shall not,
however, excuse any failure or delay in the payment of money due under this Agreement.

Section 16. Waiver of Subrogation. Notwithstanding any other provision of this
Agreement, the parties each hereby waive any and all rights of recovery, claims and causes of
action against each other and their respective directors, trustees, officers and employees for any
loss or damage that may occur by any causes which are insured against under the terms of their
respective products liability insurance policies, regardless of the cause or origin, provided that
such waiver by the parties does not limit in any way their respective rights to recovery under such
insurance policies and is limited only to the extent of such actual recovery.

Section 17. Independence of the Parties. Nothing in this Agreement shall be construed
to render either of the parties to be the employee, partner, joint venturer, legal representative or
agent of the other party, nor shall either party have the right or authority to assume, create or
incur any liability or any obligation of any kind, express or implied, against or in the name of or
on behalf of the other party.

Section 18. Severability. In the event any provision of this Agreement or the
application thereof to any party or circumstances shall be invalid or unenforceable to any extent,
the remainder of this Agreement and the application of such provision to parties or circumstances
other than those to which it is held invalid or unenforceable shall not be affected thereby, and
each provision of this Agreement shall be valid and be enforced to the full extent permitted by
law.

Section 19.   Governing Law. This Agreement shall be construed and enforced in
accordance with the laws of the State of California applicable to contracts between residents of
said state to be performed solely in said state.

Section 20. Notices. All notices, elections, request, demands and other communications
called for or contemplated by this Agreement shall be in writing and shall be deemed to have
been duly given when received by telephone facsimile at the numbers set forth below for each
party or when received or sent by overnight courier to the addresses set forth for each party below
or when mailed by registered or certified mail. return receipt requested, postage prepaid, to:

Alfred E. Mann Foundation
for Scientific Research:

12744 San Fernando Road
Sylmar, California 91342
Attention: Vice President
Telephone Facsimile No.  (818) 364-2647

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00061
EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 14

Advanced BIONICS Corporation:

> 12740 San Fernando Road
> Sylmar, California 91342
> Attention: President
> Telephone Facsimile No. (813) 362-5069

Either party will have the right to change its address or facsimile number set forth above by delivering written notice of such change to the other party in the manner set forth above.

    **Section 21. Entire Agreement.** This Agreement contains the entire and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous understandings, discussions and negotiations of any kind. This Agreement may not be supplemented or amended except in a writing signed by both of the parties hereto, and no rights or obligations of any patty hereunder can be waived except in a writing signed by the party making the waiver.

    **Section 22. Counterparts.** This Agreement may be executed in two or more counterparts, both of which taken together, shall constitute a single original instrument.

    **Section 23.    Definitions.** The terms defined in this Agreement can be located as follows:

| Term | Section |
|------|---------|
| Affiliate | 1.7 |
| Confidential Information | 10. |
| Fair Market Value | 2.4 |
| FDA | 5.1 |
| Cochlear Implant Field | 1.6 |
| Know-how | 1.4 |
| Licensed Device | 1.5 |
| Licensed Methods | 1.5 |
| Master Licenses | 1.1 |
| Net Revenues | 2.2 |
| Primary Patents | 1.2 |
| Secondary Patents | 1.3 |

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00062

EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 15

ALFRED E. MANN FOUNDATION                    ADVANCED BIONICS  CORPORATION
FOR SCIENTIFIC RESEARCH

By *Joseph H. Schulman*                       By *Jeffrey H. Greiner*
Joseph H. Schulman, Ph.D., Vice President        Jeffrey H. Greiner, President

## EXHIBIT A

1.   Master Licenses:

     Gerald E. Loeb (Patent No. 5,571,148)

2.   Primary Patents

| Patent No. | Date Issued | Title |
|---|---|---|
| 5,776,172 | 07/07/98 | Multichannel Implantable Cochlear Stimulator |
| 5,609,616 | 03/11/97 | Physician's Testing System and Method for Testing Implantable Cochlear Stimulation |
| 5,603,726 | 02/18/97 | Multichannel Cochlear Implant System Including Wearable Speech Processor |
| 5,571,148 | 11/05/96 | Implantable Multichannel Stimulator |
| 5,569,307 | 10/29/96 | Implantable Cochlear Stimulator Having Backtelemetry Handshake Signal |
| 5,545,191 | 03/13/96 | Method for Optimally Positioning and Securing the External Unit of a Transcutaneous Transducer of the Skin of a Living Body |
| 5,531,774 | 07/02/96 | Multichannel Implantable Cochlear Stimulator Having Programmable, Bipolar, Monopolar or Multipolar Electrode Configurations |
| 5,522,865 | 06/04/96 | Voltage/Current control System for a Human Tissue Stimulator |
| 5,477,855 | 12/26/95 | Shield for Conductors of an Implantable Device |
| 5,443,493 | 08/22/95 | Cochlea Stimulating Electrode Assembly, Insertion Tool, Hold |
| 4,991,582 | 02/12/91 | Hermetically Sealed Ceramic and Metal Package for Electronic |

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00063

EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 16

| 4,990,845 | 02/05/91 | Floating Current Source |
| 4,931,795 | 06/05/90 | Digital to Analog Signal Converter |

CONFIDENTIAL - ATTORNEY EYES ONLY

AB00064

340

EXHIBIT N

Cochlear Implant License Agreement
AEMF-BIONICS
Page 17

Primary Patent Applications

| Filing Date | Serial No. | Title |
|---|---|---|
| 06/23/98 | 09/103,264 | Multichannel Implantable Cochlear Stimulator |
| 05/23/95 | 08/447,455 | Implantable Stimulator That Prevents DC Current Flow Without Coupling Capacitors |

3.  Secondary Patents

[To be Determined]

CONFIDENTIAL - ATTORNEY EYES ONLY         AB00065

EXHIBIT O



# FISH & NEAVE

JESSE J. JENNER
DIRECT DIAL  212.596.9019
DIRECT FAX  646.728.2581
E-MAIL  JJENNER@FISHNEAVE.COM

April 16, 2003

## VIA FACSIMILE (CONF. BY MAIL)

Joseph H. Schulman, Ph.D.
President, Alfred E. Mann Foundation
for Scientific Research
P.O. Box 905
Santa Clarita, CA 91380-9005

Dear Joe:

As you may know, Advanced Bionics Corporation ("Advanced Bionics") has
asked us to investigate the claim for royalties by the Alfred E. Mann Foundation for Scientific
Research ("the Foundation") under the May 18, 1999 license agreement in connection with
Advanced Bionic's new product, the Hi-Res 90k/CIII.  We understand that the Foundation
believes that Advanced Bionics is using certain "know how" (referenced in Sections 1.4 and 1.5
of the license agreement) which the Foundation believes requires that royalties must be paid
under the agreement to the Foundation.  Please identify the "know how" that the Foundation
believes that Advanced Bionics is using that calls for such royalty payments.  In order to
expedite our consideration of this matter, we would appreciate a response at your earliest
convenience.

Sincerely yours,

Jesse J. Jenner

JJJ:jsc

Defendants' EXHIBIT 1089
WITNESS: Greiner
PAGE  1  OF  1
RENEE D. ZEPEZAUER, 6275
DATE:  12·16·08

625 UNIVERSITY AVENUE, PALO ALTO, CA 94301  TEL 650.617.4000  FAX 650.617.4090
1251 AVENUE OF THE AMERICAS, NEW YORK, NY 10020  TEL 212.596.9000  FAX 212.596.9090
1825 I STREET, NW, SUITE 400, WASHINGTON DC 20006  TEL 202.857.6222  FAX 202.857.6287

CONFIDENTIAL - ATTORNEYS EYES ONLY                        AB00342

# EXHIBIT P

ALFRED E. MANN                          12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

     Plaintiff,

          vs.                          Case No.
                         CV-07-08108
                         GHK (CTx)
COCHLEAR CORPORATION and
COCHLEAR LTD.,,

     Defendants.

_____

CONFIDENTIAL - ATTORNEYS EYES ONLY

VIDEOTAPED DEPOSITION OF ALFRED E. MANN

Taken at the Law Offices of:
Sarnoff Court Reporters and Legal Technologies
2250 South Rancho Drive, Suite 195
Las Vegas, Nevada  89102

Wednesday, December 10, 2008

9:52 a.m.


Reported By:
Gale Salerno
RMR, CCR No. 542

Job No. 100329

EXHIBIT P

ALFRED E. MANN                          12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

     Plaintiff,

        vs.

COCHLEAR CORPORATION and
COCHLEAR LTD.,,

     Defendants.

Case No.
CV-07-08108
GHK (CTx)

_____

CONFIDENTIAL - ATTORNEYS EYES ONLY

VIDEOTAPED DEPOSITION OF ALFRED E. MANN

Taken at the Law Offices of:
Sarnoff Court Reporters and Legal Technologies
2250 South Rancho Drive, Suite 195
Las Vegas, Nevada  89102


Wednesday, December 10, 2008

9:52 a.m.


Reported By:
Gale Salerno
RMR, CCR No. 542

Job No. 100329

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT P

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 6

09:55  1    your individual capacity, and my understanding is

09:55  2    you're being presented as a witness for the

09:56  3    Foundation as well.

09:56  4        A.   I'm happy to do so.

09:56  5        Q.   Are you an officer or a director of the

09:56  6    foundation?

09:56  7        A.   No, I'm not.

09:56  8        Q.   When you said you're happy to testify as to

09:56  9    topics A through G of 16 --

09:56  10       A.   Let me qualify that.  I'm not happy to

09:56  11   testify, but I'm willing to testify.

09:56  12       Q.   The reason -- I'm not trying to play games

09:56  13   here.  The statute requires that it's either an

09:56  14   officer, director, or someone who consents to testify

09:56  15   on behalf of the corporation.  So that's the only

09:56  16   reason I'm using that language consent.

09:56  17       A.   I consent to testify.

09:56  18       Q.   Thank you.

09:56  19            Were you at one time chairman of the board

09:56  20   of the Alfred Mann Foundation?

09:56  21       A.   Yes, I was.

09:56  22       Q.   When did that end?

09:56  23       A.   I can't remember exactly.  It was two or

09:56  24   three years ago.

09:57  25       Q.   I would like to show you a -- to mark as

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

345                                    EXHIBIT P

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 7

| 09:57 | 1 | Exhibit 1083, please, this next document. |
| 09:57 | 2 | A.   It may have been just two years.  In fact, |
| 09:57 | 3 | maybe not even quite two years. |
| 09:57 | 4 | (Exhibit 1083 was marked for |
| 09:57 | 5 | identification.) |
| 09:57 | 6 | BY MR. CHAPMAN: |
| 09:57 | 7 | Q.   Exhibit 1083, I'll just make the |
| 09:57 | 8 | representation that it's a portion of the Alfred Mann |
| 09:57 | 9 | Foundation website that we printed out recently. |
| 09:57 | 10 | This document, based on your testimony, |
| 09:57 | 11 | appears to be out of date; is that correct? |
| 09:57 | 12 | A.   This is out of date. |
| 09:57 | 13 | Q.   Do you know if these other people that are |
| 09:57 | 14 | mentioned on Exhibit 1083 are still on the board of |
| 09:57 | 15 | the Alfred Mann Foundation? |
| 09:58 | 16 | A.   To the best of my knowledge, Mr. Kresa is. |
| 09:58 | 17 | Mr. Lebel is not.  Mr. Greenberg is now the chairman |
| 09:58 | 18 | of the board.  Brian Mann is on the board.  And I |
| 09:58 | 19 | believe -- I believe they have another member of the |
| 09:58 | 20 | board, but I don't remember his name. |
| 09:58 | 21 | Q.   I'm not going to try and take you through |
| 09:58 | 22 | your entire long and very successful career, so I'll |
| 09:58 | 23 | try and hit some of the highlights that are relevant |
| 09:58 | 24 | to this case. |
| 09:58 | 25 | Somewhere in the late 60s or early 70s you |

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 10

```
10:01  1    created.
10:01  2            So I can't give you an exact amount of the
10:01  3    money, but those amounted over the years -- I don't
10:01  4    know how much, but probably the better part of
10:01  5    $200 million.
10:01  6       Q.   We'll probably get to some of those later
10:01  7    on.
10:01  8       A.   I can't give you any details beyond that
10:01  9    because I don't recall the numbers.
10:01 10       Q.   That's okay.  Did anyone else endow the
10:01 11    Foundation at the time it was established?
10:01 12       A.   There were a number of minor gifts from
10:01 13    time to time by people, but most of the endowment was
10:02 14    really from me.
10:02 15       Q.   When AMF was originally founded, what was
10:02 16    the mission of the foundation?
10:02 17       A.   To create medical devices for the benefit
10:02 18    of humanity.
10:02 19       Q.   Has that mission changed at all while you
10:02 20    were chairman of the foundation?
10:02 21       A.   I hope not.
10:02 22       Q.   Were you the chairman from 1985 until the
10:02 23    time that you stopped being chairman two or three
10:02 24    years ago?
10:02 25       A.   Yes.
```

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 23

10:23   1   a couple of them, MRPA.  And they were developing the

10:23   2   pump separately, as a separate entity.  And it was to

10:23   3   be marketed by Advanced Bionics along with the

10:23   4   neuro-stimulator.

10:23   5          In, I think beginning of 2004, the board of

10:23   6   directors of Bionics decided to acquire the pump

10:23   7   business.  And that was completed not long before the

10:23   8   acquisition of Bionics by Boston Scientific.

10:23   9       Q.   When was Bionics acquired by Boston

10:24  10   Scientific?

10:24  11       A.   I believe it closed in -- it may not be

10:24  12   right, but I think it was either in May or June of

10:24  13   2004.

10:24  14       Q.   Prior to that closing, who owned Advanced

10:24  15   Bionics?

10:24  16       A.   I owned roughly half of it.

10:24  17       Q.   Who owned the other half?

10:24  18       A.   Various people.  Some of the employees

10:24  19   and -- oh, we had given -- I had given a million

10:24  20   shares, arranged for a million shares to go to the

10:24  21   Foundation.  Actually, with a pump it became

10:24  22   2.1 million shares actually that went to the

10:24  23   foundation.

10:24  24       Q.   I'm stepping back in time to MiniMed

10:24  25   Technologies.  Did you ever consider simply selling

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 26

10:28  1    return for this technology?  And they said they would

10:28  2    take over the responsibility for the six patients we

10:28  3    had implanted.

10:28  4           And so went back and forth a couple of

10:28  5    times, several times.  And it became clear that all

10:29  6    they intended to do was take care of the six patients

10:29  7    and not pay anything else.

10:29  8           And I believe that all together, I thought

10:29  9    it was less, but I remember that we did an evaluation

10:29  10   at one point.  We had spent something like 11 million

10:29  11   dollars developing it.  And those were in 1990

10:29  12   dollars.  So that was a fair amount of money.

10:29  13          And they offered nothing for that.  And so

10:29  14   I at one point said thank you, but no thank you, and

10:29  15   got up and walked out.

10:29  16          And as we exited the offices, Mr. Sandler

10:29  17   looked at me and said I can see by the look in your

10:29  18   face we're now in the cochlear implant business.  And

10:29  19   it was at that point I decided to create Advanced

10:29  20   Bionics.

10:29  21      Q.   Before or after Cochlear, did you talk to

10:29  22   any other companies before you set up Advanced

10:29  23   Bionics?

10:29  24      A.   I actually did.  We had a conversation with

10:30  25   3M.  They had an early stage nerve root, a cochlear

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 28

| | | |
|---|---|---|
| 10:31 | 1 | the foundation for where -- |
| 10:31 | 2 | A.    Basically, what happened -- it is really |
| 10:31 | 3 | irrelevant, but I can tell you what occurred.  They |
| 10:31 | 4 | came to see me, I believe it was in February of, or |
| 10:31 | 5 | maybe even late January of 2004.  And they said they |
| 10:32 | 6 | wanted to acquire Advanced Bionics. |
| 10:32 | 7 | And I basically said it was too early.  We |
| 10:32 | 8 | had only one of the four product platforms with |
| 10:32 | 9 | commercial products, and that was just a cochlear |
| 10:32 | 10 | implant.  Our revenue was very small. |
| 10:32 | 11 | They insisted they wanted it, and they said |
| 10:32 | 12 | they would give me a deal I couldn't refuse.  And |
| 10:32 | 13 | they did. |
| 10:32 | 14 | And it worked very well for the first year |
| 10:32 | 15 | and a half roughly, but it was a crazy deal.  It made |
| 10:32 | 16 | no sense for them. |
| 10:32 | 17 | But they were criticized for it.  But then |
| 10:32 | 18 | in -- let's see, 2005, I guess, they ultimately ended |
| 10:32 | 19 | up buying Guidant, which was a large cardiac rhythm |
| 10:33 | 20 | management pacemaker and defibrillator company.  Also |
| 10:33 | 21 | paid much too much for that company, and they were |
| 10:33 | 22 | under a lot of pressure.  Wall Street was very |
| 10:33 | 23 | unhappy with them. |
| 10:33 | 24 | And they ended up saying that they couldn't |
| 10:33 | 25 | afford the deal they did with us.  And they tried to |

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 29

10:33   1    change it.  But I said, you know, you can't.  It's

10:33   2    cast in an agreement, you can't breech the agreement.

10:33   3    I wouldn't agree to it unless 90 percent of the

10:33   4    minority shareholders, or earn-out holders really at

10:33   5    that point, because we did an earn-out deal.  Unless

10:33   6    they would agree, and why would they agree to

10:33   7    something that wasn't what they already had.  It had

10:33   8    to be at least as good.

10:33   9            And so they backed off.  And then finally

10:33  10    they came to me, I guess it was in 2006, in the

10:34  11    spring of 2006, and said that they had to make the

10:34  12    change, and if I wouldn't agree to it, they were

10:34  13    going to do it anyway unilaterally.

10:34  14            And that led to a dispute, and we finally

10:34  15    resolved it by dividing the company.  They took the

10:34  16    neuro-stimulation business, which they wanted, and we

10:34  17    got back the cochlear implant and the infusion pump

10:34  18    business.  And they paid us what was the net excess

10:34  19    value over those companies that would have been due

10:34  20    under the earn-out arrangement.

10:34  21       Q.   That's -- now we're getting to the relevant

10:34  22    part that I wanted to ask about.

10:34  23            As part of that transfer back of the

10:34  24    cochlear implant business, was there an entity called

10:34  25    Advanced Bionics, LLC that was set up?

ALFRED E. MANN                              12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 31

| | | |
|---|---|---|
| 10:37 | 1 | Scientific and Advanced Bionics, LLC that allocates |
| 10:37 | 2 | intellectual property rights? |
| 10:37 | 3 | A.   Yes. |
| 10:37 | 4 | Q.   Do you know if the license between AMF and |
| 10:37 | 5 | Advanced Bionics Corporation is included in that |
| 10:37 | 6 | agreement that allocates the rights between Boston |
| 10:37 | 7 | Scientific and Advanced Bionics? |
| 10:37 | 8 | A.   All of the intellectual property that was |
| 10:37 | 9 | owned by Advanced Bionics Corporation before the |
| 10:37 | 10 | acquisition and during the stay in Boston Scientific, |
| 10:37 | 11 | all of that technology, regardless of where it was |
| 10:37 | 12 | used, is transferred to the new LLC to the extent |
| 10:37 | 13 | that it related primarily to the cochlear implant, |
| 10:38 | 14 | and to the extent that it applied to any other |
| 10:38 | 15 | product was transferred to Advanced Bionics, but for |
| 10:38 | 16 | use only in cochlear implants. |
| 10:38 | 17 | Q.   I've seen mention somewhere of a company |
| 10:38 | 18 | called Boston Scientific Neuro-Modulation |
| 10:38 | 19 | Corporation. |
| 10:38 | 20 | A.   That's what they call it now, because we |
| 10:38 | 21 | got the name Advanced Bionics back as well. |
| 10:38 | 22 | Q.   So that was the successor to the original |
| 10:38 | 23 | Advanced Bionics Corporation? |
| 10:38 | 24 | A.   Yes.  I believe so.  I can't tell you |
| 10:38 | 25 | exactly what the legal structure and the conversions |

ALFRED E. MANN                          12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 32

10:38  1    and transfers were.  But in effect, Boston Scientific

10:38  2    Neuro-Modulation is a successor to all of the

10:38  3    business of all the old Advanced Bionics relating to

10:38  4    neuro-stimulation with the SES and with certain

10:39  5    applications of what we call a BION.

10:39  6        Q.    But to the extent it related to cochlear

10:39  7    implants, all of the intellectual property went to

10:39  8    the Advanced Bionics, LLC?

10:39  9        A.    Correct.

10:39  10       Q.    Then if I understood correctly, there's a

10:39  11   holding corporation that owns Advanced Bionics, LLC?

10:39  12       A.    Yes.  It owns most of Advanced Bionics.  Of

10:39  13   the existing equity, not including employee options,

10:39  14   12 percent of that originally was retained by Boston.

10:39  15   That has since been diluted to I think 9.4 percent,

10:39  16   if I remember correctly.

10:39  17            And for some reason, the lawyers wanted me,

10:40  18   part of my interest in the holding company to be in

10:40  19   the LLC just for the organization of it.  So I own

10:40  20   some of LLC.  I don't know what the percentage is.

10:40  21   Most of my holdings are still in the holding company.

10:40  22       Q.    It's complicated and not particularly

10:40  23   relevant, so I won't dwell on it.

10:40  24            How much -- is it possible to say how much

10:40  25   Boston Scientific paid for Advanced Bionics?

ALFRED E. MANN                     12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 33

| | | |
|---|---|---|
| 10:40 | 1 | A.    Well, they paid about two and a half |
| 10:40 | 2 | billion plus about 200 million of further investment |
| 10:40 | 3 | in our products.  So about two and three quarter |
| 10:40 | 4 | billion they paid. |
| 10:40 | 5 | MR. BODINE:  At this point, I think we |
| 10:40 | 6 | should mark the entire transcript as attorneys eyes |
| 10:40 | 7 | only to the extent that it contains any confidential |
| 10:40 | 8 | information that will be protected under the |
| 10:40 | 9 | protective order, and then we will designate the |
| 10:40 | 10 | testimony as appropriate. |
| 10:41 | 11 | BY MR. CHAPMAN: |
| 10:41 | 12 | Q.    Does AMF own any part of Advanced Bionics, |
| 10:41 | 13 | LLC? |
| 10:41 | 14 | A.    Yes. |
| 10:41 | 15 | Q.    Do you know how much they own of Advanced |
| 10:41 | 16 | Bionics, LLC? |
| 10:41 | 17 | A.    I'm not sure.  There may be a small amount |
| 10:41 | 18 | additionally.  But mainly they had 2.1 million shares |
| 10:41 | 19 | of Advanced Bionics, which we arranged to give them |
| 10:41 | 20 | based on certain transactions and gifts from me. |
| 10:41 | 21 | So they have at least 2-point -- well, I |
| 10:41 | 22 | believe they stated in the earn-out, because they |
| 10:41 | 23 | could have opted out of that.  So I believe they |
| 10:41 | 24 | continued to own the rights associated with |
| 10:42 | 25 | 2.1 million shares. |

ALFRED E. MANN                    12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 34

10:42  1        Q.   So in 2004, AMF would have sold its shares

10:42  2   to Boston Scientific, but retained earn-out rights?

10:42  3        A.   There were earn-out rights.  They got --

10:42  4   the deal that was concluded gave people the choice of

10:42  5   taking $11 plus earn-out rights that were -- that

10:42  6   I'll describe or $21 to be bought out completely.

10:42  7   And the agreement required that 25 percent of the

10:42  8   people accept the $21.

10:42  9        And the earn-out rights amounted to -- for

10:42 10   two different products that were either the cochlear

10:42 11   implant and the stimulator, the spinal cord

10:43 12   stimulator, that was close to being marketed for six

10:43 13   years.

10:43 14        We got three times the incremental increase

10:43 15   in revenues.  And for the other two products, three

10:43 16   years later it started, and went for three more

10:43 17   years.  So it was about nine years of earn-out rights

10:43 18   beginning in the second year after we sold it,

10:43 19   beginning in 2005.

10:43 20        And then in addition, there were a bunch

10:43 21   of hundred million dollar bonuses for reaching

10:43 22   certain sales milestones and some smaller milestones

10:43 23   that paid lesser amounts.  So the whole transaction

10:43 24   was really incredibly large.

10:43 25        Q.   Large, yes.

ALFRED E. MANN                          12/10/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 35

10:44  1        When Advanced Bionics, LLC was set up, did

10:44  2   the ownership of Advanced Bionics, LLC go back to

10:44  3   their earn-out right holders?

10:44  4        A.   The earn-out right holders were given the

10:44  5   option of -- let's see, how is it done?  They got

10:44  6   whatever the money was that was being paid by Boston,

10:44  7   which amounted to $1,150,000,000.  And they had the

10:44  8   option of investing up to their share or pro rata,

10:44  9   whatever was remaining from others, of 150 million of

10:44  10  that.

10:44  11       So they could take either their share of a

10:44  12  billion dollars or the share of 1,150,000,000.  And

10:45  13  if they took the smaller amount, they got an interest

10:45  14  in the LLC of the cochlear implant business and also

10:45  15  the pump business.

10:45  16       Q.   Did AMF exercise that option to take an

10:45  17  interest in --

10:45  18       A.   It's my understanding, but I don't know

10:45  19  this, I just believe -- I shouldn't really say.  I

10:45  20  should say I don't know.  But I believe they actually

10:45  21  stayed in with the earn-out or with the investment.

10:45  22  But that is -- I have no factual knowledge of that.

10:46  23       Q.   I'm going to try to speed this along, so

10:46  24  I'm going to think rather than talk for a minute.

10:46  25       A.   Okay.

Case 2:07-cv-08108-FMO-SH   Document 319-4   Filed 11/26/13   Page 64 of 217   Page ID
#:11095

Page 40

```
 1
 2
 3
 4
 5
 6
 7
 8           I, ALFRED E. MANN, do hereby declare under
 9    penalty of perjury that I have read the foregoing
10    transcript; that I have made any corrections as
11    appear noted in ink, initialed by me, or attached
12    hereto; that my testimony as contained herein is true
13    and correct.
14           EXECUTED this ____ day of _____,
15    20___, at _____, _____.
                        (City)              (State)
16
17
18                         _____
                           ALFRED E. MANN
19
20
21
22
23
24
25
```

EXHIBIT Q

JEFFREY GREINER                          12/16/08
ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

      Plaintiff,

      vs.

COCHLEAR CORPORATION and
COCHLEAR LTD.,

      Defendants.
_____

AND RELATED CROSS-ACTION.
_____

Case No.
CV 07-08108 GHK (CTx)


ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JEFFREY GREINER

Santa Clarita, California

Tuesday, December 16, 2008


Reported by:
RENEE D. ZEPEZAUER, CRR
CSR No. 6275
JOB No. 100679

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

358                                          EXHIBIT Q

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

Page 2

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3   ALFRED E. MANN FOUNDATION FOR
    SCIENTIFIC RESEARCH,
4
              Plaintiff,
5                                      Case No.
         vs.                           CV 07-08108 GHK (CTx)
6
    COCHLEAR CORPORATION and
7   COCHLEAR LTD.,

8             Defendants.
    _____
9
    AND RELATED CROSS-ACTION.
10  _____

11

12

13

14            Videotaped Deposition of JEFFREY

15       GREINER, taken on behalf of Defendants,

16       at 25129 Rye Canyon Loop, Suite 200,

17       Santa Clarita, California, beginning at

18       11:09 a.m. and ending at 12:17 p.m.,

19       Tuesday, December 16, 2008, before RENEE

20       D. ZEPEZAUER, Certified Shorthand

21       Reporter No. 6275.

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
                  877.955.3855

JEFFREY GREINER                          12/16/08
ATTORNEYS' EYES ONLY

                                              Page 11

11:14:15   1    entity that -- that held us, I'm not entirely sure of

           2    that to be honest with you.

           3        Q    Okay.  It's not that important so I'll move on.

           4    Has Advanced Bionics -- did -- well, strike that.

11:14:40   5             It's a little confusing because the corporation

           6    and the LLC.

