SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
BRUCE G. CHAPMAN, Cal. Bar No. 164258
bchapman@sheppardmullin.com
SCOTT R. MILLER (Cal. Bar No. 112656)
smiller@sheppardmullin.com
LAURA M. BURSON (Cal. Bar No. 204459)
lburson@sheppardmullin.com
MANUEL C. NELSON, Cal. Bar No. 229590
mnelson@sheppardmullin.com
DENNIS J. SMITH, Cal. Bar No. 233842
dsmith2@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:  213.620.1398

Attorneys for Defendants and
Counterclaimants COCHLEAR LTD. and
COCHLEAR AMERICAS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, | Case No. CV 07-08108 FMO (SHx) |
| Plaintiff, | **VOLUME 5 OF EXHIBITS (Y-HH) TO OMNIBUS DECLARATION OF SCOTT R. MILLER RE PARTIES' JOINT MOTIONS _IN LIMINE_** |
| v. | |
| COCHLEAR CORPORATION (n/k/a COCHLEAR AMERICAS), COCHLEAR LTD., and ADVANCED BIONICS, LLC, | [Joint Motions _in Limine,_ Declaration of Jerry Schloffman and [Proposed] Orders filed/lodged concurrently herewith] |
| Defendants. | Pre-Trial Conference and Hearing on Motions _in Limine_: Dec. 17, 2013 Time: 10:00 a.m. Ctrm: 22 |
| | Trial Date: January 13, 2014 **Hon. Fernando M. Olguin** |
| AND RELATED COUNTERCLAIMS. | |

# EXHIBIT Y

OCEAN TOMO

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

-------------------------------------------------------------------------------------------------------

**ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,
Plaintiff and Counterdefendant,**

**v.**

**COCHLEAR CORPORATION (N/K/A COCHLEAR AMERICAS) AND COCHLEAR LTD.,
Defendants and Counterclaimants.**

-------------------------------------------------------------------------------------------------------

**Expert Report of Cate M. Elsten**

**19 January 2009**

***Attorneys' Eyes Only***

503

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ........................................................................................................... 2

    A. Hearing Loss ........................................................................................................... 2

    B. Functionality of Cochlear Implants ........................................................................ 3

    C. Development of Cochlear Implants ......................................................................... 4

    D. The Cochlear Implant Industry ............................................................................... 5

    E. Programming CI Systems and the Role of Telemetry ............................................ 7

        1. Impedance Telemetry ...................................................................................... 8

        2. Neural Response Telemetry ("NRT") ............................................................. 9

        3. Compliance Telemetry .................................................................................... 9

    F. The Parties at Issue ............................................................................................... 10

        1. Alfred E. Mann Foundation for Scientific Research ..................................... 10

        2. Advanced Bionics ......................................................................................... 10

        3. Cochlear Limited and Cochlear Americas .................................................... 10

    G. The Patents at Issue ............................................................................................. 11

    H. Products at Issue ................................................................................................... 12

        1. The Nucleus 22 ............................................................................................. 12

        2. The Nucleus 24 ............................................................................................. 12

        3. The Nucleus Freedom .................................................................................... 13

        4. The SPrint Speech Processor ......................................................................... 13

        5. The ESPrit Speech Processor ........................................................................ 13

        6. The Esprit 3G Speech Processor .................................................................... 13

        7. The Freedom Speech Processor ..................................................................... 14

    I. Timeline of Relevant Events ................................................................................. 16

III. OPINIONS EXPRESSED, WITH THE BASES AND REASONS THEREFOR ............................ 19

    A. Based on financial records and testimony provided to date, I have calculated Cochlear revenue of between $677.7 million and $720.3 million on sales of CI components used in allegedly infringing systems between December 2001 and June 2008. ................................................................................................................... 19

        1. Cochlear has generated revenue of $445.5 million from infringing sales of the CI24 in the Americas between December 2001 and June 2008. ....................... 20

        2. Cochlear has generated revenue of $232.2 million from infringing sales of SPrint and SP12 speech processors sold in conjunction with CI24 implants in the Americas between December 2001 and June 2008. .................................. 21

        3. Cochlear has generated revenues of approximately $42.6 million from sales of ESPrit 3G speech processors used in conjunction with CI24 implants in the Americas between December 2001 and June 2008. ....................................... 22

i

*Attorneys' Eyes Only*

EXHIBIT Y



B. Consideration of conventional valuation methodologies produces a number of quantitative royalty indicators useful in the determination of a starting range for a reasonable royalty in this case. ............................................................................22

    1. Based on information currently available to me, the Market Approach indicates royalty rates in the range of approximately 2.0% to 18.1% have been paid by or to parties relevant to this suit for hearing-related and other medical device technologies.............................................................................22

    2. Based on information currently available to me, the Income Approach provides quantitative royalty indicators in the range of 15.1% to 31.5% of sales.................................................................................................................29

    3. Based on information currently available to me, there does not appear to be either sufficient data or an appropriate factual or conceptual basis for application of the Cost Approach in this case. ..............................................31

    4. Quantitative royalty indicators provide useful benchmarks for my reasonable royalty analysis. ...............................................................................................31

C. Reference to the fifteen factors and "hypothetical negotiation" construct defined in *Georgia-Pacific v. United States Plywood Corp.* indicates a reasonable royalty for Cochlear's use of the AMF Patents would be 7.5% of sales. .................................32

D. Absent additional information from Cochlear or its experts, it is my opinion that a royalty of 7.5% would be reasonable for both of the Mann Patents or either individually, although the period for which damages are calculated may be abbreviated if only the '691 patent is found valid and infringed. .................................44

E. Prejudgment Interest.....................................................................................................44

IV.   **DATA AND INFORMATION CONSIDERED IN FORMING THESE OPINIONS** .........................................45

V.    **EXHIBITS TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS** ...................................45

VI.   **QUALIFICATIONS INCLUDING PUBLICATIONS AND TESTIMONY** ..............................................45

VII.  **COMPENSATION PAID FOR SERVICES**....................................................................................46

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

## I.   INTRODUCTION

I have been asked to provide opinions regarding damages the Alfred E. Mann Foundation for Scientific Research ("AMF" or "Plaintiff") may claim if there is a finding of liability against Cochlear Limited and Cochlear Corporation (n/k/a Cochlear Americas; collectively, "Cochlear" or "Defendant")[1] for alleged infringement of U.S. Patent No. 5,609,616 ("the '616 Patent") and U.S. Patent No. 5,938,691 ("the '691 Patent"; collectively "the AMF Patents.")  This is a preliminary report of my opinions and the bases for those opinions.  My report includes additional information required by Federal Rule of Civil Procedure 26(a)(2)(B).

Section II of this report provides brief background information on the market for the patented products, the patented technology, the parties in suit and other information used in my analyses.  Section III of this report outlines my preliminary opinions.  My opinions at this time are based on an independent examination of documents and discovery produced in this case, conversations with AMF and Advanced Bionics personnel[2] and certain third-party documents as disclosed in my report text and appendices.

The disclosures in this report are based on discovery to date and currently available information.  To the extent additional relevant information comes to light, including but not limited to supplemental production from the parties, reports from either party's expert(s), rulings from the Court and any additional materials produced through discovery or otherwise made available, I may amend or supplement my opinions as necessary and permitted by the Court.

As in all cases, whether engaged by counsel for a plaintiff or a defendant, an assumption that liability will be found is necessary as a basis for my analysis.  It does not imply I have been engaged to provide opinions on issues relevant to a determination of liability or have determined such liability exists.

This report has been prepared in connection with the above referenced case.  The report is to be used for the specific purposes of this litigation and is not to be used for any other purpose without the express written consent of Ocean Tomo.

---

[1] Although I may refer to the defendants collectively as "Cochlear" in my report, this is not to be construed as a legal conclusion or other assumption that Cochlear, Ltd. and Cochlear Americas are properly regarded as a single entity for purposes of damage determination in this lawsuit.  When referencing either entity individually, I will use its full corporate name.

[2] To date, I have had conversations with Jerry Schloffman, Vice President of Global Marketing at Advanced Bionics and Larry Fischer, Chief Financial Officer of AMF.

1

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

## II. BACKGROUND

### A. Hearing Loss

I understand that in a normal functioning ear, sound is perceived when movements of the basilar membrane are sensed by a line of hair cells in a part of the ear known as the cochlea.[3]  If the hair cells are damaged, a patient's auditory system cannot transform sound into neural impulses and hearing impairment or loss results.[4]  Individuals with hearing impairment may be categorized by the severity of their impairment as follows:[5]

| Level of Hearing Loss | Decibel Level (What can you hear?) | Sound Equivalent |
|---|---|---|
| Typical or Standard | Less than 20 dB | |
| Mild | 20-40 dB | Cannot hear whispered conversation in a quiet atmosphere at close range |
| Moderate | 40-60 dB | Cannot hear normal conversation in a quiet atmosphere at close range |
| Severe | 60-90 dB | Cannot hear speech; may only hear loud noises such as a vacuum cleaner or lawn mower at close range |
| Profound | Greater than 90 dB | Cannot hear speech; may only hear extremely loud noises such as a chain saw or the vibrating component of a loud sound |

While researchers have found it difficult to quantify the deaf population,[6] an estimated 28 million people in the United States suffer from some degree of hearing loss.[7]  An estimated 12,000 children born each year in the U.S. have some form of hearing impairment, making it the most common birth defect in this country.[8]

Historically, mitigation of hearing loss has involved hearing aids, which may be useful for people with mild to moderate hearing loss.  Hearing aids are electronic devices which collect sound from the environment through a microphone, amplify it and transmit the amplified sound into the ear.[9]

---

[3] http://www.americanscientist.org/issues/id.942,y.0,no.,content.true,page.1,css.print/issue.aspx
[4] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998
[5] http://www.agbell.org/DesktopDefault.aspx?p=Hearing_Loss_Chart; http://www.agbell.org/docs/soyourchild.pdf
[6] Mitchell, Ross E., "How Many Deaf People are There in the United States?  Estimates From the Survey of Income and Program Participation," Gallaudet Research Institute, Oxford University Press, 2005
[7] http://www.agbell.org/DesktopDefault.aspx?p=HL_Information_and_Resources
[8] *Ibid.*
[9] *Ibid.*  http://www.agbell.org/DesktopDefault.aspx?p=Hearing_Aids

2

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

However, hearing aids provide little or no benefit for many people, including those with severe to profound hearing loss.

**B. Functionality of Cochlear Implants**

Cochlear implants may be used in people with severe to profound hearing loss who experience minimal or no benefit from hearing aids.[10] Cochlear implants work by bypassing the damaged part of the ear. The cochlear implant system collects sound from the environment, converts the sound into electrical signals and delivers those signals directly to the auditory nerve, where they are interpreted as sound by the part of the brain responsible for hearing.[11]

The Hearing Loss Association of America describes the functionality of a cochlear implant ("CI") as involving the following steps:[12]

1. Sounds are picked up by a microphone.

2. Sound from the microphone is transmitted to the speech processor, which is a miniaturized, battery-powered computer.

3. The speech processor filters, analyzes and digitizes the sound into coded signals.

4. The coded signals are sent from the speech processor to the transmitting coil.

5. The transmitting coil sends the coded signals to the cochlear implant receptor under the skin.

6. The cochlear implant delivers the electrical energy of sound to an electrode array inserted during surgery into the cochlea.

7. The electrodes stimulate the remaining nerve fibers, which then send the sound information through the auditory system to the brain for interpretation.



---

[10] http://www.agbell.org/DesktopDefault.aspx?p=Using_a_Cochlear_Implant
[11] http://www.agbell.org/DesktopDefault.aspx?p=How_Cochlear_Implants_Work
[12] http://www.hearingloss.org/docs/CI%20Booklet.pdf

3

*Attorneys' Eyes Only*

**EXHIBIT Y**



The major components of a CI system include an implant and a speech processor.  The implant is placed inside the skull with wires running to the cochlea.  A headset or headpiece is placed on the outside of the head and usually attached to the implant using magnets.  The speech processor can be worn either behind the ear ("BTE") [13] or on the recipient's belt.[14]

In a BTE system, these components are positioned on a typical recipient as shown below:[15]



## C.  Development of Cochlear Implants

The first CIs were implemented in humans in the early 1970s. [16]  Early devices, such as the House/3M device,[17] were single channel implants capable of providing electrical stimulation at a single site in the cochlea using one electrode.[18]  By current standards, these were relatively crude devices that allowed noise recognition sufficient to aid implant recipients in conjunction with lip reading skills. [19]  At the time of their development it was still unknown whether similar devices would ever be able to replicate speech, or even whether electrical stimulation of the auditory nerve could produce anything other than undifferentiated noise.  In 1984, the House/3M device became the first CI approved by the FDA for use in the U.S.[20]  Recipients experienced

---

[13] http://www.cochlearamericas.com/Products/261.asp

[14] http://www.cochlearamericas.com/Products/262.asp

[15] http://www.bionicear.com/Your_Journey_to_Hearing/Adults/Learning/Treatments_forHearing_Loss.cfm?langid=1

[16] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[17] The House/3M implant was developed by Dr. William House and his associates in the 1970s.

[18] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[19] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

[20] http://www.accessdata.fda.gov/

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

predictably limited hearing gains with these single-channel devices and few could actually recognize speech.[21]

Beginning in the 1980s, researchers began experimenting with multiple channel implants, which allowed multiple electrodes to be stimulated simultaneously. Cochlear Ltd. and its subsidiary Nucleus Limited began to manufacture a multi-electrode implant called the "Nucleus," which had been developed by a team of doctors and scientists at the University of Melbourne, Australia.[22] The Nucleus eventually became the "Nucleus 22," capable of stimulating 22 electrodes. It was approved by the FDA in 1985 for use in the U.S.[23]

In 1986, the Alfred E. Mann Foundation for Scientific Research "took on the development of an implantable high-speed cochlear implant with two-way telemetry."[24] This work led to the development of a multi-channel CI system ultimately commercialized by Advanced Bionics as the "Clarion."[25] The Clarion received FDA approval in August 1996. For the next five years, competition for sales of CIs in the U.S. was limited to two competitors, Advanced Bionics and Cochlear.[26] During this period the companies competed for sales primarily by improving the hearing quality of their respective products.[27] In 1998 Cochlear responded to Advanced Bionics' entry into the U.S. market with the release of the "Nucleus 24" CI device.[28]

In 2001, Austrian device manufacturer MED-EL Corporation ("MED-EL") entered the U.S. market when it received FDA approval for its "Combi 40+" CI device.[29] Since 2001, each manufacturer has released subsequent versions of its implants and speech processors, including Cochlear's "Nucleus Freedom," Advanced Bionics' "Clarion CII" and "HiRes 90K" implants and "Harmony" speech processor and MED-EL's "SONATA." The CI systems currently available from each of the three manufacturers differ in the way they process and encode sound and how they transmit it to the auditory nerve. There does not appear to be a consensus in the market on whether any method is consistently superior to the others.[30]

## D.  The Cochlear Implant Industry

As noted previously, from 1996 to 2001, Cochlear and Advanced Bionics were the only companies with CIs approved by the FDA for sale in the U.S. The companies competed for sales principally by marketing to doctors and audiologists, with a focus on the fundamental performance of their respective devices. As the goal of any CI is to enable a recipient to hear, doctors would select the product they believed had the best chance of achieving hearing restoration for a given recipient.

---

[21] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

[22] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[23] http://www.accessdata.fda.gov/

[24] http://aemf.org/mission.asp

[25] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998

[26] http://www.pslgroup.com/dg/9f3e.htm

[27] Conversation with Mr. Schloffman

[28] http://www.accessdata.fda.gov/

[29] *Ibid.*

[30] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

5

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

By the late 1990s, all commercialized CIs allowed recipients to achieve sentence recognition of 70% to 90%.[31]  This does not imply they all were or are capable of producing the desired result in all cases.  Rather, all devices may produce a wide range of ultimate hearing performance from patient to patient after implementation.[32]  As a result of relative parity in basic functionality, however, incremental improvements in basic device performance became less important from a marketing perspective and other functional features became relatively more important:

> "Since the devices have a similar range of outcomes, other criteria are often considered when choosing a cochlear implant: usability of external components, cosmetic factors, battery life, reliability of the internal and external components, MRI compatibility, mapping strategies, customer service from the manufacturer, the familiarity of the user's surgeon and audiologist with the particular device, and anatomical concerns."[33]

In addition to doctors and audiologists, CI recipients[34]  also have influence over the specific brand of CI to be implanted. [35]  A recipient may prefer either a BTE or a belt-worn speech processor, for example, or may prefer the styles, colors, monitoring or other features offered by a particular manufacturer.  I understand from Advanced Bionics' VP of Global Marketing, Jerry Schloffman, that as the market has evolved, parity among manufacturers in basic device performance has resulted in a shift in marketing focus from a relatively greater emphasis on doctors and audiologists to a relatively greater emphasis on recipients.  Consequently, CI manufacturers also devote resources and materials to marketing their products directly to implant recipients.

Of the three companies with current FDA approval to sell CIs in the U.S., Cochlear was the first and essentially represented 100% of the relevant market from 1985 until Advanced Bionics' U.S. market entry in 1996.  Cochlear has generally maintained the lead in U.S. market share since that time.[36]  Advanced Bionics has generally been second in terms of market share and MED-EL has been third.

James Findlay Patrick, Cochlear's Chief Scientist and Senior Vice President, estimated the U.S. market for CIs at between 8,000 and 10,000 units per year.[37]  In February 2008, investment bank JPMorgan estimated worldwide CI unit sales growth had averaged approximately 15% per year between 2001 and 2007.[38]  The worldwide market for CIs is expected to continue to grow by between 16% and 22% per annum,[39]  driven in part by the increasing number of recipients opting for bilateral implants (implants in both ears.) [40]   A report by independent research firm Neurotech predicted the worldwide market would grow to $1.59 billion by 2012.[41]  In February

---

[31] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004

[32] http://www.answers.com/topic/cochlear-implant

[33] *Ibid.* and http://www.hearingloss.org/docs/CI%20Booklet.pdf

[34] I will use the term "CI recipient" for convenience, recognizing that when the child is the recipient, the person influencing the decision on which implant to use will actually be a parent or guardian.

[35] *Cochlear Implants*, American Speech-Language Hearing Association Working Group on Cochlear Implants, 2004, p. 9

[36] COC-5000153 and COC-5000159, COC-5000335

[37] Deposition of James Findlay Patrick, 18 December 2008 (the "Patrick Deposition"), p. 60

[38] COC-3000894

[39] COC-3000903; www.medtechinsight.com/ReportA577.html; www.neurotechreports.com/pages/marketprojections12.html

[40] COC-3000869

[41] www.neurotechreports.com/pages/marketprojections12.html

6

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

2008, investment bank ABN-AMRO projected Cochlear's sales from the Americas region will grow from $249.8 million in fiscal year 2007 to $465.3 million by fiscal year 2010.[42]

## E.   Programming CI Systems and the Role of Telemetry

I understand that in order to properly facilitate sound perception and speech recognition, a CI system must be programmed by an audiologist.  Each implant recipient is individually "fitted" or "mapped" to ensure safe and effective electric stimulation.  Four to six weeks after the device is implanted, the recipient returns to the hospital or audiologist's clinic and the device is "turned on."  An audiologist then attaches the patient's speech processor to a computer and performs a series of tests to attempt to maximize the recipient's hearing restoration.  Audiologists are concerned with determining the threshold level ("T-level") and the maximum or most comfortable loudness level ("C-level" or "M-level.") [43]

Each manufacturer has its own approach to speech coding.  Cochlear's Nucleus system employs several processing strategies, including spectral peak ("SPEAK"), advanced combined encoder ("ACE") and continuous interleaved sampling ("CIS.")  The Advanced Bionics Clarion system uses CIS and simultaneous analog stimulation ("SAS.")  MED-EL also uses CIS in its device.[44]

I understand the fitting process is a time-consuming, labor-intensive one involving interaction between the audiologist and the recipient.  The process may be especially difficult when it involves small children or other recipients with limitations on their capability to provide reliable feedback:

> *"[T]he process of selecting an optimal stimulation paradigm can be rather time-consuming. The fitting procedures will also become more complex as an increasing number of parameters (e.g. the rate of stimulation, the number of active channels) need to be optimized in order to achieve good individually fitted speech processor programs. The problems are further compounded for the ever-increasing number of very young children being implanted who are less likely to be able to provide accurate subjective feedback about the settings of the fitting parameters. Objective measures are therefore desirable to assist with the optimization process by narrowing down the initial choices of parameter settings for the individual user."[45]*

"Back telemetry" is used by audiologists to objectively measure the performance of the device once implanted in a recipient.  Broadly defined, telemetry refers to the "electronic transmission of data between distant points."[46]  In CIs, back telemetry is used by doctors and audiologists to communicate with and measure the performance of CI devices.

> *"Most modern cochlear implants have already had or will soon have sophisticated telemetry functions that allow close, accurate monitoring and measurement of electrode impedance, electrical field distribution, and nerve activities.  The impedance monitoring can detect both*

---

[42] COC-3000861; this projection includes all of Cochlear's products, including products unrelated to CIs.

[43] http://www.hearingloss.org/magazine/2007MarApr/MarkRossMayJune07.pdf

[44] Cochlear Implants, UTMB Dept. of Otolaryngology, 5 February 2003

[45] *A Simple Two-Component Model of the Electrically Evoked Compound Action Potential in the Human Cochlea*, Wai Kong Lai and Norbert Dillier, <u>Audiol Neurootol</u> 2000; 5:333 – 345

[46] http://medical-dictionary.thefreedictionary.com/telemetry

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

*open and shorted electrodes, while electrical field distribution and nerve activities allow
objective measures of electrode interaction and nerve survival. These measures are
becoming increasingly important for the objective fitting of the cochlear implant, particularly
in children who cannot provide reliable subjective responses."* [47]

Cochlear highlighted the inclusion of the telemetry feature in its Pre-Market Approval
Application to the FDA for its Nucleus 24 CI product.

*"Comprehensive telemetry allows assessment of internal device status through automated
recording of electrode impedances and voltage compliance."* [48]

Three specific types of back telemetry, "impedance telemetry," "neural response telemetry" and
"compliance telemetry," are described in detail below:

## 1.  Impedance Telemetry

Impedance telemetry is a specific type of back telemetry referring to the measurement of
current and voltage in the electrodes to determine impedance, which allows an audiologist or
surgeon to determine if a CI system is functioning properly.[49]

*"There are two types of telemetry systems.  One is known as impedance telemetry.  This
type of telemetry checks the internal receiver to determine if the electrodes are
functioning according to specification.  Why is this type of telemetry necessary?
Impedance telemetry permits the audiologist to monitor the internal device each time the
child comes to the center after implantation.  All of the newer systems have this type of
telemetry."* [50]

Impedance telemetry is particularly important in very young patients:

*"Normal intraoperative findings provided immediate reassurance to the implant team
and parents of young children that the implant was fully functioning and that the
electrical stimulation was activating the auditory pathways.  These objective measures
also identified potentially challenging cases, such as those with low levels of sensitivity to
electrical stimulation and susceptibility to facial nerve stimulation.  An audit showed that
intraoperative measures provided valuable assistance in the initial fitting of the
device."* [51]

I understand impedance telemetry is typically used by surgeons and audiologists to perform
testing of a CI while the recipient is still in surgery, thereby avoiding the need for later
adjustments or further procedures.  Dr. David Kelsall, an ear surgeon at Rocky Mountain Ear
Center, testified he performs impedance telemetry in all of his CI surgeries[52] and would

---

[47] Zeng, Fan-Gang, "Trends in Cochlear Implants," *Trends in Amplification*, Vol. 8, No. 1, 2004
[48] COC-2008647
[49] Deposition of Tony Nygard, 1 October 2008 (the "Nygard Deposition"), pp. 108 – 109.  I understand
the back telemetry relevant to AMF's patents is referred to amongst doctors and audiologists as "voltage
telemetry" or "impedance telemetry."
[50] The Parent's Guide to Cochlear Implants, Patricia M. Chute and Mary Ellen Nevins, p. 33-34
[51] http://www.ncbi.nlm.nih.gov/pubmed/15732380
[52] Deposition of David Kelsall, M.D., 10 December 2008, (the "Kelsall Deposition"), p. 13 – 14

8

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

prefer a device with telemetry to a device without telemetry, all else equal.[53]

Impedance telemetry is also used post-operatively by audiologists to identify an improperly functioning device[54] and to give audiologists an objective measure of device performance, allowing for more consistent and accurate programming of speech processors. This may lead to reduced time required to map the device. In fact, the instructions for use of Cochlear's "CustomSound" software, the software program used to program its CI devices, recommend the audiologist perform an impedance test every time the software is connected to a CI.[55]

I understand impedance telemetry is used by all three CI device manufacturers in the U.S. As described in Section II.H, below, Cochlear's Nucleus 24 implants and certain speech processors include the ability to perform impedance telemetry. I understand Advanced Bionics' CI systems have been capable of impedance telemetry since its entry into the U.S. market, and product information available from MED-EL's website indicates its products include back telemetry capability.[56]

## 2. Neural Response Telemetry ("NRT")

Neural response telemetry is used by doctors and audiologists to communicate with a CI via radio frequency. It is generally used to measure electrically evoked compound action potential ("ECAP") from the auditory nerve.[57]   These measures are useful for:[58]

- ▪ "Objective verification of auditory nerve function in response to electrical stimulation
- ▪ Objective verification of device function
- ▪ Assistance in programming the speech processor for individuals who cannot provide reliable behavioral responses
- ▪ Verification or confirmation of the accuracy of questionable behavioral responses"

Cochlear's Nucleus 24 and Freedom products offer NRT. Advanced Bionics' HiRes 90K product, which received FDA approval in 2003, offers "NRI," a similar functionality with respect to telemetry.

## 3. Compliance Telemetry

Compliance telemetry relates to the ability to detect whether a CI is receiving enough power.[59]

---

[53] Kelsall Deposition, pp. 26 – 28
[54] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=239406
[55] COC-2008666 – COC-2008669 and COC-2008696
[56] http://www.medel.com/english/30_Products/01_MAESTRO/Cochlear_Implants/06_Comprehensive _Diagnostic_Toolkit.php; I understand AMF sent a letter to MED-EL in July 2003 notifying it of potential infringement of the '616 patent (see AB00344.)
[57] Deposition of Christopher van den Honert, 8 December 2008 (the "van den Honert Deposition"), pp. 58 – 59
[58] www.audiologyonline.com/articles/article_detail.asp?article_id=1569
[59] van den Honert Deposition, p. 54

9

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

### F.  The Parties at Issue

#### 1.  Alfred E. Mann Foundation for Scientific Research

AMF is a non-profit "medical research foundation dedicated to bringing advanced medical technologies to the public to provide significant improvement to the health, security, and quality of life for people suffering from debilitating medical conditions."[60]  AMF was established by entrepreneur and medical device development pioneer Alfred Mann in 1985 to develop and promulgate innovative medical technologies that might not otherwise be pursued by for-profit entities.[61]

In addition to CIs, AMF has developed technologies for glucose sensors and microstimulators.  Its technologies are licensed to medical device manufacturers and sold worldwide. [62]  In 1999, AMF exclusively licensed its cochlear technologies, including the patents-in-suit, twelve other U.S. patents, one U.S. patent application and know-how to Advanced Bionics.[63]

#### 2.  Advanced Bionics

Advanced Bionics was founded by Alfred Mann in 1993, to develop medical devices related to neurostimulation, including pain management and cochlear implants.[64]  I understand Mr. Mann was motivated to found Advanced Bionics in part because earlier discussions with Cochlear failed to produce any license or cooperative agreement.[65]  Advanced Bionics' CIs are sold under the "Clarion," "Clarion CII," "Auria" and "Harmony" trade names.  Advanced Bionics is the second largest manufacturer of CIs in the world and directly competes with Cochlear for sales.[66]

In June 2004, Advanced Bionics was purchased by Boston Scientific Corporation ("BSC") for approximately $740 million in cash, plus earn-out payments.[67]  In settlement of subsequent litigation, BSC bought the earn-out payments and sold portions of Advanced Bionics, including the CI product lines, back to Mr. Mann and other investors in 2008.[68]

#### 3.  Cochlear Limited and Cochlear Americas

Cochlear, Ltd. engages in the development, manufacture and sale of implantable hearing solutions.[69]  Its current products include the "Nucleus Freedom," "Nucleus Hybrid," "DACS" and "Baha" hearing systems.[70]  The company was founded in 1981 and is headquartered in

---

[60] http://www.aemf.org/about.asp
[61] *Ibid.*
[62] *Ibid.*
[63] AMF018352
[64] Capital IQ Private Company Profile, Advanced Bionics Corporation.
[65] Mann Deposition, pp. 26 – 27
[66] Deposition of Theresa Adkins, 30 December 2008, p. 26
[67] Boston Scientific Corporation, SEC Form 10-K for the fiscal year ended 31 December 2004, p. 52
[68] http://www.reuters.com/article/pressRelease/idUS225723+04-Jan-2008+PRN20080104
[69] Capital IQ Public Company Profile, Cochlear, Ltd.
[70] *Ibid.*  I understand the "Baha" is a bone-anchored hearing device and thus fundamentally dissimilar from CIs.

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

Sydney, Australia.[71]  In its fiscal year ended 30 June 1999 Cochlear Ltd. reported a pre-tax profit of $AU 23 million in operating income on approximately $AU 127.2 million in net sales.[72]  Cochlear Americas, a subsidiary of Cochlear Ltd., was founded in 1984.  It markets and sells Cochlear's hearing solutions in the United States.[73]

As detailed below in Section II.H, AMF alleges that certain implant systems manufactured and sold by Cochlear and its subsidiaries infringe claims of the AMF Patents and are therefore subject to monetary damages.

## G.  The Patents at Issue

The current dispute involves the alleged infringement by Cochlear of two patents owned by AMF and exclusively licensed to Advanced Bionics:

▪ U.S. Patent No. 5,609,616, entitled "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator," and issued 11 March 1997.  The abstract of the '616 patent reads as follows:

> *A physician's tester provides for physician monitoring and control of an implantable human tissue stimulator system, such as an implantable cochlear stimulator (ICS) system. During normal operation, the tissue stimulator system includes an implantable stimulator and a wearable processor (WP). The physician's tester is designed around a microprocessor, and is basically a modification of the WP. The tester provides control over the selection of voltages and currents to be measured and the presetting of parameters in the implantable stimulator during testing of the implanted stimulator and/or a patient's response to data transmitted by the WP/tester to the implanted stimulator. The physician's tester is portable and utilizes telemetry coupling with the implanted stimulator to provide communication between the tester and stimulator for the monitoring, control and measurement of the stimulator parameters. The tester resides in a portable housing having a control panel and a visual display. The control panel allows the physician to manually set various parameter levels.  The visual display provides alpha numeric data for viewing.  Various devices, such as additional displays and/or a printer, may be coupled to the tester through a display port and/or an infrared serial output port in order to permit a print out of the displayed data or other information.*

▪ U.S. Patent No. 5,938,691, entitled "Multichannel Implantable Cochlear Stimulator," and issued 17 August 1999. The abstract of the '691 patent reads as follows:

> *A cochlea stimulation system includes a patient wearable system comprising an externally wearable signal processor (WP) and a headpiece in electronic communication with an implanted cochlear stimulator (ICS). The ICS comprises eight output stages each having two electrically isolated capacitor-coupled electrodes, designated "A" and "B", circuits for monitoring the voltages on these electrodes, and circuits for both transmitting status information to and receiving control information from the WP. Based upon information received from the WP, a processor within the ICS can control both the frequency and the widths of the output stimulation pulses applied to the electrodes and*

---

[71] COC-5002191
[72] COC-5002192
[73] http://www.hearingreview.com/issues/articles/HPR_2007-07_02.asp

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

> *may select which electrodes to monitor. The ICS receives power and data signals*
> *telemetrically through the skin from the WP. To save power, the ICS may be "powered*
> *down" by the WP based upon the absence of audio information or "powered up" if audio*
> *is present. The WP communicates with the headpiece over a co-axial cable using one*
> *frequency for transmitting signals and a second different frequency for receiving signals.*

I understand the patents in suit relate to the testing and operation of an implant and a speech processor. An important aspect of the patents is the back telemetry capability which both provides the physician with the capability to fit the CI to the patient and monitor the integrity of the cochlear stimulating electrodes and enables maintaining operation of the implant-speech processor combination within operational requirements.

## H.  Products at Issue

Cochlear's technology can be broadly categorized into three generations, as embodied in its in Nucleus 22, Nucleus 24 and Nucleus Freedom implants. Speech processors sold with these systems during the 2001 to 2008 time period can be categorized into four generations, as embodied in Cochlear's SPrint, ESPrit, ESPrit 3G and Freedom processors.

### 1.  The Nucleus 22

The Nucleus 22 received FDA approval in 1985 and was Cochlear's first commercial CI. It contained a "CI22" implant with 22 independent channels, each programmed to provide a specific sound sensation from high to low pitch.[74] During the late 1990s the Nucleus 22 was sold with a "Spectra" speech processor.[75] Later generation speech processors compatible with the Nucleus 22 included the "ESPrit 22" released in 2000,[76] the "ESPrit 3G" for Nucleus 22 released in 2004[77] and the Freedom speech processor for Nucleus 22 released in 2008.[78] I understand the Nucleus 22 implant is not capable of back telemetry.

### 2.  The Nucleus 24

In June 1998, a little less than two years after Advanced Bionics received FDA approval for its first CI system, Cochlear released the Nucleus 24. The original Nucleus 24 design, the "CI24M," had a straight array of 22 intracochlear electrodes like the Nucleus 22, but introduced new stimulation capability with the addition of two extracochlear electrodes.[79] The CI24M allowed for increased available pulse rates and had a smaller implant bed than its predecessor, an impact resistant titanium casing, telemetry to facilitate maintenance and neural response telemetry to facilitate programming for young children.[80]

In 2000, the "CI24R" was released and substantially replaced the CI24M. The CI24R had an even smaller implant housing, allowing use in younger children. An enhanced version of the

---

[74] COC-5002021
[75] *Ibid.*
[76] COC-5002326
[77] COC-5000159
[78] Cochlear 2008 Annual Report, p. 15
[79] Nucleus Reliability Report, Vol. 5 June 08
[80] COC-5002079 – COC-5002080

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

CI24R was released in 2003 with the Contour Advance electrode, which minimizes force on the cochlea during implantation.[81]

A Nucleus 24 recipient initially had the choice of two speech processors, the ESPrit or the SPrint.[82]  The ESPrit 3G speech processor was made available for Nucleus 24 recipients in 2002[83] and the Freedom speech processor was made available for Nucleus 24 recipients in fiscal year 2007.[84]

### 3.   The Nucleus Freedom

In the fourth quarter of Cochlear's 2005 fiscal year, or about a year after Advanced Bionics' acquisition by BSC, Cochlear received FDA approval for its newest generation of CI, the Nucleus Freedom or CI24RE.[85]  The Nucleus Freedom allows for more efficient asynchronous stimulation[86] and has a "Softip" to protect the cochlea during surgery, a self-curling array designed to place the electrodes as close as possible to the auditory nerve, and a SmartSound digital microchip designed to handle a broad range of possible future upgrades.[87] The Nucleus Freedom is shipped with the Freedom speech processor.

### 4.   The SPrint Speech Processor

The SPrint, or SP5, was the belt-worn speech processor released with the Nucleus 24 implant. The SPrint featured digital signal processing, was programmable with multiple speech coding strategies including SPEAK, CIS and ACE,[88] and included telemetry capability.  I understand some Nucleus 24 owners initially purchased the SPrint and later the ESPrit speech processor, while others purchased both a SPrint and ESPrit speech processor at the time of implantation in order to have the flexibility of using either a belt-worn or BTE speech processor.[89]

### 5.   The ESPrit Speech Processor

The ESPrit speech processor was released with the Nucleus 24 implant and was the first commercially available BTE speech processor.  In keeping with the space and weight constraints inherent in a BTE processor, the primary features of the ESPrit were its low-power integrated circuit design and energy efficient speech coding strategies.[90]  In 2000 Cochlear released a version of the ESPrit speech processor for the Nucleus 22 under the name "ESPrit 22."[91]  The ESPrit speech processor is not capable of back telemetry.

### 6.   The Esprit 3G Speech Processor

In 2002, Cochlear released an ESPrit 3G speech processor for the Nucleus 24 which included the company's complete range of speech coding strategies (SPEAK, CIS, ACE, etc.) and a

---

[81] Nucleus Reliability Report, Vol. 5 June 08
[82] COC-5002079
[83] COC-5000016
[84] COC-5000439
[85] Cochlear's fiscal year begins on 1 July and ends on 30 June
[86] Nucleus Reliability Report, Vol. 5 June 08
[87] http://www.cochlearamericas.com/Products/23.asp
[88] COC-5002079
[89] COC-5002205
[90] COC-5002079
[91] COC-5002326

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

whisper setting for listening to soft noises.[92]  In 2004 Cochlear released a version of the ESPrit 3G for use with the Nucleus 22.[93]  The ESPrit 3G speech processor is not capable of back telemetry.

### 7.  The Freedom Speech Processor

The Freedom speech processor, or SP12, was originally sold with the Nucleus Freedom implant.[94]  In addition to the features included in previous speech processors, the Nucleus Freedom has two microphones allowing it to soften distracting background noise in loud environments and can automatically adjust sound levels in dynamic environments.[95]  It is also water resistant[96] and allows for the use of back telemetry.  Versions of the SP12 speech processor compatible with the Nucleus 24 and Nucleus 22 were released in 2006 and 2008 respectively.[97]

CIs offered by Cochlear that include impedance telemetry are accused of infringing the AMF patents.  I understand the CI24 implants were the primary implant offered by Cochlear during the relevant period in this case.  There are several versions of the CI24 product, all allowing impedance telemetry and including the following:

- CI24M - Micro Implant
- CI24M - Cochlear Implant
- CI24 Contour
- CI24 Contour CA
- CI24RE (ST)
- CI24R (ST)
- CI24RE (CA)
- CI24RE Hybrid

As described above, the various versions of the CI24 fall into two distinct generations sold under the trade-names Nucleus 24, released in the first quarter of fiscal year 1998, and Nucleus Freedom, released in the second quarter of fiscal year 2005.[98]  Both versions of the CI24 implant are alleged to infringe the AMF patents.  Sales records produced by Cochlear indicate it sold 33,241 CI24 implants between December 2001 and June 2008.[99]  As shown on Figure 1, below, unit sales of the CI24 series generally increased over this period:

---

[92] COC-5000016
[93] COC-5000159
[94] For purposes of this report, I will refer to the Freedom processor as "SP12" to avoid confusion with the Nucleus Freedom CI product.
[95] *Nucleus Freedom Launched in USA*, Cochlear Press Release, 14 March 2005.
[96] *Ibid.*
[97] COC-5000439 and Cochlear 2008 Annual Report, p. 15
[98] COC-5000326 – COC-5000327
[99] See Exhibit 3.5

14

*Attorneys' Eyes Only*

**EXHIBIT Y**



**Figure 1**
**Unit Sales of CI24 Implants**[100]



Cochlear also manufactures and sells in the U.S. speech processors capable of performing back telemetry.  Cochlear Limited's Manager for the department of Enabling Technologies, Tony Nygard, testified the SPrint and SP12 speech processors are capable of performing back telemetry, while the ESPrit and ESPrit 3G versions are not.[101]  Unit sales of Cochlear's speech processors are shown on Figure 2, below:

---

[100] The first period on Figure 1 corresponds to December 2001 rather than a full quarter.
[101] Nygard Deposition, p. 103

*Attorneys' Eyes Only*

EXHIBIT Y





**Figure 2**
**Unit Sales of Speech Processors** [102]

As shown on Figure 2 above, sales of the ESPrit speech processor were negative for the almost the entire period for which data were produced.  I understand Cochlear has refused to produce sales data prior to December 2001.  The SPrint speech processor was sold in generally stable quantities between December 2001 and the release of the SP12 speech processor in the first quarter of 2005.  The ESPrit 3G speech processor experienced a spike in sales after its release for commercial sale in the U.S. in 2002 and again in 2004 after the release of ESPrit 3G compatible with the Nucleus 22.  The ESPrit 3G was the highest selling speech processor during the time period prior to the release of the SP12.  The SP12 processor was released in the U.S. in the first quarter 2005.  It effectively replaced all earlier models and has been sold in generally increasing quantities since its introduction.

## I.   Timeline of Relevant Events

For purposes of understanding the current dispute, it may be useful to review the following timeline of relevant events:[103]

---

[102] The first period on Figure 2 corresponds to December 2001 rather than a full quarter.
[103] All "Quarters" refer to calendar years (1 January through 31 December), not Fiscal Years.

*Attorneys' Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

- 1981                Cochlear Limited was founded in Australia.[104]

- 26 Feb 1984         The House/3M, a single channel cochlear implant, became the first CI to receive FDA approval in the U.S.[105]

- 31 Oct 1985         Cochlear received FDA Approval to sell the Nucleus 22 CI in the U.S. for use in adults.[106]

- 22 Sep 1989         The original patent application entitled "Cochlea Stimulating System for Improving the Hearing of the Hearing Impaired" was filed on behalf of AMF.

- 27 Jun 1990         The FDA approved the Nucleus 22 CI for use in children aged two to seventeen. [107]

- 1993                Advanced Bionics was founded.  Testimony indicates a verbal agreement for use of any AMF patents related to CI technology was implemented at or around this time.[108]

- 25 May 1995         The application for what would become the '616 Patent was filed with the United States Patent and Trademark Office ("USPTO.")[109]

- Aug 1996            Advanced Bionics received FDA approval to sell its "Clarion" CI system in the U.S.[110]

- 11 Mar 1997         The '616 Patent, entitled "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator," issued with AMF named as assignee. [111]  It will expire on 11 March 2014

- FY 1997             Cochlear released the CI24 in international markets, along with the SPrint and ESPrit speech processors.[112]

- 23 Jun 1998         The application for what would become the '691 Patent was filed with the USPTO.[113]

- 25 Jun 1998         Cochlear received FDA approval to sell the Nucleus 24, including the allegedly infringing telemetry feature, in the U.S.[114]

---

[104] http://www.powerhousemuseum.com/collection/database/?irn=363656
[105] http://www.accessdata.fda.gov/
[106] *Ibid.*
[107] *Ibid.*
[108] Deposition of David Lee Hankin, 17 December 2008, pp. 16 – 17
[109] The '616 Patent
[110] http://www.pslgroup.com/dg/9f3e.htm
[111] The '616 Patent
[112] COC-5002076
[113] The '691 Patent
[114] http://www.accessdata.fda.gov/

17

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

- 18 May 1999     Advanced Bionics and AMF reduced to writing the terms of their existing agreement in practice for uses of AMF patents related to the cochlear implant field.[115]

- 17 Aug 1999     The '691 Patent, entitled "Multichannel Implantable Cochlear Stimulator," issued with AMF named as assignee. [116] It will expire on 22 September 2009.

- 20 Aug 2001     MED-EL received FDA approval to sell the "Combi 40+" CI in the United States.[117]

- 2002     Cochlear introduced the ESPrit 3G BTE speech processor for the Nucleus 24. [118]

- 1 Jan 2004     AMF modified its Cochlear Technology License Agreement with Advanced Bionics.[119]

- May 2004     Cochlear released the ESPrit 3G BTE speech processor for the Nucleus 22 in the U.S.[120]

- 1 Jun 2004     Advanced Bionics was acquired by BSC for approximately $740 million plus earn-outs. [121]

- March 2005     Cochlear released the Nucleus Freedom CI and compatible SP12 speech processor. [122]

- Sep 2006     Cochlear launched the Freedom processor for Nucleus 24 in the U.S.[123]

- 13 Dec 2007     AMF filed suit against Cochlear alleging infringement of the AMF Patents

- Q2 2008     The Cochlear SP12 speech processor was released for the Nucleus 22 implant.[124]

---

[115] AMF018352
[116] The '691 Patent
[117] http://www.accessdata.fda.gov/scripts/cdrh/devicesatfda/index.cfm
[118] COC-5000016
[119] AMF045305
[120] COC-5000159
[121] Boston Scientific Corporation, SEC Form 10-K for the fiscal year ended 31 December 2004, p. 52
[122] www.cochlear.ch/Corp/Press/409.asp
[123] COC-5000439
[124] Cochlear 2008 Annual Report, p. 15

18

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

---

### III. OPINIONS EXPRESSED, WITH THE BASES AND REASONS THEREFOR

I understand federal statute provides that damages awarded in a patent case shall be "adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer."  In practical terms, in order to assess potential damages in a patent infringement case a determination is typically made of whether and to what extent the plaintiff would have realized additional sales "but for" the defendant's alleged infringement.  These sales may be quantified as the profits lost by the plaintiff.  Additional sales, if any, made by the defendant are then subject to a reasonable royalty.  Alternatively, the plaintiff may elect to claim damages in the form of a reasonable royalty on all sales made by the defendant.

My use of the term "reasonable royalty" in this matter is consistent with the following definition of the term in the case of *Georgia-Pacific v. United States Plywood Corp.*: [125]

> "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

I have calculated damages in this case by applying a reasonable royalty rate to a royalty base comprising the Defendants' sales of components accused of infringing the system and methods claimed in the AMF Patents.  My conclusions, including my assessment of relevant quantitative and qualitative factors, are discussed below.

**A.  Based on financial records and testimony provided to date, I have calculated Cochlear revenue of between $677.7 million and $720.3 million on sales of CI components used in allegedly infringing systems between December 2001 and June 2008.**

As discussed above, AMF alleges that certain devices manufactured and sold by Cochlear infringe the AMF Patents.  I also understand that use of these devices is alleged to infringe the AMF Patents.  In particular, the CI24 implants and the SPrint and SP12 speech processors sold with CI24 implants are accused of infringement.  I have also calculated an alternative royalty base that includes sales of ESPrit 3G speech processors sold with CI24 implants.

---

[125] *318 F. Supp.1116 (S.D.N.Y.1970), modified and affirmed, 446 F.2d 295 (2d Cir. 1971)*

19

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

**Table 1**
**Summary of Royalty Base**

| | Royalty Base Without ESPrit 3G | Royalty Base With ESPrit 3G |
|---|---|---|
| CI24 | $445,493,118 | $445,493,118 |
| SPrint | $48,500,493 | $48,500,493 |
| SP12 | $183,715,500 | $183,715,500 |
| ESPrit 3G | - | $42,640,156 |
| | | |
| Royalty Base | $677,709,110 | $720,349,267 |

I have quantified the appropriate royalty base in this case as follows.

**1.  Cochlear has generated revenue of $445.5 million from infringing sales of the CI24 in the Americas between December 2001 and June 2008.**

Cochlear produced sales data for the period December 2001 through June 2008 for CIs sold in the "Americas" region.  I understand these data represent sales made in the U.S., Canada and Latin America.  I further understand all products sold by Cochlear Americas are imported into the U.S. and therefore subject to U.S. patent law.[126]

As discussed above in Section II.H, during the damages period the CI24 was Cochlear's primary implant, accounting for almost all of its implant sales.  I understand AMF alleges all versions of the CI24 implant are capable of performing back telemetry.  Cochlear contends that a SPrint or SP12 implant must be used in conjunction with a CI24 implant in order to perform impedance telemetry.  However, I understand surgeons and audiologists can and do also perform impedance telemetry on recipients of a CI24 implant with an ESPrit or ESPrit 3G by attaching the recipient's implant to a SPrint or SP12 device owned by the hospital or audiologist.  Christopher van den Honert, Cochlear America's vice president of research and applications, testified in deposition:

> "*the utility of the telemetry arises in the context of the clinician's office, and if one really needs the information provided by telemetry, one can use an alternate processor for that purpose.  It need not be the processor that was provided to the recipient for take-home use.*"[127]

Based on this, I have included all sales of Cochlear's CI24 devices sold between December 2001 and June 2008 in my determination of the appropriate royalty base.  A summary of revenue and unit sales for the CI24 is presented below:

---

[126] Nygard Deposition, p. 147
[127] van den Honert Deposition, p. 115

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

**Table 2**
**CI24 Revenue and Unit Sales - December 2001 to June 2008**

|  | Revenue | Units |
|---|---|---|
| CI24M - Micro Implant | - | (1) |
| CI24M - Cochlear Implant | $802,549 | 204 |
| CI24 Contour | $117,888,274 | 9,486 |
| CI24 Contour CA | $35,759,020 | 2,781 |
| MATCI24R (CA) | $2,019,098 | 150 |
| CI24RE (ST) | $6,134,568 | 397 |
| CI24R (ST) | $10,755,209 | 1,699 |
| CI24RE (CA) | $271,069,630 | 18,463 |
| CI24R (CS) | $48,400 | 2 |
| CI24RE Hybrid | $1,016,370 | 60 |
| Total | $445,493,118 | 33,241 |

2. **Cochlear has generated revenue of $232.2 million from infringing sales of SPrint and SP12 speech processors sold in conjunction with CI24 implants in the Americas between December 2001 and June 2008.**

As discussed in Section II.H, I understand the SPrint and versions of the SP12 intended for use with the CI24 are alleged to infringe the AMF Patents.  A summary of the revenue and unit sales generated by Cochlear from SPrint and SP12 is presented below:

**Table 3**
**SPrint and SP12 Revenues and Units**

|  | Revenue | Units |
|---|---|---|
| SPrint | $48,500,493 | 8,660 |
| SP12 - Final Pack Beige | $261,000 | 52 |
| SP12 - Base System Beige | - | 14 |
| SP12 BTE Beige | $83,993,574 | 18,753 |
| SP12 BTE Brown | $39,597,329 | 8,471 |
| SP12 BTE Black | $20,475,408 | 4,311 |
| SP12 BTE Silver | $32,279,972 | 7,009 |
| SP12 BTE Pink | $4,562,122 | 1,068 |
| SP12 BTE Blue | $3,566,599 | 828 |
| Total | $233,236,497 | 49,166 |

21

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

I understand the SPrint and SP12 were generally only compatible with the CI24 implants during the damages period, and therefore were used in an infringing combination. However, I understand that in the fourth quarter of Cochlear's Fiscal Year 2008 Cochlear introduced a version of the SP12 speech processor that was compatible with CI22 implants. I have estimated unit sales of the SP12 associated with CI22 implants in that quarter at 200 units, corresponding with revenue of $1,020,504.[128] When these sales are subtracted from the total sales of the SPrint and SP12 the total infringing speech processor revenue is $232,215,992.[129]

**3. Cochlear has generated revenues of approximately $42.6 million from sales of ESPrit 3G speech processors used in conjunction with CI24 implants in the Americas between December 2001 and June 2008.**

As noted above in Section II.A.1, the fact that a CI24 was sold in conjunction with an ESPrit 3G speech processor does not preclude the use of back telemetry on the recipient's CI. These speech processors were therefore sold as part of an allegedly infringing CI device, and therefore may be appropriately included in the royalty base.

Prior to May 2004, the ESPrit 3G speech processor was only available in the U.S. for use with the CI24 implant. Therefore, for the period between December 2001 and the first quarter of 2004 I have quantified all sales of ESPrit 3G as sales made for use with the CI24 implant. For the period after the first quarter of 2004, I have subtracted the total number of potential upgrades of CI22 recipients to ESPrit 3G from the total ESPrit 3G sales during the period to estimate ESPrit 3G sales sold with CI24 implants.

Between December 2001 and June 2008, Cochlear generated revenue of approximately $42,640,156 from sales of ESPrit 3G speech processors sold with CI24 implants.[130]

**B. Consideration of conventional valuation methodologies produces a number of quantitative royalty indicators useful in the determination of a starting range for a reasonable royalty in this case.**

In order to determine a range of royalty indicators that may be appropriate in the current matter, I have considered generally accepted *Market*, *Income* and *Cost* valuation methodologies typically used in evaluating intangible assets such as the AMF Patents. These methodologies are discussed below.

**1. Based on information currently available to me, the Market Approach indicates royalty rates in the range of approximately 2.0% to 18.1% have been paid by or to parties relevant to this suit for hearing-related and other medical device technologies.**

The Market Approach values assets based on comparable transactions between unrelated parties. As described in <u>Valuing Intangible Assets</u>,

---

[128] See Exhibit 2.3
[129] See Exhibit 2.1
[130] See Exhibit 2.6

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

> *"The market approach uses two categories of analytical procedures to indicate value: 1) The collection and analysis of market-derived empirical transaction data; that is, data regarding the sale or licensing of the subject intangible asset itself and of comparative intangible assets; and 2) An assessment of the current market conditions (i.e., the economic conditions that influence price) and of the changes in market conditions between the dates of the empirical transactional data and the date of the [hypothetical negotiation]."* [131]

With the Market Approach, an examination of the terms of technology transfers with some similarity to the hypothetical transaction is undertaken and inferences are drawn from resulting observations to identify terms AMF and Cochlear might have agreed to in the hypothetical negotiation.  Specifically, I have considered the licensing histories of both Cochlear and AMF.

**a.   Cochlear has produced documents related to two license agreements for patents or technologies related to cochlear implants, one of which includes stated running royalties of between 2.0% and 5.0% of sales.  This license also included terms that would impact the actual effective rate of the license, but that cannot be quantified based on information provided by Cochlear to date or otherwise available to me.**

As of the date of this report, Cochlear has produced two licenses in this matter:

- *Cross License Agreement, signed 1 May 2002 with Advanced Bionics*.[132]  Advanced Bionics owned U.S. Patent No. 6,125,302, entitled "Precurved Modiolar-Hugging Cochlear Electrode."  Cochlear owned U.S. Patent Application Serial No. 09/454,976 entitled "Cochlear Implant Electrode Array" and Application Serial No. 09/983,292, a continuation of the '976 application.

  Advanced Bionics issued to Cochlear a nonexclusive, fully paid-up license under the '302 patent.  Cochlear granted to Advanced Bionics a nonexclusive, fully paid-up license to the '976 application and agreed to drop all claims in the '292 application that it copied from the '302 patent.

- *IHPS Technology License Agreement with the University of Melbourne.*  On 10 December 1982, Nucleus Limited ("Nucleus") entered into a License Agreement with the University of Melbourne ("MU") and the Commonwealth of Australia related to patents and applications related to an "Implantable Hearing Prosthesis System ('IHPS.')" [133]  Nucleus was granted an exclusive right to the licensed patents and know-how to "manufacture IHPS in Australia" and "use and sell IHPS in all countries of the world."[134]  Nucleus did not have the right to manufacture the IHPS outside of Australia without consent from the Commonwealth.[135]  The agreement included 29 Australian, European, Japanese, and U.S. patents and applications, including four U.S. patent applications.[136]

---

[131] Reilly, Robert F. and Schweihs, Robert P., <u>Valuing Intangible Assets</u>, 1999, p. 102
[132] COC-5002389
[133] COC-5002608 – COC-5002623
[134] COC-5002610
[135] COC-5002611
[136] COC-5002622 – COC-5002623

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

Nucleus was to pay to MU and the Commonwealth royalties specified as 5% of net selling price "on all sales of IHPS or any item forming part of IHPS" for the first 12,000 units and 2% on sales thereafter.[137]   The IHPS was defined as "the electrode, receiver-stimulator, transmitter and speech processor."[138]   The agreement was in effect until expiration of the last patent.   On 30 December 1983 Nucleus sublicensed the technology to Cochlear.[139]   On 22 August 1985, a Deed of Novation was signed between Cochlear PTY Limited, the Commonwealth of Australia and MU under which Cochlear essentially replaced Nucleus and assumed "the rights and liabilities of Nucleus in the original license agreement."[140]   As of the date of this agreement, the licensed patents had been expanded to include 46 patents and applications, including four issued U.S. patents and five additional U.S. patent applications.[141]

On 20 April 2000, in exchange for Cochlear undertaking additional research and development activities, the Commonwealth of Australia agreed to waive its portion of royalties payable from Cochlear for the three-year period beginning 1 January 2000.[142]   Cochlear's obligations included maintaining its staff and facilities in Australia, spending 12% of sales on research and development activities, developing a CI adapted for sale in developing countries and developing software to permit remote programming of CIs by Australian-based audiologists for recipients in other countries.[143]   This agreement appears to have been terminated on 12 September 2006.[144]

On 30 June 2008, Cochlear agreed to make a one-time payment of $AU 2,500,000 plus GST[145] to Hearworks PTY Ltd. and $AU 500,000 plus GST to UM.[146]   Cochlear was granted an exclusive, royalty-free license to the patents contained in the original 1982 license agreement as well as additional patents jointly owned by Hearworks and UM.[147]

**b.   AMF licensed its CI technologies to Advanced Bionics for running royalties and up-front, lump sum consideration in the form of stock.   The effective rate of this agreement may be reasonably calculated as between 9.3% and 18.1% of sales.**

On 18 May 1999, AMF and Advanced Bionics executed a written license agreement for technology related to CIs.[148]   Testimony by AMF's Chief Executive Officer David Lee Hankin indicted this written agreement memorialized an existing agreement in practice between the parties.[149]   AMF granted Advanced Bionics an exclusive, worldwide license to "practice under and use" AMF's patents and know-how related to CIs and to "make,

---

[137] COC-5002614
[138] COC-5002609
[139] COC-5002600
[140] COC-5002601
[141] COC-5002606 – COC-5002607
[142] COC-5002544 – COC-5002545
[143] COC-5002546
[144] COC-5002396
[145] GST is defined as "Goods and Services Tax"
[146] COC-5002397 – COC-5002399
[147] *Ibid.*
[148] AMF018352 – AMF018368
[149] Deposition of David Lee Hankin, 17 December 2008, pp. 16 – 19

24

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

have made, use, lease, sell and otherwise commercially exploit" devices and methods that relate to cochlear implants and utilize or incorporate AMF's patents or know-how. [150]

Compensation paid to AMF for this license included one million shares of Advanced Bionics stock (4.6% of the outstanding shares)[151] and running royalties of 3.0% of net revenues for the first four years, 2.5% for the subsequent four years and 2.0% for all years thereafter.[152]  The agreement was to remain in effect until expiration of the last remaining patent or until the know-how became public information.[153]

The licensed properties included thirteen U.S. patents issued between 1990 and 1998, including the '616 patent,[154] and two U.S. patent applications, including one that matured into the '691 patent.[155]  The licensed properties also included secondary patents to be determined, defined as any foreign patents or applications related to the primary patents, and any U.S. or foreign patents or applications related to inventions or discoveries made by AMF.[156]

The license was amended by the parties on 1 January 2004.  Advanced Bionics granted AMF an additional 1.1 million shares in exchange for reduced royalties of 3.0% retroactively for 1 January 2003 through 18 May 2003, 2.5% for 19 May 2003 through 31 December 2003, 1.25% for 2004 through 2007, and 1.0% thereafter.  The term of the amended agreement was 18 years.[157]

Documents produced by AMF indicate it received running royalties from Advanced Bionics related to cochlear devices beginning in 1999 through 2008.[158]  In addition, AMF's financial documents indicate that in June 2004, AMF received $11 per share for each of the 2.1 million shares of Advanced Bionics that it owned, for a total of $23.1 million.[159]  Furthermore, AMF retained a pro-rata share of the earn-out payments (and, ultimately, the purchase of these rights) paid from BSC to Advanced Bionics under the merger agreement.[160]

Documents produced indicate that AMF received or will receive payments related to the BSC earn-out provisions of $79,149,231 as follows:[161]

---

[150] AMF018352 – AMF018353
[151] One million shares out of 21,572,026 shares outstanding = 4.6%
[152] AMF018354
[153] AMF018356
[154] AMF018366 – AMF018367
[155] AMF018368
[156] AMF018353
[157] AMF045254 – AMF045275
[158] AMF045193
[159] AMF045615
[160] *Ibid.*
[161] See Exhibit 4.4

25

*Attorneys' Eyes Only*

EXHIBIT Y

⬤ INTELLECTUAL CAPITAL EQUITY

**Table 4**
**Earn-Out Payments from BSC to AMF**

|  | **Total** |
|---|---|
| 2005 Earn-Out Payment | $10,164,231 |
| 2006 Earn-Out Payment | $12,915,000 |
| Payment from Trust | $1,050,000 |
| Purchase of 2008 Earn-Out Payment | $30,660,000 |
| Purchase of 2009 Earn-Out Payment | $24,360,000 |
|  |  |
| Total | $79,149,231 |

I understand the 2005, 2006 and 2007 payments were made with regard to BSC's sales of CIs during the time it owned Advanced Bionics. When these payments are considered along with the running royalties received by AMF, the effective rate paid by Advanced Bionics to AMF increases to 9.3%.[162]

I further understand the 2008 and 2009 payments related to future obligations of BSC under the merger agreement. Including these payments along with the running royalties paid by Advanced Bionics and the cash paid per share increases the effective running royalty rate to 18.1%.[163]

**c. AMF entered into two additional agreements with Advanced Bionics for running royalty rates between 3.0% and 4.0% of sales.**

AMF entered into two additional license agreements with Advanced Bionics effective 18 May 1999. Both agreements specified a running royalty rate of 3.0% of sales for an exclusive right to patents and other intellectual property owned by AMF. On 1 January 2004, AMF and Advanced Bionics modified the licenses to increase the royalty to rate to 4.0%. AMF also received a royalty-free cross-license to intellectual property owned by Advanced Bionics.

Detailed descriptions of each of these licenses are as follows:

- **Battery Powered Bion Technology Field License** – *"shall mean and include that field of knowledge relating to medical devices, processes and methods involving or relating to a system of addressable, programmable implantable stimulators, and/or addressable, implantable transducer-telemeters."*[164] AMF granted Advanced Bionics an exclusive right to make, have made, use, lease, sell and otherwise commercially exploit[165] three U.S. patents, one U.S. patent application, three foreign patent applications[166] and know-how.[167] Advanced Bionics agreed to pay to AMF a

---

[162] See Exhibit 4.2
[163] See Exhibit 4.1. I understand Advanced Bionics continues to pay royalties to AMF on sales of CIs and AMF retains an interest in Advanced Bionics that entitles it to other forms of potential future compensation.
[164] AMF045215
[165] AMF045214
[166] AMF045228 – AMF045229

26

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

running royalty of 3.0% of net revenues.[168]

On 1 January 2004 AMF and Advanced Bionics terminated this license and entered into a "License, Royalty and Manufacturing Agreement" related to "Battery Powered Bion Devices and Services."  AMF granted Advanced Bionics the exclusive right to make, have made, manufacture, use, lease, offer to lease, market, sell, and offer to sell "Bion devices" outside of the AMF field of use.  AMF also granted to Advanced Bionics royalty-free rights to manufacture "FES Micro-Stimulators" and "FES Micro-Stimulator Auxiliary Devices."[169]  Advanced Bionics granted to AMF a royalty-free, worldwide, non-exclusive cross-license to all of Advanced Bionics' intellectual property in the Bion Devices field.[170] Advanced Bionics paid AMF a running royalty of 4.0% of net revenues and 50% of any net revenues received from any sublicense.[171]

- **RF Bion Technology Field License –** *"shall mean and include that field of knowledge relating to medical devices, processes and methods involving or relating to a continuously RF-powered, non battery-powered system of addressable, programmable, implantable stimulators, addressable implantable transducer-telemeters and/or extracorporeal transmitters…"*[172]  AMF granted Advanced Bionics an exclusive right to make, have made, use, lease, sell and otherwise commercially exploit[173] seven U.S. patents and know-how.[174]  Advanced Bionics agreed to pay to AMF a running royalty of 3.0% of net revenues.[175]

On 1 January 2004 AMF and Advanced Bionics terminated this license and entered into a "License, Royalty and Manufacturing Agreement" related to "RF Bion Devices and Services."[176]  AMF granted Advanced Bionics the exclusive right to make, have made, manufacture, use, lease, offer to lease, market, sell, and offer to sell "Bion devices" outside of the AMF field of use.  AMF also granted to Advanced Bionics royalty-free rights to manufacture "FES Micro-Stimulators" and "FES Micro-Stimulator Auxiliary Devices."[177]  Advanced Bionics granted to AMF a royalty-free, worldwide, non-exclusive cross-license to all of Advanced Bionics' intellectual property related to "FES Micro-Stimulators" and "FES Micro-Stimulator Auxiliary Devices."[178] Advanced Bionics agreed to pay to AMF a running royalty of 4.0% of net revenues on sales of "Bion devices," "Bion Services," "FES Bion Devices," and "FES Bion Services" and 50% of net revenues received from any sublicense.[179]

---

[167] AMF045215
[168] AMF045216
[169] AMF045281
[170] AMF045282
[171] This agreement also included royalty-free, non-exclusive and exclusive manufacturing rights to "RF Bion" products.  AMF045281 – AMF045286
[172] AMF045234
[173] AMF045233
[174] AMF045247
[175] AMF045235
[176] AMF045305 – AMF045334
[177] AMF045310
[178] AMF045311
[179] This agreement also included royalty-free non-exclusive and exclusive manufacturing rights to "RF Bion" products.  AMF045310 – AMF045315

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

d.  **Parties related to or owned by Alfred Mann have licensed technologies for 2.0% to 10.0% of sales.**

I understand that on 1 September 1998, Medical Research Group, LLC ("MRG") and MiniMed, Inc. ("MiniMed") entered into an agreement related to implantable insulin pump systems for diabetes patients.  MiniMed was the predecessor company from which Advanced Bionics was spun off.  I understand Alfred Mann owned approximately 70% of MiniMed.[180]  Under the agreement "MRG will pay to MiniMed a royalty of ten percent (10%) of Licensed Pump Sales from the sale, lease, sublicensing or other commercial exploitation of Licensed Products that are for the delivery of insulin during the term of this Agreement until aggregate royalties in the amount of $5 million have been paid and thereafter a royalty equal to three percent (3%) of such Licensed Pump Sales… in the event the Licensed Products include the Enhancement Technology,[181] the applicable royalty rates pursuant to the preceding sentence will be reduced to five percent (5%) of Licensed Pump Sales instead of ten percent (10%) and two percent (2%) of Licensed Pump Sales instead of three percent (3%)."[182]

e.  **I have not located any publicly available license agreements indicative of customary industry rates or practices for licensing patents related to CI systems.**

In determining a reasonable royalty rate, it may be useful to consider licensing practices within the industry.  No third-party licenses have been produced by either party to this matter and I have been unable to locate any publicly available licenses for patents or other forms of proprietary technology related to CI systems or any of their constituent components.  I respectfully reserve the right to supplement my opinions should any such relevant information become available.

f.  **Quantitative royalty indicators from the Market Approach are summarized below.**

None of the licenses discussed above provides an exact match or a comparison substantially similar in all material respects to the subject property.  The license between Cochlear and Advanced Bionics was a royalty-free cross-license and is therefore not indicative of the monetary value assigned to any licensed properties.  Cochlear's license agreement with the Commonwealth of Australia and the University of Melbourne reflected a long-standing relationship between Cochlear and a public institution and ultimately appears to have been more analogous to a joint development agreement than a "naked" patent license as contemplated in a hypothetical negotiation in this case.  Moreover, this license imposed obligations on Cochlear that appear to represent material direct or opportunity costs.  These would increase the actual, effective rate paid by Cochlear under the license; however, the data and other information necessary to calculate or estimate this increase are not available to me.

The license between AMF and Advanced Bionics related to CIs includes the patents in suit.  However, both it and the other licenses between these parties offered exclusivity, which is discussed further in section III.C.3 of my report, following.  The license between MRG and MiniMed related to technologies other than CIs.  Finally, all of the agreements considered vary as to the number of identified patents included.  However, there does not

---

[180] Deposition of Alfred E. Mann, 10 December 2008 ("Mann Deposition"), p. 12
[181] Elsewhere defined as "Electronic enhancements for Pump Technology that MRG develops…"
[182] MiniMed, Inc., SEC Form 10-Q, for the quarterly period ended 2 October 1998, Exhibit 10.2

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

appear to be any observable correlation between the number of patents licensed and the license rates.

These limitations notwithstanding, when considered in aggregate the licenses identified as part of the Market Approach provide a range of quantitative royalty indicators that are useful for the determination of a reasonable royalty between AMF and Cochlear for the AMF Patents.  My findings are illustrated in Figure 3 below:

**Figure 3**
**Summary of Market Approach Royalty Indicators**



2. **Based on information currently available to me, the Income Approach provides quantitative royalty indicators in the range of 15.1% to 31.5% of sales.**

As described in <u>Valuing Intangible Assets</u>:

"*The income approach is based upon the economic principal of anticipation (sometimes also called the principle of expectation).  In this approach, the value of the subject intangible asset is the present value of the expected economic income to be earned from the ownership of that intangible asset.  As the name implies, the [licensee] anticipates the expected economic income to be earned from the [license of] the subject intangible asset.*

29

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

*This expectation of prospective economic income is converted to a present worth – that is the indicated value of the subject intangible asset."* [183]

One variation on the Income Approach, known commonly as the "Analytical Approach," is premised on the theory that the value of a patented technology may be measured by comparing the profits of products incorporating the patents to otherwise equivalent but non-patented products or to some company or industry norm.[184]  In this case, I have compared the profitability of Cochlear's non-accused ESPrit 3G processors to the accused SP12 and SPrint speech processors.  The range of findings based on this Analytical Approach is summarized below:

**Table 5**
**Analytical Approach: Accused Speech Processors Compared to ESPrit 3G**

| | |
|---|---|
| SP12 v. ESPrit 3G Profit Premium | $1,211 |
| SP12 Average Selling Price | $4,561 |
| Royalty Indicator | 26.5% |
| | |
| SPrint v. ESPrit 3G Profit Premium | $1,535 |
| SPrint Average Selling Price | $5,601 |
| Royalty Indicator | 27.4% |

As described in Section III.A, above, Cochlear produced sales records beginning in December 2001.  At that time, the CI24 series of implants were the primary products sold by Cochlear.  The non-infringing, predecessor CI22 implant was not sold in meaningful quantities at that time.  I understand Cochlear has refused to produce sales data prior to December 2001 or further information related to the revenues or profits associated with the CI22 implant.  As a result, I have not been able to perform a similar Analytical Approach analysis for the CI24 implants at this time.  If further data are produced by Cochlear that would allow computation of a meaningful Analytical Approach for implants, I will amend or supplement my opinions as necessary.

I have also compared the profits earned by Cochlear on sales of accused components to profits earned by firms in the "Electromedical and Electrotherapeutic Apparatus Manufacturing" industry.[185]  The profits earned by Cochlear on accused products indicate a premium of 15.1% to 31.5% over typical industry profit margins:[186]

---

[183] Reilly, Robert F. and Schweihs, Robert P., Valuing Intangible Assets, 1999, p. 113
[184] See, for example, *TWM Manufacturing Co., Inc. v. Dura Corp. and Kidde, Inc.,* 789 F.2d 895
[185] This industry comprises "establishments primarily engaged in manufacturing electromedical and electrotherapeutic apparatus, such as magnetic resonance imaging equipment, medical ultrasound equipment, pacemakers, hearing aids, electrocardiographs, and electromedical endoscopic equipment."
[186] *Annual Statement Studies,* The Risk Management Association, 2003 – 2008; http://www.statementstudies.org/

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

**Table 6**
**Analytical Approach: Accused Products Compared to Normal Industry Profit Margin**

|                  | SP12  | SPrint | CI24  |
|------------------|-------|--------|-------|
| Gross Margin     | 90.1% | 79.2%  | 73.7% |
| Normal Margin    | 58.6% | 58.6%  | 58.6% |
| Royalty Indicator| 31.5% | 20.6%  | 15.1% |

As shown above, the Analytical Approach in this case indicates a range of 15.1% – 31.5% of sales may be appropriate for consideration in determining a reasonable royalty in this case.

3. **Based on information currently available to me, there does not appear to be either sufficient data or an appropriate factual or conceptual basis for application of the Cost Approach in this case.**

As described in Valuing Intangible Assets,

> "*The cost approach to intangible asset analysis is based on the economic principles of substitution and price equilibrium (often called the competitive equilibrium price). These basic economic principles assert that [a licensee] will pay no more for an investment [or technology] than the cost to obtain (i.e., either by purchase or construction) an investment [or technology] of equal utility. In other words, a willing [licensee] for an intangible asset will pay no more for the subject intangible asset than the price of an intangible property of comparable utility...*"[187]

Properly applied, the cost approach considers out-of-pocket expenditures as well as risks, lost sales and other adverse economic impacts connected with an alternative to the subject intangible property. At this time, I am not aware of any available non-infringing alternatives that could have been employed by Cochlear. However, I reserve the right to review and comment on any purported non-infringing alternatives that may be proposed by Cochlear or its experts.

4. **Quantitative royalty indicators provide useful benchmarks for my reasonable royalty analysis.**

The following table summarizes my consideration of generally accepted *Market*, *Income* and *Cost* valuation methodologies in this case.

---

[187] Reilly, Robert F. and Schweihs, Robert P., Valuing Intangible Assets, 1999, pp. 96 – 97

31

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

**Figure 4**
**Summary of Quantitative Royalty Indicators**



C. **Reference to the fifteen factors and "hypothetical negotiation" construct defined in** *Georgia-Pacific v. United States Plywood Corp.* **indicates a reasonable royalty for Cochlear's use of the AMF Patents would be 7.5% of sales.**

As discussed above, I understand AMF seeks damages in the form of a reasonable royalty on the sale of Cochlear's accused CI sales.  My use of the term "reasonable royalty" in this matter is consistent with the following definition of the term in the case of *Georgia-Pacific v. United States Plywood Corp., 318 F. Supp.1116 (S.D.N.Y.1970), modified and affirmed, 446 F.2d 295 (2d Cir. 1971),* as cited earlier.

In determining a reasonable royalty in litigation, reference is often made to fifteen factors set forth in the *Georgia-Pacific* case.  I have identified each of these factors in subsequent sections of this report and provided commentary and analyses related to them.  However, it is important to bear in mind these so-called "Georgia-Pacific factors" are a non-exclusive standard for calculating a reasonable royalty and the applicability or weight given to any individual factor will vary depending on the circumstances of the case.  My conclusion of a reasonable royalty for the claimed properties is based on both quantitative analyses and consideration of relevant qualitative factors.

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

The fifteenth *Georgia-Pacific* factor indicates a reasonable royalty may be determined in part through reconstruction of what is often referred to as a "hypothetical negotiation" between two presumed willing parties.  In other words, it invites consideration of a royalty the now-plaintiff and the now-defendant might have agreed to if they had negotiated a license prior to the commencement of the alleged infringement.  The assumed date of a hypothetical negotiation is generally the "eve of infringement" – that is, shortly or immediately before the first sale or offer for sale of the alleged infringing product.  As discussed below in Section II.H of this report, contemporaneous business records produced by Cochlear indicate it first offered accused products for sale in the U.S. in June 1998.  I have assumed the hypothetical negotiation would have occurred at approximately this time.[188]  However, I understand from counsel that AMF may be entitled to monetary damages beginning in December 2001, six years prior to the filing of this lawsuit by AMF.  Therefore, while a hypothetical negotiation in this case would have taken place in mid-1998, my tabulation of reasonable royalty damages in this case does not begin until December 2001.

For purposes of analyzing damages claimed in litigation, I understand courts have recognized the usefulness of permitting some assumption that the two willing parties in a hypothetical negotiation could have foreseen certain subsequent events, rather than being entirely restricted to information they demonstrably knew at the assumed negotiation date.  In other words, it may be appropriate to consider actual activities or events subsequent to the hypothetical negotiation date in order to facilitate an understanding of the position of the negotiating parties, particularly where complete and objectively reliable information on the parties' positions at the time of the hypothetical negotiation is deficient.  In reaching my conclusion, I have considered such actual events as necessary and appropriate.

These factors and my observations on them relevant to this case are as follows:

1. ***Factor One:   "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."***

   I understand AMF has licensed the AMF Patents only once, on an exclusive basis to Advanced Bionics.  My consideration of whether this license may be regarded as an established royalty is based on my understanding of current standards espoused by the courts, such as the following criteria defined in the case of *Sun Studs Inc. v. ATA Inc.*.[189]

   - The agreements must have been entered into prior to when infringement began.
   - The rate must not have been paid under threat of suit or in settlement of litigation.
   - The rate must be paid for comparable rights.
   - The rate must be paid by enough parties to indicate it is reasonable.

   The agreement entered into by AMF with Advanced Bionics was in effect prior to the hypothetical negotiation date (in that testimony indicates it memorialized an existing understanding and practice between the parties) and was not paid under threat of litigation.  However, it was for exclusive rights and therefore was agreed to by only one licensee.  As such, I have not considered the AMF license to Advanced Bionics as an established royalty in this case.  However, I do consider it informative, as discussed elsewhere in my report.

---

[188] Although not issued until 1999, the '691 patent application had been filed prior to Cochlear's receipt of FDA approval for U.S. sales of accused CIs.
[189] *Sun Studs Inc. v. ATA Inc.*, 872 F 2d.

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

2. *Factor Two: "The rates paid by the licensee for the use of other patents comparable to the
patent in suit."*

As discussed above, Cochlear has produced two licenses related to the products or
technologies at issue in this case. One of these licenses was a cross-license between Cochlear
and Advanced Bionics and did not call for any royalty payments. The other was between
Cochlear and the University of Melbourne and the Commonwealth of Australia for
technology related to cochlear devices, specifying running royalties between 2.0% and 5.0%
of sales. However, as described above in Section III.B.5, this agreement is between a public
institution and a commercial entity. Cochlear agreed to a number of conditions which would
be expected to impose direct or opportunity costs to the company. These conditions would
thus increase the effective cost of the license to Cochlear and increase the effective value of
the license to the University of Melbourne and/or the Commonwealth of Australia; however,
the extent of this impact cannot be quantified based on information provided by Cochlear or
otherwise publicly available. However, it is reasonable to conclude that the nominal rate of
2.0% to 5.0% would likely understate an informative rate for purposes of comparison to a
hypothetical negotiation in this case.

3. *Factor Three: "The nature and scope of the license, as exclusive or non-exclusive; or as
restricted or non-restricted in terms of territory or with respect to whom the manufactured
product may be sold."*

A hypothetical license in this case would be non-exclusive. It would be assumed to be
restricted to sales covered by U.S. patent law, but otherwise unrestricted. Royalty rates for
non-exclusive licenses are typically lower than for exclusive licenses, *all else equal*. For
example, a study by Ernst & Young LLP found that "non-exclusive, non international,
licensing transactions" carried an average royalty rate of 3.01%, while exclusive licenses
carried an average royalty rate of 4.98%.[190] The average non-exclusive rate was thus
approximately 60% of the average exclusive rate. This is generally consistent with my
experience involving adjustments for exclusivity in actual licensing practice.

In this case, however, consideration of the impact of non-exclusivity on a hypothetical
negotiation is complicated by the existence of AMF's actual, exclusive license with
Advanced Bionics. Thus, with respect to the impact of non-exclusivity on a hypothetical
license in this case, "all else" is not "equal." At a minimum, AMF as the hypothetical
licensor would anticipate that Advanced Bionics would demand some reduction in the
compensation terms of its own license should AMF wish to convert it to a non-exclusive
basis (as would be necessitated by the hypothetical negotiation in this case.) AMF's only
means of recompense for such a reduction would be to seek a premium from Cochlear, over
and above what might otherwise be considered a reasonable royalty for a non-exclusive
license. Given the fact that AMF's exclusive license included terms (such as stock
compensation) which effectively allied its economic interests with those of Advanced Bionics
to a greater extent than would be the case with a simple running royalty, this premium would
be expected to be material. As such, I would not expect a "typical/all-else-equal" adjustment
for non-exclusivity to be appropriate in this case.

---

[190] O' Haver, Russ, and Finnegan, Brain, "Estimating the Effects of Exclusivity and Geographic
Market Characteristics on Royalty Rates: Some Preliminary Results," Ernst & Young LLP

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

4. **Factor Four: "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly."**

AMF's Chief Executive Officer, David Lee Hankin, testified that AMF does not have a formal licensing policy. However, it does have "informal" goals it seeks to achieve:

> Q.  *Does AMF have a formal patent licensing policy?*
>
> A.  *No.*
>
> Q.  *Does AMF have an informal patent license policy?*
>
> A.  *I suppose.*
>
> Q.  *What is that informal licensing policy?*
>
> A.  *We attempt to achieve several goals in our – in the licensing of our technologies. The first goal that we attempt to achieve is to ensure that technologies reach the intended patient population. The second goal is to assure that the licensee has the wherewithal to accomplish the first goal, financial or otherwise. The third goal is to preserve our rights and the value in the intellectual property that we've created. Those are the overarching underpinnings of our informal policy.[191]*

I understand AMF and Cochlear held discussions in the early 1990s, which may have included discussion of licensing technology related to CIs.[192]  I understand from discussions with Larry Fischer and testimony by Mr. Mann that Advanced Bionics was founded by Alfred Mann and others specifically for the purpose of commercializing CI technologies developed by AMF after discussions with Cochlear failed to produce any agreement.  As of the date of the hypothetical negotiation, AMF had an established relationship with Advanced Bionics and intended to continue to license its developed technology to Advanced Bionics on an exclusive basis.

Although AMF as a research institution relies on licensing its technologies to achieve its organizational goals, in this case it granted an exclusive license, which may be considered a "special condition" that would not apply to other potential licensees, including Cochlear.

5. **Factor Five: "The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."**

Although AMF does not directly manufacture or sell CIs, due to its exclusive licensing arrangement with Advanced Bionics, AMF's royalty revenue and other economic interests were directly linked to Advanced Bionics at the time of a hypothetical negotiation.  Advanced Bionics and Cochlear were head-to-head competitors for sales of the accused cochlear implants and speech processors.  Therefore, any sale made by Cochlear rather than by Advanced Bionics would be expected to decrease AMF's financial returns from its agreement with Advanced Bionics.  This factor would lead AMF to expect a relatively higher rate in a hypothetical negotiation than might be expected in a typical negotiation between a research institution and a for-profit commercializing entity.

---

[191] Hankin Deposition, pp. 44 – 45
[192] Mann Deposition, pp. 24 – 26

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

6.  ***Factor Six: "The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."***

As previously discussed, my royalty base includes all revenue associated with the sale of Cochlear's implants and speech processors made or sold for use in infringing CI systems in the Americas region.  My conclusion of a royalty base is predicated on several key assumptions and conclusions, including the following:

- ▪ The implants and speech processors are assumed to be covered by the patents in suit.

- ▪ The implants and speech processors function together to achieve the results anticipated by the patents.

- ▪ The implants and speech processors are typically marketed and sold together, or the speech processor is sold to upgrade the functionality of an existing compatible implant.

- ▪ The implant and speech processor(s) used by any given recipient will be produced by the same manufacturer; components from different manufacturers cannot be "mixed and matched."

- ▪ The patented features are a critical element of demand for the implants and speech processors as a functional system, as discussed in later sections of this report.

- ▪ Royalties under AMF's existing license with Advanced Bionics are calculated on both implants and speech processors.  Cochlear also evidently paid royalties on both implants and speech processors under its license with the Commonwealth of Australia and UM.

I have therefore assumed all of these sales would be considered part of the royalty base and none would be considered "convoyed" or derivative of a smaller base of infringing sales.  My royalty rate opinion is scaled to include all components accused by AMF of being used in infringing CI systems.  However, if the Court finds some components are not properly included in the royalty base as recited elements, such components would then be considered convoyed sales, and my opinion of the applicable royalty rate would be adjusted upward accordingly.

In addition to implants and speech processors, Cochlear has also sold a number of products in combination with the allegedly infringing CI systems that may be considered "convoyed sales" as contemplated by this Georgia-Pacific factor.  These include at least the following:

- ▪ Headsets
- ▪ Programming Systems
- ▪ Repairs
- ▪ Spares & Accessories

Revenue associated with the sale of these components is shown on Table 5, below:

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

**Table 7**
**Revenue from Sales of Headsets, Programming Systems,**
**Repairs, and Spares & Accessories, December 2001 – June 2008**[193]

|                      | Revenue       |
|----------------------|---------------|
| Headsets             | $2,990,414    |
| Programming Systems  | $342,967      |
| Repairs              | $1,144,856    |
| Spares & Accessories | $20,471,246   |
|                      |               |
| Total                | $24,949,483   |

Cochlear has not provided detailed information regarding the components of the "Spares & Accessories" category, and therefore there may be additional convoyed sales for which data have not been provided. For example, Cochlear's website lists several additional products for sale including battery packs, microphones, cables and coils.[194]

A separate issue, as discussed earlier, is that between December 2001 and June 2008 Cochlear generated revenue of $42.6 million from sales of ESPrit 3G speech processors which can be used with CI24 implants.[195] I have currently included sales of these products in the sales base to which a running royalty should be applied. If the Court finds these sales should *not* be included in the royalty base, they would be considered convoyed sales under Georgia-Pacific Factor Six and the profits to be earned on these sales of ESPrit 3G speech processors would serve to increase a hypothetical royalty.

7. ***Factor Seven: "The duration of the patent and the term of the license."***

I understand the '616 patent issued in May 1997 and the '691 patent issued in August 1999. At the time of a hypothetical negotiation, the '616 patent had nearly sixteen years of legal life remaining and the '691 patent had approximately eleven years. "Waiting out" the expiration of the patents would not have presented a practical alternative to Cochlear. Perhaps more importantly, I understand that over ten years after the issuance of AMF's patents, all CIs in the U.S. currently practice the patents at issue and I am aware of no commercially acceptable non-infringing alternative to AMF's Patents that exists now or is contemplated in the relevant future. This factor indicates the patents also enjoy a relatively lengthy economic life and would tend to increase a royalty rate.

8. ***Factor Eight: "The established profitability of the product made under the patent; its commercial success; and its current popularity."***

I have considered the profitability of Cochlear's accused products relative to its non-accused products in Section III.B.2 of this report. I have also considered the overall success of Cochlear and its accused implants and speech processors. In the period July 2001 through

---

[193] See Exhibit 6.5
[194] www.cochlearstore.com
[195] See Exhibit 2.6

37

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

June 2008, Cochlear generated $1.9 billion (69.8%) in gross profits and $527.0 million (19.8%) in operating profits on $2.7 billion in revenue.[196]  Cochlear generated an average annual revenue increase of 14.8% and an average annual operating profit increase of 18.9% over a six-year period.

**Table 8**
**Cochlear Ltd. Revenue, Gross Profit, and Operating Profit (Thousands)**

|  | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Revenue | $252,706 | $286,011 | $249,981 | $320,444 | $428,516 | $539,711 | $578,845 | $2,656,214 |
| Gross Profit | $179,740 | $203,374 | $165,021 | $220,745 | $297,554 | $378,377 | $409,832 | $1,854,643 |
| Operating Profit | $48,685 | $59,238 | $12,208 | $53,050 | $83,869 | $132,747 | $137,236 | $527,033 |

The accused products have been more profitable than Cochlear's overall results.  Between December 2001 and June 2008, Cochlear generated $677.7 million in revenue from U.S. sales of back telemetry capable implants and speech processors, resulting in gross profits of $531.9 million, or 78.5% of revenue, and operating profits of $196.2 million, or 28.9% of revenue.[197]

**9.  Factor Nine: "The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results," and**

**10.  Factor Ten: "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by licensor; and the benefits to those who have used the invention."[198]**

*Georgia-Pacific* Factors Nine and Ten are often analyzed together because of their inherent similarity.

As described above in Section II.C.1, back telemetry as described by the AMF Patents is used by surgeons and audiologists intraoperatively during a CI implantation procedure.  It is also used while "mapping" a patient's CI:

> "The process of mapping actually begins in the operating room. My audiologist will be there during surgery to measure the viability of each electrode electronically (impedance and neural response telemetry). Then an X-ray will be taken and if the scan looks good, the surgeon will close the incision. Once the incision has healed and the implant's external component placed in position, the implant will be activated. At this time, the audiologist will commence her/his critical role in programming.
>
> The more I have gotten into this, the greater is my appreciation of this whole new world of professional challenges facing audiologists. Mapping (or programming) the implant is a complex process, depending, it seems, equally on the client's responses and the

---

[196] See Exhibit 5.3
[197] See Exhibit 5.1
[198] *Georgia-Pacific* Factors Nine and Ten are often analyzed together due to their inherent similarity.

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

*competency of the audiologist.  Clearly, it is not a "cookbook" procedure. From everything I've been able to gather, the "art" of working with human beings, plus the ability to interpret a client's overt or involuntary responses, is a key ingredient to a successful map. An overriding goal is to "map" as much of the acoustic input as possible into the electronic dynamic range determined during the mapping process.*

*The audiologist determines the amount of electrical current necessary to produce an audible sound in each electrode (the "T" level), and then the current level which produces a loud, but comfortable audible sensation (the "C" point). The difference between these two points is the electrical dynamic range. The audiologist also has to make a number of other programming decisions, such as the rate of stimulation, the bandwidth of each electrical pulse and the acoustic frequencies to assign to each electrode."* [199]

The benefits of back telemetry are particularly useful for young patients, or other patients who have limited ability to provide accurate feedback to an audiologist:

*"Nucleus products now come equipped for intraoperative testing.  This allows the audiologist to map the patient's electrode array while the patient is asleep.  This is especially useful for infants and small children who are often not cooperative with conventional mapping techniques.  Intraoperative repositioning is also a possibility if the mapping shows poor responses."* [200]

James Findlay Patrick described the benefit of back telemetry over previous modes of testing CIs in his deposition:

*Q. Why do you believe that the inclusion of telemetry to measure electrode voltage compliance and impedance was a leading innovation in the CI24M?*

*A.   Because it simplifies implant functional diagnosis.*

*Q. And when you say it simplifies implant functional diagnosis, what do you mean by that? What – what does implant functional diagnosis involve and how is it simplified?*

*A.   It means – it just – if you're wanting to test the implant function, you can do much more just using measures that are available to the testing person on the programming system, rather than needing to add extra hardware, for example, to monitor surface potentials on the head of the patient which is what you'd be doing otherwise.*

*Q. So without the inclusion of telemetry to measure electrode voltage compliance and impedance, what your – your testimony is that you would have to use more, would it be accurate to say more complicated technology or more – more complex method?*

*A. You need – you need to use additional technology rather than doing it with the implant system itself.* [201]

---

[199] http://www.hearingloss.org/magazine/2007MarApr/MarkRossMayJune07.pdf
[200] Cochlear Implants, UTMB Dept. of Otolaryngology, 5 February 2003
[201] Patrick Deposition, pp. 80 – 81

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

**11. *Factor Eleven: "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."***

The available evidence in this matter confirms that Cochlear's use of the technology at issue in this matter has been extensive. As discussed above, sales records currently indicate the company has generated over $677.7 million in revenue on its sales of accused CI systems through 30 June 2008.[202] Moreover, as detailed in Exhibit 3.1, Cochlear generated profit premiums on the sales of accused speech processors as compared to speech processors not capable of back telemetry. Both the extent of Cochlear's infringing use and the expected value of its infringement are implicit in the quantitative section of my report.

Separately, I have considered evidence of the relative importance of impedance telemetry as implicated by the patents in suit to the demand for the accused products. CIs are complex devices that embody many technologies, whether patented or otherwise. However, not all of these technologies are of equal importance to the functionality or desirability of the CI employing them. Further, not all of these technologies are capable of providing a unique advantage to companies employing them.

As discussed earlier in my report, I understand that by the time of a hypothetical negotiation in this case, all manufacturers had achieved approximate parity in terms of the ability of their CI systems to produce sound enhancement. The ability to capture market share came to depend on features beyond this basic functionality.

Jerry Schloffman, VP of Global Marketing at Advanced Bionics, has indicated the company's ability to offer impedance telemetry under its exclusive license for the patents in suit as "a cornerstone" of the company's Clarion device. It provided a "competitive edge" and was instrumental in enabling the company to quickly gain market share from Cochlear, which essentially represented 100% of the U.S. market prior to the Clarion's introduction. Cochlear's introduction of the accused Nucleus 24 device effectively negated this competitive advantage. I understand from Mr. Schloffman that Cochlear's Nucleus 24 also offered other advancements, such as NRT technology and BTE models; however, Advanced Bionics was able to introduce similar features within a reasonable timeframe, again achieving functional parity. At this time, I believe there is sufficient evidence to conclude that, had Advanced Bionics maintained an exclusive ability to offer impedance telemetry as contemplated by its license with AMF, it would have represented a significant competitive advantage with the ability to drive demand and market share for Advanced Bionics at Cochlear's expense. Therefore, Cochlear's alleged infringement has been of material economic and strategic value, factors which would increase a royalty in this case.

**12. *Factor Twelve: "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."***

I have considered licenses entered into by AMF and Cochlear in my analysis of the *Market Approach*, as well as *Georgia-Pacific* Factors One and Two. While informative, these licenses produce a relatively broad range of results, and neither they nor any other information currently available to me provide evidence of a customary approach in the relevant business for licensing patents of the type in suit.

---

[202] See Exhibit 2.1

*Attorneys' Eyes Only*

EXHIBIT Y

 INTELLECTUAL CAPITAL EQUITY

13. **Factor Thirteen: "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."**

I have considered the profit attributable to the accused products vis-à-vis non-accused products in Section III.B.1, above under the so-called Analytical Approach in which profits on accused and non-accused speech processors are compared. Certain contributions identified by *Georgia-Pacific* Factor Thirteen, such as the manufacturing process and business risks, would bear on both accused and non-accused products and thus be isolated from the analysis. To the extent that Cochlear has contributed additional technologies to its accused products that may account for some portion of the identified profit premium, it has not produced documents sufficient to reliably quantify the incremental value of any such non-accused technology. However, I have considered such additional technologies qualitatively in the conclusion of my analysis.

14. **Factor Fourteen: "The opinion and testimony of qualified experts."**

No other expert reports or testimony are currently available to me in this case. I respectfully reserve the right to consider such information if and as it becomes available to me.

15. **Factor Fifteen: "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."**

Factor Fifteen describes the integration of the other factors within the willing buyer / willing seller hypothetical negotiation framework. As implied, the parties in the negotiation are presumed to be *willing*, that is, both as business entities are assumed to seek to reach an agreement. Another key factor in this hypothetical negotiation is that both parties are assumed to "lay their cards on the table" so each has an understanding of the other's position.

In the hypothetical negotiation framework, factors that would strengthen AMF's bargaining position at the time of a hypothetical negotiation include the following:

- AMF had licensed the patents exclusively to Advanced Bionics and their relationship was structured in a manner that provided AMF economic incentive to promote Advanced Bionics' success in the market.

- Advanced Bionics as AMF's exclusive licensee competed directly with Cochlear for sales of the allegedly infringing CI systems.

- I am aware of no non-infringing alternatives available to Cochlear, either at the time of a hypothetical negotiation with AMF or currently. The patents had a relatively long remaining economic and legal life.

41

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

- The accused products had the reasonably foreseeable ability to generate significant sales revenue and premium profits for Cochlear, as compared to non-accused products (to the extent Cochlear's production enables such comparison) and to industry norms.

- The market for CIs had grown at double-digit rates and was expected to sustain strong growth for the foreseeable future.

- The benefits of back telemetry as implicated by the patents in suit are material factors in purchase decisions for the accused products and has the ability to impact industry market shares.

- Although a number of other features are important to purchasers of CI, manufacturers in the industry have generally demonstrated the ability to achieve parity with respect to these features within relatively short times.  The ability to have exclusive use of back telemetry as contemplated by the patents would have material value to Advanced Bionics and, by extension, to AMF.

- The patents would be considered valid and infringed, absent an agreement.

Factors that would strengthen Cochlear's bargaining position include the following:

- In addition to assuming the business risk associated with developing, testing, manufacturing, selling and supporting the accused CIs, Cochlear has contributed to their commercial success through a number of functional features unrelated to the patents in suit.

- A hypothetical license would be non-exclusive.  Although AMF would necessarily seek a premium royalty to compensate for anticipated reduction in the value of its existing license with Advanced Bionics, Cochlear could not contemplate a unique advantage in the market as a result of the license.

- Cochlear had a demonstrated ability to disseminate technology, such as that represented by the patents in suit, which is one of AMF's informal goals when licensing its technology.

As detailed above, consideration of commonly accepted valuation methodologies produces a relatively wide range of indicators for a hypothetical royalty in this case, from a 2.0% stated rate (although this likely understates the actual effective rate) to an effective rate of 18.1%.  Given the facts and circumstances of this case, I do not believe that simply using the mean or median of these results would be the most reliable method of producing a reasonable royalty.  Rather, I believe the parties would likely start by considering the effective rate[203] provided to

---

[203] There is no contemporaneous record of AMF's expectations for the ultimate value of the stock portions of its license with Advanced Bionics.  I have based my calculations of effective rates on actual results.  There is no objective indication that these actual results exceeded what would have been reasonable expectations on AMF's part at the time of the hypothetical negotiation.  In fact, had Advanced Bionics maintained exclusive use of the technology embodied in the patents as contemplated in its agreement with AMF, it appears likely it would have achieved higher market shares, which would have increased the effective rate paid to AMF under the license.  I therefore believe my calculation of effective rates is appropriately

42

*Attorneys' Eyes Only*

EXHIBIT Y


INTELLECTUAL CAPITAL EQUITY

AMF by its license including the patents in suit with Advanced Bionics and then adjusting for the relevant differences between that license and a hypothetical license between AMF and Cochlear.

Cochlear would likely desire an adjustment to the Advanced Bionics rate for the lack of exclusivity.  Applying a 60% factor as discussed above would reduce the effective rate of the Advanced Bionics license to approximately 5.6% to 10.9% (depending on the number of years for which earn-out payments are considered.)  Cochlear would also note that the Advanced Bionics license included a number of patents in addition to the two in suit.  Finally, Cochlear would note its material market share and the revenue prospects that presented to AMF.  AMF would likely counter that a "typical" reduction for non-exclusivity was not appropriate, as the negative impact of converting its license with Advanced Bionics from exclusive to non-exclusive would have to be considered.  It could also note, as I have earlier, that there does not appear to be any direct or directional correlation between the number of patents included in various CI licenses and their stated or effective rates.  Further, I understand that Advanced Bionics considered the patents in suit to be key among those licensed from AMF,[204] and AMF could reasonably argue that Advanced Bionics had already demonstrated the commercial success of the patented features, thereby reducing the risk to Cochlear of their implementation.  Finally, AMF would likely note that Cochlear's historic market share may not be indicative of its future market share, absent access to the patented technology.  I believe both parties would likely assess convoyed sales of items such as headsets and spare parts as impacting Advanced Bionics (as actual licensee) and Cochlear (as hypothetical licensee) to a similar degree and would not argue for any adjustment to the effective rate of the Advanced Bionics license.  However, if sales of the ESPrit 3G are considered convoyed sales rather than part of the royalty base, these sales have no analog with respect to Advanced Bionics and AMF would likely argue they should increase a royalty.

Both parties having advanced valid arguments, I believe Cochlear would likely argue for a rate closer to 5% and AMF would likely argue for a rate closer to 10%.  Given the totality of the facts and circumstances as currently known in this case, my opinion is that a simple resolution of these positions would be to split the difference and arrive at a reasonable royalty of 7.5%.  Cochlear would reasonably and prudently assess a 7.5% royalty as allowing it to maintain market share while retaining the majority of premium profits to be generated through the licensed product.  AMF would achieve wider promulgation of its technology and, given Cochlear's market share, would likely anticipate that a 7.5% royalty would generate sufficient additional revenues to offset reduced returns from its license with Advanced Bionics.

Total reasonable royalties payable from Cochlear to AMF would be $54,026,195, as shown below:

---

conservative and well within the parameters that could have been reasonably expected at the time of a hypothetical negotiation.
   [204] Conversation with Mr. Schloffman

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

**Table 9**
**Summary of Damages**

|  | Royalty Base | Reasonable Royalty Rate | Damages |
|---|---|---|---|
| Royalty Base With ESPrit 3G | $720,349,267 | 7.5% | $54,026,195 |
| Royalty Base Without ESPrit 3G | $677,709,110 | 7.5% | $50,828,183 |

**D.  Absent additional information from Cochlear or its experts, it is my opinion that a royalty of 7.5% would be reasonable for both of the AMF Patents or either individually, although the period for which damages are calculated may be abbreviated if only the '691 patent is found valid and infringed.**

My opinion in this respect is based on the following:

- The hypothetical negotiation date would not change significantly if only one patent was found valid and infringed.  The '616 patent issued prior to the first alleged infringement and the date of a hypothetical negotiation for that patent alone would be consistent with the date assumed in my report.  While the '691 patent issued approximately fourteen months after the alleged infringement began,  I am not aware of any material changes in the market or circumstances of the negotiating parties that would warrant changes in my conclusion as to a reasonable royalty on this basis.

- As noted earlier in my report, licenses entered into by both parties do not indicate any direct or directional correlation between the number of patents licensed and royalty rates.

- No Cochlear products are accused of infringing one patent but not the other, and I understand Cochlear would need to license either one or both of the patents in order to offer the accused products with full back telemetry functionality.

I do understand that the time period for which damages may be claimed may be abbreviated if only the '691 patent is found valid and infringed, depending on the Court's resolution of issues related to notice and marketing.  Cochlear has provided sales data for accused products on a quarterly basis.  Therefore, damages for some shorter period could be readily calculated or reasonably estimated, depending on the Court's final determination with respect to date.

**E.  Prejudgment Interest**

I understand the Court will typically determine the appropriateness of an award of interest, as well as the rate and method for calculating such interest if awarded.  I will offer opinions on the economic justification for some proposed rate or compute interest amounts based on an assumed rate and methodology if requested and as permitted by the Court.

44

*Attorneys' Eyes Only*

EXHIBIT Y



INTELLECTUAL CAPITAL EQUITY

## IV. DATA AND INFORMATION CONSIDERED IN FORMING THESE OPINIONS

A list of the documents provided from the discovery in this case is provided in Appendix A to this report.

## V.  EXHIBITS TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS

Exhibits currently used as a summary of my opinions are included in Appendix B to this report. These exhibits do not include copies of original source documents produced by the parties to this litigation or demonstrative exhibits that may be used at trial.  I may supplement or amend these exhibits to the extent additional documents, exhibits or other materials are produced.  Additional demonstrative exhibits may also be prepared.

## VI. QUALIFICATIONS INCLUDING PUBLICATIONS AND TESTIMONY

I will serve as testifying expert on this case, if required.  I am a Managing Director for Ocean Tomo, a firm that provides financing, asset and risk management, merger and acquisition consulting, expert services in litigation and valuation of intellectual capital.  I have been a consultant on intellectual property and corporate finance matters since 1990.  Prior to its acquisition by Ocean Tomo, I served as the Principal in charge of the Intellectual Property and Dispute Services Practice of Tait Advisory Services LLC.  Until November 2001 I was a Partner for PricewaterhouseCoopers, L.L.P.

Before 1990 I had over eleven years of industry experience in financial, marketing and accounting management for entertainment, retail and consumer products companies.  My positions included Chief Financial Officer for Cleveland's Playhouse Square Center, Senior Corporate Sales and Marketing Analyst for Dayton Hudson Corporation's Target Stores Division, Manager of Financial and Strategic Planning for Aveda Corporation and Chief Operating Officer for Sign Consultants, Inc.

I have experience developing strategies and participating in negotiations for the purchase, sale and licensing of intellectual property, both as a consultant and in my positions in industry. I am a Certified Licensing Professional and a Certified Management Accountant.  I am also a member of the Licensing Executives Society and the International Trademark Association, for whom I serve on the editorial board of The Trademark Reporter.  I am a past member of the Board of Governors for the Brand Name Education Foundation and a current member of the American Marketing Association.  I hold a Bachelor of Arts degree from Oberlin College and a Master of Arts degree in business from the University of Wisconsin-Madison.

My professional publications within the past ten years and my previous testimony in litigation are included in Appendix C to this report.

45

*Attorneys' Eyes Only*

EXHIBIT Y

INTELLECTUAL CAPITAL EQUITY

## VII. COMPENSATION PAID FOR SERVICES

Fees for Ocean Tomo personnel's time and expenses have been charged at applicable market rates on this case. My billing rate for this matter is $495 per hour. My payment is not contingent on the outcome of this case.

Respectfully,

Cate Elsten

*Attorneys' Eyes Only*

EXHIBIT Y

# Appendix A

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**DOCUMENTS REVIEWED: COCHLEAR PRODUCTION**

| Beginning Bates Number | Ending Bates Number | Beginning Bates Number | Ending Bates Number | Beginning Bates Number | Ending Bates Number | Beginning Bates Number | Ending Bates Number |
|---|---|---|---|---|---|---|---|
| COC-1001340 | COC-1001340 | COC-2086758 | COC-2086858 | COC-5001046 | COC-5001091 | COC-5002319 | COC-5002386 |
| COC-1001341 | COC-1001342 | COC-2087896 | COC-2087923 | COC-5001092 | COC-5001132 | COC-5002387 | COC-5002387 |
| COC-1001343 | COC-1001343 | COC-2088184 | COC-2088193 | COC-5001133 | COC-5001173 | COC-5002388 | COC-5002388 |
| COC-1001465 | COC-1001471 | COC-2088347 | COC-2088358 | COC-5001174 | COC-5001215 | COC-5002389 | COC-5002394 |
| COC-1001521 | COC-1001525 | COC-3000382 | COC-3000423 | COC-5001216 | COC-5001263 | COC-5002395 | COC-5002416 |
| COC-1004155 | COC-1004155 | COC-3000382 | COC-3000423 | COC-5001264 | COC-5001307 | COC-5002427 | COC-5002435 |
| COC-1007751 | COC-1007769 | COC-3000850 | COC-3000944 | COC-5001308 | COC-5001352 | COC-5002436 | COC-5002444 |
| COC-1007782 | COC-1007788 | COC-3001214 | COC-3001221 | COC-5001353 | COC-5001400 | COC-5002445 | COC-5002455 |
| COC-2006082 | COC-2006083 | COC-3002538 | COC-3002640 | COC-5001401 | COC-5001441 | COC-5002456 | COC-5002481 |
| COC-2006184 | COC-2006185 | COC-5000000 | COC-5000069 | COC-5001442 | COC-5001480 | COC-5002482 | COC-5002484 |
| COC-2006224 | COC-2006225 | COC-5000070 | COC-5000141 | COC-5001481 | COC-5001517 | COC-5002485 | COC-5002495 |
| COC-2008639 | COC-2008750 | COC-5000142 | COC-5000225 | COC-5001518 | COC-5001557 | COC-5002496 | COC-5002512 |
| COC-2012990 | COC-2013019 | COC-5000226 | COC-5000316 | COC-5001558 | COC-5001598 | COC-5002513 | COC-5002535 |
| COC-2026366 | COC-2026536 | COC-5000317 | COC-5000427 | COC-5001599 | COC-5001650 | COC-5002536 | COC-5002543 |
| COC-2026537 | COC-2026537 | COC-5000428 | COC-5000536 | COC-5001651 | COC-5001695 | COC-5002544 | COC-5002551 |
| COC-2034366 | COC-2034394 | COC-5000537 | COC-5000561 | COC-5001696 | COC-5001748 | COC-5002552 | COC-5002556 |
| COC-2034621 | COC-2034629 | COC-5000562 | COC-5000587 | COC-5001749 | COC-5001792 | COC-5002557 | COC-5002579 |
| COC-2070422 | COC-2070422 | COC-5000588 | COC-5000614 | COC-5001793 | COC-5001813 | COC-5002580 | COC-5002596 |
| COC-2070739 | COC-2070780 | COC-5000615 | COC-5000641 | COC-5001814 | COC-5001845 | COC-5002597 | COC-5002607 |
| COC-2077260 | COC-2077322 | COC-5000642 | COC-5000674 | COC-5001846 | COC-5001885 | COC-5002608 | COC-5002623 |
| COC-2083636 | COC-2083699 | COC-5000675 | COC-5000703 | COC-5001886 | COC-5001994 | COC-5002624 | COC-5002645 |
| COC-2083700 | COC-2083700 | COC-5000704 | COC-5000759 | COC-5001995 | COC-5001998 | COC-5002646 | COC-5002651 |
| COC-2083778 | COC-2083788 | COC-5000760 | COC-5000813 | COC-5001999 | COC-5002005 | COC-5002652 | COC-5002652 |
| COC-2085496 | COC-2085570 | COC-5000814 | COC-5000863 | COC-5002006 | COC-5002009 | COC-5002653 | COC-5002653 |
| COC-2085571 | COC-2085695 | COC-5000864 | COC-5000916 | COC-5002010 | COC-5002068 | | |
| COC-2085696 | COC-2085719 | COC-5000917 | COC-5000960 | COC-5002069 | COC-5002128 | | |
| COC-2085727 | COC-2085727 | COC-5000961 | COC-5001005 | COC-5002189 | COC-5002252 | | |
| COC-2085811 | COC-2085811 | COC-5001006 | COC-5001045 | COC-5002253 | COC-5002318 | | |

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**DOCUMENTS REVIEWED: AMF PRODUCTION**

| Beginning Bates Number | Ending Bates Number | Beginning Bates Number | Ending Bates Number |
|---|---|---|---|
| AMF04658 | AMF04684 | AMF45470 | AMF45488 |
| AMF04685 | AMF04704 | AMF45489 | AMF45560 |
| AMF04769 | AMF04770 | AMF45561 | AMF45562 |
| AMF04772 | AMF04773 | AMF45563 | AMF45568 |
| AMF04784 | AMF04784 | AMF45569 | AMF45577 |
| AMF04787 | AMF04789 | AMF45578 | AMF45580 |
| AMF04803 | AMF04804 | AMF45581 | AMF45583 |
| AMF04807 | AMF04871 | AMF45584 | AMF45606 |
| AMF45193 | AMF45196 | AMF45607 | AMF45620 |
| AMF45197 | AMF45199 | AMF45621 | AMF45636 |
| AMF45200 | AMF45202 | AMF45637 | AMF45652 |
| AMF45203 | AMF45205 | AMF45653 | AMF45668 |
| AMF45206 | AMF45213 | AMF45707 | AMF45713 |
| AMF45214 | AMF45230 | AMF45720 | AMF45720 |
| AMF45231 | AMF45232 | AB00344 | AB00344 |
| AMF45233 | AMF45248 | | |
| AMF45249 | AMF45253 | | |
| AMF45254 | AMF45275 | | |
| AMF45276 | AMF45304 | | |
| AMF45305 | AMF45334 | | |
| AMF45335 | AMF45336 | | |
| AMF45345 | AMF45363 | | |
| AMF45364 | AMF45383 | | |
| AMF45384 | AMF45395 | | |
| AMF45396 | AMF45413 | | |
| AMF45414 | AMF45431 | | |
| AMF45432 | AMF45452 | | |
| AMF45453 | AMF45469 | | |

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**DOCUMENTS REVIEWED: COURT FILINGS AND DEPOSITIONS**

Complaint for Patent Infringement, Filed 13 December 2007
Amended Notice of Videotaped 30(b)(6) Deposition to Cochlear Americas, 30 July 2008
Deposition of Tony Nygard, 1 October 2008, Transcript and Errata
Deposition of David Kelsall, 8 December 2008
Deposition of Christopher Van Den Honert, 8 December 2008
Deposition of Jeffrey Graunke, 12 December 2008
Deposition of Lawrence Fischer, 17 December 2008
Deposition of David Hankin, 17 December 2008
Deposition of Tony Nygard, 1 October 2008, Exhibit No. 6
Deposition of Alfred Mann, 10 December 2008
Deposition of James Patrick, 18 December 2008
Deposition of Theresa Adkins, 30 December 2008

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**DOCUMENTS REVIEWED: PUBLIC DOCUMENTS**

*A Simple Two-Component Model of the Electrically Evoked Compound Action Potential in the Human Cochlea* , Audiology Neuro-Otology 2000;5:333-345, 4 April 2000
Boston Scientific Corporation SEC Form 10-K for the year ended 31 December 2004
Boston Scientific Corporation, Scimed Life Systems, Inc., Advanced Bionics Corporation, *et al.* , Agreement and Plan of Merger, 28 May 2004
Cochlear 2008 Annual Report
*Cochlear Implants* , Glen Porter and Arun Gadre, UTMB Department of Otolaryngology, 5 February 2003
*Cochlear Implants: When Hearing Aids Aren't Enough* , Hearing Loss Association of America
*Cochlear Implants: Working Group on Cochlear Implants* , American Speech-Language-Hearing Association, 2004
*Esprit 3G for Nucleus 22* , Cochlear Press Release, 28 May 2004
*Estimating the Effects of Exclusivity and Geographic Market Characteristics on Royalty Rates: Some Preliminary Results* , Russ O'Haver and Brian Finnegan, Ernst & Young LLP, 1996
*Fundamentals of Clinical ECAP Measures on Cochlear Implants - Part 1: Use of ECAP in Speech Processor Programming* , Michelle Hughes, 10 April 2006
*How Many Deaf People Are There in the United States?  Estimates from the Survey of Income and Program Participation* , Rosee Mitchell, Gallaudet Research Institute, 21 September 2005
http://medical-dictionary.thefreedictionary.com
http://www.accessdata.fda.gov
http://www.advancedbionics.com
http://www.aemf.org
http://www.agbell.org
http://www.agbell.org/docs/soyourchild.pdf
http://www.answers.com
http://www.bionicear.com/
http://www.capitaliq.com
http://www.cochlearamericas.com
http://www.hearingreview.com/issues/articles/HPR_2007-07_02.asp
http://www.medel.com
http://www.ncbi.nlm.nih.gov/pubmed/15732380
http://www.powerhousemuseum.com/collection/database/?irn=363656
http://www.pslgroup.com/dg/9f3e.htm
http://www.reuters.com/article/pressRelease/idUS225723+04-Jan-2008+PRN20080104
*Mimicking the Human Ear* , Philipos C. Loizou, IEEE Signal Processing Magazine, September 1998
*Neurotech Reports Releases Market Projections Through 2012* , Neurotech Business Report
*Nucleus Freedom Launch in USA* , Cochlear Press Release, 14 March 2005
*Nucleus Reliability Report* , Cochlear, Volume 5, June 2008
*Reflections on My Cochlear Implant* , Mark Ross, Hearing Loss Magazine, March/April 2007
*RMA Estatement Studies*
*The Design and Function of Cochlear Implants* , Michael Dorman and Blake Wilson, The American Scientist
*The Parents Guide to Cochlear Implants* , Patricia Chute and Ellen Nevins, Gallaudet University Press, 2002
*Trends in Cochlear Implants* , Fan-Gang Zeng, Trends in Amplification, Volume 8, Number 1, 2004
*U.S. Markets for Neurostimulation Products* , Medtech Insights, November 2006
U.S. Patent No. 5,609,616
U.S. Patent No. 5,938,691
*Valuing Intangible Assets, Robert Reilly and Robert Schweihs, McGraw-Hill, 1998*

*Confidential: Attorneys' Eyes Only*

EXHIBIT Y

# Appendix B

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**DAMAGES**
**Exhibit 1.1**

| Low Damages | | High Damages | |
|---|---|---|---|
| Reasonable Royalty Rate (1) | 7.5% | Reasonable Royalty Rate (1) | 7.5% |
| Low Royalty Base (2) | $677,709,110 | High Royalty Base (2) | $720,349,267 |
| Low Damages | $50,828,183 | High Damages | $54,026,195 |

**Sources:**
(1) Expert Report of Cate Elsten, p. 43
(2) Exhibit 2.1

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ROYALTY BASE**
**Exhibit 2.1**

| | Royalty Base without ESPrit 3G | Royalty Base with ESPrit 3G |
|---|---|---|
| CI24 (1) | $445,493,118 | $445,493,118 |
| SPrint (2) | $48,500,493 | $48,500,493 |
| SP12 (3) | $183,715,500 | $183,715,500 |
| ESPrit 3G (4) | - | $42,640,156 |
| Royalty Base | $677,709,110 | $720,349,267 |

**Sources:**
(1) Exhibit 2.2
(2) Exhibit 6.3
(3) Exhibit 2.3
(4) Exhibit 2.6

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**CI24 REVENUE, DECEMBER 2001 - JUNE 2008**
**Exhibit 2.2**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| CI24M - Cochlear Implant | $217,528 | $236,721 | $271,950 | $55,350 | $21,000 | - | - | $802,549 |
| CI24 Contour | $22,697,591 | $46,033,153 | $34,628,834 | $8,240,596 | $2,259,860 | $2,551,202 | $1,477,038 | $117,888,274 |
| CI24 Contour CA | - | $1,583,488 | $10,835,999 | $20,269,052 | $1,573,346 | $911,550 | $585,585 | $35,759,020 |
| MATCI24R (CA) | - | - | - | $2,033,373 | ($14,275) | - | - | $2,019,098 |
| CI24RE (ST) | - | - | - | $526,122 | $1,512,341 | $1,959,854 | $2,136,251 | $6,134,568 |
| CI24R (ST) | $1,105,757 | $2,030,946 | $1,706,763 | $2,275,426 | $1,834,732 | $1,145,793 | $655,792 | $10,755,209 |
| CI24RE (CA) | - | $120,160 | $31,000 | $22,493,100 | $69,308,421 | $83,594,320 | $95,522,629 | $271,069,630 |
| CI24R (CS) | - | $32,900 | - | $15,500 | - | - | - | $48,400 |
| CI24RE Hybrid | - | - | - | $64,450 | $598,200 | $353,720 | - | $1,016,370 |
| Total | $24,020,876 | $50,037,368 | $47,474,546 | $55,972,969 | $77,093,625 | $90,516,439 | $100,377,295 | $445,493,118 |

**Source:**
Exhibit 6.1

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**REVENUE FROM SP12 SPEECH PROCESSORS USED WITH A CI24**
**Exhibit 2.3**

| | Total |
|---|---|
| Total CI22 Recipients (1) | 8,000 |
| SP12 for CI22 Uptake Rate (2) | 2.50% |
| SP12 Units Used with a CI22 | 200 |
| SP12 ASP (3) | $5,103 |
| Revenue from SP12 Units Used with a CI22 | $1,020,504 |
| Total SP12 Revenue (4) | $184,736,004 |
| Revenue from SP12 Units Used with a CI24 | $183,715,500 |

**Sources:**
(1) *ESPrit 3G for the Nucleus 22* , Cochlear Press Release, 28 May 2004
(2) COC-3000857
(3) Exhibit 2.4
(4) Exhibit 2.5

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**AVERAGE SELLING PRICE OF SP12 SPEECH PROCESSORS - Q4 FISCAL YEAR 2008**
**Exhibit 2.4**

| | Q4 FY 2008 Revenue (1) | Q4 FY 2008 Units (2) | Q4 FY 2008 ASP |
|---|---|---|---|
| SP12 BTE Beige | $8,215,213 | 1,638 | $5,015 |
| SP12 BTE Brown | $5,260,235 | 1,033 | $5,092 |
| SP12 BTE Black | $2,779,058 | 527 | $5,273 |
| SP12 BTE Silver | $3,021,847 | 590 | $5,122 |
| SP12 BTE Pink | $706,468 | 132 | $5,352 |
| SP12 BTE Blue | $590,543 | 112 | $5,273 |
| | | | |
| Total | $20,573,364 | 4,032 | $5,103 |

**Source:**
COC-5001769

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**SP12 REVENUE, DECEMBER 2001 - JUNE 2008**
**Exhibit 2.5**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| SP12 - Final Pack Beige | - | - | - | $261,000 | - | - | - | $261,000 |
| SP12 BTE Beige | - | - | - | $4,409,604 | $19,289,052 | $31,195,417 | $29,099,501 | $83,993,574 |
| SP12 BTE Brown | - | - | - | $1,460,968 | $7,904,744 | $13,891,873 | $16,339,744 | $39,597,329 |
| SP12 BTE Black | - | - | - | $618,000 | $3,752,936 | $7,435,146 | $8,669,326 | $20,475,408 |
| SP12 BTE Silver | - | - | - | $1,099,500 | $7,211,304 | $12,677,864 | $11,291,304 | $32,279,972 |
| SP12 BTE Pink | - | - | - | - | $174,000 | $1,907,096 | $2,481,026 | $4,562,122 |
| SP12 BTE Blue | - | - | - | - | $120,000 | $1,331,592 | $2,115,007 | $3,566,599 |
| | | | | | | | | |
| Total | - | - | - | $7,849,072 | $38,452,036 | $68,438,988 | $69,995,908 | $184,736,004 |

**Source:**
Exhibit 6.3

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**REVENUE FROM ESPRIT 3G SPEECH PROCESSORS USED WITH THE CI24 IMPLANT**
**Exhibit 2.6**

|  | Revenue |
|---|---|
| 1 December 2001 - June 2002 (1) | $4,122,259 |
| Fiscal Year 2003 (1) | $16,698,181 |
| FY 2004 - FY 2008 (2) | $21,819,716 |
| Revenue from ESPrit 3G Units Used with a CI24 | $42,640,156 |

**Sources:**
(1) Exhibit 2.9
(3) Exhibit 2.7

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*

**REVENUE FROM ESPRIT 3G SPEECH PROCESSORS USED WITH CI24 IMPLANTS AFTER THE INTRODUCTION OF ESPRIT 3G FOR CI22**

**Exhibit 2.7**

|  | **FY 2004 - FY 2008** |
|---|---|
| Esprit 3G Units (1) | 12,164 |
| U.S. Nucleus 22 Implants (2) | 8,000 |
| Minimum Esprit 3G Units Used with a CI24 | 4,164 |
| ESPrit 3G ASP (1) | $5,240 |
| Revenue from ESPrit 3G Units Used with a CI24 | $21,819,716 |

**Sources:**

(1) Exhibit 2.8

(2) *ESPrit 3G for Nucleus 22* , Cochlear Press Release, 28 May 2004

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ESPRIT 3G PROCESSOR AVERAGE SELLING PRICE, FISCAL YEAR 2004 - FISCAL YEAR 2008**
**Exhibit 2.8**

| | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|
| ESPrit 3G Revenue | $22,209,231 | $22,580,158 | $9,235,340 | $7,704,862 | $2,010,810 | $63,740,401 |
| ESPrit 3G Units | 5,488 | 5,160 | 1,399 | 24 | 93 | 12,164 |
| Average Selling Price | | | | | | $5,240 |

**Sources:**
(1) Exhibit 2.9
(2) Exhibit 2.10

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*

**ESPRIT 3G PROCESSOR REVENUE**

**Exhibit 2.9**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Beige ESPrit 3G | $2,598,045 | $10,670,053 | ($33,000) | $15,000 | ($6,000) | ($24,950) | - | $13,219,148 |
| Brown ESPrit 3G | $621,130 | $2,873,956 | $4,500 | - | - | ($3,500) | - | $3,496,086 |
| Black ESPrit 3G | $142,700 | $924,180 | $15,000 | ($6,000) | - | - | - | $1,075,880 |
| Silver ESPrit 3G | $760,384 | $2,893,069 | ($33,000) | - | - | ($3,000) | - | $3,617,453 |
| ESPrit 3G Beige | - | - | $14,619,270 | $13,714,026 | $2,362,835 | $1,407,391 | $402,912 | $32,506,434 |
| ESPrit 3G Brown | - | - | $4,207,290 | $3,747,986 | $910,500 | $521,526 | $146,500 | $9,533,802 |
| ESPrit 3G Black | - | - | $1,336,750 | $2,005,200 | $237,500 | $192,829 | $146,400 | $3,918,679 |
| ESPrit 3G Silver | - | - | $4,067,835 | $4,552,654 | $331,460 | $145,740 | $61,400 | $9,159,089 |
| ESPrit 3G Deferred | - | ($663,076) | ($1,975,414) | ($1,448,708) | $5,399,045 | $5,468,826 | $1,253,598 | $8,034,271 |
| Total | $4,122,259 | $16,698,181 | $22,209,231 | $22,580,158 | $9,235,340 | $7,704,862 | $2,010,810 | $84,560,841 |

**Source:**

Exhibit 6.3

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ESPRIT 3G PROCESSOR UNITS SOLD**
**Exhibit 2.10**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Beige ESPrit 3G | 1,949 | 3,576 | (102) | (17) | (3) | (111) | (39) | 5,253 |
| Brown ESPrit 3G | 472 | 1,060 | (16) | (4) | - | (24) | (12) | 1,476 |
| Black ESPrit 3G | 145 | 291 | (3) | (2) | (1) | (4) | (1) | 425 |
| Silver ESPrit 3G | 624 | 949 | (9) | (5) | - | (32) | (9) | 1,518 |
| ESPrit 3G Beige | - | - | 3,334 | 2,905 | 880 | 139 | 117 | 7,375 |
| ESPrit 3G Brown | - | - | 995 | 852 | 318 | 74 | 13 | 2,252 |
| ESPrit 3G Black | - | - | 347 | 424 | 91 | 9 | 25 | 896 |
| ESPrit 3G Silver | - | - | 942 | 1,007 | 114 | (27) | (1) | 2,035 |
| ESPrit 3G Deferred | - | - | - | - | - | - | - | - |
| Total | 3,190 | 5,876 | 5,488 | 5,160 | 1,399 | 24 | 93 | 21,230 |

**Source:**
Exhibit 6.4

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ANALYTICAL APPROACH: ACCUSED SPEECH PROCESSORS VERSUS NON ACCUSED SPEECH PROCESSORS**
**Exhibit 3.1**

| | SP12 v. ESPrit 3G | SPrint v. ESPrit 3G |
|---|---|---|
| Accused Speech Processor Gross Profit per Unit | $4,110 | $4,435 |
| ESPrit 3G Gross Profit per Unit | $2,899 | $2,899 |
| Profit Premium per Unit | $1,211 | $1,535 |
| Accused Speech Processor Average Selling Price | $4,561 | $5,601 |
| Royalty Indicator | 26.5% | 27.4% |

**Source:**
Exhibit 3.3

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ANALYTICAL APPROACH: ACCUSED PRODUCTS VERSUS INDUSTRY**
**Exhibit 3.2**

|                           | SP12   | SPrint | CI24    |
|---------------------------|--------|--------|---------|
| Gross Profit per Unit (1) | $4,110 | $4,435 | $9,875  |
| Average Selling Price (1) | $4,561 | $5,601 | $13,402 |
| Gross Margin              | 90.1%  | 79.2%  | 73.7%   |
| RMA Margin (3)            | 58.6%  | 58.6%  | 58.6%   |
| Royalty Indicator         | 31.5%  | 20.6%  | 15.1%   |

**Sources:**
(1) Exhibit 3.3
(2) Annual Statement Studies, The Risk Management Association, *Electromedical and Electrotherapeutic Apparatus Manufacturing*  industry , 2003 – 2008.
(http://www.statementstudies.org) To be conservative I have used the highest gross margin for any industry segment during the period 2003-2008.

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*

**GROSS PROFIT PER UNIT**

**Exhibit 3.3**

|  | SP12 | SPrint | ESPrit 3G | CI24 |
|---|---|---|---|---|
| Revenue (1) | $184,736,004 | $48,500,493 | $84,560,841 | $445,493,118 |
| Units (2) | 40,506 | 8,660 | 21,230 | 33,241 |
| Average Selling Price | $4,561 | $5,601 | $3,983 | $13,402 |
| Standard Cost Per Unit (3) | $451 | $1,166 | $1,084 | $3,527 |
| Gross Profit per Unit | $4,110 | $4,435 | $2,899 | $9,875 |

**Sources:**

(1) Exhibit 2.5, Exhibit 6.3, Exhibit 2.9, and Exhibit 2.2

(2) Exhibit 3.4, Exhibit 6.4, Exhibit 2.10, and Exhibit 3.5

(3) Exhibit 3.6 and Exhibit 3.9

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**SP12 UNITS**
**Exhibit 3.4**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| SP12 - Final Pack Beige | - | - | - | 52 | - | - | - | 52 |
| SP12 - Base System Beige | - | - | - | 14 | - | - | - | 14 |
| SP12 BTE Beige | - | - | - | 1,207 | 4,582 | 7,114 | 5,850 | 18,753 |
| SP12 BTE Brown | - | - | - | 289 | 1,794 | 3,168 | 3,220 | 8,471 |
| SP12 BTE Black | - | - | - | 127 | 871 | 1,654 | 1,659 | 4,311 |
| SP12 BTE Silver | - | - | - | 222 | 1,705 | 2,890 | 2,192 | 7,009 |
| SP12 BTE Pink | - | - | - | - | 51 | 521 | 496 | 1,068 |
| SP12 BTE Blue | - | - | - | - | 34 | 375 | 419 | 828 |
| Total | - | - | - | 1,911 | 9,037 | 15,722 | 13,836 | 40,506 |

**Source:**
Exhibit 6.4

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**CI24 UNITS**
**Exhibit 3.5**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| CI24M - Micro Implant | - | - | (1) | - | - | - | - | (1) |
| CI24M - Cochlear Implant | 45 | 59 | 70 | 22 | 8 | - | - | 204 |
| CI24 Contour | 1,825 | 3,577 | 2,594 | 678 | 280 | 340 | 192 | 9,486 |
| CI24 Contour CA | - | 123 | 827 | 1,439 | 159 | 146 | 87 | 2,781 |
| MATCI24R (CA) | - | - | - | 152 | (2) | - | - | 150 |
| CI24RE (ST) | - | - | - | 37 | 86 | 127 | 147 | 397 |
| CI24R (ST) | 146 | 292 | 305 | 374 | 300 | 179 | 103 | 1,699 |
| CI24RE (CA) | - | 8 | 2 | 1,459 | 4,454 | 5,894 | 6,646 | 18,463 |
| CI24R (CS) | - | 1 | - | 1 | - | - | - | 2 |
| CI24RE Hybrid | - | - | - | 4 | 36 | 20 | - | 60 |
| Total | 2,016 | 4,060 | 3,797 | 4,166 | 5,321 | 6,706 | 7,175 | 33,241 |

**Source:**
Exhibit 6.2

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**SPEECH PROCESSOR STANDARD COST PER UNIT**
**Exhibit 3.6**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| ESPrit 3G | $934 | $1,356 | $1,001 | $1,021 | $878 | $636 | $733 | $1,084 |
| SPrint | $1,120 | $1,274 | $1,201 | $1,012 | $960 | $870 | $871 | $1,166 |
| SP12 | - | - | - | $482 | $468 | $470 | $412 | $451 |

**Sources:**
Exhibit 3.8 and Exhibit 3.7

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**SPEECH PROCESSOR UNITS FROM STANDARD COST DATA**
**Exhibit 3.7**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| ESPrit 3G | 3,298 | 5,876 | 5,488 | 5,160 | 1,399 | 24 | 93 | 21,338 |
| SPrint | 1,694 | 2,741 | 2,238 | 1,798 | 506 | (180) | (99) | 8,698 |
| SP12 | - | - | - | 1,911 | 9,037 | 15,720 | 13,834 | 40,502 |

**Source:**
COC-5002006

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**SPEECH PROCESSOR STANDARD COST**
**Exhibit 3.8**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| ESPrit 3G | $3,078,955 | $7,970,092 | $5,495,590 | $5,266,864 | $1,228,725 | $15,261 | $68,193 | $23,123,680 |
| SPrint | $1,896,489 | $3,492,381 | $2,688,055 | $1,819,149 | $485,993 | ($156,563) | ($86,224) | $10,139,280 |
| SP12 | - | - | - | $921,502 | $4,229,003 | $7,393,714 | $5,705,571 | $18,249,790 |

**Source:**
COC-5002006

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**CI24 STANDARD COST PER UNIT**
**Exhibit 3.9**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| CI24M | $2,072 | $2,600 | $2,554 | $3,078 | $2,772 | - | - | $2,521 |
| CI24 Contour | $3,084 | $3,766 | $3,601 | $3,874 | $3,462 | $3,436 | $3,622 | $3,572 |
| CI24R (CA) | - | $3,735 | $3,894 | $3,789 | $3,457 | $3,667 | $3,714 | $3,790 |
| CI24R (CA2) | - | - | - | $3,960 | $3,366 | - | - | $3,968 |
| CI24RE (ST) | - | - | - | $2,573 | $2,949 | $2,845 | $3,020 | $2,907 |
| CI24K | $2,543 | $3,181 | $2,994 | $3,052 | $2,773 | $2,863 | $3,109 | $2,944 |
| CI24 RE (CA1) | - | $3,737 | $8,211 | $3,511 | $3,440 | $3,470 | $3,674 | $3,540 |
| | | | | | | | | |
| Total Implants | $3,012 | $3,706 | $3,599 | $3,631 | $3,395 | $3,445 | $3,651 | $3,527 |

**Source:**
Exhibits 3.10 and 3.11

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*

**CI24 UNITS FROM COST DATA**
**Exhibit 3.10**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| CI24M | 47 | 59 | 69 | 22 | 8 | - | - | 205 |
| CI24 Contour | 1,855 | 3,577 | 2,594 | 678 | 280 | 340 | 192 | 9,516 |
| CI24R (CA) | - | 123 | 827 | 1,439 | 159 | 146 | 87 | 2,781 |
| CI24R (CA2) | - | - | - | 152 | (2) | - | - | 150 |
| CI24RE (ST) | - | - | - | 37 | 86 | 127 | 147 | 397 |
| CI24K | 191 | 292 | 305 | 374 | 300 | 179 | 103 | 1,744 |
| CI24 RE (CA1) | - | 8 | 2 | 1,463 | 4,490 | 5,914 | 6,650 | 18,527 |
| Total Implants | 2,093 | 4,059 | 3,797 | 4,165 | 5,321 | 6,706 | 7,179 | 33,320 |

**Source:**
COC-5002006

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**CI24 STANDARD COSTS**
**Exhibit 3.11**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| CI24M | $97,386 | $153,413 | $176,198 | $67,725 | $22,178 | - | - | $516,900 |
| CI24 Contour | $5,720,378 | $13,469,660 | $9,340,346 | $2,626,303 | $969,325 | $1,168,160 | $695,340 | $33,989,512 |
| CI24R (CA) | - | $459,410 | $3,220,574 | $5,453,056 | $549,602 | $535,429 | $323,157 | $10,541,228 |
| CI24R (CA2) | - | - | - | $601,985 | ($6,731) | - | - | $595,254 |
| CI24RE (ST) | - | - | - | $95,202 | $253,593 | $361,353 | $443,987 | $1,154,135 |
| CI24K | $485,675 | $928,866 | $913,125 | $1,141,500 | $831,782 | $512,515 | $320,274 | $5,133,737 |
| CI24 RE (CA1) | - | $29,898 | $16,422 | $5,137,272 | $15,444,261 | $20,522,738 | $24,430,538 | $65,581,129 |
| | | | | | | | | |
| Total Implants | $6,303,439 | $15,041,247 | $13,666,665 | $15,123,043 | $18,064,010 | $23,100,195 | $26,213,296 | $117,511,895 |

**Source:**
COC-5002006

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*

**ADVANCED BIONICS LICENSE EFFECTIVE ROYALTY**

**Exhibit 4.1**

|  | **Total** |
|---|---|
| Cash Payout From Purchase (1) | $23,100,000 |
| Running Royalties (2) | $11,448,889 |
| AMF Share of Earn-Out (3) | $79,149,231 |
| Royalty Income | $113,698,120 |
| Advanced Bionics Revenue (2) | $628,438,451 |
| Effective Royalty | 18.1% |

**Sources:**
(1) Exhibit 4.3
(2) Exhibit 4.5
(3) Exhibit 4.4

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ADVANCED BIONICS LICENSE EFFECTIVE ROYALTY**
**Exhibit 4.2**

|  | Total |
|---|---|
| Cash Payout From Purchase (1) | $23,100,000 |
| Running Royalties (2) | $11,448,889 |
| AMF Share of Earn-Out (3) | $24,129,231 |
| Royalty Income | $58,678,120 |
| Advanced Bionics Revenue (2) | $628,438,451 |
| Effective Royalty | 9.3% |

**Sources:**
(1) Exhibit 4.3
(2) Exhibit 4.5
(3) Exhibit 4.4

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**AMF'S PORTION OF THE ADVANCED BIONICS PURCHASE PRICE**
**Exhibit 4.3**

| | Boston Scientific Transaction |
|---|---|
| AMF Shares of Advanced Bionics | 2,100,000 |
| Cash Paid per Share | $11.00 |
| Cash Payout From Purchase | $23,100,000 |

**Source:**
AMF045614 - AMF045615

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**PAYMENTS TO AMF RELATED TO THE ADVANCED BIONICS EARN-OUTS**
**Exhibit 4.4**

|  | Total |
|---|---|
| 2005 Earn-Out Payment (1) | $10,164,231 |
| 2006 Earn-Out Payment (2) | $12,915,000 |
| Payment from Trust (3) | $1,050,000 |
| Purchase of 2008 Earn-Out Payment (4) | $30,660,000 |
| Purchase of 2009 Earn-Out Payment (4) | $24,360,000 |
| Total | $79,149,231 |

**Sources:**
(1) AMF045632
(2) AMF045647
(3) AMF045720
(4) AMF045663

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**ADVANCED BIONICS ESTIMATED REVENUE**
**Exhibit 4.5**

| | Royalty (1) | Rate (2) | Revenue |
|---|---|---|---|
| Q3 1999 | $377,003 | 3.00% | $12,566,767 |
| Q4 1999 | $275,556 | 3.00% | $9,185,200 |
| Q1 2000 | $269,791 | 3.00% | $8,993,033 |
| Q2 2000 | $279,843 | 3.00% | $9,328,100 |
| Q3 2000 | $308,737 | 3.00% | $10,291,233 |
| Q4 2000 | $349,823 | 3.00% | $11,660,767 |
| Q1 2001 | $267,436 | 3.00% | $8,914,533 |
| Q2 2001 | $414,863 | 3.00% | $13,828,767 |
| Q3 2001 | $420,880 | 3.00% | $14,029,333 |
| Q4 2001 | $606,674 | 3.00% | $20,222,467 |
| Q1 2002 | $171,144 | 3.00% | $5,704,800 |
| Q2 2002 | $161,082 | 3.00% | $5,369,400 |
| Outstanding Royalty Payment | $762,543 | 3.00% | $25,418,100 |
| Q3 2002 | $49,045 | 3.00% | $1,634,833 |
| Q4 2002 | $266,096 | 3.00% | $8,869,867 |
| Q1 2003 | $277,290 | 3.00% | $9,243,000 |
| Q2 2003 (3) | $237,455 | 2.76% | $8,591,811 |
| Extra Payment After Audit | $20,868 | 2.50% | $834,720 |
| Q3 2003 | $418,350 | 2.50% | $16,734,000 |
| Q4 2003 | $727,740 | 2.50% | $29,109,600 |
| Q1 2004 | $228,050 | 1.25% | $18,244,000 |
| Q2 2004 | $268,338 | 1.25% | $21,467,040 |
| Q3 2004 | $224,162 | 1.25% | $17,932,960 |
| Q4 2004 | $112,226 | 1.25% | $8,978,080 |
| Q1 2005 | $249,913 | 1.25% | $19,993,040 |
| Royalty Overpay | $20,041 | 1.25% | $1,603,280 |
| Q3 2005 | $228,550 | 1.25% | $18,284,000 |
| Q4 2005 | $275,975 | 1.25% | $22,078,000 |
| Q1 2006 | $240,288 | 1.25% | $19,223,040 |
| Q2 2006 | $282,363 | 1.25% | $22,589,040 |
| Q3 2006 | $269,675 | 1.25% | $21,574,000 |
| Q4 2006 | $292,800 | 1.25% | $23,424,000 |
| Q1 2007 | $265,825 | 1.25% | $21,266,000 |
| Q2 2007 | $348,525 | 1.25% | $27,882,000 |
| Q3 2007 | $350,363 | 1.25% | $28,029,040 |
| Q4 2007 | $380,850 | 1.25% | $30,468,000 |
| Q1 2008 | $346,088 | 1.00% | $34,608,800 |
| Q2 2008 | $402,638 | 1.00% | $40,263,800 |
| | | | |
| Total | $11,448,889 | N/A | $628,438,451 |

**Source:**
(1) AMF045193
(2) AMF018354 and AMF045259
(3) The royalty rate was 3.0% through 18 May 2003 and 2.5% for the period 19 May 2003 - 31 December 2003.  I have used the weighted average for the Q2 2003: ((48/91)*.03)+((43/91)*.025) = .0276.

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**COCHLEAR'S PROFITS FROM SALES OF ACCUSED PRODUCTS**
**Exhibit 5.1**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Revenue from CI24 (1) | $24,020,876 | $50,037,368 | $47,474,546 | $55,972,969 | $77,093,625 | $90,516,439 | $100,377,295 | $445,493,118 |
| Revenue from SPrint (2) | $8,452,933 | $14,886,769 | $11,843,510 | $9,389,476 | $2,076,480 | $1,452,950 | $398,375 | $48,500,493 |
| Revenue from SP12 (3) | - | - | - | $7,849,072 | $38,452,036 | $68,438,988 | $68,975,404 | $183,715,500 |
| Total Revenue from Accused Products | $32,473,809 | $64,924,137 | $59,318,056 | $73,211,517 | $117,622,141 | $160,408,377 | $169,751,074 | $677,709,110 |
| Standard Cost of CI24 (4) | ($6,303,439) | ($15,041,247) | ($13,666,665) | ($15,123,043) | ($18,064,010) | ($23,100,195) | ($26,213,296) | ($117,511,895) |
| Standard Cost of SPrint (5) | ($1,896,489) | ($3,492,381) | ($2,688,055) | ($1,819,149) | ($485,993) | $156,563 | $86,224 | ($10,139,280) |
| Standard Cost of SP12 (5) | - | - | - | ($921,502) | ($4,229,003) | ($7,393,714) | ($5,623,085) | ($18,167,304) |
| Total Cost of Accused Products | ($8,199,928) | ($18,533,628) | ($16,354,720) | ($17,863,694) | ($22,779,006) | ($30,337,346) | ($31,750,157) | ($145,818,479) |
| Gross Profit | $24,273,881 | $46,390,509 | $42,963,336 | $55,347,823 | $94,843,135 | $130,071,031 | $138,000,917 | $531,890,632 |
| | 74.7% | 71.5% | 72.4% | 75.6% | 80.6% | 81.1% | 81.3% | 78.5% |
| Distribution, Marketing, and Field Technical Expenses (6) | ($9,927,215) | ($20,213,103) | ($20,729,202) | ($23,068,057) | ($34,258,194) | ($41,920,509) | ($45,891,104) | ($196,007,384) |
| | 30.6% | 31.1% | 34.9% | 31.5% | 29.1% | 26.1% | 27.0% | 28.9% |
| Administration Expenses (6) | ($1,370,498) | ($4,099,824) | ($4,983,807) | ($5,771,584) | ($8,221,165) | ($11,482,771) | ($10,584,277) | ($46,513,926) |
| | 4.2% | 6.3% | 8.4% | 7.9% | 7.0% | 7.2% | 6.2% | 6.9% |
| Research and Development Expenses (6) | ($5,522,730) | ($8,405,763) | ($10,548,027) | ($9,473,467) | ($16,174,431) | ($19,600,809) | ($23,465,646) | ($93,190,871) |
| | 17.0% | 12.9% | 17.8% | 12.9% | 13.8% | 12.2% | 13.8% | 13.8% |
| Other Expenses from Ordinary Activities (6) | ($20,689) | - | - | - | - | - | - | ($20,689) |
| | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Operating Profit from Accused Products | $7,432,749 | $13,671,818 | $6,702,300 | $17,034,716 | $36,189,346 | $57,066,942 | $58,059,890 | $196,157,761 |
| | 22.9% | 21.1% | 11.3% | 23.3% | 30.8% | 35.6% | 34.2% | 28.9% |

**Sources:**
(1) Exhibit 2.2
(2) Exhibit 6.3
(3) Exhibit 2.5
(4) Exhibit 3.11
(5) Exhibit 3.8
(6) Exhibit 5.3

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**REVENUE AND STANDARD COST OF SP12 SPEECH PROCESSORS USED WITH A CI24, FISCAL YEAR 2008**
**Exhibit 5.2**

|  | Revenue |  |  | Standard Cost |
|---|---|---|---|---|
| SP12 Units Used with a CI22 (1) | 200 | SP12 Units Used with a CI22 (1) | | 200 |
| Average Selling Price (2) | $5,103 | Standard Cost Per Unit (4) | | $412 |
| Revenue from SP12s Used with a CI22 | $1,020,504 | Standard Cost of SP12s Used with a CI22 | | $82,486 |
| Total FY 2008 SP12 Revenue (3) | $69,995,908 | Total FY 2008 SP12 Standard Cost (5) | | $5,705,571 |
| Revenue from SP12s Used with a CI24 | $68,975,404 | Standard Cost of SP12s Used with a CI24 | | $5,623,085 |

**Sources:**
(1) Exhibit 2.3
(2) Exhibit 2.4
(3) Exhibit 2.5
(4) Exhibit 3.6
(5) Exhibit 3.8

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**COCHLEAR LTD. CONSOLIDATED INCOME STATEMENTS (THOUSANDS)**
**Exhibit 5.3**

| | FY 2002 (1) | FY 2003 (2) | FY 2004 (2) | FY 2005 (3) | FY 2006 (3) | FY 2007 (4) | FY 2008 (4) | Total |
|---|---|---|---|---|---|---|---|---|
| Revenue From Operating Activities(5) | $252,706 | $286,011 | $249,981 | $320,444 | $428,516 | $539,711 | $578,845 | $2,656,214 |
| Cost of Sales | ($72,966) | ($82,637) | ($84,960) | ($99,699) | ($130,962) | ($161,334) | ($169,013) | ($801,571) |
| Gross Profit | $179,740 | $203,374 | $165,021 | $220,745 | $297,554 | $378,377 | $409,832 | $1,854,643 |
| | 71.1% | 71.1% | 66.0% | 68.9% | 69.4% | 70.1% | 70.8% | 69.8% |
| Distribution, Marketing, and Field Technical Expense | ($77,252) | ($89,045) | ($87,358) | ($100,968) | ($124,808) | ($141,046) | ($156,487) | ($776,964) |
| | 30.6% | 31.1% | 34.9% | 31.5% | 29.1% | 26.1% | 27.0% | 29.3% |
| Administration Expenses | ($10,665) | ($18,061) | ($21,003) | ($25,262) | ($29,951) | ($38,635) | ($36,092) | ($179,669) |
| | 4.2% | 6.3% | 8.4% | 7.9% | 7.0% | 7.2% | 6.2% | 6.8% |
| Research and Development Expenses | ($42,977) | ($37,030) | ($44,452) | ($41,465) | ($58,926) | ($65,949) | ($80,017) | ($370,816) |
| | 17.0% | 12.9% | 17.8% | 12.9% | 13.8% | 12.2% | 13.8% | 14.0% |
| Other Expenses from Ordinary Activities | ($161) | - | - | - | - | - | - | ($161) |
| | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Operating Profit | $48,685 | $59,238 | $12,208 | $53,050 | $83,869 | $132,747 | $137,236 | $527,033 |
| | 19.3% | 20.7% | 4.9% | 16.6% | 19.6% | 24.6% | 23.7% | 19.8% |

**Notes:**
(1) COC-5000049
(2) COC-5000197
(3) COC-5000368 and COC-5000381
(4) Cochlear Ltd., Annual Report for Fiscal Year 2008, pp. 48 and 62
(5) I have excluded revenue related to "Foreign Exchange Gains on Hedged Sales" and "Rendering of Services."

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**COCHLEAR REVENUE FROM THE SALE OF IMPLANTS IN THE AMERICAS**
**Exhibit 6.1**

| | 1 Dec. 2001 -<br>30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Z99012 | $71,370 | $303,199 | $169,126 | $315,299 | $248,123 | $462,316 | $138,174 | $1,707,607 |
| Abi 24M | $412,925 | $266,439 | $422,259 | $675,781 | $787,906 | $931,236 | $685,022 | $4,181,568 |
| CI22M | ($29,680) | ($16,050) | ($15,500) | - | - | - | - | ($61,230) |
| CI24M - Micro Implant | - | - | - | - | - | - | - | - |
| CI24M - Cochlear Implant | $217,528 | $236,721 | $271,950 | $55,350 | $21,000 | - | - | $802,549 |
| CI24 Contour | $22,697,591 | $46,033,153 | $34,628,834 | $8,240,596 | $2,259,860 | $2,551,202 | $1,477,038 | $117,888,274 |
| CI24 Contour CA | - | $1,583,488 | $10,835,999 | $20,269,052 | $1,573,346 | $911,550 | $585,585 | $35,759,020 |
| Contour with Softtip | - | - | - | - | - | - | - | - |
| MATCI24R (CA) | - | - | - | $2,033,373 | ($14,275) | - | - | $2,019,098 |
| CI24RE (ST) | - | - | - | $526,122 | $1,512,341 | $1,959,854 | $2,136,251 | $6,134,568 |
| CI24R (ST) | $1,105,757 | $2,030,946 | $1,706,763 | $2,275,426 | $1,834,732 | $1,145,793 | $655,792 | $10,755,209 |
| CI24RE (CA) | - | $120,160 | $31,000 | $22,493,100 | $69,308,421 | $83,594,320 | $95,522,629 | $271,069,630 |
| CI24R (CS) | - | $32,900 | - | $15,500 | - | - | - | $48,400 |
| CI24RE Hybrid | - | - | - | $64,450 | $598,200 | $353,720 | - | $1,016,370 |
| CI6+16+2M | - | $122,650 | $150,960 | $135,560 | ($14,480) | - | - | $394,690 |
| PABI 24M | - | - | - | - | $77,064 | - | - | $77,064 |
| Percutaneous Implant | - | - | - | - | - | - | - | - |
| Other Implants | - | - | - | - | - | - | - | - |
| Perc Externals | - | - | - | - | - | - | - | - |
| Freedom H10 | - | - | - | - | - | - | $75,800 | $75,800 |
| Total | $24,475,491 | $50,713,606 | $48,201,391 | $57,099,609 | $78,192,238 | $91,909,991 | $101,276,291 | $451,868,617 |

**Source:**
COC-5000714-COC-5001884

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**COCHLEAR UNIT SALES OF IMPLANTS IN THE AMERICAS**
**Exhibit 6.2**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Z99012 | 5 | 24 | 24 | 21 | 13 | 34 | 3 | 124 |
| Abi 24M | 32 | 21 | 24 | 38 | 38 | 46 | 33 | 232 |
| CI22M | (3) | (3) | (1) | - | - | - | - | (7) |
| CI24M - Micro Implant | - | - | (1) | - | - | - | - | (1) |
| CI24M - Cochlear Implant | 45 | 59 | 70 | 22 | 8 | - | - | 204 |
| CI24 Contour | 1,825 | 3,577 | 2,594 | 678 | 280 | 340 | 192 | 9,486 |
| CI24 Contour CA | - | 123 | 827 | 1,439 | 159 | 146 | 87 | 2,781 |
| Contour with Softtip | - | - | - | - | - | - | - | - |
| MATCI24R (CA) | - | - | - | 152 | (2) | - | - | 150 |
| CI24RE (ST) | - | - | - | 37 | 86 | 127 | 147 | 397 |
| CI24R (ST) | 146 | 292 | 305 | 374 | 300 | 179 | 103 | 1,699 |
| CI24RE (CA) | - | 8 | 2 | 1,459 | 4,454 | 5,894 | 6,646 | 18,463 |
| CI24R (CS) | - | 1 | - | 1 | - | - | - | 2 |
| CI24RE Hybrid | - | - | - | 4 | 36 | 20 | - | 60 |
| CI6+16+2M | - | 11 | 9 | 8 | 2 | - | - | 30 |
| PABI 24M | - | 2 | 3 | 1 | 5 | 1 | (2) | 10 |
| Percutaneous Implant | - | - | 8 | - | - | 4 | - | 12 |
| Other Implants | - | - | - | - | - | - | - | - |
| Perc Externals | - | - | 7 | 10 | - | 4 | - | 21 |
| Freedom H10 | - | - | - | - | - | - | 4 | 4 |
| Total | 2,050 | 4,115 | 3,871 | 4,244 | 5,379 | 6,795 | 7,213 | 33,667 |

**Source:**
COC-5000714-COC-5001884

*Attorneys' Eyes Only*

589

EXHIBIT Y

Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.
**COCHLEAR REVENUE FROM THE SALE OF SPEECH PROCESSORS IN THE AMERICAS**
**Exhibit 6.3**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| SP7, ARW | - | - | - | - | | | | - |
| Beige/Beige Esprit | $1,183,861 | ($84,265) | ($12,000) | $5,000 | - | - | - | $1,092,596 |
| Beige/Brown Esprit | $500,640 | ($30,000) | ($6,000) | | - | - | - | $464,640 |
| Brown/Brown Esprit | $242,760 | ($9,000) | ($3,000) | | - | - | - | $230,760 |
| Black/Black Esprit | $6,000 | | | | - | - | - | $6,000 |
| Discount - First 1000 Spectra Trade In | | | ($4,121,760) | ($633,600) | - | - | - | ($4,755,360) |
| Discount - No Special Promotion | | | ($133,000) | ($1,654,405) | - | - | - | ($1,787,405) |
| Discount - Esprit 22 Trade In | | | ($356,800) | ($1,381,690) | - | - | - | ($1,738,490) |
| Beige Esprit 3G | $2,598,045 | $10,670,053 | ($33,000) | $15,000 | ($6,000) | ($24,950) | - | $13,219,148 |
| Brown Esprit 3G | $621,130 | $2,873,956 | $4,500 | | - | ($3,500) | - | $3,496,086 |
| Black Esprit 3G | $142,700 | $924,180 | $15,000 | ($6,000) | | - | - | $1,075,880 |
| Silver Esprit 3G | $760,384 | $2,893,069 | ($33,000) | | - | ($3,000) | - | $3,617,453 |
| Esprit 3G Beige | - | - | $14,619,270 | $13,714,026 | $2,362,835 | $1,407,391 | $402,912 | $32,506,434 |
| Esprit 3G Brown | - | - | $4,207,290 | $3,747,986 | $910,500 | $521,526 | $146,500 | $9,533,802 |
| Esprit 3G Black | - | - | $1,336,750 | $2,005,200 | $237,500 | $192,829 | $146,400 | $3,918,679 |
| Esprit 3G Silver | - | - | $4,067,835 | $4,552,654 | $331,460 | $145,740 | $61,400 | $9,159,089 |
| Esprit 3G Deferred | - | ($663,076) | ($1,975,414) | ($1,448,708) | $5,399,045 | $5,468,826 | $1,253,598 | $8,034,271 |
| Black Esprit22 | $11,000 | $83,000 | $9,000 | ($6,000) | | - | - | $97,000 |
| Beige/Beige Esprit22 | $1,274,900 | $1,614,871 | $374,200 | ($54,000) | ($6,000) | - | $6,000 | $3,209,971 |
| Beige/Brown Esprit22 | $303,700 | $420,750 | $91,671 | ($30,000) | | - | - | $786,121 |
| Spectra 22 | - | - | - | - | | - | - | - |
| Spectra 22, Smd | $55,150 | $67,350 | $47,635 | $33,178 | $2,500 | - | - | $205,813 |
| MSP | - | - | - | - | | - | - | - |
| Sprint | $8,452,933 | $14,886,769 | $11,843,510 | $9,389,476 | $2,076,480 | $1,452,950 | $398,375 | $48,500,493 |
| Z60067 | - | - | - | $6,000 | | - | - | $6,000 |
| SP12 - Final Pack Beige | - | - | - | $261,000 | - | - | - | $261,000 |
| SP12 - Base System Beige | - | - | - | - | - | - | - | - |
| SP12 BTE Beige | - | - | - | $4,409,604 | $19,289,052 | $31,195,417 | $29,099,501 | $83,993,574 |
| SP12 BTE Brown | - | - | - | $1,460,968 | $7,904,744 | $13,891,873 | $16,339,744 | $39,597,329 |
| SP12 BTE Black | - | - | - | $618,000 | $3,752,936 | $7,435,146 | $8,669,326 | $20,475,408 |
| SP12 BTE Silver | - | - | - | $1,099,500 | $7,211,304 | $12,677,864 | $11,291,304 | $32,279,972 |
| SP12 BTE Pink | - | - | - | - | $174,000 | $1,907,096 | $2,481,026 | $4,562,122 |
| SP12 BTE Blue | - | - | - | - | $120,000 | $1,331,592 | $2,115,007 | $3,566,599 |
| Hybrid for Freedom Beige | - | - | - | - | | - | $10,275 | $10,275 |
| Hybrid for Freedom Silver | - | - | - | - | | - | $10,275 | $10,275 |
| FTEP Redemption | - | - | $325,743 | $159,245 | - | - | - | $484,988 |
| FTEP Certs Issued | - | - | ($2,375,895) | $574,328 | - | - | - | ($1,801,567) |
| FTEP Revaluations | - | ($1,506,972) | - | - | - | - | - | ($1,506,972) |
| Total | $16,153,203 | $32,140,683 | $27,892,535 | $36,836,762 | $49,760,356 | $77,596,800 | $72,431,643 | $312,811,982 |

**Source:**
COC-5000714-COC-5001884

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**COCHLEAR UNIT SALES OF SPEECH PROCESSORS IN THE AMERICAS**
**Exhibit 6.4**

| | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| SP7, ARW | - | - | - | - | - | (1) | - | (1) |
| Beige/Beige Esprit | (1,410) | (2,532) | (5) | - | - | (13) | (4) | (3,964) |
| Beige/Brown Esprit | 165 | (20) | (5) | 1 | - | (15) | (2) | 124 |
| Brown/Brown Esprit | 73 | (6) | - | - | - | (1) | - | 66 |
| Black/Black Esprit | 1 | - | - | - | - | - | - | 1 |
| Discount - First 1000 Spectra Trade In | - | - | - | - | - | - | - | - |
| Discount - No Special Promotion | - | - | - | - | - | - | - | - |
| Discount - Esprit 22 Trade In | - | - | - | - | - | - | - | - |
| Beige Esprit 3G | 1,949 | 3,576 | (102) | (17) | (3) | (111) | (39) | 5,253 |
| Brown Esprit 3G | 472 | 1,060 | (16) | (4) | - | (24) | (12) | 1,476 |
| Black Esprit 3G | 145 | 291 | (3) | (2) | (1) | (4) | (1) | 425 |
| Silver Esprit 3G | 624 | 949 | (9) | (5) | - | (32) | (9) | 1,518 |
| Esprit 3G Beige | - | - | 3,334 | 2,905 | 880 | 139 | 117 | 7,375 |
| Esprit 3G Brown | - | - | 995 | 852 | 318 | 74 | 13 | 2,252 |
| Esprit 3G Black | - | - | 347 | 424 | 91 | 9 | 25 | 896 |
| Esprit 3G Silver | - | - | 942 | 1,007 | 114 | (27) | (1) | 2,035 |
| Esprit 3G Deferred | - | - | - | - | - | - | - | - |
| Black Esprit22 | 1 | 12 | 2 | (1) | - | - | - | 14 |
| Beige/Beige Esprit22 | 275 | 324 | 80 | (11) | (1) | - | 1 | 668 |
| Beige/Brown Esprit22 | 66 | 77 | 17 | (5) | - | - | - | 155 |
| Spectra 22 | - | (2) | (1) | (1) | - | - | (1) | (5) |
| MSP | - | - | - | (8) | - | - | - | (8) |
| Spectra 22, Smd | 16 | 27 | 27 | 7 | 1 | (1) | - | 77 |
| Sprint | 1,656 | 2,741 | 2,238 | 1,798 | 506 | (180) | (99) | 8,660 |
| Z60067 | - | - | - | 2 | - | - | - | 2 |
| SP12 - Final Pack Beige | - | - | - | 52 | - | - | - | 52 |
| SP12 - Base System Beige | - | - | - | 14 | - | - | - | 14 |
| SP12 BTE Beige | - | - | - | 1,207 | 4,582 | 7,114 | 5,850 | 18,753 |
| SP12 BTE Brown | - | - | - | 289 | 1,794 | 3,168 | 3,220 | 8,471 |
| SP12 BTE Black | - | - | - | 127 | 871 | 1,654 | 1,659 | 4,311 |
| SP12 BTE Silver | - | - | - | 222 | 1,705 | 2,890 | 2,192 | 7,009 |
| SP12 BTE Pink | - | - | - | - | 51 | 521 | 496 | 1,068 |
| SP12 BTE Blue | - | - | - | - | 34 | 375 | 419 | 828 |
| Hybrid for Freedom Beige | - | - | - | - | - | - | 2 | 2 |
| Hybrid for Freedom Silver | - | - | - | - | - | - | 2 | 2 |
| FTEP Redemption | - | (1,207) | - | - | - | - | - | (1,207) |
| FTEP Certs Issued | - | 2,614 | - | - | - | - | - | 2,614 |
| FTEP Revaluations | - | - | - | - | - | - | - | - |
| Total | 4,033 | 7,904 | 7,841 | 8,853 | 10,942 | 15,535 | 13,828 | 68,936 |

**Source:**
COC-5000714-COC-5001884

*Attorneys' Eyes Only*

EXHIBIT Y

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd.*
**COCHLEAR UNITS AND REVENUE FROM SALES OF HEADSETS, PROGRAMMING SYSTEMS, REPAIRS, AND SPARES & ACCESSORIES IN THE AMERICAS**
**Exhibit 6.5**

| Units | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Headsets | 2,009 | 3,467 | 2,808 | 2,199 | 965 | 815 | 382 | 12,645 |
| Programming Systems | 198 | 232 | 145 | 570 | 451 | 395 | 467 | 2,458 |
| Repairs | 162 | (488) | (63) | (1,836) | 82 | (1,055) | 901 | (2,297) |
| Spares & Accessories | 105,064 | 165,067 | 183,147 | 219,244 | 1,088,132 | 1,120,400 | 1,082,357 | 3,963,411 |
| Total | 107,433 | 168,278 | 186,037 | 220,177 | 1,089,630 | 1,120,555 | 1,084,107 | 3,976,217 |

| Revenue | 1 Dec. 2001 - 30 Jun. 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | Total |
|---|---|---|---|---|---|---|---|---|
| Headsets | $741,310 | $1,300,099 | $311,190 | $159,098 | $197,502 | $165,003 | $116,212 | $2,990,414 |
| Programming Systems | $146,802 | $58,690 | $61,500 | $46,200 | $10,200 | $9,975 | $9,600 | $342,967 |
| Repairs | $38,895 | $146,025 | $144,803 | $105,690 | ($256,682) | $308,771 | $657,354 | $1,144,856 |
| Spares & Accessories | ($678,880) | ($945,439) | $1,366,760 | $796,032 | $6,485,532 | $6,428,074 | $7,019,167 | $20,471,246 |
| Total | $248,127 | $559,375 | $1,884,253 | $1,107,020 | $6,436,552 | $6,911,823 | $7,802,333 | $24,949,483 |

**Source:**
COC-5000714-COC-5001884

*Attorneys' Eyes Only*

EXHIBIT Y

# Appendix C

EXHIBIT Y



**OCEAN TOMO™**

INTELLECTUAL CAPITAL EQUITY ®

# CATE ELSTEN
# CURRICULUM VITAE

January 2009

**Cate Elsten** is a Managing Director for Ocean Tomo, an integrated consulting firm providing financial products and services related to Intellectual Property, including expert testimony, valuation, investments, risk management and transactions.   Ocean Tomo assists clients – corporations, law firms, governments and institutional investors – in realizing Intellectual Capital Equity™ value, broadly defined.

Ms. Elsten has been a consultant since 1990.  She was a Principal for Tait Advisory Services and led that firm's Intellectual Property Practice prior to its acquisition by Ocean Tomo. Before joining Tait, Ms. Elsten was a Partner in PricewaterhouseCoopers' Financial Advisory Services Practice, working with intellectual property of all types and serving as National Director for Trademark and Copyright matters.  Ms. Elsten worked in industry for twelve years before beginning her consulting career and held management positions for companies including the Corporation for Public Broadcasting, Playhouse Square Center, Dayton-Hudson Corporation's Target Stores Division (now Target Corporation), Aveda Corporation (now a division of Estée Lauder) and Sign Consultants, Inc.

Ms. Elsten has provided services including expert testimony, valuation and licensing, strategic and management consulting for companies in a wide range of industries, including biotechnology, agriculture, high-tech and traditional manufacturing, food processing, medical devices, pharmaceuticals, financial services, retail, hospitality, telecommunications, media and entertainment. She has testified on issues informing economic damages, marketing and industry trends, licensing and management practices, corporate and intellectual asset valuations and plans of reorganization in depositions, trials, arbitrations, bankruptcy courts and other settings.  She has also served as an AAA arbitrator.

Ms. Elsten is a Certified Management Accountant and a Certified Licensing Professional.  She is a member of the International Trademark Association, for whom she serves on the editorial board of The Trademark Reporter.  She is also a member of the Licensing Executives Society and the American Marketing Association and has served on the Board of Governors for the Brand Name Education Foundation.  She has lectured on a variety of intellectual property topics for the Los Angeles and Orange County Patent Lawyers Associations, Minnesota Institute of Legal Education, Institute for International Research, International Business Forum and other professional organizations and universities.  She serves as a member of the board of directors for the Mexican Heritage Corporation.

EXHIBIT Y



# OCEAN TOMO™
INTELLECTUAL CAPITAL EQUITY®

| | |
|---|---|
| **PROFESSIONAL EXPERIENCE** | Managing Director, *Ocean Tomo*<br>July 1, 2003 to present<br><br>Principal, *Tait Advisory Services, LLC*<br>2001-2003<br><br>Partner (Principal), *PricewaterhouseCoopers, LLP*<br>Director, *Coopers & Lybrand, LLP*<br>1992-2001<br><br>Senior Manager, *Ernst & Young, LLP*<br>1990-1992<br><br>Chief Operating Officer, *Sign Consultants, Inc.*<br>1989-1990<br><br>Manager of Financial and Strategic Planning, *Aveda Corporation*<br>1988-1989<br><br>Senior Corporate Sales and Marketing Analyst, *Dayton-Hudson Corporation, Target Stores Division*<br>1984-1988<br><br>Chief Financial Officer, *Playhouse Square Center*<br>1981-1984 |

---

| | |
|---|---|
| **EDUCATION** | University of Wisconsin-Madison, Master of Arts in Business.  Graduated 1981.  Beta Gamma Sigma.<br><br>Oberlin College, B.A., Bachelor of Arts in English and Art History.  Graduated 1979.  Phi Beta Kappa. |

---

| | |
|---|---|
| **ACTIVE MEMBERSHIPS** | International Trademark Association<br>Licensing Executives Society<br>American Marketing Association |

---

EXHIBIT Y

## OCEAN TOMO
### INTELLECTUAL CAPITAL EQUITY®

| | |
|---|---|
| **PUBLICATIONS** | "Bubbles and Squeaks:  'Irrational Exuberance' and Its Impact (or Lack Thereof) on Damages Under the Lanham Act in the Dot.Com Era," <u>The Trademark Reporter</u>, Vol. 95, No. 5.  Robert Morrill and Kevin Arst, co-authors. |
| | "Damage Issues of Trademark, Trade Secret, False Advertising and Copyright Cases," Chapter 21, <u>Litigation Services Handbook: The Role of the Financial Expert</u>, Third Edition, John Wiley & Sons, Inc., Roman L. Weil, Michael J. Wagner and Peter B. Frank, editors, 2001. |
| | "Establishing Intellectual Property Values", <u>E-Coverage Guide</u>, The National Underwriter Co., Leo L. Clarke and Martin C. Loesch, editors, 2000. S. Michael Markman, co-author. |
| | "Trademark Litigation: Thunder on the Horizon?", Minnesota Institute of Legal Education, 1999 and 2001. |
| | "False Advertising Damages: Highlights of the Past Twenty Years and the Current Implications for Developing and Rebutting Damages Claims", Coopers & Lybrand L.L.P. Intellectual Property News, 1997. |

---

| | |
|---|---|
| **EXPERT TESTIMONY** | *PalTalk Holdings, Inc. v. Microsoft Corporation*<br>Primary Action:  Patent Infringement<br>Venue:  Federal Court, Eastern District of Texas |
| | *Crocs, Inc. v. Australia Unlimited, Inc.*<br>Primary Action:  Patent and Trade Dress Infringement<br>Venue:  Federal Court, District of Colorado |
| | *Northbrook Digital Corporation v. Browster, Inc*<br>Primary Action:  Patent Infringement<br>Venue:  Federal Court, District of Minnesota |
| | *Medtronic AVE et al. v. Cordis Corporation*<br>Primary Action:  Patent Infringement<br>Venue: Federal Court, Eastern District of Texas |
| | *Boston Scientific Corporation et al. v. Johnson & Johnson and Cordis Corporation*<br>Primary Action:  Patent Infringement<br>Venue:  Federal Court, Northern District of California |
| | *Avago Technologies General IP PTE Ltd. & Avago Technologies ECBU IP PTE Ltd. v. Elan Microelectronics Corp. and Elan Information Technology Group*<br>Primary Action:  Patent Infringement<br>Venue:  Federal Court, Northern District of California |

EXHIBIT Y



Timeline, Inc. v. ProClarity Corporation
Primary Action:  Patent Infringement
Venue:  Federal Court, Western District of Washington

Hitachi, Ltd. and Hitachi Automotive Products (USA), Inc. v. BorgWarner Inc. and Borg Warner Morse Tec Inc.
Primary Action:  Patent Infringement
Venue:  Federal Court, Delaware

Cache la Poudre Feeds, L.L.C. v. Land O'Lakes, Inc. et al.
Primary Action:  Trademark Infringement
Venue:  Federal Court, District of Colorado

Peter A. Hochstein et al. v. Microsoft Corporation
Primary Action:  Patent Infringement
Venue:  Federal Court, Eastern District of Michigan, Southern Division

ICON Health & Fitness, Inc. v. The Nautilus Group, Inc. et al.
Primary Action:  Trademark Infringement and False Advertising
Venue:  Federal Court, District of Utah

Linear Technology Corporation v. Micrel, Inc.
Primary Action:  Patent Infringement
Venue:  Federal Court, Northern District of California, San Francisco

CIVIX-DDI, LLC v. Expedia, Inc. et al.
Primary Action: Patent Infringement
Venue:  Federal Court, Northern District of Illinois

Applied Medical Resources Corp. v. Ethicon Endo-Surgery, Inc.
Primary Action:  Patent Infringement
Venue:  Federal Court, Central District of California

Mylan Pharmaceuticals Inc. v. The Procter & Gamble Company
Primary Action:  False Advertising
Venue:  Federal Court, Southern District of New York

S&M NuTec, L.L.C. v. T.F.H. Publications, Inc.
Primary Action:  Trade Dress Infringement
Venue:  Federal Court, Western District of Missouri

Hi-Shear Technology Corporation v. United Space Alliance LLC and USBI Co.
Primary Action:  Theft of Trade Secrets
Venue:  Circuit Court, Brevard County Florida

# OCEAN TOMO™
### INTELLECTUAL CAPITAL EQUITY®

*Boston Scientific Corporation and Target Therapeutics, Inc. v. Cordis Corporation*
Primary Action: Patent Infringement
Venue:  Federal Court, Northern District of California

*Schwan's IP, LLC and Schwan's Consumer Brands North America, Inc. v. Kraft
Pizza Company*
Primary Action:  Trademark Infringement
Venue:  Federal Court, Minnesota

*The Nautilus Group, Inc v. Icon Health & Fitness, Inc.*
Primary Action:  Patent Infringement
Venue:  Federal Court, Western District of Washington

*AT&T v. Microsoft Corporation*
Primary Action:  Patent Infringement
Venue: Federal Court, Southern District of New York

*Mastercard Int'l, Inc. v. First National Bank of Omaha*
Primary Action:  Trademark Infringement
Venue:  Federal Court, Southern District of New York

*Greenlight Financial Services, Inc. v. Hartford Casualty Insurance Company*
Primary Action:  Insurance Dispute, Advertising Injury
Venue:  Federal Court, Central District of California

*GFI America, Inc. v. Tecumseh Poultry LLC*
Primary Action:  Trademark Infringement
Venue:  Federal Court, Minnesota

*Knot Just Beads v. Knot Just Beads, Inc.*
Primary Action: Trademark Infringement
Venue: District Court, Alabama

*Imagexpo L.L.C. v. Microsoft Corporation*
Primary Action:  Patent Infringement
Venue:  Federal Court, Eastern District of Virginia

*On-Line Technologies, Inc. v. Perkin-Elmer Corporation et al.*
Primary Actions:  Patent Infringement, Theft of Trade Secrets
Venue:  Federal Court, District of Connecticut

*ATC Distribution Group, Inc. v. WTT et al.*
Primary Action:  Copyright Infringement
Venue:  Federal Court, Western District of Kentucky

EXHIBIT Y

# OCEAN TOMO™

### INTELLECTUAL CAPITAL EQUITY®

*Gold Banc Corporation, Inc. v. Credit Union National Association, Inc.*
Primary Action:  Trademark Infringement
Venue:  Federal Court, District of Kansas

*A&A Mechanical, Inc. v. Thomas & Betts*
Primary Action:  Breach of Contract
Venue:  Federal Court, Western District of Kentucky

*General Data Company Inc. v. Solvay Paperboard Company, L.L.C.*
Primary Action:  Copyright Infringement
Venue:  Federal Court, Southern District of Ohio, Western Division

*We Media, Inc. v. Cablevision Systems Corp. et al.*
Primary Action:  Trademark Infringement, Unfair Competition
Venue:  Federal Court, Southern District of New York

*Vicki D. Smith v. Mather Hamilton & Co., et al.*
Primary Action: Professional Malpractice
Venue:  Circuit Court, Jefferson County, Kentucky

*Halston LLC v. HF6, Inc. and Heller Financial, Inc.*
Primary Action:  Licensing Dispute (Breach of Contract)
Venue:  Federal Court, Southern District of New York

*Thomas Horn et al. v. Robert B. McQueen et al.*
Primary Action:  Breach of Fiduciary Duty
Venue:  Federal Court, Western District of Kentucky

*Luigino's, Inc. v. Robert Peterson and IBP, Inc.*
Primary Action: Theft of Trade Secrets
Venue: Federal Court, District of Minnesota

*Heidi Ott A.G. and Heidi Ott v. Target Corporation, et al.*
Primary Action:  Trademark Infringement
Venue:  Federal Court, District of Minnesota

*Monsanto Company v. Pioneer Hi-Bred International, Inc.*
Primary Action:  Licensing Dispute (Breach of Contract), Patent Infringement
Venue:  Federal Court, Eastern District of Missouri

*Simon Property Group, LP v. mySimon, Inc.*
Primary Action:  Trademark Infringement (Cybersquatting)
Venue:  Federal Court, Southern District of Indiana

EXHIBIT Y

OCEAN TOMO™
INTELLECTUAL CAPITAL EQUITY®

*Pioneer Hi-Bred International, Inc. v. Monsanto Company*
Primary Action:  Licensing Dispute (Breach of Contract), Patent Infringement
Venue:  Federal Court, Eastern District of Missouri

*Scott Schroering et al. v. KFS et al.*
Primary Action:  Breach of Contract
Venue:  Jefferson County Circuit Court, Kentucky

*Darrel Lemon v. Prince Rogers Nelson, et al.*
Primary Action:  Copyright Infringement
Venue:  Federal Court, Western District of Washington

*Wrench LLC et al. v. Taco Bell Corporation*
Primary Action:  Advertising Dispute (Breach of Contract)
Venue:  Federal Court, Western District of Michigan

*Ferdinand Picket v. Prince Rogers Nelson*
Primary Action:  Copyright Infringement
Venue:  Federal Court, Northern District of Illinois

*Oreck Corporation v. Wal-Mart Stores, Inc.*
Primary Action:  Unfair Competition
Venue:  Federal Court, Eastern District of Louisiana

*Conco, Inc. v. General Dynamics Ordnance Systems, Inc. and Lockheed Martin Ordnance Systems, Inc*
Primary Action:  Breach of Contract
Venue: Jefferson County Circuit Court, Kentucky

*EG&G Instruments, Inc. v. Canberra Industries, Inc.*
Primary Action:  Patent Infringement
Venue:  Federal Court, Eastern District of Tennessee

*KCJ Corporation v. Kinetic Concepts, Inc., et al*
Primary Action:  Patent Infringement
Venue:  Federal Court, District of Kansas

*StairMaster Sports/Medical Products, Inc. v. Groupe Procycle, Inc. and Procycle U.S.A., Inc*
Primary Action:  Patent Infringement
Venue:  Federal Court, Western District of Washington

*Spec-Mix, Inc. v. Midwest Premix, Inc. and Midwest Block & Brick, Inc.*
Primary Action:  Patent Infringement
Venue:  Federal Court, Western District of Missouri

EXHIBIT Y

## OCEAN TOMO

INTELLECTUAL CAPITAL EQUITY®

*F.J. Joseph Inc. v. Lida Advertising, Inc.*
Primary Action:  Advertising Dispute (Breach of Contract)
Venue: Federal Court, District of Kansas

*Graphic Technologies, Inc. v. Pitney Bowes, et al*
Primary Action:  Licensing Dispute (Breach of Contract)
Venue: Federal Court, District of Kansas

*Hillerich & Bradsby v. Heavy Hitter Industries and the Major League Baseball Players Association*
Primary Action:  Endorsement Rights Dispute
Venue:  Federal Court, Western District of Kentucky

*Perfume Pizazz, Inc. v. The May Department Stores Company*
Primary Action:  Trade Libel
Venue:  Greene County Circuit Court, Missouri

*Fireplace Manufacturers, Inc. vs. Hearth Technologies, Inc.*
Primary Action:  Patent Infringement
Venue:  Federal Court, District of Minnesota

*In re: Worth A. Sallee et al*
Primary Action:  Lender Liability
Venue:  Federal Bankruptcy Court, Western District of Kentucky

*In re: Drivers & Drovers Diversified, Inc.*
Primary Action:  Shareholder Dispute
Venue:  Federal Bankruptcy Court, Western District of Kentucky

*Ostex International, Inc. v. Boehringer-Mannheim*
Primary Action:  Licensing Dispute (Breach of Contract)
Venue:  Arbitration, Seattle, Washington

*Straight Arrow Products, Inc. v. Miriam Collins Palm Beach Beauty Products Company*
Primary Action:  Trademark Infringement
Venue:  Federal Court, Eastern District of Pennsylvania

*Stout Industries, Inc. v. Anheuser-Busch, Inc.,*
Primary Action:  Breach of Contract
Venue:  Circuit Court of the City of St. Louis, MO

*Porous Media Corporation v. Pall Corporation*
Primary Action:  Unfair Competition
Venue:  Federal Court, District of Minnesota

EXHIBIT Y



## OCEAN TOMO™
INTELLECTUAL CAPITAL EQUITY®

*Travelers Express Company, Inc. v. American Express Integrated Payment Systems, Inc.*
Primary Action:  Patent Infringement
Venue:  Federal Court, District of Minnesota

*Jurgens v. CBK, Inc.*
Primary Action: Patent Infringement
Venue: Federal Court, Western District of Tennessee

---

**CONTACT**       Cate Elsten
Ocean Tomo
101 Montgomery Street, Suite 2100
San Francisco, CA 94104

415-388-0368 Direct
415-520-9994 Facsimile
415-272-4762 Cell
celsten@oceantomo.com

EXHIBIT Y

# EXHIBIT Z

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

       Plaintiff,

                         Case No.
       vs.                  CV 07-08108 GHK (CTx)

COCHLEAR CORPORATION and
COCHLEAR LTD.,

       Defendants.

_____

AND RELATED CROSS-ACTION.
_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF DAVID LEE HANKIN

Santa Clarita, California

Wednesday, December 17, 2008

Reported by:
RENEE D. ZEPEZAUER, CRR
CSR No. 6275

JOB No. 101707B

EXHIBIT Z

DAVID LEE HANKIN                                    12/17/08
CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 2

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    ALFRED E. MANN FOUNDATION FOR
     SCIENTIFIC RESEARCH,
5
              Plaintiff,
6                                    Case No.
              vs.                    CV 07-08108 GHK (CTx)
7
     COCHLEAR CORPORATION and
8    COCHLEAR LTD.,

9              Defendants.

10

11   _____
     AND RELATED CROSS-ACTION.
12   _____

13

14              Videotaped Deposition of DAVID LEE

15         HANKIN, taken on behalf of Defendants,

16         at 25134 Rye Canyon Loop, Suite 200,

17         Santa Clarita, California, beginning at

18         11:02 a.m. and ending at 1:02 p.m.,

19         Wednesday, December 17, 2008, before

20         RENEE D. ZEPEZAUER, Certified Shorthand

21         Reporter No. 6275.

22

23

24

25

EXHIBIT Z

DAVID LEE HANKIN                              12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4            MERCHANT & GOULD
              BY:  BRIAN G. BODINE
 5            Attorney at Law
              701 Fifth Avenue, Suite 4100
 6            Seattle, Washington  98104
              (206) 342-6200
 7

 8    For Defendants and Counterclaimants Cochlear Corporation
      (n/k/a Cochlear Americas) and Cochlear Ltd.:
 9
              CONNOLLY BOVE LODGE & HUTZ LLP
10            BY:  BRUCE G. CHAPMAN
              Attorney at Law
11            333 South Grand Avenue, Suite 2300
              Los Angeles, California  90071
12            (213) 787-2500

13

14    The Videographer:

15            BRENT JORDAN
              SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
16            20 Corporate Park, Suite 350
              Irvine, California  92606
17            (877) 955-3855

18

19    Also Present:

20            MALCOLM ROMANO

21

22

23

24

25
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855
EXHIBIT Z

                    DAVID LEE HANKIN                    12/17/08
            CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                  Page 40

12:25:43   1   themselves or are you talking -- what are you talking --

           2       Q    The implants themselves.

           3       A    No.

           4       Q    Are you aware of any testing or inspection done

12:25:59   5   by anyone at AMF apart from this litigation of

           6   Cochlear's sound processors?

           7       A    The actual sound processors?

           8       Q    Yes.

           9       A    The actual device; is that what you're driving

12:26:34  10   at?

          11       Q    Yes.

          12       A    No.

          13       Q    Are you aware of any inspection or testing done

          14   of -- by anyone at AMF apart from preparation for this

12:26:43  15   litigation of Cochlear's programming system for its --

          16       A    Again, the actual programming system.

          17       Q    The actual programming system for the --

          18       A    The physical programming system.

          19       Q    The physical programming system.

12:27:00  20       A    Not to my knowledge.

          21       Q    Has Advanced Bionics Corporation marked its

          22   cochlear implant products with -- well, strike that.

          23            I'd like to show you what's previously been

          24   marked as Exhibit 1001 and also what's previously been

12:27:45  25   marked as Exhibit 1002.

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 41

| 12:27:48 | 1 | A     Yeah. |

12:27:48   1        A     Yeah.

2        Q     Do you understand Exhibit 1001 and 1002 to be

3     copies of the patents -- of the patents involved in this

4     litigation?

12:28:00   5        A     That's my understanding, yes.

6        Q     Okay.  Has Advanced Bionics Corporation marked

7     its products with the patent numbers of either exhibits

8     1001 or 1002?

9        A     My understanding is that I believe they mark --

12:28:17  10     I'm going to get this wrong, but I believe they mark the

11     '616 and for sure I don't know if they mark the '691.

12        Q     Have -- have you seen marking of Advanced

13     Bionics' products with the '616 patent number?

14        A     I have seen a -- a manual.

12:28:49  15        Q     Other than the manual, have you seen any

16     Advanced Bionics products marked with the '616 patent?

17        A     Again, if I'm correct, I know that one of them

18     is for sure marked.

19        Q     Let me -- let me -- I think I have the manual.

12:29:10  20        A     That would be great.  That would help.  If you

21     give me the manual, I can tell you for sure because I

22     can read it.

23        Q     And I'd like to have this marked as Exhibit

24     1125, please.

12:29:42  25              (Defendants' Exhibit 1125 was marked.)

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

12:29:46    1    BY MR. CHAPMAN:

            2        Q    Take your time, but have you seen Exhibit 1125

            3    before?

            4        A    Yeah, I've seen this.  I'm pretty sure this is

12:29:52    5    the one I've seen or I've seen a version of this.  Okay.

            6        Q    Is Exhibit 1125 the Advanced Bionics manual

            7    that you referred to earlier?

            8        A    It's either this one or a version of this one.

            9    I can't tell you exactly which version I read.  I'm sure

12:31:28   10    there's more than one version.

           11        Q    Okay.  Let's turn to page that's marked

           12    AMF45705 in Exhibit 1125.

           13        A    Yes, sir.

           14        Q    Do you have that page?

12:31:43   15        A    I do.

           16        Q    And toward the bottom of the page there is --

           17    okay.  Let me turn that into a question.

           18            Is there a reference on that page to U.S.

           19    patent No. 5,609,616?

12:32:15   20        A    Yes.

           21        Q    Is there a reference on that page to patent No.

           22    5,938,691?

           23        A    I don't see one.

           24        Q    Other than this or a similar brochure that

12:32:34   25    you've seen, has Advanced Bionics Corporation marked its

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 43

12:32:41  1   products with U.S. patent No. 5,609,616?

          2       A    '616?

          3       Q    '616.

          4       A    I don't know.

12:32:50  5       Q    Has Advanced Bionics Corporation marked any of

          6   its products with patent No. 5,938,691?

          7       A    I don't know.

          8       Q    I'd like to refer back to Exhibit 1091.  I

          9   think you should have that in front of you.  It's the

12:33:11 10   January 1, 2004, license agreement.

         11       A    Okay.

         12       Q    Is there any requirement in Exhibit 1091 that

         13   Advanced Bionics Corporation marked its products with

         14   patent numbers, any patent numbers?

12:33:38 15       A    No.  This was an oversight actually in the

         16   negotiations.  There clearly was in the 1999 agreement,

         17   and we were working so fast and so hard to get this

         18   thing done before the close of the Boston Scientific

         19   acquisition that it was just an oversight.

12:33:58 20       Q    And that provision did not transfer through to

         21   the one agreement?

         22       A    It should have, it just, as I said, it was an

         23   oversight and, again, it was one of these things where

         24   we were working so hard, but, you know, I knew that

12:34:10 25   they -- I knew that they marked in their -- in their

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855
609                                    EXHIBIT Z

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

12:34:14  1    brochure.  I think they continued to mark after the

          2    fact.  So you could say it did it natural practice.

          3         Q    Well, other than the brochure, similar

          4    brochures to 1125 AMF is not aware whether the '616

12:34:34  5    patent number has been marked on Advanced Bionics

          6    Corporation's products; is that correct?

          7         A    Other than in the brochure?

          8         Q    Yes, other than the brochure.

          9         A    No.  As soon as I knew it was in the brochure,

12:34:59 10    I didn't really worry about it too much.

         11         Q    And AMF is not aware of any marking of any

         12    Advanced Bionics Corporation U.S. patent No. 5,938,691;

         13    correct?

         14         A    No, I'm not aware of it.

12:35:26 15         Q    Does AMF have a formal patent licensing policy?

         16         A    No.

         17         Q    Does AMF have an informal patent license

         18    policy?

         19         A    I suppose.

12:35:57 20         Q    What is that informal patent licensing policy?

         21         A    We attempt to do -- excuse me.

         22              We attempt to achieve several goals in our --

         23    in the licensing of our technologies.  The first goal

         24    that we attempt to achieve is to ensure that

12:36:34 25    technologies reach the intended patient population.  The

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1

2

3

4

5

6

7

8

9          I, DAVID LEE HANKIN, do hereby declare under

10    penalty of perjury that I have read the foregoing

11    transcript; that I have made any corrections as appear

12    noted, in ink, initialed by me; that my testimony as

13    contained herein, as corrected, is true and correct.

14          EXECUTED this _____ day of _____,

15    200___, at _____, _____.
                      (City)              (State)

16

17

18                    _____

19                    DAVID LEE HANKIN

20

21

22

23

24

25

DAVID LEE HANKIN                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; that the

9    foregoing transcript is a true record of the testimony

10   given.

11         Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [X ] was [  ] was not requested.

15         I further certify I am neither financially

16   interested in the action nor a relative or employee of any

17   attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated: _____

22

23        _____
          RENEE D. ZEPEZAUER
          CSR #6275
24

25

# EXHIBIT AA

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH,

           Plaintiff,
                                    Case No.
           vs.                      CV 07-08108 GHK (CTx)

COCHLEAR CORPORATION and
COCHLEAR LTD.,

           Defendants.


_____
AND RELATED CROSS-ACTION.
_____

           CONFIDENTIAL - ATTORNEYS' EYES ONLY

    VIDEOTAPED DEPOSITION OF JOSEPH SCHULMAN, Ph.D.

              Santa Clarita, California

            Wednesday, December 17, 2008






Reported by:
RENEE D. ZEPEZAUER, CRR
CSR No. 6275

JOB No. 101707C

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALFRED E. MANN FOUNDATION FOR
     SCIENTIFIC RESEARCH,
 5
              Plaintiff,
 6                                   Case No.
              vs.                    CV 07-08108 GHK (CTx)
 7
     COCHLEAR CORPORATION and
 8   COCHLEAR LTD.,

 9              Defendants.

10

11   _____
     AND RELATED CROSS-ACTION.
12   _____

13

14              Videotaped Deposition of JOSEPH

15         SCHULMAN, Ph.D., taken on behalf of

16         Defendants, at 25134 Rye Canyon Loop,

17         Suite 200, Santa Clarita, California,

18         beginning at 2:32 p.m. and ending at

19         4:26 p.m., Wednesday, December 17, 2008,

20         before RENEE D. ZEPEZAUER, Certified

21         Shorthand Reporter No. 6275.

22

23

24

25
```

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

1    APPEARANCES:

2

3    For Plaintiff:

4            MERCHANT & GOULD
             BY:  BRIAN G. BODINE
5            Attorney at Law
             701 Fifth Avenue, Suite 4100
6            Seattle, Washington  98104
             (206) 342-6200
7

8    For Defendants and Counterclaimants Cochlear Corporation
     (n/k/a Cochlear Americas) and Cochlear Ltd.:
9
             CONNOLLY BOVE LODGE & HUTZ LLP
10           BY:  BRUCE G. CHAPMAN
             Attorney at Law
11           333 South Grand Avenue, Suite 2300
             Los Angeles, California  90071
12           (213) 787-2500

13

14   The Videographer:

15           BRENT JORDAN
             SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
16           20 Corporate Park, Suite 350
             Irvine, California  92606
17           (877) 955-3855

18

19   Also Present:

20                   MALCOLM ROMANO

21

22

23

24

25

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

15:20:16    1        A    Yes.  I did that.

            2        Q    Let me show -- let me show you what's

            3    previously been marked as Exhibit 1001.  Do you

            4    understand that to be a copy of the '616 patent?

15:20:30    5        A    Yes.

            6        Q    Did AMF ever write to Cochlear to inform it of

            7    AMF's belief that it was infringing the '691 patent?

            8        A    Yes.

            9        Q    When was that letter written?

15:20:45   10        A    Oh, I don't know.  Might have started as early

           11    as 2000.  I don't remember exactly when we did that.  I

           12    don't remember.  When I found out -- when I discovered

           13    that they were using telemetry, that's when.

           14        Q    Was the discovery that they were using

15:21:10   15    telemetry the basis for those letters being sent to

           16    Cochlear?

           17        A    Yes.  And -- so it was apparently common

           18    knowledge before that.  I just didn't -- didn't know

           19    about it.  I don't know how long they had the telemetry.

15:21:38   20    They didn't have it when this document was made.

           21        Q    Why don't -- why don't we take a quick break

           22    because I think I'd like to dig out one of the earlier

           23    exhibits.

           24             MR. BODINE:  That's fine.

15:21:59   25             MR. CHAPMAN:  Maybe you can look into that

EXHIBIT AA

JOSEPH SCHULMAN, PH.D.                          12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 31

15:22:01  1    issue.

          2              THE VIDEOGRAPHER:  Off video at 3:23 p.m.

          3              (Recess.)

          4              THE VIDEOGRAPHER:  Back on video at 3:40 p.m.

15:39:12  5              MR. BODINE:  And I'll make a representation on

          6    the record during the break I made some phone calls

          7    about documents that are found in exhibits 1126 through

          8    1141, and those were not in the files of the Mann

          9    Foundation.  Those were in the files of the Mann

15:39:30 10    Foundation's lawyers', and were obtained probably in

         11    2007.

         12    BY MR. CHAPMAN:

         13        Q    Dr. Schulman, I'd like to show you a letter

         14    that's previously been marked as Exhibit 1071.  You

15:39:52 15    referred to a letter that you sent to Cochlear earlier

         16    where you informed them that they were infringing the

         17    '616 patent; correct?

         18        A    Right.

         19        Q    Is Exhibit 1071 that letter?

15:40:08 20        A    Say that again.

         21        Q    Is Exhibit 1071 the letter that you sent to

         22    Cochlear to inform them?

         23        A    Oh.  Yes, this is probably that letter.

         24        Q    Okay.

15:40:18 25        A    There were two letters, I guess, because -- no.

EXHIBIT AA

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 32

15:40:21  1    No.  I guess just one letter.

          2        Q    That letter, Exhibit 1071, does not mention the

          3    '691 patent; correct?

          4        A    Right.  This just mentions the '616 patent.

15:40:37  5        Q    Okay.  Was there another letter that mentioned

          6    the '691 patent?

          7        A    There might have been on the following time.  I

          8    don't know.  I think I was no longer president when the

          9    second letter was sent.

15:40:52 10        Q    So you don't specifically know about a

         11    letter --

         12        A    Oh, no, maybe I was president.  I'm sorry.  Say

         13    that again.

         14        Q    Do you -- do you -- did -- well, let me ask it

15:41:07 15    more directly.  Let me show you what's previously been

         16    marked as Exhibit 1002.  That is the '691 patent;

         17    correct?

         18        A    Yeah, that is the '691 patent, yes.

         19        Q    Did AMF ever write to Cochlear to inform them

15:41:22 20    that in AMF's belief they were infringing the '691

         21    patent?

         22        A    I don't know.  On this letter they don't, but I

         23    don't know.

         24        Q    In "this letter" you mean Exhibit 1071?

15:41:37 25        A    That's correct.  In the second letter that was

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                   Page 33

15:41:43   1    written, I don't know.

           2         Q    Does AMF have a document retention policy?

           3         A    Yes.

           4         Q    What is that document retention --

15:42:07   5         A    Well, we just file everything.  We try to file

           6    the final document and try to throw away the marked up

           7    originals and that's about it.

           8         Q    Is that policy written?

           9         A    No.

15:42:18  10         Q    Is there any policy for destroying documents

          11    after a certain period of time?

          12         A    No.  That's -- that's -- I'm only speaking for

          13    when I was president.

          14         Q    You don't know as of today whether there's a

15:42:39  15    written document --

          16         A    I have no idea.  Now that we have a lawyer who

          17    is the president, there probably is.  I don't know.

          18              MR. BODINE:  And topic 17 is excluding any

          19    litigation holds; correct?

15:42:55  20              MR. CHAPMAN:  Yes.  It's just asking about the

          21    policy generally.

          22              MR. BODINE:  Okay.

          23              MR. CHAPMAN:  But that brings up a question, I

          24    guess.

15:43:08  25         Q    Dr. Schulman, is there a litigation hold

JOSEPH SCHULMAN, PH.D.                    12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1

2

3

4

5

6

7

8        I, JOSEPH SCHULMAN, Ph.D., do hereby declare under

9   penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me; that my testimony as

12  contained herein, as corrected, is true and correct.

13        EXECUTED this _____ day of _____,

14  200___, at _____, _____.
                    (City)              (State)

15

16

17              _____

18              JOSEPH SCHULMAN, Ph.D.

19

20

21

22

23

24

25

JOSEPH SCHULMAN, PH.D.                          12/17/08
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 59

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that any

5   witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand which

8   was thereafter transcribed under my direction; that the

9   foregoing transcript is a true record of the testimony

10  given.

11          Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [X ] was [  ] was not requested.

15          I further certify I am neither financially

16  interested in the action nor a relative or employee of any

17  attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: _____

22

23          _____
            RENEE D. ZEPEZAUER
            CSR #6275

24

25

# EXHIBIT BB

# COCHLEAR TECHNOLOGY LICENSE AND ROYALTY AGREEMENT

This agreement ("Agreement") is entered as of January 1, 2004 ("Effective Date"), by and between the Alfred E. Mann Foundation for Scientific Research ("AMF"), a not-for-profit corporation organized and existing under the laws of the State of California, with principal place of business at 25134 Rye Canyon Loop, Suite 200, Santa Clarita, California 91355 and Advanced Bionics Corporation ("AB"), a corporation organized and existing under the laws of the State of Delaware, with principal place of business at Mann Biomedical Park, 25129 Rye Canyon Loop, Valencia, California 91355.

*WHEREAS* prior to the Effective Date, AMF and AB previously entered and remain party to four (4) agreements and one amendment to an agreement (collectively "Old Agreements"), as follows:

  a.  License Agreement – Cochlear Stimulation Field of Use dated May 18, 1999;
  b.  License Agreement – Battery Powered Bion Field dated May 18, 1999;
  c.  License Agreement – RF Bion Field dated May 18, 1999;
  d.  AOP Agreement – Battery Powered Bion Field dated May 23, 2001; and
  e.  Amendment to License Agreements dated October 11, 2001.

*WHEREAS* AMF and AB wish to terminate the Old Agreements and simultaneously enter three (3) new agreements (collectively "New Agreements"), as follows:

  a.  Cochlear Technology License and Royalty Agreement, and
  b.  License, Royalty And Manufacturing Agreement – Battery Powered Bion® Devices And Services, and
  c.  License, Royalty And Manufacturing Agreement – RF Bion® Devices and Services;

*WHEREAS* AMF owns certain United States and foreign patents, technologies and know-how related to devices commonly known as cochlear implants and has developed and/or has rights to certain technology, scientific knowledge, know-how, trade secrets, ideas and other information and data relating thereto.

*WHEREAS* AMF desires to grant and AB desires to accept the grant of certain rights, licenses and interests to enable AB to exploit such patents and other rights in accordance with the terms hereof.

Now therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.  **DEFINITIONS**

  a.  "Affiliate" means with respect to any Person, any Person that directly or indirectly owns or controls 25% or more of that Person or is 25% or more owned by or

Defendants' EXHIBIT 1091
WITNESS: Greiner
PAGE 1 OF 22
RENEE D. ZEPEZAUER, 6275
DATE 12.16.08

controlled by that Person, or toehrwise shares 25% or more common ownership with
that Person.

b. "AMF Cochlear Technology" means all of AMF Patents and AMF Know-how in the
Cochlear Stimulation Field of Use.

c. "AMF Know-how" means all technology, trade secrets, scientific knowledge, ideas,
techniques, models, diagrams, drawings, plans, specifications, research plans,
research data, development plans, development data, production data, production
plans, test reports, experimental results, inventions, discoveries, improvements,
processes, formulae, marketing plans, routes to market, disclosed or undisclosed
customer relationships, applications thereof and other know-how and/or other
information owned or controlled by AMF or any Affiliate of AMF or to which either
of them has any rights as of the Effective Date or at any time during the Term relating
to the Cochlear Stimulation Field of Use.

d. "AMF Cochlear Patents" means any patents issued upon inventions, discoveries,
improvements, modifications, further inventions or designs invented or developed by
AMF or on its behalf in the Cochlear Stimulation Field of Use that are owned,
licensed or controlled by AMF or any Affiliate of AMF or to which any of them has
any rights under any license agreement or otherwise now or at any time during the
Term.

e. "AMF Cochlear Technology" means all AMF Cochlear Patents and AMF Know-how
in the Cochlear Stimulation Field of Use.

f. "Change of Control" means either (a) an acquisition of equity interests of a Party if the
acquiring Person - other than Mr. Alfred Mann or an affiliate or successor of Mr.
Mann, would thereafter be the actual or beneficial owner of 50% or more of the
Party's voting securities or be entitled to elect more than 50% of the directors of the
Party; (b) a merger or consolidation of the Party resulting in the holders of the Party's
equity interests immediately prior to such transaction holding less than 50% of the
total voting stock of the surviving company after such transaction; (c) a sale or
exchange of all or more than 50% (by value) of the property and assets of the Party;
or (d) the transfer of substantially all of a Party's assets relating to the Cochlear
Stimulation Field of Use, whether by merger, consolidation, sale of assets or
otherwise but not including transfer to an Affiliate.

a. "Claim(s)" mean all manner of action or actions, cause or causes of action, at law or
in equity, suits, debts, liens, contracts, agreements, rights, promises, liabilities, claims,
obligations, demands, damages, losses, costs, penalties, fees (including, without
limitation, reasonable attorney's fees), and/or reasonable expenses, of any kind or
nature whatsoever, known or unknown, suspected or unsuspected, concealed or
hidden, fixed or contingent.

b. "Cochlear Stimulation Field of Use" means that field of knowledge relating to the
development, manufacture, use, marketing, sale, support and service of any hardware,
software, process or system that electrically stimulates the cochlear nerve and use
thereof.

c. "Confidential Information" means information or material, including oral disclosure
of information, provided by one Party to the other Party in connection with this
Agreement. Notwithstanding the foregoing, Confidential Information shall not
include information (a) which is in or enters the public domain other than by actions

623
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00298

of the Receiving Party provided, the disclosure of Confidential Information in a patent or other publication shall not release the Receiving Party from its obligation to maintain in confidence any Confidential Information not specifically disclosed therein or fairly ascertainable there from; (b) possessed by the Receiving Party without restriction at the time of receipt under this Agreement or the Old Agreements; (c) used or disclosed with prior written approval of the Disclosing Party; (d) independently developed by the Receiving Party; (e) which becomes known to the receiving party from another source without breaching any obligation of confidentiality; or (f) made available by the Disclosing Party to a Third Party on an unrestricted, non-confidential basis. The Parties agree that the terms and conditions of this Agreement (but not its existence) are Confidential Information.

d. "Disclosing Party" means the Party that discloses information, including, without limitation, Confidential Information.

e. "Fair Market Value" means the amount of cash a willing buyer would pay a willing seller, neither being under any compulsion to buy or sell and each having access to all relevant information regarding valuation. If "Fair Market Value" is disputed by the Parties, it shall be decided by a mutually acceptable independent appraiser at the expense of whichever Party's "Fair Market Value" estimate proves wrong, or in the event both Parties estimates prove to be wrong, borne equally by the Parties.

f. "FDA" means the United States Food and Drug Administration.

g. "Infringement" means an alleged, actual, suspected, potential or threatened infringement, misappropriation or unauthorized use by a Third Party of AMF Cochlear Technology.

h. "Insolvent" means that a party hereto becomes the subject of any proceeding instituted by or against such party seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debt under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property), any such proceeding will remain undismissed or unstayed for a period of sixty (60) days.

i. "Master License(s)" means the license agreements listed in Exhibit A hereto, entered into by AMF prior to entering the Old Agreements, upon which some of the rights and licenses granted by AMF hereunder may be dependent.

a. "Net Revenues" means net sales (regardless of the character of those sales, including without limitation, cash, cash equivalents, securities, credits, offsets, license or sublicense fees) of a cochlear implant products (but including only the portion of hybrid devices related to the electrical stimulation of the cochlear nerve), related services or auxiliary devices to unaffiliated third parties by AB and its Affiliates, calculated in accordance with GAAP consistently applied, which calculation will generally consist of gross revenues, including recurring royalty revenues received in respect of AMF Intellectual Property and any non-recurring payments received in

CONFIDENTIAL - ATTORNEYS EYES ONLY

624

EXHIBIT BB
AB00299

respect of AMF Intellectual Property, less (i) fees payable in connection with the sale of a product, related services or auxiliary devices to non-affiliated third parties at the request of customers (including group purchasing organization administration fees, warehousing and distribution fees, and electronic exchange fees or charges), (ii) cash or product discounts, refunds, replacements, or credits granted to purchasers for the return of a product, related services or auxiliary devices or as reimbursement for damaged product, (iii) freight, postage, insurance and other shipping charges paid in connection with a product, related services or auxiliary devices , and (iv) sales and use taxes, customs, duties, and other governmental taxes or charges (except taxes or charges based on income), including any value added taxes incurred in connection with the sale of a product, related services or auxiliary devices. When Net Revenues are paid in a currency other than United States dollars, the amount of royalties payable with respect thereto will first be determined in the foreign currency of the country in which the Net Revenues are paid and will then be converted into equivalent United States dollars using the exchange rate reported in the Wall Street Journal for the last day of the calendar quarter for which the related royalties are payable. If Net Revenues are paid in a form other than cash, the amount thereof will be equal to the Fair Market Value of such securities or property as reasonably determined by AB and reasonably satisfactory to AMF. Notwithstanding anything to the contrary in this Agreement, Net Revenues will not include any amount relating to the license, sublicense, or cross-license of any Intellectual Property in connection with the settlement of an Intellectual Property dispute, but with respect to which related monetary amounts, if any, will be allocated in accordance with Sections 8 and/or 11. Net Revenues also includes the reasonable, good faith allocation of revenues attributed to a product, related services or auxiliary devices sold in concert with or simultaneously with the sale of other devices or services. For purposes of this Agreement, a reasonable, good faith allocation attributable to a product, related services or auxiliary devices will occur when such allocation is at least in proportion to the relative cost of goods sold (calculated in accordance with generally accepted accounting principals ("GAAP") consistently applied) of each product or service in the bundle.

j.  "Party" or "Parties" means AMF and AB, individually and collectively, depending on the context of use within this Agreement.

k.  "Person" means a natural person, corporation, limited liability company, association, joint stock company, limited partnership, general partnership, proprietorship, trust, union, association, court, tribunal, agency, government, department, commission, self-regulatory organization, arbitrator, board, bureau, instrumentality or other entity, enterprise authority or business organization.

l.  "Receiving Party" means the Party that receives information, including, without limitation, Confidential Information.

m.  "Third Party" or "Third Parties" means any Person other than AB or AMF or any Affiliate thereof.

2.  LICENSES

EXHIBIT BB
AB00300

2.1   Initial License Grant.  Subject to the limitations set forth in Section 2.4, AMF hereby grants to AB an exclusive, royalty-bearing (as provided below), worldwide license throughout the Term, with a right to sublicense (subject to the provisions in Section 2.6(a) through (e)) in and to the AMF Cochlear Technology to make, have made, use, lease, offer to lease, sell, offer to sell and otherwise commercially exploit products and perform services in the Cochlear Stimulation Field.

2.2   Development Efforts of AMF.  Following the Effective Date, AMF shall have no specific obligation to continue developing technologies in the Cochlear Stimulation Field of Use.  If AMF develops additional technologies in the Cochlear Stimulation Field of Use, such technologies shall automatically become AMF Cochlear Technology and automatically be licensed to AB without further action, in accordance with the terms of Section 2.1 and 2.3.

2.3   License Following Term.  Subject to the limitations set forth in Section 2.4, and provided that this Agreement is not terminated before the expiration of the Term, at the end of the Term, AB shall have an exclusive, perpetual, fully paid-up, royalty-free, worldwide license, with a right to sublicense that is not subject to the restrictions in Section 2.6(a) through (e) in and to the AMF Cochlear Technology licensed to AB to make, have made, use, lease, offer to lease, sell, offer to sell and otherwise commercially exploit products and services in the Cochlear Stimulation Field of Use.

2.4   Nature of Licenses.  Certain of the rights and licenses granted by AMF to AB may be subject to the Master Licenses and certain rights may be limited by the terms of the Master Licenses.  With respect to the rights licensed under this Agreement which are licensed to AMF under the Master Licenses, this Agreement shall constitute a sublicense.  So long as this Agreement is not terminated pursuant to Section 6.2 , AMF will not license or otherwise authorize any other Person to exercise any of the rights licensed to AB pursuant to this Agreement and shall provide written notice to AB of any uncured default under the Master Licenses actually known by AMF sufficient for AB to step in and cure the default or take other steps necessary or appropriate to protect its interests therein.

2.5   Change of Control.  In the event of a Change of Control of AB, AMF's obligation to grant further licenses to AB following the commencement of the Term pursuant to Sections 2.2 and 2.3 shall automatically terminate.

2.6   Right to Sublicense.  With respect to the AMF Cochlear Technology licensed or sublicensed by AMF to AB hereunder, AMF hereby grants to AB the exclusive worldwide right and license to grant sublicenses to Affiliates of AB.  In each sublicense agreement, AB will include the following provisions:

   a.   confidentiality requirements on all of its sublicensees comparable to the requirements of Section 12.3;

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00301

    b.  corresponding reporting, inspection and audit rights for the sublicensor satisfying all of the conditions set forth in Section 3.5 (but AB shall be responsible for the report, for the payment of the royalties provided for herein and for inspection and audit rights whether or not its sublicensee honors its obligations thereto); and

    c.  a provision terminating the sublicense agreement if this Agreement is terminated in accordance with Section 6;

    d.  AB shall negotiate the royalty rates provided in Section 3.1 as a "pass through" in respect of any license, sub-license or other similar arrangement it might enter such that AMF will receive royalties based on the reported Net Revenue of the sublicensee.

## 3.  EQUITY ISSUANCE; ROYALTIES

3.1    <u>Grant of AB Stock.</u>  On the Effective Date, AB will issue to AMF one million one hundred thousand (1,100,000) shares of AB common stock (the "Common Stock").

3.2    <u>Royalty Rates.</u>  Each calendar quarter during the Term (and retroactively in the case of subsection a, below), AB shall pay AMF royalties on all Net Revenues, as follows:

    a.  Retroactively, for the period commencing on January 1, 2003 through and including May 18, 2003, three percent (3%);

    b.  Retroactively, for the period of May 19, 2003 through and including December 31, 2003, two and one half percent (2.5%);

    c.  For years 2004, 2005, 2006 and 2007, one and one quarter percent (1.25%); and

    d.  For the balance of the term, one percent (1%).

3.3    <u>Manner of Payment.</u>  All amounts payable by AB to AMF as royalties pursuant to this Agreement shall be payable in United States funds.

3.4    <u>Reports.</u>  Sixty (60) days following the close of each calendar quarter during the Term, AB shall provide AMF with a Report for the previous calendar quarter that calculates the royalties due under this Agreement.   The Reports will contain sufficient detail to enable AMF to understand and verify the accuracy of the calculation of Net Revenues and each material element thereof, including details with respect to each sublicense agreement. AB shall provide AMF a report for the year 2003 ("2003 Report") and a report for the first calendar quarter for the year 2004, pursuant to this Section 3.3, within sixty (60) days following the date on which both Parties have executed this Agreement.

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00302

637

3.5 <u>Payment of Royalties</u>.  Concurrently with the delivery of each quarterly report, AB shall tender the royalties due and owing to AMF.  Untimely royalty payments shall accrue interest at the lesser of the prime rate of interest plus 5% or the maximum lawful rate.  If AB remits royalties in an untimely manner three or more times during any three-year period during the Term, AMF shall have the right to terminate the Agreement in accordance with Section 6 hereof.  With respect to royalties due pursuant to Sections 3.2.a and b and for the first calendar quarter of the year 2004, AB shall tender payment concurrently with the 2003 Report.

3.6 <u>Audit Rights</u>.  No more than once annually, and only with respect to AB's last two full fiscal years, AMF will have the right at reasonable times and upon reasonable notice to inspect and cause an audit of the books and records of AB, its Affiliates and sublicensees relating to the subject matter of the reports required by Section 3.4.  Any such inspection or audit shall be at AMF's sole expense unless the results thereof indicate an underpayment of royalties exceeding five percent (5%) of the amount due for any six-month period ("Audit Period"), in which event AB shall pay the cost of the audit.  If 2 or more audits reveal that AB has made underpayments for any Audit Period of ten percent (10%) or greater to AMF in a two-year period, AB will pay to AMF an amount equal to twenty percent (20%) of the total unpaid amount ultimately determined to be due and payable for that Audit Period.

4.  [INTENTIONALLY DELETED]

5.  RELATIONSHIP AMONG AGREEMENTS

5.1 The New Agreements shall be effective conditioned on concurrent full execution of each and all of the New Agreements.  Following the execution of each of the New Agreements by AB and AMF, the Old Agreements, including all obligations of the Parties thereunder, shall be terminated.

6.  TERM AND TERMINATION

6.1 <u>Term</u>.  This Agreement shall commence on the Effective Date and shall continue in full force and effect for a period of eighteen (18) years unless terminated earlier in accordance with the terms hereof.

6.2 <u>Termination By AMF</u>.  AMF may terminate this Agreement upon written notice to AB if:

a. Unless otherwise provided herein, AB defaults in the performance of any of its material obligations under this Agreement and within 60 days after the delivery of written notice from AMF of such default, AB fails to cure the same or, if such default does not involve the payment of money and cannot be

NYDOCS02/689283.1  Revised on 5/4/04                    7

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00303

cured within such 60 day period, AB fails to commence or to diligently proceed with the curing of such default; or

b.  Any material representation or warranty made by AB herein shall prove to be false in any material respect; or

c.  AB becomes insolvent

6.3  Termination by AB.  AB may terminate this Agreement upon written notice to AMF if:

a.  AMF defaults in the performance of any of its obligations under this Agreement and, within 60 days after delivery of written notice of AB of such default, AMF fails to cure the same, or if such default does not involve the payment of money and cannot be cured within such 60 day period, AMF fails to commence or diligently proceed with the curing of such default; or

b.  AMF becomes insolvent; or

c.  Any material representation or warranty made by AMF herein shall prove to be false in any material respect.

6.4  Effect of Termination.  If AMF terminates this Agreement pursuant to Section 6.2, AB shall immediately cease exercising all rights hereunder with respect to the AMF Cochlear Technology except to the extent necessary to meet outstanding contractual obligations to sell products manufactured by AB or its sublicensees or contractors or in the process of being manufactured in the Cochlear Stimulation Field of Use or perform services therein.  If AB terminates this Agreement pursuant to Section 6.3.a or 6.3.c, AMF shall grant to AB a non-exclusive, perpetual, non-royalty-bearing, worldwide license in and to the AMF Cochlear Technology to make, have made, use, lease, sell and otherwise commercially exploit products or perform services in the Cochlear Stimulation Field of Use.  If AB is the terminated Party, upon such termination, AB shall no longer have any obligation to perform any obligation of AMF under any Master License which was assumed hereunder and is to be performed after the date of such termination.

6.5  Return of Materials.  Within thirty (30) days after the expiration or termination of this Agreement by a Party as permitted by Section 6.2 or 6.3, as applicable, for any reason, each Party shall return to the other Party in accordance with the other Party's reasonable instructions any and all materials furnished by the other Party hereunder.  If a party does not request the return of any materials, the materials may not be used outside of the scope of this Agreement unless a Party obtains prior written approval from the other Party.

6.6  Survival.  Sections 1, 3, 6.4, 6.5, 6.6, and 12 shall survive the expiration of the Term and the termination of this Agreement.

7.  REPRESENTATIONS AND WARRANTIES; INVESTMENT COVENANTS

7.1  Representations and Warranties of AMF.  AMF represents and warrants:

NYDOCS02/689283.1 Revised on 5/4/04                    8

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00304

a. AMF is a duly organized, validly existing California non-profit public benefit corporation and has full power and authority to enter into this Agreement and to perform its obligations hereunder.

b. Neither the execution and delivery of this Agreement nor the transactions contemplated hereby constitute a default under or conflict with any contract, agreement, indenture or other instrument to which AMF is a party or to which it or any of its property is subject.

c. To the best of AMF's knowledge, the AMF Cochlear Technology and the exercise by AB of the rights granted hereunder will not infringe any patents or other proprietary rights of any third party with respect to the Cochlear Stimulation Field of Use.

d. AMF has not sold, assigned or transferred to any person or entity any interest in the AMF Cochlear Technology or purported to do so except as provided in the Master Licenses or in AMF's contracts with the National Institute of Health and/or Medical Research Group, LLC.  AMF has provided AB with true, correct, and complete copies of the Master Licenses, AMF's contracts with the National Institutes of Health, and AMF's contracts with Medical Research Group, LLC.

e. AMF is not, and to AMF's knowledge no other party is, in default of any material obligation under any of the Master Licenses.

f. AMF understands that the transfer of the Common Stock provided for in this Agreement is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.

g. AMF UNDERSTANDS AND ACKNOWLEDGES THAT ITS INVESTMENT IN AB INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL MEANS WHO HAVE NO IMMEDIATE NEED FOR LIQUIDITY OF THE AMOUNT INVESTED, AND THAT SUCH INVESTMENT INVOLVES A RISK OF LOSS OF ALL OR A SUBSTANTIAL PART OF SUCH INVESTMENT. AMF FURTHER UNDERSTANDS AND ACKNOWLEDGES THAT ITS INVESTMENT IN AB INVOLVES VARIOUS OTHER RISKS.

h. AMF is able to bear the substantial economic risks of an investment in AB for an indefinite period of time, has no need for liquidity in such investment, and, at the present time, could afford a complete loss of such investment.

i. AMF has such knowledge and experience in financial, tax and business matters so as to enable AMF to evaluate the merits and risks of an investment in AB and to make an informed investment decision with respect to that investment.

j. AMF is not relying on AB with respect to the tax or other economic considerations of an investment in AB and has obtained, or had the opportunity to obtain, the advice of AMF's own legal, tax and other advisors.

k. AMF will not sell or otherwise transfer the Common Stock without registration under the Securities Act and applicable state or foreign securities

NYDOCS02/689283.1 Revised on 5/4/04                    9

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00305

laws unless AMF provides, at AMF's expense, an opinion of counsel in form satisfactory to AB to the effect that registration under the Securities Act and such laws is not required and the sale or transfer of the Common Stock would not cause AB's initial distribution of securities to violate any such laws.

l.   AMF is purchasing the Common Stock for AMF's own account, for investment and not with a view to resale or distribution except in compliance with the Securities Act. AMF has not offered or sold any portion of the Common Stock being acquired nor does AMF have any present intention of selling, distributing or otherwise disposing of any portion of the Common Stock in violation of the Securities Act.

m.   AMF is aware that there is currently no market for the Common Stock.

n.   AMF is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act.

7.2    AB's Representations and Warranties.   AB represents and warrants as follows:

a.   AB is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is qualified to do business and is in good standing in the State of California and has full corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

b.   Neither the execution and delivery of this Agreement nor the transactions contemplated hereby constitute a default under or conflict with any contract, agreement, indenture or other instrument to which AB is a party or to which it or any of its property is subject.

7.3    NO OTHER WARRANTIES.
EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, EACH PARTY MAKES NO WARRANTIES CONCERNING THE AMF COCHLEAR TECHNOLOGY OR ANY OTHER SUBJECT PERTAINING OR RELATED TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SPECIFICALLY AS TO THE AMF COCHLEAR TECHNOLOGY, EACH PARTY MAKES NO WARRANTY OR REPRESENTATION (1) AS TO THE VALIDITY OR SCOPE OF THE AMF COCHLEAR TECHNOLOGY, (2) THAT THE AMF COCHLEAR TECHNOLOGY OR ANY DEVICES OR SERVICES BASED UPON THE AMF COCHLEAR TECHNOLOGY WILL BE FREE FROM INFRINGEMENT ON PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES, OR (3) THAT THIRD PARTIES ARE NOT IN ANY WAY INFRINGING UPON THE AMF COCHLEAR TECHNOLOGY.

7.4.    AMF hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances to which AB is subject in connection with the issuance of the

NYDOCS02/689283.1  Revised on 5/4/04                10

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00306

Common Stock, including, without limitation, such additional information as AB may reasonably deem appropriate with regard to AMF's suitability.

7.5 AMF ACKNOWLEDGES THAT THE COMMON STOCK TO BE ISSUED PURSUANT TO THIS AGREEMENT HAS NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE INFORMATION OR THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

7.6 Each certificate of AB issued to represent shares of Common Stock shall bear the following legend on the face or reverse side thereof:
"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND IS BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THESE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THEY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN OPINION OF COUNSEL IN FORM REASONABLY SATISFACTORY TO AB IS FURNISHED TO AB TO THE EFFECT THAT REGISTRATION UNDER THE SECURITIES ACT AND SUCH LAWS IS NOT REQUIRED."

Any certificate issued at any time in exchange or substitution for any certificate bearing such legends (except a new certificate issued upon the completion of a public distribution of the Common Stock represented thereby) shall also bear such legends, unless in the opinion of AB and/or counsel to AB the securities represented thereby need no longer be subject to the restrictions contained herein.

## 8. INDEMNIFICATION

8.1 <u>AB</u>. AB agrees to indemnify, defend and hold harmless AMF and its Affiliates, shareholders, directors, officers, employees, representatives, attorneys, agents and assigns from and against any and all Claims arising out of or related to any breach of any of AB's representations and warranties, covenants or obligations herein.

8.2 <u>AMF</u>. AMF agrees to indemnify, defend and hold harmless AB, as well as its Affiliates, shareholders, directors, officers, employees, representatives, attorneys, agents and assigns from and against any and all Claims arising out of or related to any breach of any of AMF's representations and warranties, covenants or obligations herein.

8.3 <u>Indemnification Procedure for Third Party Claims</u>.

632
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00307

8.3.1   Notice of Claim. If any Third Party notifies any Party to this Agreement ("Indemnified Party") with respect to any matter ("Third Party Claim") which may give rise to a claim for indemnification under this Agreement, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing. However, no delay shall affect the Indemnified Party's right to indemnification, except to the extent that Indemnifying Party is actually prejudiced by that delay.

8.3.2   Assumption of Defense. The Indemnifying Party will have the right at any time to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages by the Indemnifying Party and includes an unconditional release of each Indemnified Party that may be a party to that Third Party Claim. The Indemnified Party may participate in the defense of such Third Party claim with counsel of its choice (reasonably satisfactory to the Indemnifying Party) at its own cost.

8.3.3   Delay. Unless and until an Indemnifying Party assumes the defense of a Third Party Claim as provided in Section 8.3.2, above, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

8.3.4   Consent. In no event will the Indemnified Party consent to the entry of judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party.

8.3.5   Allocation of Awards. In the event the Indemnifying Party obtains or is awarded any recovery pursuant to the Third Party Claim or any counterclaim brought in connection therewith, including, without limitation, a recovery of damages, attorneys' fees or costs, such recovery shall first be applied to reimburse the Indemnifying Party for costs incurred in connection with such proceedings and then shall be payable sixty percent (60%) to the Indemnifying Party and forty percent (40%) to the Indemnified Party.

## 9. REGULATORY MATTERS

9.1   Good Manufacturing Practices. All products subject to this Agreement (or a related sublicense) will be manufactured and tested by AB (or its sub licensees or

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00308

contractors) in material compliance with all applicable laws, including, without limitation, to the extent applicable, the Good Manufacturing Practice regulations of the FDA in effect at the time of such manufacturing and/or testing. Each Party shall notify the other Party of any inspection of the production facilities uses to manufacture such devices and other uses of their respective Intellectual Property by the FDA or any other governmental authority and shall furnish AMF with copies of any Form 483 (and responses to) or similar report to the extent that such report applies to any manufactured pursuant to this Agreement.

9.2   Records and Traceability. Each Party will and will cause all of its sub licenses and contractors to maintain complete and accurate traceability records for all products subject to this Agreement and all critical components thereof, including pertinent data, research reports, test results and know-how data, all in material compliance with all FDA and other U.S. or other applicable laws or regulations. AB and AMF will also maintain adequate sales records regarding Net Revenues. AMF and AB each agree to provide each other with reasonable access to all such records upon reasonable request.

## 10.   FILING, PROSECUTION AND MAINTENANCE OF PATENTS

10.1   Responsibility of AMF. Except as provided in subparagraph (b) below,

a.   AMF agrees to confer with AB regarding the timing, scope, claims and prosecution of additional United States and/or foreign patent applications, the countries in which foreign patent applications should be filed, and the taking of other legal steps to protect the rights of AMF and AB in the AMF Cochlear Technology.   AMF, at AMF's sole cost, shall file, prosecute and maintain domestic and foreign patent applications with respect to the AMF Cochlear Technology and shall take such other legal steps as AMF shall reasonably determine, after consultation with AB, to be necessary or appropriate to protect the rights of AMF and AB in the AMF Cochlear Technology. All such applications shall be prosecuted in the name of AMF and subject to its control, and AB shall cooperate with AMF in filing, prosecuting and maintaining such applications and taking such other legal steps and will execute and deliver any document and instruments in connection therewith which AMF may reasonably request.

b.   Notwithstanding a., above, the Parties acknowledge that under the terms of the Master Licenses certain rights and responsibilities with respect to prosecuting and maintaining patents is allocated to other parties, and the rights and obligations of the parties set forth in subparagraph a., above, shall not apply to that event.

10.2   Rights and Responsibilities of AB.

634
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00309

a. AB agrees to reimburse the reasonable out-of-pocket patent costs of AMF for the prosecution and maintenance of all foreign patents that AB agrees are necessary and appropriate to protect its rights in the AMF Cochlear Technology. AB may elect not to pay the patent prosecution and maintenance costs associated with any foreign patent application or foreign patent, in which case AMF has the option to pay such costs, and AB shall forfeit its right to an exclusive license within the jurisdiction covered by such foreign patent application or foreign patent, but AB shall retain a non-exclusive license within the jurisdiction covered by such foreign patent.

b. In the event AMF fails to file or prosecute any United States or foreign patent by application pursuant to Section 10.1.a, above, after delivery of a written request by AB to do so, and AB considers such filing or prosecution necessary or appropriate to protect the rights of AB in the AMF Cochlear Technology, AB shall have the right to file and prosecute at its own expense any such patent application, and the filing and prosecution of any such application and the resulting patents shall be under the sole control of AB but shall nevertheless be subject to the provisions of this Agreement. AMF will cooperate with AB in its prosecution of any such patent to the same extent that AB is required to cooperate with AMF pursuant to Section 10.1.a.

## 11.   INFRINGEMENT OF AMF COCHLEAR TECHNOLOGY

11.1   <u>Notice of Infringement</u>.   Immediately upon learning of an Infringement, a Party shall provide the other Party with written notice of the Infringement, which notice shall include the material details about such Infringement (e.g. identity of infringing party, how infringement occurs).

11.2   <u>AB Defense Against Infringement</u>.

11.2.1   <u>AB's Control of the Defense</u>.   AB, at its sole election and cost (subject to reimbursement as provided below), will have the first right to control the proceeding relating to Infringement. AB may engage counsel of its choice and will control all litigation and settlement strategy and tactics. AB will keep AMF fully informed as to any material developments in the matter. AMF will provide all reasonable assistance in any such matter and will have the right, but not the obligation, to engage counsel of its choice, at its expense, and participate in the matter with AB's counsel.

11.2.2   <u>Recovery and Allocation</u>.   After consultation with AMF, AB is authorized to enter into any settlement or judgment that involves any outcome other whether or not involving the payment of money without the prior written approval of AMF. In any resulting settlement or judgment, funds received will first be applied to reimburse the actual costs of the handling of the matter, the two Parties receiving reimbursement in the same proportion as their actual expenses. Royalties on products judged to be infringed by any

635
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00310

AMF Intellectual Property will next be allocated to AMF in accordance with the royalty rates set forth in Section 3 and any additional funds received will be divided between the Parties, with sixty percent (60%) to AB and forty percent (40%) to AMF. Any license, sublicense, or cross-license of any AMF Cochlear Technology that results from a settlement or judgment will be subject to Section 2.6.

11.3 <u>AMF Defense Against Infringement.</u>

11.3.1 <u>AMF's Control of the Defense.</u> If AB elects not to defend against an Infringement, AMF may control the proceeding relating to Infringement. If AMF elects to defend the AMF Cochlear Technology, it may engage counsel of its choice and will control all litigation and settlement strategy and tactics. AMF will keep AB fully informed as to any material developments in the matter. AB will provide all reasonable assistance in any such matter and will have the right, but not the obligation, to engage counsel of its choice, at its expense, and participate in the matter with AMF's counsel.

11.3.2 <u>Recovery and Allocation.</u> In any resulting settlement or judgment, funds received will first be applied to reimburse the actual costs of the handling of the matter, the two Parties receiving reimbursement in the same proportion to their actual expenses. Royalties on products judged to be infringed by any AMF Intellectual Property will next be allocated to AMF in accordance with the royalty rates set forth in Section 3 and any additional funds received will be divided between the Parties, with sixty percent (60%) to AMF and forty percent (40%) to AB. Any license, sublicense, or cross-license of any AMF Cochlear Technology that results from a settlement or judgment will be subject to Section 2.6.

12. **GENERAL**

12.1 <u>Export and Import Controls.</u> Each of the Parties shall comply with all applicable laws, regulations, and rules relating to the export and import of products, commodities, software and technical data, and shall not export or import any products, commodities, software or technical data; or any products received from any other Party; or direct products of such commodities, software or technical data, to any proscribed country, party, or entity listed in such applicable laws, regulations, and rules, unless properly authorized by the prevailing authority in the government of the United States of America.

12.2 <u>Non-solicitation.</u> During the Term and for a period of two (2) years following the termination or expiration of this Agreement, whether directly or indirectly, neither Party, for itself or any other Person, shall solicit, induce or encourage any employee, officer, director or consultant to or of the other Party to terminate his or

636
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00311

her relationship with that other Party and accept new employment with another Person.

12.3   <u>Confidential Information</u>.   During the Term of this Agreement, the Parties may provide one another with Confidential Information. The Receiving Party shall receive and hold such information in confidence, disclose Confidential Information to employees or agents having a need-to-know for the purposes of exercising its rights or performing its obligations under this Agreement, and shall not disclose and agrees to prevent the disclosure of Confidential Information to Third Parties. This obligation shall continue in effect for three (3) years following the expiration or termination of the Agreement. Nothing in this Agreement will prevent a Party from disclosing information it is required to disclose to comply with an order of a court of competent jurisdiction, provided that the non-disclosing party is given adequate opportunity to seek a protective order from such disclosure.

12.4   <u>No Agency</u>.   Each Party is an independent contractor and not an employee, partner, joint venturer, representative or agent of any other Party to this Agreement. Nothing contained in this Agreement shall constitute making or appointing one Party the representative or agent of any other Party. No Party shall   (a) hold itself out as a representative of any other Party or otherwise contrary to the terms of this Agreement, (b) enter into any agreement on behalf of any other Party or otherwise purport to bind any other Party in any way contrary to the terms of this Agreement, or (c) make any representation or take any act contrary to the terms hereof. Except as otherwise agreed in writing, no Party shall be liable for any debts or other liabilities of any other Party.

12.5   <u>Force Majeure</u>.   Notwithstanding anything to the contrary in this Agreement, neither party shall be liable to the other for any failure or performance hereunder which is due to an act of God, accident, fire, lockout, strike or other labor dispute, riot or civil commotion, war, embargo, acts of civil or military authorities, denial of or delays in processing of export license applications, failure of technical or electrical facilities not within such party's reasonable control, act of public enemy, enactment, rule, order or act of government (whether national or local), breakdown of machinery, computer failure, shortages of materials, inability to obtain labor, strikes or fuel crises, or other act or events of a similar or different nature beyond the reasonable control of either party, any such act or event being deemed an event of force majeure. Except as otherwise provided herein, the time for performance will be extended for a period equal to the duration of the force majeure.

12.6   <u>Dispute Resolution</u>.

12.6.1   <u>Governing Law and Jurisdiction</u>.   This Agreement is governed by and construed and enforced in accordance with the laws of the State of California, without regard to its choice of law provisions. If a dispute

637
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00312

arises under this Agreement, each of the Parties first agrees to appoint one or more authorized executive(s) to meet and confer with the other Party in an attempt to resolve the dispute informally. If informal discussions fail to result in a complete resolution of the dispute, the Parties agree to submit the dispute to mandatory non-binding mediation. If mandatory non-binding mediation does not result in a complete resolution of the dispute, each party hereto submits itself to the jurisdiction of a court of competent jurisdiction located in the State of California, County of Los Angeles. Each party agrees that service of process in any action or proceeding relating to this Agreement may be effected by sending a copy of the summons and complaint by registered or certified mail in the United States with postage prepaid and return receipt requested. Each Party hereby waives its right to contest service of process.

12.6.2 <u>Legal Expenses</u>.   The prevailing party in any legal action brought by one Party against the other and arising out of or related to this Agreement shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its expenses, including court costs, experts' fees and reasonable attorneys' fees.

12.6.3 <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.6.3.

12.7 <u>No Consequential Damages.</u>
EXCEPT WITH RESPECT TO DISCLOSURE OF CONFIDENTIAL INFORMATION, IN ADDITION TO THE OTHER LIMITATIONS SET FORTH IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL OR SPECIAL OR SIMILAR OR LIKE DAMAGES ARISING FROM ANY DEFECT, ERROR OR FAILURE TO PERFORM WITH RESPECT TO THE AMF COCHLEAR TECHNOLOGY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE OR PROFIT, OR LOSS OF USE OF EITHER, OR COSTS OF CAPITAL, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

EXHIBIT BB
AB00313

12.8   Compliance with Laws.

12.8.1   AMF Compliance with Law. AMF will materially comply with the requirements of any law, regulation or executive order of the United States of America and fifty United States and indigenous territories as may be in effect from time to time.

12.8.2   AB Compliance with Law. AB will materially comply with the requirements of any law, regulation or executive order of the United States of America and fifty United States and indigenous Territories as may be in effect from time to time

12.9   Performance By Affiliates and Sub Licensees.   The Parties recognize that AB may perform some or all of its obligations under this Agreement through Affiliates and Sub Licensees, provided, however, that each Party shall remain responsible and be guarantor of the performance by its Affiliates and Sub Licensees and shall cause its Affiliates and Sub Licensees to comply with the provisions of this AB Agreement in connection with such performance.

12.10   Miscellaneous. The duties, obligations, rights and remedies under this Agreement are in addition to and not in limitation of those otherwise imposed or available by law.   Failure by any Party to enforce a provision of this Agreement shall not constitute a waiver of that or any other provision of the Agreement.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. If any article, section or clause of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable under any applicable statute or rule of law then it shall be deemed to be omitted and replaced with a similar or equivalent term which is valid and enforceable.   No Party shall hold itself out contrary to the terms of this Agreement nor shall any Party become liable by any representation, act or omission of any other Party contrary to the provisions hereof.   This Agreement is not entered into for the benefit of any Third Party (other than any Indemnified Party) and shall not be deemed to give any right or remedy to any such Third Party whether or not referred to herein.   No remedy or election hereunder shall be deemed exclusive but shall, whenever possible, be cumulative with all other remedies at law or in equity.   No officer, employee, representative or person has any authority to make any representation or promise not contained in this Agreement and no Party has executed this Agreement upon reliance on any such representation or promise.   No waiver, modification, or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by an authorized representative of the Party charged therewith.   The Parties reasonably agree to execute any and all additional documents, including, without limitation, licenses, assignments, certificates and other instruments necessary to carry out the provisions of this Agreement. If this Agreement is executed in counterparts, such counterparts shall constitute one and the same instrument. The Parties agree and acknowledge that this Agreement has

639
CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00314

been drafted through joint efforts of their respective legal counsel after full and arms' length negotiations; therefore, the rule of contractual construction that all ambiguities shall be construed against the drafting party shall not apply to the interpretation of this Agreement. Headings of paragraphs herein are inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Unless otherwise stated, section references are to the sections of this Agreement.

12.11   <u>Assignment</u>. Neither Party will sell, assign, mortgage, hypothecate or otherwise transfer any interest in this Agreement, voluntarily or involuntarily, by operation of law or otherwise, or enter into any agreement as a result of which any other Person shall have any interest in this Agreement without the prior written consent of the other Party, which consent will not be unreasonably withheld. Notwithstanding the foregoing, either Party will have the right to assign or otherwise transfer its rights under this Agreement as part of a Change of Control or a transfer to Affiliate. Any attempted assignment by either Party, except as expressly allowed by this Section, is null and void. Subject to the foregoing, this Agreement will benefit and bind the permitted successors and assigns of the Parties.

12.12   <u>Notices</u>.   All notices, reports, statements, accountings and other documents required to be given or delivered hereunder will be given in writing either by personal delivery, by certified mail or recognized overnight carrier which delivery is confirmed by a signed receipt, to the addresses set forth below or such other address as either of the Parties will subsequently provide by notice to the other. All such notices will be sufficiently given when actually received (as conclusively determined by the date on the signed receipt).

If to AMF:          Alfred E. Mann Foundation for Scientific Research
                    25145 Rye Canyon Loop
                    Valencia, California 91355
                    Attention: President
                    Facsimile: 661-702-6708

With a copy to:     Alfred E. Mann Foundation for Scientific Research
                    Attention: General Counsel
                    25145 Rye Canyon Loop
                    Valencia, California 91355
                    Facsimile: 661-702-6710

If to AB:           Advanced Bionics Corporation
                    Mann Biomedical Park
                    25129 Rye Canyon Loop
                    Valencia, California 91355
                    Attention: President

NYDOCS02/689283.1  Revised on 5/4/04                19

CONFIDENTIAL - ATTORNEYS EYES ONLY
EXHIBIT BB
AB00315

Facsimile: 661-362-1700

With a copy to:                     Advanced Bionics Corporation
                                    Mann Biomedical Park
                                    25129 Rye Canyon Loop
                                    Valencia, California 91355
                                    Attention: General Counsel

or to such other address as either party may furnish to the other in writing in
accordance herewith, except that notices of changes of address will be effective only
upon receipt.

12.13   Entire Agreement.  This Agreement constitutes the entire agreement between the
        Parties with respect to the subject matter to this Agreement, and supersedes and
        replaces all prior or contemporaneous understandings or agreements, written or oral,
        regarding such subject matter.  This Agreement includes the following exhibit, which
        is incorporated into, and made a part of this Agreement:

        EXHIBIT A –MASTER LICENSES

IN WITNESS HEREOF, by their respective signatures, the Parties have agreed as of the date
first above written.

ADVANCED BIONICS CORPORATION

By: _Jeffrey H. Greiner_

Its: _PRESIDENT_

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH

By: _____

Its: _____

NYDOCS02/689283.1  Revised on 5/4/04            20

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00316

Facsimile: 661-362-1700

With a copy to:        Advanced Bionics Corporation
                       Mann Biomedical Park
                       25129 Rye Canyon Loop
                       Valencia, California 91355
                       Attention:  General Counsel

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices of changes of address will be effective only upon receipt.

12.13   Entire Agreement.   This Agreement constitutes the entire agreement between the Parties with respect to the subject matter to this Agreement, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  This Agreement includes the following exhibit, which is incorporated into, and made a part of this Agreement:

EXHIBIT A – MASTER LICENSES

IN WITNESS HEREOF, by their respective signatures, the Parties have agreed as of the date first above written.

ADVANCED BIONICS CORPORATION

By:_____

Its:_____

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH

By: _Joseph H. Schulman_

Its: _President_

NYDOCS02/685283.1  Revised on 5/4/04              20

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00317

**EXHIBIT A**

MASTER LICENSES

NYDOCS02/689283.1  Revised on 5/4/04                    21

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT BB
AB00318

EXHIBIT CC



AMF45669

Defendants' EXHIBIT 1125
WITNESS: Hankin
PAGE 1 OF 38
RENEE D. ZEPEZAUER, 6275
DATE: 12·17·08

EXHIBIT CC



# USER GUIDE

for the **CLARION®** Behind-The-Ear (BTE)
Sound Processor

**CLARION®**
BY ADVANCED BIONICS®

AMF45670

EXHIBIT CC

# Contents

**Labeling** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

**BTE Sound Processors**
   BTE Sound Processor Kit Contents . . . . . . . . . . . . . . . . . .1

**BTE Sound Processor Components**
   Earhook  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
   Electronics Module  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
   Microphone  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
   Toggle Switch  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
   Battery  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
   Headpiece  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

**Assembling your BTE Sound Processor**
   Attaching the Earhook . . . . . . . . . . . . . . . . . . . . . . . . . . .7
   Connecting the Headpiece and Cable  . . . . . . . . . . . . . . .7
   Connecting the Battery to the Electronics Module  . . . . . . .8
   Customizing the Platinum Headpiece - Color Caps  . . . . . . .8

**Using your BTE Sound Processor**
   Turning your BTE Sound Processor On/Off  . . . . . . . . . . . .11
   Placement of your BTE Sound Processor  . . . . . . . . . . . . .11
   Using the Toggle Switch  . . . . . . . . . . . . . . . . . . . . . . . . .11
   Changing the Battery . . . . . . . . . . . . . . . . . . . . . . . . . . .14
   Using the Telephone  . . . . . . . . . . . . . . . . . . . . . . . . . . .15

**Care and Maintenance of your BTE Sound Processor**
   Cleaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
   BTE Processor Protection . . . . . . . . . . . . . . . . . . . . . . . .17
   Rechargeable Batteries . . . . . . . . . . . . . . . . . . . . . . . . . .19
   Rechargeable Battery Wallet . . . . . . . . . . . . . . . . . . . . . .20
   Battery Charger and Power Supply . . . . . . . . . . . . . . . . .20

AMF45671

EXHIBIT CC

**BTE Sound Processor Accessories**

Auxiliary Audio Earhook . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Auxiliary Microphone . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Other External Auditory Input Devices  . . . . . . . . . . . . . . .26

**Troubleshooting your BTE Sound Processor**

No sound heard; no response from user  . . . . . . . . . . . . . .27
Static heard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
Muffled or distorted sounds heard  . . . . . . . . . . . . . . . . . . .28
Headpiece or BTE gets wet . . . . . . . . . . . . . . . . . . . . . . . .28
Blinking Yellow LED on Battery Charger  . . . . . . . . . . . . .29
No Green LED on Battery Charger  . . . . . . . . . . . . . . . . . .29
Problems with Adherence of Headpiece to the Head  . . . .29

**Contact Us**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

## Labeling

Below are samples of the labeling on the package of the BTE Sound Processor.




The symbols below are used on the labeling for the product and for transportation, and their meanings are as follows:



EN60601-1    Classification Information:
Ordinary Construction
Continuous Operation

**AMF45672**

EXHIBIT CC

# BTE Sound Processors

This User Guide provides information on the use and maintenance of the following CLARION® Behind-the-Ear (BTE) processor models:

Platinum BTE™ (CI-5210) - designed for use with the CLARION 1.0, CLARION 1.2, AND CLARION S-Series internal implants (typically those implanted from 1990-April 2001).

CII BTE™ (CI-5220) - designed for use with the CLARION CII Bionic Ear™ System (typically those implanted from April 2001 on).

### BTE Sound Processor Kit Contents

Your BTE Sound Processor Kit may include the following:

| Description | Model # |
|---|---|
| BTE Sound Processor | CI-5210/ CI-5220 |
| Battery Charger | CI-5600 |
| Charger Power Supply | CI-5610 |
| Power Supply Adapters | CI-5630 |
| Mini Battery | CI-5510 |
| Standard Battery | CI-5518 |
| Extended Battery | CI-5535 |
| User Reference Binder | CI-8220 |
| 3 inch Cable | CI-5403 |
| 4 inch Cable | CI-5404 |
| 9.5 inch Cable | CI-5409 |
| Earhook | CI-5700 |
| Carrying Case | CI-7410 |
| Dri-Aid Kit | CI-7301 |
| Charger Travel Case | CI-7250 |
| Battery Wallet | CI-7110 |
| Audio Interface Cable | CI-5815 |
| Auxiliary Microphone | CI-5810 |
| Auxiliary Audio Earhook | CI-5705 |
| Platinum Headpiece & Caps/Clip/Tool | AB-7300 |
| BTE Instructional Video | CI-8230 |

Please refer to the contents card that accompanies your BTE Sound Processor kit to verify the actual contents.

AMF45673

EXHIBIT CC

# BTE Sound Processor Components

Your BTE Sound Processor has the same processing capabilities as the CLARION body-worn sound processors and is available in beige or brown. Your CLARION BTE consists of an earhook, electronics module, microphone, toggle switch, rechargeable battery, cable and headpiece.



## Earhook

The earhook resembles that of most hearing aids. It is designed to hold the BTE Sound Processor in place behind the ear. Two sizes are provided to accommodate your ear comfortably - a standard earhook and a small earhook. Your audiologist can assist you in determining which is more appropriate for you. Generally, the larger earhook suits adult CLARION users while the smaller earhook is most appropriate for children.

## Electronics Module

The electronics module houses the operating electronics of your BTE Sound Processor. The cable connection port is on the back of

**AMF45674**

EXHIBIT CC

the electronics module. You will attach one end of the headpiece cable to this port.

## Microphone



The microphone captures sound and is located on the electronics module behind the earhook. Because the BTE Sound Processor contains its own forward facing microphone, the microphone in the headpiece is automatically de-activated when used with the BTE Sound Processor.

## Toggle Switch

The BTE Sound Processor has one toggle switch which is located on the back side of the BTE Sound Processor. This toggle switch serves as both a program selector switch and as a volume or sensitivity control.

## Rechargeable Battery

A custom Lithium-Ion rechargeable battery module powers your BTE Sound Processor. The rechargeable battery module comes in different sizes with different operating times that depend on your unique program, implant type and other user variables.

There are three battery sizes, mini, standard, and extended. The optimal battery for your implant type is included in your kit. You may purchase additional or different batteries if you wish. Actual use time for each battery size will vary depending on the type of sound processing program you use.

> **WARNING:**   Your BTE Sound Processor should be serviced only by Advanced Bionics. Do not attempt to open or repair the processor. Unauthorized opening of the processor will void the warranty.

## Headpiece

Your headpiece is held in place by a magnet, which lines up with an internal magnet that is located in the implant. When placing the headpiece on your head, the headpiece centers itself as the two magnets attract each other.  The headpiece comes with an adjustable magnetic strength. Your audiologist will determine the most appropriate magnetic strength for you at the time of programming.

The Platinum Headpiece™ is supplied to all new CLARION users. Existing CLARION users can continue to use their current headpiece.

> **NOTE:**   *The microphone on the headpiece is not activated when used in conjunction with the CLARION BTE. Only the forward facing microphone located within the BTE is operational.*

Your headpiece is designed to operate with both your BTE and body-worn processor.

Headpiece Cable:

A headpiece cable connects the BTE Sound Processor to the headpiece. A connector is located just below the toggle switch. The cable connects the Headpiece to the BTE Sound Processor.

> **WARNING:**   Your headpiece should be serviced only by Advanced Bionics. Do not attempt to open or repair the headpiece base. Unauthorized opening of the headpiece base will void the warranty.

**AMF45675**

EXHIBIT CC

# Assembling your BTE Sound Processor



### Attaching the Earhook

The earhook is easily screwed on and off. You should turn the earhook until it is tight and flush with the electronics module of your BTE. The earhook is designed NOT to tighten completely in order to ensure easy repositioning for comfort. Don't hesitate to turn it an additional turn if you prefer it tighter. Turning additional turns will NOT cause damage to the earhook or electronics module.

### Connecting the Headpiece and Cable



At one end of the headpiece cable is a two-pin plug that you will insert into the cable connector on the headpiece. The pins have different diameters that match the two holes in the cable connector.





At the other end of the headpiece cable is a two-hole plug that connects to the two-pin headpiece cable connector on the back of the BTE Sound Processor. The female end of the cable contains a raised area that will align with a groove on the cable connection port of the electronics module.

Connecting the cable:

1.  Align the raised area on the end of the cable with the groove on the cable connector on the BTE electronics module and slide in place until it is secure.



2.  Orient the connector so that the large pin on the cable matches the large hole size on the headpiece and insert into the holes.

Removing the cable:

1.  Remove the battery from the electronics module (see details on page 15).

2.  Hold the cable's strain relief (the plastic plug) and gently pull it away.

AMF45676

EXHIBIT CC

*NOTE:* *Each kit contains a 3" (7.6 cm) and a 4" (10.2 cm) cable. An additional 9.5" (24.1 cm) cable is also available. The longer cable allows you to wear the BTE Sound Processor on the opposite ear.*

*NOTE:* *Be sure that you turn off the processor by disconnecting the battery before you remove the cable from the headpiece.*




## Connecting the Rechargeable Battery to the Electronics Module

To attach the rechargeable battery module:

1.  Locate the slide tracks on the underside of the electronics module and the top of the battery module.

2.  Position the battery module so the battery contact is toward the back of the BTE processor.

3.  Guide the battery module into the tracks on the electronics module.

4.  Slide the battery module onto the electronics module until it stops and the battery and electronics module are aligned.



*NOTE:* *Do not force the battery module onto the BTE electronics module. The battery is designed to be inserted in only one direction.*

## Customizing the Platinum Headpiece - Color Caps

Your Platinum Headpiece comes with six interchangeable color caps, a Headpiece Color Cap Removal Tool to change the Color Cap, and a Headpiece Clip.



*NOTE:* *The headpiece magnet(s) are located under the Color Cap. Be careful not to lose the magnet(s) when changing the*

*Color Caps. Felt disks are included with the headpiece to secure the magnets in place.*

Changing the Platinum Headpiece Color Cap:

1.  Disconnect the headpiece cable from the headpiece.

2.  Locate the cable connector.



3.  Insert the Headpiece Color Cap Removal Tool as shown below into the slot above the headpiece cable connector.






4.  Push the tool straight back to lift the color cap as shown below.



5.  Close the headpiece by carefully aligning the Headpiece Color Cap on the Headpiece and pressing both parts together to snap them back into place.

**AMF45677**

EXHIBIT CC

# Using your BTE Sound Processor



## Turning your BTE Sound Processor On/Off

You will use the battery module to turn your BTE Sound Processor on and off.

· To turn off the BTE Sound Processor, you must remove the battery (see details on page 14).

· To turn on the BTE Sound Processor, attach the battery (see details on page 8).

When you are not using your BTE Sound processor, you should remove the battery module; otherwise, the processor will remain on and the battery will continue to drain.

## Putting on your BTE Sound Processor



1. Check that a charged battery module has been correctly mounted onto the BTE.

2. Check that the headpiece cable is properly plugged into the cable connector on the processor.

3. Place the BTE over your ear and the headpiece on your head over the implant.

IMPORTANT!   Use only the BTE Sound Processor that has been pro-grammed especially for you.Using a different proces-sor, which has been loaded with a different program, may be ineffective in providing sound information and may cause physical discomfort.

## Using the Toggle Switch

<u>Changing programs:</u>



Your audiologist can store multiple programs on your BTE Sound Processor during your fitting session. These programs may repre-sent different sound processing strategies or variations of a single sound processing strategy.

· You can change from one program to the next by pressing and holding the toggle switch in the upward direction for more than one second.

**AMF45678**

653

EXHIBIT CC

· To return to previous programs, you must press and hold the toggle switch in the downward direction for more than one second.

· You will notice a brief moment of silence as you change from one program to the next. The program changes when you release the switch and it springs back to the mid point.

· The last position is a reserved for the future implementation of the microphone test position and is not programmed to provide stimulation. You will hear silence when you toggle to this position.

NOTE:   The toggle switch does not have a round-robin capability; i.e., when you toggle upward to the last program (or microphone test position), you must toggle downward to use the first program again.

Controlling volume or sensitivity:

The toggle switch can function as either a volume or sensitivity control and is set as one or the other on a program-by-program basis during your fitting session. Your audiologist will let you know how the toggle switch function was set for each program on your BTE Sound Processor.

There are 20 possible steps for volume or sensitivity, 10 in the upward direction and 10 in the downward direction.

The volume control determines the amount of amplification applied to the acoustic input. Decreasing the volume will make sounds softer, while increasing the volume will make sounds louder.

The sensitivity control determines the quietest level of sound that will be picked up from the environment by the microphone. Decreasing the sensitivity level makes softer sounds less audible and may help eliminate background noise. Increasing the sensitivity level makes softer or more distant sounds more audible.

*Increasing/Decreasing Volume or Sensitivity*

· You can increase the volume or sensitivity by pressing and quickly releasing the toggle switch in the upward direction for less than one second.

· To decrease the volume or sensitivity you must press and quickly release the toggle switch in the downward direction for less than one second.

*Initial Volume or Sensitivity Settings*

When you first attach a battery module to the BTE Sound Processor, which causes the processor to turn on, the volume is set to the most comfortable level. This most comfortable level is established during your programming session. If you prefer to reduce volume you can toggle the volume down before putting on your BTE.

The sensitivity is automatically set to the optimum level for everyday environments. The most comfortable volume level corresponds to the 12:00 position on the volume control and the optimum sensitivity level corresponds to the 12:00 position on the sensitivity control on the body-worn processor.

*Adjusting for Background Noise*

In some situations, background noise may interfere with your ability to hear clearly. Background noise can be particularly distracting in situations where a large number of people are speaking at once or in a noisy environment. Decreasing the sensitivity on the BTE Sound Processor may help eliminate some of the background noise.

**Remember that the toggle switch only functions as a sensitivity control if it has been set to the sensitivity function by your audiologist during your fitting session.**

Using the auxiliary microphone in noisy situations may also be helpful.

AMF45679

654

EXHIBIT CC

## Changing the Rechargeable Battery

Typically, you will only change the rechargeable battery when it has depleted its charge. However, you may also wish to return to the start-up settings of the BTE by disconnecting, waiting 5 seconds and then reconnecting the battery. For example, if you are unsure of which program you are on (listening to) or of the settings, by removing and then reattaching the rechargeable battery, your BTE will automatically return to the first program at a comfortable loudness level.

When you are not using your BTE, you should remove the battery. Removing the battery turns off the BTE. As long as the battery is connected, the BTE continues to operate, so the battery life continues to drain.

*NOTE: Make sure that you rotate usage of your batteries. This will ensure optimal battery life.*

Removing the rechargeable battery module:

1.  Slide the battery in a forward direction until it releases from the BTE electronics module.



Attaching the rechargeable battery module:

1.  Locate the slide tracks on the underside of the BTE electronics module and the top of the battery module.

2.  Position the battery module so the battery contact is toward the back of BTE electronics module (see the photo above).

3.  Guide the battery module into the tracks on the BTE electronics module.

    *NOTE: Do not force the battery module onto the BTE electronics module; the battery is designed to be inserted in only one direction.*

4.  Slide the battery module onto the BTE electronics module until it engages.

**WARNING:**   Replace with battery provided by Advanced Bionics only. Use of another battery may present a risk.

**CAUTION:**   Do not attempt to operate your system with the batteries improperly inserted as it may damage the internal components of the processor.

**NOTE TO EUROPEAN CUSTOMERS:**

*For proper disposal of rechargeable battery modules, please return depleted battery modules to the local Advanced Bionics Corporation representative or Advanced Bionics SARL.*

## Using the Telephone

Your audiologist will indicate when you should begin to use the telephone with your new BTE. You can use the telephone by placing the speaker directly over the microphone located within your BTE at the base of the earhook, over the auxiliary microphone, or by using the auxiliary audio earhook with a telecoil pickup or telephone adapter (See BTE Sound Processor Accessories).



Remember, the headpiece microphone is not activated and therefore, placing the telephone over the headpiece will not assist you in listening to a caller on the telephone. You should practice with several telephones, some with adjustable volume, to find what works best for you. Initially, you may want to practice using the

AMF45680

EXHIBIT CC

telephone with your audiologist or a familiar person. Be patient. Telephone communication with the implant often improves over time as you gain experience using the device.

Using digital cellular phones:

Using or being in close vicinity to someone who is using certain digital cellular phones may cause interference with the cell phone's reception or problems with the quality of sound from your device. If such interference occurs, you can turn off your processor or move a greater distance from the source. Before purchasing a digital cellular phone, you should evaluate whether or not interference is evident. No such interference has been noted with cellular phones that use older analog technology.

# Care and Maintenance of your BTE Sound Processor

Although your CLARION BTE Sound Processor has been designed and built to withstand daily wear and tear, care must be taken to protect both the implanted and external components of the device. For a detailed discussion of clinical results, warnings and precautions please refer to the Package Insert located at the back of this guide. It is a good idea to carry the User Identification Card, which was provided with your documentation, with you at all times.

## Cleaning

If necessary, the BTE Sound Processor and Headpiece can be cleaned with a slightly dampened cloth or tissue. Take care that water does not drip into any connectors or the microphone. Water or other fluids should never enter the BTE Sound Processor or the Headpiece.

CAUTION:    Immersion in water will damage the BTE Sound Processor and Headpiece electronics!

To prevent intermittent operation of the processor, the battery contacts on the battery module and on the processor should be kept free from dirt, dust, perspiration or moisture. Clean the contacts with a dry cotton swab at least once a month and immediately after exposure to moisture or perspiration.

## BTE Sound Processor Protection

Your BTE Sound Processor contains advanced electronics that can be damaged. Care should always be taken when using or handling. If the processor is dropped, check it for proper functioning. If you suspect that the processor has been damaged, contact your cochlear implant center or service centre.

Care should be taken to avoid the following:
· Dropping the processor.

· Leaving the processor any place where it can come in contact with water or moisture. Remember to remove the processor and headpiece before bathing, showering, or swimming.

AMF45681

EXHIBIT CC



· Exposing the processor to extreme temperatures (below 32° Fahrenheit [0° Celsius] or above 115° Fahrenheit [45° Celsius]) (e.g., a closed car on a hot day or near a heater/radiator).

· Static electricity has the potential of damaging the electrical components of the processor. Care should be taken to avoid situations in which static electricity is commonly created. If static electricity is present, touch something conductive (e.g., a metal object) prior to handling the external equipment or before your BTE contacts another person or object. Children should remove their BTE before engaging in activities that commonly create static electricity, such as playing on plastic play equipment.

While the processor is extremely durable, it should be treated with care and attention. Additionally, you should check your cable regularly (every month or so) to see if it is frayed or damaged. If your cable appears to be damaged, it should be replaced.

<u>Dri-Aid Kit:</u>
A Dri-Aid Kit is included in your BTE Sound Processor Kit. Regularly place the BTE Sound Processor and Headpiece (without the battery module) into the Dri-Aid Kit to help prevent moisture build-up in the electronic components. The Dri-Aid Kit includes the plastic bag and crystal container.

*Using the Dri-Aid Kit:*
1. Remove the labels on both sides of the crystal container to expose the crystals.

2. Observe the color of the crystals through the openings.
   <u>If they are Blue:</u>
   The crystals are unsaturated and ready to be used.
   *Note: If the crystals have not been used for a while, they may appear dark in color, they are fine and can be used.*

   <u>If they are Pink:</u>
   The crystals are saturated and you will first need to regenerate the crystals.

3. Remove the battery and place the crystal container, headpiece and BTE in the plastic bag.

4. Leave in the plastic bag overnight. The crystals turn pink as moisture is absorbed.

*Regenerating the Crystals:*
Place the crystal container in a pre-heated oven at 350°F / 176°C for 30-45 minutes until the crystals have turned blue. The crystals can be regenerated indefinitely.  However, if they remain pink after heating, you must replace the Dri-Aid Kit.

## Rechargeable Batteries

When you are not using your BTE Sound Processor, you should remove the rechargeable battery module; otherwise, the processor will remain on and the battery will continue to drain.

Battery capacity decreases with age. This is normal for all rechargeable batteries and should not be considered a defect. You may begin to notice a small decrease following approximately 2-3 months of use.

*NOTE: Remove battery module from the BTE when equipment is not likely to be used for an extended period of time.*

To prevent intermittent operation of the BTE Sound Processor, the battery contacts on the rechargeable battery and on the processor should be kept free from dirt and dust. Clean the contacts with a dry cotton swab at least once a month and immediately after exposure to moisture or perspiration.

If the rechargeable battery is dropped, inspect it for evidence of damage or cracking. If any evidence of damage is seen, the battery should be disposed of immediately.

**WARNING:** The battery used in this device may present risk of fire or chemical burn if mistreated.  Do not disassemble, heat above 100°C (212°F), or incinerate.  Dispose of used batteries promptly.  Never put batteries in mouth.  If swallowed, contact your physician or local poison control center.

**WARNING:** To prevent injury or burns, do not allow metal objects, such as keys or coins, to contact or short circuit the battery terminals. Battery wallets are provided to carry and protect the battery.

**AMF45682**

EXHIBIT CC



## Rechargeable Battery Wallet

Rechargeable battery wallets are provided with each BTE. The wallets allow you to carry multiple batteries safely and conveniently on your key chain, in your pocket, or in your purse.



## Battery Charger and Power Supply

The battery charger provided with the BTE Sound Processor is designed to recharge four battery modules simultaneously. It takes approximately 3-5 hours to fully recharge a battery.

**Battery modules do not need to be fully depleted before recharging.**

CAUTION:   Only use the battery charger for charging the CLARION BTE battery modules. DO NOT use it to charge any other batteries.

LED indicators

A green LED illuminates when the charger is connected to a power source and indicates power flowing to the unit. Along the side of the charger are 4 LED (Light-Emitting Diode) indicators, one for each battery module that indicate charge status. The LED is yellow when the battery charging cycle is in process. The LED turns off when the battery modules are fully charged.




Charging the Batteries:

The following section describes assembling the battery charger and inserting the rechargeable batteries in the charger.

*Assembling the Charger:*
1. Place the charger on a flat surface.

Battery Charger



2. Select the power plug appropriate for your location.

Power Plugs



3. Connect the power plug to the power supply.

Power Supply — Connect Power Plug



4. Connect the cable from the power supply to the charger.

Power Supply — Connect to Battery Charger



5. Insert the the power plug that you connected to the power supply into the wall outlet. Green LED indicates proper connection.

AMF45683

EXHIBIT CC

*Inserting the rechargeable batteries in the battery charger:*
1. Locate the slide tracks on the battery charger.

 

2. Position the battery module so that the battery contact is facing the vertical wall of the charger where the pins reside.



3. Slide the battery module onto the charger until it engages.

You can insert up to four battery modules in the charger. The charger is designed so the battery modules can only be inserted in one direction. 

- Battery modules will start charging automatically. The yellow LED indicator will illuminate to signal that charging is in progress.

- When a battery module is fully charged, the LED indicator for that module will turn off.

*Note:* *If you place a partially charged battery module in the charger, the battery module may be fully charged in a lesser period of time. You can remove the battery module at any time. The battery charger and batteries will not be damaged if the battery modules remain in the charger longer than the required charging time.*

*It is a good idea to use the battery modules on a rotating basis to maximize battery life. You can label the battery modules (1, 2, 3, etc.) to keep track of the rotation.*

*You must recharge your batteries at least once every 3 months even if you are not using them.*

*Removing the battery modules from the charger:*
1. Gently press down the tab that holds the battery module in place.



2. Gently slide the battery module up and out of the slide tracks.

The rechargeable battery module and battery charger contacts should be kept free from dirt and dust. Dirty contacts can result in battery charger malfunction. Clean the contacts at least once a month using a dry cotton swab.

If the battery charger or power supply is dropped, inspect it for evidence of damage or cracking. If any evidence of damage is seen, the battery charger or power supply should be replaced. Prior to use, you should inspect the battery charger cable to ensure that it is not frayed or damaged and that the plug is not broken. If your power cord appears to be damaged, it should be replaced.

AMF45684

       EXHIBIT CC

# BTE Sound Processor Accessories



The following accessories are available for use with your BTE Sound Processor:

· Auxiliary Audio Earhook
· BTE Auxiliary Microphone
· Audio Interface Cable

## Auxiliary Audio Earhook

You can connect your BTE Sound Processor to an external input such as the Auxiliary Microphone or an assistive lis-
tening device. The standard earhook is designed to be removable, and can be replaced with an Auxiliary Audio Earhook. An external input cable is perma-nently attached to this earhook. This cable terminates in a mini plug that can connect to the Auxiliary Microphone or with other audio equipment or assistive listening technology (in conjunction with the Audio Interface Cable).



## Auxiliary Microphone

You may prefer using the Auxiliary Microphone in some listening environments. The Auxiliary Microphone can be hand-held or worn on your lapel or collar. You may want to experi-ment with several microphone positions to determine which location is best for you.

*NOTE: It is not necessary to use the Audio Interface Cable when using the Auxiliary Microphone.*

Using the Auxiliary Microphone:

1. Remove the standard earhook and replace it with the Auxiliary Audio Earhook.

2. Plug the Auxiliary Microphone into the connector located on the end of the Auxiliary Audio Earhook cable.

3. Place the microphone in a secure position using the cable clip provided.

**AMF45685**

EXHIBIT CC

4. Ensure that the battery is properly attached to the BTE Sound Processor and adjust the volume or sensitivity as necessary.

When the Auxiliary Microphone is used, the microphone located in the BTE Sound Processor may remain on or shut off depending on how your system is programmed by your audiologist. 

> IMPORTANT! The Auxiliary Microphone provided by Advanced Bionics is designed to work specifically with your BTE. For this reason, please do not use any microphone other than the one designated by Advanced Bionics for the BTE Sound Processor.

## Other External Auditory Input Devices

In addition to the accessories that are provided with the BTE Sound Processor, you may want to connect other external auditory input devices to your processor. The Audio Interface Cable can be used to connect other external auditory input devices with the BTE Sound Processor. One end of the Audio Interface Cable connects to the end of the Auxiliary Audio Earhook cable. The other end of the Audio Interface Cable is designed to connect with battery-powered FM systems, tape recorders, telephone adapters or television audio amplifiers. 

Please contact Advanced Bionics prior to using such external auditory input devices to verify that the devices in question are compatible with the CLARION system.

# Troubleshooting your BTE Sound Processor

The following is a description of how to troubleshoot your CLARION BTE Sound Processor. If a problem persists after trying the remedies below, contact your implant center, service centre or Advanced Bionics Corporation for support.

**No sound heard; no response from user**
- Ensure that the cable is inserted into the processor, and the headpiece is properly positioned.

- Ensure that a charged battery module is being used.

*If the battery module is charged:*
- Replace the headpiece cable.

- Try auxiliary microphone connected to the audio earhook with a program that is set up to allow auxiliary input and repeat the process.

  If this fixes the problem, place the BTE in Dri-Aid kit overnight. If there is still no sound heard, then call your audiologist.

**Static heard**
- Ensure that the sensitivity control is not set too high, if it is enabled.

- Clean contacts on battery and BTE.

- Replace the headpiece cable.

- Try auxiliary microphone connected to the audio earhook with a program that is set up to allow auxiliary input and repeat the process.

  *NOTE: Please verify that your program is set by the audiologist to allow for external audio input.*

  If this fixes the problem, place the BTE in Dri-Aid kit overnight. If there is still no sound heard, then call your audiologist.

**AMF45686**

**Muffled or distorted sounds heard**

· Ensure that the sensitivity control is properly set, if it is enabled.

· Remove any material (hats, headbands, etc.), which may be covering the BTE microphone.

· Try auxiliary microphone connected to the audio earhook with a program that is set up to allow auxiliary input and repeat the process.

If this fixes the problem, place the BTE in Dri-Aid kit overnight. If there is still no sound heard, then call your audiologist.

**Headpiece or BTE gets wet**

· Remove the battery module immediately.

· Place BTE and/or headpiece in the Dri-Aid Kit.

· Contact your cochlear implant center, service center or Advanced Bionics Corporation for further instructions.

**IMPORTANT!**
*Do not attempt to clean or dry the headpiece or processor. Do not use if exposure to fluids is suspected. Do NOT try to speed up the drying process with the use of a microwave, oven or hair dryer, as these may further damage the internal electronics.*

WARNING:   If your system appears to be working, but you experience a deterioration in the volume or the quality and clarity of sound, contact your audiologist, as your processor may need to be reprogrammed.

WARNING:   Your processor should be serviced only at Advanced Bionics. Do not attempt to open or repair the processor. Do not continue to use the processor if any part of it is damaged. Unauthorized opening of the processor, or other equipment, will void the warranty and may compromise system performance.

**Blinking Yellow LED on Battery Charger**

· Indicates that the charger or battery is faulty

· Try the battery in a different position. If the battery charges properly when moved to a new position, the charger may have a faulty position.

· Contact your cochlear implant center, service center or Advanced Bionics Corporation for further instructions.

**No Green LED on Battery Charger**

· Verify charger is connected to power.

· Replace power supply, adapters, charger

**Problems with Adherence of the Headpiece to the Head**

*Increase Magnet Strength*
If your headpiece frequently falls off during normal activities, you may need a stronger magnet in the headpiece.

· Contact your cochlear implant center.

*Use Earmold*
· Use an Earmold to further secure the BTE.

*Use Headpiece Clip*
You can use the headpiece clip to increase adherence of the headpiece to the head in cases where the magnet strength is not sufficient.

Attaching the Clip to the Headpiece:

1. Open the headpiece (see *Changing the Platinum Headpiece Color Cap* instructions, pg 7).

2. Position the headpiece clip so that the flexible metal hinge fits between grip tabs on the headpiece cap - from the bottom view, approximately the 2:00 position for a left side implant or the 10:00 position for a right side implant.



**AMF45687**

EXHIBIT CC

3. Carefully fit the Headpiece Color Cap over the clip's hinge and snap it into place.

<u>Using the Headpiece with the Clip:</u>

1. Grip the headpiece and open the clip between your fingers and thumb as shown.



2. Hold the hair over the implant flat to the skull with the index finger of one hand.



3. Guide the clip along the skin and under the hair, then release when the headpiece is positioned over the implant.



*NOTE: The clip works best when it is placed perpendicular to the direction of the hair (see photo step 2).*

*Be sure the BTE is turned off before removing the cable from the Headpiece.*



# Contact Us

Advanced Bionics is committed to providing the highest quality products and service to our customers. We welcome your comments about the CLARION BTE Sound Processor or your suggestions to improve the product. Please feel free to contact Advanced Bionics or discuss your suggestions with your implant professional.

Corporate Headquarters
Advanced Bionics Corporation
12740 San Fernando Road
Sylmar, California 91342, U.S.A.
(800) 678-2575 within US and Canada
(661) 362-1400
(661) 362-1500 Fax
(800) 678-3575 TDD
www.advancedbionics.com
Email: info@advancedbionics.com

European Headquarters
Advanced Bionics SARL
76, rue de Battenheim
68170 Rixheim, France
+33 (0) 3-89-65-98-00
+33 (0) 3-89-65-50-05 Fax
Email: europe@advancedbionics.com

Asia-Pacific
Advanced Bionics
25129 Rye Canyon Loop
Santa Clarita, California 91355, U.S.A.
(661) 362-1400
(661) 362-1500 Fax
Email: asiapacific@advancedbionics.com

Technical information will be provided to upon request.

Advanced Bionics, CLARION, Platinum BTE, and CII BTE are registered trademarks of Advanced Bionics Corporation in the United States of America and other countries. This device is protected under one or more of the following U.S. Patents: 4,400,590, 4,405,831, 4,495,917, 4,686,765, 4,721,551, 4,819,647, 4,837,049, 4,931,795, 4,969,468, 4,990,845, 4,991,582, 5,443,493, 5,477,855, 5,513,793, 5,522,865, 5,531,774, 5,545,191, 5,569,307, 5,571,148, 5,584,869, 5,601,617, 5,603,726, 5,609,616, 5,626,629, 5,738,270, 5,776,172, 5,833,714, 5,876,425. Other U.S. and/or foreign patents are pending.

9055049-001 Rev D

AMF45688

EXHIBIT CC

# www.bionicear.com

**Corporate Headquarters**
**Advanced Bionics Corporation**
12740 San Fernando Road
Sylmar, California 91342, U.S.A.
(800) 678-2575 within US and Canada
(661) 362-1400
(661) 362-1500 Fax
(800) 678-3575 TDD
www.advancedbionics.com
Email: info@advancedbionics.com

**European Headquarters**
**Advanced Bionics SARL**
76, rue de Battenheim
68170 Rixheim, France
+33 (0) 3-89-65-98-00
+33 (0) 3-89-65-50-05 Fax
Email: europe@advancedbionics.com

**Asia-Pacific**
**Advanced Bionics Asia-Pacific**
25129 Rye Canyon Loop
Santa Clarita, California 91355, U.S.A.
(661) 362-1400
(661) 362-1500 Fax
Email: asiapacific@advancedbionics.com

AMF45689

JUN01

© 2001 Advanced Bionics Corporation. All Rights Reserved. Printed in U.S.A.

EXHIBIT CC





*Platinum Series*™

SOUND   PROCESSOR   USER   GUIDE

AMF45690

EXHIBIT CC

# Contents

I.   **Platinum Sound Processor** .................. 1

Volume Control .............................................. 1
Sensitivity Control ......................................... 2
Headpiece Jack ............................................. 2
Dual Color LED Indicator .............................. 2
Audible Alarm ............................................... 4
Auxiliary Jack ................................................ 4

II.   **Headpiece & Cable** ............................. 5

Single-Unit Headpiece ................................... 5
Color Caps .................................................... 5
Headpiece Clip .............................................. 6
Cable ............................................................ 8

III.  **Batteries & Battery Charger** .................. 9

Battery Replacement ..................................... 9
Battery Charger ........................................... 11

IV.  **Accessories** ........................................ 13

Platinum Sound Processor Kit ..................... 13
Carrying Cases ............................................ 13
Auxiliary Microphone ................................... 16
Telecoil Pickup ............................................ 16
Telephone Adapter ...................................... 17
Headpiece Microphone Tester Earphones ..... 18
Other External Auditory Input Devices .......... 18

V.   **Using the CLARION Platinum Sound Processor** .......................................... 19

Getting Started ............................................ 19
Adjusting for Background Noise ................... 20
Using the Telephone .................................... 20

VI.  **Troubleshooting Guide** ...................... 22

No sound heard; no response from user ........ 22

AMF45691

EXHIBIT CC

User hears static.............................................. 22
Headpiece falls off........................................... 23
Headpiece or Processor gets wet...................... 23
Performing a System Check............................... 24
Replacing Components ..................................... 26
Troubleshooting Action Table............................ 29

VII.  **Caring for Your Cochlear Implant
      System** ............................................... **30**

Cleaning ......................................................... 30
Processor Protection ...................................... 30
Implant Protection.......................................... 31

VIII. **Future Product Improvements ......... 32**

## Labeling

Below is a sample of the labeling on the package of the Processor.



The symbols below are used on the labeling for the product and for transportation, and their meanings are as follows:



EN60601-1   Classification Information:
            Ordinary Construction
            Continuous Operation

**AMF45692**

Turning the control to the right (toward the larger end of the scale) increases the volume.  During your programming session, your Processor will be adjusted so that the indicator on the volume control when positioned halfway along the scale (12:00 position) on the control panel represents the Most Comfortable Loudness level.

## Sensitivity Control

The sensitivity control (•₀●●₀•), located to the right of the volume control, determines the quietest level of sound that will be picked up from the environment by the microphone.  Turning the control to the left decreases the sensitivity so that softer sounds are not picked up by the microphone.  This may help eliminate background noise.  Turning the control to the right increases the sensitivity so that softer or more distant sounds can be picked up by the microphone.

## Headpiece Jack

The headpiece jack is located to the right of the sensitivity control.  The cable, which connects the Processor to the Headpiece, is inserted here.

## Dual Color LED Indicator

The LED (Light-Emitting Diode) indicator is a light located on the control panel adjacent to the headpiece jack.  The LED has three primary functions:  battery charge status, lock status, and microphone/system status.  Depending on the function, the LED will illuminate with either a red or a green light.  When the Processor is turned on, the LED light will first indicate battery charge status, followed by lock status.  The microphone/system status may be checked once lock has been obtained.

### 1. Battery Charge Status

When the Processor program switch is turned from the off (o) position to positions •, ••, or •ₐ•, the red LED light will blink as follows:

- Up to *4 quick blinks* indicate that the battery is fully charged.
- *2 to 3 quick blinks* indicate that the battery is sufficiently charged to power the system.
- *1 quick blink* indicates that the battery charge is nearly depleted.

To check the battery charge status while the Processor is in operation, turn the Processor off and then back on to any program position.  The red LED light sequence will indicate the battery charge status.

### 2. Lock Status

When the Processor program switch is turned from the off (o) position to positions •, ••, or •ₐ•, and the battery charge sequence is complete, the red LED indicator begins to flash approximately once per second to indicate lock status.  Flashing will continue until the headpiece is properly positioned on the head.  Once the headpiece is transmitting to the implant, the flashing will stop, signifying that the system is sending information correctly.

### 3. Microphone/System Status

When the battery and lock sequences are complete, microphone and system status can be verified.  The green LED indicator will flicker in response to loud sounds presented near the microphone, verifying that the microphone is receiving sound, data is being transmitted to the implant and the Processor is receiving information back from the implant.  Increasing the sensitivity will cause the green LED to flash in response to softer sounds, while decreasing the sensitivity will require more intense sounds for the LED to react.  The green light is not expected to illuminate continuously during everyday use, especially if the user is in a quiet environment.

**AMF45693**

EXHIBIT CC

Changing the Platinum Headpiece Color Cap:



**Headpiece Color Cap Removal Tool**

1. Open the Headpiece by inserting the Headpiece Color Cap Removal Tool into the slot above the headpiece cable connector and pushing the tool straight back to lift the color cap as shown below.

 

 

2. Close the Headpiece by carefully aligning the Headpiece Color Cap on the Headpiece and pressing both parts together to snap them back into place.

## Headpiece Clip



Attaching the Clip to the Headpiece:

1. Open the Headpiece as per Changing the Platinum Headpiece Color Cap instructions above.

2. Position the clip so that the flexible metal hinge fits between grip tabs on the headpiece cap – from the bottom view, approximately the 2:00 position for a left side implant or the 10:00 position for a right side implant.

 

3. Carefully fit the Headpiece Color Cap over the clip's hinge and snap it back into place.



Using the Headpiece with the Clip:

1. Hold the hair over the implant flat to the skull with the index finger of one hand.



2. Grip the headpiece and open the clip between your fingers and thumb as shown.



3. Guide the clip along the skin and under the hair, then release when the headpiece is positioned over the implant.



**Note:** The clip works best when it is placed perpendicular to the direction of the hair (see photo step 1).

**AMF45694**

EXHIBIT CC



## Cable

The cable connects the headpiece to the Processor and provides the pathway for relaying information between the internal and external components of the system. At one end of the cable is a two-pin plug that is inserted into the headpiece. A small coaxial plug is located at the other end of the cable. This plug is inserted into the headpiece jack in the Processor.

To remove the cable from the headpiece, always hold the cable's strain relief (the plastic plug) and gently pull it away. The cable should be removed from the headpiece only when it is being replaced.

**NOTE:** Be sure the Processor is turned off before removing the cable from the headpiece.
Each patient is provided with a spare cable. Each cable includes a small clip that can be used to help hold the cable in place.

## III. Batteries & Battery Charger

A Lithium Ion rechargeable battery or a compartment that accommodates three standard AA batteries powers your CLARION Processor. The rechargeable battery provides an average of ten to twelve hours of use, depending on your unique program. Three standard AA alkaline batteries may also be used. Actual use time will vary depending on the type of sound processing program you use.

When you are not using your Processor, it should be turned off; otherwise, the battery will continue to drain. To ensure continuous operation of your CLARION System throughout the day, you are provided with one battery charger, four rechargeable batteries and one battery compartment for use with AA batteries.

**NOTE:** Remove battery pack when equipment is not likely to be used for an extended period of time.

To prevent intermittent operation of the Processor, the battery contacts on the battery and on the Processor should be kept free from dirt and dust. Clean the contacts at least once a month, using an alcohol swab.

If the battery is dropped, inspect it for evidence of damage or cracking. If any evidence of damage is seen, the battery should be replaced.

**WARNING:** Batteries may explode if disposed of in fire. To prevent injury or burns, do not allow metal objects, such as keys or coins, to contact or short circuit the battery terminals. Battery covers are provided for use when carrying rechargeable batteries or the AA battery compartment. The battery covers will protect the battery.

## Battery Replacement

To remove the rechargeable battery:
- Turn the Processor off (o).
- Gently press and raise the battery release lever on the side of the Processor.

**AMF45695**

EXHIBIT CC

- Slide the battery in the direction of the lever until it releases from the Processor.

To insert the rechargeable battery pack:
- Locate the slide tracks on the underside of the Processor and the top of the battery pack.
- Position the battery pack so the battery contact is toward the lever on the Processor.
- Guide the battery pack into the tracks on the Processor.
- Slide the battery pack onto the Processor until it engages.
- **Do not force the battery into the Processor.  The battery is designed to be inserted in only one direction.**





To insert batteries into the AA battery compartment:
- Unsnap battery pack utilizing thumb recess on top of pack.
- When inserting AA batteries, make sure that the positive and negative contacts on the batteries are lined up correctly as noted on the label inside the battery compartment.
- Replace cover by hooking pack together at the bottom and gently hinging to snap until closed.
- Insert AA battery compartment using steps outlined above.
- When the AA battery compartment is not in use, keep it protected with the battery cover that has been provided.

**CAUTION**: Do not attempt to operate your system with the batteries improperly inserted as it may damage the internal components of the Processor.

**NOTE TO EUROPEAN CUSTOMERS:** For proper disposal of rechargeable battery packs, please return depleted battery packs to the nearest local Advanced Bionics Corporation representative or the designated follow-up Audiologist.

## Battery Charger

The battery charger provided with the Platinum Sound Processor is designed so that two rechargeable battery packs can be charged simultaneously.  Along the side of the charger are four LED (Light-Emitting Diode) indicators, two for each battery, which indicate charge status.  The battery charger has a charging cycle of approximately 2.5 hours.  A green light is displayed when the battery charging cycle is complete.  Batteries do not need to be fully depleted before recharging.

To charge the battery packs:
- Place charger on a flat surface and plug the power cord into outlet.
- Gently insert one or two battery packs in the charger so that the battery contacts on each battery match up with the contacts in the battery charger.  The charger is designed so the batteries will only insert in one direction.



- Battery will start charging automatically.  The yellow LED indicator will illuminate to signal that charging is in progress.
- When battery is fully charged, the green LED indicator will illuminate.

AMF45696

EXHIBIT CC

Please note that if a partially charged battery is placed in the charger, the battery may be fully charged in a lesser period of time. The battery can be removed at anytime. The battery charger and batteries will not be damaged if the batteries remain in the charger longer than the required charging time (approximately 2.5 hours). It is a good idea to use the batteries on a rotating basis to maximize battery life. Batteries can be labeled (e.g., 1, 2, 3, etc.) to keep track of the rotation.

**CAUTION:** The battery charger is used for charging the battery provided only. It cannot be used to charge off-the-shelf AA batteries.

The rechargeable battery pack and battery charger contacts should be kept free from dirt and dust. Dirty contacts can result in battery charger malfunction. Clean the contacts at least once a month using an alcohol swab.

If the battery charger is dropped, inspect the device for evidence of damage or cracking. If any evidence of damage is seen, the battery charger should be replaced. Prior to use, you should inspect the battery charger power cord to ensure that it is not frayed or damaged and that the plug is not broken. If your power cord appears to be damaged, it should be replaced.

# IV. Accessories

## Platinum Sound Processor Kit

The Platinum Sound Processor Kit includes the following items:

| | |
|---|---|
| 1 | Platinum Sound Processor |
| 4 | Rechargeable Batteries with Covers |
| 1 | AA Battery Compartment with Cover |
| 1 | Battery Charger |
| 1 | Power Supply |
| 1 | Power Cord |
| 1 | Adult: Leather Carrying Case – Black |
| 1 | Adult: Sport Carrying Case – Tan |
| 1 | Child: Harness Case – Tan |
| 1 | Child: Sport Carrying Case – Purple |
| 1 | Auxiliary Microphone |
| 1 | Telephone Adapter |
| 1 | Telecoil Pickup |
| 1 | Child: Headpiece Microphone Tester Earphones |
| 1 | Headpiece |
| 2 | Headpiece Cables |
| 1 | User Reference Binder |

## Carrying Cases

A variety of carrying cases is available for your Platinum Sound Processor. Pediatric Kits are packaged with a Harness Case and a Sport Case. Adult Kits come with a Leather Carrying Case and a Sport Case. Carrying Cases in additional colors and styles can be purchased as accessories.

**NOTE:** Nylon carrying cases are hand washable in mild soap. Air dry only; do not machine dry.

AMF45697

EXHIBIT CC

## Harness Case

A harness with an attached case is provided in the Pediatric Processor Kit to allow the Processor to be worn on a child's chest or back. The harness is constructed of durable elastic webbing and is adjustable using Velcro® tabs. The attached case is lined and constructed of lightweight nylon fabric. The case contains a built-in knob cover flap to help prevent accidental adjustment of Processor controls during activity.

## Leather Carrying Case

The Adult Processor Kit comes equipped with a quality leather carrying case that snaps securely over the Processor. A clip on the back of the case secures it to your waistband or belt. Cable protector holes located near the belt clip extend the life of headpiece cables when used as illustrated on the following page.

## Sport Carrying Case

A lined water-resistant case, which can be worn on the waist or a belt, is provided. A flap secured with Velcro folds over the top of the Processor to protect the controls, and a clip on the back of the case secures it to your waistband. A belt loop on the case provides additional security for more physical activities. The case is provided in both the Adult and Pediatric Processor Kits. Cable protector holes located near the belt clip extend the life of headpiece cables when used as illustrated on the following page.

**Extending the Life of Your Headpiece Cables**

1. Plug in the cable as shown.



2. Feed the cable through the far buttonhole.



3. Feed the cable through the other buttonhole.



AMF45698

EXHIBIT CC

## Auxiliary Microphone

You may find that using the auxiliary microphone is preferable in some or all listening environments. The auxiliary microphone can be hand-held or worn on your lapel or collar. You may want to experiment with several microphone positions to find out which location is best for you.

To use the auxiliary microphone:

1. Turn the Processor off by turning the program switch to the off (o) setting.

2. Plug the auxiliary microphone into the auxiliary jack located on the side of the Processor.

3. Place the microphone in a secure position using the cable clip provided.

4. Turn the Processor on by turning the program switch to •, ••, or •••, depending on which program you want and adjust the volume and sensitivity as necessary.

5. Turn your Processor off prior to removing the auxiliary microphone.

When the auxiliary microphone is used, the microphone located in the headpiece may remain on or shut off depending on how your system is programmed by your audiologist.

**IMPORTANT:** The auxiliary microphone provided by Advanced Bionics is designed to work specifically with your Processor. For this reason, please do not use any microphone other than the one designated by Advanced Bionics for the CLARION system.

## Telecoil Pickup

The telecoil pickup is provided as an interface to audio induction loop assistive listening systems, e.g., "room loops" and "neck loops," and as an alternative to placing the telephone receiver next to the microphone of the headpiece or auxiliary microphone.

To use the telecoil pickup, plug the connector of the pickup into the auxiliary jack on the side of the Processor. For use with audio induction loops, position the telecoil pickup inside the perimeter of the audio loop. For use with a hearing aid compatible telephone, attach the suction cup to the earpiece of the telephone receiver. When using the telecoil pickup with a telephone having a textured (non-smooth) finish, it will be necessary to hold the telecoil pickup in place while using the telephone. HINT: Move the telecoil pickup around the earpiece of the telephone receiver to find the best signal, or "sweet spot."

## Telephone Adapter

The telephone adapter is provided as an alternative to placing the telephone receiver next to the microphone of the headpiece or auxiliary microphone.



Set up the telephone adapter as follows:
• Unplug the handset cord from the telephone base.
• Plug the short cord into the handset jack on the telephone base.
• Mount the unit in a convenient location with the adhesive pad.
• Plug the handset into the modular jack on the telephone adapter.



**AMF45699**

EXHIBIT CC

To use the telephone adapter, plug the long gray line into the auxiliary jack on the side of the Processor.  Adjust your volume and sensitivity controls as needed.

**NOTE:** Only use the Telephone Adapter with phones that have the dial pad in the base.  The adapter will not work with phones that have the dial pad in the handset.

## Headpiece Microphone Tester Earphones

The headpiece microphone tester earphones allow a subjective listening assessment of the quality of the sound as it is received by the headpiece microphone.  Intermittencies in the headpiece cable can also be detected.

To use the headpiece microphone tester earphones, turn the program switch on the Processor to the microphone tester (Δ) position, plug connector of the earphones into the auxiliary jack on the side and of the Processor and place the earphones over your ears.  See the Troubleshooting Action Table in Section VI of this manual.

**NOTE:** The Headpiece Microphone Tester Earphones are only provided in the Pediatric Platinum Sound Processor Kit.

## Other External Auditory Input Devices

In addition to the accessories that are provided with the CLARION Platinum Sound Processor, many patients want to use external auditory input devices.  The same auxiliary jack that is used for the auxiliary microphone or telephone adapter can be used for other external auditory input sources such as battery-powered FM systems, tape recorders, or television audio amplifiers.

Please contact Advanced Bionics prior to using such a device to verify that the device in question is compatible with the CLARION system.

## V.  Using the CLARION Platinum Sound Processor

### Getting Started

In order to use the Processor, follow the steps below:

1. Verify that the Processor program switch is in the off (o) position.

2. Check that a charged battery or an AA battery pack has been correctly mounted onto the Processor.

3. Adjust the volume ( ) so that the indicator notch on the control is all the way to the left.

4. Check the position of the sensitivity control (•●●•) so that the indicator notch on the control is to the left of the midpoint at the 10:30 position.

5. Check that the headpiece connector is properly plugged into the headpiece jack on the Processor.

6. Place the headpiece on the head over the implant.

7. Turn the Processor on by turning the program switch to the appropriate position (as determined by your clinician).  Note that the red LED indicator should blink at least once.

8. Verify that the red LED indicator on the Processor stops flashing once communication is established with the implant.

9. Readjust the volume and sensitivity controls as necessary.  Adjustment of the controls may vary throughout the day depending upon the listening environment.

**IMPORTANT:** Use only the Processor that has been programmed especially for you.  Using a different Processor, which has been loaded with a different program, may be ineffective in

AMF45700

  EXHIBIT CC

providing sound information and may cause physical discomfort.

**IMPORTANT:** Be sure to turn the Processor off before removing the headpiece.

**NOTE TO EUROPEAN CUSTOMERS:** Under limited circumstances, the CLARION Cochlear Implant System may cause interference with TV reception. Based on internal testing and field experience, there is no evidence that this interference causes safety-related hazards.

## Adjusting for Background Noise

In some situations, background noise may interfere with your ability to hear clearly. Background noise can be particularly distracting in situations where a large number of people are speaking at once or in a noisy environment. Decreasing the sensitivity of the Processor by turning the sensitivity control toward the left may help eliminate some of the background noise. Using the auxiliary microphone may also be helpful.

## Using the Telephone

Your clinician may recommend when it is appropriate to begin working with the telephone. The telephone can be used by placing the phone directly over the headpiece, over the auxiliary microphone, or by using the telephone adapter.

Experiment with all modes of telephone communication. Be patient. Telephone communication with the implant often improves over time as one gains experience using the device. When using the telecoil adapter, the telephone handset must be hearing aid-compatible, meaning the phone has an electromagnetic coupling capacity.

When using digital cellular phones: Using or being in close vicinity to someone using certain digital cellular phones may cause interference with the cell phone's reception. If such interference occurs, you can turn off your Processor or move a greater distance from the source. Before purchasing a digital cellular phone, you should evaluate whether

or not interference is evident. No such interference has been noted with cellular phones using analog technology.

AMF45701

676

EXHIBIT CC

# VI. Troubleshooting Guide

The following is a description of the most common problems you may encounter with your CLARION Platinum Sound Processor and solutions for addressing those problems. After trying the remedies below, if the problem persists, contact your implant center or Advanced Bionics Corporation for support.

 

## No sound heard; no response from user

- Ensure that the cable is inserted into Processor, and the headpiece is properly positioned. Turn the Processor off (o) and back to position •, ••, or •••.

- If the red LED indicator:
  - *Does not blink,* replace the CLARION battery pack with another fully-charged battery pack or an AA battery pack.
  - *Blinks quickly 1 to 4 times and then flashes continuously,* replace the cable and/or headpiece.
  - *Blinks quickly 1 to 4 times, followed by 1 or more flashes, stops flashing and no sounds are heard,* replace the headpiece. If a headpiece is not available, use the auxiliary microphone with a program that is set up to allow auxiliary input and repeat the process.
  - *Blinks quickly 1 to 4 times, followed by 1 or more flashes, stops flashing, green LED illuminates in response to loud Speech at the site of the microphone, and sounds are heard,* the system is functioning properly.

 

## User hears static

- Ensure that the sensitivity control is properly set (10:30 position).

- Replace the cable.



## User hears muffled or distorted sounds

- Ensure that the sensitivity control is properly set (10:30 position).

- Remove any material (hats, headbands, etc.), which may be covering the headpiece microphone opening.

- Use the auxiliary microphone to determine if a new microphone is needed for the headpiece.

## Headpiece falls off

- Use the cable clip to provide additional stability to prevent the headpiece from falling to the ground.

- If your headpiece frequently falls off during normal activities, it may indicate the need for a stronger magnet. Contact your cochlear implant center.

## Headpiece or Processor gets wet

- Turn the Processor off immediately.

- Contact an implant center or Advanced Bionics for further instructions.

  **IMPORTANT:** Do not attempt to clean or dry the headpiece or Processor. Do not use if exposure to fluids is suspected.

  **WARNING:** If your system appears to be working, but you experience a deterioration in the volume or the quality and clarity of sound, contact your audiologist as your Processor may need to be reprogrammed.

  **CAUTION:** Your Processor should be serviced only at Advanced Bionics. Do not attempt to open or repair the Processor. Do not continue to use the Processor if any part of it is damaged. Unauthorized opening of the Processor, or other equipment, will void the warranty and may compromise system performance.

**AMF45702**

## Replacing Components

The three most common actions required to restore CLARION to proper functioning are: (1) replacing the battery, (2) replacing the cable, and (3) replacing the Headpiece, as described below.

 

### 1. Lithium Ion Rechargeable Battery

CLARION is powered by a custom-designed, rechargeable *Lithium Ion Battery*. An alternative battery pack, containing three AA alkaline batteries, can be used with the Processor.

Depending on the amount of power consumed using individual programs, the Lithium Ion Battery provides an average of 10-12 hours of operation. As described in Checking the System, Step 1, a depleted or nearly depleted battery should be replaced with a fully-recharged battery by taking the following actions.

To replace the Lithium Ion Rechargeable Battery:

- Turn the Program Switch to the off position.
- Remove the used battery by gently pressing and raising the release lever on the left side of the Processor, while at the same time sliding the battery case toward the lever. Return the used battery to the charger, according to the instructions in Section III of this User Guide.
- Align the slide track on the top of the replacement battery case with the slide track on the underside of the Processor.
- Guide the battery case onto the Processor slide track and slide the case until it engages into place on the Processor. Do not force the battery case. It is designed to be inserted in only one direction. Forcing the case may jam or damage the slide mechanism.
- Perform the system check sequence, Steps 1-3, as described at the beginning of this section.

### To replace the AA Battery Case

- Unsnap the AA battery pack utilizing the thumb recess on the top of the case.
- Insert AA batteries into the battery compartment, making sure that the positive and negative contacts are in the correct orientations, as labeled inside the cover.
- Replace the cover by hooking the case together at the bottom and gently snapping it closed.
- Align the slide track on the top of the replacement battery case with the slide track on the underside of the Processor.
- Guide the battery case onto the Processor slide track and slide the case until it engages into place on the Processor. Do not force the battery case, it is designed to be inserted in only one direction. Forcing the case may jam or damage the slide mechanism.
- Perform the system check sequence Steps 1-3, as described in the beginning of this section.

### 2. The Cable

The cable provides a relay for the transfer of signals between the Headpiece and the Processor. At one end of the cable is a *single-pin (coaxial) plug* that is inserted into the Headpiece jack. The jack is located at the top of the Processor. At the other end of the cable is a two-pin plug that is inserted into the Headpiece. A *strain relief* portion near the *two-pin plug* is designed to protect the cable from damage during handling.

To replace the Cable:

- Turn the Program Switch to the *off* position.
- Remove the Headpiece from the Cable by holding the cable at its *strain relief* portion and gently pulling the cable away from the Headpiece. Disconnect the cable from the Processor.
- Insert the *single-pin plug* of the replacement Cable into the Headpiece *jack*, and insert the *two-pin plug* into the headpiece connector. Take care to match the larger pin on the plug to the larger hole of the Headpiece connector.

**AMF45703**

EXHIBIT CC

# VII. Caring for Your Cochlear Implant System

Although your CLARION Platinum Sound Processor has been designed and built to withstand daily wear and tear, care must be taken to protect both the implanted and external components of the device. For a detailed discussion of clinical results, warnings and precautions please refer to the *Package Insert* located at the back of this guide. It is a good idea to carry the *User Identification Card* with you at all times.

## Cleaning

If necessary, the Processor and headpiece can be cleaned with a slightly dampened cloth or tissue. Take care that water does not drip into any connectors or the microphone. Water should not be allowed inside either the Processor or headpiece.

**CAUTION:** Immersion in water will damage the Processor and headpiece electronics.

To prevent intermittent operation of the Processor, the battery contacts on the battery pack and on the Processor should be kept free from dirt and dust. Clean the contacts at least once a month with an alcohol swab.

## Processor Protection

Your Processor contains advanced electronics that can be damaged. Care should always be taken when using or handling your device. If the Processor is dropped, check it for proper functioning. If you suspect that the Processor has been damaged, contact your cochlear implant center for a replacement. Additionally, the programming cable connector located on the underside of your Processor should be kept free from dirt and dust, as well as contact with objects that may damage the

connector. Care should be taken to avoid the following:

- Dropping the Processor.
- Leaving the Processor any place where it can come in contact with water or moisture. Remember to remove the Processor and headpiece when bathing, showering, or swimming
- Exposing the Processor to extreme temperatures (below 32° Fahrenheit [0° Celsius] or above 115° Fahrenheit [45° Celsius]).
- Static electricity has the potential of damaging the electrical components of the Processor. Care should be taken to avoid situations in which static electricity is commonly created such as when pulling on and off clothes or walking across a wool rug. If static electricity is present, patients should touch something conductive (e.g., a metal object) prior to handling the external equipment or before their cochlear implant system contacts another person or object. Children should remove their headpiece and Processor before engaging in activities that commonly create static electricity, such as playing on plastic play equipment.

While the Processor has been built to be as sturdy as possible, it should be treated with gentle care and attention. Additionally, you should check your cable regularly (every week or so) to see if it is frayed or damaged. If your cable appears to be damaged, it should be replaced.

## Implant Protection

The implant is capable of withstanding the effects of running, exercise and normal activity. Regardless of the activity, precautions must be taken in order to avoid a blow to the head, which could result in damage to the implanted device resulting in device failure.

**WARNING:** When engaging in physical activities that include the possibility of trauma or impact, extra precautions should be taken, such as using a protective helmet, to reduce the risk of damage to the implant. Contact sports in which blows to the head or impact at the implant site are likely to occur should be avoided. If it is suspected that the device has been damaged, call your audiologist.

AMF45704



EXHIBIT CC

# VIII.Future Product Improvements

Advanced Bionics is committed to providing the best products and service to our customers.  We welcome your comments about the CLARION Platinum Sound Processor or your suggestions to improve the product.  Please feel free to contact Advanced Bionics or to discuss your suggestions with your clinician.

Advanced Bionics Corporation
12740 San Fernando Road
Sylmar, California  91342  U.S.A.
Tel:  +1 818-362-7588
Tel:  800-678-2575 (in U.S.)
Fax:  +1 818-362-5069
TDD:  +1 818-364-0458
TDD:  800-678-3575 (in U.S.)
e-mail:  info@advancedbionics.com

Advanced Bionics SARL
76, rue de Battenheim
68170 Rixheim, France
Tel:  +33 (0)3 89 65 98 00
Fax:  +33 (0)3 89 65 50 05
e-mail:  europe@advancedbionics.com

Technical information will be provided to qualified personnel upon request.

© 2000 Advanced Bionics® Corporation.  All rights reserved.

Advanced Bionics® and CLARION® are registered trademarks of Advanced Bionics Corporation in the United States of America and other countries.

This device is protected under one or more of the following U.S. Patents:  4,400,590, 4,405,831, 4,495,917, 4,686,765, 4,721,551,  4,819,647, 4,837,049, 4,931,795, 4,969,468, 4,990,845, 4,991,582,  5,443,493, 5,477,855, 5,513,793, 5,522,865,  5,531,774, 5,545,191, 5,569,307,  5,571,148, 5,584,869, 5,601,617, 5,603,726,  5,609,616, 5,626,629, 5,738,270, 5,776,172, 5,833,714, 5,876,425.  Other U.S. and/or foreign patents are pending.

**9055033-001**
**Rev. E**

August 2001

**AMF45705**

EXHIBIT CC



**CLARION**®
BY ADVANCED BIONICS®

**Advanced Bionics Corporation**
12740 San Fernando Road
Sylmar, California 91342
(+1) 818.362.7588

**Advanced Bionics SARL**
76, rue de Battenheim
68170 Rixheim, France
(+33) (0) 3.89.65.98.00

**www.cochlearimplant.com**

AMF45706

9055037-001 Rev C

EXHIBIT CC

EXHIBIT DD



**SUPPLEMENTAL EXPERT REPORT OF JOHN CHOMA, PH.D.**

November 30, 2012

EXHIBIT DD

I am the same John Choma who previously provided two infringement reports on behalf of Alfred E. Mann Foundation for Scientific Research ("AMF") in 2009 in this litigation against Cochlear.  I have been asked to supplement my opinions and provide this document accordingly.

## INTRODUCTION

I incorporate by reference into this document all of the reports and declarations in this case that I previously submitted, including my original infringement report submitted in January, 2009 and a March, 2009 supplemental infringement report.  This supplemental report does not change any of my previously-expressed opinions. Rather, I have been asked to submit this report to address several discrete issues including the impact of the court's claim construction order, which was not available at the time of my previous submission, and infringement by products about which Cochlear first provided information in 2011, known collectively as "Nucleus 5," that include implantable cochlear stimulators and wearable speech processors.[1]

The additional materials I have considered are listed in Appendix A.

As the court has construed the claims, I now refine certain of my infringement analysis in response to the Court's construction. For clarity, I have also provided additional explanation of my infringement analysis for those and other claim terms where appropriate.  Further, where appropriate, I have provided opinions as to infringement of certain claim elements under the Doctrine of Equivalents or under the "Equivalents Thereof" literal infringement standard for means-plus-function claims.  Attached as appendices B through E is an updated version of the detailed infringement charts provided with my initial report (corresponding respectively to Appendix H, I, F and G of my initial report). The charts indicate the Court's present construction for the claim terms.  My infringement analysis was done in accordance with that construction.

---

[1] I understand that the parties have agreed that infringement of the new Cochlear CI422 implant (a CI24RE 'stimulator/receiver' with a modified electrode array, COC 7000045) depends on a finding of infringement of the CI24RE.  My analysis of the CI24RE therefore applies to the CI422.

**SUPPLEMENTAL OPINIONS ABOUT THE NUCLEUS 5 DEVICES**

I have been asked to provide an infringement opinion regarding Cochlear's Nucleus 5 devices. The Nucleus 5 system includes implantable cochlear stimulators and wearable processors.

The Nucleus 5 implants and wearable processors infringe the '691 and '616 patents in the same manner as the CI24RE implant and SP12 processor analyzed in detail in the attached infringement charts because, as described below, they have the same relevant design and functionality. Therefore, I have not prepared a separate chart for the Nucleus 5 products - the CI24RE implant and SP12 charts apply equally to the Nucleus 5 products.  Where I deemed necessary, primarily for purposes of clarity, I do provide additional analysis relating to the Nucleus 5 products for certain claim elements.  That additional analysis is presented in the attached charts for the CI24RE and SP12.

**Nucleus 5 Implantable Stimulators**

On November 20, 2008, Cochlear submitted to the FDA a 180-day supplement to its previously-approved application for the Nucleus Cochlear Implant System. "The supplement [sought] approval to market two modified versions of the Nucleus Freedom Cochlear Implant" - the CI500 cochlear implant series (the CI512 and CI513)[2] also known as the Nucleus 5 implants. COC-2091521-23. Cochlear's executive summary to that submission stated:

> The CI500 implant series was designed using *the same key internal electronic components and circuitry* as the presently marketed Freedom series of implant models. The main differences between the CI500 implant series and the Freedom series are:
>
> • A reduction in the thickness of the receiver/stimulator chassis
>
> • Use of a titanium plate electrode in place of the Platinum Plate ECE
>
> • Additional reference resistors allowing a greater number of unique implant ID combinations

---

[2] The CI500 series further includes the CI551 which is described as "the addition of a previously approved electrode array (P970051/S015) entitled the Double Array cochlear implant (model CI24M DAI, also called N24 CI 11+11+2M[]) to the approved CI500 (P970051/S048) series stimulator-receiver component;" (COC-7000010).

684                                                                    EXHIBIT DD

- A new production line with more efficient environmental and manufacturing controls

- A slightly different grade of liquid silicone

- Improved manufacturing processes for the electrode array of the CI513

. . . .

The electronic functionality of the CI500 implant series is equivalent to that of the Freedom series, therefore verification and validation activities were conducted to confirm the suitability of the mechanical and electrical properties of the new design.

COC-2091524-25 (emphasis added). Further, Cochlear represented that the CI500 implants use the "[s]ame CIC4 Integrated Circuit as the CI24RE." COC-2091541, COC-2091584.  Cochlear noted that its "submission is based on the equivalence of the CI500 implant series to the CI24RE series," i.e., the implant which is the subject of two of the four claim charts I submitted previously, revised versions of which are submitted as attachments to this supplement. COC-2091525.

"The CI512 consists of the CI500 mated to the Contour Advance Electrode Array, while the CI513 is made up of the same receiver/stimulator attached to the Contour Advance Enhanced Electrode Array." COC-2091525. The CI500 "is also referred to in some documentation under the development names: CI24Si and Mulberry B. *The CI500 is a repackaged version of the electronics included in the currently approved Freedom Cochlear Implant*." COC-2091525 (emphasis added). "The stimulation rates and other electronic capabilities of the implant are unchanged from the previous generation. The only functional difference in the device is related to the implant ID functionality. There are two additional reference resistors in the CI500, allowing for a total of 1,000,000 unique combinations, further decreasing the risk of unintentional use of the wrong processor by recipients." COC-2091527. Cochlear's submission noted that both the CI512 and CI513 cochlear implant design have "Similar electrical circuit configuration with equivalent functionality to the CI24RE,"  and that "[a]s the electrical functionality of both implants is equivalent and no new claims and functions are made for the CI512 or CI513, it was determined that additional clinical data is not required." COC-2091541.

EXHIBIT DD

That equivalence is also described in the Design Description, CI500 Series Implant, COC-6000086-87, which notes that "The implant shall function electrically as a CI24RE implant." COC-6000086-87 at 6.   Design Description, CI500 Series Implant also notes that "***The electrical circuit design of the CI500 electronics is the same as for the CI24RE implant*** except there is provision for more implant ID resistors." COC-6000086-87 at 9.

### The Nucleus 5 Wearable Processors

Cochlear noted that "[t]he functionality of the CP810 is based on the Freedom processor; no new speech coding strategies are introduced with this supplement, and the available stimulation rates remain the same. . . . . The signal processing path of the CP810 (from audio input to RF coil output) is based directly on the Freedom DSP firmware design, and as such uses the same primary functions." COC-2094292, COC-2094294.  "No new clinical data was required to demonstrate safety and effectiveness, as the results for the CI24RE models presently on the market are valid." COC-2094292. The CP810 has a number of minor changes from the previously-analyzed Freedom processor, including the addition of "bi-directional wireless capability to enable the use of a remote in accessing features of the processor," which is merely necessary for the functionality of a Remote Assistant. COC-2094293.

Cochlear's documents also refer to the Nucleus 5/CP800/810 wearable processor as the SP15. Cochlear's submission provided a comparison of the SP15 and the previously approved (and analyzed) Freedom/SP12 processor:

> The functional blocks of the SP15 and Freedom are similar. ***Both processors use the same ASIC, the CHAMP-LP, to drive all signal processing and micro-controller based operations.*** This is the "heart" of both sound processors. The SP15 signal processing path from audio input to RF coil output is based directly on the Freedom DSP firmware design, and as such uses the same primary functions as on Freedom. The functions that have been modified in order to improve efficiency and/or performance are:
>
> • The filterbank output analysis rate on Freedom is variable, and set approximately equal to the stimulation rate, up to a maximum of 2600 Hz. On SP15, the Filterbank output analysis rate is fixed at 1000 Hz, and interpolated up to a maximum of 3500 Hz. The two schemes provide an equivalent function for the Filterbank to stimulation process.
>
> • The Freedom uses a hardware directional microphone to pick up sound from a specific direction. The SP15 combines the output of its dual omni-directional

EXHIBIT DD

microphones to form a directional microphone response. It has the advantage that the directionality can be varied due to its implementation in firmware.

COC-2094332-34. The SP15 is compatible with the Freedom implant, and is hardware ready to support legacy implants of the Nucleus 24 (CI24) family. COC-2094330. The CP810/SP15/Mulberry B/Nucleus 5 Processor uses the same ASIC, the CIC4, as the prior Freedom implant. COC-2099129-30; COC-2091541.   The changes between the SP15 and SP12 (Freedom) sound processors do not affect my infringement analysis.

**Custom Sound Software**

The Nucleus 500 series products operate with Custom Sound programming software.  For example, the CI500 Series Implants were introduced for regulatory approval with Custom Sound 2.0.  COC-2091524.  The CP810/SP15 operates with Custom Sound 3.0. COC-2094311.

The CP810/SP15 is programmed in the same manner as the SP5 and SP12 processors:

By connecting the SP15 sound processor to a SP15 programming shoe, the SP15 sound processor can be programmed using the Freedom Programming Pod and the Custom Sound computer program.  COC-2094424, COC-2094445.

The SP15/CP810 with Custom Sound infringe in the same way as the previously analyzed SP12 processors, and the claim charts describing the SP12 processors therefore also apply to the SP15/CP810.

**ACCUSED PRODUCTS**

The attached tables provide my infringement analysis for the following implants:

-CI24M implants

-CI24R implants (including CI24R (CS), CI24R (CA), CI24R (CA2), CI24R (ST))

-CI24RE implants (including CI24RE (ST), CI24RE(CA) and CI24RE Hybrid)

-CI500 implants (CI512, CI513, CI551)

-CI422.

The attached tables provide my infringement analysis for the following speech processors:

-  Sprint (SP5)

EXHIBIT DD

- SP12

- CP800 series (including CP810).

## EVIDENCE OF DIRECT INFRINGEMENT BY COCHLEAR'S CUSTOMERS

I am aware of and, if asked, would testify to the following instance of direct infringement of claim 10 of the '616 patent by Cochlear's customers and/or product users.

On June 12, 2012, I met with Ginger Stickney, Ph.D., F.A.A.A. She is a consulting expert with more than 13 years experience in the field of audiology with a specialization in cochlear implants for pediatric and adult patients. Dr. Stickney demonstrated a Freedom speech processor as well as a Nucleus 5 (CP810) speech processor with Custom Sound software, including an impedance test training mode demonstration. She also showed me a Nucleus 5 implantable stimulator demonstration device (CI500 series).

In response to my explicit inquiry, Dr. Stickney told me that she has and continues to utilize the equipment that she demonstrated to me (Custom Sound software and speech processors) to perform impedance testing on her patients (adults and children), including as an initial step in the setting of Threshold and Comfort levels. She has utilized Common Ground, Monopolar #1, Monopolar #2 and Monopolar #1 and 2 modes when performing impedance testing before mapping a patient's settings. She also informed me that she performs an impedance test on each electrode before every patient mapping. However, she has deactivated electrodes for testing when an electrode was known to be defective.

Dr. Stickney also told me that she was trained by Cochlear personnel on how to perform impedance testing. Approximately two years ago she attended a Cochlear training "workshop" (possibly in Long Beach, California) that included approximately twenty other audiologists from the Los Angeles and Orange County areas. At this conference, Cochlear personnel and/or representatives taught the audiologists about the then-new Nucleus 5 line of products, including how to perform impedance testing. Dr. Stickney has and continued to use manuals provided by Cochlear - similar to those cited in my charts - that describe impedance testing.

EXHIBIT DD

Based on this information, I believe that Dr. Stickney has and continues to utilize the Cochlear equipment consistent with the testing and programming methods outlined in Cochlear's manuals and as described in my infringement charts.

I have also reviewed the deposition of David Kelsall taken in December, 2008.  In that deposition, Dr. Kelsall, a neurotologist (i.e., ear surgeon), who performs Cochlear implants (p. 4), testified that he does impedance testing on Cochlear implants in the operating room after the implant device is surgically placed within the patient.  (p. 13-15, 21).  A laptop with Custom Sound, a programming pod and speech processor are all used to perform impedance testing.  (p. 14-15, 17).  Dr. Kelsall was trained to do this impedance testing by his staff who were, in turn, trained by Cochlear representatives.  (p. 16-17).  Further, the impedance testing performed by Dr. Kelsall is explained in training manuals provided by Cochlear (p. 16-19).

Based on my analysis of claim 10 of the '616 patent, I believe that Dr. Stickney and Dr. Kelsall, as well as others, have in the past and - at least in the case of Dr. Stickney - continue to use the method of claim 10 of the '616 patent in their respective practices.  Both were trained directly and indirectly by Cochlear to perform the infringing method through training sessions by Cochlear personnel and the use of manuals provided by Cochlear.  References to certain of those manuals are found in my infringement claim charts.

**SMALLEST PATENT-PRACTICING SALEABLE UNIT**

I believe that a Cochlear speech processor and a Cochlear implant are implicated by the claims of the '616 and '691 patent that are the subject of my claim charts and therefore constitute the smallest patent-practicing saleable unit of a system falling within the scope of the claims. The evidence that I cite in the third column of my attached charts makes it clear that the claims encompass both a sound processor and an implant.  I also note that this conclusion is supported by Figure 1 of the patents which shows a preferred embodiment of the invention as including a speech processor and an implant:

EXHIBIT DD



Fig. 1

The    '616 Patent    describes this embodiment as follows: "[a] preferred embodiment of the present invention comprises a cochlea stimulating system including an externally wearable signal receiver and processor (WP) and an implanted cochlea stimulator (ICS)."  Column 3, lines 10-13.  Therefore, the language of the specification describing the invention as well as the various components included in the asserted claims demonstrates that the smallest saleable patent-practicing unit includes both a speech processor (WP) and the implant (ICS).  Additionally, both the speech processor and the implant are critical components for the operability of the claimed invention.

John Choma, Ph.D.

11/30/2012

Date

EXHIBIT DD

EXHIBIT EE



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

---------------------------------------------------------------------------------------------------------

**ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,**
**Plaintiff and Counterdefendant,**


**v.**


**COCHLEAR CORPORATION (N/K/A COCHLEAR AMERICAS) AND COCHLEAR LTD. ET AL.,**
**Defendants and Counterclaimants.**


---------------------------------------------------------------------------------------------------------

**Supplemental Expert Report of Cate M. Elsten**

**30 November 2012**

*Confidential: Attorneys' Eyes Only*

*Attorneys' Eyes Only*

EXHIBIT EE


INTELLECTUAL CAPITAL EQUITY

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................................. 1

II.     BACKGROUND ................................................................................................................... 2

        A.   Hearing Loss ............................................................................................................ 2

        B.   Functionality of Cochlear Implant Systems ............................................................ 3

        C.   Development of Cochlear Implant Systems ............................................................. 5

        D.   The Cochlear Implant Industry ............................................................................... 7

        E.   Programming CISs and the Role of Telemetry ....................................................... 9

             1.   Impedance Telemetry .................................................................................. 10

             2.   Neural Response Telemetry ("NRT") ......................................................... 11

             3.   Compliance Telemetry ................................................................................ 12

        F.   The Parties at Issue ............................................................................................... 12

             1.   Alfred E. Mann Foundation for Scientific Research .................................. 12

             2.   Advanced Bionics ....................................................................................... 12

             3.   Cochlear Limited and Cochlear Americas ................................................. 13

        G.   The Patents at Issue .............................................................................................. 14

        H.   Products at Issue ................................................................................................... 16

             1.   The Nucleus 22 ........................................................................................... 16

             2.   The Nucleus 24 ........................................................................................... 17

             3.   The Nucleus Freedom ................................................................................. 17

             4.   The SPrint ................................................................................................... 17

             5.   The ESPrit ................................................................................................... 18

             6.   The ESPrit 3G ............................................................................................. 18

             7.   The Freedom ............................................................................................... 18

             8.   The Nucleus 5 ............................................................................................. 18

             9.   The Nucleus CI422 ..................................................................................... 19

        I.   Timeline of Relevant Events ................................................................................. 21

III.    OPINIONS EXPRESSED, WITH THE BASES AND REASONS THEREFOR .................................. 25

        A.   Based on financial records and testimony provided to date, I have calculated
             Cochlear revenue of between $1.539 billion and $1.582 billion on sales of allegedly
             infringing Cochlear Implant Systems ("CISs") between December 2001 and June
             2012. ...................................................................................................................... 27

             1.   Cochlear has generated revenue of $667.2 million from infringing sales of the
                  CI24 in the Americas between December 2001 and June 2012 and $254.3
                  million from infringing sales of the CI500 and CI422 series from September
                  2009 to June 2012. ..................................................................................... 27

             2.   Cochlear has generated revenue of $361.2 million from infringing sales of the
                  SPrint and SP12  in the Americas between December 2001 and June 2012 as

i

*Attorneys' Eyes Only*

EXHIBIT EE

ELLECTUAL CAPITAL EQUITY

    well as $246.8 million from sales of the CP800 series from September 2009 to June 2012. ........................................................................................................29

    3.  Cochlear has generated revenues of approximately $42.2 million from allegedly infringing sales of the ESPrit 3G used in conjunction with the CI24 in the Americas between December 2001 and June 2012. ..............................29

B.  Consideration of conventional valuation methodologies produces a number of quantitative royalty indicators useful in the determination of a starting range for a reasonable royalty in this case. ...................................................................................30

    1.  Based on information currently available to me, in particular the license between AMF and Advanced Bionics that includes the patents-in-suit, the Market Approach indicates royalty rates in the range of approximately 4.8% to 9.8% have been paid by or to parties relevant to this suit for hearing-related and other medical device technologies. ........................................................30

    2.  Based on information currently available to me, the Income Approach provides quantitative royalty indicators in the range of 16.1% to 33.5% of sales. ..............................................................................................................42

    3.  Based on information currently available to me, there does not appear to be either sufficient data or an appropriate factual or conceptual basis for application of the Cost Approach in this case. .................................................47

    4.  Quantitative royalty indicators provide useful benchmarks for my reasonable royalty analysis. ................................................................................................47

C.  Reference to the fifteen factors and "hypothetical negotiation" construct defined in *Georgia-Pacific v. United States Plywood Corp.* indicates a reasonable royalty for Cochlear's use of the AMF Patents would be 7.5% of sales. ......................................48

D.  Absent additional information from Cochlear or its experts, it is my opinion that a royalty of 7.5% would be reasonable for both of the AMF Patents or either individually, although the period for which damages are calculated may be abbreviated if only the '691 patent is found valid and infringed. .................................66

IV.    PREJUDGMENT INTEREST ............................................................................................ 67

V.    DATA AND INFORMATION CONSIDERED IN FORMING THESE OPINIONS ......................... 67

VI.    EXHIBITS TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS ......................... 67

VII.    QUALIFICATIONS INCLUDING PUBLICATIONS AND TESTIMONY ..................................... 67

VIII.    COMPENSATION PAID FOR SERVICES............................................................................. 68

*Attorneys' Eyes Only*

EXHIBIT EE


INTELLECTUAL CAPITAL EQUITY

## I.   INTRODUCTION

I have been asked to provide opinions regarding damages the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics LLC[1] ("AMF" and "Advanced Bionics" respectively or, collectively, "Plaintiffs") may claim if there is a finding of liability against Cochlear Limited and Cochlear Corporation (n/k/a Cochlear Americas; collectively, "Cochlear" or "Defendant")[2] for alleged infringement of U.S. Patent No. 5,609,616 ("the '616 Patent") and/or U.S. Patent No. 5,938,691 ("the '691 Patent"; collectively "the AMF Patents" or the "patents-in-suit" ).  I previously filed a Preliminary Damages Report for this matter on 19 January 2009 and a Surrebuttal Report on 30 March 2009, the latter in response to a Rebuttal Report authored by Mr. Russell Parr and filed 11 March 2009 on behalf of the Defendants ("the Parr Report").

The opinions found in my Preliminary and Surrebuttal Reports are incorporated in this Supplemental Report in their entirety and remain unchanged except as modified herein.  Since the time of my Surrebuttal Report, I have had further conversations with AMF personnel and reviewed certain additional production and publically available documents. As in all cases, the passage of time has also introduced additional potentially relevant case law.  This report sets forth my current opinions at this time.

Section II of this report provides brief background information on the market for the patented products, the patented technology, the parties in suit and other information used in my analyses.  Section III of this report outlines my affirmative opinions and includes responses to key conclusions of the Parr Report.  I have utilized footnotes throughout the report in an effort to improve its flow and readability.  The footnotes are an integral part of my report and are intended to carry the same weight as if included in the main body of the report.  My opinions at this time are based on an independent examination of documents and discovery produced in this case, conversations with AMF and Advanced Bionics personnel[3] and certain third-party documents as disclosed in my report text and appendices.

The disclosures in this report are based on discovery to date and currently available information.  To the extent additional relevant information comes to light, including but not limited to supplemental production from the parties, reports from either party's expert(s), rulings from the Court and any additional materials produced through discovery or otherwise made available, I may amend or supplement my opinions if necessary and if permitted by the Court.

As in all cases, whether engaged by counsel for a plaintiff or a defendant, an assumption that liability will be found is necessary as a basis for my analysis.  It does not imply I have been engaged to

---

[1] Advanced Bionics, LLC became a wholly-owned subsidiary of Advanced Bionics Corporation on 8 November 2009 as part of the Agreement and Plan of Merger executed by Attempo 21 AG, Omega Merger Sub, Inc., Advanced Bionics Corporation, Alfred E. Mann Living Trust, the 2004 Jeffrey Greiner Revocable Trust and Alfred E. Mann as Seller Representative.

[2] Although I may refer to the defendants collectively as "Cochlear" in my report, this is not to be construed as a legal conclusion or other assumption that Cochlear, Ltd. and Cochlear Americas are properly regarded as a single entity for purposes of damage determination in this lawsuit.  When referencing either entity individually, I will use its full corporate name.

[3] To date, I have had conversations with the following: Jerry Schloffman, Vice President of Global Marketing at Advanced Bionics; Larry Fischer, former Chief Financial Officer of AMF; John Petrovich, Senior Vice President and General Counsel of AMF; Mark Chamberlain, Chief Operating Officer of AMF; David Hankin, Chief Executive Officer of AMF; Farah Boroomand, Chief Financial Officer of AMF, John Gord, Electrical Engineering Consultant at AMF; Glenn Griffith, Principal RF Communications Engineer; and  Dr. Ginger Stickney, audiologist.

1

*Attorneys' Eyes Only*

EXHIBIT EE


INTELLECTUAL CAPITAL EQUITY

provide opinions on issues relevant to a determination of liability or have determined such liability exists.

This report has been prepared in connection with the above referenced case.  The report is to be used for the specific purposes of this litigation and is not to be used for any other purpose without the express written consent of Ocean Tomo.

## II.  BACKGROUND

### A.  Hearing Loss

I understand that in a fully functioning ear, sound is perceived when movements of the basilar membrane are sensed by a line of hair cells in a part of the ear known as the cochlea.[4]  If the hair cells are damaged, a patient's auditory system cannot transform sound into neural impulses and hearing impairment or loss results.[5]  Individuals with hearing impairment may be categorized by the severity of their impairment as follows:[6]

| Level of Hearing Loss | Decibel Level (What can you hear?) | Sound Equivalent |
|---|---|---|
| Typical or Standard | Less than 20 dB | |
| Mild | 20-40 dB | Cannot hear whispered conversation in a quiet atmosphere at close range |
| Moderate | 40-60 dB | Cannot hear normal conversation in a quiet atmosphere at close range |
| Severe | 60-90 dB | Cannot hear speech; may only hear loud noises such as a vacuum cleaner or lawn mower at close range |
| Profound | Greater than 90 dB | Cannot hear speech; may only hear extremely loud noises such as a chain saw or the vibrating component of a loud sound |

While researchers have found it difficult to quantify the deaf population,[7] an estimated 48 million people in the United States suffer from some degree of hearing loss.[8]  An estimated 12,000

---

[4] http://www.americanscientist.org/issues/id.942,y.0,no.,content.true,page.1,css.print/issue.aspx
[5] Loizou, Philipos C., "Mimicking the Human Ear," *IEEE Signal Processing Magazine*, September 1998
[6] http://www.agbell.org/DesktopDefault.aspx?p=Hearing_Loss_Chart; http://www.agbell.org/docs/soyourchild.pdf
[7] Mitchell, Ross E., "How Many Deaf People are There in the United States?  Estimates From the Survey of Income and Program Participation," Gallaudet Research Institute, Oxford University Press, 2005
[8] http://www.hopkinsmedicine.org/news/media/releases/one_in_five_americans_has_hearing_loss

*Attorneys' Eyes Only*

EXHIBIT EE


INTELLECTUAL CAPITAL EQUITY

**2. Cochlear has generated revenue of $361.2 million from infringing sales of the SPrint and SP12 in the Americas between December 2001 and June 2012 as well as $246.8 million from sales of the CP800 series from September 2009 to June 2012.**

As discussed in Section II.H, I understand the SPrint and versions of the SP12 intended for use with the CI24 are alleged to infringe the AMF patents-in-suit, as are all sales of the CP800. A summary of the revenue and unit sales generated by Cochlear from the SPrint, SP12 and CP800 series is presented below:

**Table 3**
**SPrint, SP12 and CP800 Revenue and Units, December 2001 to June 2012[178]**

|  | Revenue | Units |
|---|---|---|
| SPrint | $48,474,714 | 8,056 |
| SP12 | $312,718,313 | 63,923 |
| Total | $361,193,027 | 71,979 |
| CP800 Series | $246,819,688 | 52,178 |
| Total with CP800 Series | $608,012,714 | 124,157 |

I understand the SPrint and SP12 were generally only compatible with the CI24 during the damages period, and therefore were used in an infringing combination. However, I understand that in the fourth quarter of Cochlear's Fiscal Year 2008 Cochlear introduced a version of the SP12 that was compatible with the CI22. I have estimated unit sales of the SP12 associated with the CI22 from 2008 to 2012 at 1,083 units, corresponding with revenue of $5,527,051.[179] When these sales are subtracted from the total sales of the SPrint and SP12 the total infringing revenue is $361,193,027.[180]

**3. Cochlear has generated revenues of approximately $42.2 million from allegedly infringing sales of the ESPrit 3G used in conjunction with the CI24 in the Americas between December 2001 and June 2012.**

As noted above in Section II.A.1, the fact that a CI24 was sold in conjunction with an ESPrit 3G does not preclude the use of back telemetry on the recipient's CIS, and I understand that in fact such use was common.[181] Absent any further evidence or argument from Cochlear or its expert, these speech processors may be appropriately included in the royalty base.

---

[178] Exhibits 2.1, 2.4, 3.3, and 3.4
[179] See Exhibit 2.4
[180] See Exhibit 2.1
[181] Discussion with Dr. Ginger Stickney, Audiologist

29

*Attorneys' Eyes Only*

EXHIBIT EE


INTELLECTUAL CAPITAL EQUITY

Prior to May 2004, the ESPrit 3G was only available in the U.S. for use with the CI24. Therefore, for the period between December 2001 and May 2004 I have quantified all sales of ESPrit 3G as sales made for use with the CI24.  For the period after the first quarter of 2004, I have subtracted the total number of potential upgrades of CI22 recipients to ESPrit 3G from the total ESPrit 3G sales during the period to estimate ESPrit 3Gs sold with CI24s.[182]

Between December 2001 and June 2012, Cochlear generated revenue of approximately $42,182,070 from sales of the ESPrit 3G sold with the CI24.[183]

**B.  Consideration of conventional valuation methodologies produces a number of quantitative royalty indicators useful in the determination of a starting range for a reasonable royalty in this case.**

In order to determine a range of royalty indicators that may be appropriate in the current matter, I have considered generally accepted *Market*, *Income* and *Cost* valuation methodologies typically used in evaluating intangible assets such as the AMF Patents.  These methodologies are discussed below.

**1.  Based on information currently available to me, in particular the license between AMF and Advanced Bionics that includes the patents-in-suit, the Market Approach indicates royalty rates in the range of approximately 4.8% to 9.8% have been paid by or to parties relevant to this suit for hearing-related and other medical device technologies.**

The Market Approach values assets based on comparable transactions between unrelated parties.  As described in <u>Valuing Intangible Assets</u>,

> *"The market approach uses two categories of analytical procedures to indicate value: 1) The collection and analysis of market-derived empirical transaction data; that is, data regarding the sale or licensing of the subject intangible asset itself and of comparative intangible assets; and 2) An assessment of the current market conditions (i.e., the economic conditions that influence price) and of the changes in market conditions between the dates of the empirical transactional data and the date of the [hypothetical negotiation]."*[184]

With the Market Approach, an examination of the terms of technology transfers with some similarity to the hypothetical transaction is undertaken and inferences are drawn from resulting observations to identify terms AMF and Cochlear might have agreed to in the hypothetical negotiation.  Specifically, I have considered the licensing histories of both Cochlear and AMF.

**a.  Cochlear has produced documents related to two license agreements for patents or technologies related to CISs, one of which includes stated running royalties of between 2.0% and 5.0% of sales.  This license also included terms that would impact the actual effective rate of the license, but that cannot be quantified based on information provided by Cochlear to date or otherwise available to me.**

---

[182] Exhibit 2.8
[183] See Exhibit 2.7
[184] Reilly, Robert F. and Schweihs, Robert P., <u>Valuing Intangible Assets</u>, 1999, p. 102

30

*Attorneys' Eyes Only*

EXHIBIT EE

 INTELLECTUAL CAPITAL EQUITY

Before 1990 I had over eleven years of industry experience in financial, marketing and accounting management for entertainment, retail and consumer products companies.  My positions included Chief Financial Officer for Cleveland's Playhouse Square Center, Senior Corporate Sales and Marketing Analyst for Dayton Hudson Corporation's Target Stores Division (now Target Corporation), Manager of Financial and Strategic Planning for Aveda Corporation (now a subsidiary of Estée Lauder) and Chief Operating Officer for Sign Consultants, Inc.

I have experience developing strategies and participating in negotiations for the purchase, sale and licensing of intellectual property, both as a consultant and in my positions in industry. I am a Certified Licensing Professional and a Certified Management Accountant.  I am also a member of the Licensing Executives Society and the International Trademark Association, f or whom I served three consecutive terms on the editorial board of The Trademark Reporter.  I am a past member of the Board of Governors for the Brand Name Education Foundation and a current member of the American Marketing Association.  I hold a Bachelor of Arts degree from Oberlin College and a Master of Arts degree in business from the University of Wisconsin-Madison.

My professional publications within the past ten years and my previous testimony in litigation are included in Appendix C to this report, which has been updated for testimony since the issuance of my Preliminary and Surrebuttal Reports.

## VIII.   COMPENSATION PAID FOR SERVICES

Fees for Ocean Tomo personnel's time and expenses have been charged at applicable market rates on this case.  My billing rate for this matter is currently $525 per hour.  My payment is not contingent on the outcome of this case.

Respectfully,

Cate Elsten

68

*Attorneys' Eyes Only*

EXHIBIT EE

EXHIBIT FF

1   DANIEL GRUNFELD, (SBN 128494)
    daniel.grunfeld@kayescholer.com
2   KAYE SCHOLER LLP
    1999 Avenue of the Stars, Suite 1700
3   Los Angeles, California  90067
    Telephone: (310) 788-1000
4   Facsimile: (310) 788-1200

5   SCOTT LINDVALL
    scott.lindvall@kayescholer.com
6   KAYE SCHOLER LLP
    425 Park Avenue
7   New York, New York 10022
    Telephone: (212) 836-8000
8   Facsimile: (212) 836-8689

9   Attorneys for Plaintiff
    ALFRED E. MANN FOUNDATION FOR
10  SCIENTIFIC RESEARCH

11

12                  **UNITED STATES DISTRICT COURT**

13                  **CENTRAL DISTRICT OF CALIFORNIA**

14  ALFRED E. MANN FOUNDATION          Case No. CV 07-08108 (CTX)
    FOR SCIENTIFIC RESEARCH,
15                                     **DECLARATION OF**
                Plaintiff,             **GINGER STICKNEY, Ph.D.,**
16                                     **F.A.A.A.**

17       v.

18  COCHLEAR CORPORATION and
    COCHLEAR LTD.,
19
                Defendants.
20
    COCHLEAR AMERICAS and
21  COCHLEAR LTD.,

22              Counterclaimants,

23       v.

24  ALFRED E. MANN FOUNDATION
    FOR SCIENTIFIC RESEARCH,
25
                Counterdefendant.
26

27       1.    I, Dr. Ginger Stickney, declare and state as follows:

28

61297248_1.DOCX

KAYE SCHOLER LLP

699                                            EXHIBIT FF

2. The facts set forth in this declaration are based upon my personal knowledge. I am competent to testify to the information set forth herein if called upon to do so.

3. I am an audiologist with more than fourteen years experience in the field of audiology with a specialization in cochlear implants for pediatric and adults patients. A majority of my cochlear implant patients utilize cochlear implants manufactured by Cochlear Ltd.

4. In my capacity as an audiologist I have been working with patients having Cochlear implants since 1998, including patients with Nucleus 24, Nucleus Freedom and Nucleus 5 implants. Those implants utilize various wearable processors that are capable of back telemetry. The back telemetry function allows for electrode impedance measurement through use of Cochlear software such as Custom Sound and WinDPS. I have used such software to measure electrode impedance for patients.

5. My job consists of setting a sound MAP for each of my cochlea patients. A sound MAP is a customized setting of threshold levels (T-level) and comfort levels (C-level) relating to each stimulating electrode connected to the patients' implant. I understand T-level to be a minimum level of stimulation that causes a patient to perceive sound while a C-level is a level of stimulation causing the perception of the most comfortable loudness. The MAP for each patient is checked and often readjusted at each visit. The process of creating and adjusting a MAP is often referred to as "mapping."

6. Patient visits happen frequently after initial implant, e.g., every two weeks, and then less frequently over time. After the patient has adjusted to the implant, visits occur every year or so. At the beginning of every mapping session during a patient visit I perform an electrode impedance test for each active electrode. I understand this to be standard procedure according to instruction I have received from Cochlear personnel and its training materials.

KAYE SCHOLER LLP

61297248_1.DOCX

2

EXHIBIT FF

7.      Often times, an electrode impedance test will reveal that one or more electrodes are not functioning properly.  As a result, the setting of C-levels and T-levels for the functioning electrodes will be set differently to accommodate the non-functioning electrode.  Further, as part of the MAP, the non-functioning electrode(s) will be permanently deselected such that in a future visit and mapping session an impedance test will not be run on the non-functioning electrode but will be run on the functioning electrodes.  I have also manually deselected electrodes for impedance testing during patient mapping using the Cochlear software's ability to select and deselect electrodes for testing.

8.      I have utilized all of the electrode stimulation modes for electrode impedance testing, including Common Ground, Monopolar #1, Monopolar #2 and Monopolar #1 and 2 modes. The Cochlear software allows me to select which stimulation mode to utilize for both impedance testing and setting C-levels and T-levels.  The software also allows me to select which mode to use during T-level and C-level mapping.

KAYE SCHOLER LLP

6129724K_1.DOCX

3

701

EXHIBIT FF

9.     I have been trained by Cochlear personnel on how to perform impedance testing and the setting of C-levels and T-levels. As an example, approximately two to three years ago I attended a Cochlear training "workshop" (possibly in Long Beach, California) that included approximately twenty other audiologists from the Los Angeles and Orange County areas. At this conference, Cochlear personnel and/or representatives taught me and other audiologists in attendance about the then-new Nucleus 5 line of products, including how to perform impedance testing. I have and continued to use manuals provided by Cochlear that describe impedance testing and the setting of C-levels and T-levels.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on June 20, 2013 at 4:00 PM Orange, CA

Ginger Stickney, Ph.D., F.A.A.A.

KAYE SCHOLER LLP

61297248 1.DOCX                                                                4

702                                                        EXHIBIT FF

EXHIBIT GG

DANIEL JOHNSON, JR. (SBN 57409)
DANIEL GRUNFELD (SBN 128494)
MICHAEL J. LYONS (SBN 202284)
JASON E. GETTLEMAN (SBN 269733)
MORGAN, LEWIS & BOCKIUS LLP
3000 El Camino Real, Suite 7000
Palo Alto, CA  94306-2122
Tel:   650.843.4000
Fax:   650.843.4001
Email:  djjohnson@morganlewis.com
Email:  dgrunfeld@morganlewis.com
Email:  mlyons@morganlewis.com
Email:  jgettleman@morganlewis.com

Attorneys for Plaintiff
ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Alfred E. Mann Foundation for Scientific Research, <br><br> Plaintiff, <br><br> vs. <br><br> Cochlear Corporation, et al., <br><br> Defendants. | Case No. 2:07-cv-08108-FMO-SH <br><br> **PLAINTIFF ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH'S PROPOSED WITNESS LIST** <br><br> **JURY TRIAL DEMANDED** <br><br> *[L.R.Civ. 16-5]* <br><br> Pretrial Conference:  December 17, 2013 <br> Trial Date:  January 13, 2014 <br> Time:  9:00 a.m. <br> Courtroom:  22, 5th Floor |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

703

PLAINTIFF'S PROPOSED WITNESS LIST
2:07-CV-08108-FMO-SH
EXHIBIT GG

Pursuant to the Local Rule 16-5, the Court's Initial Standing Order and the October 18, 2013 Order re: Further Proceedings, Plaintiff Alfred E. Mann Foundation for Scientific Research hereby submits for exchange the following list of witnesses that it intends to call or cross-examine at trial, either live or by way of deposition testimony.  An asterisk has been placed next to the witnesses who may be called only if the need arises.  Plaintiff specifically reserve the right to supplement this list based on a review of pre-trial documents and call witnesses not on this list for the sole purpose of impeachment and/or rebuttal.

## PROPOSED WITNESS LIST

### By Live Testimony

| Witness | Brief Summary of the Substance of Anticipated Testimony | Estimated Length of Examination |
|---|---|---|
| Farah Boroomand* | At least the Foundation's business activities and practices; the Foundation's founding, history, and innovations. | Direct: 0.5 hours |
| Charles "Chuck" Byers* (may be contacted through counsel for the Foundation) | At least the Foundation's research and development of cochlear implants and testing devices; the Foundation's history and innovations; and the state of the art at the time of the inventions described in the '616 and '691 patents. | Direct: 1.0 hour |
| Mark Chamberlain* (may be contacted through counsel for the Foundation) | At least regarding licensing of the Foundation patents; factual information for damages | Direct: 0.5 hours |
| Cate Elsten | At least the measure of damages attributed to infringement of the '616 and '691 patents; rebuttal to Cochlear's damages witnesses, and other matters disclosed in her expert report and deposition. | Direct: 2.0 hours |
| Bryant Gold* | At least the prosecution of the | Direct: 1 hour |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

1

704

PLAINTIFF'S PROPOSED WITNESS LIST 2:07-CV-08108-FMO-SH

EXHIBIT GG

| | | |
|---|---|---|
| | '616 and '691 patents. | |
| John C. Gord* | At least conception, development, reduction to practice, and prosecution of the '616 and '691 patents; inventions described and claimed therein; and the state of the art at the time of the inventions described and claimed therein. | Direct: 0.5 hours |
| Jeff Griener* | At least Advanced Bionics business activities and practices; and Advanced Bionics history and innovations. | Direct: 0.5 hours |
| David Lee Hankin* | At least the Foundation's business activities and practices; the Foundation's founding, history, and innovations. | Direct: 0.5 hours |
| Steve Hazard*<br><br>May be contacted through counsel for Advanced Bionics, Todd Malynn, at the following address:<br><br>Feldman Gale<br>Promenade West<br>880 West First Street, Suite 315<br>Los Angeles, CA 90012 | At least Advanced Bionics history and innovations; Advanced Bionics cochlear implant devices; his duties and experiences training audiologists and neurotologists who are treating patients having Cochlear and Advanced Bionics cochlear implants; and the Foundation's history and innovations. | Direct: 0.5 hours |
| Dr. David Kelsall* | At least his duties and experiences as a neurotologist (*i.e.*, ear surgeon) having treated patients having Cochlear and Advanced Bionics cochlear implants; and features, functionality, and operation of the accused Cochlear devices. | Direct: 0.5 hours |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

2

705

PLAINTIFF'S PROPOSED WITNESS
LIST 2:07-CV-08108-FMO-SH
EXHIBIT GG

| Alfred E. Mann* | At least the Foundation's founding and history; the Foundation's research and innovations; the Foundation's business activities and practices; and attempts to develop and license the asserted patents. | Direct: 1.0 hour |
|---|---|---|
| Phil Mobley* | At least regarding the Foundation's research and development of cochlear implants and testing devices. | Direct: 0.5 hours |
| Dr. John Niparko* | At least his duties and experiences as a surgeon having treated patients having cochlear implants. | Direct: 0.5 hours |
| Thomas Santogrossi*<br><br>May be contacted through counsel for Advanced Bionics, Todd Malynn, at the following address:<br><br>Feldman Gale Promenade West 880 West First Street, Suite 315 Los Angeles, CA 90012 | At least Advanced Bionics business activities and practices; Advanced Bionics history and innovations; Advanced Bionics cochlear implant devices; the Foundation's history and innovations; and the state of the art at the time of the inventions described and claimed in the '616 and '691 patents. | Direct: 1.0 hour |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

3

706

PLAINTIFF'S PROPOSED WITNESS LIST 2:07-CV-08108-FMO-SH

EXHIBIT GG

| Robert Schindler* (may be contacted through counsel for the Foundation) | At least the state of the art at the time of the inventions described in the '616 and '691 patents; and his duties and experiences as a surgeon having treated patients having cochlear implants. | Direct: 0.5 hours |
|---|---|---|
| Joseph H. Schulman* | At least conception, development, reduction to practice, and prosecution of the '616 and '691 patents; inventions described and claimed therein; the state of the art at the time of the inventions described and claimed therein; attempts to develop and license the asserted patents; and the Foundation's founding, history, and innovations. | Direct: 0.5 hours |
| Dr. Ginger Stickney, Ph.D., F.A.A.A.* | At least regarding her duties and experiences as an audiologist having treated patients having Cochlear and Advanced Bionics cochlear implants; and features, functionality, and operation of the accused Cochlear devices. | Direct: 0.5 hours |
| Bruce H. Stoner, Jr.* | At least examination procedures at the USPTO; rebuttal to Cochlear's inequitable conduct witnesses; and other matters disclosed in his expert report. | Direct: 0.5 hours |
| Primoz Strojnik* | At least conception, development, reduction to practice, and prosecution of the '616 and '691 patents; inventions described and claimed therein; and the state of the art at the time of the inventions described and claimed therein. | Direct: 0.5 hours |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

4

707

PLAINTIFF'S PROPOSED WITNESS
LIST 2:07-CV-08108-FMO-SH
EXHIBIT GG

| James H. Wolfe* | At least conception, development, reduction to practice, and prosecution of the '616 and '691 patents; inventions described and claimed therein; and the state of the art at the time of the inventions described and claimed therein. | Direct: 0.5 hours |
|---|---|---|
| Darrin Young | At least background and description of the subject matter claimed in the '616 and '691 patents; infringement and validity of the '616 and '691 patents; rebuttal to Cochlear's technical witnesses; expert reports of John Choma; and other matters disclosed in Young's expert reports and deposition. | Direct: 4.0 hours |
| Dr. Nancy Young* | At least her duties and experiences as a surgeon having treated patients having cochlear implants. | Direct: 0.5 hours |

### By Deposition Testimony

| Witness | Brief Summary of the Substance of Anticipated Testimony | Estimate of the Length of Direct Examination |
|---|---|---|
| Theresa Adkins* | At least regarding sales and marketing of the accused Cochlear devices. The Foundation has designated portions of his videotaped deposition. | Direct: 0.5 hours |
| Jeffrey Graunke* | At least regarding sales and marketing of the accused Cochlear devices. The Foundation has designated portions of his videotaped deposition. | Direct: 0.5 hours |
| Tony Nygard* | At least regarding the features, functionality, and design considerations of the accused Cochlear devices; sales and marketing of the accused | Direct: 0.5 hours |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

5

708

PLAINTIFF'S PROPOSED WITNESS LIST 2:07-CV-08108-FMO-SH

EXHIBIT GG

| | | |
|---|---|---|
| | Cochlear devices; and Cochlear's business practices.  The Foundation has designated portions of his videotaped deposition. | |
| James Findlay Patrick* | At least regarding the features, functionality, and design considerations of the accused Cochlear devices.  The Foundation has designated portions of his videotaped deposition. | Direct: 0.5 hours |
| Christopher van den Honert* | At least regarding the features, functionality, and design considerations of the accused Cochlear devices.  The Foundation has designated portions of his videotaped deposition. | Direct: 0.5 hours |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24505576.4

6

PLAINTIFF'S PROPOSED WITNESS
LIST 2:07-CV-08108-FMO-SH

EXHIBIT GG

1

2   Dated:        November ___, 2013          Respectfully submitted,

3                                            MORGAN, LEWIS & BOCKIUS LLP

4

5                                            By _____

6                                               Michael J. Lyons
                                                Attorneys for Plaintiff
7                                               Alfred E. Mann Foundation for
                                                Scientific Research

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24498495.1

7

PLAINTIFF'S PROPOSED WITNESS
LIST 2:07-CV-08108-FMO-SH

**EXHIBIT GG**

EXHIBIT HH

Bruce G. Chapman (State Bar No. 164,258)
bchapman@cblh.com
Manuel C. Nelson (State Bar No. 229,590)
mnelson@cblh.com
John L. Paik (State Bar No. 216,024)
jpaik@cblh.com
Keith D. Fraser (State Bar No. 216,279)
kfraser@cblh.com
**CONNOLLY BOVE LODGE & HUTZ LLP**
333 S. Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone (213) 787-2500; Fax (213) 687-0498

Attorneys for Defendants and Counterclaimants
COCHLEAR LTD. and COCHLEAR AMERICAS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, | Case No. **CV 07-08108 GHK (CTX)** |
| Plaintiff, | **INITIAL DISCLOSURES OF DEFENDANTS COCHLEAR LTD. AND COCHLEAR AMERICAS PURSUANT TO RULE 26(a)(1)(A) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |
| v. | |
| COCHLEAR CORPORATION (n/k/a COCHLEAR AMERICAS) and COCHLEAR LTD., | |
| Defendants. | |
| COCHLEAR AMERICAS and COCHLEAR LTD., | |
| Counterclaimants, | |
| v. | |
| ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, | |
| Counterdefendant. | |

Defendants Cochlear Ltd. and Cochlear Americas (collectively "Cochlear" unless otherwise noted), by undersigned counsel, make the following initial disclosures pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure ("FRCP"). These disclosures are based upon information reasonably available to Cochlear as of this date. Cochlear's investigation is ongoing, and discovery in this case has only just begun. Cochlear reserves the right to supplement these disclosures if necessary. By making these disclosures, Cochlear does not represent that it is identifying every document, thing or witness possibly relevant to this lawsuit. Additionally, Cochlear's disclosures are made subject to, and without in any way waiving, the right to object (1) on the grounds of privilege, work product, authentication, competency, relevance, materiality, hearsay, undue burden, or any other objection supported by law or fact, or to the use of any such information for any purpose, in whole or in part, in any subsequent proceeding in this action or in any other action, and (2) on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.

**FRCP 26(a)(1)(A)(i)**

At this time, after conducting such inquiry and investigation as is reasonable under the circumstances, Cochlear believes that the following individuals are likely to have discoverable information that Cochlear may use to support its claims or defenses. The following list is limited to those persons that Cochlear is specifically aware of at this time.

| Name | Last Known Address | Subject(s) Including |
| --- | --- | --- |
| Acimovic, R. | Yugoslavia (?) | Prior art. |
| Bahdra, N. | Cleveland, OH | Prior art. |
| Bajd, Tadej | Yugoslavia (?) | Prior art. |
| Barreras, Sr., Francisco Jose | Miami, FL | Prior art. |
| Bartz, Melvin C. | Newport Beach, CA | Prior art. |
| Batty, Jr., John R. | Miami, FL | Prior art. |

1

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Beane, Russell R. | Sepulveda, CA | Prior art. |
| Beazell, James W. | Rancho Palos Verdes, CA | Prior art. |
| Bennett, Robert M. | Ham Lake, MN | Prior art. |
| Bernard, Richard A. | Norwalk, CT | Prior art. |
| Blackledge, Vernon O. | Scottsdale, AZ | Prior art. |
| Bliley, Paul D. | McMinnville, OR | Prior art. |
| Borkan, William N. | 3364 NE 167th St., N. Miami Beach, FL  33160 | Prior art. |
| Bosiers, Wim | Belgium | Prior art. History and development of cochlear implants. |
| Botros, Andrew | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming. Nucleus 24 cochlear implant system diagnosis and programming. Nucleus Freedom cochlear implant system diagnosis and programming. |
| Bourgeois, Ivan | Verviers, Belgium | Prior art. |
| Brinker, Jeffrey A. | Washington Hospital Center, 110 Irving St., N.W., Washington DC 20010 | Prior art. |
| Buchowski, Roman | Wheeling, Illinois | Prior art. |
| Buckett, James | Cleveland, OH | Prior art. |
| Bullara, Leo A. | Glendora, CA | Prior art. |
| Bullock, Theodore H. | Los Angeles, CA | Prior art. |
| Byers, Charles L. | Vacaville, CA | Prior art. |
| Cameron, David B. | McMinnville, OR | Prior art. |
| Cameron, Tracy | University of Alberta, Edmonton, Alberta, T6G252 Canada | Prior art. |

2

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Carter, Paul | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 implant system testing. Nucleus 24 implant system testing. Nucleus Freedom implant system testing. |
| Casey, D. E. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Causey, G. Donald | Chevy Chase, MD | Prior art. |
| Causey, III, James D. | Simi Valley, CA | Prior art. |
| Chouard, Claude-Henri | Paris, France | Prior art. |
| Chu, Morgan | 1800 Avenue of the Stars Suite 900 Los Angeles, CA 90067 | Laches. Estoppel. |
| Citron, Paul | New Brighton, MN | Prior art. |
| Clark, Professor Graeme | The Centre for Clinical Neuroscience and Neurological Research St. Vincent's Hospital P.O. Box 2900, Melbourne VIC 3065, Australia | History and development of cochlear implant systems. |
| Criley, J. Michael | Boston, MA or Torrance CA | Prior art. |
| Crosby, Peter A. | Drummoyne, Australia | Prior art. |
| Cryer, Adrian | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 24 cochlear implant. Nucleus Freedom cochlear implant. |
| Daly, Christopher | 95 Cheryl Crescent Newport NSW 2106 Australia | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Davis, Ross | Kennebec Valley Medical Center, Augusta, ME | Prior art. |
| de Paep, Dr. K. | Privé Praktijk Grote Baan 290 Melsele 9120 Belgium | Prior art. History and development of cochlear implants. |
| DeCote, Jr., Robert | Miami Beach, FL | Prior art. |
| DeLuca, Carlo J. | Newton, MA | Prior art. |
| Denniston, III, Rollin H. | Anoka, MN | Prior art. |
| Dewancker, J. | Belgium | Prior art. History and development of cochlear implants. |
| Dormer, Kenneth J. | Edmond, OK | Prior art. |
| Doyle, James H. | Garden Grove, CA | Prior art. |
| Duffin, Edwin G. | New Brighton, MN | Prior art. |
| Duggan, Stephen R. | 4180 120th Street West, Rosemount, MN 55068 | Prior art. |
| Duncan, James L. | Alpharetta, GA | Prior art. |
| Echarri, Robert | Miami, FL | Prior art. |
| Engebretson, A. Maynard | Ladue, MO | Prior art. |
| Faltys, Michael A. | Northridge, CA | Prior art. History and development of cochlear implants. Scope, noninfringement, invalidity, unenforceability of the patents in suit. |
| Fenner, Hans | Stuttgart, Germany | Prior art. |
| Fishbein, Michael C. | Boston, MA or Torrance CA | Prior art. |
| Fong, M. M. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Fountain, Glen H. | Silver Spring, MD | Prior art. |
| Fredrickson, John | Clayton, MO | Prior art. |
| Gacanin, Franjo | Yugoslavia (?) | Prior art. |

4

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|------|-------------------|---------------------|
| Galbraith, Douglas C. | Stanford, CA | Prior art. |
| Gheewala, Tushar R. | Stanford, CA | Prior art. |
| Gibson, Peter | Cochlear Limited<br>14 Mars Road<br>PO Box 629<br>Lane Cove NSW 2066<br>Australia<br>Phone: 61 2 9428 6555 | Prior art.<br>History and development of cochlear implant systems.<br>Nucleus 24 cochlear implant.<br>Nucleus Freedom cochlear implant. |
| Gilmore, L. Donald | Wellesly Hills, MA | Prior art. |
| Glover, Eugene G. | Minneapolis, MN | Prior art. |
| Goorevich, Michael | Cochlear Limited<br>14 Mars Road<br>PO Box 629<br>Lane Cove NSW 2066<br>Australia<br>Phone: 61 2 9428 6555 | Nucleus 24 speech processors.<br>Nucleus Freedom speech processors.<br>Nucleus 24 cochlear implant system diagnosis and programming.<br>Nucleus Freedom cochlear implant system diagnosis and programming. |
| Gord, John C. | Los Angeles, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Graupe, Daniel | Fort Collins, CO | Prior art. |
| Gray, R. F. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Hafelfinger, Werner | Valencia, CA | Prior art. |
| Hartlaub, Jerome T. | New Brighton, MN | Prior art. |
| Hashem, James F. | Malden, MA | Prior art. |
| Hepp, Dennis G. | Coon Rapids, MN | Prior art. |
| Herndon, Matthew Kent | Stanford, CA | Prior art. |
| Hildebrandt, Jurgen | Munich, Germany | Prior art. |
| Hirose, Frank M. | Boston, MA or Torrance CA | Prior art. |

5

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Hochmair, Erwin S. | Jaunerstr 27, A-1130, Vienna, Austria | Prior art. |
| Hochmair, Ingeborg J. | Jaunerstr 27, A-1130, Vienna, Austria | Prior art. |
| Hoffmann, Christian | Munich, Germany | Prior art. |
| Hortmann, Guenter | Neckartenzlingen, Germany | Prior art. |
| Hutchison, Steve | Kirkwood, MO | Prior art. |
| Janssen, Jan | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. Laches. Estoppel. |
| Jelnikar, T. | Yugoslavia (?) | Prior art. |
| Jirak, Thomas L. | Plymouth, MN | Prior art. |
| Jones, W. Kinzy | Pembroke Pines, FL | Prior art. |
| Joris, Philip | Departement Neurowetenschappen Afdeling Neurofysiologie O&N II Herestraat 49 - bus 01021 BE-3000  Leuven Belgium | Prior art. History and development of cochlear implants. |
| Kaplan, Morton R. | Santa Barbara, CA | Prior art. |
| Kie Sioe Tan, Jozef I. | Sylmar, CA | Prior art. |
| Kilgore, K. L. | Cleveland, OH | Prior art. |
| King, Murray P. | Simi Valley, CA | Prior art. |
| Kinsbergen, Jacques | Belgium | Prior art. History and development of cochlear implants. |
| Kissiah, Jr., Adam M. | 155 E. Brandy La., Merritt Island, FL 32952 | Prior art. |
| Kitchin, David A. | Seabrook, MD | Prior art. |
| Klun, B. | Yugoslavia (?) | Prior art. |
| Kocsis, Louis L. | Elmhurst, Illinois | Prior art. |

6

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Kralj, Alojz | Yugoslavia (?) | Prior art. |
| Kunick, Klaus | Stuttgart, Germany | Prior art. |
| Lauro, Luciano | Ivrea, Italy | Prior art. |
| Lee, Jr., David G. | Columbia, MD | Prior art. |
| Lekholm, Anders | Bromma, Sweden | Prior art. |
| Lenzkes, Herbert H. | Pomona, CA | Prior art. |
| Lesnick, Alan F. | Miami, FL | Prior art. |
| Loeb, Gerald E. | Queens University, Biomedical Engineering Unit, Kingston, Ontario, K7L3N6 Canada | Prior art. |
| MacLeod, Patrick | Chatenay-Malabry, France | Prior art. |
| Mann, Alfred E. | Los Angeles, CA | Prior art. |
| Mann, Brian M. | 12079 Beaufait, Northridge, CA 91326 | Prior art. |
| Markowitz, Harold T. | Ham Lake, MN | Prior art. |
| Maurer, Donald D. | Anoka, MN | Prior art. |
| McDermott, Dr. Hugh | The University of Melbourne 384-388 Albert Street East Melbourne VIC 3002 Australia | Prior art. History and development of cochlear implant systems. |
| McDonald, Ray S. | St. Paul, MN | Prior art. |
| Meador, John | 1117 Red Bud Trail, Austin, TX 78746 | Prior art. |
| Melen, Roger D. | Stanford, CA | Prior art. |
| Mensink, Kornelis A. | Brummen, Netherlands | Prior art. |
| Merzenich, Michael M. | San Francisco, CA | Prior art. |
| Michelson, Robin P. | Redwood City, CA | Prior art. |
| Mirowski, Mieczyslaw | Owings Mills, MD | Prior art. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Moeneclaey, Liliane | Department Vg. Morfologie Middelheimcampus G.U.114 Groenenborgerlaan 171 2020 Antwerpen Belgium | Prior art. History and development of cochlear implants. |
| Moore, George P | Los Angeles, CA | Prior art. |
| Moore, Robert F. | Oxnard, CA | Prior art. |
| Morgan, Wayne A. | Granada Hills, CA | Prior art. |
| Mower, Morton M. | Baltimore, MD | Prior art. |
| Mumford, Van E. | Miami, FL | Prior art. |
| Murphy, Tony | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 24 cochlear implant. Nucleus Freedom cochlear implant. |
| Nagler, Robert | Chomedey, Quebec, CA | Prior art. |
| Nanes, Mario | Mount Sinai Medical Center, Miami Beach, FL | Prior art. |
| Nedungadi, Ashok P. | Lake Oswego, OR | Prior art. |
| Neumann, Robert A. | Blaine, MN | Prior art. |
| Nygard, Tony | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |
| Offeciers, Prof. Dr. Erwin | Sint-Augustinus Ziekenhuis Oosterveldlaan 24 2610 Wilrijk Belgium | Prior art. History and development of cochlear implants. |
| Ohara, Yuichi | Tokyo, Japan | Prior art. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Patrick, Dr. Jim | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |
| Peck, Raymond A. | Queens University, Biomedical Engineering Unit, Kingston, Ontario, K7L3N6 Canada | Prior art. |
| Peckham, Hunter | Cleveland, OH | Prior art. |
| Peeters, Prof. Dr. Stefaan | 3WIN nv Galileilaan 18 2845 Niel Belgium | Prior art. History and development of cochlear implants. |
| Perkel, Donald H | Los Angeles, CA | Prior art. |
| Pihlar, B. | Yugoslavia (?) | Prior art. |
| Platia, Edward V. | Washington Hospital Center, 110 Irving St., N.W., Washington DC 20010 | Prior art. |
| Pless, Benjamin | Menlo Park, CA | Prior art. |
| Pomella, Piero | Ivrea, Italy | Prior art. |
| Pourmehdi, Soheyl | Cleveland, OH | Prior art. |
| Rebscher, Stephen J. | San Francisco, CA | Prior art. |
| Renger, Herman L. | 2790 Stokes Canyon Road, Calabasas, CA 91302 | Prior art. |
| Ricard, Claude F. F. | Aix en Provence, France | Prior art. |
| Richard, Gordon L. | Minco, OK | Prior art. |
| Roberts, Dr. Chris | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Laches. Estoppel. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Rodrigues, Victor | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming. Nucleus 24 cochlear implant system diagnosis and programming. Nucleus Freedom cochlear implant system diagnosis and programming. |
| Rohrer, John S. | Tempe, AZ | Prior art. |
| Roline, Glenn M. | Anoka, MN | Prior art. |
| Rostami, Ali | Santa Monica, CA | Prior art. |
| Rottier, Riaan | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 implant system testing. Nucleus 24 implant system testing. Nucleus Freedom implant system testing. |
| Rozman, J. | Yugoslavia (?) | Prior art. |
| Rueter, John C. | Shoreview, MN | Prior art. |
| Ryan, John G. | San Jose, CA | Prior art. |
| Sansen, Willy | Afdeling ESAT - MICAS, Micro-elektronica en Sensoren Kasteelpark Arenberg 10 - bus 2443, 3001 Heverlee, Belgium | Prior art. History and development of cochlear implants. |
| Sarada, Thyagaraj | Norwalk, CT | Prior art. |
| Sasmor, Louis | Miami, FL | Prior art. |
| Satchwell, Bruce R. | West Pennant Hills, AU | Prior art. |
| Schaefer, Donald W. | Belleville, WI | Prior art. |
| Schindler, R. A. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Schloss, Harold C. | Los Angeles, CA | Prior art. |
| Schroeppel, Edward A. | Miramar, FL | Prior art. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|------|--------------------|--------------------|
| Schulman, Joseph H. | Los Angeles, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit.<br>Laches.<br>Estoppel. |
| Sega, Janez | Yugoslavia (?) | Prior art. |
| Segundo, José P. | Los Angeles, CA | Prior art. |
| Seligman, Dr. Peter | Cochlear Limited<br>Level 1, 174 Victoria Parade<br>East Melbourne, Vic 3002<br>Australia<br>Phone: 61 2 9428 6555 | Prior art.<br>History and development of cochlear implant systems.<br>Nucleus 22 cochlear implant system.<br>Nucleus 24 cochlear implant system.<br>Nucleus Freedom cochlear implant system. |
| Sholder, Jason A. | 21037 Cantara St., Canoga Park, CA 91304 | Prior art. |
| Silvian, Sergiu | Pasadena, CA | Prior art. |
| Simic, V. | Yugoslavia (?) | Prior art. |
| Simone, Cathy | Cochlear Limited<br>14 Mars Road<br>PO Box 629<br>Lane Cove NSW 2066<br>Australia<br>Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming.<br>Nucleus 24 cochlear implant system diagnosis and programming.<br>Nucleus Freedom cochlear implant system diagnosis and programming. |
| Slocum, Chester D. | Miami, FL | Prior art. |
| Smith, Bobby L. | Cedar, MN | Prior art. |
| Smith, Brian | Cleveland, OH | Prior art. |
| Snell, Jeffery D. | 17135 Bircher St., Granada Hills, CA 91344 | Prior art. |
| Soma, Mani | Stanford, CA | Prior art. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Somers, Dr. Thomas | AZ Sint-Augustinus Oosterveldlaan 24 Wilrijk 2610 Belgium | Prior art. History and development of cochlear implants. |
| Sorenson, Paul D. | Blaine, MN | Prior art. |
| Southwood, Robert | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming. Nucleus 24 cochlear implant system diagnosis and programming. Nucleus Freedom cochlear implant system. |
| Stage, T.G. | Cleveland, OH | Prior art. |
| Stanic, U. | Yugoslavia (?) | Prior art. |
| Stearns, William P. | Scottsdale, AZ | Prior art. |
| Stefancic, M. | Yugoslavia (?) | Prior art. |
| Strojnik, Primoz | Granada Hills, CA | Prior art. History and development of cochlear implants. Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Stypulkowski, Paul H. | St. Paul, MN | Prior art. |
| Susset, Jacques G. | Montreal, Quebec, CA | Prior art. |
| Tan, Kie S. | Boston, MA or Torrance CA | Prior art. |
| Thompson, David L. | Fridley, MN | Prior art. |
| Troyk, Philip R. | Illinois Institute for Technology, Chicago, IL 60616 | Prior art. |
| Turk, Rajko | Yugoslavia (?) | Prior art. |
| Ursic, I. | Yugoslavia (?) | Prior art. |
| Valencic, V. | Yugoslavia (?) | Prior art. |
| Van Arragon, Gerrit W. | Dieren, NL | Prior art. |

12

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|------|--------------------|--------------------|
| Van Baelen, Erika | Cochlear Technology Centre Mechelen Campus Schalienhoevedreef 20 I B-2800 Mechelen Belgium Phone: 32 15 36 2803 | Nucleus Freedom speech processors. |
| Van Camp, Prof. K. | Belgium | Prior art. History and development of cochlear implants. |
| Van Compernolle, Dirk S. | Palo Alto, CA | Prior art. |
| Van Dan Honert, Chris | Cochlear Americas 400 Inverness Parkway Suite 400 Englewood Colorado 80112 USA Phone: 303-790-9010 | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |
| Van Durme, Marianne | Belgium | Prior art. History and development of cochlear implants. |
| Van Paemel, M. | Belgium | Prior art. History and development of cochlear implants. |
| Vavken, E. | Yugoslavia (?) | Prior art. |
| Vodovnik, Lojze | Yugoslavia (?) | Prior art. |
| Voelkel, Andy | Venice, CA | Prior art. History and development of cochlear implants. Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Wang, Xintao | Houston, TX | Prior art. |
| Weinberg, Alvin H. | Miami, FL | Prior art. |

EXHIBIT HH

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| West, Ron | Australia<br>Email:<br>Ronewest@aol.com | Prior art.<br>History and development of cochlear implant systems.<br>Nucleus 22 cochlear implant system.<br>Nucleus 24 cochlear implant system. |
| White, Robert L. | Stanford, CA | Prior art. |
| Whitmoyer, David I. | Los Angeles, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Wittkampf, Frederik H. M. | Brummen, Netherlands | Prior art. |
| Wolfe, James H. | Canyon Country, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Zollner, Manfred | Munich, Germany | Prior art. |
| Zwicker, Eberhard | Icking, Germany | Prior art. |

Any contact with the above-named people employed or formerly employed by Cochlear Limited, Cochlear Americas, or Cochlear Technology Centre should be made through counsel for Cochlear.

Cochlear reserves the right to supplement these disclosures after additional investigation and discovery, including the right to supplement these disclosures with the addition of expert witnesses. Cochlear also reserves the right to identify and call as witnesses additional persons about whom Cochlear may learn during the course of its investigation and the discovery in this case, including third party discovery. Cochlear believes that there may be employees or former employees of the plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF") or third parties who

EXHIBIT HH

1  have discoverable information that Cochlear may use to support its claims or

2  defenses.

3     **FRCP 26(a)(1)(A)(ii)**

4     Pursuant to FRCP 26(a)(1)(A)(ii), Cochlear hereby describes the categories of

5  documents, electronically stored information, and/or tangible things that are in the

6  possession, custody or control of Cochlear or Cochlear's counsel and that Cochlear

7  may use to support its claims or defenses.  Cochlear reserves the right to supplement

8  this disclosure after further investigation and discovery.

9     In making these disclosures, Cochlear does not waive any applicable privileges

10  or protection, including attorney client privilege or work product.  Additionally,

11  Cochlear reserves the right to appropriately designate for protection any document,

12  electronically stored information, and/or tangible thing under any future protective

13  order entered in this case, and such document, electronically stored information,

14  and/or tangible thing will be produced only as consistent with and subject to such

15  designations and protections.  Further, in response to any discovery request under

16  FRCP 34, Cochlear reserves the right to produce information in the manner in which

17  it is kept in the ordinary course of business where the information is maintained by

18  Cochlear, including Australia.  Finally, by providing this disclosure, Cochlear is not

19  representing that any particular such document, electronically stored information,

20  and/or tangible thing exists or is presently within Cochlear's possession, custody or

21  control.

22     • Prosecution histories of U.S. Patent Nos. 5,603,726, 5,609,616,

23        5,569,307, 5,531,774, 5,776,172, 5,938,691, 5,522,865, 5,876,425, and

24        U.S. Patent Appl. Ser. Nos. 07/411,563 and 07/752,069 (located at the

25        offices of Cochlear's counsel).

26     • Prior art references, articles, publications, patents, and patent

27        applications (located at the offices of Cochlear's counsel).

28

EXHIBIT HH

- Correspondence between Cochlear and AMF, or their respective representatives, regarding the patents in suit (located at Cochlear Ltd. in Australia).
- To the extent they exist, one sample of each Nucleus 22 cochlear implant, Nucleus 24 cochlear implant, and Nucleus Freedom cochlear implant, and speech processors used with such implants (located at Cochlear Ltd. in Australia).
- To the extent they exist, one sample of each Nucleus 22 diagnosis and programming system, Nucleus 24 diagnosis and programming system, and Nucleus Freedom diagnosis and programming system (located at Cochlear Ltd. in Australia).
- To the extent they exist, one sample of each Nucleus 22 testing system, Nucleus 24 testing system and Nucleus Freedom testing system (located at Cochlear Ltd. in Australia).
- Schematics or diagrams sufficient to show the electrical configurations of the Nucleus 22, Nucleus 24, and Nucleus Freedom cochlear implants, speech processors used with such implants, and diagnosis, programming and testing systems used with such cochlear implant and speech processor systems (located at Cochlear Ltd. in Australia).
- Technical documents, including operating and training manuals and specifications, sufficient to show the operation and function of the Nucleus 22, Nucleus 24, and Nucleus Freedom cochlear implants, speech processors used with such implants, and diagnosis and programming used with, and testing performed on, such cochlear implant and speech processor systems (located at Cochlear Ltd. in Australia).
- Design history records showing the research, design, and development of the Nucleus 22 product line (located at Cochlear Ltd. in Australia).

16

EXHIBIT HH

- Design history records showing the research, design, and development of the Nucleus 24 product line (located at Cochlear Ltd. in Australia).

**FRCP 26(a)(1)(A)(iii)**

This section is not applicable, as the recovery of attorneys' fees and costs sought by Cochlear under 35 U.S.C. § 285 are not damages.

**FRCP 26(a)(1)(A)(iv)**

Cochlear is not aware of any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this case or to indemnify or reimburse for payments made to satisfy the judgment.


DATED:  April 23, 2008                    Connolly Bove Lodge & Hutz LLP


By: _____
    Bruce G. Chapman
    Manuel Nelson
    Attorneys for Defendants and
    Counterclaimants Cochlear Corporation
    and Cochlear Ltd.

EXHIBIT HH

CERTIFICATE OF SERVICE

    I, Dori Dellisanti, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause.  My business address is Connolly Bove Lodge & Hutz LLP, 333 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

    On April 23, 2008, I served the foregoing documents described as: **INITIAL DISCLOSURES OF DEFENDANTS COCHLEAR LTD. AND COCHLEAR AMERICAS PURSUANT TO RULE 26(A)(1)(A) OF THE FEDERAL RULES OF CIVIL PROCEDURE** on the following person in this action by placing a true copy thereof enclosed in sealed envelope addressed as follows:

| | |
|---|---|
| **VIA U.S. MAIL:**<br><br>Charles S. Barquist, Esq.<br>Morrison & Foerster LLp<br>555 W. Fifth St.,<br>Los Angeles, CA 90013-1024 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel:  (213) 892-5200<br>Email:  cbarquist@mofo.com |
| **VIA U.S. MAIL:**<br><br>Brian G. Bodin, Esq.<br>Brett A. Hertzberg, Esq.<br>Merchant & Gould, P.C.<br>701 Fifth Ave., Suite 4100<br>Seattle, WA 98104 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel:  (206) 342-6200<br>Email:  bbodine@merchantgould.com<br>          bhertzberg@merchantgould.com |
| **VIA U.S. MAIL:**<br><br>Peter A. Gergely, Esq.<br>Merchant & Gould, P.C.<br>1050 17th St., Suite 1950<br>Denver, CO 80265-0100 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel:  (303) 357-1670<br>Email:  pgergely@merchantgould.com |

[X] **BY MAIL**  I am readily familiar with the firm's practice regarding collection and processing of correspondence for mailing.  Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal

EXHIBIT HH

cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY PERSONAL SERVICE**:  I caused such envelope to be delivered by hand to the addressee(s) as stated above.

[ ] **BY E-Mail**  I caused such document(s) to be served via e-mail to the foregoing firms.

[X] **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on April 23, 2008 at Los Angeles, California.

| Dori Dellisanti | Dori Dellisanti |
|---|---|
| Name | Signature |

EXHIBIT HH