# Exhibit 20

Exhibit 20
634

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **Alfred E. Mann Foundation for Scientific Research**<br>    Plaintiff and Counterdefendant<br><br>v.<br><br>**Cochlear Corporation (N/K/A Cochlear Americas) and Cochlear Ltd. et al,**<br>    Defendants and Counterclaimants | USDC Case No.: CV 07-08108-GHK (CTX) |

**Supplemental Expert Damages Report of Russell L. Parr, CFA, ASA, CLP**

**January 4, 2013**

-1-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**IPRA, INC**

Exhibit 20
635

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2012
Page 2

## INTRODUCTION

I have been asked by counsel for Cochlear Ltd. and Cochlear Americas ("Cochlear") to provide an update to my opinion of the damages that would be adequate to compensate Alfred E. Mann Foundation for Scientific Research ("AEMF") for alleged patent infringement by Cochlear. I have been asked to consider damages measured by a theory of reasonable royalty. I have not considered damages based on a theory of lost profits. I have also been asked to comment on the expert report prepared for the Plaintiff by Ms. Cate M. Elsten, dated November 30, 2012.

I understand that Cochlear has been accused of infringing two patents as listed below:

- US Patent No. 5,609,616 ("the '616 Patent"), titled Physician's Testing System and Method for Testing Implantable Cochlear Stimulator, issued March 11, 1997.

- US Patent No. 5,938,691 ("the '691 Patent"), titled Multichannel Implantable Cochlear Stimulator, issued August 17, 1999.

The opinions presented in this report are based on (1) my education, professional career and relevant experience as described in my curriculum vitae, attached hereto as Appendix A, and (2) my review of various documents, court filings, patents and deposition transcripts as listed in Appendix B and/or footnoted in this report. I have also spoken to Tony Nygard, manager of Enabling Technologies and the technology development program at Cochlear, Ltd.

I reserve the right to alter or amend the opinions stated herein if additional information becomes known to me.

I have not been asked to provide, and do not have any opinion regarding, the validity, enforceability or infringement of the patents at issue in this case. For the purpose of this analysis, I have assumed the patents at issue are valid, enforceable and infringed by Cochlear.[1]

IPRA, Inc. is being compensated for my time at the hourly rate of $575.00. This compensation is not dependent in any way on the outcome of this litigation.

---

[1] My opinion also considers the effect if only one patent, or alternatively one claim, is valid, enforceable and infringed.

-2-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
636

Case 2:07-cv-08108-FMO-SH   Document 325-20   Filed 11/26/13   Page 4 of 15   Page ID #:12450

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 3

**OPINION**

I have considered damages based on a reasonable royalty. A reasonable royalty reflects the amount of royalty that the two parties would have negotiated had they entered into license negotiations prior to the infringing activities. Based on my analysis, as reported herein, I conclude that Cochlear should pay AEMF a reasonable royalty not higher than $5,599,404 to $18,473,664, depending on the damages period that is ultimately determined to be applicable.

**QUALIFICATIONS, PUBLICATIONS AND TESTIMONIAL EXPERIENCE**

I am Russell L. Parr, CFA, ASA, CLP President, IPRA, Inc. I am a consultant, author, lecturer and publisher specializing in intellectual property valuation and management. I have practiced as an intellectual property valuation and royalty rate consulting professional for over 25 years. My clients include multinational corporations, universities, and individual inventors.

Some of the corporations and universities for which I have conducted valuations and royalty rate studies include AT&T, Baxter International, IBM, Rockwell International, Mott's, Mead-Johnson, Hewlett-Packard Corporation, Dr. Seuss, Princeton University, Carnegie Mellon University, Rutgers University, Edwards LifeSciences, Inc. and Bayer. The work I have conducted for these and other entities involved valuations, infringement litigation testimony, and royalty rate analyses for use by my clients in license negotiations. For example, I provided royalty rate analyses to AT&T for use as the basis at which to transfer patented technology. My royalty rate opinion for Baxter was used for patent licensing negotiations in the medical products industry. I provided royalty rate opinions to IBM and Rockwell International regarding telecommunication industry patent license negotiations. I provided Mott's with a royalty rate analyses for use in patent license negotiations in the beverage industry. Hewlett-Packard and Mead-Johnson hired me to provide strategic planning advice about intellectual property management. For Dr. Seuss, I provided the estate of Theodor Geisel with a copyright valuation opinion for use in estate tax filings. For Princeton, Rutgers and Carnegie Mellon, I provided royalty rate analyses for use in patent license negotiations. Edwards and Bayer hired me to provide patent infringement litigation support, analysis and expert testimony.

