Case 2:07-cv-08108-FMO-SH Document 325-21 Filed 11/26/13 Page 1 of 14 Page ID #:12462

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 15

value beyond that reported by AEMF on its tax return.

The license between AMF and AB included patents and technologies unrelated to back telemetry but related to other aspects of the cochlear implant products. The additional patents licensed in the AEMF-AB license included:

U.S. Patent No. 4,931,795 titled "Digital to Analog Signal Converter," which claims a digital to analog signal converter.

U.S. Patent No. 4,990,485 titled "Floating Point Current Source," which claims a floating point current source.

U.S. Patent No. 4,991,582 titled "Hermetically Sealed Ceramic and Metal Package for Electronic Devices Implantable in Living Bodies," which claims a ceramic metal package.

U.S. Patent No. 5,443,493 titled "Cochlea Stimulating Electrode Assembly, Insertion Tool, Holder and Method of Implantation," which claims a specific electrode configuration, a tool for inserting an electrode into the cochlea, and method of inserting such an electrode and using such a tool.

U.S. Patent No. 5,477,855 titled "Shield for Conductors of an Implantable Device," which claims the combination of an implantable shield and an implantable device.

U.S. Patent No. 5,522,865 titled "Voltage/Current Control System for a Human Tissue Stimulator," which claims an implanted tissue stimulator having a specific voltage/current control regardless of whether that stimulator has back telemetry.

U.S. Patent No. 5,531,774 titled "Multichannel Implantable Cochlear Stimulator Having Programmable Bipolar, Monopolar or Multipolar Electrode Configurations," which claims cochlear stimulators having programmable bipolar, monopolar or multipolar regardless of whether the stimulator includes back telemetry.

U.S. Patent No. 5,545,191 titled "Method for Optimally Positioning and Securing the External Unit of a Transcutaneous Transducer of the Skin of a Living Body," which claims a transcutaneous (across the skin) coupling apparatus and method.

U.S. Patent No. 5,571,148 titled "Implantable Multichannel Stimulator," which claims a multichannel stimulation system without regard to back telemetry.

U.S. Patent No. 6,035,237 titled "Implantable Stimulator That Prevents DC Current Flow Without Coupling Capacitors," which claims such a stimulator regardless of whether or not it includes back telemetry.

In addition to licensing its cochlear implant technology to ABC, AEMF transferred its

Case 2:07-cv-08108-FMO-SH Document 325-21 Filed 11/26/13 Page 2 of 14 Page ID #:12463

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 16

entire know-how and cochlear program, including employees, to ABC.[40] In my March 11, 2009, I considered that the 1 million shares of ABC valued at $2.8 million may be viewed as compensation for the transfer of AEMF's cochlear program to ABC, and not as an upfront payment for the license. In Ms Elsten's report of March 30, 2009, she indicates that she learned from ABC management that the $2.8 million payment in the form of 1 million shares of stock are considered to be a royalty payment and that there is no mention of any compensation for the operating assets or employees of ABC. If this is true, the operating assets and employees of AEMF (constituting AEMF's knowhow) were transferred to ABC for free to a for-profit company owned at least in part by AEMF insider Alfred Mann.

Even if the shares are viewed as an upfront payment, in order to properly reflect the $2.8 million upfront payment as part of the royalty rate structure, the payment must be amortized over the revenues that will be enjoyed during the life of the license.

There is no evidence at the time of this license of the amount of revenues the parties expected ABC to generate over the life of the patent license. While such expectations would be best for determining an effective royalty rate, I have had to use the revenues that have actually been realized. Such revenues are presented in Exhibit 1 to this report. Amortization of the $2.8 million upfront payment indicated an additional royalty rate of 0.50%. When this is combined with the running royalty rates of 2% to 3%, then the effective royalty rate is 2.5% to 3.5% for the entire patent portfolio and know-how licensed to ABC.

The April 15, 1999 license between AEMF and ABC is the best evidence of the value of the licensed patent portfolio and know-how at the time of the hypothetical negotiation in 1998. It represents a running royalty rate of 2% to 3% or an effective royalty rate of 2.5% to 3.5% for the AEMF intellectual property if the upfront payment of $2.8 million is not for the know how attributable to the operating assets and employees of AEMF.

