Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 29

for the America, Europe and Asia.[76] Regulatory and reimbursement approvals were obtained for Japan in January 2000.[77]

By 2001 the Nucleus 24 was approved for world-wide marketing. For the period 2001 through 2005, Cochlear business was dominated by cochlear implants that presumably used the telemetry invention. In 20005 Cochlear acquired a bone anchored hearing device.

Comparison of 1995 and 1996 operating profits margins with profit margins in 2001 through 2005 provides a comparison of profit margins for cochlear implants with and without the telemetry invention. Exhibit 2 shows Cochlear operating profit margins for 1995 through 2012.

For Cochlear, the average operating profit margin in 1995 and 1996 was 18.2% of revenues. In 2001 the profit margins increased to 20.7% representing a 2.5% differential. When the 1995-96 average is compared to the average profit margin for 2001 through 2005, of 21.4%, the difference is 3.2%.[78]

As previously discussed, it is important to note that the introduction of the telemetry invention was not the only new technology developed during the period 1995 through 2008. Consequently, attribution of the 2.5% to 3.2% differential profit margins cannot be solely attributed to the telemetry invention.

**Cochlear Profit Margin Comparison with Industry Average**

The *TWM v. Dura* decision explains that an indication of a reasonable royalty can be obtained by comprising the operating profit margins for products that are similar but for incorporation of the accused invention. Another implementation of this approach is to compare the profits of the alleged infringer with the profits of other companies in the industry, presumably not using the invention at issue. Operating profits are the preferred level of profitability for comparison. Gross profit margins only consider the materials, labor and manufacturing costs that go into making a product. Absent from consideration are selling and overhead expenses, which when subtracted from gross profits yields operating profit before interest expenses and taxes. It is conceivable that operating expenses can be different for companies that have used patented technology than companies without a proprietary advantage. Selling expenses are an example.

---

[76] Cochlear Ltd. annual report 1999, page COC-5002196 and the 200 annual report, page COC-5002216
[77] Cochlear Ltd. annual report 2000, page COC- 5002261
[78] Exhibit 3 of this report

-29-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
663

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 30

The amounts required to sell a non-proprietary commodity type of product might be higher than a patented technology product with features and benefits that might "sell themselves" Consequently, operating profit margins are the preferred level of comparison.

For this case, I have compared the operating profit margins of Cochlear as presented in Exhibit 2 to the operating profits reported by RMA e-Statement Studies. Among other activities, RMA compiles profit information for companies in different industries. For the Electro-medical and Electrotherapeutic Apparatus Manufacturing industry, RMA reports average operating profits for 2001 through 2005 of 6.6% of revenues as presented in Exhibit 4. When this is compared to the Cochlear Ltd. operating profit margins for the same general period of 21.4% the difference is 14.8%. This is far less than the high-end of the range of 31.5% calculated by Ms. Elsten as presented on Exhibit 3.2 of her January 19, 2009 report and 33.5% calculated on Table 7, page 44 of Ms. Elsten's November 30, 2012.

The primary problem with this particular implementation of the Analytical Approach is that the entire amount of the difference represents more than just one invention. The difference might be attributed to many company characteristics including the contribution of foundation technology, well-established trademarks and high quality marketing efforts. Attributing the entire differential to a single product feature such as telemetry is just wrong. Unfortunately, this particular implementation of the Analytical Approach does not provide any means by which the entire differential can be apportioned to the various company characteristic to yield an indication of a royalty rate for a single patented feature. In fact, the cochlear implant products are compared to profits associated with a wide variety of Electro-medical and Electrotherapeutic Apparatus products having nothing to do with cochlear implants or hearing aids for that matter.

I have conducted the preceding analysis to show a better implementation of the Analytical Approach than that used by Ms. Elsten. However, I do not believe use of either Ms. Elsten's Analytical Approach analysis or mine can in anyway isolate the portion of the profit differential that should be allocated to the back telemetry invention. Since I do not believe this use of the Analytical Approach is a reasonable method for determining a reasonable royalty rate I have not updated the data that I previously used in my March 11, 2009. New data would not correct the fundamental flaw of using this approach.

-30-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
664

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 3 of 17 Page ID #:12478

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 31

**Product Profit Margin Comparison**

The *TWM v. Dura* decision explains that an indication of a reasonable royalty can be obtained by comprising the operating profit margins for products that are similar but for incorporation of the accused invention. Separate calculations are conducted to calculate the operating profit margins for the products to be compared but Ms. Elsten has improperly implemented the Analytical Approach. She has compared gross profit margins which ignore the operating expenses of selling, general and administrative expenses that are important for commercializing all products. If it is assumed that the operating expenses for the products being compared are equal for the two products then a comparison of gross profits might provide an indication of an appropriate royalty rate. However, Ms. Elsten provides no analysis to show that similar operating expenses for products with and without the back telemetry invention.