           7        A    Uh-huh.

           8        Q    Did -- has Advanced Bionics Corporation entered

           9    into any patent licenses with any parties other than the

11:14:54  10    Alfred E. Mann Foundation for Scientific Research or

          11    Boston Scientific or an affiliate of Boston Scientific?

          12        A    Yes.

          13        Q    What entity?

          14        A    I believe we entered into a license agreement

11:15:08  15    with the University of California at San Francisco.  And

          16    we may very well have entered into a license agreement

          17    with -- some kind of license agreement with Med El

          18    Corporation.

          19        Q    Was the -- the license agreement with Med El

11:15:42  20    royalty bearing in either direction?

          21        A    It was not.

          22        Q    When -- when did -- strike that.

          23             Did -- after its formation, did Advanced

          24    Bionics Corporation become profitable at a certain point

11:16:01  25    in time?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT Q

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

Page 12

| | | | |
|---|---|---|---|
| 11:16:02 | 1 | A | No, it did not. |
| | 2 | Q | Advanced Bionics Corporation was purchased by |
| | 3 | Boston Scientific in 2004; correct? | |
| | 4 | A | That's correct. |
| 11:16:16 | 5 | Q | And as of the time of that purchase Advanced |
| | 6 | Bionics Corporation was not profitable? | |
| | 7 | A | That's correct. |
| | 8 | Q | These exhibits start with 1085, and if I could |
| | 9 | mark this next document Exhibit 1085. | |
| 11:16:57 | 10 | THE VIDEOGRAPHER:  Off video at 11:18. | |
| | 11 | (Recess.) | |
| | 12 | THE VIDEOGRAPHER:  Back on video 11:19 a.m. | |
| | 13 | MR. CHAPMAN:  For the record Exhibit 1085 is | |
| | 14 | marked with the numbers AB00340 through 341. | |
| 11:18:04 | 15 | (Defendants' Exhibit 1085 was marked.) | |
| | 16 | BY MR. CHAPMAN: | |
| | 17 | Q | Mr. Greiner, have you seen Exhibit 1085 before? |
| | 18 | A | I'm sure I did. |
| | 19 | Q | At -- in Exhibit 1085 is a memo to you from Al |
| 11:18:22 | 20 | Mann dated February 19, 1999; correct? | |
| | 21 | A | That's what it appears to be, yes. |
| | 22 | Q | Do you recall the subject matter of Exhibit |
| | 23 | 1085? | |
| | 24 | A | I'm just reviewing it right now.  Thank you.  I |
| 11:19:12 | 25 | do recall the subject matter. | |

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

Page 14

| | | |
|---|---|---|
| 11:20:40 | 1 | Q    Did -- did -- were you addressing -- strike |
| | 2 | that. |
| | 3 | Was this memo, Exhibit 1085, sent to you as |
| | 4 | part of your responsibilities as -- at Advanced Bionics |
| 11:21:00 | 5 | Corporation? |
| | 6 | MR. MALYNN:  Objection to the form of the |
| | 7 | question.  You may answer. |
| | 8 | MR. BODINE:  Objection.  Lacks foundation. |
| | 9 | THE WITNESS:  I'm not sure I understand the |
| 11:21:09 | 10 | question. |
| | 11 | BY MR. CHAPMAN: |
| | 12 | Q    Okay.  What was your position at Advanced |
| | 13 | Bionics Corporation after it was formed? |
| | 14 | A    I was the day-to-day leader of the company from |
| 11:21:19 | 15 | the day it was formed until now.  The day-to-day |
| | 16 | operation leader. |
| | 17 | Q    And was Exhibit 1085 something that you |
| | 18 | considered as part of your responsibilities as the |
| | 19 | day-to-day leader of Advanced Bionics Corporation? |
| 11:21:41 | 20 | MR. MALYNN:  Objection to the form of the |
| | 21 | question.  Go ahead. |
| | 22 | THE WITNESS:  The subject matter that is being |
| | 23 | put forth by Al is certainly part of my day-to-day |
| | 24 | responsibilities. |
| 11:21:51 | 25 | BY MR. CHAPMAN: |

JEFFREY GREINER                      12/16/08
ATTORNEYS' EYES ONLY

Page 15

11:21:51   1        Q    Were you responsible for negotiating license

           2   with the Alfred E. Mann Foundation?

           3        A    Yes.

           4        Q    And were you responsible as part of that for

11:22:02   5   negotiating the royalty rate of that license?

           6        A    Yes.

           7        Q    And also were you responsible for negotiating

           8   any stock transaction as part of that license?

           9        A    Yes.

11:22:20  10        Q    I'd like to mark this next document Exhibit

          11   1086, please.

          12             (Defendants' Exhibit 1086 was marked.)

          13   BY MR. CHAPMAN:

          14        Q    Exhibit 1086 is AB001 through 16.  Should be

11:22:54  15   the top document in the stack.

          16             Do you recognize Exhibit 1086, Mr. Greiner?

          17        A    Yes, I know what it is.

          18        Q    What is it?

          19        A    It's the license agreement between the

11:23:24  20   Foundation and Advanced Bionics Corporation licensing

          21   some of the Foundation's patents.

          22        Q    Does this refresh your recollection as to

          23   whether as of February 19th, 1999, Advanced Bionics

          24   Corporation had a license from the foundation?

11:24:03  25             MR. MALYNN:  I'm going to object to the form of

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

363                                    EXHIBIT Q

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

Page 16

| | | |
|---|---|---|
| 11:24:05 | 1 | the question.  Go ahead. |
| | 2 | THE WITNESS:  I think it does, yes. |
| | 3 | BY MR. CHAPMAN: |
| | 4 | Q    And did Advanced Bionics Corporation have a |
| 11:25:09 | 5 | license from the Foundation prior to February 19, 1999? |
| | 6 | MR. MALYNN:  Object.  Vague. |
| | 7 | THE WITNESS:  Yes.  We had -- we had a verbal |
| | 8 | agreement between us that we could use their patents. |
| | 9 | BY MR. CHAPMAN: |
| 11:25:26 | 10 | Q    Do you recall when that verbal agreement was |
| | 11 | reached? |
| | 12 | A    I don't. |
| | 13 | Q    Was there a royalty that was due under that |
| | 14 | verbal agreement? |
| 11:25:40 | 15 | A    No. |
| | 16 | Q    Was there any other payment to the Foundation |
| | 17 | as part of that verbal agreement? |
| | 18 | A    Not that I'm aware of. |
| | 19 | Q    I'd like to mark this next document Exhibit |
| 11:26:05 | 20 | 1087 and it is Bates numbered AB00049 through AB00065. |
| | 21 | (Defendants' Exhibit 1087 was marked.) |
| | 22 | BY MR. CHAPMAN: |
| | 23 | Q    Do you recognize Exhibit 1087, Mr. Greiner? |
| | 24 | A    Give me a couple minutes. |
| 11:26:39 | 25 | Q    Sure.  Take as long as you want. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

364                                          EXHIBIT Q

JEFFREY GREINER                                12/16/08
ATTORNEYS' EYES ONLY

Page 18

11:31:03    1    don't remember.

            2        Q    I'm going to point you to what I think are the

            3    differences and you can tell me if it refreshes your

            4    recollection.

11:31:11    5        A    Great.

            6        Q    If you take a look at the page of Exhibit 1087

            7    No. AB00051.  It appears to me that the paragraph 2.1

            8    starting with "In the event a licensed device or

            9    licensed methods of Bionics under this agreement also

11:31:45   10    constitutes..."  Do you see that sentence?  It's about

           11    halfway down.

           12        A    I see that sentence.

           13        Q    I'll make the representation that I -- that I

           14    found that that -- beginning at that sentence down to

11:31:58   15    the end of the paragraph is new.  My question is:  Does

           16    that refresh your recollection at all as to why the two

           17    agreements?

           18        A    No, it doesn't.

           19        Q    Another difference that I believe exists is the

11:32:38   20    last paragraph on page AB00051, same page, starts "In

           21    addition net revenue shall include..."   Do you see that

           22    paragraph?

           23        A    I do.

           24        Q    Does that refresh your recollection as to why

11:32:56   25    there might be two agreements?

JEFFREY GREINER                              12/16/08
ATTORNEYS' EYES ONLY

Page 19

| | | |
|---|---|---|
| 11:32:58 | 1 | A    I have no present memory of it, no, it does |
| | 2 | not. |
| | 3 | Q    I would like to mark this next document Exhibit |
| | 4 | 1088, please.  And it bears Bates numbers AB00066 |
| 11:33:21 | 5 | through 69. |
| | 6 | (Defendants' Exhibit 1088 was marked.) |
| | 7 | BY MR. CHAPMAN: |
| | 8 | Q    Do you recognize -- and take as much time as |
| | 9 | you need.  Do you recognize Exhibit 1088? |
| 11:36:11 | 10 | A    I'm generally familiar with the subject matter. |
| | 11 | Q    Exhibit 1088 appears to be a first amendment to |
| | 12 | license agreements that you signed; is that correct? |
| | 13 | A    That's right. |
| | 14 | Q    In the beginning of the agreement under 1 it |
| 11:36:27 | 15 | refers to a license agreement cochlear implant field |
| | 16 | dated 5-18-1999.  Do you see that reference? |
| | 17 | A    I do. |
| | 18 | Q    And does that reference correspond to Exhibit |
| | 19 | 1087? |
| 11:36:42 | 20 | A    It seems to, yes. |
| | 21 | Q    Were the -- strike that. |
| | 22 | Was the Foundation and Advanced Bionics |
| | 23 | Corporation treating Exhibit 1087 as the operable |
| | 24 | license agreement in the cochlear implant field? |
| 11:37:01 | 25 | MR. BODINE:  Objection.  Calls for speculation. |

JEFFREY GREINER                          12/16/08
ATTORNEYS' EYES ONLY

Page 20

```
11:37:04    1           THE WITNESS:  I believe that that's true.
            2    BY MR. CHAPMAN:
            3        Q    In Exhibit 1088 -- is Exhibit 1088 an agreement
            4    to resolve a dispute between the Foundation and Advanced
11:37:21    5    Bionics Corporation?
            6        A    Yes.
            7        Q    What was that dispute?
            8        A    It had to do with foreign filings and the
            9    payment of foreign filings and who retained the rights
11:37:34   10    associated with those foreign filings.
           11        Q    Was -- was that dispute resolved satisfactorily
           12    to Advanced Bionics Corporation's perspective?
           13           MR. MALYNN:  Object to the form of the
           14    question.
11:37:55   15           THE WITNESS:  It was resolved as most disputes
           16    are resolved.  You know, we both compromised to get
           17    something done.
           18    BY MR. CHAPMAN:
           19        Q    I'd like to mark this next document Exhibit
11:38:10   20    1089, please.
           21           (Defendants' Exhibit 1089 was marked.)
           22    BY MR. CHAPMAN:
           23        Q    Exhibit 1089 is Bates numbered AB00342.  Have
           24    you seen Exhibit 1089 before?
11:38:42   25        A    I don't know as we sit here.
```

JEFFREY GREINER                          12/16/08
ATTORNEYS' EYES ONLY

                                                              Page 21

11:38:46    1        Q     In -- was there a dispute between the

            2    Foundation and Advanced Bionics Corporation in 2003

            3    regarding the payment of royalties?

            4        A     I'm not sure I'd characterize it as a dispute.

11:39:15    5        Q     How would you characterize it?

            6        A     I think we raised -- we raised the issue as to

            7    whether we had a continuing obligation to -- to pay

            8    royalties to the Foundation.

            9        Q     Was that because of a new product?

11:39:29   10        A     Yes.

           11        Q     And was an agreement reached as to whether

           12    Advanced Bionics had a continuing obligation to pay

           13    royalties?

           14        A     You know, just as I answered the previous

11:39:51   15    question.  I'm not sure it was resolved in that manner.

           16    But certainly we worked on a different deal and came to

           17    a different conclusion and, if you will, renegotiated a

           18    new agreement.

           19        Q     Was Advanced Bionics Corporation ever a

11:40:20   20    publicly held company?

           21        A     No.

           22        Q     We will get I think to that new agreement in a

           23    second, but I'll ask you something else first.  I'd like

           24    to mark this next document as Exhibit 1090, please.  It

11:40:42   25    is Bates numbered AB00346.

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

                                                    Page 22

11:41:08    1              (Defendants' Exhibit 1090 was marked.)

            2    BY MR. CHAPMAN:

            3         Q    Do you recall Exhibit 1090?

            4         A    If I can take just a couple moments to read it.

11:41:23    5         Q    Certainly.

            6         A    Yes, I do recall.

            7         Q    What is Exhibit 1090?

            8         A    It's a letter written by Bryant Gold who leads

            9    our intellectual property department to the leader of

11:41:53   10    the intellectual department of the Alfred E. Mann

           11    Foundation Malcolm Romano basically saying that we

           12    elect, that is Advanced Bionics elects, not to bring

           13    suit against either Cochlear Med El which according to

           14    the license agreement gives the Mann Foundation the

11:42:11   15    ability to do that on its own.

           16         Q    And this -- this notice is dated or this letter

           17    is dated July 24th, 2003; correct?

           18         A    Yes.

           19         Q    I would like to mark this next document Exhibit

11:42:33   20    1091, please.  It is Bates numbered AB00297 through

           21    AB00318.

           22              (Defendants' Exhibit 1091 was marked.)

           23    BY MR. CHAPMAN:

           24         Q    This may -- so it may take a little time for

11:43:09   25    review.  Take as much time as you want, but my question

JEFFREY GREINER                        12/16/08
ATTORNEYS' EYES ONLY

Page 23

11:43:12  1   will be:  Do you recognize Exhibit 1091?

2        A    I just looked at the document to know what I

3   think it is so okay.

4        Q    What do you think it is?

11:45:23  5   A    I think it's the -- as I talked earlier, the

6   renegotiated license agreement between the Foundation

7   and Advanced Bionics pertaining to cochlear products.

8        Q    And on Exhibit 1091 at page AB00316.

9        A    Uh-huh.

11:45:45  10  Q    Is that your signature?

11       A    That is my signature.

12       Q    Did you -- were you responsible for negotiating

13  this agreement on behalf of Advanced Bionics

14  Corporation?

11:45:54  15  A    No.  I was not responsible for the negotiation,

16  but ultimately I'm responsible for -- for signing the

17  completed product.

18       Q    Who was responsible for the negotiation?

19       A    That's a good question.  I believe this

11:46:38  20  agreement was negotiated principally by Dean Baker who

21  is a board member on the board of directors.

22       Q    After January 1st, 2004, was Exhibit 1091 the

23  operative cochlear license between the Foundation and

24  Advanced Bionics Corporation?

11:47:00  25  A    At that time, yes.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

370                                    EXHIBIT Q

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

Page 27

| | | |
|---|---|---|
| 11:52:35 | 1 | licenses with the Foundation? |
| | 2 | A   Yes. |
| | 3 | Q   And were royalties paid under each of those |
| | 4 | licenses? |
| 11:52:46 | 5 | A   I believe so. |
| | 6 | Q   Is it possible to tell -- for you to tell from |
| | 7 | looking at Exhibit 1093 whether these payments are for |
| | 8 | any particular license? |
| | 9 | A   No, I don't believe so. |
| 11:53:25 | 10 | Q   In general could the bulk of royalties be |
| | 11 | attributed to one license as opposed to other licenses? |
| | 12 | MR. MALYNN:  Objection to the form of the |
| | 13 | question. |
| | 14 | THE WITNESS:  Yes. |
| 11:53:34 | 15 | BY MR. CHAPMAN: |
| | 16 | Q   Which license could you attribute the bulk of |
| | 17 | the royalties? |
| | 18 | A   The bulk of the royalties were for the cochlear |
| | 19 | licenses -- cochlear patents. |
| 11:53:46 | 20 | Q   I would like to mark this next document Exhibit |
| | 21 | 1094, please. |
| | 22 | (Defendants' Exhibit 1094 was marked.) |
| | 23 | BY MR. CHAPMAN: |
| | 24 | Q   Exhibit 1094 is Bates numbered AB00230 through |
| 11:54:04 | 25 | AB00250.  Take as much time as you need to review it, |

JEFFREY GREINER                                    12/16/08
ATTORNEYS' EYES ONLY

Page 32

12:04:38    1    either way?

            2        A    I believe it was not royalty bearing either

            3    way.

            4        Q    I would like to mark this next Exhibit 1096,

12:04:57    5    please.

            6            (Defendants' Exhibit 1096 was marked.)

            7    BY MR. CHAPMAN:

            8        Q    Exhibit 1096 is Batès numbered AB00017 through

            9    AB00032.  And take as much time as you need, but my

12:05:23   10    question is:  Do you recognize Exhibit 1096?

           11        A    I do.

           12        Q    What is Exhibit 1096?

           13        A    It's the agreement between the Mann Foundation

           14    and Advanced Bionics Corporation for the licensing

12:05:53   15    rights to what we call the RF bion.  Bion, b-i-o-n.

           16        Q    And on page AB00030 of Exhibit 1096 that's your

           17    signature; correct?

           18        A    That's my signature, yes.

           19        Q    Were you responsible for negotiating Exhibit

12:06:19   20    1096 on behalf of Advanced Bionics Corporation?

           21            MR. MALYNN:  Objection to the form of the

           22    question.

           23            THE WITNESS:  I don't recall who negotiated

           24    the -- the license agreement, but I obviously signed it

12:06:33   25    and ultimately responsible for it.

JEFFREY GREINER                    12/16/08
ATTORNEYS' EYES ONLY

Page 33

12:06:38    1    BY MR. CHAPMAN:

             2        Q    Under -- on page AB0019 of Exhibit 1096,

             3    royalty -- the agreement sets a royalty rate of

             4    3 percent of net revenue; correct?

12:06:53    5        A    Yes.

             6        Q    Did Advanced Bionics Corporation ever pay a

             7    royalty under this agreement Exhibit 1096?

             8        A    I don't believe we did.

             9        Q    I'd like to mark this next document Exhibit

12:07:11   10    1097.  It's Bates numbered AB00033 through AB00048.

            11             (Defendants' Exhibit 1097 was marked.)

            12    BY MR. CHAPMAN:

            13        Q    Again, take as much time, but do you recognize

            14    Exhibit 1097?

12:09:08   15        A    Learn a lot about people when you listen to

            16    their ...

            17             Yes, I've looked at it.

            18        Q    What is Exhibit 1097?

            19        A    It's a license agreement between the Foundation

12:09:20   20    and Advanced Bionics for the rights to what we call the

            21    battery powered bion.

            22        Q    Did you sign Exhibit 1097 on behalf of Advanced

            23    Bionics Corporation?

            24        A    I did.

12:09:38   25        Q    On page AB0035 of Exhibit 1097 the agreement

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

373                                          EXHIBIT Q

JEFFREY GREINER                          12/16/08
ATTORNEYS' EYES ONLY

Page 34

| 12:09:48 | 1 | sets a royalty of 3 percent.  Do you see that? |
| | 2 | A    Yes. |
| | 3 | Q    Did Advanced Bionics Corporation pay any |
| | 4 | royalties to the Foundation under Exhibit 1097? |
| 12:09:59 | 5 | A    I don't believe we did. |
| | 6 | Q    I'd like to mark this next document as Exhibit |
| | 7 | 1098, please.  It's Bates numbered AMF045276 through |
| | 8 | AMF045304. |
| | 9 | (Defendants' Exhibit 1098 was marked.) |
| 12:10:36 | 10 | MR. BODINE:  And we don't have copies of those |
| | 11 | documents so I would ask -- and if you got other |
| | 12 | documents that we need another set of copies for that we |
| | 13 | can get a copy. |
| | 14 | MR. CHAPMAN:  Do you want to go off the record |
| 12:10:45 | 15 | and copy that? |
| | 16 | MR. BODINE:  I think that's good.  If you got |
| | 17 | others, we should make them at this time. |
| | 18 | MR. CHAPMAN:  This is the last one. |
| | 19 | MR. MALYNN:  I don't have a copy of this. |
| 12:10:57 | 20 | MR. CHAPMAN:  Let's go off the record. |
| | 21 | THE VIDEOGRAPHER:  Off the record at 12:12 p.m. |
| | 22 | (Recess.) |
| | 23 | THE VIDEOGRAPHER:  Back on record.  12:17 p.m. |
| | 24 | MR. CHAPMAN:  Before we went off the record I |
| 12:16:17 | 25 | marked Exhibit 1098.  I have now realized that Exhibit |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

374                                                    EXHIBIT Q



January 28, 2009

Patricia Y. Schuler, RPR
Sarnoff Court Reporters and
  Legal Technologies
Suite 350
20 Corporate Park
Irvine, CA  92606

**Re:  Alfred E. Mann Foundation for Scientific Research vs. Cochlear Corporation and Cochlear Ltd., Case No. CV 07-08108 GHK (CTX), Job No. 100680 – Corrections to Videotaped Deposition of Jeffrey Greiner - Tuesday, December 16, 2008**

Page 7
Line 2 – counsel over patents for the Foundation.

Page 9
Line 1 – Q    Did you at some point ~~you~~ become acting general
Line 18 – A   I'm not sure when ~~that~~ Advanced Bionics was

Page 28
Line 13 – Scientific Neuromodulation ~~Neuro Modulation~~ Corporation?

Page 29
Line 1 – Boston Scientific Neuromodulation ~~Neuro Modulation~~ Corporation?
Line 7 – Boston Scientific Neuromodulation Corporation ~~Neuro Modulation~~.

Page 30
Line 23 – the general field of neuromodulation ~~neuro modulation~~.

Page 33
Line 15 – A   ~~Learn a lot about people when you listen to~~
Line 16 - ~~their ...~~


I, JEFFREY GREINER, do hereby declare under the penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted above; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this ___28___ day of January, 2009, at Valencia, California.


JEFFREY GREINER


Mann Biomedical Park • 25129 Rye Canyon Loop • Valencia, CA 91355
v: 800.678.2575 • f: 661.362.1507 • tty: 800.678.3575

375                                                                                    EXHIBIT Q



January 28, 2009

Patricia Y. Schuler, RPR
Sarnoff Court Reporters and
  Legal Technologies
Suite 350
20 Corporate Park
Irvine, CA  92606

**Re:  Alfred E. Mann Foundation for Scientific Research vs. Cochlear Corporation and Cochlear Ltd., Case No. CV 07-08108 GHK (CTX), Job No. 100680 –
Corrections to Videotaped Deposition of Jeffrey Greiner - Tuesday, December 16, 2008**

Page 7
Line 2 – counsel over patents for the Foundation.

Page 9
Line 1 – Q    Did you at some point ~~you~~ become acting general
Line 18 – A    I'm not sure when ~~that~~ Advanced Bionics was

Page 28
Line 13 – Scientific Neuromodulation ~~Neuro Modulation~~ Corporation?

Page 29
Line 1 – Boston Scientific Neuromodulation ~~Neuro Modulation~~ Corporation?
Line 7 – Boston Scientific Neuromodulation Corporation ~~Neuro Modulation~~.

Page 30
Line 23 – the general field of neuromodulation ~~neuro modulation~~.

Page 33
Line 15 – A    ~~Learn a lot about people when you listen to~~
Line 16 - ~~their ...~~

I, JEFFREY GREINER, do hereby declare under the penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted above; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _28_ day of January, 2009, at Valencia, California.

JEFFREY GREINER

Mann Biomedical Park • 25129 Rye Canyon Loop • Valencia, CA 91355
v: 800.678.2575  •  f: 661.362.1507 • tty: 800.678.3575

EXHIBIT Q

EXHIBIT R

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

       Plaintiff,

          vs.

Case No.
CV 07-08108 GHK (CTx)

COCHLEAR CORPORATION and
COCHLEAR LTD.,

       Defendants.


AND RELATED CROSS-ACTION.


CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF DAVID LEE HANKIN

Santa Clarita, California

Wednesday, December 17, 2008


Reported by:
RENEE D. ZEPEZAUER, CRR
CSR No. 6275

JOB No. 101707B

EXHIBIT R

Page 2

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    ALFRED E. MANN FOUNDATION FOR
     SCIENTIFIC RESEARCH,

5
              Plaintiff,

6                                      Case No.
              vs.                      CV 07-08108 GHK (CTx)

7
     COCHLEAR CORPORATION and

8    COCHLEAR LTD.,

9             Defendants.

10

11   _____
     AND RELATED CROSS-ACTION.

12   _____

13

14           Videotaped Deposition of DAVID LEE

15       HANKIN, taken on behalf of Defendants,

16       at 25134 Rye Canyon Loop, Suite 200,

17       Santa Clarita, California, beginning at

18       11:02 a.m. and ending at 1:02 p.m.;

19       Wednesday, December 17, 2008, before

20       RENEE D. ZEPEZAUER, Certified Shorthand

21       Reporter No. 6275.

22

23

24

25

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 25

11:45:31    1        Q    What was your role in the negotiation?

            2             MR. BODINE:  Exclude from your answer any

            3    attorney-client privileged information, information that

            4    you may have exchanged --

11:45:43    5             THE WITNESS:  Yes.  Yes, sir.  I was involved

            6    in the negotiation and documentation of this agreement.

            7    BY MR. CHAPMAN:

            8        Q    What was your position at AMF at the time?

            9        A    General counsel.

11:46:08   10        Q    Why did AMF and Advanced Bionics Corporation

           11    terminate the prior agreement and enter into a new

           12    agreement in 2004?

           13             MR. BODINE:  Objection to the extent it calls

           14    for speculation.  And the same instruction with respect

11:46:48   15    to the attorney-client privileged information.

           16             THE WITNESS:  It was a business transaction

           17    that AMF believed was favorable to AMF.  That was AMF's

           18    motivation.

           19    BY MR. CHAPMAN:

11:47:06   20        Q    Was there --

           21        A    I can't speculate as to what Advanced Bionics'

           22    motivation was.

           23        Q    Was there a dispute between -- prior to

           24    entering into this agreement that's marked as Exhibit

11:47:18   25    1091 was there a dispute between AMF and Advanced

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

| 11:47:21 | 1 | Bionics as to whether Advanced Bionics owed a royalty on |
| | 2 | new products? |
| | 3 | A    Any products? |
| | 4 | Q    Newly developed products by Advanced Bionics |
| 11:47:37 | 5 | Corporation. |
| | 6 | A    In any category of medicine? |
| | 7 | Q    In cochlear implants. |
| | 8 | A    There was a dispute, yes. |
| | 9 | Q    What was the nature of that dispute? |
| 11:48:02 | 10 | A    I don't think I can respond to that without |
| | 11 | revealing privileged information. |
| | 12 | Q    Did you discuss that dispute with anyone at |
| | 13 | Advanced Bionics Corporation? |
| | 14 | A    No. |
| 11:48:53 | 15 | Q    And I'm not asking for your discussions with -- |
| | 16 | as counsel with anyone at Advanced Bionics, but I'm |
| | 17 | simply asking for Advanced Bionics -- I'm sorry.  Let me |
| | 18 | strike that. |
| | 19 |        I'm not asking for your communications as |
| 11:49:14 | 20 | counsel with anyone at AMF.  I'm simply asking as an AMF |
| | 21 | witness, if AMF can describe the nature of the dispute |
| | 22 | with Advanced Bionics prior to the entering into the |
| | 23 | agreement that's Exhibit 1091. |
| | 24 |        MR. BODINE:  I'll instruct you to exclude from |
| 11:49:31 | 25 | your answer any attorney-client privileged information. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

380                                    EXHIBIT R

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27

| | | |
|---|---|---|
| 11:49:39 | 1 | THE WITNESS: Yes. |
| | 2 | BY MR. CHAPMAN: |
| | 3 | Q    Yes, you can? |
| | 4 | A    Yes. |
| 11:49:43 | 5 | Q    Please -- please explain the nature of the |
| | 6 | dispute without disclosing any attorney-client |
| | 7 | privileged information. |
| | 8 | A    It was Advanced Bionics' contention that no |
| | 9 | further royalty was due to AMF under the terms of the |
| 11:50:04 | 10 | agreement.  AMF disputed that contention. |
| | 11 | Q    And Exhibit 1091 was entered into to resolve |
| | 12 | that dispute?  Is that correct? |
| | 13 | A    No. |
| | 14 | Q    Okay.  Was that dispute resolved? |
| 11:50:24 | 15 | A    Yes. |
| | 16 | Q    How was it resolved? |
| | 17 | A    I don't think I can respond to that without |
| | 18 | revealing privileged information. |
| | 19 | Q    Well, I guess I don't understand because I'm |
| 11:51:14 | 20 | not asking for any communications internally or with you |
| | 21 | and anyone at AMF, but simply the method by which the |
| | 22 | dispute was resolved between Advanced Bionics |
| | 23 | Corporation and the Foundation as independent entities. |
| | 24 | A    That's a different question. |
| 11:51:35 | 25 | Q    Okay.  Can you answer that question? |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

381                                              EXHIBIT R

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 28

11:51:37   1        A    Yes.  As I understand it there was an

           2    acknowledgement by Cochlear -- excuse me, by Advanced

           3    Bionics that the position that AMF held had merit, and

           4    there was a softening of Advanced Bionics' position.