In addition, I personally own intellectual property and have engaged in successful

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 4

negotiations that have led to the licensing of these assets.

My education includes a Masters in Business Administration and a Bachelor of Science in Electrical Engineering from Rutgers University. I have also been awarded the professional designations, Chartered Financial Analyst (CFA) from the CFA Institute, Accredited Senior Appraiser (ASA) from the American Society of Appraisers, and Certified Licensing Professional from the Licensing Executive Society.

In addition to my consulting practice at IPRA, Inc., I publish three books regarding royalty rates at which intellectual property is licensed. These books are sold to a worldwide customer base and are used to accomplish intellectual property valuations and license agreements. The titles of these books are <u>Royalty Rates for Pharmaceuticals & Biotechnology, 8th Edition</u>, <u>Royalty Rates for Technology, 5th Edition</u> and <u>Royalty Rates for Trademarks & Copyrights, 3rd Edition</u>.

I am also the author or co-author of additional books on the valuation and management of intellectual property published by John Wiley & Sons, Inc. Some of my books are published in Italian, Japanese, Chinese, Russian and Korean. These books are titled – <u>Royalty Rates for Licensing Intellectual Property,</u> <u>Intellectual Property – Licensing & Joint Venture Profit Strategies,</u> <u>Intellectual Property Infringement Damages,</u> <u>Technology Licensing,</u> <u>Investing in Intangible Assets,</u> and <u>Intellectual Property – Valuation, Exploitation & Infringement Damages</u>.

In addition to my activities as a consultant, author and publisher, I have been a guest speaker regarding intellectual property matters at over forty professional conferences including those sponsored by the American Intellectual Property Law Association, Licensing Executives Society and the World Intellectual Property Organization.

I have testified at trial or deposition over fifty times regarding damages related to intellectual property infringement matters.

Details of my education, professional experience, articles, books and past expert testimony are described in my Curriculum Vitae, a copy of which is attached as Appendix A.

## BACKGROUND

Hearing loss is the partial or extreme loss of a person's ability to receive information by listening. The most extreme cases of hearing loss are known as deafness, a term used when the

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 5

hearing loss is so severe a person cannot understand information when listening is the sole means of receiving it.[2]

It is difficult to precisely quantify the precise number of deaf people in the United States because different definitions can be used for deafness. Regardless of the definition, there are a large number of Americans with significant hearing impairment that can benefit from medical intervention. Across all age groups, in the United States, approximately 1 million people (0.38% of the population, or 3.8 per 1,000) over 5 years of age are "functionally deaf" and more than half are over 65 years of age. About 8 million people (3.7%) over 5 years of age are hard of hearing (that is, have some difficulty hearing normal conversation even with the use of a hearing aid). Again, more than half of those who are hard of hearing are over 65 years of age. These estimates are based upon self-reported (or informant-reported) hearing difficulty and not on independent audiometric measurements.[3]

The Survey of Income and Program Participation (SIPP) is one of a few national surveys that regularly collect data identifying the American population of persons with hearing loss or deafness. Estimates from the SIPP indicate that less than 1 in 20 Americans are currently deaf or hard of hearing. In round numbers, nearly 10 million persons are hard of hearing and close to 1 million are functionally deaf. More than half of all persons with hearing loss or deafness are 65 years or older and less than 4% are less than 18 years of age. These findings are limited to those who report difficulty hearing "normal conversation" and do not include the larger population of persons with hearing loss for which only hearing outside the range and circumstances of normal conversation is affected.[4]

Considering the large population of the hearing impaired, James Patrick of Cochlear estimates the annual U.S. market for cochlear implants at between 8,000 and 10,000.[5]