Regardless, the value of the $2.8 million shares is the amount agreed to at the date of the agreement and should not be confused with the future value that may have been achieved if ABC was successful. The shares were valued at $2.8 million as supported by this value being used for tax returns filed with the IRS. Whether ABC had provided cash of $2.8 million or stock valued at $2.8 million the value of the licensed intellectual property at the date of this agreement is $2.8

---

[40] Deposition of Joseph Schulman PhD, December 2, 2008, page 44

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 3 of 14   Page ID #:12464

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 17

million plus the 2% to 3% running royalty and nothing more.

**Other ABC and AEMF Licenses**

On January 1, 2004 (six years after the hypothetical negotiation date), AEMF and ABC entered into a new agreement, replacing the 1999 agreement and subsequent amendments. In this new agreement, AEMF granted ABC rights to cochlear implant patented technology on an exclusive and worldwide basis. AEMF received 1.1 million shares of Advance Bionics and a running royalty rate of between 1% and 3% of net revenues.[41] The January 1, 2004 agreement and ABC's obligation to pay royalties terminates on January 1, 2022.  As of the January 1, 2004 agreement, AEMF had a total of 2.1 million shares of ABC, valued at $11 per share, equaling $23.1 million. An effective royalty rate can be determined for this new agreement by amortizing the $23.1 million across future expected revenues but the resulting effective royalty rate has nothing to do with the value of the licensed intellectual property at the 1998 hypothetical negotiation date. By developing an effective royalty rate for the January 1, 2004 license agreement and attributing it to the value of the licensed intellectual property in 1998, values that did not exist at the time of the hypothetical negotiation are being improperly attributed to licensed property.

Consider a hypothetical transaction for a car in 1998 where the buyer and seller agree that the car is worth $20,000. To complete this transaction the buyer offers, and the seller accepts, shares of IBM stock that are valued at $20,000. At the date of the exchange the car is valued at $20,000 and no more. Suppose then that six years later the shares of stock that the buyer accepted for the car have increased in value to $40,000. Attribution of the $40,000 to the value of the car in 1998 is completely wrong.  At the 1998 transaction date the car was valued at $20,000 and the later value of the IBM stock has nothing to do with the value of the car in 1998. Likewise, if the shares paid for the car in 1998 were to drop in value to $10,000 six years later the result is *not* that the car was worth only $10,000 in 1998. It is the same for the 1 million shares of stock associated with the 1999 transaction between ABC and AEMF.

---

[41] Cochlear Technology License and Royalty Agreement AB00297-318

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 18

**Boston Scientific Transaction and Breakup**

BSC purchased ABC in May 2004. Thereafter a dispute arose that resulted in breaking apart ABC. Effective January 3, 2008, ABC was renamed Boston Scientific Neuromodulation Corporation and AB LLC was assigned ABC's rights in the cochlear implant business and patents.[42] Mr. Mann indicated that BSC overpaid for ABC as well as other companies and that Wall Street was unhappy with BSC.[43]

When BSC acquired ABC they continued to make royalty payments for the cochlear license to AEMF. After the new AB LLC acquired the cochlear implant business from ABC, AB LLC continued to make running royalty payments to AMEF.[44]

Thereafter, AB LLC was returned to Alfred E. Mann and other original shareholders of ABC while BSC kept the neuro-stimulation pain management business.[45] Principal shareholders of AB LLC reportedly paid $150 million to buy back the business.[46]

In the original 2004 purchase agreement, BSC agreed to make earn-out payments. As part of the break-up deal in 2008, BSC made equalizing payments described by Alfred E, Mann, "…they paid us what was the net excess value over those companies that would have been due under the earn-out arrangement".[47]