In Ms. Elsten's damages report dated January 19, 2009 she suggests that a comparison of the gross profit margins of the SP12 and ESPrit 3G yields an indication of a royalty rate for the telemetry invention. On Exhibit 3.3 of Ms. Elsten's report, gross profit margins for the following products are provided:

|  |  |
|---|---|
| SP12 | 90% (telemetry) |
| SPrint | 79.2% (telemetry) |
| ESPrit 3G | 72.8% (no telemetry) |
| CI24 | 73.7% (telemetry) |

On Exhibit 3.1 of Ms. Elsten's report dated January 19, 2009 she calculates a profit premium by comparing the SP12 and ESPrit 3G then calculates the premium as a percent of the accused product selling price. This calculation is wrong and incorrectly indicates royalty rates of 26.5% and 27.4%. When the gross profit margins are correctly compared, lower royalty rates are indicted. Comparing the SP12 and ESPrit 3G profit margins indicates a royalty rate of 17.2%. Comparing the Sprint and ESPrit 3G profit margins indicates a royalty rate of 6.4%.

In Ms. Elsten's reported dated November 30, 2012 she calculates royalty rates in Table 5, page 43 based on profitability comparisons ranging from 28% to 32.1%.

Again, there are significant problems with relying on this profit comparison to yield a royalty rate indication for the telemetry invention. As discussed below, the differences of features between the products compared is significantly more than solely the inclusion of back telemetry.

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 4 of 17 Page ID #:12479

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 32

<u>Sprint and ESPrit 3G Comparison</u>

The SPrint is a body-worn speech processor that incorporated back telemetry. The next speech processors introduced by Cochlear were the ESPrit and the ESPrit 3G which did not have back telemetry. Then, when the Freedom speech processor, also referred to as SP12, was introduced it incorporated back telemetry. James Patrick testified that the ESprit was the first behind-the-ear speech processor allowing recipients to get rid of the cable recipients had to wear between their earpiece and the body-worn speech processor. It was invented to improve comfort and convenience for the recipient and telemetry was not as important. Telemetry was omitted from the first behind-the-ear speech processors because of power limitations. James Patrick stated, "Obviously, if the reverse telemetry had been overwhelmingly important, then we wouldn't have made the choices that we made."[79]

Furthermore Ms. Elsten's comparison of the SPrint and Esprit 3G devices is terribly misleading. The SPrint is a body worn speech processor. The ESPrit 3G is a miniaturized, multichannel speech processor worn behind the ear. The SPrint incorporated telemetry. The ESPrit 3G did not but the ESPrit 3G also lacked other significant features that the SPrint possessed.

The Sprint, body worn, speech processor used a digital signal processor that is optimized by software providing a greater number of sound processing options than the ESPrit 3G which was hardware based. The ESprit 3G processor was also limited in that it can store 50% fewer MAPS than the Sprint processor.

MAPS are important. They allow recipients to toggle through multiple settings that allow the speech processor to provide superior performance in different sound environments including, noisy environments, quiet environments, conversational environments and musical environments. The SPrint speech processor possessed the capability to customize many MAPS for recipients. The ESPrit 3G possessed only two alternate MAPS. As a result many recipients would purchase both a Sprint and ESPrit 3G. When mobility was desired a recipient could use the ESPrit 3G but when more Map options were desired the recipient would switch to the body-worn SPrint speech processor.[80]

---

[79] Deposition of James Patrick, December 19, 2008, pages 70-77
[80] "The enthusiasm for the ear level ESPrit speech process was high, with recipients valuing the cosmetic benefits of this world-first product. Many recipients chose to purchase both the ESPrit and the body worn

Case 2:07-cv-08108-FMO-SH   Document 325-22   Filed 11/26/13   Page 5 of 17   Page ID #:12480

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 33

The ESPrit not only lacked telemetry but it lacked the superior digital processor of the Sprint. It lacked the ability to be customized for the recipients. Its primary feature was that it was the first behind the ear speech processor, but it did not provide the superior performance of the Sprint.

These significant differences represent much more that the incorporation of telemetry and Ms. Elsten has seriously erred when she attributes the entire gross profit margin differential solely to the telemetry invention.