11:52:11   5        Q    Why did the -- why did Advanced Bionics and AMF

           6    enter into Exhibit 1091 -- the license that's Exhibit

           7    1091?

           8        A    This agreement was entered into and the

           9    motivation for this agreement to be entered into

11:52:32  10    occurred as a series of events unfolded in early 1994

          11    when Boston Scientific expressed an interest in

          12    acquiring Advanced Bionics Corporation.

          13        Q    What were those series of events?

          14        A    The series of events were that Boston

11:53:18  15    Scientific sought to acquire Advanced Bionics

          16    Corporation and as a result it was the general feeling

          17    that AMF could monetize some of its cochlear implant

          18    technology by trading royalty for stock.

          19        Q    At the time that -- strike that.

11:54:11  20             Do you know when Advanced Bionics Corporation

          21    was acquired by Boston Scientific?

          22        A    Yes.

          23        Q    When?

          24        A    June 1, 2004, the agreements were signed as I

11:54:37  25    recall.  I don't know at what point in time the SEC

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

382                              EXHIBIT R

Page 55

```
 1
 2
 3
 4                       .
 5
 6
 7
 8
 9        I, DAVID LEE HANKIN, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript; that I have made any corrections as appear
12   noted, in ink, initialed by me; that my testimony as
13   contained herein, as corrected, is true and correct.
14        EXECUTED this _____ day of _____,
15   200___, at _____, _____.
                       (City)            (State)
16
17
18              _____
19              DAVID LEE HANKIN
20
21
22
23
24
25
```

# EXHIBIT S

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

        Plaintiff,

                          Case No.
        vs.                 CV 07-08108 GHK (CTx)

COCHLEAR CORPORATION and
COCHLEAR LTD.,

        Defendants.

_____

AND RELATED CROSS-ACTION.
_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF LAWRENCE ALLEN FISCHER

Santa Clarita, California

Wednesday, December 17, 2008


Reported by:
RENEE D. ZEPEZAUER, CRR
CSR No. 6275

JOB No. 101707A

Page 2

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    ALFRED E. MANN FOUNDATION FOR
     SCIENTIFIC RESEARCH,
5
               Plaintiff,
6                                        Case No.
               vs.                       CV 07-08108 GHK (CTx)
7
     COCHLEAR CORPORATION and
8    COCHLEAR LTD.,

9              Defendants.

10

11   _____
     AND RELATED CROSS-ACTION.
12   _____

13

14             Videotaped Deposition of LAWRENCE

15          ALLEN FISCHER, taken on behalf of

16          Defendants, at 25134 Rye Canyon Loop,

17          Suite 200, Santa Clarita, California,

18          beginning at 9:43 a.m. and ending at

19          10:38 a.m., Wednesday, December 17,

20          2008, before RENEE D. ZEPEZAUER,

21          Certified Shorthand Reporter No. 6275.

22

23

24

25

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                    Page 17

09:57:07   1        A    I do not.

           2        Q    Do you know if Advanced Bionics was a public

           3    company as of March of 2000?

           4        A    I don't know.

09:57:48   5        Q    I would like to mark this next document Exhibit

           6    1103, please.

           7            (Defendants' Exhibit 1103 was marked.)

           8    BY MR. CHAPMAN:

           9        Q    Do you recognize Exhibit 1103?

09:58:14  10        A    I have not studied it before, but it looks like

          11    the 990 tax return filed for the Foundation as of 1990.

          12        Q    When did you join the Foundation?

          13        A    Last year.  2007.

          14        Q    Do you have responsibilities in connection with

09:58:34  15    preparing tax returns?

          16        A    I'm responsible to get the current year tax

          17    return prepared and filed.

          18        Q    Can you tell me if -- well, in 19 -- this tax

          19    return Exhibit 1103 appears to be for the fiscal year

09:58:57  20    beginning April 1, 1990, and ending March 31, 1991;

          21    correct?

          22        A    Yes.

          23        Q    During that fiscal year did the Foundation

          24    receive any royalties from Advanced Bionics?

09:59:17  25        A    I -- I don't know.

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                        Page 18

09:59:26    1       Q    If you turn to the pages marked AMF045362.  The

            2    schedule 14 part XVII-B, line 2.  It's down at the

            3    bottom of the page.  Do you see that?  Income produced?

            4       A    Which page again?  Okay.

09:59:59    5       Q    45 --

            6       A    XVII-B -- B -- line 2?

            7       Q    The bottom one.  Line 2, yes.  The bottom

            8    entry.  It says, "No income was produced from direct

            9    charitable activities or program-related investments."

10:00:12   10       A    Yes.

           11       Q    Does that indicate that the Foundation did not

           12    receive any income payments during the fiscal year for

           13    Exhibit 1103?

           14       A    What is your question again?

10:00:34   15       Q    Does -- does that entry indicate that the

           16    Foundation did not receive any income or payments during

           17    the fiscal year that is part of Exhibit 1103?

           18       A    I think that that's a sentence to support

           19    schedule 14, line 2.

10:00:55   20       Q    Okay.

           21       A    And I guess I'd have to go look at schedule 14.

           22       Q    Let's do that, if we can find it.  I believe

           23    it's on AMF045352.

           24       A    Right.

10:01:39   25       Q    Do you have an understanding as to what

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                              Page 19

10:01:41   1   schedule 14 shows?

           2        A    Undistributed income.  And I'd have to look at

           3   the instructions to read it all.

           4        Q    Can you tell me if Exhibit 1103 shows any

10:01:55   5   income from -- or payments --

           6        A    Shows no undistributed income on schedule 14.

           7        Q    From Advanced Bionics or -- from Advanced

           8   Bionics Corporation; correct?  Or anyone else.

           9        A    It -- it shows on the first schedule the

10:02:19  10   revenue lines and that -- on the front page is the

          11   revenue that was received from those sources.

          12        Q    Okay.  Which line are you looking at?

          13        A    I'm looking on page 1.  I'm looking at line 12

          14   which shows the total revenues received by the

10:02:42  15   foundation.

          16        Q    Okay.

          17        A    Now, we can look up a GAAP definition of

          18   revenue if you -- if you would like.

          19        Q    Well, on this first page it appears to

10:03:12  20   breakdown the source of those revenues, does it not?

          21   There's $195,544 from contributions, gifts, or grants?

          22        A    Right.

          23        Q    There's $27,358 from interest on savings and

          24   temporary cash investments; correct?

10:03:32  25        A    Right.

EXHIBIT S

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 20

```
10:03:33   1        Q    There's 858,684 from dividends and interest

           2   from securities; correct?

           3        A    Yes.

           4        Q    And then there's a net loss from sale of assets

10:03:47   5   of $15,785?

           6        A    Right.

           7        Q    And that results in the total of 1,065,801;

           8   correct?

           9        A    That's correct.

10:04:08  10        Q    And we can take a look -- just give me a

          11   second, please.  Is there a schedule that shows --

          12   breaks out the contribution of gifts and grants?

          13        A    I don't know.  Let's look.  Schedule looks

          14   like -- looks like part XVII-2 programs.  It says

10:05:53  15   schedule 12.

          16        Q    That schedule appears to be --

          17        A    Expenses.

          18        Q    -- programs of the Foundation; right?  Not

          19   grants to the Foundation?

10:06:11  20        A    That's right.  That's grant programs.  Those

          21   are expense programs.  And then income producing XVII-A.

          22        Q    And that shows a grant from --

          23        A    National Institutes of Health.

          24        Q    And -- and no one else; correct?

10:06:27  25        A    That's right.  But I don't know what that --
```

LAWRENCE ALLEN FISCHER                     12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                    Page 21

10:06:30    1    that grant's for.

            2        Q    Right.  But schedule XVII -- I-A does not show

            3    any income or revenue from Advanced Bionics; correct?

            4        A    It does not.

10:06:49    5        Q    I'd like to mark this next document Exhibit

            6    1104, please.

            7            (Defendants' Exhibit 1104 was marked.)

            8            MR. CHAPMAN:  This should become quicker as I

            9    become more familiar.  The reporter needs to stamp it.

10:07:29   10        Q    Do you recognize Exhibit 1104?

           11        A    Yes.  It is the 990 tax return filed by the

           12    Alfred Mann Foundation for the year ending March 31st,

           13    1992.

           14        Q    And if it's helpful I'd like to direct you to

10:07:51   15    page AMF045374 which has analysis of income producing

           16    activities.  Do you see that page?

           17        A    I do.

           18        Q    During the fiscal year ending March 31st,

           19    1992, did the Foundation receive any income from

10:08:13   20    Advanced Bionics?

           21        A    No.

           22        Q    I'd like to mark this next document as Exhibit

           23    1105, please.

           24            (Defendants' Exhibit 1105 was marked.)

10:08:48   25    BY MR. CHAPMAN:

                                                    EXHIBIT S

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                    Page 22

10:08:50    1        Q     Can you tell me what Exhibit 1105 is?

            2        A     It is the tax return 990 for the Alfred Mann

            3   Foundation filed for the year ending March 31, 1992 --

            4   1993, sorry.

10:09:07    5        Q     And during the fiscal year ending March 31st,

            6   1993, did the Foundation receive any income from

            7   Advanced Bionics Corporation?

            8        A     According to schedule XVI-A, no.

            9        Q     I'd like to mark this next document Exhibit

10:09:36   10   1106, please.

           11            (Defendants' Exhibit 1106 was marked.)

           12   BY MR. CHAPMAN:

           13        Q     Can you tell me what Exhibit 1106 is?

           14        A     It is the Alfred Mann Foundation tax return

10:09:55   15   filed for the year ending March 31st, 1994.

           16        Q     In the fiscal year ending March 31st, 1994,

           17   did the Foundation receive any income from Advanced

           18   Bionics Corporation?

           19        A     Let's look and see.  According to the part

10:10:41   20   XVI -- XVI-A, no.

           21        Q     I just want to go back to -- because I think I

           22   forgot to ask you a question.  Exhibits 1103, 1104, and

           23   1105, and it's basically the same question, but during

           24   the fiscal years ending March 31st, 1991,

10:11:22   25   March 31st, 1992, and March 31st, 1993, did the

                                                    EXHIBIT S

LAWRENCE ALLEN FISCHER                          12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

10:11:29     1    Foundation receive any income from MiniMed?

             2        A    Well, let's look.  According to schedule XVII-A

             3    XVI -- on the year ending 1991 and XVI-A for the year

             4    ending '92 and XVI-A ending year '93, no.

10:12:35     5        Q    I'd like to mark this next document as Exhibit

             6    1107, please.

             7            (Defendants' Exhibit 1107 was marked.)

             8    BY MR. CHAPMAN:

             9        Q    Can you tell me what Exhibit 1107 is?

10:12:57    10        A    This is the Alfred Mann Foundation tax return

            11    for the year ending March 31st, 1995.

            12        Q    And in the year ending March 31st, 1995, did

            13    the Foundation receive any income from Advanced Bionics

            14    Corporation?

10:13:12    15        A    According to schedule part XVI-A, no.

            16        Q    And I would like to mark this next document

            17    Exhibit 1108, please.

            18            (Defendants' Exhibit 1108 was marked.)

            19    BY MR. CHAPMAN:

10:13:41    20        Q    What is Exhibit 1108?

            21        A    It's the tax return for the Alfred Mann

            22    Foundation for the year ending March 31st, 1996.

            23        Q    And during the fiscal year ending March 31st,

            24    1996, did the Foundation receive any income from

10:13:57    25    Advanced Bionics Corporation?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                              Page 24

10:13:59   1        A    According to part XVI-A, no.

           2        Q    I'd like to mark this next document is -- as

           3    Exhibit 1109, please.

           4             (Defendants' Exhibit 1109 was marked.)

10:14:40   5    BY MR. CHAPMAN:

           6        Q    Could you tell me what Exhibit 1109 is?

           7        A    This is the Alfred Mann Foundation tax return

           8    for the year ending March 31st, 1997.

           9        Q    And can you tell -- strike that.

10:14:54  10             During the year, fiscal year ending

          11    March 31st, 1997, did the Foundation receive any

          12    income from Advanced Bionics Corporation?

          13        A    According to part XVI-A, no.

          14        Q    If you could turn to -- I have one other

10:15:11  15    question regarding this.

          16        A    Okay.

          17        Q    Turn to page AMF045458 of Exhibit 1109.  Toward

          18    the bottom there's a section summary of direct

          19    charitable activities.  Do you see that section?

10:15:36  20        A    Uh-huh.

          21        Q    And item 3 is advanced cochlear project

          22    research and development of cochlear implant with

          23    external sound sensor.  Do you see that?

          24        A    Yes.

10:15:46  25        Q    During the year did the Foundation expend

LAWRENCE ALLEN FISCHER                                12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                        Page 25

10:15:48    1   $203,766 on that program?

            2        A    Yes, in accordance with that schedule.

            3        Q    I'd like to have this next document marked

            4   Exhibit 1110, please.

10:16:22    5            (Defendants' Exhibit 1110 was marked.)

            6   BY MR. CHAPMAN:

            7        Q    Could you tell me what Exhibit 1110 is?

            8        A    This is the Alfred Mann Foundation tax return

            9   for the year ended March 31st, 1998.

10:16:34   10        Q    For the year ending March 31, 1998, did the

           11   Foundation receive any income from Advanced Bionics

           12   Corporation?

           13        A    According to schedule XVI-A, no.

           14        Q    On that schedule there's mention of Novacor

10:17:01   15   Medical Corp.  Do you see that?

           16        A    I do.

           17        Q    Do you know what that is?

           18        A    I do not.

           19        Q    It appears from the schedule, though, that the

10:17:10   20   Foundation received --

           21        A    Some income.

           22        Q    -- about $67,000 in income from that

           23   corporation.

           24        A    Yes.

10:17:28   25        Q    I'd like to mark this next document as Exhibit

EXHIBIT S

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                      Page 26

10:17:32    1    1111, please.

            2            (Defendants' Exhibit 1111 was marked.)

            3    BY MR. CHAPMAN:

            4        Q    Can you tell me what Exhibit 1111 is?

10:17:49    5        A    It is the Alfred Mann Foundation tax return for

            6    the year ending March 31, 1999.

            7        Q    And during the year ending March 31st, 1999,

            8    did the Foundation receive any income from Advanced

            9    Bionics Corporation?

10:18:10   10        A    According to schedule XVI-A, no.

           11        Q    I'd like to mark this next document Exhibit

           12    1112, please.

           13            (Defendants' Exhibit 1112 was marked.)

           14    BY MR. CHAPMAN:

10:18:41   15        Q    Can you tell me what Exhibit 1112 is?

           16        A    Alfred Mann Foundation tax return for the year

           17    ending March 31st, 2000.

           18        Q    During the year ending March 31st, 2000, did

           19    the Foundation receive any income from Advanced Bionics

10:18:59   20    Corporation?

           21        A    I think we've got a new return here.  It's

           22    changed.  If you go to page 4 you find that there's

           23    $2.8 million worth of stock that's been recorded for the

           24    corporation, and I'm looking for the breakdown of

10:20:25   25    income.  There's an other revenue line of $3,177,000,

EXHIBIT S

LAWRENCE ALLEN FISCHER 12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27

10:21:18  1  but I don't see a breakdown of the detail of it.

2       Q    And which page of that?

3       A    Front page.  First page.  And I'm looking for

4  the detail that goes with that.  I don't believe it's

10:21:42  5  broken down in the return.  So I don't know whether

6  there was money from Advanced Bionics other than my

7  schedule shows that we did receive royalty income from

8  Advanced Bionics.

9       Q    Right.  Well, let's talk about that for a

10:21:55  10  second.  If you look at Exhibit 1102, it shows in the

11  year 2000 -- the transfer share $2,800,000; right?

12       A    Uh-huh.

13       Q    And that does appear on the tax return.

14       A    Yes, it does.

10:22:14  15       Q    On Exhibit 1112.  Is there -- do you have any

16  reason to believe that the income from the royalties

17  that are shown on 1102 would not also have been

18  reported?

19       A    It would make sense that they were reported.

10:23:00  20       Q    Next -- I'd like to mark the next document as

21  1113, please.

22            (Defendants' Exhibit 1113 was marked.)

23  BY MR. CHAPMAN:

24       Q    Can you tell me what Exhibit 1113 is?

10:23:19  25       A    It is the Alfred Mann Foundation tax return for

EXHIBIT S

LAWRENCE ALLEN FISCHER                            12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                      Page 28

10:23:22   1    the year ended March 31st, 2001.

           2         Q    And during the year ending March 31st, 2001,

           3    did Advanced Bionics -- according to Exhibit 1113 did

           4    Advanced Bionics pay any moneys to the Foundation?

10:23:45   5         A    I don't see the detail broken down of the

           6    revenue received during the year, but schedule 1102

           7    would show the revenue that was received by the

           8    Foundation.

           9         Q    Okay.  And there would be no reason to believe

10:24:01  10    that the revenue received by the Foundation in Exhibit

          11    1102 would generally not have been reported in the

          12    appropriate tax return?

          13         A    No reason.  It would -- it would be here.

          14         Q    Okay.  Can I have this next document marked as

10:24:29  15    Exhibit 1114, please.  And we're going to run through

          16    these very quickly.

          17         A    Okay.

          18              (Defendants' Exhibit 1114 was marked.)

          19    BY MR. CHAPMAN:

10:24:48  20         Q    Can you tell me what Exhibit 1114 is?

          21         A    It is the Alfred Mann Foundation tax return for

          22    the year ending March 31st, 2002.

          23         Q    I'd like to have this next document marked as

          24    Exhibit 11,015, please.

10:25:03  25              (Defendants' Exhibit 1115 was marked.)

EXHIBIT S

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                              Page 29

10:25:16    1          MR. CHAPMAN:  I think I may have said 11,015

            2   and I meant 1115.

            3       Q    Can you tell me what Exhibit 1115 is?

            4       A    Alfred Mann Foundation tax return for the year

10:25:31    5   ending March 31st, 2002.

            6       Q    I'm sorry.  You're looking at Exhibit 1115?

            7       A    Oh, 15.  No.  1115 would be the tax return for

            8   the year ending March 31st, 2003.

            9       Q    And I'd like to have this next document marked

10:25:50   10   as Exhibit 1116, please.

           11          (Defendants' Exhibit 1116 was marked.)

           12   BY MR. CHAPMAN:

           13       Q    Could you tell me what Exhibit 1116 is?

           14       A    It is the Alfred Mann Foundation tax return for

10:26:12   15   the year ending March 31st, 2004.

           16       Q    And I'd like to have this next document marked

           17   as Exhibit 1117, please.

           18          (Defendants' Exhibit 117 was marked.)

           19   BY MR. CHAPMAN:

10:26:36   20       Q    Can you tell me what Exhibit 1117 is?

           21       A    It's the Alfred Mann tax return for the year

           22   ending March 31st, 2005.

           23       Q    And this next document marked Exhibit 1118.

           24          (Defendants' Exhibit 1118 was marked.)

10:26:59   25   BY MR. CHAPMAN:

                                          EXHIBIT S

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                    Page 30

10:26:59   1      Q   And can you tell me what Exhibit --

           2      A   It's the Alfred Mann tax return --

           3      Q   I'm sorry.  This is obvious what the question

           4   is, but I need to finish it so I got a complete record.

10:27:10   5      A   Okay.

           6      Q   Can you tell me what Exhibit 1118 is?

           7      A   It is Alfred Mann tax return for the year

           8   ending March 31st, 2006.

           9      Q   Thank you.  I'd like to have this next exhibit

10:27:28  10   marked Exhibit 1119, please.

          11          (Defendants' Exhibit 1119 was marked.)

          12   BY MR. CHAPMAN:

          13      Q   Can you tell me what Exhibit 1119 is?

          14      A   It is the Alfred Mann tax return for the year

10:27:51  15   ending March 31st, 2007.

          16      Q   On -- I'm not quite sure how to identify this,

          17   but I guess it's numbered at the bottom page 12 of

          18   Exhibit 1119.

          19      A   Page 12.  Okay.

10:28:21  20      Q   There is a part IV reason for non-private

          21   Foundation status.  Do you see that?

          22      A   Right.

          23      Q   And there's a box 9 checked medical research

          24   organization operated in conjunction with hospital, and

10:28:38  25   it says some other things.

LAWRENCE ALLEN FISCHER                12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 31

| | | |
|---|---|---|
| 10:28:39 | 1 | A    Yes. |
| | 2 | Q    Do you see that?  That seems to refer to a |
| | 3 | statement 18. |
| | 4 | A    Yes. |
| 10:28:45 | 5 | Q    And I'd like to turn to statement 18.  Which I |
| | 6 | believe is on page 31 of the exhibit. |
| | 7 | A    Yes. |
| | 8 | Q    And it says hospital name, city, and state or |
| | 9 | county.  Long Beach, Durham, San Diego, Cleveland, Heinz |
| 10:29:06 | 10 | Vet Hospital, California.  Do you see those entries? |
| | 11 | A    Yes. |
| | 12 | Q    Can you tell me what is the name of the |
| | 13 | hospital in Long Beach? |
| | 14 | A    I cannot. |
| 10:29:14 | 15 | MR. BODINE:  Objection.  Beyond the scope of |
| | 16 | the 30(b)(6) deposition. |
| | 17 | BY MR. CHAPMAN: |
| | 18 | Q    How about the one in -- in Durham? |
| | 19 | MR. BODINE:  Same objection. |
| 10:29:27 | 20 | BY MR. CHAPMAN: |
| | 21 | Q    You can answer. |
| | 22 | A    Oh, I don't -- I don't -- I don't know the |
| | 23 | names of the hospitals without looking them up. |
| | 24 | Q    Any of the hospitals on this page. |
| 10:29:36 | 25 | A    No. |

EXHIBIT S

LAWRENCE ALLEN FISCHER                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36

1

2

3

4

5

6

7

8          I, LAWRENCE ALLEN FISCHER, do hereby declare under

9      penalty of perjury that I have read the foregoing

10     transcript; that I have made any corrections as appear

11     noted, in ink, initialed by me; that my testimony as

12     contained herein, as corrected, is true and correct.

13          EXECUTED this _6th_ day of _JANUARY_,

14     200_9_, at _VALENCIA_, _CA_.
                    (City)            (State)

15

16

17                    _Lawrence Allen Fischer_

18                    LAWRENCE ALLEN FISCHER

19

20

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

401

EXHIBIT'S

# Errata Sheet

**Pg/Ln**                                    **Correction**

35 / 1     Change from: Delete line 1-6
           Change to: Minimum Royalties are all due From Boston Scientific

___ / ___  Change from: Under the BPB License Agreement
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

___ / ___  Change from: _____
           Change to: _____

Signature: _Lawrence Of Lake_     Date: _1/6/09_

EXHIBIT S

EXHIBIT T

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

        Plaintiff,

      vs.

COCHLEAR CORPORATION and
COCHLEAR LTD.,

        Defendants.

_____

AND RELATED CROSS-ACTION.

_____

Case No.
CV 07-08108 GHK (CTx)

VIDEOTAPED DEPOSITION OF CATE ELSTEN

Los Angeles, California

Wednesday, April 1, 2009

ATTORNEYS' EYES ONLY

Reported by:

RENEE D. ZEPEZAUER, CRR
CSR No. 6275
JOB No. 108221

Page 2

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5    ALFRED E. MANN FOUNDATION FOR
     SCIENTIFIC RESEARCH,
6
              Plaintiff,
7                                           Case No.
          vs.                               CV 07-08108 GHK (CTx)
8
     COCHLEAR CORPORATION and
9    COCHLEAR LTD.,

10             Defendants.
     _____
11
     AND RELATED CROSS-ACTION.
12   _____

13

14             Videotaped Deposition of CATE

15        ELSTEN, taken on behalf of Defendants,

16        at 333 South Grand Avenue, Suite 2300,

17        Los Angeles, California, beginning at

18        9:42 a.m. and ending at 1:24 p.m.,

19        Wednesday, April 1, 2009, before RENEE

20        D. ZEPEZAUER, Certified Shorthand

21        Reporter No. 6275.

22

23

24

25

CATE ELSTEN                                    04/01/09

Page 20

```
10:04:58  1      A    Articles, yeah.

          2      Q    Are those articles identified in your CV?

          3      A    No.  They would fall outside the ten-year

          4  disclosure.

10:05:10  5      Q    Can you -- to the extent you recall, can you

          6  tell me what those articles were?

          7      A    I don't remember the titles.  I think there

          8  was -- and they were all -- you know, they all would

          9  have been, like, articles you write for CLE symposiums

10:05:34 10  or things of that sort where the articles are published,

         11  but I think there was one on, you know, establishing

         12  reasonable royalty in a litigation context.  And I think

         13  there was another one on license negotiations.

         14      Q    Do you recall what organization sponsored that

10:05:54 15  CLE?

         16      A    For those two.  No.  The -- the second one, the

         17  one on license negotiations, I think that would have

         18  been published by Coopers & Lybrand.  And the other one,

         19  my guess would be Minnesota Institute of Legal

10:06:25 20  Education, but it is a guess.

         21      Q    Any other articles that you can recall outside

         22  the ten-year time period that relate to patent damages

         23  or patent licensing?

         24      A    Not that I can recall.

10:06:56 25      Q    Have you negotiated any patent licenses?
```

CATE ELSTEN                           04/01/09

Page 21

| | | | |
|---|---|---|---|
| 10:06:59 | 1 | A | Yes. |

2       Q     Who did you negotiate patent licenses for?

3       A     I'm sure I won't remember every one, but -- for

4    3M on one occasion.  For a company called Therapeutic

10:07:16  5    Antibodies.  For companies I worked for including Aveda

6    Corporation and Sign Consultants.  For a group of doctor

7    inventors, and I don't remember their -- they had a

8    corporate name, it was a partnership, but I don't

9    remember the name.  For Honeywell, for -- oh, for a

10:07:59 10    company called PressOn Automotive.  Let's see.  For a

11    subsidiary of Citi Group.  Let's see.  There's one for a

12    company -- shoot.  What was it?  It was a food service

13    company.  I can't remember their name.  Those are the

14    ones that come to mind.

10:08:41 15       Q     Were those all patent licenses?

16       A     Yeah.

17       Q     What was your role in the negotiations?

18       A     Well, those are all cases where I would have

19    been the primary negotiator.  I'm excluding cases where

10:08:57 20    I was part of a team, but I wasn't the lead negotiator.

21    That would be a broader list.

22       Q     Over what time period were these -- when's the

23    last time you negotiated a patent license?

24       A     About three months ago.

10:09:16 25       Q     And which party was that for?

CATE ELSTEN                                    04/01/09

Page 22

10:09:18   1        A      I don't think I can disclose that.  As far as I
           2   know that's still under confidentiality agreement.
           3        Q      Okay.  So they were not on the list of -- of
           4   people you identified?
10:09:27   5        A      No.  And then the first time would have been
           6   about 1987, I think.
           7        Q      Have you negotiated any patent licenses that
           8   included a payment in stock?
           9        A      Yes.
10:10:08  10        Q      Can you identify the parties you've done that
          11   for?
          12        A      No.
          13        Q      Is that the most recent negotiation that you
          14   had?
10:10:16  15        A      No.
          16        Q      Was -- were the licenses where you negotiated a
          17   payment in stock, were they exclusive or nonexclusive
          18   patent licenses?
          19        A      There have been both.
10:10:46  20        Q      In the licenses where there's been a payment in
          21   stock, were they solely patent licenses or did they
          22   include other transfers?
          23        A      Both.  And by that I mean they're -- they're --
          24   I can think of examples of each.
10:11:07  25        Q      Do you personally own any intellectual

CATE ELSTEN                                        04/01/09

Page 23

10:11:10   1   property?