**Cochlear Implants**

A cochlear implant is an implanted electronic hearing device designed to produce useful hearing sensations in a person with severe to profound deafness by electrically stimulating

---

[2] http://agbell.org/DesktopDefault.aspx?p=About_Hearing_Loss
[3] How Many People are Deaf in The United States, http://gri.gallaudet.edu/Demographics/deaf-US.php
[4] How Many Deaf People Are There in the United States? Estimates from the Survey of Income and Program Participation, Ross E. Mitchell, http://jdsde.oxfordjournals.org/cgi/content/full/11/1/112
[5] Deposition of James F. Patrick, December 18, 2008, page 60

-5-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
639

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 6

auditory nerve inside the inner ear. These implants usually consist of two main components:

- The externally worn microphone, sound processor and transmitter system.
- The implanted receiver and electrode system, which contains the electronic circuits that receive signals from the external system and send electrical currents to the inner ear.

Currently, the devices have a magnet surgically inserted into the skull of a recipient that holds the external system in place next to the implanted internal system. The external system may be worn entirely behind the ear or it may be worn in a pocket, belt pouch, or harness.[6]

Cochlear implants were developed in the 1970s to help profoundly deaf individuals who gained little or no benefit from traditional hearing aids. When hearing is functioning normally, the inner ear converts sound waves into electrical impulses, which are sent to the brain and recognized as sound. A cochlear implant works in a similar manner—when surgically implanted behind the ear, the electronic device is able to bypass damaged portions and stimulate the auditory nerve to restore hearing.[7]

A cochlear implant works essentially in this way:
1. Sound is received by the microphone.
2. Electrical pulses that represent the energy contained in sound signals are sent from the microphone to the speech processor.
3. The speech processor selects and codes the most useful portions of the sound signals.
4. Code is sent to the transmitter.
5. Transmitter sends code across skin to receiver/stimulator.
6. Receiver/stimulator converts code to electrical signals.
7. Electrical signals are sent to electrode array in the cochlea to stimulate auditory nerve fibers.
8. Signals are recognized as sounds by the brain.[8]

Not everyone with hearing impairment is a candidate for a cochlear implant. For an adult, a candidate needs to get less than 50% word recognition in one ear and less than 60% in the opposite ear while using a hearing aid. The candidate must have what falls between moderate and

---

[6] http://www.fda.gov/cdrh/cochlear/WhatAre.html#a
[7] http://agbell.org/DesktopDefault.aspx?p=Cochlear_Implants
[8] http://agbell.org/DesktopDefault.aspx?p=How_Cochlear_Implants_Work

-6-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
640

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 7

profound hearing loss. For children, the candidate must be at least one year old. A hearing aid must have failed the child candidate and the candidate must have severe to profound hearing loss.[9]

**Key Players in Cochlear Implants**

Cochlear considers the market for cochlear implants to be competitive. It competes with Advanced Bionics LLC and Med-El. Cochlear has 70% of the market. Advanced Bionics has 20% of the market and Med-El has 10% of the market.[10]

*AEMF.* AEMF develops and licenses medical technology. Alfred Mann, founder of AEMF, testified that AEMF was founded to create medical devices for the benefits of mankind.[11] AEMF licenses its technology and has an informal licensing policy described by David L. Hankin, Chief Executive Officer of AEMF. Mr. Hankin stated that, AEMF attempts to achieve goals in the licensing of its technologies including: 1) ensuring that its technologies reach intended patient populations, 2) ensuring the licensee has the wherewithal to accomplish the first goal, and 3) to preserve the rights of AEMF and value of its intellectual property. Mr. Hankin testified that AEMF has licensed technologies to at least seven businesses or institutions and AEMF has licensed cochlear implant technology to Advanced Bionics Corporation.[12]