The earn-out payments received by AEMF are calculated by Ms. Elsten in her November 30, 2012 report on table 4, page 34 to equal over $79 million. Ms Elsten has used to these payments in combination with other compensation for the ABC business to develop an effective royalty rate that she concludes is 9.8%. This effective royalty rate has nothing to do with the value established for the AEMF intellectual property established by the April 15, 1999 agreement. Ms. Elsten wishes to attribute deal terms and compensation derived from agreements in 2004 and 2008 (ten years after the 1998 hypothetical negotiation) to the 1998 value of the AEMF intellectual property. This is wrong for the same reason I illustrated with the car for IBM

---

[42] Cochlear Patent Assignment AB 00230-250
[43] Mann Deposition 28:2-29:8
[44] Deposition of Lawrence Allen Fischer, December 17, 2008, pages 15 and 16
[45] Source: Boston Scientific Ends Troubled Marriage, August 10, 2007
http://blogs.wsj.com/health/2007/08/10/boston-scientific-ends-a-troubled-marriage/
[46] Boston Globe Wire Service, August 10, 2007,
http://www.boston.com/business/globe/articles/2007/08/10/device_maker_to_undo_part_of_purchase/?p1=MEWell_Pos4
[47] Deposition of Alfred E. Mann, December 10, 2008, page 29

-18-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
652

Case 2:07-cv-08108-FMO-SH Document 325-21 Filed 11/26/13 Page 5 of 14 Page ID #:12466

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 19

stock transaction. It is simply inconceivable that when AMF and ABC negotiated the original license they foresaw that ABC would be acquired, split and partially transferred in such a complex way. The use by Ms. Elsten of such foresight in calculating her royalty rate is wrong.

**Sonova**

On November 7, 2009, AB LLC and AEMF entered yet another amendment to the license agreement which, according to Ms. Elsten, was intended to clarify that the original transaction was a license agreement and not an assignment. On November 8, 2009 AB LLC and AEMF entered into a further amended license agreement that discharged AB LLC's obligation to make future royalty payments to AEMF for a one-time fully paid-up lump sum amount of $8.5 million. Ms. Elsten says that this last amendment was a condition of the acquisition of AB LLC by Sonova AG ("Sonova"), through its affiliates, Attempto 21 AG and Omega Merger Sub. Sonova subsequently acquired AB LLC that same year for $489 million, resulting in a payment of $18,067,413 to AEMF for the sale of its interest. With the acquisition of AB LLC, Sonova expected that the revenue of AB LLC would double within the next 3-5 years and to increase its EBITA margin to 20% or beyond. Advanced Bionics was also expected to remain an independent business unit.[48] Approximately a year after its acquisition, in 2010, AB LLC voluntarily recalled its HiRes 90K cochlear implant device worldwide and removed the device from the market due to a malfunction which resulted in severe pain, overly loud sounds and/or shocking sensations to certain recipients.[49] Sonova subsequently wrote down the value if of AB LL by CHF 157 million.

**Other Licenses**

AEMF has also entered into other license agreements. It entered into an exclusive worldwide license agreement regarding Battery-Powered Bion Technology with ABC on April 15, 1999. The license grants rights to use the battery invention relating to medical devices, processes and methods involving or relating to a system of addressable, programmable, implantable stimulators, and/or addressable, implantable transducer-telemeters. ABC agreed to pay 3% of net revenues for the rights conveyed. A subsequent agreement, dated January 15, 2004,

---

[48] http://www.sonova.com/en/investors/news/Pages/ab_closing.aspx
[49] http://www.sonova.com/en/investors/news/Pages/MM_e_201011223.aspx

-19-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
653

Case 2:07-cv-08108-FMO-SH Document 325-21 Filed 11/26/13 Page 6 of 14 Page ID #:12467

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 20

between the two parties required a royalty of 4% on net revenues.[50]

AEMF also entered into an exclusive worldwide license agreement regarding RF Bion Technology with ABC on April 15, 1999. The license grants rights to use the RF-Bion invention for processes and methods involving or related to continuously RF-powered, non-battery powered, systems of addressable, programmable, implantable stimulators, addressable, implantable transducer-telemeters and or extracorporeal transmitters. ABC agreed to pay 3% of net revenues for the rights conveyed.[51]

I have been provided with a license agreement regarding cochlear implant technology between The Regents of the University of California San Francisco and Pacesetter Infusion Ltd. dated December 30, 1988.[52] The agreement granted Pacesetter with exclusive rights to use the licensed technology for commercialization of cochlear implant products. Pacesetter agreed to pay The Regents a license fee of $50,000 plus running royalties of 4.25% of net revenues for cochlear electrodes, and 0.75% of net revenue on implantable components for a cochlear product and 1.75% of net revenues on all wearable auditory processors. The agreement ran for a period of ten years.