SP12 and ESPrit 3G Comparison

When the SP12 was introduced it incorporated a digital signal processor like the Sprint. It also allowed customization for recipients and for the creation of more MAPS. The SP12 also used three microphones allowing a recipient to implement directional focusing on sounds that a recipient wanted to specifically emphasize. The SP12 was not only a behind the ear speech processor but it was digital and provided many benefits important to recipients and by the way, it incorporated the telemetry invention which was considered expendable when the ESPrit 3G was introduced.

Furthermore, both the Sprint and SP12 speech processor are based on digital technology, controlled by software. As Cochlear continues to enhance their software, users of the Sprint and SP12 can enjoy the enhancements provided by the new software with their exiting speech processors. This is not possible for the ESprit 3G hardware based speech processor.[81]

Further complications with Ms. Elsten comparison are indicated on Exhibit 3 to this report which shows the enormous number of important and different features that exist between the products she is comparing. This approach is only useful if the only difference between the products involves having or not having back telemetry. Ms. Elsten attributes the entire profit margin differential to the back telemetry invention and makes no effort to apportion the profit different among the many different features, only one of which is back telemetry.

In Ms. Elsten's reported dated November 30, 2012 she calculates royalty rates in Table 5, page 43 based on profitability comparisons ranging from 28% to 32.1%. She adds to her analysis

---

Sprint speech processor with the Nucleus 24 system." Cochlear 1999 Annual Report page 24, COC-5002196
[81] Telephone discussion with Tony Nygard, March 2, 2009, 6pm.

Case 2:07-cv-08108-FMO-SH   Document 325-22   Filed 11/26/13   Page 6 of 17   Page ID #:12481

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 34

a gross margin premium comparison of the ESPrit 3G with the CP800. This is again a very unreasonable comparison. The CP800 is smaller, capable of working with a remote, has the industry's first telcoil, has specialized support for bilateral implantation, and has the industry's first IP57 water resistance rating.[82]

**25% Rule**

In my previous report, dated March 11, 2009 I discussed the 25% Rule and concluded that it provided no useful guidance. The Federal Circuit in *Uniloc v. Microsoft* eliminated use of the 25% Rule as a basis for determining a reasonable royalty rate. I have therefore not discussed the 25% Rule in this report.

**14. The opinion and testimony of qualified experts;**

I have not reviewed the opinions or testimony of other experts in this case other than the damages reports of Ms. Elsten.

**15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee -- who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

I have been asked to use June 1998 as the hypothetical negotiation date when the parties in this lawsuit would work together to negotiate a license for the patents-in-suit. I also understand that the damages period may involve three different dates for which I have calculated damages:

1. The longest damages period is for the six years prior to the filing of this lawsuit in December 2007, running from 2001 through 2012.
2. If the defendant, Cochlear is successful with its marking defense then the longest potential damages period would be between 2003 and 2012.
3. If Cochlear succeeds in its laches defense, the damages period runs from December

---

[82] http://www.cochlear.com/sea/nucleus-cochlear-implants/nucleus5/upgrading-to-nucleus-5

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 7 of 17 Page ID #:12482

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 35

2007 through 2012.

As the parties approached a hypothetical negotiation they would both know and consider at least the following:

1. AMEF would not be overly concerned about negotiating a royalty rate that would force it to accept a reduction in its royalty rate terms with ABC or AB LLC. A lower, non-exclusive royalty rate would allow AEMF to enjoy royalties on Cochlear's significant market share, which is 70% in the US.[83] Furthermore, the royalty rate that ABC and AB LLC pay to AEMF is for exclusive rights to all of AEMF's cochlear implant related patents. Any reduction ABC or AB LLC would demand for loss of its exclusivity should only relate to that portion of the total royalty rate paid by ABC and AB LLC as it relates to the patents-in-issue and only for the US. No changes to the royalty rate between AEMF and Advanced Bionics for sales outside the US would be needed.

2. AEMF has a stated mission of making sure new medical technology is widely made available to patients and to protect its intellectual property rights. It should be eager to have Cochlear get AEMF's invention to Cochlear's 70% market share and thereby benefiting many more people in need.

3. Cochlear would argue that the success of its products and the profits generated from its operations are derived from the many technologies and inventions previously discussed in this report and not just the telemetry invention of the patents-in-issue.