           2       A    Do I?

           3       Q    Yes.

           4       A    No.

10:11:20   5       Q    I would like to take a short break while I go

           6   and get a tissue.

           7               MR. BODINE:  Okay.

           8               THE VIDEOGRAPHER:  Off video.  10:11 a.m.

           9               (Recess.)

10:18:17  10               THE VIDEOGRAPHER:  Back on video 10:18 a.m.

          11   BY MR. CHAPMAN:

          12       Q    In Exhibit 1153 on page 1, of footnote 2, you

          13   identify conversations with Jerry Schloffman.  Did I

          14   pronounce that correctly?

10:18:38  15       A    I think it's Schloffman.

          16       Q    Schloffman.

          17       A    Yeah.

          18       Q    When did you first speak to Mr. Schloffman?

          19       A    I don't recall with specificity.  I think it

10:18:48  20   probably would have been maybe between two weeks and a

          21   month before the report was filed.  So some plane

          22   between mid December and mid January.

          23       Q    Did you speak to Mr. Schloffman on any other

          24   occasions?

10:19:14  25       A    Not that I recall, no.

CATE ELSTEN                                    04/01/09

Page 24

10:19:15  1        Q    And Mr. Schloffman was the -- is the

          2   vice-president of global marketing at Advanced Bionics;

          3   is that correct?

          4        A    That's my understanding.

10:19:30  5        Q    Do you know when he first started in that

          6   position?

          7        A    I don't.

          8        Q    Do you know when he first started working for

          9   Advanced Bionics?

10:19:38 10        A    No, not with specificity.  My recollection from

         11   the conversation is that he has been with them for some

         12   time because he had knowledge of a long-time series of

         13   events.

         14        Q    But he didn't specifically say how long --

10:19:56 15        A    He might have, but I don't recall.

         16        Q    And it says that you also spoke with Larry

         17   Fischer.  When did you first speak with Mr. Fischer?

         18        A    Again, I couldn't be specific.  I would say --

         19   you know, most likely within two months, month to two

10:20:14 20   months prior to the filing of the report.

         21        Q    Did you speak to Mr. Fischer on any other

         22   occasions?

         23        A    Yes.  I've spoken with Mr. Fischer perhaps two

         24   to four times.

10:20:26 25        Q    When's the last time you spoke to Mr. Fischer?

CATE ELSTEN                     04/01/09

Page 83

```
1
2
3
4
5
6
7
8
9         I, CATE ELSTEN, do hereby declare under penalty of
10    perjury that I have read the foregoing transcript; that I
11    have made any corrections as appear noted, in ink,
12    initialed by me; that my testimony as contained herein, as
13    corrected, is true and correct.
14         EXECUTED this 15th day of MAY
15    2009 , at MILL VALLEY , CA
                    (City)            (State)
16
17
18                    _____
                      CATE ELSTEN
19
20
21
22
23
24
25
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

092e11a9-daec-4f93-953d-851ab802ea9c

EXHIBIT T

# Errata Sheet

| Pg / Ln | Correction |
|---------|------------|
| **13 / 8** | Change from: JeffersMangles<br>Change to: Jeffer Mangels |
| **23 / 21** | Change from: plane<br>Change to: time |
| **44 / 16** | Change from: it<br>Change to: it was |
| **47 / 15** | Change from: through 2009<br>Change to: through 2008 |
| **48 / 9** | Change from: 2009<br>Change to: 2008 |
| **54 / 11** | Change from: Cochlear's<br>Change to: Cochlear has |
| **54 / 19** | Change from: be<br>Change to: have been |
| **57 / 18** | Change from: day<br>Change to: date |
| **59 / 18** | Change from: assumption's<br>Change to: assumption is |
| **65 / 15** | Change from: is<br>Change to: are |
| **68 / 17** | Change from: Bionic's<br>Change to: Bionics's |

Signature: _____     Date: 05/15/09

411                                                        EXHIBIT T

# EXHIBIT U

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

        Plaintiff,

    vs.                                    No. CV 07-08108 GHK (SHx)

COCHLEAR CORPORATION (n/k/a
COCHLEAR AMERICAS), COCHLEAR
LTD., and ADVANCED BIONICS, LLC,

        Defendants.
_____

COCHLEAR AMERICAS and COCHLEAR
LTD.,

        Counterclaimant,

    vs.

ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

        Counterdefendant.
_____

VIDEOTAPED DEPOSITION OF CATE M. ELSTEN

VOLUME II

Tuesday, January 29, 2013

San Francisco, California



Reported by:
Darcy J. Brokaw
RPR, CRR, CSR No. 12584

Job No. 10004916

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4  ALFRED MANN FOUNDATION FOR
    SCIENTIFIC RESEARCH,
 5
                   Plaintiff,
 6
           vs.                        No. CV 07-08108 GHK (SHx)
 7
    COCHLEAR CORPORATION (n/k/a
 8  COCHLEAR AMERICAS), COCHLEAR
    LTD., and ADVANCED BIONICS, LLC,
 9
                   Defendants.
10  _____
    COCHLEAR AMERICAS and COCHLEAR
11  LTD.,

12                 Counterclaimant,

13         vs.

14  ALFRED E. MANN FOUNDATION FOR
    SCIENTIFIC RESEARCH,
15
                   Counterdefendant.
16  _____

17

18       Videotaped deposition of CATE M. ELSTEN, Volume II,

19  taken on behalf of Defendants/Counterclaimants, at

20  Four Embarcadero Center, 17th Floor, San Francisco,

21  California, beginning at 9:37 a.m. and ending at

22  2:22 p.m. on Tuesday, January 29, 2013, before

23  Darcy J. Brokaw, RPR, CRR, CSR #12584.

24

25
```

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1    had worked for Advanced Bionics, maybe.  I'd have to
2    look that up.
3              And they follow -- they followed the
4    marketplace as a consequence of, in part, I think, their
5    interest in Advanced Bionics and their involvement in
6    the market.
7         Q.   When you say "their interest in Advanced
8    Bionics," what do you mean by "interest"?
9         A.   Well, they had an investment interest in
10   Advanced Bionics, and they had provided technology.
11        Q.   They no longer have an investment interest in
12   Advanced Bionics, do they?
13        A.   Well, I don't think Advanced Bionics, as such,
14   exists in the -- in the form of which they had the
15   investment.  So my understanding is no, they don't.
16        Q.   Do you know when that, their investment in
17   Advanced Bionics, ceased to exist?
18        A.   My understanding is that it ceased to exist
19   upon the sale to Sonova.  And the date is in my report,
20   but I'd have to consult that.  I don't recall it off the
21   top of my head.
22        Q.   Would you say that the most important feature
23   of a cochlear implant is to allow a recipient to hear?
24        A.   I think that's the fundamental function, yes.
25        Q.   If you could turn to page 7.

www.aptusCR.com

414                                         EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1              You have a quote toward the top of the page,

2      and it begins:

3                    "Since the devices have a similar range

4              of outcomes, other criteria are often

5              considered when choosing a cochlear implant."

6              And then that quote goes on to list a number

7      of different features.  Do you see that?

8         A.   No, that's --

9         Q.   I'm sorry, page 8.

10        A.   Oh.

11        Q.   Let's go to page 8.

12        A.   Okay.

13        Q.   And let me start over again.

14             At the top of page 8, you have an indented

15     quotation that begins:

16                   "Since the devices have a similar range

17             of outcomes, other criteria are often

18             considered when choosing a cochlear implant."

19             And then it goes on to list a number of

20     different features.  Do you see that?

21        A.   Yes.

22        Q.   Are those features drivers of demand?

23        A.   I think for any particular system, they can

24     contribute to the choice of manufacturer.  My

25     understanding is not that they drive demand for the

EXHIBIT U

 1    cochlear implant in a general sense.

 2          Q.   I see.

 3               If I understand that correctly, those features

 4    may drive demand for a particular manufacturer's

 5    cochlear implant but not for a cochlear implant in

 6    general.  Is that correct?

 7          A.   Generally.  Although I can certainly posit

 8    hypotheticals for a given individual that would be more

 9    important.

10          Q.   You reference a conversation in your report

11    with Advanced Bionics' vice president of global

12    marketing, Jerry Schloffman?

13          A.   Yes.

14          Q.   When did you talk to Mr. Schloffman?

15          A.   Oh, I talked to Mr. Schloffman prior to my

16    earlier reports in this case, not within the last few

17    years.

18          Q.   Do you know if he is still at Advanced

19    Bionics?

20          A.   I don't.  I don't think so, but I'm not sure.

21          Q.   How important was the information from

22    Mr. Schloffman in your analysis?

23          A.   Well, that's a tough question to answer.  The

24    conversation I had with him certainly helped me to

25    understand the nature of the market, the nature of the

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1    products, the things that were important to my overall

2    understanding of the case.

3         Q.   You use the term "back telemetry" throughout

4    your report.

5              I'm going to try to ask this generally, and we

6    may end up in specific places, but do you understand --

7    is it correct, in my understanding, that your definition

8    of "back telemetry" includes impedance telemetry?

9         A.   That's my understanding, yes.

10        Q.   Does your definition of "back telemetry"

11   include neural response telemetry?

12        A.   Well, I might quibble with the use of the term

13   "my definition of."

14             When I use the term, as it relates to the

15   patented feature, my understanding is it's restricted to

16   impedance telemetry.

17        Q.   Okay.  So I think we'll hit it as we go

18   through.  Because sometimes you refer to impedance

19   telemetry and sometimes back telemetry, and I just want

20   to make sure that I understand what the reference is to.

21             I asked this question at your earlier

22   deposition, but I'll ask it again just to make sure that

23   nothing has changed.  Your understanding is that

24   impedance telemetry is covered by the patents-in-suit,

25   correct?

Cate Elsten - Vol. II        **Alfred Mann Foundation v. Cochlear Corp.**

1      A.   My understanding is that the patents-in-suit

2    relate to impedance telemetry.

3      **Q.   Your understanding is that the patents-in-suit**

4    **do not relate to neural response telemetry, correct?**

5      A.   I would say at least not as claimed in this

6    case.  Whether they might be for another purpose, I

7    don't know.

8      **Q.   And is it your understanding that the**

9    **patents-in-suit do not relate to compliance telemetry?**

10      A.   It would be the same answer.  As it's relevant

11    to my work in the suit, my understanding is no.  Whether

12    that might be claimed for some other purpose, I don't

13    know.

14      **Q.   So the back telemetry that is really at issue**

15    **for purposes of your report is impedance telemetry,**

16    **correct?**

17      A.   That's my understanding.

18      **Q.   I'll refer you to a section.  I don't know**

19    **that we need to look at your report, but it might be**

20    **helpful.**

21       **At the bottom of page 12 and going on to**

22    **page 13, you indicate that "In June 2004, Advanced**

23    **Bionics was purchased by Boston Scientific ('BSC') for**

24    **approximately $740 million in cash, plus earn-out**

25    **payments."**

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1           Do you see that sentence?

2       A.   Yes.

3       Q.   Does that sentence correctly reflect your

4    understanding?

5       A.   Yes, I believe so.

6       Q.   Do you -- what was the date -- well, strike

7    that.

8            In your analysis, you considered a

9    hypothetical negotiation for a license, did you not?

10      A.   Yes.

11      Q.   What was the date of that hypothetical

12   negotiation?

13      A.   Let's see.  I need to try to get this right

14   because it's a little confusing in this case.

15           Let's see.  It would be, I believe, 1998.  And

16   I think I can pinpoint it to a month, but...

17           June 1998, more or less.

18      Q.   What page are you looking at?

19      A.   22, the second page of the time line that I

20   have in here.

21      Q.   And that would be the date associated with

22   Cochlear receiving FDA approval for U.S. sales of

23   Nucleus 24?

24      A.   Yes.

25      Q.   Do you believe that the eventual sale of

www.aptusCR.com

419                                              EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1   Advanced Bionics to Boston Scientific was foreseeable by

2   the parties in June of 1998?

3        A.   With specificity, I don't know.   In a general

4   sense, I think a sale of the company would have been

5   reasonably foreseeable.

6        Q.   A sale of the company to someone would be

7   reasonably foreseeable?

8        A.   Yes.

9        Q.   How about a sale to Boston Scientific?

10       A.   That, I don't know.

11       Q.   How about a sale to Boston Scientific for

12  740 million in cash plus earn-out payments?

13       A.   I think that would fall within a reasonable

14  range of expectations.   Whether there was any specific

15  expectation or target of that type at that date, I don't

16  know.

17       Q.   Would it be foreseeable to the parties that

18  Advanced Bionics might be worth nothing in 2004?

19       A.   I don't think that would have been a

20  reasonable expectation at the time of the hypothetical

21  negotiation, or I don't think it would have been an

22  expectation with a high probability of being correct.

23       Q.   Okay.   I think there are two things, so let's

24  break that up.

25            Would it be foreseeable to the parties that

420                                                      EXHIBIT U

Cate Elsten - Vol. II         Alfred Mann Foundation v. Cochlear Corp.

```
 1    there was some probability that Advanced Bionics might
 2    be worth nothing in 2004?
 3              MR. RAMALLO:  Objection.  Incomplete
 4    hypothetical.
 5              THE WITNESS:  Could I hear that question
 6    again, please?
 7    BY MR. CHAPMAN:
 8         Q.  Certainly.
 9              Would it be foreseeable to the parties that
10    there was some possibility that Advanced Bionics might
11    be worth nothing in 2004?
12         A.  I don't think it would be reasonably probable.
13    In business, nothing is impossible.  Nothing at least
14    along those lines.  But I don't think it would have been
15    reasonably probable.
16         Q.  So it was foreseeable and it was at least
17    possible that Advanced Bionics would be worth nothing in
18    2004?
19              MR. RAMALLO:  Objection.  Incomplete
20    hypothetical, asked and answered.
21              THE WITNESS:  Could I hear that again, please?
22    BY MR. CHAPMAN:
23         Q.  So it was foreseeable that it was at least
24    possible that Advanced Bionics would be worth nothing in
25    2004?
```

421                              EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

```
 1              MR. RAMALLO:  Same objections.
 2              THE WITNESS:  I would say no, other than in
 3     the sense that any business in existence today might
 4     cease to exist at some point in the future.  I don't
 5     think it would have been a reasonably probable
 6     expectation.
 7     BY MR. CHAPMAN:
 8         Q.  At the time of -- well, strike that.
 9              Do you understand that the Advanced Bionics --
10     let me start over.
11              Do you understand that Advanced Bionics
12     received a license from AMF in 1993?
13         A.  Yes as to the fact.  As to the date, sadly,
14     I'd have to take a quick look at that same time line.
15     Unless you just want to represent that's it's accurate,
16     in which case -- yeah.
17              Yes, that's consistent with what's in my time
18     line.
19         Q.  As of -- in 1993, Advanced Bionics was a
20     brand-new startup business, correct?
21         A.  That's generally my understanding.
22         Q.  Before the license from AMF, are you aware of
23     any technology owned by Advanced Bionics?
24         A.  I'm not personally, no.
25         Q.  Was it foreseeable by AMF in 1993 that
```

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1   me to delve into the details of that for my work on the

2   case.

3   BY MR. CHAPMAN:

4       Q.   Do brand-new startup businesses generally have

5   a higher risk of failure than businesses that have been

6   operating for an extended period of time?

7       A.   I don't think I could generalize about that.

8       Q.   Okay.  So let me go back to my question, my

9   original question.

10          In 1993, was it foreseeable by AMF that

11  Advanced Bionics might be worth nothing in 2004?

12          MR. RAMALLO:   Objection.   Incomplete

13  hypothetical.

14          THE WITNESS:   I don't think I know enough

15  about -- 1993 sort of fell outside the period of

16  analysis for purposes of my work.  So I really don't

17  have the information I'd need to comment on that.

18  BY MR. CHAPMAN:

19      Q.   Do you believe that the parties to the

20  hypothetical negotiation in June of 1998 foresaw that

21  Advanced Bionics would be purchased for $740 million in

22  cash plus earn-out payments?

23          MR. RAMALLO:   Objection.   Asked and answered.

24          THE WITNESS:   I think that a sale of some sort

25  in the future would be reasonably foreseeable.  And I

Page 116

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1    think the details you gave me are within the range of

2    reasonable expectations.

3    BY MR. CHAPMAN:

4        Q.   What do you believe the range of reasonable

5    expectations is?

6        A.   I hadn't thought of a low and a high with

7    regard to that.

8            (Reporter inquires.)

9            THE WITNESS:   I had not thought of a low and a

10   high with regard to that specific aspect.

11   BY MR. CHAPMAN:

12       Q.   Okay.   Back on page 13, the first full

13   sentence on that page says:

14            "In settlement of subsequent litigation

15            in 2008, BSC bought the earn-out payments and

16            sold portions of Advanced Bionics, including

17            the CIS product lines, back to Mr. Mann and

18            other investors."

19       Do you see that sentence?

20       A.   Yes.

21       Q.   Does that sentence correctly reflect your

22   understanding of facts?

23       A.   Yes.

24       Q.   Do you believe that subsequent litigation with

25   BSC was foreseeable by the parties in June of 1998, the

424                                          EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1   parties to the hypothetical negotiation?

2       A.   I think -- similar to my answer about

3   reasonably foreseeable, I think that it would be prudent

4   for them to have had an expectation of litigation, or

5   some action to keep the investment on course might be

6   necessary in the future.

7           I would doubt if they specifically anticipated

8   litigation, but I would also be surprised if they had

9   ruled it out.

10      Q.   The parties to the hypothetical negotiation in

11  1998 would not have foreseen the specific resolution of

12  that litigation, would they?

13      A.   Well, I don't think -- if your question

14  implies that they would have foreseen exactly how things

15  played out, I doubt it.  People seldom do.

16          Would they have been surprised to learn that

17  that was the course of future action?  I doubt that

18  that's true.

19      Q.   The license agreement between Advanced Bionics

20  and AMF was amended in 2009 to provide for an

21  8.5 million single, one-time royalty payment, correct?

22      A.   Correct.

23      Q.   Did that amendment -- well, strike that.  Let

24  me ask it in a more open way.

25          What role, if any, did that amendment play in

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1    your analysis?

2         A.  It's considered in certain of my calculations.

3         Q.  In 2009, Advanced Bionics was purchased by

4    Sonova, correct?

5         A.  That's my understanding, yes.

6         Q.  And -- strike that.

7              What role, if any, did the purchase of

8    Advanced Bionics by Sonova play in your analysis?

9         A.  Certain of the financial terms of that

10   transaction are included in some of my calculations.

11        Q.  Do you believe it was foreseeable, in the

12   hypothetical, in the hypothetical negotiation in June of

13   1998, that Sonova would purchase Advanced Bionics in

14   2009?

15        A.  I believe an event of that type would have

16   been reasonably foreseeable.  I don't have any reason to

17   believe or not believe that they would have anticipated

18   the specific purchaser.

19        Q.  And the specific amount of the purchase would

20   not have been anticipated by the parties to a

21   hypothetical negotiation in June of 1998, would it?

22             MR. RAMALLO:  Objection.  Vague.

23             THE WITNESS:  Again, I think that that

24   purchase price was in a range of reasonably foreseeable

25   probabilities.  Whether they nailed it to the penny, I'd

Cate Elsten - Vol. II          Alfred Mann Foundation v. Cochlear Corp.

```
 1    rather doubt.
 2    BY MR. CHAPMAN:
 3         Q.   Do you believe the parties -- strike that.
 4              Is there a range that the parties reasonably
 5    foresaw for the purchase by Sonova?
 6         A.   Well, if you're asking me as to the parties'
 7    state of mind, there may have been.  I haven't seen a
 8    record of it.  In my own experience, it would fall
 9    within a reasonable range.
10         Q.   Did you make any determination of what that
11    range was?
12         A.   I didn't, not with specificity.
13         Q.   On page 13, in the second -- in the first full
14    paragraph, you have a discussion of the right to bring
15    suit and a split in recovery from that suit.
16              Do you see that discussion?
17         A.   I do.
18         Q.   Did that play any -- did that right to control
19    and split play any role in your analysis?
20         A.   In my analysis, no.  I can't think of any way
21    that it did.
22         Q.   On page 13, under the section 3, Cochlear
23    Limited and Cochlear Americas.
24         A.   Yes.
25         Q.   Let me get this sentence.
```

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

```
 1   10:34 a.m.
 2   BY MR. CHAPMAN:
 3       Q.  I'm going to hand you an exhibit that was
 4   previously marked as Exhibit 1001.
 5           Have you seen Exhibit 1001 before?
 6       A.  Yes.
 7       Q.  It is the '616 patent considered in your
 8   opinion, correct?
 9       A.  Correct.
10       Q.  The '616 patent is for a "Physician's Testing
11   System and Method For Testing Implantable Cochlear
12   Stimulator," correct?
13       A.  That's the title, yes.
14       Q.  And the physician's -- strike that.
15           Do you have an understanding whether the
16   "physician's testing system" is part of the cochlear
17   implant system that you have identified in your report?
18           MR. RAMALLO:  Objection.  Vague.
19           THE WITNESS:  I guess I haven't devoted
20   thought to how "physician's testing system" is defined
21   in the context of the patent.  So I keep going back to
22   my area of analysis.  To my knowledge, it wasn't
23   included in the component sales that Cochlear provided.
24   So it's not part of my analysis.
25   ///
```

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

```
 1    BY MR. CHAPMAN:
 2         Q.   Did you consider in your analysis the scope of
 3    the claims in the '616 patent?
 4         A.   Not in the sense that I think you're using the
 5    term.  To me, that's a matter of patent analysis in a
 6    legal sense, and that's not what I do.
 7         Q.   Do you have an understanding as to what the
 8    '616 patent covers?
 9         A.   Again, to me, that sounds like it calls for a
10    legal conclusion or a technical conclusion, and that's
11    not within my area of expertise.
12         Q.   I'll ask this more generally.
13              Is the type of product covered -- no, maybe I
14    won't.  Strike that.
15              Next I'd like to show you another exhibit that
16    was previously marked as 1002.
17              Have you seen Exhibit 1002 before?
18         A.   Yes.
19         Q.   It is one of the patents-in-suit, correct?
20         A.   Yes.
21         Q.   Do you have an understanding as to whether
22    Exhibit 1002 relates to a physician's testing system?
23         A.   In any sense, no, I don't have that
24    understanding.  All I could tell you is that it's not in
25    the title.  And to go beyond that, even in a crude
```

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1    sense, I'd have to read the patent again.

2         Q.  The scope -- was the scope of the claims in

3    the '691 patent important to your analysis in your

4    Expert Report?

5              MR. RAMALLO:  Objection.  Vague.

6              THE WITNESS:  To the extent I understand that

7    question, I would say not directly.  As a damages

8    expert, I start with an assumption that the

9    patents-in-suit are valid and infringed absent a

10   license, and that's as far as it goes for me.

11   BY MR. CHAPMAN:

12        Q.  Is it important in a damages analysis to

13   determine what products are covered by a patent-in-suit?

14        A.  Ultimately, yes.

15        Q.  And -- strike that.

16             Did you assume that the two patents-in-suit

17   covered the same products?

18        A.  My understanding is that the same products are

19   alleged to infringe both patents, or at least that was

20   the starting assumption.

21        Q.  And was it your assumption that both

22   patents-in-suit relate to impedance telemetry?

23        A.  I don't think that was my understanding with

24   respect to the patents in their entirety.  My

25   understanding is that that was the functionality that

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1   system important to your analysis?

2           MR. RAMALLO:  Objection.  Vague and ambiguous.

3           THE WITNESS:  Well, again, not having a

4   complete understanding of what "programming system"

5   means in light of the sales data that's been provided to

6   me, I don't think I have a basis for answering that.

7   BY MR. CHAPMAN:

8       Q.  Do you have an understanding of what a

9   programming system is for a cochlear implant?

10          MR. RAMALLO:  Objection.  Vague and ambiguous.

11          THE WITNESS:  I've got to go back to what I

12  said at the top of the dep, which is I know that you

13  need to have an ability, there needs to be a means of

14  programming the system in order for it to work; but to

15  the extent that your question implies some level of

16  specificity beyond that, no.

17  BY MR. CHAPMAN:

18      Q.  Do you have an understanding of how frequently

19  impedance telemetry is used in programming a cochlear

20  implant?

21      A.  Well, to some extent, that builds on the

22  prior, which is -- the term "programming" isn't

23  specifically defined for me in the context of these

24  questions.  I have some understanding of what an average

25  or a norm might be.

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1              (Reporter inquires.)

2              THE WITNESS:  Or a norm might be.

3    BY MR. CHAPMAN:

4         Q.  What might the average or norm be?

5         A.  Well, I know we had a conversation with an

6    audiologist who said typically she might use impedance

7    telemetry half a dozen or so times at the time the

8    implant was initially installed.  I'm not sure what's

9    the right -- installed, inserted, implanted.  And maybe

10   two, three, four times in the 12-month period after

11   that.

12        Q.  When did you have the discussion with the

13   audiologist?

14        A.  Within the last -- within a couple of months

15   before the report was filed.

16        Q.  Did the audiologist discuss programming?

17             MR. RAMALLO:  Objection.  Vague.

18             THE WITNESS:  Not in any sense that I recall.

19   BY MR. CHAPMAN:

20        Q.  Did the audiologist -- strike that.

21             Who was the audiologist?

22        A.  She's identified in my report.  Her first name

23   is Ginger, I remember that.  Ginger Stickney,

24   S-t-i-c-k-n-e-y.

25        Q.  Did you speak to Ginger Stickney in person?

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

```
1        A.  No.

2        Q.  Did you speak to her by telephone?

3        A.  Yes.

4        Q.  Was anyone else present on that telephone

5   call?

6        A.  Yes.

7        Q.  Who was present on the telephone call?

8        A.  I don't recall.

9        Q.  Was it counsel?

10       A.  I honestly don't recall.  I'd have to

11  speculate.  I would speculate yes, but I don't recall.

12       Q.  What do you recall -- to the extent you

13  recall, what did Ginger Stickney tell you?

14       A.  What I just told you in the answer.

15       Q.  That she runs impedance telemetry a certain

16  number of times after implantation?

17       A.  Well, I'll go back to the whole answer.

18           What she said is she might use it half a dozen

19  or so times at the time of the implant, at the time the

20  implant's implanted -- there's got to be a better way to

21  put that -- and then two to four times maybe per year

22  afterwards.

23           And that would be barring any problems with

24  the unit, in which case it would be used more often.

25       Q.  Was Ms. Stickney referring to a particular
```

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1          Q.   This being Exhibit 1087?

2          A.   The stickers didn't get put on, so -- I think

3     so.

4          Q.   It's down at the bottom.

5          A.   Oh, that.  Okay, all right.  Yes, yes.

6               I'm sorry, I didn't see that tag.

7          Q.   Okay.  We can put 1086 aside.

8          A.   Okay.

9          Q.   And I'll ask questions about 1087.

10              On the first page of Exhibit 1087, it

11    specifies the grant of the license between AMF and

12    Advanced Bionics Corporation, correct?

13         A.   Correct.

14         Q.   And that grant of license includes primary

15    patents, secondary patents, know-how, and the right to

16    make, have made, use, lease and otherwise commercially

17    exploit licensed devices and license methods, correct?

18         A.   Yes, among other things.

19         Q.   And if you'd turn to section 1.4 in the

20    license agreement.

21         A.   Yes.

22         Q.   "Know-how" is very broadly defined to be

23    any -- pretty much anything -- well, that's going to be

24    a vague question.  Strike that.

25              In section 1.4, "know-how" is broadly defined,

EXHIBIT U

1    is it not?

2          MR. RAMALLO:  Objection.  The document speaks

3    for itself.

4          THE WITNESS:  I don't know if I'd characterize

5    that as "broad."  It's pretty typical boilerplate for a

6    know-how definition in a context such as this.

7    BY MR. CHAPMAN:

8          Q.  Did AMF transfer know-how to Advanced Bionics?

9          A.  Any know-how?  I'm not sure.  My understanding

10   is that it wasn't material or considered material for

11   the determination of the monetary terms.