*Advanced Bionics LLC ("AB LLC").* AB LLC was joined as a plaintiff to this suit on September 28, 2010 and is, in part, the successor entity to Advanced Bionics Corporation ("ABC"). AB LLC and ABC shall be collectively referred to as "ABC." AB LLC holds the exclusive and fully paid-up license to the AEMF patents, including the two patents-in-suit, which were originally licensed by AEMF to ABC. In 1993, Alfred E. Mann founded ABC to develop cochlear implants and micro-stimulators used in pain management. In 2004, Boston Scientific Corporation ("BSC") purchased ABC for approximately $740 million in cash, plus earn-out payments and, in 2008, BSC sold the cochlear implant business of ABC back to some of its original shareholders in the form of AB LLC. BSC kept the micro-stimulation portion of the ABS business related to pain management technologies, paying an additional amount as compensation for future earn-outs. In 2009, the license agreement was amended to discharge AB

---

[9] Deposition of Scott Rinehart, December 9, 2008, page 41
[10] Deposition of Theresa Adkins, December 30, 2008, page 25-6
[11] Deposition of Alfred E. Mann, December 10, 2008, page 10
[12] Deposition of David Lee Hankin, December 17, 2009 pages 44 and 45

-7-
CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
641

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 8

LLC from ongoing future royalty payments to AEMF for a one-time fully paid-up lump sum amount of $8.5 million.[13] Sonova AG ("Sonova") acquired AB LLC that same year for $489 million, resulting in a payment of $18,067,413 to AEMF for the sale of its interest. With the acquisition of AB LLC, Sonova expected that the revenue of AB LLC would double within the next 3-5 years and to increase its EBITA margin to 20% or beyond.[14] Advanced Bionics was also expected to remain an independent business unit.[15] Approximately a year after its acquisition, in 2010, AB LLC voluntarily recalled its HiRes 90K cochlear implant device worldwide and removed the device from the market due to a malfunction which resulted in severe pain, overly loud sounds and/or shocking sensations to certain recipients.[16] This resulted in a 157 million Swiss Franc (approximately $150 million) impairment to AB LLC's goodwill.[17]

*Cochlear Ltd.* Cochlear Ltd. is an Australian company that makes and sells two implantable devices technologies for the hearing impaired: 1) cochlear implants, of which the company has about 70% of the world market, and 2) bone anchored hearing implants for conductive hearing loss and single sided deafness.[18] Marketing of Cochlear products in the US is conducted by Cochlear Americas, a subsidiary of Cochlear Ltd., and is focused on surgeons and audiologists.[19]

*MED-EL GmbH* manufactures medical devices specializing in hearing implant systems for individuals with hearing loss. The company offers hearing implants for differing degrees of hearing loss including cochlear implants, middle ear implants and an electric acoustic stimulation hearing implant systems.

**Technology at Issue**

This litigation is not about foundational patents or enabling technology for cochlear implant systems.[20] Nor is it even about back telemetry in the broad sense as urged in Ms.

---

[13] AMF050886-AMF050918
[14] http://www.sonova.com/en/investors/news/Pages/ab_closing.aspx
[15] http://www.sonova.com/en/investors/news/Pages/ab_closing.aspx
[16] http://www.sonova.com/en/investors/news/Pages/MM_e_201011223.aspx
[17] http://www.sonova.com/en/investors/Pages/DetailView.aspx?XmlSource=http://xml.newsbox.ch/corporate_web/che/sonova/press_release/339_105_8f12c.xml; and http://www.oanda.com/currency/historical-rates/
[18] Citi Investment Banker Analysis, February 12, 2008, COC 3000851
[19] Deposition of Theresa Adkins, December 30, 2008, page 20
[20] http://www.ipaustralia.gov.au/patents/ex_ear.shtml

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
642

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 9

Elsten's reports of March 30, 2009 and November 30, 2012. I understand that back telemetry for cochlear implants was known before the applications for AEMF's patents.[21]

More precisely, this litigation is about two patents directed to incremental improvements of specific features using back telemetry in connection with cochlear implants.

The '691 patent claims are directed to specific applications of back telemetry, such as the use of back telemetry for power control and the use of back telemetry to transmit signals that have been generated from stimulating signals applied to the electrodes of the implanted stimulator at controlled frequencies or pulse widths.