**Elsten's Analysis of the AEMF Licenses**

Ms. Elsten's analysis relies on events subsequent to the early licenses involving Cochlear and ABC. She has looked far beyond the initial deal terms and values of licensing deals and incorporated unforeseen transactions such as the sales of ABC to Boston Scientific, the subdivision of the ABC by Boston Scientific whereupon the cochlear implant business of ABC was returned to AEMF and other partners and then the sale of ABC again to Sonova. Such events could not have been within the contemplation of the AEMF and ABC when they entered into the original verbal and written licenses, which are contemporaneous with the hypothetical negotiation. This reliance on subsequent unforeseeable events is a fundamental flaw in Ms. Elsten's analysis.

A second fundamental flaw in Ms. Elsten's analysis occurs when she fails to apportion the royalty to the technology at issue in this case. AEMF provided a patent license and know-

---

[50] License, Royalty and Manufacturing Agreement, Battery Powered Bion® Devices and Services AMF0452763-304
[51] AB00019-32
[52] Exclusive License Agreement for Cochlear Products AMF 029301-330

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 7 of 14   Page ID #:12468

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 21

how regarding many areas of cochlear implants apart from back telemetry. Yet Ms. Elsten's analysis treats the royalty under the AEMF/ABC license as entirely attributable to the back telemetry inventions claimed in the patents-in-suit. The reality is that ABC essentially received and paid for enabling technology for its product, not just limited back telemetry features. The amount that ABC paid is therefore not representative of the inventions in the patents-in-suit standing alone.

2. **The rates paid by the licensee for the use of other patents comparable to the patent in suit;**

On December 10, 1982, the University of Melbourne and Nucleus Ltd. entered into a license agreement whereby Nucleus licensed the exclusive rights to the foundational patents owned by the Commonwealth of Australia and the University of Melbourne that resulted from the development effort previously conducted. Nucleus agreed to pay running royalties of 5% on sales of the first 12,000 units and 2% of sales thereafter.[53]

On August 22, 1985, a Deed of Novation transferred rights granted to Nucleus Ltd. by the Commonwealth to Cochlear Pty Ltd.[54]

On June 30, 2008, Cochlear Ltd. entered into the IHPS Technology License Agreement with The University of Melbourne Hearing CRC Ltd. and Hearworks PTY Ltd. to obtain royalty-free use of the foundation patents licensed on December 10, 1982. Cochlear paid AU$3 million.[55] This was a payment to eliminate the remaining obligation to pay 2% royalties.[56]

Insofar as the IHPS Technology License Agreement covers patents for the foundational technology underlying the cochlear implant system, Cochlear would not expect to pay this amount or more for patents directed to incremental improvements on cochlear implants.

The Cochlear license agreements are a better indication of a royalty rate to associate with cochlear implant technology because these transactions are between unrelated parties, not having any common control, as opposed to the common ownership of ABC and AEMF.

---

[53] COC-5002608-23
[54] COC-5002485-95
[55] COC-5002395-416
[56] The Cochlear Ltd. license calls for a 5% running royalty on the first 12,000 and 2% thereafter. Considering the number of units actually sold, the effective royalty rate is only slightly higher than 2% of revenues.

Case 2:07-cv-08108-FMO-SH Document 325-21 Filed 11/26/13 Page 8 of 14 Page ID #:12469

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 22

The license agreements in factors 1 and 2 indicate running royalty rates between 0.75% and 4.25% of revenue.