4. Cochlear would argue that even the 2% royalty rate paid by them to the University of Melbourne is too high because they ultimately bought-out the agreement for a $3 million one-time payment and became free of continuing running royalties, and because that license brought enabling technology to Cochlear far beyond individual features such as the telemetry involved in this case. AEMF would argue that the telemetry inventions of the patents-in-issue are needed for implementation of Cochlear's cochlear implants.

---

[83] Deposition of Theresa Adkins, December 30, 2008, page 26

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 8 of 17 Page ID #:12483

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 36

5. If the parties believed that the absence of such telemetry inventions could effectively block successful implementation of Cochlear's cochlear implant business model then the parties would agree that the telemetry invention is of equal value to the foundational patents Cochlear licensed from the University of Melbourne, setting the upper limited for an exclusive license for the telemetry invention at 2%.

6. Both parties would agree that the non-exclusive and limited geographical territory (US only) rights being negotiated should be reflected in the royalty rate. Consequently, both parties would apply the 60% nonexclusive adjustment factor previously discussed in this report and settle on for the patents-in-suit collectively of no more than 1.2%.

7. I have been asked to assume as an alternative that only a license the '616 patent is required, and further assume as an alternative that only a license to claim 10 of the '616 patent is required. If those assumptions are correct, then the parties would likely have negotiated a significantly lower royalty than 1.2%, which would have been applied against a lower base.

8. The '616 Patent the claims a physician's tester. I understand that Cochlear distributes programming software that AEMF contends is this physician's tester. The licenses discussed above are, however, for more fundamental enabling technology. As a result, in a hypothetical negation, the parties would not likely have used the royalty rates in those licenses, but would have negotiated a lower royalty rate for just a tester. This appears especially true if a license is only required for claim 10 of the '616 patent. Claim 10 is a method where the last step requires displaying of information back telemetered from the implant. I understand and have been asked to assume that, in Cochlear's Custom Sound programming software, the display of the back telemetered data is an optional feature not required to use the program for its intended purpose. It is unlikely that Cochlear would have been willing to pay a substantial royalty rate on an optional feature on a limited component such as a physician's tester.

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 9 of 17 Page ID #:12484

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 37

9. Additionally, for the '616 patent, the smallest saleable unit is the software for physician's tester and the appropriate royalty base involves only the physician's tester and not the system being tested.[84]

## CONCLUSION

I have considered damages based on a reasonable royalty. A reasonable royalty reflects the amount of royalty that the two parties would have negotiated had they entered into license negotiations prior to the infringing activities. Based on my analysis, as reported herein, I conclude the following, only if the '691 patent in addition to the '616 patent is found to be enforceable, valid and infringed and the royalty base of Ms. Elsten is deemed to be appropriate:

The longest damages period is for the six years prior to the filing of this lawsuit in December 2007, running from December 2001 through 2012. Exhibit 5 to this report shows accused sales of $1,539,472.026. Application of the maximum 1.2% royalty rate yields a maximum indication of damages of $18,473,664.

If the defendant, Cochlear is successful with its marking defense then the damages period run no more than between August 2003 and 2012. Exhibit 5 to this report shows accused sales of $940,845,640. This amount uses sales calculated on Exhibit 5.1 where sales are estimated for the period August 2003 through June 2004. Application of the maximum 1.2% royalty rate yields a maximum indication of damages of $11,290,147.

If Cochlear succeeds in its laches defense or further limits the damages period due to the marking defense, then the damages period runs from December 2007 through 2012. Exhibit 5 to this report shows accused sales of $466,616,993 based on Exhibit 5.2 where sales for the period December 2007 through June 2008 have been estimated. Application of the maximum 1.2% royalty rate yields a maximum indication of damages of $5,599,404.

---

[84] My previous illustration involving the automotive engine diagnostic device applies here. A patented auto engine diagnostic testing device, if it were alleged to infringe, would be the smallest salable unit and the sole basis for a royalty base. The fact that it needs to be connected to an auto engine to function does not mean that an unpatented auto engine should be included in the royalty base. It is the same for the physician's tester covered by the '616 Patent. The fact that it monitors an unpatented device does not mean the device being monitored should be part of the patent base.

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 10 of 17 Page ID #:12485

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 38

In the event that only the '616 patent survives trial, the royalty base offered by Ms. Elsten is wholly inappropriate and must be based on a smallest salable unit solely associated with only the physician's tester invention. Ms. Elsten has not properly addressed an appropriate royalty base in the instance where only the '616 Patent is found to be valid, enforceable and infringed. Indeed, Ms. Elsten has not provided any quantification, or even approximation, for revenue attributable to the software alone. I am therefore unable to quantify reasonable royalty damages for the '616 patent alone at anything other than $0.