12         Q.  When you say "not material," do you mean it

13   had zero value?

14         A.  No, not necessarily.  I mean the parties, as I

15   understand from conversation with representatives of

16   both Advanced Bionics and the Mann Foundation, did not

17   regard it as a key component of the license agreement.

18         Q.  And where did you obtain that information?

19         A.  From discussions with -- I'd have to look back

20   at this.  I think primarily it would have been

21   Mr. Fischer and Mr. Schloffman.

22         Q.  Do you know if either of those two were

23   involved in the negotiation of the license agreement

24   that is Exhibit 1087?

25         A.  I did, but I don't recall as I sit here.  I

1    think there's deposition testimony on that, though.

2         Q.  If there is not deposition testimony by

3    Mr. Fischer and Mr. Schloffman, do you know of any other

4    place where we might learn whether they were involved in

5    the negotiation of Exhibit 1087?

6         A.  Other than by asking them or their

7    successors -- I would say by asking their successors.

8             Or I'm sorry, I think that -- well, I'm

9    speculating now.  I think there are other individuals

10   who know the answer to that question.  I think their

11   successors would be two of them, but I think there are

12   others.

13            For instance, there were others on the list of

14   people that I've spoken with for purposes of this report

15   that I think would know the answer to that question, but

16   I wouldn't want to speculate beyond that.

17        Q.  So let's go back to the know-how.  I think you

18   said that it didn't have -- they said that it didn't

19   have a material value?  Is that correct?

20        A.  I don't think they put it quite that way, but

21   they talked about what the drivers of value were for the

22   license agreement from their viewpoint, and that was not

23   among them.

24        Q.  Did they attribute any value -- strike that.

25            Did they attribute any portion of the royalty

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

```
 1     under Exhibit 1087 as corresponding to the know-how?
 2          A.  Not to my understanding.
 3          Q.  Did they attribute no portion of the royalty
 4     in Exhibit 1087 to the know-how?
 5          A.  That was my general understanding, although I
 6     don't recall a question being posed quite that way.
 7          Q.  That the know-how did not -- that the royalty
 8     was not for payment of know-how?
 9          A.  That's correct.
10          Q.  Did anyone you spoke to indicate that AMF was
11     otherwise paid for the know-how that was transferred to
12     Advanced Bionics?
13          A.  No.
14          Q.  Are you familiar with a tax concept for
15     nonprofits called "excess benefits"?
16          A.  No, not that I can recall.  My tax accounting
17     for nonprofits is more than rusty.
18          Q.  If we look at paragraph 1.5 of Exhibit 1087,
19     it defines "Licensed Devices" and "Licensed Methods."
20               Do you see that?
21          A.  Yes.
22          Q.  Do you know whether AMF transferred any
23     licensed devices and licensed methods to Advanced
24     Bionics?
25          A.  Not that I'm aware of.  At least as defined in
```

www.aptusCR.com

EXHIBIT U

Cate Elsten - Vol. II          Alfred Mann Foundation v. Cochlear Corp.

1    this agreement.

2        Q.  Did you discuss with anyone whether any

3    portion of the royalty payments in Exhibit 1087 was

4    attributable to licensed devices and licensed methods?

5        A.  My understanding was that it was not, although

6    I did not pose the question that way.

7        Q.  That no portion of the royalty -- sorry.  It's

8    your understanding that no portion of the royalty was

9    payment for licensed devices and licensed methods,

10    correct?

11        A.  That was my understanding.

12        Q.  And that's based on a discussion with

13    Mr. Schloffman and Mr. Fischer?

14        A.  Yes.

15        Q.  Anything else?

16        A.  No, not that I can recall.

17        Q.  Did you do any independent analysis of the --

18    any know-how or licensed devices and licensed methods

19    transferred by AMF to Advanced Bionics?

20        A.  How do you mean "independent analysis"?

21        Q.  Did you do anything to identify what know-how

22    and licensed devices and methods were transferred to

23    Advanced Bionics?

24        A.  Just inquiry of knowledgeable personnel and

25    if -- and I can't remember if they were, but if these

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1   subjects had been discussed in the depositions, we would
2   have looked at that as well.
3        Q.   The depositions of Mr. Fischer,
4   Mr. Schloffman, nothing else?
5        A.   Mr. Mann possibly.  Anyone else who might have
6   had knowledge.
7        Q.   Did you talk to Mr. Mann?
8        A.   I don't recall having done so.
9             But he was deposed, of course.
10       Q.   Well, right.  So I understand you had a
11  conversation with Mr. Fischer and Mr. Schloffman,
12  correct?
13       A.   Yes.
14       Q.   And you read the depositions, including the
15  deposition of Mr. Mann?
16       A.   Yes.
17       Q.   Besides the conversation with Mr. Fischer and
18  Mr. Schloffman and the depositions that you read, did
19  you anywhere else obtain information on know-how,
20  licensed devices or licensed methods transferred from
21  AMF to Advanced Bionics?
22       A.   No.  And it is something I would have had in
23  mind in reviewing the record.
24       Q.   Let's go back to the first page of
25  Exhibit 1087.

Cate Elsten - Vol. II          Alfred Mann Foundation v. Cochlear Corp.

1           Section 1.2 has the definition of "primary

2   patents," correct?

3      A.   Yes.

4      Q.   And it says that the primary patents are

5   listed in Exhibit A, correct?

6      A.   Yes.

7      Q.   Let's turn, then, to Exhibit A of 1087.

8           Exhibit A lists under No. 1, Master Licenses,

9   a patent to Gerald E. Loeb, and it specifies Patent

10  No. 5,571,148.

11           Do you see that?

12      A.   Yes.

13      Q.   Do you know if that patent relates to back

14  telemetry?

15      A.   I don't believe so, but in truth, I don't

16  recall.

17      Q.   That patent is not one of the patents-in-suit,

18  though, correct?

19      A.   No.   And I really don't think it has anything

20  to do with back telemetry.

21      Q.   Did you do any analysis to determine the value

22  associated with Patent No. -- license to Patent

23  No. 5,571,148?

24      A.   If any, you mean?

25      Q.   If any.

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1          A.   Yes.   No.

2          Q.   Excuse me?

3               (Reporter inquires.)

4               THE WITNESS:   No.

5    BY MR. CHAPMAN:

6          Q.   So you did no analysis of the value of any of

7    that patent?

8          A.   Okay.   I'd probably better stop here and ask

9    you to clarify what you mean by "analysis of value."

10         Q.   Did you make any determination of the value

11   associated with a license to Advanced Bionics of the

12   Gerald E. Loeb patent?

13         A.   I made inquiries, and the indication was that

14   no value in the sense of monetary value was assigned to

15   it at the time of the license.

16         Q.   In section 2, there's a list of primary

17   patents.   Did you make any determination of the value

18   attributable to the license of primary patents other

19   than the two patents-in-suit?

20         A.   I did no analysis of independent value.   I did

21   make inquiries.

22         Q.   And what did those inquiries reveal?

23         A.   The indication from the conversations, which I

24   think is consistent with the topic as covered in

25   deposition, is that no independent value was assigned to

EXHIBIT U

Cate Elsten - Vol. II                          Alfred Mann Foundation v. Cochlear Corp.

1    those in determining the royalty portion of the
2    agreement.
3         Q.  When you say "no independent value," is that
4    different from no value?
5         A.  I could also say no monetary value.
6             "Value" is such a broad term and can have so
7    many meanings.  But my understanding was that no portion
8    of the monetary compensation specified in the license
9    agreement was associated with patents other than the
10   ones in suit or, in this case, applications it matured
11   into.
12        Q.  Were you told that all of the royalty that was
13   paid -- strike that.
14            Were you told that all of the royalty that was
15   payable under Exhibit 1087 was attributable to
16   patents-in-suit?
17        A.  Not to the patents-in-suit but to the
18   technology in suit.
19        Q.  That technology being impedance telemetry?
20        A.  That's my understanding, yes.
21        Q.  And to the extent that the primary patents
22   relate to something other than impedance technology,
23   none of the royalty payments were attributed to those
24   technologies, correct?
25        A.  That's my understanding, yes.

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1        Q.   And where did that understanding come from?

2        A.   At least from my discussions with

Mr. Schloffman and Mr. Fischer, and I don't recall at

this time whether there was deposition testimony on that

subject or not.

6        Q.   Besides Mr. Schloffman and Mr. Fischer and

7   deposition testimony that you reviewed, was there any

8   other source attributing all of the value of the

9   royalties paid under Exhibit 1087 to impedance

10  telemetry?

11       A.   I'm sorry, could I hear that again?

12       Q.   Besides Mr. Schloffman and Mr. Fischer and

13  deposition testimony that you reviewed, was there any

14  other source attributing all of the value of the

15  royalties paid under Exhibit 1087 to impedance

16  telemetry?

17       A.   Well, payable under 1087, yes, I'd agree with

18  that.

19       Q.   You'd agree that there was no other source?

20       A.   Yeah.  Yes.

21            That was inartfully put, I'm sorry.

22       Q.   Your discussion with Mr. Schloffman was after

23  this litigation began?

24       A.   Yes.

25       Q.   And your discussion with Mr. Fischer was after

EXHIBIT U

1    this litigation began, correct?

2         A.  Correct.

3         Q.  After this litigation began -- strike that.

4             Were you told whether Advanced Bionics

5    otherwise compensated AMF for technology licensed in the

6    primary patents apart from impedance telemetry?

7         A.  I have no knowledge of any separate

8    compensation.

9             And I guess, more specific to your question,

10   no, no one told me that.

11        Q.  Did Mr. Schloffman tell you -- well, strike

12   that.

13            Did either Mr. Schloffman or Mr. Fischer tell

14   you how they determined that no portion of the royalty

15   payable under Exhibit 1087 was for any technology other

16   than impedance telemetry?

17        A.  Well, that wasn't the nature of this

18   discussion or the nature of the information as they

19   conveyed it.  What they conveyed was that the technology

20   in suit was what drove the deal or drove specifically

21   the monetary portion of the deal; and by extension, the

22   monetary portion was not attributable to other licensed

23   properties.

24        Q.  Did they tell you how they determined that the

25   technology in suit -- let me back up.

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1      By "technology in suit," you mean impedance
2   telemetry?
3      A.  Yes, or however else that may be legally
4   defined.
5      Q.  And did they tell you how they determined that
6   the technology in suit was what drove the deal?
7      A.  How they determined it?  No, I don't recall us
8   discussing that.
9      Q.  Did they tell you any facts that led you to --
10  strike that.
11      Did they tell you any facts to confirm that
12  the technology in suit was what drove the deal?
13      A.  I don't understand the question.
14      Q.  Did you do anything to confirm that the
15  technology in suit was what drove the deal in the
16  license of Exhibit 1087?
17      MR. RAMALLO:  Objection.  Vague.
18      THE WITNESS:  The discussions that -- with
19  Mr. Schloffman and Mr. Fischer and my examination of
20  other relevant parts of the record.
21      MR. CHAPMAN:  I'm done with Exhibit 1087, so
22  maybe this would be a good time for a lunch break.
23      THE WITNESS:  Oh, sure.
24      THE VIDEOGRAPHER:  We are off the record at
25  12:24 p.m.

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1              At page 32 of your report, in the last full

2      paragraph, you indicate that:

3                  "Compensation paid to AMF for this

4              license included one million shares of

5              Advanced Bionics stock (4.6 percent of the

6              outstanding shares) and running royalties of

7              3.0 percent of net revenues for the first four

8              years, 2.5 percent for the subsequent four

9              years and 2.0 percent for all years

10             thereafter."

11             Do you see that sentence?

12     A.   Yes.

13     Q.   If I understand, all of that compensation is

14     attributable, in your view, to the patents-in-suit?

15     A.   I'm sorry, could you ask it again?

16     Q.   Am I correct in my understanding that all of

17     the compensation that you discuss in that paragraph is

18     attributable to the patents-in-suit?

19     A.   That's my understanding.

20     Q.   And it's not attributable to other things that

21     might have been licensed by AMF, correct?

22     A.   That's my understanding.

23     Q.   And then let's turn to the next page, page 33.

24             And in the first full paragraph, you discuss

25     an amendment by the parties on January 1st, 2004.

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1          Do you see that?

2      A.   Yes.

3      Q.   And in that amendment, AMF was granted

4  additional shares of stock by Advanced Bionics, correct?

5      A.   Correct.

6      Q.   Was that -- strike that.

7          Were those additional grants of stock in 2004

8  foreseeable by the parties in June of 1998 during the

9  hypothetical negotiation?

10          MR. RAMALLO:   Objection.  Vague.

11          THE WITNESS:   I think transactions or

12  alterations of -- transactions of this type are common

13  in this industry.  And therefore, I think they could

14  have been reasonably foreseeable or within the

15  parameters of what was reasonably foreseeable.

16  BY MR. CHAPMAN:

17      Q.   It was -- let me back up.

18          Was it reasonably foreseeable that there would

19  be an amendment to the Advanced Bionics-AMF license in

20  June of 1998?

21      A.   I think generally a transaction of that type

22  would be within the reasonably foreseeable big picture,

23  the "big picture" being realization of value from the

24  licensing of the patents.

25      Q.   Was it foreseeable to the parties in the

EXHIBIT U

1    hypothetical negotiation in June of 19- -- well, strike

2    that.

3              Was the particular grant of 1.1 million shares

4    foreseeable to the parties in the hypothetical

5    negotiation in June 1998?

6              MR. RAMALLO:  Objection.  Vague.

7              THE WITNESS:  I don't know whether they had

8    any alternative scenario that they anticipated at that

9    time, if you're asking the question with specificity.

10   BY MR. CHAPMAN:

11        Q.  I'm asking the question specifically for the

12   share grant that was in the 2004 license --

13        A.  Yes.  So, in other words, if the question is

14   did they foresee that exact number of shares being

15   transacted in that way on that date, the answer is I

16   don't know.

17        Q.  Was all -- were all of the additional shares

18   granted in the January 2004 amendment attributable to

19   the patents-in-suit?

20        A.  That's my understanding.

21        Q.  Was any of the -- so none of the additional

22   shares granted in January 2004 were attributable to

23   know-how?

24        A.  That's my understanding.

25        Q.  And none of the additional shares granted in

1    January of 2004 were attributable to patents other than

2    the patents-in-suit?

3          A.   That's my understanding.

4          Q.   Let's take a look at page 34.

5               Under Table 4, it says:

6                    "I've been informed by David Hankin,

7               AMF's chief executive office and former

8               general counsel, that AMF places greater

9               emphasis on the receipt of equity in

10              transactions involving AMF's technology than

11              on ongoing royalty payments."

12              Do you see that sentence?

13         A.   Yes.

14         Q.   When did you talk to Mr. Hankin?

15         A.   Again, that would have been within the couple

16   months or so prior to the filing of the report.

17         Q.   Did you talk to Mr. Hankin at all at the time

18   of your prior report?

19         A.   I didn't at the time of the initial report.  I

20   don't recall whether I talked to him prior to my

21   supplemental report or not -- or my surrebuttal report.

22              If I did, it should have been disclosed in the

23   footnote to that.

24         Q.   So that's how we could identify when the -- if

25   it was not in the surrebuttal report and it is in this

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1    human body, correct?

2         A.   Some of them are, yeah.

3              And the footnote is representative.  There's a

4    longer list that you can get if you look at the RMA

5    source document.

6         Q.   Did you make any attempt to compare Cochlear's

7    profitability to companies manufacturing electronic

8    implantable devices?

9         A.   That's included in this category.

10        Q.   Right.  But it's not isolated in the category,

11   correct?

12        A.   No.  I'm not aware of any data that's that

13   specific.

14        Q.   Is impedance telemetry the basis for demand

15   for cochlear implants?

16             MR. RAMALLO:  Objection.  Vague, incomplete

17   hypothetical.

18             THE WITNESS:  Could you repeat the question?

19   I'm not sure I understood it.

20   BY MR. CHAPMAN:

21        Q.   Is impedance telemetry the basis of demand for

22   cochlear implants?

23             MR. RAMALLO:  Objection.  Vague and

24   incomplete.

25             THE WITNESS:  Well, first of all, say, do you

Cate Elsten - Vol. II        Alfred Mann Foundation v. Cochlear Corp.

1   mean in the real world or the hypothetical world?

2   BY MR. CHAPMAN:

3       **Q.  In the real world.**

4       A.  In the real world, because everyone has it, I

5   don't think it's the basis.  I think it's become one of

6   a number of fairly undifferentiated features due to the

7   infringement.

8       **Q.  You have made no attempt in your report to**

9   **allocate the portion of Cochlear's revenue attributable**

10  **to impedance telemetry, have you?**

11      A.  The revenue as opposed to the profits?

12      **Q.  Yes.**

13      A.  No.

14      **Q.  Have you made any -- strike that.**

15      A.  Although, I mean, I will add you could infer a

16  revenue apportionment from the profit apportionment.

17  But no, I haven't directly apportioned revenues.

18      **Q.  And you've applied the reasonable royalty that**

19  **you determined to the entirety of the revenue from**

20  **Cochlear's CISs with impedance telemetry, correct?**

21      A.  There's no reason why I need that read back,

22  but could you do it anyway?

23      **Q.  Sure.**

24      A.  Thank you.  My attention wandered there.  I'm

25  sorry.

EXHIBIT U

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

1      Q.  Well, it was perhaps a somewhat awkward

2    question.

3           The revenue that you used to apply the

4    reasonable royalty represents all of the revenue of

5    Cochlear's CIS for products, including impedance

6    telemetry, correct?

7      A.  For products -- I would say for products

8    capable of impedance telemetry, yes.

9      Q.  On page 45 of your report -- and I think it's

10   the second-to-the-last full sentence on that page,

11   suggests that the -- it says:

12               "This suggests that the initial increase

13          in profitability on CISs with back telemetry

14          may logically be concluded to be due to the

15          presence of back telemetry itself."

16          Do you see that?

17     A.  Yes.

18     Q.  When you referred to back telemetry there,

19   what type of back telemetry are you referring to?

20     A.  I don't think I distinguished for purposes of

21   that sentence.

22          I'm sorry, I'm going to go back a couple of

23   sentences and take a running start at this.

24          All right.  Back telemetry, in that sense, I

25   think would be -- would include both impedance and back

EXHIBIT U

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I, CATE M. ELSTEN, the witness herein, declare

 4    under penalty of perjury that I have read the foregoing

 5    in its entirety; and that the testimony contained

 6    therein, as corrected by me, is a true and accurate

 7    transcription of my testimony elicited at said time and

 8    place.

 9

10         Executed this _____ day of

11    _____, 2013, at

12    _____, California.

13

14

15

16                      _____

17                      CATE M. ELSTEN

18

19

20

21

22

23

24

25
```

Page 213

EXHIBIT U

```
 1                    DEPOSITION ERRATA SHEET

 2     Page No. _____ Line No. _____

 3     Change: _____

 4     Reason for change: _____

 5     Page No. _____ Line No. _____

 6     Change: _____

 7     Reason for change: _____

 8     Page No. _____ Line No. _____

 9     Change: _____

10     Reason for change: _____

11     Page No. _____ Line No. _____

12     Change: _____

13     Reason for change: _____

14     Page No. _____ Line No. _____

15     Change: _____

16     Reason for change: _____

17     Page No. _____ Line No. _____

18     Change: _____

19     Reason for change: _____

20     Page No. _____ Line No. _____

21     Change: _____

22     Reason for change: _____

23

24

25     _____         _____
       CATE M. ELSTEN                            Dated
```

EXHIBIT U

Case 2:07-cv-08108-FMO-SH  Document 319-4  Filed 11/26/13  Page 167 of 217  Page ID #:11198

Cate Elsten - Vol. II                    Alfred Mann Foundation v. Cochlear Corp.

```
 1                    REPORTER CERTIFICATION

 2

 3          I, Darcy J. Brokaw, a Certified Shorthand

 4     Reporter, do hereby certify:

 5          That prior to being examined, the witness in

 6     the foregoing proceedings was by me duly sworn to

 7     testify to the truth, the whole truth, and nothing but

 8     the truth;

 9          That said proceedings were taken before me at

10     the time and place therein set forth and were taken down

11     by me in shorthand and thereafter transcribed into

12     typewriting under my direction and supervision;

13          I further certify that I am neither counsel

14     for, nor related to, any party to said proceedings, nor

15     in any way interested in the outcome thereof.

16          In witness whereof, I have hereunto subscribed

17     my name.