The '616 patent is directed to a physician's tester that can be used to test cochlear implants and a method that displays measurements made during the testing of a cochlear implant. I understand that this patent covers the physician's tester regardless of whether it is connected to any components of the cochlear implant or the speech processor. Consequently, the invention covered by this patent is narrow, involving only the testing unit and use of the unit that is used by audiologists and doctors to test cochlear patients.

I understand that back telemetry may be used in Cochlear's cochlear implants for monitoring of the implant and assessing impedance of the electrodes.[22]

Secondly, I understand that in Cochlear's cochlear implant back telemetry may be used for Neural Response Telemetry (NRT) to measure the compound action potential of the auditory nerve and transfers the measurement to external equipment.[23] I understand that during a Neural Response Telemetry (NRT) test, a recording is made of the activity of the inner ear never fibers in response to an electrical signal that is sent to the implanted electrode. This confirms that the inner ear nerve endings are being stimulated. This information may be used by audiologist for initial settings of the implant recipient's speech processor. This is especially helpful with setting up the speech processor for young recipients.[24] Applications of the NRT include: a) confirmation that implant is working and stimulating auditory nerves, b) estimating threshold and maximum comfort levels as an aid to programming for young children, c) assessment of changes in response

---

[21] Specifically, as noted by Cochlear's expert Dr. Loeb at page 4 of his expert report: "Back-telemetry is described in detail in McDermott's thesis ("McDermott Thesis"), the 1984 McDermott Article, the 1989 McDermott Article, and McDermott's U.S. Patent No. 4,947, 844 ("McDermott '844 patent"). Expert Report of Loeb dated November 25, 2012.
[22] Deposition of James Patrick, December 18, 2008, pages 41-3
[23] Deposition of Christopher van den Honert, December 8, 2008, pages 16 and 17
[24] COC-2006082

-9-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
643

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 10

to electrical stimulation over time.[25]

It is my understanding that back telemetry does not contribute to the daily performance of Cochlear's cochlear implants nor the benefits enjoyed by implant recipients. Compared to the other features of the cochlear implants, back telemetry is very rarely used. It is primarily used during surgical implanting of the device to assure it is properly working and by the audiologist or physician when the system is turned-on, which typically takes place approximately six weeks after surgery.[26]

**ENTIRE MARKET VALUE RULE**

Ms. Elsten relies on the value of the entire cochlear implant system (as she defines that system to include the implant and speech processor) as constituting the royalty base. As explained above, the '691 and '616 patents are directed to incremental improvements relating to back telemetry, an infrequently used feature of a complex and multi-component system supporting a cochlear implant. Calculating a royalty on the entire system, as defined by Ms. Elsten, would improperly compensate AMF for non-infringing components which comprise a significant portion of the system. Ms. Elsten does nothing to apportion damages to the patented features claimed by the '691 and '616 patents or actual use of those features . Rather, Ms. Elsten relies on the entire market value rule and calculates damages based on the entire "cochlear implant system." The glaring failure in Ms. Elsten's analysis is the lack of any evidence that the patented features drive the demand for the entire cochlear implant system.

Recent Federal Circuit decisions have established that the patentee bears a significant evidentiary burden in order to invoke the entire market value rule. In *Lucent Technologies, Inc. v. Gateway*, the Federal Circuit held that the patentee had failed to demonstrate that its patented method, embodied as a date-picker feature of Microsoft Outlook was the *basis* for consumer demand for the entire software. The court noted that the date-picker feature was only a very small and relatively less important component of a much larger software program. Moreover, the vast majority of features of the software program, when used, did not infringe. There was no evidence that anyone at any time ever purchased Microsoft Outlook because it had the patented

---

[25] COC-2006185
[26] Deposition of David Kelsall, MD, December 10, 2008, pages 13 and 14

-10-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
644

Case 2:07-cv-08108-FMO-SH   Document 325-20   Filed 11/26/13   Page 12 of 15   Page ID #:12458

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 11

date picker. "[W]hen we consider the importance of the many features not covered by the [patented method] compared to the one infringing feature in Outlook, we can only arrive at the unmistakable conclusion that the invention described in claim 19 of the Day patent is not the reason consumers purchase Outlook.."[27]