3. **The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;**

The hypothetical license the parties would have negotiated would have been for a non-exclusive license in the United States. In the Plaintiff's damage report of Ms. Elsten, dated January 19, 2009, she refers to an Ernst & Young study that suggests a nonexclusive transaction would yield a royalty rate equivalent to 60% of an exclusive rate.[57] Application of this adjustment for non-exclusivity provides an indication of an appropriate royalty rate between 0.45% and 2.55%.[58]

4. **The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly;**

As previously noted, Alfred Mann, founder of AEMF, testified that AEMF was founded to create medical devices for the benefits of mankind.[59] David L. Hankin, Chief Executive Officer of AEMF elaborated on the informal licensing policy of AEMF when he stated that AEMF attempts to achieve goals in the licensing of its technologies including: 1) ensuring that its technologies reach intended patient populations, 2) ensuring the licensee has the wherewithal to accomplish the first goal, and 3) to preserve the rights of AEMF and value of its intellectual property. Mr. Hankin testified that AEMF has licensed technologies to at least seven businesses or institutions.[60]

5. **The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter;**

---

[57] Russ O'Haver and Brian Finnegan, Ernst & Young, Estimating the Effects of Exclusivity and Geographic market Characteristics on Royalty Rates: Some Preliminary Results, 1996
[58] 60% of 0.75% equals 0.45% and 60% of 4.25% equals 2.55%
[59] Deposition of Alfred E. Mann, December 10, 2008, page 10
[60] Deposition of David Lee Hankin, December 17, 2009 pages 44 and 45.

AEMF is a technology and development company that brings its inventions to market using licensing transactions. Cochlear is a technology development company that commercializes its proprietary technology by making and marketing cochlear implants.

In addition to developing technology, AEMF also owned common stock in ABC and part of AB LLC, a competitor of Cochlear Ltd. AEMF was also controlled by Alfred E. Mann who was also an owner and officer of ABC and AB LLC.

The relationship between Cochlear and AEMF is not as simple as a typical inventor/company relationship. AEMF has granted ABC an exclusive worldwide license to its technology including the patents at issue in this case. When negotiating with Cochlear for non-exclusive rights in the US, AEMF would have to consider that ABC would expect the same terms given to Cochlear because a license with Cochlear would make ABC rights in the US non-exclusive.

I believe that AEMF should be willing to lower its royalty rate requirements with ABC as a result of dealing with Cochlear because a license agreement with Cochlear would provide AEMF with royalty income from a company controlling 70% of the US market for cochlear implants while AEMF's relationship with ABC relates to only 20% of the market. A license with Cochlear would provide AEMF with a royalty based that is 3.5 times larger than that which it has with AB.

In addition, if a lower royalty rate were negotiated with Cochlear for non-exclusive use of AEMF's patents, AEMF would only be lowering its royalty rate requirements with ABC for rights to practice only the patents-at-issue in the US market. There is no reason for AEMF to reduce its royalty rate requirements to ABC for its other patents not in-suit for the US or rest of the world.

6. **The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales;**

I understand that Cochlear sells accessories for its products such as headsets and repairs. I have not seen evidence that Cochlear Ltd. enjoys any significant revenue or profits from the sale of any accessory products that would be considered convoyed sales.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
657

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 10 of 14   Page ID #:12471

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 24

**7. The duration of the patent and the term of the license;**

The '616 patent will expire on March 11, 2014 and the '691 patent expired on September 22, 2009. In the event that only the '691 patent survives this litigation, the royalty base and damages would only be associated with revenues of products prior to September 22, 2009.

**8. The established profitability of the product made under the patent, its commercial success, and its current popularity;**

ABC uses the telemetry invention in their cochlear implant products. For the purpose of my analysis, I must assume that Cochlear Ltd. also uses the various telemetry-related inventions in their cochlear implant products.