I reserve the right to update my analysis and conclusion as more information is discovered.

Respectfully submitted,

*[signature]*

_____
Russell L. Parr, CFA, ASA, CLP
President
IPRA, Inc.

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 39

## Exhibit 1

### Advanced Bionics Estimated Revenue

Estimated Advanced Bionics Revenues

| Period | Revenues | Discount Factor 15% | Present Value |
|---|---|---|---|
| Q3 & Q4 1999 | $ 21,751,967 | 0.9325 | $20,283,814 |
| 2000 | $ 40,273,133 | 0.8109 | $32,656,426 |
| 2001 | $ 56,995,100 | 0.7051 | $40,187,678 |
| 2002 | $ 46,997,000 | 0.6131 | $28,815,602 |
| 2003 | $ 64,513,131 | 0.5332 | $34,395,992 |
| 2004 | $ 66,622,080 | 0.4636 | $30,887,308 |
| 2005 | $ 61,958,320 | 0.4031 | $24,978,346 |
| 2006 | $ 86,810,080 | 0.3506 | $30,432,411 |
| 2007 | $ 107,645,040 | 0.3048 | $32,814,242 |
| 2008 | $ 119,005,100 | 0.2651 | $31,545,404 |
| 2009 | $ 123,691,800 | 0.2305 | $28,511,075 |
| 2010 | $ 120,838,127 | 0.2004 | $24,220,261 |
| 2011 | $ 127,943,714 | 0.1743 | $22,299,542 |
| 2012 | $ 147,344,360 | 0.1516 | $22,331,231 |
| 2013 | $ 154,672,640 | 0.1318 | $20,384,254 |
| 2014 | $ 154,672,640 | 0.1146 | $17,725,438 |
| 2015 | $ 154,672,640 | 0.0997 | $15,413,424 |
| 2016 | $ 154,672,640 | 0.0867 | $13,402,978 |
| 2017 | $ 154,672,640 | 0.0754 | $11,654,763 |
| 2018 | $ 154,672,640 | 0.0655 | $10,134,577 |
| 2019 | $ 154,672,640 | 0.0570 | $8,812,675 |
| 2020 | $ 154,672,640 | 0.0495 | $7,663,196 |
| 2021 | $ 154,672,640 | 0.0431 | $6,663,649 |
| Cumulative Revenues | | | |
| Q3 1999- 2017 | $ 1,965,752,152 | | $ 482,940,189 |
| Q3 1999- 2021 | $ 2,584,442,712 | | $ 516,214,285 |
| Upfront Payment | $ 2,800,000 | | $ 2,800,000 |
| Effective Royalty Rate for the $2.8 million stock. | | | |
| Q3 1999- 2017 | 0.14% | | 0.58% |
| Q3 1999- 2021 | 0.11% | | 0.54% |

Source: Elsten report, November 30, 2012, Exhibit 4.8, Q3 1999 - 2013

-39-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
673

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 40

**Exhibit 2**
Cochlear Ltd.
Income Statement
1995 through 2012
(A$ millions)

| Year | Revenues | EBIT | EBIT Margin | Source |
|---|---|---|---|---|
| 1995 | 68.3 | 12.2 | 17.9% | COC-5002210 |
| 1996 | 72.3 | 13.3 | 18.4% | COC-5002210 |
| 1997 | 71.9 | 14.3 | 19.9% | COC-5002210 |
| 1998 | 91.7 | 17.5 | 19.1% | COC-50000441 |
| 1999 | 127.2 | 23.1 | 18.2% | COC-50000441 |
| 2000 | 144.2 | 30.4 | 21.1% | COC-50000441 |
| 2001 | 220.1 | 45.5 | 20.7% | COC-50000441 |
| 2002 | 255.0 | 51.5 | 20.2% | COC-50000441 |
| 2003 | 306.1 | 80.1 | 26.2% | (1) |
| 2004 | 282.2 | 45.5 | 16.1% | (1) |
| 2005 | 349.0 | 82.5 | 23.6% | (1) |
| 2006 | 452.3 | 111.5 | 24.7% | (1) |
| 2007 | 559.4 | 150.2 | 26.9% | (1) |
| 2008 | 601.7 | 167.3 | 27.8% | (1) |
| 2009 | 694.7 | 183.3 | 26.4% | (1) |
| 2010 | 734.8 | 220.5 | 30.0% | (1) |
| 2011 | 809.6 | 242.7 | 30.0% | (1) |
| 2012 | 779.0 | 215.3 | 27.6% | (1) |
| Average EBIT Margin 2001-2012 | | | 25.0% | |