18

19     Dated:  February 5, 2013

20

21     _____

       Darcy J. Brokaw
22     CSR No. 12584, RPR, CRR

23

24

25
```



EXHIBIT U

# EXHIBIT V

# COCHLEAR TECHNOLOGY LICENSE AND ROYALTY AGREEMENT

This agreement ("Agreement") is entered as of January 1, 2004 ("Effective Date"), by and between the Alfred E. Mann Foundation for Scientific Research ("AMF"), a not-for-profit corporation organized and existing under the laws of the State of California, with principal place of business at 25134 Rye Canyon Loop, Suite 200, Santa Clarita, California 91355 and Advanced Bionics Corporation ("AB"), a corporation organized and existing under the laws of the State of Delaware, with principal place of business at Mann Biomedical Park, 25129 Rye Canyon Loop, Valencia, California 91355.

*WHEREAS* prior to the Effective Date, AMF and AB previously entered and remain party to four (4) agreements and one amendment to an agreement (collectively "Old Agreements"), as follows:

   a.  License Agreement – Cochlear Stimulation Field of Use dated May 18, 1999;
   b.  License Agreement – Battery Powered Bion Field dated May 18, 1999;
   c.  License Agreement – RF Bion Field dated May 18, 1999;
   d.  AOP Agreement – Battery Powered Bion Field dated May 23, 2001; and
   e.  Amendment to License Agreements dated October 11, 2001.

*WHEREAS* AMF and AB wish to terminate the Old Agreements and simultaneously enter three (3) new agreements (collectively "New Agreements"), as follows:

   a.  Cochlear Technology License and Royalty Agreement, and
   b.  License, Royalty And Manufacturing Agreement – Battery Powered Bion® Devices And Services, and
   c.  License, Royalty And Manufacturing Agreement – RF Bion® Devices and Services;

*WHEREAS* AMF owns certain United States and foreign patents, technologies and know-how related to devices commonly known as cochlear implants and has developed and/or has rights to certain technology, scientific knowledge, know-how, trade secrets, ideas and other information and data relating thereto.

*WHEREAS* AMF desires to grant and AB desires to accept the grant of certain rights, licenses and interests to enable AB to exploit such patents and other rights in accordance with the terms hereof.

Now therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1. DEFINITIONS

   a.  "Affiliate" means with respect to any Person, any Person that directly or indirectly owns or controls 25% or more of that Person or is 25% or more owned by or

Defendants' EXHIBIT 1091
WITNESS: Greiner
PAGE 1 OF 22
RENEE D. ZEPEZAUER, 6275
DATE 12.16.08

CONFIDENTIAL - ATTORNEYS EYES ONLY      AB00297

    controlled by that Person, or toehrwise shares 25% or more common ownership with that Person.

b. "AMF Cochlear Technology" means all of AMF Patents and AMF Know-how in the Cochlear Stimulation Field of Use.

c. "AMF Know-how" means all technology, trade secrets, scientific knowledge, ideas, techniques, models, diagrams, drawings, plans, specifications, research plans, research data, development plans, development data, production data, production plans, test reports, experimental results, inventions, discoveries, improvements, processes, formulae, marketing plans, routes to market, disclosed or undisclosed customer relationships, applications thereof and other know-how and/or other information owned or controlled by AMF or any Affiliate of AMF or to which either of them has any rights as of the Effective Date or at any time during the Term relating to the Cochlear Stimulation Field of Use.

d. "AMF Cochlear Patents" means any patents issued upon inventions, discoveries, improvements, modifications, further inventions or designs invented or developed by AMF or on its behalf in the Cochlear Stimulation Field of Use that are owned, licensed or controlled by AMF or any Affiliate of AMF or to which any of them has any rights under any license agreement or otherwise now or at any time during the Term.

e. "AMF Cochlear Technology" means all AMF Cochlear Patents and AMF Know-how in the Cochlear Stimulation Field of Use.

f. "Change of Control" means either (a) an acquisition of equity interests of a Party if the acquiring Person - other than Mr. Alfred Mann or an affiliate or successor of Mr. Mann, would thereafter be the actual or beneficial owner of 50% or more of the Party's voting securities or be entitled to elect more than 50% of the directors of the Party; (b) a merger or consolidation of the Party resulting in the holders of the Party's equity interests immediately prior to such transaction holding less than 50% of the total voting stock of the surviving company after such transaction; (c) a sale or exchange of all or more than 50% (by value) of the property and assets of the Party; or (d) the transfer of substantially all of a Party's assets relating to the Cochlear Stimulation Field of Use, whether by merger, consolidation, sale of assets or otherwise but not including transfer to an Affiliate.

a. "Claim(s)" mean all manner of action or actions, cause or causes of action, at law or in equity, suits, debts, liens, contracts, agreements, rights, promises, liabilities, claims, obligations, demands, damages, losses, costs, penalties, fees (including, without limitation, reasonable attorney's fees), and/or reasonable expenses, of any kind or nature whatsoever, known or unknown, suspected or unsuspected, concealed or hidden, fixed or contingent.

b. "Cochlear Stimulation Field of Use" means that field of knowledge relating to the development, manufacture, use, marketing, sale, support and service of any hardware, software, process or system that electrically stimulates the cochlear nerve and use thereof.

c. "Confidential Information" means information or material, including oral disclosure of information, provided by one Party to the other Party in connection with this Agreement. Notwithstanding the foregoing, Confidential Information shall not include information (a) which is in or enters the public domain other than by actions

EXHIBIT V
AB00298

of the Receiving Party provided, the disclosure of Confidential Information in a patent or other publication shall not release the Receiving Party from its obligation to maintain in confidence any Confidential Information not specifically disclosed therein or fairly ascertainable there from; (b) possessed by the Receiving Party without restriction at the time of receipt under this Agreement or the Old Agreements; (c) used or disclosed with prior written approval of the Disclosing Party; (d) independently developed by the Receiving Party; (e) which becomes known to the receiving party from another source without breaching any obligation of confidentiality; or (f) made available by the Disclosing Party to a Third Party on an unrestricted, non-confidential basis.  The Parties agree that the terms and conditions of this Agreement (but not its existence) are Confidential Information.

d.  "Disclosing Party" means the Party that discloses information, including, without limitation, Confidential Information.

e.  "Fair Market Value" means the amount of cash a willing buyer would pay a willing seller, neither being under any compulsion to buy or sell and each having access to all relevant information regarding valuation.  If "Fair Market Value" is disputed by the Parties, it shall be decided by a mutually acceptable independent appraiser at the expense of whichever Party's "Fair Market Value" estimate proves wrong, or in the event both Parties estimates prove to be wrong, borne equally by the Parties.

f.  "FDA" means the United States Food and Drug Administration.

g.  "Infringement" means an alleged, actual, suspected, potential or threatened infringement, misappropriation or unauthorized use by a Third Party of AMF Cochlear Technology.

h.  "Insolvent" means that a party hereto becomes the subject of any proceeding instituted by or against such party seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debt under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property), any such proceeding will remain undismissed or unstayed for a period of sixty (60) days.

i.  "Master License(s)" means the license agreements listed in Exhibit A hereto, entered into by AMF prior to entering the Old Agreements, upon which some of the rights and licenses granted by AMF hereunder may be dependent.

a.  "Net Revenues" means net sales (regardless of the character of those sales, including without limitation, cash, cash equivalents, securities, credits, offsets, license or sublicense fees) of a cochlear implant products (but including only the portion of hybrid devices related to the electrical stimulation of the cochlear nerve), related services or auxiliary devices to unaffiliated third parties by AB and its Affiliates, calculated in accordance with GAAP consistently applied, which calculation will generally consist of gross revenues, including recurring royalty revenues received in respect of AMF Intellectual Property and any non-recurring payments received in

NYDOCS02/689283.1 Revised on 5/4/04                    3

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00299

respect of AMF Intellectual Property, less (i) fees payable in connection with the sale of a product, related services or auxiliary devices to non-affiliated third parties at the request of customers (including group purchasing organization administration fees, warehousing and distribution fees, and electronic exchange fees or charges), (ii) cash or product discounts, refunds, replacements, or credits granted to purchasers for the return of a product, related services or auxiliary devices or as reimbursement for damaged product, (iii) freight, postage, insurance and other shipping charges paid in connection with a product, related services or auxiliary devices , and (iv) sales and use taxes, customs, duties, and other governmental taxes or charges (except taxes or charges based on income), including any value added taxes incurred in connection with the sale of a product, related services or auxiliary devices. When Net Revenues are paid in a currency other than United States dollars, the amount of royalties payable with respect thereto will first be determined in the foreign currency of the country in which the Net Revenues are paid and will then be converted into equivalent United States dollars using the exchange rate reported in the Wall Street Journal for the last day of the calendar quarter for which the related royalties are payable. If Net Revenues are paid in a form other than cash, the amount thereof will be equal to the Fair Market Value of such securities or property as reasonably determined by AB and reasonably satisfactory to AMF. Notwithstanding anything to the contrary in this Agreement, Net Revenues will not include any amount relating to the license, sublicense, or cross-license of any Intellectual Property in connection with the settlement of an Intellectual Property dispute, but with respect to which related monetary amounts, if any, will be allocated in accordance with Sections 8 and/or 11. Net Revenues also includes the reasonable, good faith allocation of revenues attributed to a product, related services or auxiliary devices sold in concert with or simultaneously with the sale of other devices or services. For purposes of this Agreement, a reasonable, good faith allocation attributable to a product, related services or auxiliary devices will occur when such allocation is at least in proportion to the relative cost of goods sold (calculated in accordance with generally accepted accounting principals ("GAAP") consistently applied) of each product or service in the bundle.

j.  "Party" or "Parties" means AMF and AB, individually and collectively, depending on the context of use within this Agreement.

k.  "Person" means a natural person, corporation, limited liability company, association, joint stock company, limited partnership, general partnership, proprietorship, trust, union, association, court, tribunal, agency, government, department, commission, self-regulatory organization, arbitrator, board, bureau, instrumentality or other entity, enterprise authority or business organization.

l.  "Receiving Party" means the Party that receives information, including, without limitation, Confidential Information.

m.  "Third Party" or "Third Parties" means any Person other than AB or AMF or any Affiliate thereof.

2.  LICENSES

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00300

2.1   Initial License Grant.  Subject to the limitations set forth in Section 2.4, AMF
hereby grants to AB an exclusive, royalty-bearing (as provided below), worldwide
license throughout the Term, with a right to sublicense (subject to the provisions
in Section 2.6(a) through (e)) in and to the AMF Cochlear Technology to make,
have made, use, lease, offer to lease, sell, offer to sell and otherwise commercially
exploit products and perform services in the Cochlear Stimulation Field.

2.2   Development Efforts of AMF.  Following the Effective Date, AMF shall have no
specific obligation to continue developing technologies in the Cochlear
Stimulation Field of Use.  If AMF develops additional technologies in the
Cochlear Stimulation Field of Use, such technologies shall automatically become
AMF Cochlear Technology and automatically be licensed to AB without further
action, in accordance with the terms of Section 2.1 and 2.3.

2.3   License Following Term.  Subject to the limitations set forth in Section 2.4, and
provided that this Agreement is not terminated before the expiration of the Term,
at the end of the Term, AB shall have an exclusive, perpetual, fully paid-up,
royalty-free, worldwide license, with a right to sublicense that is not subject to the
restrictions in Section 2.6(a) through (e) in and to the AMF Cochlear Technology
licensed to AB to make, have made, use, lease, offer to lease, sell, offer to sell and
otherwise commercially exploit products and services in the Cochlear Stimulation
Field of Use.

2.4   Nature of Licenses.  Certain of the rights and licenses granted by AMF to AB may
be subject to the Master Licenses and certain rights may be limited by the terms
of the Master Licenses.  With respect to the rights licensed under this Agreement
which are licensed to AMF under the Master Licenses, this Agreement shall
constitute a sublicense.  So long as this Agreement is not terminated pursuant to
Section 6.2 , AMF will not license or otherwise authorize any other Person to
exercise any of the rights licensed to AB pursuant to this Agreement and shall
provide written notice to AB of any uncured default under the Master Licenses
actually known by AMF sufficient for AB to step in and cure the default or take
other steps necessary or appropriate to protect its interests therein.

2.5   Change of Control.  In the event of a Change of Control of AB, AMF's obligation
to grant further licenses to AB following the commencement of the Term pursuant
to Sections 2.2 and 2.3 shall automatically terminate.

2.6   Right to Sublicense.  With respect to the AMF Cochlear Technology licensed or
sublicensed by AMF to AB hereunder, AMF hereby grants to AB the exclusive
worldwide right and license to grant sublicenses to Affiliates of AB.  In each
sublicense agreement, AB will include the following provisions:

  a.   confidentiality requirements on all of its sublicensees comparable to the
       requirements of Section 12.3;

NYDOCS02/689283.1 Revised on 5/4/04                    5

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00301

b. corresponding reporting, inspection and audit rights for the sublicensor satisfying all of the conditions set forth in Section 3.5 (but AB shall be responsible for the report, for the payment of the royalties provided for herein and for inspection and audit rights whether or not its sublicensee honors its obligations thereto); and

c. a provision terminating the sublicense agreement if this Agreement is terminated in accordance with Section 6;

d. AB shall negotiate the royalty rates provided in Section 3.1 as a "pass through" in respect of any license, sub-license or other similar arrangement it might enter such that AMF will receive royalties based on the reported Net Revenue of the sublicensee.

## 3. EQUITY ISSUANCE; ROYALTIES

3.1   Grant of AB Stock.  On the Effective Date, AB will issue to AMF one million one hundred thousand (1,100,000) shares of AB common stock (the "Common Stock").

3.2   Royalty Rates.  Each calendar quarter during the Term (and retroactively in the case of subsection a, below), AB shall pay AMF royalties on all Net Revenues, as follows:

a. Retroactively, for the period commencing on January 1, 2003 through and including May 18, 2003, three percent (3%);

b. Retroactively, for the period of May 19, 2003 through and including December 31, 2003, two and one half percent (2.5%);

c. For years 2004, 2005, 2006 and 2007, one and one quarter percent (1.25%); and

d. For the balance of the term, one percent (1%).

3.3   Manner of Payment.  All amounts payable by AB to AMF as royalties pursuant to this Agreement shall be payable in United States funds.

3.4   Reports.  Sixty (60) days following the close of each calendar quarter during the Term, AB shall provide AMF with a Report for the previous calendar quarter that calculates the royalties due under this Agreement.   The Reports will contain sufficient detail to enable AMF to understand and verify the accuracy of the calculation of Net Revenues and each material element thereof, including details with respect to each sublicense agreement. AB shall provide AMF a report for the year 2003 ("2003 Report") and a report for the first calendar quarter for the year 2004, pursuant to this Section 3.3, within sixty (60) days following the date on which both Parties have executed this Agreement.

NYDOCS02/689283.1 Revised on 5/4/04                    6

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00302

3.5    <u>Payment of Royalties</u>.   Concurrently with the delivery of each quarterly report, AB shall tender the royalties due and owing to AMF.  Untimely royalty payments shall accrue interest at the lesser of the prime rate of interest plus 5% or the maximum lawful rate.   If AB remits royalties in an untimely manner three or more times during any three-year period during the Term, AMF shall have the right to terminate the Agreement in accordance with Section 6 hereof.   With respect to royalties due pursuant to Sections 3.2.a and b and for the first calendar quarter of the year 2004, AB shall tender payment concurrently with the 2003 Report.

3.6    <u>Audit Rights</u>.   No more than once annually, and only with respect to AB's last two full fiscal years, AMF will have the right at reasonable times and upon reasonable notice to inspect and cause an audit of the books and records of AB, its Affiliates and sublicensees relating to the subject matter of the reports required by Section 3.4.  Any such inspection or audit shall be at AMF's sole expense unless the results thereof indicate an underpayment of royalties exceeding five percent (5%) of the amount due for any six-month period ("Audit Period"), in which event AB shall pay the cost of the audit.  If 2 or more audits reveal that AB has made underpayments for any Audit Period of ten percent (10%) or greater to AMF in a two-year period, AB will pay to AMF an amount equal to twenty percent (20%) of the total unpaid amount ultimately determined to be due and payable for that Audit Period.

4.    [INTENTIONALLY DELETED]

5.    RELATIONSHIP AMONG AGREEMENTS

5.1    The New Agreements shall be effective conditioned on concurrent full execution of each and all of the New Agreements.  Following the execution of each of the New Agreements by AB and AMF, the Old Agreements, including all obligations of the Parties thereunder, shall be terminated.

6.    TERM AND TERMINATION

6.1    <u>Term</u>.  This Agreement shall commence on the Effective Date and shall continue in full force and effect for a period of eighteen (18) years unless terminated earlier in accordance with the terms hereof.

6.2    <u>Termination By AMF</u>.  AMF may terminate this Agreement upon written notice to AB if:

a.    Unless otherwise provided herein, AB defaults in the performance of any of its material obligations under this Agreement and within 60 days after the delivery of written notice from AMF of such default, AB fails to cure the same or, if such default does not involve the payment of money and cannot be

NYDOCS02/689283.1  Revised on 5/4/04       7

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00303

cured within such 60 day period, AB fails to commence or to diligently proceed with the curing of such default; or

b.  Any material representation or warranty made by AB herein shall prove to be false in any material respect; or

c.  AB becomes insolvent

6.3  Termination by AB.  AB may terminate this Agreement upon written notice to AMF if:

a.  AMF defaults in the performance of any of its obligations under this Agreement and, within 60 days after delivery of written notice of AB of such default, AMF fails to cure the same, or if such default does not involve the payment of money and cannot be cured within such 60 day period, AMF fails to commence or diligently proceed with the curing of such default; or

b.  AMF becomes insolvent; or

c.  Any material representation or warranty made by AMF herein shall prove to be false in any material respect.

6.4  Effect of Termination.  If AMF terminates this Agreement pursuant to Section 6.2, AB shall immediately cease exercising all rights hereunder with respect to the AMF Cochlear Technology except to the extent necessary to meet outstanding contractual obligations to sell products manufactured by AB or its sublicensees or contractors or in the process of being manufactured in the Cochlear Stimulation Field of Use or perform services therein.  If AB terminates this Agreement pursuant to Section 6.3.a or 6.3.c, AMF shall grant to AB a non-exclusive, perpetual, non-royalty-bearing, worldwide license in and to the AMF Cochlear Technology to make, have made, use, lease, sell and otherwise commercially exploit products or perform services in the Cochlear Stimulation Field of Use.  If AB is the terminated Party, upon such termination, AB shall no longer have any obligation to perform any obligation of AMF under any Master License which was assumed hereunder and is to be performed after the date of such termination.

6.5  Return of Materials.  Within thirty (30) days after the expiration or termination of this Agreement by a Party as permitted by Section 6.2 or 6.3, as applicable, for any reason, each Party shall return to the other Party in accordance with the other Party's reasonable instructions any and all materials furnished by the other Party hereunder.  If a party does not request the return of any materials, the materials may not be used outside of the scope of this Agreement unless a Party obtains prior written approval from the other Party.

6.6  Survival.  Sections 1, 3, 6.4, 6.5, 6.6, and 12 shall survive the expiration of the Term and the termination of this Agreement.

7.  REPRESENTATIONS AND WARRANTIES; INVESTMENT COVENANTS

7.1  Representations and Warranties of AMF.  AMF represents and warrants:

NYDOCS02/689283.1  Revised on 5/4/04                 8

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00304

a. AMF is a duly organized, validly existing California non-profit public benefit corporation and has full power and authority to enter into this Agreement and to perform its obligations hereunder.

b. Neither the execution and delivery of this Agreement nor the transactions contemplated hereby constitute a default under or conflict with any contract, agreement, indenture or other instrument to which AMF is a party or to which it or any of its property is subject.

c. To the best of AMF's knowledge, the AMF Cochlear Technology and the exercise by AB of the rights granted hereunder will not infringe any patents or other proprietary rights of any third party with respect to the Cochlear Stimulation Field of Use.

d. AMF has not sold, assigned or transferred to any person or entity any interest in the AMF Cochlear Technology or purported to do so except as provided in the Master Licenses or in AMF's contracts with the National Institute of Health and/or Medical Research Group, LLC.  AMF has provided AB with true, correct, and complete copies of the Master Licenses, AMF's contracts with the National Institutes of Health, and AMF's contracts with Medical Research Group, LLC.

e. AMF is not, and to AMF's knowledge no other party is, in default of any material obligation under any of the Master Licenses.

f. AMF understands that the transfer of the Common Stock provided for in this Agreement is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.

g. AMF UNDERSTANDS AND ACKNOWLEDGES THAT ITS INVESTMENT IN AB INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL MEANS WHO HAVE NO IMMEDIATE NEED FOR LIQUIDITY OF THE AMOUNT INVESTED, AND THAT SUCH INVESTMENT INVOLVES A RISK OF LOSS OF ALL OR A SUBSTANTIAL PART OF SUCH INVESTMENT. AMF FURTHER UNDERSTANDS AND ACKNOWLEDGES THAT ITS INVESTMENT IN AB INVOLVES VARIOUS OTHER RISKS.

h. AMF is able to bear the substantial economic risks of an investment in AB for an indefinite period of time, has no need for liquidity in such investment, and, at the present time, could afford a complete loss of such investment.

i. AMF has such knowledge and experience in financial, tax and business matters so as to enable AMF to evaluate the merits and risks of an investment in AB and to make an informed investment decision with respect to that investment.

j. AMF is not relying on AB with respect to the tax or other economic considerations of an investment in AB and has obtained, or had the opportunity to obtain, the advice of AMF's own legal, tax and other advisors.

k. AMF will not sell or otherwise transfer the Common Stock without registration under the Securities Act and applicable state or foreign securities

EXHIBIT V
AB00305

laws unless AMF provides, at AMF's expense, an opinion of counsel in form satisfactory to AB to the effect that registration under the Securities Act and such laws is not required and the sale or transfer of the Common Stock would not cause AB's initial distribution of securities to violate any such laws.

l.   AMF is purchasing the Common Stock for AMF's own account, for investment and not with a view to resale or distribution except in compliance with the Securities Act. AMF has not offered or sold any portion of the Common Stock being acquired nor does AMF have any present intention of selling, distributing or otherwise disposing of any portion of the Common Stock in violation of the Securities Act.

m.   AMF is aware that there is currently no market for the Common Stock.

n.   AMF is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act.

7.2   <u>AB's Representations and Warranties</u>.  AB represents and warrants as follows:

a.   AB is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is qualified to do business and is in good standing in the State of California and has full corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

b.   Neither the execution and delivery of this Agreement nor the transactions contemplated hereby constitute a default under or conflict with any contract, agreement, indenture or other instrument to which AB is a party or to which it or any of its property is subject.

7.3   <u>NO OTHER WARRANTIES</u>.
EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, EACH PARTY MAKES NO WARRANTIES CONCERNING THE AMF COCHLEAR TECHNOLOGY OR ANY OTHER SUBJECT PERTAINING OR RELATED TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SPECIFICALLY AS TO THE AMF COCHLEAR TECHNOLOGY, EACH PARTY MAKES NO WARRANTY OR REPRESENTATION (1) AS TO THE VALIDITY OR SCOPE OF THE AMF COCHLEAR TECHNOLOGY, (2) THAT THE AMF COCHLEAR TECHNOLOGY OR ANY DEVICES OR SERVICES BASED UPON THE AMF COCHLEAR TECHNOLOGY WILL BE FREE FROM INFRINGEMENT ON PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES, OR (3) THAT THIRD PARTIES ARE NOT IN ANY WAY INFRINGING UPON THE AMF COCHLEAR TECHNOLOGY.

7.4.   AMF hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances to which AB is subject in connection with the issuance of the

NYDOCS02/689283.1  Revised on 5/4/04                    10

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00306

Common Stock, including, without limitation, such additional information as AB may reasonably deem appropriate with regard to AMF's suitability.

7.5 AMF ACKNOWLEDGES THAT THE COMMON STOCK TO BE ISSUED PURSUANT TO THIS AGREEMENT HAS NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE INFORMATION OR THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

7.6 Each certificate of AB issued to represent shares of Common Stock shall bear the following legend on the face or reverse side thereof:
"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND IS BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THESE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THEY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN OPINION OF COUNSEL IN FORM REASONABLY SATISFACTORY TO AB IS FURNISHED TO AB TO THE EFFECT THAT REGISTRATION UNDER THE SECURITIES ACT AND SUCH LAWS IS NOT REQUIRED."

Any certificate issued at any time in exchange or substitution for any certificate bearing such legends (except a new certificate issued upon the completion of a public distribution of the Common Stock represented thereby) shall also bear such legends, unless in the opinion of AB and/or counsel to AB the securities represented thereby need no longer be subject to the restrictions contained herein.

8. **INDEMNIFICATION**

8.1 AB. AB agrees to indemnify, defend and hold harmless AMF and its Affiliates, shareholders, directors, officers, employees, representatives, attorneys, agents and assigns from and against any and all Claims arising out of or related to any breach of any of AB's representations and warranties, covenants or obligations herein.

8.2 AMF. AMF agrees to indemnify, defend and hold harmless AB, as well as its Affiliates, shareholders, directors, officers, employees, representatives, attorneys, agents and assigns from and against any and all Claims arising out of or related to any breach of any of AMF's representations and warranties, covenants or obligations herein.

8.3 Indemnification Procedure for Third Party Claims.

NYDOCS02/689283.1  Revised on 5/4/04          11

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00307

8.3.1 <u>Notice of Claim</u>. If any Third Party notifies any Party to this Agreement ("Indemnified Party") with respect to any matter ("Third Party Claim") which may give rise to a claim for indemnification under this Agreement, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing. However, no delay shall affect the Indemnified Party's right to indemnification, except to the extent that Indemnifying Party is actually prejudiced by that delay.

8.3.2 <u>Assumption of Defense</u>. The Indemnifying Party will have the right at any time to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages by the Indemnifying Party and includes an unconditional release of each Indemnified Party that may be a party to that Third Party Claim. The Indemnified Party may participate in the defense of such Third Party claim with counsel of its choice (reasonably satisfactory to the Indemnifying Party) at its own cost.

8.3.3 <u>Delay</u>. Unless and until an Indemnifying Party assumes the defense of a Third Party Claim as provided in Section 8.3.2, above, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

8.3.4 <u>Consent</u>. In no event will the Indemnified Party consent to the entry of judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party.

8.3.5 <u>Allocation of Awards</u>. In the event the Indemnifying Party obtains or is awarded any recovery pursuant to the Third Party Claim or any counterclaim brought in connection therewith, including, without limitation, a recovery of damages, attorneys' fees or costs, such recovery shall first be applied to reimburse the Indemnifying Party for costs incurred in connection with such proceedings and then shall be payable sixty percent (60%) to the Indemnifying Party and forty percent (40%) to the Indemnified Party.

## 9. REGULATORY MATTERS

9.1 <u>Good Manufacturing Practices</u>. All products subject to this Agreement (or a related sublicense) will be manufactured and tested by AB (or its sub licensees or

NYDOCS02/689283.1 Revised on 5/4/04          12

contractors) in material compliance with all applicable laws, including, without limitation, to the extent applicable, the Good Manufacturing Practice regulations of the FDA in effect at the time of such manufacturing and/or testing. Each Party shall notify the other Party of any inspection of the production facilities uses to manufacture such devices and other uses of their respective Intellectual Property by the FDA or any other governmental authority and shall furnish AMF with copies of any Form 483 (and responses to) or similar report to the extent that such report applies to any manufactured pursuant to this Agreement.

9.2   <u>Records and Traceability</u>. Each Party will and will cause all of its sub licenses and contractors to maintain complete and accurate traceability records for all products subject to this Agreement and all critical components thereof, including pertinent data, research reports, test results and know-how data, all in material compliance with all FDA and other U.S. or other applicable laws or regulations. AB and AMF will also maintain adequate sales records regarding Net Revenues. AMF and AB each agree to provide each other with reasonable access to all such records upon reasonable request.

## 10.   FILING, PROSECUTION AND MAINTENANCE OF PATENTS

10.1   <u>Responsibility of AMF</u>. Except as provided in subparagraph (b) below,

    a.   AMF agrees to confer with AB regarding the timing, scope, claims and prosecution of additional United States and/or foreign patent applications, the countries in which foreign patent applications should be filed, and the taking of other legal steps to protect the rights of AMF and AB in the AMF Cochlear Technology.   AMF, at AMF's sole cost, shall file, prosecute and maintain domestic and foreign patent applications with respect to the AMF Cochlear Technology and shall take such other legal steps as AMF shall reasonably determine, after consultation with AB, to be necessary or appropriate to protect the rights of AMF and AB in the AMF Cochlear Technology. All such applications shall be prosecuted in the name of AMF and subject to its control, and AB shall cooperate with AMF in filing, prosecuting and maintaining such applications and taking such other legal steps and will execute and deliver any document and instruments in connection therewith which AMF may reasonably request.

    b.   Notwithstanding a., above, the Parties acknowledge that under the terms of the Master Licenses certain rights and responsibilities with respect to prosecuting and maintaining patents is allocated to other parties, and the rights and obligations of the parties set forth in subparagraph a., above, shall not apply to that event.

10.2   <u>Rights and Responsibilities of AB</u>.

CONFIDENTIAL - ATTORNEYS EYES ONLY
EXHIBIT V
AB00309

a. AB agrees to reimburse the reasonable out-of-pocket patent costs of AMF for the prosecution and maintenance of all foreign patents that AB agrees are necessary and appropriate to protect its rights in the AMF Cochlear Technology. AB may elect not to pay the patent prosecution and maintenance costs associated with any foreign patent application or foreign patent, in which case AMF has the option to pay such costs, and AB shall forfeit its right to an exclusive license within the jurisdiction covered by such foreign patent application or foreign patent, but AB shall retain a non-exclusive license within the jurisdiction covered by such foreign patent.

b. In the event AMF fails to file or prosecute any United States or foreign patent by application pursuant to Section 10.1.a, above, after delivery of a written request by AB to do so, and AB considers such filing or prosecution necessary or appropriate to protect the rights of AB in the AMF Cochlear Technology, AB shall have the right to file and prosecute at its own expense any such patent application, and the filing and prosecution of any such application and the resulting patents shall be under the sole control of AB but shall nevertheless be subject to the provisions of this Agreement. AMF will cooperate with AB in its prosecution of any such patent to the same extent that AB is required to cooperate with AMF pursuant to Section 10.1.a.