In *LaserDynamics Inc. v. Quanta Computer, Inc.*[28] the Federal Circuit again affirmed that the entire market value rule as a narrow exception to the requirement that the patentee apportion the damages to the patented features. The court stated that the patentee must demonstrate that the demand for the entire product is attributable to the patented feature. "It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [entire product]. Nor would it be enough to show that the [entire product] without the [patented feature] would be commercially unviable." The Court also rejected the patentee's argument practical and economic necessity compelled a calculation of the royalty based on the entire product because accounting information to enable the patentee to apportion was not available from the accused infringe. The burden of establishing entitlement to damages, whether based on an apportionment or an entire market value theory, is at all times on the patentee.

Ms. Elsten has done nothing to show that the patented technology in this case is the basis for customer demand and has not shown that the patented technology created substantial value for the cochlear implant products. Ms. Elsten recognizes that "incremental improvements" are less important from a marketing perspective and that other *functional* features are relatively more important in driving sales of cochlear implant systems, such as "FM system compatibility, usability of external components, cosmetic factors, battery life, reliability of the internal and external components, MRI compatibility, mapping strategies, customer service from the manufacturer, the familiarity of the user's surgeon and audiologist with the particular device, and anatomical concerns."[29] Mr. Elsten's recognition of the multitude of features that drive the demand for a particular cochlear implant system is inconsistent with any assertion that the incremental improvements of the '691 and the '616 patents are the basis for consumer demand. Ms. Elsten is only able to point to the deposition testimony of Dr. Kelsall that he would prefer a device with telemetry to a device without telemetry, all else equal. The fact that consumers

---

[27] *Id.* at 1338.
[28] 694 F.3d 51 (Fed. Cir. 2012)
[29] Elsten's report at pages 7-8.

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 12

would choose a product having the patented feature over an otherwise equal product that does not have the patented feature says nothing as to whether the presence of that functionality motivates consumers to buy the product in the first place.

The technology at issue is analogous to the diagnostic machine used by automobile mechanics for testing car and truck engines. The back telemetry technology is the diagnostic component of this analogy and the cochlear implant is the automobile. Ms. Elsten's damages conclusion is similar to requiring a royalty of 7.5% on the total price of a car or truck in order to value the diagnostic system used by auto mechanics. In the light of recent case law, Ms. Elsten's royalty base conclusion is wrong.

To illustrate a more reasonable royalty base, the amount of time the patented invention is used during the useful life of a cochlear implant could be considered. Assuming an implant lasts for twenty years in a patient, the implant is therefore useful for 20 years, times 365 days per year times 24 hours per day for a total of 175,200 hours. Assuming the average user sleeps 8 hours per day the implant would have no usefulness for 58,400 hours (20 years times 365 days per year times 8 hours of sleep per day). This allows for a net amount of 116,800 useful hours. The portion of these hours when the technology at issue is useful is during regular visits to audiologists for patient meetings. Assuming a patient visits their audiologist once per year and the time with the audiologist includes an entire hour using the technology at issue then the technology at issue is useful for 21 hours (20 years of usefulness times 1 visit per year to the audiologist times one hour per visit plus one use at the time the implant is implanted in the patient). The percent of time the technology is useful during the life of the implant is therefore 0.018% (21 hours divided by 116,800 hours). If applied to the royalty base that Ms. Elsten calculates on Exhibit 1.1 of her November 30, 2012 damages report in the amount of $1,539,472,024, excluding ESPrit 3G, the apportioned royalty base would be $277,105.

Based on the case law that has been established since my first report regarding this matter, I disagree with the royalty base used by Cate Elsten. It includes the entire value of the cochlear implants and speech processors when the technology at issue is used rarely during the life of the cochlear products.

In addition to disagreeing with Mr. Elsten's royalty base, I disagree with her development of a reasonable royalty rate that she applies to her erroneous royalty base as discussed throughout the remainder of this report.