Cochlear has achieved 70% of the US and world market and earned profits of between 18% and 27%.[61]

Since being founded in 1993 and through 2008, ABC has achieved only 20% market share and never became profitable.[62]

The different levels of success experienced by Cochlear and ABC, indicates that the telemetry related inventions in the patents-in-issue is not the driving force behind success in the cochlear implant marketplace. Cochlear's success is likely derived from the many other inventions and features introduced by Cochlear at the same time they introduced the telemetry invention. Just some of the significant inventions commercialized by Cochlear during the 2000s include:

- First behind-the-ear speech processor, ESPrit,
- First water resistant speech processor,
- First speech processor that uses Beam™ technology,
- First implant with self-curling electrode array that hugs the inner wall of the cochlea[63]

Moreover, Cochlear's commercial success is also due to its position and visibility as the market leader, its reputation and wide recognition among physicians, audiologists and patients, and to its extensive sales and distribution network nationwide.

---

[61] Exhibit 2 of this report
[62] Deposition of Jeffrey Greiner, December 16, 2008, pages 9 and 11 See also various Cochlear Annual Reports for support of Cochlear's market share information.
[63] COC-50000230, COC 5002075, COC 5002330, COC-5001889-90,

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 11 of 14   Page ID #:12472

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 25

9. **The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results; and**
 and
10. **The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to users of the invention;**

Dr. David Kelsall, a surgeon with twenty years of experience, testified that the capability of using telemetry to enable testing and programming is not the only consideration in selecting a cochlear implant. He stated that consideration must be given primarily to patient performance, and secondly to device reliability. He also stated that all things being equal between two devices the device with telemetry would be preferable to a device without telemetry.[64]

I understand the software used to program the Freedom cochlear system allows surgeons to obtain impedance and NRT measurements intra-operatively. I also understand that impedance testing can be accomplished by the software when recipients arrive at clinics for switch-on and follow-up visits.[65] James Patrick testified that he believes it would be hard to get such results however without some involvement of back telemetry.[66] Dr. Kelsall indicated that intraoperative testing could be accomplished by "doing electrical AB testing, which is a different electrical measurement."[67]

The technology at issue is but a small part of a complex device, used only occasionally during the life and functioning of the device.

11. **The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use;**

Cochlear Ltd. has made total sales of the accused products between December 2001 and June 2012 of $1.539 billion, with average earnings before taxes profit margins of 25%.[68]

It is important to remember that this success cannot be solely attributed to the infringed invention of incremental use of back telemetry. Exhibit 3 to this report shows many important features associated with various Cochlear Ltd. speech processors, all of which are just as likely, if

---

[64] Deposition of David Kelsall, MD, December 10, 2008 page 27.
[65] Patrick Deposition Exhibit 64, pages 21 and 23.
[66] Deposition of James Patrick, December 18, 2008, page 157
[67] Deposition of David Kelsall, MD, December 10, 2008 page 26.
[68] See Exhibit 5 to this report

-25-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
659

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 12 of 14   Page ID #:12473

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 26

not more likely, to have contributed to Cochlear's Ltd. success. In fact, the CP8000 speech processor incorporated 16 other features that can be argued have contributed significantly to Cochlear's success.

Important features beyond the back telemetry function are also associated with cochlear implants. For example, Cochlear discusses the CI24 the following features: Physical Dimension, RF Antenna Coil, Coupling Magnet, MRI Compatibility, X-Ray Identification Markings, Intracochear Electrodes, Extracochlear Electrodes, Soft Turn-On, High Rate Stimulation,[69] For the Nucleus 24, the Contour Advance model introduced the Unique Softip™ feature designed to protect the delicate cochlear structure.[70]

In none of Ms. Elsten's reports has she attempted to apportion the success achieved by Cochlear to any invention or feature beyond the infringed back telemetry invention.