EBIT: Earnings Before Interest and Taxes
(1) Source for 2003 -2012:
http://www.cochlear.com/wps/wcm/connect/intl/about/investor/financial-history/financial-history

-40-

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 41

## Exhibit 3

**Comparison of Features in Speech Processors**
Source: Figure 4 from the Elsten Damages Report dated November 30, 2012

| Feature | ESPrit 3G | Sprint | SP12 | CP800 |
|---|---|---|---|---|
| Back Telemetry | | ✓ | ✓ | ✓ |
| SPEAK | ✓ | ✓ | ✓ | ✓ |
| Continous Interleaved Sampling | ✓ | ✓ | ✓ | ✓ |
| ACE | ✓ | ✓ | ✓ | ✓ |
| Directional Microphone | ✓ | ✓ | ✓ | ✓ |
| Transmitting coil and cables | ✓ | ✓ | ✓ | ✓ |
| Enhanced battery life | | ✓ | ✓ | ✓ |
| BTE (Behind the ear) | ✓ | ✓ | ✓ | ✓ |
| Programmable volume and sensitivity controls | | ✓ | ✓ | |
| Four user selectable programs | | ✓ | ✓ | |
| ADRO (Adaptive Dynamic Range Optimzation) | | ✓ | ✓ | |
| LCD panel to display control setting and system status | | ✓ | ✓ | |
| Optional alarm indicating battery level and usage | | ✓ | | |
| Optional button lock to prevent access to the controls | | ✓ | | |
| SmartSound™ | | | ✓ | ✓ |
| Sweat and splash resistance | | | ✓ | ✓ |
| Dual microphones | | | ✓ | ✓ |
| AutoPhone | | | | ✓ |
| Dedicated music program | | | | ✓ |
| Two way remote assitant | | | | ✓ |
| See It and Go | | | | ✓ |

| Feature | Feature Description |
|---|---|
| Back Telemetry | System testing |
| SPEAK | Speech coding strategy |
| Continous Interleaved Sampling | Speech coding strategy |
| ACE | Speech coding strategy |
| Directional Microphone | Focuses on surrounding sounds |
| Transmitting coil and cables | Connetcs the coil to the sound processor |
| Enhanced battery life | Provides longer useage time between charges |
| BTE (Behind the ear) | Fits comfortably behind the ear. Discreet and designed to fit all ear sizes. |
| Programmable volume and sensitivity controls | Allows control of volume |
| Four user selectable programs | Settings for everyday use, noisy environmemts, focus on a spcific person and muscial environ |
| ADRO (Adaptive Dynamic Range Optimzation) | Adapting digital signal processor controlling the output levels of narrow frequency bands |
| LCD panel to display control setting and system status | Displays settings and current operational status |
| Optional alarm indicating battery level and usage | Provides access to battery levels |
| Optional button lock to prevent access to the controls | Locks controls so that users, such as childrne cannot change settings |
| SmartSound™ | SmartSound responds to listening environments to deliver optimal hearing. |
| Sweat and splash resistance | Allows for strenous, sweat producing activities and spending time around the water |
| Dual microphones | Two microphones for better quality sound and direction. Designed to capture sound from a |
| AutoPhone | Automatic phone detection recognises the telephone telecoil signal and switches on the tel |
| Dedicated music program | Allows connection to various devices such as MP3 players. |
| Two way remote assitant | Change hearing programs or adjust hearing via the remote wireless device. |
| See It and Go | Associated with the SmartSound technology |

-41-

SMRH:407741853.1

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
675

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 42

Exhibit 4

**334510 – Electro-medical and Electrotherapeutic Apparatus Manufacturing**
**2001-09 Annual Statement Studies**
**National - All Regions**
Source: RMA eStatement Studies

| INCOME DATA | 4/1/01 - 3/31/02 | 4/1/02 - 3/31/03 | 4/1/03 3/31/04 | 4/1/04 3/31/05 | 4/1/05 3/31/06 | 4/1/06 3/31/07 | 4/1/07 3/31/08 | Average |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| **Gross Profit** | 48.7 | 48.3 | 50.8 | 48.1 | 50.9 | 49.1 | 49.0 | 49.3 |
| **Operating Expenses** | 41.8 | 44.5 | 43.1 | 40.2 | 45.0 | 42.4 | 40.8 | 42.5 |
| **Operating Profit** | 6.8 | 3.9 | 7.8 | 7.9 | 5.8 | 6.7 | 8.1 | 6.7 |

This U.S. industry comprises establishments primarily engaged in manufacturing electro-medical and electrotherapeutic apparatus, such as magnetic resonance imaging equipment, medical ultrasound equipment, pacemakers, hearing aids, electrocardiographs, and electro-medical endoscopic equipment.