11.   **INFRINGEMENT OF AMF COCHLEAR TECHNOLOGY**

11.1   Notice of Infringement.   Immediately upon learning of an Infringement, a Party shall provide the other Party with written notice of the Infringement, which notice shall include the material details about such Infringement (e.g. identity of infringing party, how infringement occurs).

11.2   AB Defense Against Infringement.

11.2.1   AB's Control of the Defense. AB, at its sole election and cost (subject to reimbursement as provided below), will have the first right to control the proceeding relating to Infringement. AB may engage counsel of its choice and will control all litigation and settlement strategy and tactics. AB will keep AMF fully informed as to any material developments in the matter. AMF will provide all reasonable assistance in any such matter and will have the right, but not the obligation, to engage counsel of its choice, at its expense, and participate in the matter with AB's counsel.

11.2.2   Recovery and Allocation. After consultation with AMF, AB is authorized to enter into any settlement or judgment that involves any outcome other whether or not involving the payment of money without the prior written approval of AMF. In any resulting settlement or judgment, funds received will first be applied to reimburse the actual costs of the handling of the matter, the two Parties receiving reimbursement in the same proportion as their actual expenses. Royalties on products judged to be infringed by any

EXHIBIT V
AB00310

AMF Intellectual Property will next be allocated to AMF in accordance with the royalty rates set forth in Section 3 and any additional funds received will be divided between the Parties, with sixty percent (60%) to AB and forty percent (40%) to AMF. Any license, sublicense, or cross-license of any AMF Cochlear Technology that results from a settlement or judgment will be subject to Section 2.6.

11.3 <u>AMF Defense Against Infringement.</u>

    11.3.1 <u>AMF's Control of the Defense.</u> If AB elects not to defend against an Infringement, AMF may control the proceeding relating to Infringement. If AMF elects to defend the AMF Cochlear Technology, it may engage counsel of its choice and will control all litigation and settlement strategy and tactics. AMF will keep AB fully informed as to any material developments in the matter. AB will provide all reasonable assistance in any such matter and will have the right, but not the obligation, to engage counsel of its choice, at its expense, and participate in the matter with AMF's counsel.

    11.3.2 <u>Recovery and Allocation.</u> In any resulting settlement or judgment, funds received will first be applied to reimburse the actual costs of the handling of the matter, the two Parties receiving reimbursement in the same proportion to their actual expenses. Royalties on products judged to be infringed by any AMF Intellectual Property will next be allocated to AMF in accordance with the royalty rates set forth in Section 3 and any additional funds received will be divided between the Parties, with sixty percent (60%) to AMF and forty percent (40%) to AB. Any license, sublicense, or cross-license of any AMF Cochlear Technology that results from a settlement or judgment will be subject to Section 2.6.

12. **GENERAL**

    12.1 <u>Export and Import Controls.</u> Each of the Parties shall comply with all applicable laws, regulations, and rules relating to the export and import of products, commodities, software and technical data, and shall not export or import any products, commodities, software or technical data; or any products received from any other Party; or direct products of such commodities, software or technical data, to any proscribed country, party, or entity listed in such applicable laws, regulations, and rules, unless properly authorized by the prevailing authority in the government of the United States of America.

    12.2 <u>Non-solicitation.</u> During the Term and for a period of two (2) years following the termination or expiration of this Agreement, whether directly or indirectly, neither Party, for itself or any other Person, shall solicit, induce or encourage any employee, officer, director or consultant to or of the other Party to terminate his or

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00311

her relationship with that other Party and accept new employment with another Person.

12.3   Confidential Information.   . During the Term of this Agreement, the Parties may provide one another with Confidential Information.  The Receiving Party shall receive and hold such information in confidence, disclose Confidential Information to employees or agents having a need-to-know for the purposes of exercising its rights or performing its obligations under this Agreement, and shall not disclose and agrees to prevent the disclosure of Confidential Information to Third Parties.   This obligation shall continue in effect for three (3) years following the expiration or termination of the Agreement.  Nothing in this Agreement will prevent a Party from disclosing information it is required to disclose to comply with an order of a court of competent jurisdiction, provided that the non-disclosing party is given adequate opportunity to seek a protective order from such disclosure.

12.4   No Agency.   Each Party is an independent contractor and not an employee, partner, joint venturer, representative or agent of any other Party to this Agreement.   Nothing contained in this Agreement shall constitute making or appointing one Party the representative or agent of any other Party.   No Party shall   (a) hold itself out as a representative of any other Party or otherwise contrary to the terms of this Agreement, (b) enter into any agreement on behalf of any other Party or otherwise purport to bind any other Party in any way contrary to the terms of this Agreement, or (c) make any representation or take any act contrary to the terms hereof.  Except as otherwise agreed in writing, no Party shall be liable for any debts or other liabilities of any other Party.

12.5   Force Majeure.   Notwithstanding anything to the contrary in this Agreement, neither party shall be liable to the other for any failure or performance hereunder which is due to an act of God, accident, fire, lockout, strike or other labor dispute, riot or civil commotion, war, embargo, acts of civil or military authorities, denial of or delays in processing of export license applications, failure of technical or electrical facilities not within such party's reasonable control, act of public enemy, enactment, rule, order or act of government (whether national or local), breakdown of machinery, computer failure, shortages of materials, inability to obtain labor, strikes or fuel crises, or other act or events of a similar or different nature beyond the reasonable control of either party, any such act or event being deemed an event of force majeure. Except as otherwise provided herein, the time for performance will be extended for a period equal to the duration of the force majeure.

12.6   Dispute Resolution.

12.6.1   Governing Law and Jurisdiction.   This Agreement is governed by and construed and enforced in accordance with the laws of the State of California, without regard to its choice of law provisions.   If a dispute

NYDOCS02/689283.1  Revised on 5/4/04                16

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00312

arises under this Agreement, each of the Parties first agrees to appoint one or more authorized executive(s) to meet and confer with the other Party in an attempt to resolve the dispute informally. If informal discussions fail to result in a complete resolution of the dispute, the Parties agree to submit the dispute to mandatory non-binding mediation. If mandatory non-binding mediation does not result in a complete resolution of the dispute, each party hereto submits itself to the jurisdiction of a court of competent jurisdiction located in the State of California, County of Los Angeles. Each party agrees that service of process in any action or proceeding relating to this Agreement may be effected by sending a copy of the summons and complaint by registered or certified mail in the United States with postage prepaid and return receipt requested. Each Party hereby waives its right to contest service of process.

12.6.2 Legal Expenses. The prevailing party in any legal action brought by one Party against the other and arising out of or related to this Agreement shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its expenses, including court costs, experts' fees and reasonable attorneys' fees.

12.6.3 Waiver of Jury Trial. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.6.3.

12.7   No Consequential Damages.
EXCEPT WITH RESPECT TO DISCLOSURE OF CONFIDENTIAL INFORMATION, IN ADDITION TO THE OTHER LIMITATIONS SET FORTH IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL OR SPECIAL OR SIMILAR OR LIKE DAMAGES ARISING FROM ANY DEFECT, ERROR OR FAILURE TO PERFORM WITH RESPECT TO THE AMF COCHLEAR TECHNOLOGY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE OR PROFIT, OR LOSS OF USE OF EITHER, OR COSTS OF CAPITAL, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

NYDOCS02/689283.1  Revised on 5/4/04                        17

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00313

12.8  Compliance with Laws.

12.8.1  AMF Compliance with Law. AMF will materially comply with the requirements of any law, regulation or executive order of the United States of America and fifty United States and indigenous territories as may be in effect from time to time.

12.8.2  AB Compliance with Law. AB will materially comply with the requirements of any law, regulation or executive order of the United States of America and fifty United States and indigenous Territories as may be in effect from time to time

12.9  Performance By Affiliates and Sub Licensees.  The Parties recognize that AB may perform some or all of its obligations under this Agreement through Affiliates and Sub Licensees, provided, however, that each Party shall remain responsible and be guarantor of the performance by its Affiliates and Sub Licensees and shall cause its Affiliates and Sub Licensees to comply with the provisions of this AB Agreement in connection with such performance.

12.10  Miscellaneous. The duties, obligations, rights and remedies under this Agreement are in addition to and not in limitation of those otherwise imposed or available by law.  Failure by any Party to enforce a provision of this Agreement shall not constitute a waiver of that or any other provision of the Agreement.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.  If any article, section or clause of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable under any applicable statute or rule of law then it shall be deemed to be omitted and replaced with a similar or equivalent term which is valid and enforceable.  No Party shall hold itself out contrary to the terms of this Agreement nor shall any Party become liable by any representation, act or omission of any other Party contrary to the provisions hereof.  This Agreement is not entered into for the benefit of any Third Party (other than any Indemnified Party) and shall not be deemed to give any right or remedy to any such Third Party whether or not referred to herein.  No remedy or election hereunder shall be deemed exclusive but shall, whenever possible, be cumulative with all other remedies at law or in equity.  No officer, employee, representative or person has any authority to make any representation or promise not contained in this Agreement and no Party has executed this Agreement upon reliance on any such representation or promise.  No waiver, modification, or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by an authorized representative of the Party charged therewith.  The Parties reasonably agree to execute any and all additional documents, including, without limitation, licenses, assignments, certificates and other instruments necessary to carry out the provisions of this Agreement.  If this Agreement is executed in counterparts, such counterparts shall constitute one and the same instrument.  The Parties agree and acknowledge that this Agreement has

NYDOCS02/689283.1 Revised on 5/4/04                 18

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00314

been drafted through joint efforts of their respective legal counsel after full and arms' length negotiations; therefore, the rule of contractual construction that all ambiguities shall be construed against the drafting party shall not apply to the interpretation of this Agreement. Headings of paragraphs herein are inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Unless otherwise stated, section references are to the sections of this Agreement.

12.11   <u>Assignment</u>. Neither Party will sell, assign, mortgage, hypothecate or otherwise transfer any interest in this Agreement, voluntarily or involuntarily, by operation of law or otherwise, or enter into any agreement as a result of which any other Person shall have any interest in this Agreement without the prior written consent of the other Party, which consent will not be unreasonably withheld. Notwithstanding the foregoing, either Party will have the right to assign or otherwise transfer its rights under this Agreement as part of a Change of Control or a transfer to Affiliate. Any attempted assignment by either Party, except as expressly allowed by this Section, is null and void. Subject to the foregoing, this Agreement will benefit and bind the permitted successors and assigns of the Parties.

12.12   <u>Notices</u>. All notices, reports, statements, accountings and other documents required to be given or delivered hereunder will be given in writing either by personal delivery, by certified mail or recognized overnight carrier which delivery is confirmed by a signed receipt, to the addresses set forth below or such other address as either of the Parties will subsequently provide by notice to the other. All such notices will be sufficiently given when actually received (as conclusively determined by the date on the signed receipt).

If to AMF:             Alfred E. Mann Foundation for Scientific Research
                       25145 Rye Canyon Loop
                       Valencia, California 91355
                       Attention: President
                       Facsimile: 661-702-6708

With a copy to:        Alfred E. Mann Foundation for Scientific Research
                       Attention: General Counsel
                       25145 Rye Canyon Loop
                       Valencia, California 91355
                       Facsimile: 661-702-6710

If to AB:              Advanced Bionics Corporation
                       Mann Biomedical Park
                       25129 Rye Canyon Loop
                       Valencia, California 91355
                       Attention: President

NYDOCS02/689283.1 Revised on 5/4/04                     19

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT V
AB00315

Facsimile: 661-362-1700

With a copy to:

Advanced Bionics Corporation
Mann Biomedical Park
25129 Rye Canyon Loop
Valencia, California 91355
Attention: General Counsel

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices of changes of address will be effective only upon receipt.

12.13   Entire Agreement.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter to this Agreement, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  This Agreement includes the following exhibit, which is incorporated into, and made a part of this Agreement:

EXHIBIT A – MASTER LICENSES

IN WITNESS HEREOF, by their respective signatures, the Parties have agreed as of the date first above written.

ADVANCED BIONICS CORPORATION

By: *Jeffrey H. Greiner*

Its: PRESIDENT

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH

By: _____

Its: _____

NYDOCS02/689283.1 Revised on 5/4/04          20

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00316

Facsimile: 661-362-1700

With a copy to:          Advanced Bionics Corporation
                         Mann Biomedical Park
                         25129 Rye Canyon Loop
                         Valencia, California 91355
                         Attention: General Counsel

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices of changes of address will be effective only upon receipt.

12.13   Entire Agreement.   This Agreement constitutes the entire agreement between the Parties with respect to the subject matter to this Agreement, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.   This Agreement includes the following exhibit, which is incorporated into, and made a part of this Agreement:

EXHIBIT A – MASTER LICENSES

IN WITNESS HEREOF, by their respective signatures, the Parties have agreed as of the date first above written.

ADVANCED BIONICS CORPORATION

By: _____

Its: _____

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH

By: _____

Its: _____

NYDOCS02/685283.1  Revised on 5/4/04          20

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V
AB00317

# EXHIBIT A

## MASTER LICENSES

NYDOCS02/689283.1  Revised on 5/4/04          21

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT V

AB00318

EXHIBIT W

1

2

3

4

5

6

7

8                 **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   LUCENT TECHNOLOGIES, INC.,                    CASE NO. 07-CV-2000 H (CAB)

12                                    Plaintiff,    **ORDER GRANTING IN PART
                                                    AND DENYING IN PART**
13        vs.                                       **DEFENDANT MICROSOFT'S
                                                    MOTIONS IN LIMINE**
     MICROSOFT CORPORATION,
14
                                    Defendant.
15

16        On May 13, 2011, Defendant Microsoft Corporation ("Microsoft") filed its Motions in

17   Limine Nos. 14 and 15 and a motion to renew its pretrial motions (Doc. Nos. 1218, 1224-25.)

18   On May 27, 2011, Plaintiff Lucent Technologies Inc. ("Lucent") filed its opposition.  (Doc.

19   Nos. 1251-53.)  On June 8, 2011, Microsoft filed its reply.  (Doc. Nos. 1269-70.)  On June 16,

20   2011, Lucent filed a notice of supplemental authority.  (Doc. No. 1281.)  On the same day,

21   Microsoft filed an opposition to Lucent's notice of supplemental authority.  (Doc. No. 1282.)

22   The Court held a hearing on June 10 and 14, 2011.  Luke L. Dauchot and Jeanne Heffernan

23   appeared on behalf of Plaintiff Lucent.  Juanita Brooks,  Roger Denning, Francis Albert, and

24   Michael Rosen appeared on behalf of Defendant Microsoft. After due consideration, the Court

25   GRANTS in part and DENIES in part the motions.

26                            **DISCUSSION**

27        The Court has already ruled on one set of motions in limine filed by the parties.  (See

28   Doc. Nos. 1179-80.)  On the day of the motion hearing, the Federal Circuit rendered its opinion

EXHIBIT W

in Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292 (Fed. Cir. 2011). In Uniloc, the Federal Circuit rejected the 25% rule of thumb under Daubert holding that the rule "fails to tie a reasonable royalty base to the facts of the case at issue" and further clarified the entire market value rule. 632 F.3d at 1315. In light of the impact of the Uniloc opinion on the damages analysis in this case, the Court permitted the parties to update their damages expert reports and submit additional briefing. The parties now bring new motions in limine to address the supplemental reports.

## I.  Legal Standard under *Daubert*

Under Daubert, the court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Courts have the "responsibility of ensuring that all expert testimony must pertain to 'scientific, technical, or other specialized knowledge.'" Uniloc, 632 F.3d at 1315. The court must decide if such testimony is based on a "firm scientific or technical grounding" as required under Federal Rule of Evidence 702. Id. Under Rule 702, a witness qualified as an expert by knowledge, skill, experience, training or education can testify in opinion or otherwise if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Rule 703 of the Federal Rules of Evidence permits experts to render opinions even if based on inadmissible evidence so long as the inadmissible evidence is of the type reasonably relied on by experts in that field. Daubert, 509 U.S. at 595. Such inadmissible facts or data may be admissible as the basis for an expert's opinion if their "probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

In addition to reliability and relevancy, "the patentee must sufficiently tie the expert testimony on damages to the facts of the case." Uniloc, 632 F.3d at 1315 (citing Daubert, 509 U.S. at 59)). "[O]ne major determinant of whether an expert should be excluded under Daubert is whether he has justified the application of a general theory to the facts of the case." Id. If the expert methodology is sound and the evidence relied upon sufficiently relates to the case

1  at hand, disputes about the degree of relevance or accuracy may go to the testimony's weight

2  but not its admissibility. "Determining a fair and reasonable royalty is often . . . a difficult

3  judicial chore, seeming often to involve more the talents of a conjurer than those of a judge."

4  ResQNet.com Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010). Thus, the hypothetical

5  negotiation necessarily involves "an element of approximation and uncertainty." Lucent

6  Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009). However, "neither

7  a jury nor the court can base its damages calculation upon speculation about the significance

8  of evidence—only reasonable inferences, supported by the evidence, are permissible." Id.

9      For a proper calculation of patent damages, the Federal Circuit requires "sound economic

10  and factual predicates." See Riles v. Shell Exploration and Prod. Co., 298 F.3d 1301, 1311

11  (Fed. Cir. 2002); see also Grain Processing Corp. v. American Maize-Products Co., 185 F. 3d

12  1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation,

13  this court requires sound economic proof of the nature of the market and likely outcomes with

14  infringement factored out of the economic picture."); Crystal Semiconductor Corp. v. TriTech

15  Microelectronics Intern., Inc., 246 F.3d 1336, 1355 (Fed. Cir. 2001) ("Such market

16  reconstruction, though hypothetical, requires 'sound economic proof of the nature of the

17  market.'").

18      Accordingly, any economic expert testifying about patent damages must base the opinion

19  on sound economic principles meeting the test in Daubert and Rule 702 of the Federal Rules

20  of Evidence. A trial court's decision to admit expert testimony under Daubert follows the law

21  of the regional circuit. Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir.

22  2003). A trial court has broad discretion in assessing the relevance and reliability of expert

23  testimony. United States v. Finley, 301 F.3d 1000, 1007 (9th Cir. 2002). The requirement of

24  Rule 702(1) "is not intended to authorize a trial court to exclude an expert's testimony on the

25  ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702,

26  Adv. Comm. Note (2000). The inquiry into admissibility of expert opinion is a "flexible one,"

27  where "[s]haky but admissible evidence is to be attacked by cross examination, contrary

28  evidence, and attention to the burden of proof, not exclusion." Primiano v. Cook, No.

1   CV-03-00373, 2010 WL 1660303, at *4 (9th Cir. Apr. 27, 2010). "Under <u>Daubert</u>, the district

2   judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by

3   Rule 702 as explained in <u>Daubert</u>, the expert may testify and the jury decides how much weight

4   to give that testimony." <u>Id.</u> (quoting <u>United States v. Sandoval-Mendoza</u>, 472 F.3d 645, 654

5   (9th Cir. 2006)). As the Supreme Court noted in <u>Daubert</u>, "[v]igorous cross-examination,

6   presentation of contrary evidence, and careful instruction on the burden of proof are the

7   traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

8   **II.    Analysis**

9       Microsoft challenges the testimony of Lucent's damages expert, Raymond Sims, as not

10  relying on sound economic principles in his valuation of the Day patent technology. (Doc. Nos.

11  1224-25.) Specifically, Microsoft moves to exclude Lucent's application of the <u>Georgia-Pacific</u>

12  factors. (Doc. No. 1225.) Microsoft also moves to exclude the testimony of Raymond Sims

13  on the following damage theories that he presents in his expert report: (1) Add-ins analysis, (2)

14  Time Savings analysis, (3) Survey Results analysis, and (4) Business realities approach. (Doc.

15  No. 1224 at 1.) Microsoft argues that each of these theories is flawed and should be excluded

16  under <u>Daubert</u>. The Court will address each of Microsoft's contentions in turn.

17      **A.    Motion In Limine to Exclude Lucent's Application of the *Georgia-Pacific***

18          **Factors (No. 15)**

19      Microsoft moves to exclude Lucent's application of the <u>Georgia-Pacific</u> factors. (Doc.

20  No. 1225.) Lucent's damages approach applies the <u>Georgia-Pacific</u> framework to a

21  hypothetical negotiation that would have taken place between the parties at the relevant time

22  period in 1996 before infringement. Microsoft argues that in Lucent's calculation of a

23  reasonable royalty, Lucent applies both an improper royalty base and royalty rate. (<u>Id.</u> at 3.)

24      **I.    <u>Georgia-Pacific</u> Framework**

25      Upon a finding of infringement, Title 35 permits an award of "damages adequate to

26  compensate for the infringement, but in no event less than a reasonable royalty for the use made

27  of the invention by the infringer." 35 U.S.C. § 284. The burden of proving damages falls on

28  the patentee. <u>Lucent</u>, 580 F.3d at 1324 (citing <u>Dow Chems. Co. v. Mee Indus., Inc.</u>, 341 F.3d

1370, 1381 (Fed. Cir. 2003)). While there are two alternative categories of infringement compensation—lost profits and reasonable royalty—Lucent only seeks a reasonable royalty. A reasonable royalty is typically calculated by determining a royalty rate and multiplying the rate by a royalty base. See Lucent, 580 F.3d at 1339.

In calculating a reasonable royalty, one widely accepted approach is the hypothetical negotiation which attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began. Lucent, 580 F.3d at 1324. This hypothetical negotiation tries to recreate the "*ex ante* licensing negotiation scenario"—"[i]n other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme." Id. at 1324-25. In evaluating the hypothetical negotiation, the parties often apply the Georgia-Pacific framework, as enunciated in the case Georgia-Pacific Corp v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). See, e.g., Rite-Hite, 56 F.3d at 1554-55; ResQNet.com, 594 F.3d at 869-73. The fifteen Georgia-Pacific factors include:

(1) established royalty rate for the patent;

(2) license rates paid for comparable patents;

(3) type of license (exclusive/non-exclusive or restricted/non-restricted);

(4) licensor's established licensing policies;

(5) competitive relationship between licensor and licensee;

(6) convoyed sales;

(7) duration and terms of the license;

(8) commercial success and established profitability;

(9) advantages over old methods;

(10) nature of patented invention and benefits to those that use it;

(11) extent of use of the patent by the infringer;

(12) customary industry rate for invention or analogous inventions;

///
///

(13) portion of profit that should be credited to the invention as distinguished from non-patented elements, manufacturing process, business risks, or significant features added by the infringer;

(14) opinion testimony of qualified experts; and

(15) amount that licensor and licensee would have agreed upon.

Georgia-Pacific, 318 F. Supp. at 1120. In its recent opinion in Uniloc, the Federal Circuit explicitly "sanction[s] the use of the Georgia-Pacific factors to frame the reasonable royalty inquiry." 632 F.3d at 1317. "Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue. This court's rejection of the 25 percent rule of thumb is not intended to limit the application of any of the Georgia–Pacific factors." Id.

Applying these principles, the Court agrees that Lucent may use the Georgia-Pacific framework in calculating its lump-sum royalty figure. A lump sum license is a "upfront, paid-in-full royalty." Lucent, 580 F.3d at 1326. A lump sum royalty benefits the licensor by raising a substantial amount of money quickly. Id. On the other hand, a lump sum royalty benefits the licensee by limiting its liability and allowing it to use the patented technology without any concerns of further expenditure. Id. Furthermore, a lump sum royalty removes inherent risks in such negotiations, such as the risk of underreporting of actual usage of the patented technology by the licensee, and eliminates administrative burdens of having to monitor usage. Id. A lump sum royalty also eliminates any ability for the licensee to reevaluate the usefulness and value of the patented technology—the licensee is obligated to pay the agreed-upon lump sum royalty regardless of whether the patented technology is successful or even used. Id. While a lump sum royalty may eliminate risks for both parties, it may also create risks. If either party forecasts the popularity or use of the patented feature incorrectly, a licensee may end up paying a lump-sum far in excess of what the patented invention is later shown to be worth or a licensor may end up accepting a lump-sum that is far less than what the patented invention is later shown to be worth. Id. During negotiation for a lump-sum royalty figure, the parties may "consider the expected or estimated usage" of the patented invention. Lucent, 580 F.3d at 1327.

Generally, a more frequently used invention is more valuable and commands a high lump-sum royalty. Id. Conversely, a minimally used feature will command a lower lump-sum payment.

The lump sum analysis does not require the parties to precisely calculate the use of the patented feature, unlike a running royalty license. In a typical running royalty, the license is tied to the use of the patented feature standing alone or incorporated into other products. "Royalties are dependent on the level of sales or usage by the licensee." Lucent, 580 F.3d at 1326. In a lump sum calculation, the parties agree on a fully paid up amount based on "expected or estimated usage." Id. at 1327. Here, Lucent properly seeks a lump sum royalty based on its Georgia-Pacific analysis and other valuations.

### ii. Entire Market Value Rule

The Georgia-Pacific framework is well-established and commonly used in calculating damages in patent cases. See, e.g., Uniloc, 632 F.3d at 1317; Rite-Hite, 56 F.3d at 1554-55; ResQNet, 594 F.3d at 869-73. Furthermore, Lucent provides a detailed analysis under this framework through Raymond Sims's lengthy 87-page expert report. (See Doc. No. 1226 Ex. B, Expert Report of Raymond Sims.)

The crux of the parties' dispute concerning Sims's analysis is whether he properly apportions between the patented and unpatented features—as Lucent contends—or whether he improperly uses the entire market value rule—as Microsoft urges. Lucent contends that it properly apportions the royalty base to the value of only the portion of the use of the patented feature and segregates the revenues from non-infringing portions of the product. Lucent contends that an apportionment is permissible—and not in violation of the entire market value rule—under Georgia-Pacific, Uniloc, and Garretson v. Clark, 111 U.S. 120, 121 (1884). Microsoft disputes Lucent's calculation of the royalty base as an incorrect application of the entire market value rule because Lucent starts with all revenues of Outlook ($7.4 billion), not the separate revenues for the Day Patent technology from Outlook ($0) and fails to show that the Day patent technology is the basis for consumer demand of Outlook.[1]

///

---

[1]The Day patent technology is not separately sold as a stand alone product.

"The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts,'" Uniloc, 632 F.3d at 1318 (citing Lucent, 580 F.3d at 1336; Rite-Hite, 56 F.3d at 1549-50), or where the patented feature was of "such paramount importance that it substantially created the value of the component parts," Rite-Hite, 56 F.3d at 1549. Application of the entire market value rule requires adequate proof of three conditions: "(1) the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invention, Fonar Corp. v. General Electric Co., 107 F.3d 1543, 1552 (Fed. Cir. 1997); (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are parts of a complete machine or single assembly of parts, Paper Converting Machine Co. v. Magna-Graphics Corp., 745 F.2d 11, 23 (Fed. Cir. 1984); and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit, Kalman v. Berlyn Corp., 914 F.2d 1473, 1485 (Fed. Cir. 1990). Cornell University v. Hewlett-Packard Co., 609 F. Supp. 2d 279, 286-87 (N.D.N.Y. 2009). It is not enough that the infringing and non-infringing parts are sold together for mere business advantage. See Rite-Hite, 56 F.3d at 1549-50.

Unless a party satisfies the entire market value test, a patentee seeking damages for a component cannot use the entire market value of the larger product as a royalty base. Uniloc clarified that it is not enough to simply assert a low enough royalty rate and be able to use the entire market value of the product without showing that the patented feature is the basis—or a substantial basis—for consumer demand. 632 F.3d at 1319-20. It rejected the argument that "the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range as determined by the evidence." See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1338-39 (Fed. Cir. 2009). Instead, in Uniloc, the Federal Circuit noted that the qualifying language in the Lucent case just before this statement that forecloses this argument: "[t]he first flaw with any application of the entire market value rule in the present case is the lack of evidence

demonstrating the patented method of the Day patent as the basis—or even a substantial

basis—of the consumer demand for Outlook."  Uniloc, 632 F.3d at 1219-20; see Lucent, 580

F.3d at 1338.  If the patentee cannot meet this test, then "the patentee . . . must in every case

give evidence tending to separate or apportion the defendant's profits and the patentee's

damages between the patented feature and the unpatented features."  Uniloc, 632 F.3d at 1318

(citing Garretson v. Clark, 111 U.S. 120, 121 (1884)).

Lucent argues that it does not violate the entire market value rule in its revised damages

report because it has properly apportioned the royalty base.  (Doc. No. 1253 at 1.)  Conversely,

Microsoft argues that despite its claims, Lucent actually is applying the entire market value rule

because it fails to properly apportion the revenue it uses for the royalty base between the

patented and unpatented features of Outlook.  (Doc. No. 1225 at 3.)  The Court evaluates these

arguments.

### iii.    Lucent's Apportionment

Lucent's expert uses the following apportionment methodology:

"Under this apportionment analysis, the base (revenue from Outlook) would be
multiplied by 83% of users who use Outlook Calendar to manage work appointments,
events, or meetings.  The discounted base would be further adjusted to account only for
the 84% of Calendar users who set up new appointments or meetings, an activity that
implicates the Day patented technology.  The base would then be further adjusted to
account only for the 77% of Outlook Calendar users who use the patented technology
when entering the date of a new appointment.

(Doc. No. 1226 Ex. B, Expert Report of Raymond Sims, at 61.)  In discounting the base, Sims

uses data from Microsoft's internally produced statistics of Outlook Calendar usage and results

from the Jay survey on usage of Day Patent technology.  (Doc. No. 1253 at 5.)  Lucent argues

that this calculation produces a royalty base that corresponds to the value of the patented

technology.  (Id.)  Microsoft maintains that Lucent's discounting only reduces the revenue base

from all of Microsoft Outlook's revenue to the portion of Outlook's revenue that arise from