-12-

Case 2:07-cv-08108-FMO-SH   Document 325-20   Filed 11/26/13   Page 14 of 15   Page ID
 #:12460

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 13

**DETERMINATION OF DAMAGES – REASONABLE ROYALTY**

My understanding is that damages in patent infringement cases are determined according to a statute that states, "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[30]

In the absence of an established royalty rate, a reasonable royalty is determined assuming a hypothetical negotiation between a willing licensor and a willing licensee, each voluntarily trying to reach an agreement that occurs just prior to the licensee's first act of infringement and is based on the information available to both parties. The date of the hypothetical negotiation, according to the Federal Circuit, is the date at which infringement of a valid and enforceable patent first occurred.[31] I understand that reliance is frequently place on data and events subsequent to the commencement of the alleged infringement.[32] In coming to my conclusions regarding the damages that would be appropriate in this case, I have considered the factors listed in *Georgia-Pacific Corp. v. United States Plywood Corporation*, 318 F. Supp. 1116, 1120 (S.D.N.Y.), modified and affirmed, 446 F.2d 295 (2d Cir. 1971). My analysis of each of these factors is included in this report.

For this analysis I have assumed that AEMF and Cochlear would have negotiated for a license to the patents in suit on or around 1998.

I have assumed that the parties would have considered the patents (or at least parts thereof) to be valid, enforceable and infringed. I have also assumed that both parties would have had an equal understanding of the information relevant to the factors outlined by the *Georgia-Pacific* case.

In *Georgia-Pacific Corp. v. United States Plywood Corp.*, the court identified fifteen factors to consider in determining a reasonable royalty. These factors have since been widely adopted by other courts for use in reasonable royalty determinations. The fifteen factors listed by the court, and my analysis and opinion regarding their application in this case, are given below:

---

[30] 35 U.S.C. §284.
[31] Wang Laboratories, Inc. v. Toshiba Corporation et al., 993 F.2d 858 (fed. Cir. 1993).
[32] See Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568 (Fed. Cir. 1988)

-13-

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 14

**1.  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.**

I understand that Alfred E. Mann was not interested in developing the cochlear technology. In 1986 he believed the market was very small for cochlear implants and didn't have any interest in making a business out of it.[33] Even when he realized the market was larger than he initially thought he "…still didn't think it was an appropriate business in a stand-alone cochlear implant business opportunity."[34] Eventually Mr. Mann established ABC to develop cochlear implants and neuro-stimulation technology for pain management.

On April 15, 1999, AEMF memorialized in writing a verbal license agreement with ABC since "almost at the inception if not the inception" of Advanced Bionics.[35] The terms of the verbal license was the same as the 1999 written license that memorialized the terms and it exclusively licensed patented technology associated with cochlear implants to ABC.[36] The territory of the license was worldwide.

Under the license agreement, AEMF received 1 million shares of ABC common stock, representing approximately 4.6% of the company, plus running royalties of between 2% and 3% of net revenues.[37] The 1 million shares were valued at $2.8 million.

It should be noted that the $2.8 million value attributed to the 1 million shares was reported to the IRS by AEMF in its tax return as the value of the 1 million shares. Consequently, I believe the value of the 1 million shares is considered to be no more than $2.8 million by AEMF.[38] The $2.8 million value can also be supported by considering the state of Advanced Bionics, at the time the license was granted and the stock given. At this time, Advanced Bionics was a startup company. It did not have a commercial product or FDA approvals.  Specifically, Advanced Bionics was formed in January 1993.[39]  A start-up company with no commercial product, FDA approval and no marketing presence would not be expected to have any significant

---

[33] Deposition of Alfred E. Mann, December 10, 2008, 16:7-19:7.
[34] Mann 19:22-20.
[35] Deposition of David Hankin, December 17, 2008, 16:13-20.
[36] Hankin 17:17-18:1 and 19:13-15. See also, License Agreement AB00049-65
[37] License Agreement AB00001-16 In paragraph 2.1 the total issued and outstanding shares of Advanced Bionics is stated as 21,572,026.
[38] Deposition of Lawrence Allen Fischer, December 17, 2008, page 16. See also Defendants Fischer Exhibit 1102 where the 1 million shares of stock received from ABC was declared to the IRS to have a value of $2.8 million. See also AMF051328.
[39] Deposition of Jeffrey Greiner, December 16, 2008, 9:22-24.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
648