**12. The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; and**

**13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;**

Exhibit 3 to this report shows a comparison of speech processor products of Cochlear and the many features beyond the back telemetry invention that are incorporated into having a commercial product. In addition, as previously stated, the different levels of success experienced by Cochlear and ABC, indicates that the telemetry invention in the patents-at-issue is not the driving force behind success in the cochlear implant marketplace. Cochlear's success is likely derived from the many other inventions and features introduced by Cochlear at the same time they introduced the telemetry invention. Just some of the significant inventions commercialized by Cochlear during the 2000s include:

- First behind-the-ear speech processor, ESPrit,
- First water resistant speech processor,

---

[69] COC-2012994
[70] http://www.cochlear.com/wps/wcm/connect/us/for-professionals/cochlear-implants/products/implants-and-instrumentation

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
660

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 13 of 14   Page ID #:12474

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 27

- First speech processor that uses Beam™ technology,
- First implant with self-curling electrode array that hugs the inner wall of the cochlea.[71]

In Ms. Elsten's March 30, 2009 report she criticizes me for considering the many other features incorporated into the Cochlear products. She appears to dismiss these other features as representing relative parity among competitors. However, it is unlikely that any company participating in the cochlear implant market could achieve or maintain a competitive position absent these many other features. To dismiss other features such as a behind the ear device for example, as unimportant to participating in the market and attribute success solely to the back telemetry invention is very myopic.

**The Analytical Approach**

The analytical approach identifies the economic contribution of intellectual property as the difference between profits expected from infringing sales and a normal industry profit level. The analytical approach has been used to define royalty rates for infringement damages and can be used to identify the economic contribution of intellectual property for other purposes as well. The analytical approach can be summarized by the following equation:

Expected Profit Margin using the disputed invention - Normal Profit Margin = Royalty Rate

In *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986), a royalty rate for damages was calculated based on an analysis of the business plan of the infringer, prepared just prior to the onset of the infringing activity. The court discovered the profit expectations of the infringer from internal memorandums written by top executives of the company. Internal memorandums showed that company management expected to earn gross profit margins of almost 53% from the proposed infringing sales. Operating profit margins were then calculated by subtracting overhead costs to yield an expected operating profit margin of between 37% and 42%.

To find the portion of this profit level that should be considered as a royalty to the plaintiff, the court considered the standard, "normal" profits earned in the industry at the time of infringement. These profit levels were determined to be between 6.6% and 12.5%. These normal

---

[71] COC-50000230, COC 5002075, COC 5002330, COC-5001889-90,

Case 2:07-cv-08108-FMO-SH   Document 325-21   Filed 11/26/13   Page 14 of 14   Page ID #:12475

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 28

industry profits were considered to represent profit margins that would be acceptable to firms operating in the industry. The difference between the profit margins earned on infringing revenues and that from a "normal", presumably non-infringing product, ranged between 24.5% and 35.4%. This differential range of profits was found to provide an indication of the economic contribution of the intellectual property from which to calculate infringement damages. On appeal, the Federal Circuit affirmed.

**Cochlear Profit Margin Comparison during Different Time Periods**

I have implemented this approach in a number of different ways. One implementation involves comparing Cochlear operating profit margins for different years. I have compared operating profits for Cochlear during years in which its cochlear implant products did not incorporate the telemetry invention and subsequent years when its cochlear implant products did incorporate the telemetry invention. In 1995 and 1996, Cochlear products did not incorporate the telemetry invention. Eventually, the majority of Cochlear's cochlear implant products incorporated the telemetry invention.

The 1996 Cochlear Ltd. annual report states "Sales of the Nucleus Spectra 22 cochlear implant system and accessories continue to form the core of our business."[72] I understand that the Spectra 22 did not incorporate the accused telemetry invention. In 1997, Cochlear introduced the Spectra 24 system which is accused of infringing the patents-in-suit by incorporating the telemetry invention.[73] In this same year, Cochlear introduced the first miniaturized, multichannel, ear level speech processor, the ESPrit.[74]

During 1997, Cochlear continued to market both the Nucleus 22 and 24 as FDA approval in the US for the Nucleus 24 was pending. In 1998, FDA approval was granted in the US for the Nucleus 24 and was still pending in Japan.[75]

During 1999, the Nucleus 24 was launched in North America and in August 1999, regulatory approval was granted in Japan which completed the suite of regulatory requirements

---

[72] Cochlear Ltd. annual report 1996 page COC-5002015
[73] Cochlear Ltd. 1997 annual report, page COC-5002079
[74] Cochlear Ltd. annual report 1997, page COC-5002075
[75] Cochlear annual report 1998, page COC-5002133 and COC-5002136