-42-

IPRA, INC

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Exhibit 20
676

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Supplemental Expert Damages Opinion of Russell L. Parr, January 4, 2013
Page 43

## Exhibit 5
### Cochlear Ltd. Accused Revenues

| | December 1, 2001 to June 30, 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY2010 | FY2011 | FY2012 | 2001-2008 Total | Adjusted 2001-2012 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sprint (1) | $ 8,452,933 | $ 14,886,769 | $ 11,843,510 | $ 9,389,476 | $ 2,076,480 | $ 1,452,950 | $ 398,375 | $ 6,000 | $ (20,494) | $ (5,000) | $ (6,285) | $ 48,474,714 | $ 48,474,714 |
| CI24 (2) | $ 24,299,256 | $ 50,037,368 | $ 47,474,546 | $ 55,972,969 | $ 77,093,625 | $ 90,516,439 | $ 100,377,295 | $ 104,700,845 | $ 23,616,000 | $ 9,555,707 | $ 93,513,884 | $ 677,157,934 | $ 677,157,934 |
| SP12 (3) | $ - | $ - | $ - | $ 7,849,072 | $ 38,452,036 | $ 68,438,988 | $ 69,995,908 | $ 80,567,007 | $ 29,715,255 | $ 15,797,858 | $ 7,429,240 | $ 318,245,364 | $ 312,718,313 |
| CP800 (4) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 60,272,320 | $ 87,268,754 | $ 99,278,614 | $ 246,819,688 | $ 246,819,688 |
| C1500 (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 254,100 | $ 98,451,814 | $ 124,909,498 | $ 27,227,907 | $ 250,843,319 | $ 250,843,319 |
| C1422 (6) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,458,058 | $ 3,458,058 | $ 3,458,058 |
| | $ 32,752,189 | $ 64,924,137 | $ 59,318,056 | $ 73,211,517 | $ 117,622,141 | $ 160,408,377 | $ 170,771,578 | $ 185,273,852 | $ 53,310,761 | $ 25,348,565 | $ 100,936,839 | $ 1,544,999,077 | $ 1,539,472,026 (7) |

(1) Elsten November 30, 2012 report Exhibit 6.3
(2) Elsten November 30, 2012 report Exhibit 2.2
(3) Elsten November 30, 2012 report Exhibit 2.6
(4) Elsten November 30, 2012 report Exhibit 6.3
(5) Elsten November 30, 2012 report Exhibit 2.3
(6) Elsten November 30, 2012 report Exhibit 2.3

(7) Elimination of SP12s used with C122 from Elsten November 30, 2012 report, Exhibit 2.4.

| | | |
|---|---|---|
| Total SPrint, CI24 and SP12 August Sales 2003 - 2012 | $ 941,866,144 | Adjusted 2004 Sales from Exhibit 5.1 plus sales for 2005-2012 |
| Less SP12 sales asociated with CI22 implants | $ 1,020,504 | Elsten Report Exhibit 2.3 |
| Allegedly Infringing Sales August 2003 - 2008 | $ 940,845,640 | |

| | | |
|---|---|---|
| Total SPrint, CI24 and SP12 Sales December 2007 - 2012 | $ 467,637,497 | Adjusted 2008 sales from exhibit 5.2 plus sales for 2009-2012 |
| Less SP12 sales asociated with CI22 implants | $ 1,020,504 | Elsten Report Exhibit 2.3 |
| Allegedly Infringing Sales August 2003 - 2008 | $ 466,616,993 | |