actual infringing uses of the Day patent technology.

In this case, Microsoft was found to infringe Claims 19 and 21 of U.S. Patent No.

4,763,356 ("Day patent").  Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301 (Fed.

Cir. 2009).  Both Claim 19 and 21 of the Day patent are method claims.  Id. at 1310-11.  The

parties agree that to infringe on a method claim, all steps of the claimed method must be actually practiced. <u>See</u> Lucent, 580 F.3d at 1317 (<u>citing</u> <u>Joy Techs., Inc. v. Flakt, Inc.</u>, 6 F.3d 770, 775 (Fed. Cir. 1993)). However, the parties dispute whether damages are limited to only those instances where the claimed method is actually practiced. Microsoft argues that infringement damages for infringement of a method claim must be limited to devices performing the patented method. Citing <u>Cardiac Pacemakers, Inc. v. St. Jude Medical</u>, Microsoft argues the Federal Circuit has held that infringement damages can only be calculated on those devices that actually performed the patented method during the relevant infringement period. 576 F.3d 1348, 1359 (Fed. Cir. 2009).

Lucent opposes this bright line rule and instead points out that the Federal Circuit in <u>Lucent</u> explicitly rejected Microsoft's argument that for method claims, damages must be limited to the proven number of instances of actual infringing use. <u>See</u> Lucent, 580 F.3d at 1323. In affirming the validity and infringement of the Day patent, the Federal Circuit stated that "[b]ased on the evidence of record, Microsoft . . . sold approximately 110 million units of the three software products capable of practicing the methods of the asserted claims." <u>Id.</u> at 1308, 1323. Typically, damages can only be assessed on devices that perform the actual method. <u>Cardiac Pacemakers</u>, 576 F.3d at 1359. In <u>Lucent</u>, the Court noted that Lucent had the burden to prove that its lump sum damages award was supported by the extent the infringing method was actually used. <u>Lucent</u>, 580 F.3d at 1334-35. On the other hand, the Federal Circuit in <u>Lucent</u> did not limit the consideration to only proven instances of infringement by direct testimony. The <u>Lucent</u> court specifically rejected Microsoft's argument that "for method claims, <u>Dynacore Holdings Corp v. U.S. Philips Corp.</u>, 363 F.3d 1263 (Fed. Cir. 2004), requires that damages be limited to the proven number of instances of actual infringing use." <u>Id.</u> at 1323-24 ("Microsoft states that '[u]nder <u>Dynacore</u>, Lucent had to tie its damages claim to demonstrated instances of direct infringement.' . . . we reject both arguments as presented by Microsoft.") The court stated "[w]e have never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence." <u>Id.</u> at 1334. Instead, the court noted that such a strict requirement would create a

07cv2000
EXHIBIT W

hypothetical negotiation that is "far removed from what parties regularly do during real-world licensing negotiations." Id.

In this case, Lucent is seeking a lump sum royalty figure, based on a hypothetical negotiation that would have taken place before the infringement. In such cases, "companies in the high-tech computer industry often strike licensing deals in which the amount paid for a particular technology is not necessarily limited to the number of times a patented feature is used by a consumer." Id. The court explained that a company has strong reasons to not tie damages strictly to use—namely, because the administrative cost of monitoring use could be expensive and that for some inventions, value is added by simply having the patented feature available for use. Id. Thus, "potential licensors and licensees routinely agree to royalty payments regardless of whether the invention is used frequently or infrequently by the consumer." Id.

As a result, the Federal Circuit in Lucent did not require that damages be strictly limited to specific instances of infringement, proven with direct evidence. However, "the damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers." Lucent, 580 F.3d at 1334. "This is so because this is what the parties to a hypothetical negotiation would have considered." Id. Accordingly, Lucent must properly introduce evidence as to the extent of the use of the Day patent technology in Microsoft's products and, while damages do not have to be strictly tied to their usage numbers in a lump sum payment, Lucent must correlate its damage numbers to that usage.

Turning to Lucent's apportionment on the entire revenue base of Outlook, Lucent's calculation limits the revenue base to the revenue of Outlook for consumers that practice the Day patent technology under this series of calculations:

| Entire Revenue of Outlook | X | % Outlook users who use Outlook Calendar | X | % Calendar users who schedule new appointments or meetings | X | % users who schedule new events and use Day patent technology |
|---|---|---|---|---|---|---|

///

1     This calculation limits the portion of Outlook revenue to instances where a user actually
2  uses the infringing Day patent technology.  Under Lucent, while damages do not have to be
3  strictly limited to this number, the damages award must be "correlated, in some respect" to the
4  infringing use by consumers.  See Lucent, 580 F.3d at 1334.  Thus, the Court concludes Lucent
5  comports with the Federal Circuit's directive to correlate damages to usage.  This calculation
6  sets the actual market for the infringing products.  The market is reduced from the entire market
7  of Outlook (including copies where the infringing method is not used) down to only the revenue
8  from Outlook where the infringing method is practiced with other noninfringing uses.  This
9  discounting is appropriate.

10              **iv.    Microsoft's Entire Market Value Objection**

11     Even though Lucent limits the market to revenue from Outlook corresponding to
12  infringing uses, Microsoft argues that Lucent fails to further apportion this market base to
13  account for the Day patent technology being a small feature of many others inside Outlook in
14  violation of the entire market value rule.  Lucent contends that it is apportioning the royalty
15  base in a way that corresponds to the value of the patented technology.  (Doc. No. 1253.)
16  Citing to Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc., 2011 WL 218948, *4 (E.D.
17  Mich. Jan. 20, 2011), a decision that postdates Uniloc, Lucent argues that its analysis does not
18  rely on the entire market value rule but "rather employs the traditional Georgia-Pacific factors
19  in a manner which merely implicates some of the same principles underlying the rule."  Thus,
20  Lucent argues that "its experts do not need to meet the formal, rigid prerequisites to the entire
21  market value rule in order to employ this shared principle."  Id.  Additionally, Lucent argues
22  that it did comport with the entire market value rule because it considered use of the Day patent
23  technology to be a proxy for the value of the technology.

24     After careful consideration of Lucent's expert's calculation and the arguments of the
25  parties, the Court concludes that Lucent's method of apportionment does not properly apportion
26  between the patented and unpatented features of Outlook in a way that separates out from the
27  royalty base the portion that can be attributed to the Day patent technology.  See Uniloc, 632
28  F.3d at 1318.  Though Lucent discounts the base to include only the revenue from Outlook

where a user uses the Day patent technology, Lucent fails to show that it is entitled to capture this entire market value as the base. Specifically, Lucent has not shown that the Day patent technology is the basis for consumer demand for most Outlook users. At best, Lucent has introduced evidence to show that the Day patent technology is the basis for consumer demand for about 7% of users based on the Jay survey. (See Doc. No. 1226 Ex. L, Deborah Jay survey report; Doc. No. 1252 Ex. G, Deborah Jay survey report App. E at Table 15.) For a product that is feature-rich like Outlook, use as a proxy for value does not appropriately account for all the other unpatented features that consumers use besides the Day patent technology even when consumers invoke the Day patent methods. See IP Innovation LLC v. Redhat, Inc., 705 F. Supp. 2d 687, 689-90 (E.D. Tex. 2010).

For example, every time a user invokes the Day patent technology to schedule a new appointment or meeting, the user may contemporaneously use several other patented features. Moreover, just because a user of Outlook uses the Day patent technology does not mean that the user does not at other times use the other patented features of Outlook. Thus, under Lucent's argument, if a user uses the Day patent technology, revenue from the sale of Outlook to this user is included in the royalty base. The user may also use Outlook for email or tasks or the other features in calendar. Lucent does not show why it is entitled to a royalty base for the 43% of customers who use the Day patent technology where other features, in addition to the Day patent technology, are used. Put into concrete terms, if a sample user uses the infringing Day patent technology but also uses many other features in Outlook, Lucent has not shown that it is entitled to include in the royalty base all $67 of revenue generated from this sample user:



Thus, the Court concludes that to comport with the entire market value rule, Lucent must further apportion the base in a way that better accounts the value of the Day patent technology compared to the other features in Outlook that are not covered by the Day patent.

Alternatively, if Lucent wants to use the entire market value of infringing copies of Outlook, the entire market value rule requires a showing that for these copies of Outlook, the Day patent is the basis or a substantial basis for consumer demand or the Day patent technology is of "such paramount importance that it substantially created the value of the component parts." Rite-Hite, 56 F.3d at 1549-50; see Uniloc, 632 F.3d at 1318; Lucent, 580 F.3d at 1336.

Lucent further argues that under several Georgia-Pacific factors, its licensing practice historically applies to the fair market value of the entire product sold by the licensee. (Doc. No. 1253 at 4.) Thus, Lucent argues that it should be allowed to introduce the entire revenue under this policy. (Id.) The Court does not intend to prevent Lucent from introducing its historical licensing policy in its damages case as these practices are relevant to several Georgia-Pacific factors. See, e.g., Mondis Technology, Ltd. v. LG Electronics, Inc., et al., Case No. 07-CV-565-TJW-CE, Doc. No. 55 at 5 (E.D. Tex. June 14, 2011). In Mondis, the plaintiff supported its damages figure with thirteen comparable licenses that applied a rate to the entire market base of accused products. Id. In contrast, Lucent only presents two bundled licenses where the Day patent is bundled with many other patents and one generalized license. Thus, as applied to the facts of this case, under Uniloc and Lucent, the Court declines to allow Lucent to introduce the entire revenue of Outlook due to its potentially prejudicial effect. Lucent may introduce its "Alternative Apportionment" on a unit price of Outlook. However, Lucent needs to further apportion by some measure to separate between the patented and unpatented features as tied to the facts of this case and economic realities.

In summary, the Court concludes that Lucent fails to properly apportion its damages calculation to separate between the patented features and unpatented features of Microsoft Outlook. Lucent must perform an additional apportionment in order to introduce a proper royalty base for its damages calculation or meet the three factored test for the entire market value rule if it seeks to use all revenue from infringing copies of Outlook as its base. The Court

declines to specify the nature of a proper apportionment, leaving that calculation to Plaintiff, consistent with the law. Once the royalty base has properly been apportioned, the reasonable royalty is calculated by applying the royalty rate to this apportioned base. Lucent, 580 F.3d at 1339; see Uniloc, 632 F.3d at 1318. The Court recognizes that the Georgia-Pacific factor 13 has historically permitted a party to apportion between the patented and non-patented features. The Court does not intend to eliminate that consideration from the hypothetical negotiation. Nevertheless, the Court concludes that the present apportionment is inadequate.

### v.   Lucent's Licensing Policies

Additionally, Microsoft also objects to Lucent's royalty rate calculation. (Doc. No. 1225 at 8-9.) Microsoft argues that Lucent introduces its policy of a starting point for negotiations as 1% up to a maximum of 5%, but does not show that this rate was ever achieved. (Id. at 8-9.) Further, Microsoft argues that Lucent uses the licensing policing in the Acer and Locus agreements without tying them to the facts of this case—in particular, without showing that the technology licensed in those agreements are similar to the Day patent technology. (Id. at 10-13.)

The Court previously held that Sims may testify that Lucent's starting point for negotiations is 1% up to a maximum of 5%. (Doc. No. 1180 at 21-22.) The Court noted that "[r]ecognizing the Georgia-Pacific factors, the Court declines to exclude Lucent's licensing practice. Lucent's expert testified that Lucent's starting point for negotiations is 1% up to a maximum of 5%. Testimony about the starting point of a negotiation is admissible under the Georgia-Pacific analysis for a hypothetical negotiation. See Uniloc, No. 2010-1035 at 47." (Id.) Such testimony as to Lucent's historical licensing policies remains relevant to Georgia-Pacific factor 4 which allows consideration of the licensor's past licensing practices.

Moreover, the Court also previously declined to exclude Lucent's Acer and Locus agreements and concluded that the licenses are relevant to show Lucent's licensing practices tied to the hypothetical negotiation in this case and to rebut Microsoft's challenges to Lucent's licensing rates. (Id. at 22.) Both the Acer and Locus agreements included licensing of bundles of Lucent patents, including the Day patent. (Doc. No. 1253 at 7.) Thus, these licenses are

07cv2000
EXHIBIT W

relevant to <u>Georgia-Pacific</u> factors 1, 4, and 12. <u>Georgia-Pacific</u>, 318 F. Supp. at 1120.
Furthermore, the licenses are relevant to show Lucent's licensing practices tied to the
hypothetical negotiation in this case and to rebut Microsoft's challenges to Lucent's licensing
rates. <u>See, e.g.</u>, <u>Mondis Technology, Ltd. v. LG Electronics, Inc., et al.</u>, Case No. 07-CV-565-
TJW-CE, Doc. No. 55 at 5 (E.D. Tex. June 14, 2011).

Accordingly, the Court reaffirms and declines to modify its rulings at this time as to
Lucent's licensing policy. The licensing policies remain relevant to Lucent's damages case
under the <u>Georgia-Pacific</u> framework. Microsoft may challenge the policies on cross-
examination and introduce any contrary evidence.

## B. Motion In Limine to Exclude Certain Damages Theories (No. 14)

Additionally, Microsoft moves to exclude the testimony of Raymond Sims on the
following damage theories: (1) Add-ins analysis, (2) Time Savings analysis, (3) Survey Results
analysis, and (4) Business realities approach. (Doc. No. 1224 at 1.) Microsoft argues that each
of these theories is flawed and should be excluded under <u>Daubert</u>. With the legal standards of
<u>Daubert</u> in mind, the Court addresses the methodologies in turn.

### I. Add-ins Analysis

First, Microsoft objects to Sims's use of a third party add-in—a software component that
adds specific capabilities to larger software applications—as a proxy to determine the value of
the Day patent technology. (Doc. No. 1224 at 4.) Sims chose the E-mail follow-up add-in from
the Microsoft Office Add-Ins website, with a list price of $12, as a proxy for value of the Day
patent. (<u>Id.</u> at 5.) Microsoft argues that this chosen add-in has not been shown to be sufficiently
comparable to the Day patent technology. (<u>Id.</u>) In particular, Microsoft points out that Sims
has not shown why this add-in should be considered in lieu of other add-ins that are offered for
free or offered at less expensive prices. (<u>Id.</u>) Furthermore, Microsoft argues that Lucent has
not shown that there is any market for this add-in and that anyone has purchased it for the $12
asking price. (<u>Id.</u>) In opposition, Lucent argues that its technical expert Bruce Tognazzini
sufficiently establishes that the E-mail follow-up add-in is sufficiently comparable. (Doc. No.
1252 at 10-11.)

In addition, Microsoft objects to the Add-ins analysis because Sims's damages calculations include the total number of licenses of Outlook. Sims calculates a proxy for the worth of the patented component, the Day patent technology—the $12 price of the E-mail follow-up add-in, discounted by a bulk discount of 60%—to reach $4.80. Sims then calculates the total number of infringing licenses by multiplying the total number of Outlook Licenses to the percentage of Outlook users that use the patented technology—in this case 109.5 million Outlook licenses times 43.3% usage based on the Jay survey to reach 47.4 million licenses. This calculation correlates the damages figure to the actual usage of the patented method by limiting the copies of Outlook considered to be only those where the infringing method is used. See Lucent, 580 F.3d at 1334. Sims then calculates the final damages figure by multiplying the proxy value for the Day patent technology—$4.80—by the number of infringing licenses of Outlook—47.5 million— to reach a final damages number of $227.4 million. Microsoft argues that unless Lucent shows that the Day patent technology is the basis or a substantial basis for consumer demand, Lucent cannot base any damages calculation on the total number of Outlook units sold because of the entire market value rule. See Uniloc, 632 F.3d at 1318; Lucent, 580 F.3d at 1336; Rite-Hite, 56 F.3d at 1549-50.

In opposition, Lucent argues that the entire market value rule is not implicated in its calculation because Lucent does not base its damages number on the entire revenue of Outlook. Lucent argues that the $4.80 value it uses as a proxy for the Day patent technology value only captures the value attributed to the Day patent technology, and does not include any valuation of unpatented components of Outlook. Thus, by multiplying a comparable small feature value times the number of total infringing licenses, Lucent argues that it is valuing only the Day patent technology and is not improperly including any value from unpatented components.

The Court does not see any inherent Daubert issues with the methodology of using an adds-in analysis as a proxy for the value of small components that are not sold independently. However, if Lucent intends to use an add-in as a proxy for what the Day patent technology may be worth to Microsoft, Lucent needs to show a market for the add-in. If there is no market for the add-in, there is no evidence that consumers would buy the add-in. Moreover, if the add-in

1  was then incorporated into Microsoft Outlook, there is no evidence that any consumer would

2  pay Microsoft anything additional because of the inclusion of the add-in. See Uniloc, 632 F.3d

3  at 1314 ("If the patentee failed to tie the theory to the facts of the case, the testimony must be

4  excluded."). Here, after discovery, Lucent has not presented any evidence of the number of

5  sales of the E-mail follow-up add-in. Thus, without evidence that there is a market for this add-

6  in, the add-ins analysis does not meet the requirement for damages being based on "sound

7  economic and factual predicates." Riles, 298 F.3d at 1311; Grain Processing, 185 F.3d at 1350;

8  Crystal Semiconductor, 246 F.3d at 1355. Accordingly, the Court grants Microsoft's motion

9  to exclude Lucent's add-ins analysis.

10              **ii.    Time Savings Analysis**

11         Second, Microsoft objects to Lucent's time savings analysis. (Doc. No. 1224 at 9.) Sims

12  calculates a damages figure that is based on time a customer saves when using the Day patent

13  technology over alternatives. (Id. at 9-10.) The calculation is based on a one-second time

14  savings every time a consumer uses the Day patent technology, and multiplies that savings by

15  the average total number of times a consumer would use the Day patent technology over the

16  lifetime of the Outlook product—about 7 times a week over the 2 year lifespan of a licensed

17  copy of Outlook for a total of 728 uses. (Id.) Sims then takes this time savings and multiplies

18  it by the average hourly wage ($12.09) in 1996, the date of the hypothetical negotiation, and

19  considers the resulting number as the value of the Day patent technology to a consumer who

20  buys Outlook. (Id. at 10.)

21         Microsoft objects to this methodology because it argues that Lucent fails to tie this value

22  to consumers to value that would be passed onto Microsoft. (Doc. No. 1224 at 10.) In

23  particular, Microsoft argues that Lucent has failed to present any evidence that any customer

24  would pay Microsoft more for Outlook based on this time savings. (Id. at 13-14.) In addition,

25  Microsoft argues that the one second time savings is not supported by a scientific basis. (Id.

26  at 10-12.) Lucent argues that it has tied consumer time savings to its value to Microsoft. (Doc.

27  No. 1252 at 12.) Furthermore, Lucent argues that the one time savings number comes

28  ///

1 from its technical expert, Bruce Tognazzini, who is qualified to give such scientific testimony.
2 (Id. at 13.)

3     The Court concludes that Lucent has shown factual predicates the time savings
4 calculations and has presented expert testimony from a technical expert to support the theory.
5 The one second time savings is based on testimony of Lucent's technical expert, Bruce
6 Tognazzini, who is familiar with the patented technology and its alternatives. The usage data
7 is extracted from Microsoft's internal documents on usage of the Day patent technology.
8 Moreover, as Lucent cites, courts have at times considered time savings as a proper basis for
9 calculating damages. See Grepke v. Gen. Elec. Co., 280 F.3d 508, 511-13 (7th Cir. 1960)
10 (finding that the plaintiff's estimates of the time saved by his invention were a proper basis for
11 damages); Ziggity Sys., Inc. v. Val Watering Sys., 769 F. Supp. 752, 827-28 (E.D. Pa. 1990)
12 (finding cost savings relevant under the Georgia-Pacific framework). Such evidence of time
13 savings may also be relevant to show "the profits and savings that could be made upon . . . sale
14 or adoption [of the patented component]." Georgia-Pacific, 318 F. Supp. at 1121.

15     Both the Grepke and Ziggity cases cited by Lucent discuss time savings as relevant to
16 the damages. For example, in Grepke, the defendant General Electric Company utilized the
17 patented invention in its manufacturing plant. 280 F.2d at 513. Use of the patented method
18 saved time in Defendant's plant. Id. The plaintiff in the case then translated the time savings
19 directly to a cost savings to defendant. Id. Similarly, in Ziggity, the defendants admitted that
20 they used the patented invention to save money in their manufacturing operations, and use of
21 a non-infringing product would have cost the defendant's more money. 769 F. Supp. 752 at
22 827-28.

23     The fact that consumers of Defendant Microsoft's product Outlook may enjoy a time
24 savings as a result of the Day patent technology is relevant to the Georgia-Pacific factor 9, the
25 advantages of the patented technology. 318 F. Supp. at 1120. Accordingly, the Court permits
26 Lucent to introduce the time savings analysis but only with a limiting instruction to the jury that
27 the number represents only the time savings value of the Day patent technology to consumers
28 and not necessarily what Microsoft would pay for the feature. Since the time savings represents

1  a relevant factor under the <u>Georgia-Pacific</u> analysis and with the limiting instruction to the jury,

2  the Court concludes that the testimony does not violate <u>Daubert</u> or the entire market value rule.

3  **iii.  Survey Results Analysis**

4  Third, Microsoft objects to Lucent's survey results analysis as an inaccurate

5  manipulation of Deborah Jay's survey. (Doc. No. 1224 at 14.) Microsoft main contention is

6  that Sims ignores the error of margin in the Jay survey in his analysis. (<u>Id.</u> at 15-20.) Lucent

7  opposes and argues that Sims's approach is correct and based on sound principles. (Doc. No.

8  1252 at 14-17.)

9  In a previous motion in limine motion, Microsoft challenged the results of the Deborah

10  Jay Survey. (Doc. No. 1032.) The Court declined to exclude the survey results in their entirety.

11  The Court noted the language from the Federal Circuit in <u>Lucent</u> that explicitly suggested the

12  usage of consumer survey data to support reasonable royalties. (Doc. No. 1180); <u>see Lucent</u>,

13  580 F.3d at 1333-34. Of course, any survey methodology must be consistent with sound

14  principles. Here, Lucent supports its survey methodology with the report of a widely

15  recognized survey expert, Dr. Jay. Microsoft, on the other hand, conducted its own survey but

16  elected to retain it as its own work product.

17  The Court has carefully considered whether the Jay survey is sufficiently reliable to be

18  admissible. The Court notes, however, that it is not a fact finder, and challenges to credibility

19  go to a jury. Microsoft's concerns on the correctness of survey methodology or analysis,

20  including the error rate, may be addressed through vigorous cross-examination and presentation

21  of contrary evidence. <u>See Daubert</u>, 509 U.S. at 596. Microsoft may vigorously cross-examine

22  both Dr. Jay and Sims on the accuracy numbers that they use in their analysis. Microsoft may

23  cross examine both experts on whether the 7% is truly representative of the percentage of

24  Outlook decision makers who would not have purchased the product but for the inclusion of the

25  Day Patent technology. Microsoft may question the error rate to this small percentage of users.

26  Furthermore, Microsoft may cross examine Sims on the accuracy of his use of the $67 per unit

27  of Outlook price for his calculation. The Court recognizes that a consumer survey is only a

28  sampling of respondents with results subject to interpretation and data analysis. Lucent's

survey results are an attempt to show the value of the Day patent technology to consumers as suggested by the Federal Circuit in <u>Lucent</u>. <u>See</u> 580 F.3d at 1333-34. Microsoft's objections—while not frivolous—go to the weight of the survey, not its admissibility.

Additionally, Microsoft objects to the survey results theory because Sims's damages calculations include the total number of licenses of Outlook. Sims starts his calculations by calculating a proxy for the worth of the patented component, the Day patent technology. From Jay's survey, Sims assumes that 7% of purchase decision maker users of the Day Patent technology would not have purchased Outlook without the Day patent technology. Thus, to get his proxy value for the Day patent technology, Sims multiplies this 7% to the per unit revenue price of Outlook ($67) and then to Microsoft's profit margin on Outlook (76%). Sims's calculation arrives at a valuation of the Day patent technology at $3.56 per copy of Outlook. Sims then calculates the total number of infringing licenses by multiplying the total number of Outlook Licenses to the percentage of Outlook users that use the patented technology—in this case 109.5 million Outlook licenses times 43.3% usage based on the Jay survey to reach 47.4 million licenses. This calculation correlates the damages figure to the actual usage of the patented method by limiting the copies of Outlook considered to be only those where the infringing method is used. <u>See</u> <u>Lucent</u>, 580 F.3d at 1334. Finally, Sims calculates the final damages figure by multiplying the proxy value for the Day patent technology by the number of infringing licenses of Outlook to reach a final damages number. Microsoft argues that unless Lucent shows that the Day patent technology is the basis or a substantial basis for consumer demand, Lucent cannot base any damages calculation on the total number of Outlook units sold because all units sold represents the entire market of Outlook or otherwise, Lucent would be in violation of the entire market value rule.

In opposition, Lucent argues it has accounted for those that recognize the Day patent—7%—as the basis for consumer demand in Outlook. Lucent argues that the value it uses as a proxy for the Day patent technology value only accounts for the value attributed to the Day patent technology, and does not include any valuation of unpatented components of Outlook. In particular, the proxy value is reached by considering only the 7% of users who

1   would not have bought Outlook without the Day patent technology.  Thus, by multiplying this
2   value times the number of total infringing licenses, Lucent argues it is valuing only that portion
3   of Outlook revenue that can be attributed to the Day patent technology.

4   After careful consideration of the parties' arguments as to this analysis, the Court
5   declines to exclude the survey results analysis under <u>Daubert</u> or the entire market value rule.
6   By apportioning the value of Outlook by the number of users who would not have purchased
7   Outlook but for the Day patent technology (7%), Sims accounts for a portion of the market of
8   Outlook users that may be attributable to the Day patent technology, subject to Microsoft's
9   challenges on cross-examination.  Accordingly, the Court denies Microsoft's motion to exclude
10  Lucent's survey results analysis.

11              **iv.    Business Realities Approach**

12  Microsoft also objects to Sims's business realities approach.  (Doc. No. 1224 at 22-24.)
13  Microsoft argues that Sims's final conclusion—that the parties will meet in the middle of their
14  respective walk away approaches—is not grounded in the facts of his case.  (<u>Id.</u>)  In opposition,
15  Lucent argues that its approach is not unlike the real-world negotiation approach that
16  Microsoft's expert, Robert Mnookin, uses in his damages calculation.  (Doc. No. 1252 at 17-
17  19.)  In particular, Lucent contends that Sims accounts for the parties negotiating positions, and
18  couples that to the proper considerations of the hypothetical negotiation.  (<u>Id.</u> at 18.)  The Court
19  agrees with Lucent.

20  In <u>Lucent</u>, the Federal Circuit stated that "[l]itigants routinely adopt several approaches
21  for calculating a reasonable royalty."  580 F.3d at 1324.  One approach, "the hypothetical
22  negotiation or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty
23  upon which the parties would have agreed had they successfully negotiated an agreement just
24  before infringement began."  <u>Id.</u>; see also <u>Rite-Hite</u>, 56 F.3d at 1554; <u>Radio Steel & Mfg. Co.
25  v. MTD Prods., Inc.</u>, 788 F.2d 1554, 1557 (Fed. Cir. 1986); <u>Georgia-Pacific</u>, 318 F. Supp. at
26  1120 (S.D.N.Y. 1970).  The hypothetical negotiation attempts to create the "*ex ante* licensing
27  negotiation scenario" between the two parties.  <u>Lucent</u>, 580 F.3d at 1325 ("In other words, if
28  ///

- 22 -

07cv2000
EXHIBIT W

the infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme.").

The Court concludes that Sims's business realities negotiation theory is based on reliable principles and methods. See Fed. R. Evid. 702; Daubert, 509 U.S. at 595. Microsoft's objection is not the methodology, but the math. Microsoft disputes Lucent's values obtained under the add-ins analysis, the time savings analysis, and the survey results analysis—not the methodology of the negotiation. Furthermore, the Court previously concluded during a previous motion in limine motion by Microsoft that both experts from Lucent and Microsoft could testify about their negotiation theories. (See Doc. Nos. 1026, 1180 at 11-12.) Accordingly, the Court denies the motion to preclude Sims from testifying on his business realities negotiation theory, subject to the Court's conclusions about the underlying valuation in this order.

**III.    Motion to Renew Pretrial Motions**

Microsoft moves to renew all its previously filed pretrial motions. (Doc. No. 1218; see Doc. Nos. 1016-35.) In opposition, Lucent renewed all its previous oppositions to Microsoft's pretrial motions. (Doc. No. 1251; see Doc. Nos. 1048, 1058, 1066-73, 1089-93.) Accordingly, the Court renews its previous orders on Microsoft's pretrial motions, except to the extent they have been modified by this order. (See Doc. No. 1155-56, 1180.)

**CONCLUSION**

After due consideration, the Court orders the following:

1.    The Court grants in part and denies in part Microsoft's Motion in Limine No. 15 to exclude Lucent's application of the Georgia-Pacific factors. The Court grants the motion to exclude Lucent's royalty base calculation as a violation of the entire market value rule. The Court denies the motion otherwise. (Doc. No. 1225.)

2.    The Court grants in part and denies in part Microsoft's Motion in Limine No. 14 to exclude certain damages theories presented by Lucent's damages expert, Raymond Sims. The Court grants the motion to exclude the add-ins. The Court

07cv2000

**EXHIBIT W**

1    denies the motion to exclude the time analysis theory but requires a proper

2    limiting instruction to the jury.  The Court denies the motion otherwise, with

3    respect to the survey results analysis and business realities negotiations approach.

4    (Doc. No. 1224.)

5        As to any motion in limine that the Court granted, any party seeking to admit evidence

6  at trial must seek a hearing outside the presence of the jury at an appropriate time and make the

7  request for a hearing outside the presence of the jury.

8        In light of its rulings in this Order, the Court will allow the parties to supplement their

9  damages expert reports to comport with the Court's rulings.  The parties may any modified

10 expert report or addendum on or before **June 23, 2011**.  The parties may file any further

11 objection to the modified expert reports on or before **June 29, 2011**.  At the parties option, the

12 Court permits a one hour deposition of any expert modifying a report and also of William

13 Kennedy, to be completed by **July 11, 2011.**  The Court sets a motion hearing on any objections

14 filed for **July 13, 2011** at **9:00 a.m.**

15        **IT IS SO ORDERED.**

16 DATED: June 16, 2011

17

18        MARILYN L. HUFF, District Judge
         UNITED STATES DISTRICT COURT

19

20

21

22

23

24

25

26

27

28

- 24 -

07cv2000

**EXHIBIT W**

# EXHIBIT X

# AMF

## ALFRED MANN FOUNDATION

July 21, 2003

**VIA EXPRESS MAIL**

Jack O'Mahoney
CEO and President
Cochlear Pty Ltd.
14 Mars Road
Lane Cove NSW 2066
AUSTRALIA

Dear Jack:

This letter is intended to inform you that we have received information that your Nucleus cochlear implants utilize features that may infringe our U.S. Patent 5,609,616. This patent is owned by the Alfred E. Mann Foundation for Scientific Research (AEMF). A copy of U.S. Patent 5,609,616 is enclosed for your information.

Although that patent is licensed to the Advanced Bionics Corporation, our licensee has decided, in accordance with the terms of our agreement, to defer enforcement of that patent to the AEMF. In doing so, Advanced Bionics has asked that we first explore a license agreement with Cochlear Pty Ltd. rather than undertake legal action to prevent you from using such important and patented technology in fitting patients. We are receptive to any reasonable resolution of the matter.

Please acknowledge your receipt of this letter and in light of the circumstances described above, please suggest how you would like to proceed. We would appreciate your response no later than August 8, 2003.

Very truly yours,

Joseph H. Schulman, PhD
President

Enclosure
JS:mwl

Defendants'
EXHIBIT 1071
WITNESS: Schulman, Ph.D
PAGE 1 OF 1
RENEE D. ZEPEZAUER, 6275
DATE: 12-2-08

28460 Avenue Stanford, Valencia, CA  91355   P.O. Box 905   Santa Clarita, CA  91380-9005
661.775.3995   Fax 661.775.9775   www.aemf.org

EXHIBIT X
AMF004044