-43-

IPRA, INC

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Exhibit 20**
677

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 44

**Exhibit 5.1**

**Cochlear Accused Sales for Fiscal Year 2004**

|  | FY04 1st Qtr. | FY04 2nd Qtr. | FY04 3rd Qtr. | FY04 4th Qtr. | FY04 Total |
|---|---|---|---|---|---|
| Ci24M | $ 74,450 | $ 54,500 | $ 97,000 | $ 46,000 | $ 271,950 |
| CI24 Contour | $ 9,072,007 | $ 11,386,573 | $ 6,981,409 | $ 7,188,845 | $ 34,628,834 |
| CI24 Contour CA | $ 550,612 | $ 1,028,240 | $ 2,955,394 | $ 6,301,753 | $ 10,835,999 |
| CI24R(ST) | $ 381,556 | $ 528,989 | $ 339,796 | $ 456,422 | $ 1,706,763 |
| Ci24RE(CA) | $ - | $ 31,000 | $ - | $ - | $ 31,000 |
|  | $ 10,078,625 | $ 13,029,302 | $ 10,373,599 | $ 13,993,020 | $ 47,474,546 |
| Source: | COC 5000926 | COC 5000970 | COC 5001015 | COC5001057 |  |
|  |  |  |  |  |  |
| Sprint | $ 2,928,000 | $ 2,990,400 | $ 2,971,870 | $ 2,953,240 | $ 11,843,510 |
| Source: | COC 500937 | COC 500978 | COC 5001023 | COC 5001065 |  |
|  |  |  |  |  |  |
| Total Accused Sale | $ 13,006,625 | $ 16,019,702 | $ 13,345,469 | $ 16,946,260 | $ 59,318,056 |
| Adjusted Accused | $ 8,671,083 | $ 16,019,702 | $ 13,345,469 | $ 16,946,260 | $ 54,982,514 |

Accused sales for 2004 have been estimated by reducing sales for the 1st quater of fiscal year 2004 by one-third.

SMRH:407741853.1

-44-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
678

Case 2:07-cv-08108-FMO-SH Document 325-22 Filed 11/26/13 Page 17 of 17 Page ID #:12492

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 45

Exhibit 5.2

**Cochlear Accused Sales for Fiscal Year 2008**

|  | FY08 1st Qtr. | FY08 2nd Qtr. | FY08 3rd Qtr. | FY08 4th Qtr. | FY08 Total |
|---|---|---|---|---|---|
| CI24 Contour | $ 539,500 | $ 521,450 | $ 288,682 | $ 127,406 | $ 1,477,038 |
| CI24 Contour CA | $ 251,885 | $ 174,400 | $ 101,450 | $ 57,850 | $ 585,585 |
| CI24 RE(ST) | $ 513,102 | $ 562,238 | $ 576,920 | $ 483,991 | $ 2,136,251 |
| CI24R(ST) | $ 52,010 | $ 386,550 | $ 58,482 | $ 158,750 | $ 655,792 |
| CI24RE(CA) | $ 21,372,233 | $ 24,880,627 | $ 22,750,265 | $ 26,519,504 | $ 95,522,629 |
|  | $ 22,728,730 | $ 26,525,265 | $ 23,775,799 | $ 27,347,501 | $ 100,377,295 |
| Source: | COC 5001620 | COC 5001662 | COC 5001707 | COC 5001760 |  |
|  |  |  |  |  |  |
| Sprint | $ 106,500 | $ 133,075 | $ 104,950 | $ 53,850 | $ 398,375 |
| SP12 Biege | $ 6,712,233 | $ 7,738,569 | $ 6,433,486 | $ 8,215,213 | $ 29,099,501 |
| SP12 Brown | $ 3,316,826 | $ 4,255,895 | $ 3,506,788 | $ 5,260,235 | $ 16,339,744 |
| SP12 Black | $ 1,784,109 | $ 2,079,510 | $ 2,026,649 | $ 2,779,058 | $ 8,669,326 |
| SP12 Silver | $ 2,541,537 | $ 2,849,061 | $ 2,878,859 | $ 3,021,847 | $ 11,291,304 |
| SP12 Pink | $ 398,255 | $ 741,415 | $ 635,088 | $ 706,468 | $ 2,481,226 |
| SP12 Blue | $ 519,665 | $ 521,875 | $ 482,924 | $ 590,543 | $ 2,115,007 |
|  | $ 15,379,125 | $ 18,319,400 | $ 16,068,744 | $ 20,627,214 | $ 70,394,483 |
| Source: | COC 5001628 | COC 5001671 | COC 5001717 | COC 5001769 |  |
|  |  |  |  |  |  |
| Total Accused Sales | $ 38,107,855 | $ 44,844,665 | $ 39,844,543 | $ 47,974,715 | $ 170,771,778 |
| Adjusted Accused Sales | 0 | $ 14,948,222 | $ 39,844,543 | $ 47,974,715 | $ 102,767,480 |

Accused sales for December 2007 through June 2008 have been estimated by eliminating first quarter sales and using one-third of second quarter sales plus all of the 3rd and 4th quarter sales

SMRH:407741853.1 -45-

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 20
679