# Exhibit 21

Exhibit 21
712

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **Alfred E. Mann Foundation for Scientific Research**<br><br>                    Plaintiff,<br><br>        v.<br><br>**Cochlear Americas and Cochlear Ltd.**<br><br>                    Defendants, | USDC Case No.: CV 07-08108-GHK (CTX) |

# Expert Damages Report of Russell L. Parr, CFA, ASA

**March 11, 2009**

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
713

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 2

# INTRODUCTION

I have been asked by counsel for Cochlear Ltd. and Cochlear Americas ("Cochlear") to provide my opinion of the damages that would be adequate to compensate Alfred E. Mann Foundation for Scientific Research ("AEMF") for alleged patent infringement by Cochlear. I have been asked to consider damages measured by a theory of reasonable royalty. I have not considered damages based on a theory of lost profits. I have also been asked to comment on the expert report prepared for the Plaintiff by Ms. Cate M. Elsten, dated January 19, 2009.

I understand that Cochlear has been accused of infringing two patents as listed below:

- US Patent No. 5,609,616 ("the '616 Patent"), titled Physician's Testing System and Method for Testing Implantable Cochlear Stimulator, issued March 11, 1997.

- US Patent No. 5,938,691 ("the '691 Patent"), titled Multichannel Implantable Cochlear Stimulator, issued August 17, 1999.

The opinions presented in this report are based on (1) my education, professional career and relevant experience as described in my curriculum vitae, attached hereto as Appendix A, and (2) my review of various documents, court filings, patents and deposition transcripts as listed in Appendix B and/or footnoted in this report. I have also spoken to Tony Nygard, manager of Enabling Technologies and the technology development program at Cochlear, Ltd.

I reserve the right to alter or amend the opinions stated herein if additional information becomes known to me.

I have not been asked to provide, and do not have any opinion regarding, the validity, enforceability or infringement of the patents at issue in this case. For the purpose of this analysis, I have assumed the patents at issue are valid, enforceable and infringed by Cochlear.

IPRA, Inc. is being compensated for my time at the hourly rate of $575.00. This compensation is not dependent in any way on the outcome of this litigation.

# OPINION

I have considered damages based on a reasonable royalty. A reasonable royalty reflects the amount of royalty that the two parties would have negotiated had they entered into license

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
714

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and ... ...hlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 3

negotiations prior to the infringing activities. Based on my analysis, as reported herein, I conclude that Cochlear should pay AEMF a reasonable royalty in an amount between $1,220,964 and $8,132,521, depending on the damages period that is ultimately determined to be applicable.

## QUALIFICATIONS, PUBLICATIONS AND TESTIMONIAL EXPERIENCE

I am Russell L. Parr, CFA, ASA, President, IPRA, Inc. I am a consultant, author, lecturer and publisher specializing in intellectual property valuation and management. I have practiced as an intellectual property valuation and royalty rate consulting professional for over 25 years. My clients include multinational corporations, universities, and individual inventors.

Some of the corporations and universities for which I have conducted valuations and royalty rate studies include AT&T, Baxter International, IBM, Rockwell International, Mott's, Mead-Johnson, Hewlett-Packard Corporation, Dr. Seuss, Princeton University, Carnegie Mellon University, Rutgers University, Edwards LifeSciences, Inc. and Bayer. The work I have conducted for these and other entities involved valuations, infringement litigation testimony, and royalty rate analyses for use by my clients in license negotiations. For example, I provided royalty rate analyses to AT&T for use as the basis at which to transfer patented technology. My royalty rate opinion for Baxter was used for patent licensing negotiations in the medical products industry. I provided royalty rate opinions to IBM and Rockwell International regarding telecommunication industry patent license negotiations. I provided Mott's with a royalty rate analyses for use in patent license negotiations in the beverage industry. Hewlett-Packard and Mead-Johnson hired me to provide strategic planning advice about intellectual property management. For Dr. Seuss, I provided the estate of Theodor Geisel with a copyright valuation opinion for use in estate tax filings. For Princeton, Rutgers and Carnegie Mellon, I provided royalty rate analyses for use in patent license negotiations. Edwards and Bayer hired me to provide patent infringement litigation support, analysis and expert testimony.

In addition, I personally own intellectual property and have engaged in successful negotiations that have led to the licensing of these assets.

My education includes a Masters in Business Administration and a Bachelor of Science in Electrical Engineering from Rutgers University. I have also been awarded the professional designations, Chartered Financial Analyst (CFA) from the CFA Institute and Accredited Senior

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
715

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and ... ochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 4

Appraiser (ASA) from the American Society of Appraisers, both requiring the successful completion of study programs, examinations and work experience.

In addition to my consulting practice at IPRA, Inc., I publish three books regarding royalty rates at which intellectual property is licensed. These books are sold to a worldwide customer base and are used to accomplish intellectual property valuations and license agreements. The titles of these books are Royalty Rates for Pharmaceuticals & Biotechnology, 6th Edition, Royalty Rates for Technology, 4th Edition and Royalty Rates for Trademarks & Copyrights, 3rd Edition.

I am also the author or co-author of additional books on the valuation and management of intellectual property published by John Wiley & Sons, Inc. Some of my books are published in Italian, Japanese, Chinese, Russian and Korean. These books are titled – Royalty Rates for Licensing Intellectual Property, Intellectual Property – Licensing & Joint Venture Profit Strategies, Intellectual Property Infringement Damages, Technology Licensing, Investing in Intangible Assets, and Intellectual Property – Valuation, Exploitation & Infringement Damages.

In addition to my activities as a consultant, author and publisher, I have been a guest speaker regarding intellectual property matters at over forty professional conferences including those sponsored by the American Intellectual Property Law Association, Licensing Executives Society and the World Intellectual Property Organization.

I have testified at trial or deposition over fifty times regarding damages related to intellectual property infringement matters.

Details of my education, professional experience, articles, books and past expert testimony are described in my Curriculum Vitae, a copy of which is attached as Appendix A.

## BACKGROUND

Hearing loss is the partial or extreme loss of a person's ability to receive information by listening. The most extreme cases of hearing loss are known as deafness, a term used when the hearing loss is so severe a person cannot understand information when listening is the sole means of receiving it.[1]

It is difficult to precisely quantify the precise number of deaf people in the United States because different definitions can be used for deafness. Regardless of the definition, there are a

---

[1] http://agbell.org/DesktopDefault.aspx?p=About_Hearing_Loss

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
716

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 5

large number of Americans with significant hearing impairment that can benefit from medical intervention. Across all age groups, in the United States, approximately 1 million people (0.38% of the population, or 3.8 per 1,000) over 5 years of age are "functionally deaf" and more than half are over 65 years of age. About 8 million people (3.7%) over 5 years of age are hard of hearing (that is, have some difficulty hearing normal conversation even with the use of a hearing aid). Again, more than half of those who are hard of hearing are over 65 years of age. These estimates are based upon self-reported (or informant-reported) hearing difficulty and not on independent audiometric measurements.[2]

The Survey of Income and Program Participation (SIPP) is one of a few national surveys that regularly collect data identifying the American population of persons with hearing loss or deafness. Estimates from the SIPP indicate that less than 1 in 20 Americans are currently deaf or hard of hearing. In round numbers, nearly 10 million persons are hard of hearing and close to 1 million are functionally deaf. More than half of all persons with hearing loss or deafness are 65 years or older and less than 4% are less than 18 years of age. These findings are limited to those who report difficulty hearing "normal conversation" and do not include the larger population of persons with hearing loss for which only hearing outside the range and circumstances of normal conversation is affected.[3]

Considering the large population of the hearing impaired, James Patrick of Cochlear estimates the annual U.S. market for cochlear implants at between 8,000 and 10,000.[4]

**Cochlear Implants**

A cochlear implant is an implanted electronic hearing device designed to produce useful hearing sensations in a person with severe to profound deafness by electrically stimulating auditory nerve inside the inner ear. These implants usually consist of two main components:

- The externally worn microphone, sound processor and transmitter system.
- The implanted receiver and electrode system, which contains the electronic circuits that receive signals from the external system and send electrical currents to the inner ear.

---

[2] How Many People are Deaf in The United States, http://gri.gallaudet.edu/Demographics/deaf-US.php
[3] How Many Deaf People Are There in the United States? Estimates from the Survey of Income and Program Participation, Ross E. Mitchell, http://jdsde.oxfordjournals.org/cgi/content/full/11/1/112
[4] Deposition of James F. Patrick, December 18, 2008, page 60

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
717

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 6

Currently, the devices have a magnet surgically inserted into the skull of a recipient that holds the external system in place next to the implanted internal system. The external system may be worn entirely behind the ear or it may be worn in a pocket, belt pouch, or harness.[5]

Cochlear implants were developed in the 1970s to help profoundly deaf individuals who gained little or no benefit from traditional hearing aids. When hearing is functioning normally, the inner ear converts sound waves into electrical impulses, which are sent to the brain and recognized as sound. A cochlear implant works in a similar manner—when surgically implanted behind the ear, the electronic device is able to bypass damaged portions and stimulate the auditory nerve to restore hearing.[6]

A cochlear implant works essentially in this way:

1. Sound is received by the microphone.
2. Electrical pulses that represent the energy contained in sound signals are sent from the microphone to the speech processor.
3. The speech processor selects and codes the most useful portions of the sound signals.
4. Code is sent to the transmitter.
5. Transmitter sends code across skin to receiver/stimulator.
6. Receiver/stimulator converts code to electrical signals.
7. Electrical signals are sent to electrode array in the cochlea to stimulate auditory nerve fibers.
8. Signals are recognized as sounds by the brain.[7]

Not everyone with hearing impairment is a candidate for a cochlear implant. For an adult, a candidate needs to get less than 50% word recognition in one ear and less than 60% in the opposite ear while using a hearing aid. The candidate must have what falls between moderate and profound hearing loss. For children, the candidate must be at least one year old. A hearing aid must have failed the child candidate and the candidate must have severe to profound hearing loss.[8]

---

[5] http://www.fda.gov/cdrh/cochlear/WhatAre.html#a
[6] http://agbell.org/DesktopDefault.aspx?p=Cochlear_Implants
[7] http://agbell.org/DesktopDefault.aspx?p=How_Cochlear_Implants_Work
[8] Deposition of Scott Rinehart, December 9, 2008, page 41

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
718

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 7

**Key Players in Cochlear Implants**

Cochlear considers the market for cochlear implants to be competitive. It competes with Advanced Bionics LLC and Med-El. Cochlear has 70% of the market. Advanced Bionics has 20% of the market and Med-El has 10% of the market.[9]

*AEMF.* AEMF develops and licenses medical technology. Alfred Mann, founder of AEMF, testified that AEMF was founded to create medical devices for the benefits of mankind.[10] AEMF licenses its technology and has an informal licensing policy described by David L. Hankin, Chief Executive Officer of AEMF. Mr. Hankin stated that, AEMF attempts to achieve goals in the licensing of its technologies including: 1) ensuring that its technologies reach intended patient populations, 2) ensuring the licensee has the wherewithal to accomplish the first goal, and 3) to preserve the rights of AEMF and value of its intellectual property. Mr. Hankin testified that AEMF has licensed technologies to at least seven businesses or institutions and AEMF has licensed cochlear implant technology to Advanced Bionics Corporation.[11]

*Advanced Bionics Corporation ("ABC").* ABC, while not a party to this lawsuit, was founded by Alfred E. Mann. The company was established to develop cochlear implants and micro-stimulators used in pain management. In 2004, Boston Scientific Corporation (BSC) purchased ABC. In 2007, BSC sold cochlear implant business of ABC back to some of its original shareholders in the form of a new entity named Advanced Bionics LLC ("AB LLC"), while BSC kept the micro-stimulation portion of the ABC business related to pain management technologies.

*Cochlear Ltd.* Cochlear Ltd. is an Australian company that makes and sells two implantable devices technologies for the hearing impaired: 1) cochlear implants, of which the company has about 70% of the world market, and 2) bone anchored hearing implants for conductive hearing loss and single sided deafness.[12] Marketing of Cochlear products in the US is conducted by Cochlear Americas, a subsidiary of Cochlear Ltd., and is focused on surgeons and audiologists.[13]

---

[9] Deposition of Theresa Adkins, December 30, 2008, page 25-6
[10] Deposition of Alfred E. Mann, December 10, 2008, page 10
[11] Deposition of David Lee Hankin, December 17, 2009 pages 44 and 45
[12] Citi Investment Banker Analysis, February 12, 2008, COC 3000851
[13] Deposition of Theresa Adkins, December 30, 2008, page 20

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
719

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 8

**Technology at Issue**

This litigation is not about the foundational patents for Cochlear Ltd. and Cochlear Americas.[14]  Instead, it is about patents relating to specific elements of telemetry.

First, I understand that telemetry is used for monitoring of the implant and assessing impedance of the electrodes.[15]

Secondly, I understand Neural Response Telemetry (NRT) can be used to measure the compound action potential of the auditory nerve and transfers the measurement to external equipment.[16]

The telemetry invention is primarily used during surgical implanting of the device to assure it is properly working.[17]  It is my understanding that the telemetry invention does not contribute to the daily performance of Cochlear's cochlear implants nor the benefits enjoyed by recipients.

**DETERMINATION OF DAMAGES – REASONABLE ROYALTY**

My understanding is that damages in patent infringement cases are determined according to a statute that states, "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[18]

In the absence of an established royalty rate, a reasonable royalty is determined assuming a hypothetical negotiation between a willing licensor and a willing licensee, each voluntarily trying to reach an agreement that occurs just prior to the licensee's first act of infringement and is based on the information available to both parties. The date of the hypothetical negotiation, according to the Federal Circuit, is the date at which infringement of a valid and enforceable patent first occurred.[19]  I understand that reliance is frequently place on data and events subsequent to the commencement of the alleged infringement.[20]  In coming to my conclusions regarding the damages that would be appropriate in this case, I have considered the factors listed

---

[14] http://www.ipaustralia.gov.au/patents/ex_ear.shtml
[15] Depositiion of James Patrick, December 18, 2008, pages 41-3
[16] Deposition of Christopher van den Honert, December 8, 2008, pages 16 and 17
[17] Deposition of David Kelsall, MD, December 10, 2008, pages 13 and 14
[18] 35 U.S.C. §284.
[19] Wang Laboratories, Inc. v. Toshiba Corporation et al., 993 F.2d 858 (fed. Cir. 1993).
[20] See Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568 (Fed. Cir. 1988)

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER                    IPRA, INC

Exhibit 21
720

Alfred E. Mann Foundation ior Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 9

in *Georgia-Pacific Corp. v. United States Plywood Corporation*, 318 F. Supp. 1116, 1120
(S.D.N.Y.), modified and affirmed, 446 F.2d 295 (2d Cir. 1971). My analysis of each of these
factors is included in this report.

For this analysis I have assumed that AEMF and Cochlear would have negotiated for a
license to the patents in suit on or around 1998.

I have assumed that the parties would have considered the patents to be valid, enforceable
and infringed. I have also assumed that both parties would have had an equal understanding of the
information relevant to the factors outlined by the *Georgia-Pacific* case.

In *Georgia-Pacific Corp. v. United States Plywood Corp.*, the court identified fifteen
factors to consider in determining a reasonable royalty. These factors have since been widely
adopted by other courts for use in reasonable royalty determinations. The fifteen factors listed by
the court, and my analysis and opinion regarding their application in this case, are given below:

1. **The royalties received by the patentee for the licensing of the patent in suit, proving
   or tending to prove an established royalty.**

On April 15, 1999, AEMF entered a written license with ABC, exclusively licensing
patented technology associated with cochlear implants to ABC. The territory of the license was
worldwide. AEMF received 1 million shares of ABC common stock, representing approximately
4.6% of the company, plus running royalties of between 2% and 3% of net revenues.[21] The 1
million shares were valued at $2.8 million.[22] These same terms were repeated in a written license
between the same entities dated May 18, 1999.[23]

In addition to licensing its cochlear implant technology to ABC, AEMF transferred its
entire cochlear program, including employees, to ABC.[24] The 1 million shares of ABC valued at
$2.8 million may be viewed as compensation for the transfer of AEMF's cochlear program to
ABC, and not as an upfront payment for the license. If, however, the shares are viewed as an
upfront payment, in order to properly reflect the $2.8 million upfront payment as part of the
royalty rate structure, the payment must be amortized over the revenues that will be enjoyed
during the life of the license.

---

[21] License Agreement AB00001-16 In paragraph 2.1 the total issued and outstanding shares of Advanced
Bionics is stated as 21,572,026.
[22] Deposition of Lawrence Allen Fischer, December 17, 2008, page 16. See also Defendants Fischer
Exhibit 1102.
[23] License Agreement AB00049-65
[24] Deposition of Joseph Schulman PhD, December 2, 2008, page 44

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
721

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 10

It is important to note that in the Plaintiff's damages report, dated January 19, 2009, Ms. Cate Eslten has improperly amortized the up-front payment over only the revenues that ABC has derived through the second quarter of 2008 when in fact, the patent license and up-front payment are for revenues through the life of the license.

In the damages report of Ms. Elsten, her Exhibit 4.5 uses royalty payments from ABC and AB LLC and the royalty rates required by the license with AEMF to derive an estimate of ABC and AB LLC revenues for the third quarter of 1999 through the second quarter of 2008. Exhibit 1 to this report presents the quarterly data in Ms. Elsten's report on an annual basis.

ABC's obligation to pay royalties under the May 18, 1999 exclusive license ends no sooner than the termination of the last of the "Primary Patents" identified in that agreement. The last such expiring primary patent is U.S. Patent No. 6,035,237, Serial Number 08/447,455, filed May 23, 1995 and issued March 7, 2000. This last expiring Primary Patent terminates on March 7, 2017. In order to estimate the total revenues that will ultimately be covered by the AEMF license to ABC, I have used the data in Exhibit 4.5 of the Elsten report. For 2008, in order to estimate full year revenues, I have doubled the $65,076,800 of revenue shown for the first and second quarters of 2008. For 2009 through 2016 I have conservatively estimated that revenues would remain constant. For 2017, I have estimated sales for the first two months as two-twelfths of 2016 sales. When the $2.8 million upfront license payment of common stock is amortized over the entire revenue amount of $1,737,770,651 shown in Exhibit 1 to this report, the upfront payment represents an additional royalty rate of 0.16% of revenues. The effective royalty rate for the license is therefore 2.16% to 3.16%.

On January 1, 2004, AEMF and ABC entered into a new agreement, replacing the May 18, 1999 agreement and subsequent amendments. In this new agreement, AEMF granted ABC rights to cochlear implant patented technology on an exclusive and worldwide basis. AEMF received 1.1 million shares of Advance Bionics and a running royalty rate of between 1% and 3% of net revenues.[25] The January 1, 2004 agreement and ABC obligation to pay royalties terminates on January 1, 2022. As of the January 1, 2004 agreement, AEMF had a total of 2.1 million shares of ABC, valued at $11 per share, equaling $23.1 million. When the $23.1 million value of common stock is amortized over the entire revenue amount of $2,366,846,384 shown in Exhibit 1 to this report, the stock portion of compensation represents an additional royalty rate of 0.98% of revenues. The effective royalty rate is therefore 2.98% to 3.98%.

---

[25] Cochlear Technology License and Royalty Agreement AB00297-318

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
722

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 11

As previously discussed, BSC purchased ABC in May 2004. Thereafter a dispute arose that resulted in breaking apart ABC. Effective January 3, 2008, ABC was renamed Boston Scientific Neuromodulation Corporation  and AB LLC was assigned ABC's rights in the cochlear implant business and patents.[26]

Thereafter, AB LLC was returned to Alfred E. Mann and other original shareholders of ABC while BSC kept the neuro-stimulation pain management business.[27] Principal shareholders of AB LLC reportedly paid $150 million to buy back the business.[28]

In the original 2004 purchase agreement, BSC agreed to make earn-out payments. As part of the break-up deal in 2008, BSC made equalizing payments described by Alfred E, Mann, "…they paid us what was the net excess value over those companies that would have been due under the earn-out arrangement".[29] I interpret the $79,149,231 payment received by AEMF as associated with the value of the neuro-stimulation business kept by BSC, and having nothing to do with the cochlear implant business or technology.

Even if the $79,149,231 earn-out payment received by AEMF is attributed to the cochlear implant business when amortized over the same $2,366,846,384 of revenues, the additional royalty rate is 3.34%.   However, I do not believe the earn-out payment has anything to do with the cochlear implant business or the telemetry invention. I believe the payment is associated with the future earn-outs associated with the neuro-stimulation business that BSC kept and would commercialize in the future. It is unreasonable to think that BSC would make or that AEMF would require BSC to make earn-out payments on a business it did not keep.

The various license agreement executed between 1999 and 2008 involving cochlear implant patented technology, did not materially change the terms of the running royalty rates that were consistently 1% to 3% of net revenues. When the $2.8 million up-front stock payment is amortized over the life-time revenues the effective royalty rates are 1.16% to 3.16%.  If the $23.1 million value of the stock compensation is considered, then the effective royalty rate is 1.98% to 3.98% of revenues.

---

[26] Cochlear Patent Assignment AB 00230-250
[27] Source: Boston Scientific Ends Troubled Marriage, August 10, 2007
   http://blogs.wsj.com/health/2007/08/10/boston-scientific-ends-a-troubled-marriage/
[28] Boston Globe Wire Service, August 10, 2007,
   http://www.boston.com/business/globe/articles/2007/08/10/device_maker_to_undo_part_of_purchase/?p1=MEWell_Pos4
[29] Deposition of Alfred E. Mann, December 10, 2008, page 29

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
723

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 12

AEMF has also entered into other license agreements. It entered into an exclusive
worldwide license agreement regarding Battery-Powered Bion Technology with ABC on April
15, 1999. The license grants rights to use the battery invention relating to medical devices,
processes and methods involving or relating to a system of addressable, programmable,
implantable stimulators, and/or addressable, implantable transducer-telemeters. ABC agreed to
pay 3% of net revenues for the rights conveyed. A subsequent agreement, dated January 15, 2004,
between the two parties required a royalty of 4% on net revenues.[30]

AEMF also entered into an exclusive worldwide license agreement regarding RF Bion
Technology with ABC on April 15, 1999. The license grants rights to use the RF-Bion invention
for processes and methods involving or related to continuously RF-powered, non-battery
powered, systems of addressable, programmable, implantable stimulators, addressable,
implantable transducer-telemeters and or extracorporeal transmitters. ABC agreed to pay 3% of
net revenues for the rights conveyed.[31]

I understand that Alfred E. Mann was not interested in developing the cochlear
technology. In 1986 he believed the market was very small for cochlear implants and didn't have
any interest in making a business out of it. Even when he realized the market was larger than he
initially thought he "…still didn't think it was an appropriate business in a stand-alone cochlear
implant business opportunity." Eventually Mr. Mann established ABC to develop cochlear
implants and neuro-stimulation technology for pain management. Mr. Mann indicated that BSC
overpaid for ABC as well as other companies and that Wall Street was unhappy with BSC.[32]

When BSC acquired ABC they continued to make royalty payments for the cochlear
license to AEMF. After the new AB LLC acquired the cochlear implant business from ABC, AB
LLC continued to make running royalty payments to AMEF.[33]

I have been provided with a license agreement regarding cochlear implant technology
between The Regents of the University of California San Francisco and Pacesetter Infusion Ltd.
dated December 30, 1988.[34] The agreement granted Pacesetter with exclusive rights to use the
licensed technology for commercialization of cochlear implant products. Pacesetter agreed to pay
The Regents a license fee of $50,000 plus running royalties of 4.25% of net revenues for cochlear

---

[30] License, Royalty and Manufacturing Agreement, Battery Powered Bion® Devices and Services
AMF0452763-304
[31] AB00019-32
[32] Deposition of Alfred E. Mann, December 10, 2008, pages 16, 20, 28
[33] Deposition of Lawrence Allen Fischer, December 17, 2008, pages 15 and 16
[34] Exclusive License Agreement for Cochlear Products AMF 029301-330

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
724

Alfred E. Mann Foundation ᴏʀ Scientific Research v. Cochlear Americas and ᴄᴏchlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 13

electrodes, and 0.75% of net revenue on implantable components for a cochlear product and
1.75% of net revenues on all wearable auditory processors. The agreement ran for a period of ten
years.

I do not believe the stock compensation provided to AEMF by ABC represents an
independent third-party transaction and it should not be reflected as part of the value of the
AEMF cochlear licensed patents. At the time of the license agreements in 1998 and 2004 between
AEMF and Advanced Bionics, Alfred E. Mann controlled both entities. He testified that
providing the stock compensation to AEMF from ABC was a means by which to fund his
foundation. In fact, he testified that the Foundation owned pieces of the companies he created,
indicating that providing stock to the Foundation is a common practice for the Foundation and
Alfred E. Mann.[35] However, this is not a common practice in licensing deals for medical device
technology as discussed in Appendix C of this report. Consequently, the licenses entered into by
Cochlear are more indicative of arms-length, third-party transactions involving cochlear implant
technology.

## 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit;

On December 10, 1982, the University of Melbourne and Nucleus Ltd. entered into a
license agreement whereby Nucleus licensed the exclusive rights to the foundational patents
owned by the Commonwealth of Australia and the University of Melbourne that resulted from the
development effort previously conducted. Nucleus agreed to pay running royalties of 5% on sales
of the first 12,000 units and 2% of sales thereafter.[36]

On August 22, 1985, a Deed of Novation transferred rights granted to Nucleus Ltd. by the
Commonwealth to Cochlear Pty Ltd.[37]

On June 30, 2008, Cochlear Ltd. entered into the IHPS Technology License Agreement
with The University of Melbourne Hearing CRC Ltd. and Hearworks PTY Ltd. to obtain royalty-
free use of the foundation patents licensed on December 10, 1982. Cochlear paid AU$3 million.[38]
This was a payment to eliminate the remaining obligation to pay 2% royalties.

---

[35] Deposition of Alfred E. Mann, December 10, 2008, pages 6, 7, and 9.
[36] COC-5002608-23
[37] COC-5002485-95
[38] COC-5002395-416

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, ɪɴᴄ

Exhibit 21
725

Alfred E. Mann Foundation ∪, Scientific Research v. Cochlear Americas and ∪ ∪chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 14

The Cochlear license agreements are a better indication of a royalty rate to associate with cochlear implant technology because these transactions are between unrelated parties, not having any common control, as opposed to the common ownership of ABC and AEMF.

The license agreements in factors 1 and 2 indicate running royalty rates between 0.75% and 4.25% of revenue.[39]

This royalty rate range is supported by the licensing experience of AEMF with ABC. In the Plaintiff's damage report of Ms. Elsten, she shows the royalty income received from the third quarter of 1999 through the second quarter of 2008 on Exhibit 4.5 of her report. Using the royalty rates specified in the license between AEMF and ABC, Ms. Elsten derives the revenues of ABC. The total royalty payments to AEMF for the specified period equal $11,448,889 and the total revenues are shown as $628,438,451. The overall effective royalty rate equals 1.82%.[40]

3. **The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;**

The hypothetical license the parties would have negotiated would have been for a non-exclusive license in the United States. The running royalty rate range of 0.75% to 4.25% of revenues is for worldwide and exclusive rights to the technology. In the Plaintiff's damage report of Ms. Elsten, dated January 19, 2009, she refers to an Ernst & Young study that suggests a nonexclusive transaction would yield a royalty rate equivalent to 60% of an exclusive rate.[41] Application of this adjustment for non-exclusivity provides an indication of an appropriate royalty rate between 0.45% to 2.55%.[42]

4. **The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly;**

---

[39] The Cochlear Ltd. license calls for a 5% running royalty on the first 12,000 and 2% thereafter. Considering the number of units actually sold, the effective royalty rate is only slightly higher than 2% of revenues.
[40] $11,448,889 divided by $628,438,451 equals 1.82%
[41] Russ O'Haver and Brian Finnegan, Ernst & Young, Estimating the Effects of Exclusivity and Geographic market Characteristics on Royalty Rates: Some Preliminary Results, 1996
[42] 60% of 0.75% equals 0.45% and 60% of 4.25% equals 2.55%

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
726

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 15

As previously noted, Alfred Mann, founder of AEMF, testified that AEMF was founded to create medical devices for the benefits of mankind.[43] David L. Hankin, Chief Executive Officer of AEMF elaborated on the informal licensing policy of AEMF when he stated that AEMF attempts to achieve goals in the licensing of its technologies including: 1) ensuring that its technologies reach intended patient populations, 2) ensuring the licensee has the wherewithal to accomplish the first goal, and 3) to preserve the rights of AEMF and value of its intellectual property. Mr. Hankin testified that AEMF has licensed technologies to at least seven businesses or institutions.[44]

5.   **The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter;**

AEMF is a technology and development company that brings its inventions to market using licensing transactions. Cochlear is a technology development company that commercializes its proprietary technology by making and marketing cochlear implants.

In addition to developing technology, AEMF also owned common stock in ABC and now owns part of AB LLC, a competitor of Cochlear Ltd.   AEMF was also controlled by Alfred E. Mann who was and is also an owner and officer of ABC and AB LLC.

The relationship between Cochlear and AEMF is not as simple as a typical inventor/company relationship. AEMF has granted ABC an exclusive worldwide license to its technology including the patents at issue in this case. When negotiating with Cochlear for non-exclusive rights in the US, AEMF would have to consider that ABC would expect the same terms given to Cochlear because a license with Cochlear would make ABC rights in the US non-exclusive.

I believe that AEMF should be willing to lower its royalty rate requirements with ABC as a result of dealing with Cochlear because a license agreement with Cochlear would provide AEMF with royalty income from a company controlling 70% of the US market for cochlear implants while AEMF's relationship with ABC relates to only 20% of the market. A license with Cochlear would provide AEMF with a royalty based that is 3.5 times larger than that which it has with AB LLC.

---

[43] Deposition of Alfred E. Mann, December 10, 2008, page 10
[44] Deposition of David Lee Hankin, December 17, 2009 pages 44 and 45.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER                                      IPRA, INC

Exhibit 21
727

Alfred E. Mann Foundation ʳᵒʳ Scientific Research v. Cochlear Americas and ʊᵒchlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 16

In addition, if a lower royalty rate were negotiated with Cochlear for non-exclusive use of AEMF's patents, AEMF would only be lowering its royalty rate requirements with ABC for rights to practice only the patents-at-issue in the US market. There is no reason for AEMF to reduce its royalty rate requirements to ABC for its other patents not in-suit for the US or rest of the world.

6. **The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales;**

I have not seen evidence that Cochlear Ltd. enjoys any significant revenue or profits from the sale of any accessory products that would be considered convoyed sales.

7. **The duration of the patent and the term of the license;**

The '616 patent will expire on March 11, 2014 and the '691 patent will expire on September 22, 2009.

8. **The established profitability of the product made under the patent, its commercial success, and its current popularity;**

ABC uses the telemetry invention in their cochlear implant products. For the purpose of my analysis, I must assume that Cochlear Ltd. also uses the telemetry invention in their cochlear implant products.

Cochlear has achieved 70% of the US and world market and earned profits of between 18% and 27%.[45]

Since being founded in 1993, ABC has achieved only 20% market share and never became profitable.[46]

The different levels of success experienced by Cochlear and ABC, indicates that the telemetry invention in the patents-in-issue is not the driving force behind success in the cochlear implant marketplace. Cochlear's success is likely derived from the many other inventions and features introduced by Cochlear at the same time they introduced the telemetry invention. Just some of the significant inventions commercialized by Cochlear during the 2000s include:

---

[45] Exhibit 2 of this report
[46] Deposition of Jeffrey Greiner, December 16, 2008, pages 9 and 11

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
728

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 17

- First behind-the-ear speech processor, ESPrit,

- First water resistant speech processor,

- First speech processor that uses Beam™ technology,

- First implant with self-curling electrode array that hugs the inner wall of the cochlea[47]

9. **The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results; and**
   **and**
10. **The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to users of the invention;**

Dr. David Kelsall, a surgeon with twenty years of experience, testified that the capability of using telemetry to enable testing and programming is not the only consideration in selecting a cochlear implant system. He stated that consideration must be given primarily to patient performance, and secondly to device reliability. He also stated that all things being equal between two devices the device with telemetry would be preferable to a device without telemetry.[48]

I understand the software used to program the Freedom cochlear system allows surgeons to obtain impedance and NRT measurements intra-operatively. I also understand that impedance testing can be accomplished by the software when recipients arrive at clinics for switch-on and follow-up visits.[49] James Patrick testified that he believes it would be hard to get such results however without some involvement of back telemetry.[50] Dr. Kelsall indicated that intraoperative testing could be accomplished by "doing electrical AB testing, which is a different electrical measurement."[51]

11. **The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use;**

---

[47] COC-50000230, COC 5002075, COC 5002330, COC-5001889-90,
[48] Deposition of David Kelsall, MD, December 10, 2008 page 27.
[49] Patrick Deposition Exhibit 64, pages 21 and 23.
[50] Deposition of James Patrick, December 18, 2008, page 157
[51] Deposition of David Kelsall, MD, December 10, 2008 page 26.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
729

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 18

Cochler Ltd. has made total sales of the accused products between December 2001 and June 2008 of $677,710,111.[52]

**12. The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;**

**-and-**

**13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;**

I have considered two methods for addressing these two factors. One is referred to as the 25% Rule. The other is known as the Analytical Approach.

## The 25% Rule

I am aware of a rule-of-thumb that has been in use for over 40 years and is generally used by licensing executives and intellectual property consultants in order to gain insight into an order of magnitude for a royalty rate. A variety of courts, including the United States Courts of Claims, have endorsed the use of the Profit Split Rule in litigation contexts.[53]

This method is commonly referred to as the 25% Rule. This method allocates 25% to 33% of the operating profits of a product or service to important intellectual property. The general idea behind this profit split is that the licensee should be allowed to keep the majority of the profits to compensate it for the business operations that it must commit to commercialization efforts and for accepting the business risks of product commercialization. The profits allocated to a licensor provide compensation for conveying the rights to use the patented technology necessary for the product or service.

During 1999, the Nucleus 24 was launched in North America and in August 1999, regulatory approval was granted in Japan which completed the suite of regulatory requirements

---

[52] See Exhibit 3 to this report
[53] See Goldscheider, Jarosz and Mulhern Use of the 25 Percent Rule in Valuing IP, les Nouvelles (December 2002). As an example, the US District Court for the Eastern District of New York used the 25% Rule as the basis for royalty rate damages in Fonar Corporation et al v. General Electric Company, et al.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
730

Alfred E. Mann Foundation ᵁᵒʳ Scientific Research v. Cochlear Americas anᵈ ᴄᵒchlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 19

for the America, Europe and Asia. [54]   Regulatory and reimbursement approvals were obtained for Japan in January 2000. [55]

By 2001, the Nucleus 24 was approved for world-wide marketing. For the period 2001 through 2005, the Cochlear business was dominated by cochlear implant systems that presumably used the telemetry invention. In 20005 Cochlear acquired a bone anchored hearing device. Exhibit 2 shows Cochlear Ltd. operating profit margins for 1995 through 2008.

During 2001 through 2005 the Cochlear business was dominated by cochlear implant systems presumably using the telemetry invention. During that period average operating profits were 21.4% of revenues. [56] Application of the 25% rule provides an indication of an appropriate royalty rate for all of the technology used in the cochlear systems at between 5.35% and 7.12%. Unfortunately, the 25% rule provides no guidance for allocating a portion of the indicated royalty rate range to the telemetry invention.

**The Analytical Approach**

The analytical approach identifies the economic contribution of intellectual property as the difference between profits expected from infringing sales and a normal industry profit level. The analytical approach has been used to define royalty rates for infringement damages and can be used to identify the economic contribution of intellectual property for other purposes as well. The analytical approach can be summarized by the following equation:

Expected Profit Margin - Normal Profit Margin = Royalty Rate

In *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986), a royalty rate for damages was calculated based on an analysis of the business plan of the infringer, prepared just prior to the onset of the infringing activity. The court discovered the profit expectations of the infringer from internal memorandums written by top executives of the company. Internal memorandums showed that company management expected to earn gross profit margins of almost 53% from the proposed infringing sales. Operating profit margins were then calculated by subtracting overhead costs to yield an expected operating profit margin of between 37% and 42%.

---

[54] Cochlear Ltd. annual report 1999, page COC-5002196 and the 200 annual report, page COC-5002216
[55] Cochlear Ltd. annual report 2000, page COC- 5002261
[56] Average of the 2001 through 2005 of 20.7%, 20.2%, 26.2%, 16.1% and 23.6% equals 21.36%, See Exhibit 2

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
731

Alfred E. Mann Foundation .... Scientific Research v. Cochlear Americas and ....chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 20

To find the portion of this profit level that should be considered as a royalty to the plaintiff, the court considered the standard, "normal" profits earned in the industry at the time of infringement. These profit levels were determined to be between 6.6% and 12.5%. These normal industry profits were considered to represent profit margins that would be acceptable to firms operating in the industry. The difference between the profit margins earned on infringing revenues and that from a "normal", presumably non-infringing product, ranged between 24.5% and 35.4%. This differential range of profits was found to provide an indication of the economic contribution of the intellectual property from which to calculate infringement damages. On appeal, the Federal Circuit affirmed.

**Cochlear Profit Margin Comparison during Different Time Periods**

I have implemented this approach in a number of different ways. One implementation involves comparing Cochlear operating profit margins for different years. I have compared operating profits for Cochlear during years in which its cochlear implant products did not incorporate the telemetry invention and subsequent years when its cochlear implant products did incorporate the telemetry invention. In 1995 and1996, Cochlear products did not incorporate the telemetry invention. Eventually, the majority of Cochlear's cochlear implant products incorporated the telemetry invention.

The 1996 Cochlear Ltd. annual report states "Sales of the Nucleus Spectra 22 cochlear implant system and accessories continue to form the core of our business."[57] I understand that the Spectra 22 did not incorporate the accused telemetry invention. In 1997, Cochlear introduced the Spectra 24 system which is accused of infringing the patents-in-suit by incorporating the telemetry invention.[58] In this same year, Cochlear introduced the first miniaturized, multichannel, ear level speech processor, the ESPrit.[59]

During 1997, Cochlear continued to market both the Nucleus 22 and 24 as FDA approval in the US for the Nucleus 24 was pending. In 1998 FDA approval was granted in the US for the Nucleus 24 and was still pending in Japan.[60]

During 1999, the Nucleus 24 was launched in North America and in August 1999, regulatory approval was granted in Japan which completed the suite of regulatory requirements

[57] Cochlear Ltd. annual report 1996 page COC-5002015
[58] Cochlear Ltd. 1997 annual report, page COC-5002079
[59] Cochlear Ltd. annual report 1997, page COC-5002075
[60] Cochlear annual report 1998, page COC-5002133 and COC-5002136

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
732

Alfred E. Mann Foundation _._. Scientific Research v. Cochlear Americas and _ _chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 21

for the America, Europe and Asia. [61]  Regulatory and reimbursement approvals were obtained for Japan in January 2000.[62]

By 2001 the Nucleus 24 was approved for world-wide marketing. For the period 2001 through 2005, Cochlear business was dominated by cochlear implant systems that presumably used the telemetry invention. In 20005 Cochlear acquired a bone anchored hearing device.

Comparison of 1995 and 1996 operating profits margins with profit margins in 2001 through 2005 provides a comparison of profit margins for cochlear implant systems with and without the telemetry invention. Exhibit 2 shows Cochlear operating profit margins for 1995 through 2008.

For Cochlear, the average operating profit margin in 1995 and 1996 was 18.2% of revenues. In 2001 the profit margins increased to 20.7% representing a 2.5% differential. When the 1995-96 average is compared to the average profit margin for 2001 through 2005, of 21.4%, the difference is 3.2%. [63]

As previously discussed, it is important to note that the introduction of the telemetry invention was not the only new technology developed during the period 1995 through 2008. Consequently, attribution of the 2.5% to 3.2% differential profit margins cannot be solely attributed to the telemetry invention.

**Cochlear Profit Margin Comparison with Industry Average**

The *TWM v. Dura* decision explains that an indication of a reasonable royalty can be obtained by comprising the operating profit margins for products that are similar but for incorporation of the accused invention. Another implementation of this approach is to compare the profits of the alleged infringer with the profits of other companies in the industry, presumably not using the invention at issue. Operating profits are the preferred level of profitability for comparison. Gross profit margins only consider the materials, labor and manufacturing costs that go into making a product. Absent from consideration are selling and overhead expenses, which when subtracted from gross profits yields operating profit before interest expenses and taxes. It is conceivable that operating expenses can be different for companies that have used patented technology than companies without a proprietary advantage. Selling expenses are an example.

---

[61] Cochlear Ltd. annual report 1999, page COC-5002196 and the 200 annual report, page COC-5002216
[62] Cochlear Ltd. annual report 2000, page COC- 5002261
[63] Exhibit 3 of this report

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
733

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 22

The amounts required to sell a non-proprietary commodity type of product might be higher than a patented technology product with features and benefits that might "sell themselves" Consequently, operating profit margins are the preferred level of comparison.

For this case, I have compared the operating profit margins of Cochlear as presented in Exhibit 2 to the operating profits reported by RMA e-Statement Studies. Among other activities, RMA compiles profit information for companies in different industries. For the Electro-medical and Electrotherapeutic Apparatus Manufacturing industry, RMA reports average operating profits for 2001 through 2005 of 6.6% of revenues as presented in Exhibit 4. When this is compared to the Cochlear Ltd. operating profit margins for the same general period of 21.4% the difference is 14.8%. This is far less than the high-end of the range of 31.5% calculated by Ms. Elsten as presented on Exhibit 3.2 of her January 19, 2009 report.

The primary problem with this particular implementation of the Analytical Approach is that the entire amount of the difference represents more than just one invention. The difference might be attributed to many company characteristics including the contribution of foundation technology, well-established trademarks and high quality marketing efforts. Attributing the entire differential to a single product feature such as telemetry is just wrong. Unfortunately, this particular implementation of the Analytical Approach does not provide any means by which the entire differential can be apportioned to the various company characteristic to yield an indication of a royalty rate for a single patented feature.

**Product Profit Margin Comparison**

The *TWM v. Dura* decision explains that an indication of a reasonable royalty can be obtained by comprising the operating profit margins for products that are similar but for incorporation of the accused invention. Separate calculations are conducted to calculate the operating profit margins for the products to be compared but Ms. Elsten has improperly implemented the Analytical Approach. She has compared gross profit margins which ignore the operating expenses of selling, general and administrative expenses that are important for commercializing all products. If it is assumed that the operating expenses for the products being compared are equal for the two products then a comparison of gross profits might provide an indication of an appropriate royalty rate.

In Ms. Elsten's damages report dated January 19, 2009 suggests that a comparison of the gross profit margins of the SP12 and ESPrit 3G yields an indication of a royalty rate for the

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
734

Alfred E. Mann Foundation ᵢₒᵣ Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 23

telemetry invention. On Exhibit 3.3 of Ms. Elsten's report, gross profit margins for the following
products are provided:

| | |
|---|---|
| SP12 | 90% (telemetry) |
| SPrint | 79.2% (telemetry) |
| ESPrit 3G | 72.8% (no telemetry) |
| CI24 | 73.7% (telemetry) |

On Exhibit 3.1 of Ms. Elstens report she calculates a profit premium by comparing the
SP12 and ESPrit 3G then calculates the premium as a percent of the accused product selling
price. This calculation is wrong and incorrectly indicates royalty rates of 26.5% and 27.4%. When
the gross profit margins are correctly compared, lower royalty rates are indicted. Comparing the
SP12 and ESPrit 3G profit margins indicates a royalty rate of 17.2%. Comparing the Sprint and
ESPrit 3G profit margins indicates a royalty rate of 6.4%.

There a significant problems with relying on this profit comparison to yield a royalty rate
indication for the telemetry invention.


Sprint and ESPrit 3G Comparison

The SPrint is a body-worn speech processor that incorporated back telemetry. The next
speech processors introduced by Cochlear were the ESPrit and the ESPrit 3G which did not have
back telemetry. Then, when the Freedom speech processor, also referred to as SP12, was
introduced it incorporated back telemetry. James Patrick testified that the ESprit was the first
behind- the-ear speech processor allowing recipients to get rid of the cable recipients had to wear
between their earpiece and the body-worn speech processor. It was invented to improve comfort
and convenience for the recipient and telemetry was not as important. Telemetry was omitted
from the first behind-the-ear speech processors because of power limitations. James Patrick
stated, "Obviously, if the reverse telemetry had been overwhelmingly important, then we
wouldn't have made the choices that we made."[64]

Furthermore Ms. Elsten's comparison of the SPrint and Esprit 3G devices is terribly
misleading. The SPrint is a body worn speech processor. The ESPrit 3G is a miniaturized,
multichannel speech processor worn behind the ear. The SPrint incorporated telemetry. The
ESPrit 3G did not but the ESPrit 3G also lacked other significant features that the SPrint
possessed.

---

[64] Deposition of James Patrick, December 19, 2008, pages 70-77

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
735

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and ... chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 24

The Sprint, body worn, speech processor used a digital signal processor that is optimized
by software providing a greater number of sound processing options than the ESPrit 3G which
was hardware based. The ESptit 3G processor was also limited in that it can store 50% fewer
MAPS than the Sprint processor.

MAPS are important. They allow recipients to toggle through multiple settings that allow
the speech processor to provide superior performance in different sound environments including,
noisy environments, quiet environments, conversational environments and musical environments.
The SPrint speech processor possessed the capability to customize many MAPS for recipients.
The ESPrit 3G possessed only two alternate MAPS. As a result many recipients would purchase
both a Sprint and ESPrit 3G. When mobility was desired a recipient could use the ESPrit 3G but
when more Map options were desired the recipient would switch to the body-worn SPrint speech
processor.[65]

The ESPrit not only lacked telemetry but it lacked the superior digital processor of the
Sprint. It lacked the ability to be customized for the recipients. Its primary feature was that it was
the first behind the ear speech processor, but it did not provide the superior performance of the
Sprint.

These significant differences represent much more that the incorporation of telemetry and
Ms. Elsten has seriously erred when she attributes the entire gross profit margin differential solely
to the telemetry invention.

SP12 and ESPrit 3G Comparison

When the SP12 was introduced it incorporated a digital signal processor like the Sprint. It
also allowed customization for recipients and for the creation of more MAPS. The SP12 also used
three microphones allowing a recipient to implement directional focusing on sounds that a
recipient wanted to specifically emphasize. The SP12 was not only a behind the ear speech
processor but it was digital and provided many benefits important to recipients and by the way, it
incorporated the telemetry invention which was considered expendable when the ESPrit 3G was
introduced.

---

[65] "The enthusiasm for the ear level ESPrit speech process was high, with recipients valuing the cosmetic
benefits of this world-first product. Many recipients chose to purchase both the ESPrit and the body worn
Sprint speech processor with the Nucleus 24 system." Cochlear 1999 Annual Report page 24, COC-
5002196

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
736

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 25

Furthermore, both the Sprint and SP12 speech processor are based on digital technology, controlled by software. As Cochlear continues to enhance their software, users of the Sprint and SP12 can enjoy the enhancements provided by the new software with their exiting speech processors. This is not possible for the ESPtir 3G hardware based speech processor.[66]

**14. The opinion and testimony of qualified experts;**

I have not reviewed the opinions or testimony of other experts in this case other than the damages report of Ms. Elsten.

**15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee -- who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

I have been asked to use June 1998 as the hypothetical negotiation date when the parties in this lawsuit would work together to negotiate a license for the patents-in-suit. I also understand that the damages period may involve three different dates for which I have calculated damages:

1. The longest damages period is for the six years prior to the filing of this lawsuit in December 2007, running from 2001 through 2008.
2. If the defendant, Cochlear is successful with its marking defense then the longest potential damages period would be between 2003 and 2008.
3. If Cochlear succeeds in its laches defense, the damages period runs from December 2007 through 2008.

As the parties approached a hypothetical negotiation they would both know and consider at least the following:

1. AMEF would not be overly concerned about negotiating a royalty rate that would force it to accept a reduction in its royalty rate terms with ABC or AB LLC. A lower, non-exclusive royalty rate would allow AEMF to enjoy royalties on Cochlear's

---

[66] Telephone discussion with Tony Nygard, March 2, 2009, 6pm.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
737

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 26

significant market share, which is 70% in the US.[67] Furthermore, the royalty rate that ABC and AB LLC pay to AEMF is for exclusive rights to all of AEMF's cochlear implant related patents. Any reduction ABC or AB LLC would demand for loss of its exclusivity should only relate to that portion of the total royalty rate paid by ABC and AB LLC as it relates to the patents-in-issue and only for the US. No changes to the royalty rate between AEMF and Advanced Bionics for sales outside the US would be needed.

2. AEMF has a stated mission of making sure new medical technology is widely made available to patients and to protect its intellectual property rights. It should be eager to have Cochlear get AEMF's invention to Cochlear's 70% market share and thereby benefiting many more people in need.

3. Cochlear would argue that the profits it generates from its operations are derived from the many technologies and inventions previously discussed in this report and not just the telemetry invention of the patents-in-issue.

4. Cochlear and AEMF would not give consideration to the common shares transferred by ABC to AEMF as part of the licensing transaction between these two entities, knowing that such elements of compensation are rare for unrelated parties. AEMF and Cochlear would understand that the compensation terms in the license agreements between AEMF and ABC are clouded by the common control of the two entities.

5. Cochlear would argue that even the 2% royalty rate paid by them to the University of Melbourne is too high because they ultimately bought-out the agreement for a $3 million one-time payment and became free of continuing running royalties. AEMF would argue that the telemetry invention of the patents-in-issue is needed for implementation of Cochlear's cochlear implant systems.

---

[67] Deposition of Theresa Adkins, December 30, 2008, page 26

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
738

Alfred E. Mann Foundation ᵢₒᵣ Scientific Research v. Cochlear Americas and ᵤₒchlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 27

6.  If the parties believed that the absence of such telemetry invention could effectively
    block successful implementation of Cochlear's cochlear implant business model then
    the parties would agree that the telemetry invention is of equal value to the
    foundational patents Cochlear licensed from the University of Melbourne, setting the
    upper limited for an exclusive license for the telemetry invention at 2%.

7.  Both parties would agree that the non-exclusive and limited geographical territory
    (US only) rights being negotiated should be reflected in the royalty rate.
    Consequently, both parties would apply the 60% nonexclusive adjustment factor
    previously discussed in this report and settle on a 1.2% royalty rate for the telemetry
    invention.

## CONCLUSION

I have considered damages based on a reasonable royalty. A reasonable royalty reflects
the amount of royalty that the two parties would have negotiated had they entered into license
negotiations prior to the infringing activities. Based on my analysis, as reported herein, I
conclude the following:

The longest damages period is for the six years prior to the filing of this lawsuit in
December 2007, running from December 2001 through 2008. Exhibit 3 to this report shows
accused sales of $677,710,111. Application of the 1.2% royalty rate yields an indication of
damages of $8,132,521.

If the defendant, Cochlear is successful with its marking defense then the damages period
run no more than between August 2003 and 2008. Exhibit 3 to this report shows accused sales of
$575,976,623. This amount uses sales calculated on Exhibit 3.1 where sales are estimated for the
period August 2003 through June 2004. Application of the 1.2% royalty rate yields an indication
of damages of $6,911,719.

If Cochlear succeeds in its laches defense or further limits the damages period due to the
marking defense, then the damages period runs from December 2007 through 2008. Exhibit 3 to
this report shows accused sales of $101,746,976 based on Exhibit 3.2 where sales for the period
December 2007 through June 2008 have been estimated. Application of the 1.2% royalty rate
yields an indication of damages of $1,220,964.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
739

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 28

I therefore conclude that Cochlear should pay AEMF between $1,220,964 and $8,132,521 depending on the damages period that is ultimately decided in this case.

I reserve the right to update my analysis and conclusion as more information is discovered.

Respectfully submitted,

Russell L. Parr, CFA, ASA
President
IPRA, Inc.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
740

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 29

## Exhibit 1

### Advanced Bionics Estimated Revenue

Source:  1999 though Q22007 Expert Report of Cate Elsten dated January 19, 2009 Exhibit 4.5

| Year | Revenue |
|------|---------|
| 1999 | 21,751,967 |
| 2000 | 40,273,133 |
| 2001 | 56,995,100 |
| 2002 | 38,127,133 |
| 2003 | 64,513,131 |
| 2004 | 66,622,080 |
| 2005 | 61,958,320 |
| 2006 | 86,810,080 |
| 2007 | 107,645,040 |
| 2008 | 130,153,600 |
| 2009 | 130,153,600 |
| 2010 | 130,153,600 |
| 2011 | 130,153,600 |
| 2012 | 130,153,600 |
| 2013 | 130,153,600 |
| 2014 | 130,153,600 |
| 2015 | 130,153,600 |
| 2016 | 130,153,600 |
| 2017 | 130,153,600 |
| 2018 | 130,153,600 |
| 2019 | 130,153,600 |
| 2020 | 130,153,600 |
| 2021 | 130,153,600 |
| Total | 2,366,846,384 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
741

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 30

### Exhibit 2

Cochlear Ltd.
Income Statements
1995 through 2008
(A$ millions)

|  | Sales Revenues | EBIT | EBIT Margin | Source Page |
|---|---|---|---|---|
| 1995 | 68.3 | 12.2 | 17.9% | COC-5002210 |
| 1996 | 72.3 | 13.3 | 18.4% | COC-5002210 |
| 1997 | 71.9 | 14.3 | 19.9% | COC-5002210 |
| 1998 | 91.7 | 17.5 | 19.1% | COC-50000441 |
| 1999 | 127.2 | 23.1 | 18.2% | COC-50000441 |
| 2000 | 144.2 | 30.4 | 21.1% | COC-50000441 |
| 2001 | 220.1 | 45.5 | 20.7% | COC-50000441 |
| 2002 | 255.0 | 51.5 | 20.2% | COC-50000441 |
| 2003 | 306.1 | 80.1 | 26.2% | COC-50000441 |
| 2004 | 282.8 | 45.5 | 16.1% | COC-50000441 |
| 2005 | 349.0 | 82.5 | 23.6% | COC-50000441 |
| 2006 | 452.3 | 111.5 | 24.7% | COC-50000441 |
| 2007 | 559.4 | 150.2 | 26.9% | COC-50000441 |
| 2008 | 601.7 | 162.2 | 27.0% | COC-5001936 |
| Average Profits 2001-2008 | | | 23.2% | |

EBIT: earnings before interest and taxes
Source: Cochlear Ltd. selected annual reports

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
742

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 31

## Exhibit 3

### Cochlear Ltd. Accused Revenues

| | December 1, 2001 to June 30, 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | 2001-2008 Total | Source |
|---|---|---|---|---|---|---|---|---|---|
| Sprint | $ 8,452,933 | $ 14,886,769 | $ 11,843,510 | $ 9,389,476 | $ 2,076,480 | $ 1,452,950 | $ 398,375 | $ 48,500,493 | Elsten Report Exhibit 6.3 |
| CI24 | $ 24,020,876 | $ 50,037,368 | $ 47,474,546 | $ 55,972,969 | $ 77,093,625 | $ 90,516,439 | $ 100,377,295 | $ 445,493,118 | Elsten Report Exhibit 2.2 |
| SP12 | $ - | $ - | $ - | $ 7,849,072 | $ 38,452,036 | $ 68,439,988 | $ 69,995,908 | $ 184,737,004 | Elsten Report Exhibit 2.5 |
| | $ 32,473,809 | $ 64,924,137 | $ 59,318,056 | $ 73,211,517 | $ 117,622,141 | $ 160,409,377 | $ 170,771,578 | $ 678,730,615 | |

Total SPrint, CI24 and SP12 Sales December 2001 - 2008     $ 678,730,615
Less SP12 sales associated with CI22 implants                   $ 1,020,504     Elsten Report Exhibit 2.3
Allegedly Infringing Sales December 2001 - 2008              $ 677,710,111

Total SPrint, CI24 and SP12 August Sales 2003 - 2008     $ 576,997,127
Less SP12 sales associated with CI22 implants                $ 1,020,504     Elsten Report Exhibit 2.3
Allegedly Infringing Sales August 2003 - 2008              $ 575,976,623

Total SPrint, CI24 and SP12 Sales December 2007 - 2008     $ 102,767,480
Less SP12 sales associated with CI22 implants                  $ 1,020,504     Elsten Report Exhibit 2.3
Allegedly Infringing Sales August 2003 - 2008              $ 101,746,976

IPRA, INC

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Exhibit 21
743

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 32

## Exhibit 3.1

### Cochlear Accused Sales for Fiscal Year 2004

|  | FY04 1st Qtr. | FY04 2nd Qtr. | FY04 3rd Qtr. | FY04 4th Qtr. | FY04 Total |
|---|---|---|---|---|---|
| Ci24M | $ 74,450 | $ 54,500 | $ 97,000 | $ 46,000 | $ 271,950 |
| CI24 Contour | $ 9,072,007 | $ 11,386,573 | $ 6,981,409 | $ 7,188,845 | $ 34,628,834 |
| CI24 Contour CA | $ 550,612 | $ 1,028,240 | $ 2,955,394 | $ 6,301,753 | $ 10,835,999 |
| CI24R(ST) | $ 381,556 | $ 528,989 | $ 339,796 | $ 456,422 | $ 1,706,763 |
| Ci24RE(CA) | $ - | $ 31,000 | $ - | $ - | $ 31,000 |
|  | $ 10,078,625 | $ 13,029,302 | $ 10,373,599 | $ 13,993,020 | $ 47,474,546 |
| Source: | COC 5000926 | COC 5000970 | COC 5001015 | COC5001057 |  |
|  |  |  |  |  |  |
| Sprint | $ 2,928,000 | $ 2,990,400 | $ 2,971,870 | $ 2,953,240 | $ 11,843,510 |
| Source: | COC 500937 | COC 500978 | COC 5001023 | COC 5001065 |  |
|  |  |  |  |  |  |
| Total Accused Sales | $ 13,006,625 | $ 16,019,702 | $ 13,345,469 | $ 16,946,260 | $ 59,318,056 |
| Adjusted Accused Sa | $ 8,671,083 | $ 16,019,702 | $ 13,345,469 | $ 16,946,260 | $ 54,982,514 |

Accused sales for 2004 have been estimated by reducing sales for the 1st quater of fiscal year 2004 by one-third.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
744

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 33

## Exhibit 3.2

### Cochlear Accused Sales for Fiscal Year 2008

|                       | FY08 1st Qtr. | FY08 2nd Qtr. | FY08 3rd Qtr. | FY08 4th Qtr. | FY08 Total     |
|-----------------------|--------------:|--------------:|--------------:|--------------:|---------------:|
| CI24 Contour          | $ 539,500     | $ 521,450     | $ 288,682     | $ 127,406     | $ 1,477,038    |
| CI24 Contour CA       | $ 251,885     | $ 174,400     | $ 101,450     | $ 57,850      | $ 585,585      |
| CI24 RE(ST)           | $ 513,102     | $ 562,238     | $ 576,920     | $ 483,991     | $ 2,136,251    |
| CI24R(ST)             | $ 52,010      | $ 386,550     | $ 58,482      | $ 158,750     | $ 655,792      |
| CI24RE(CA)            | $ 21,372,233  | $ 24,880,627  | $ 22,750,265  | $ 26,519,504  | $ 95,522,629   |
|                       | $ 22,728,730  | $ 26,525,265  | $ 23,775,799  | $ 27,347,501  | $ 100,377,295  |
| Source:               | COC 5001620   | COC 5001662   | COC 5001707   | COC 5001760   |                |
| Sprint                | $ 106,500     | $ 133,075     | $ 104,950     | $ 53,850      | $ 398,375      |
| SP12 Biege            | $ 6,712,233   | $ 7,738,569   | $ 6,433,486   | $ 8,215,213   | $ 29,099,501   |
| SP12 Brown            | $ 3,316,826   | $ 4,255,895   | $ 3,506,788   | $ 5,260,235   | $ 16,339,744   |
| SP12 Black            | $ 1,784,109   | $ 2,079,510   | $ 2,026,649   | $ 2,779,058   | $ 8,669,326    |
| SP12 Silver           | $ 2,541,537   | $ 2,849,061   | $ 2,878,859   | $ 3,021,847   | $ 11,291,304   |
| SP12 Pink             | $ 398,255     | $ 741,415     | $ 635,088     | $ 706,468     | $ 2,481,226    |
| SP12 Blue             | $ 519,665     | $ 521,875     | $ 482,924     | $ 590,543     | $ 2,115,007    |
|                       | $ 15,379,125  | $ 18,319,400  | $ 16,068,744  | $ 20,627,214  | $ 70,394,483   |
| Source:               | COC 5001628   | COC 5001671   | COC 5001717   | COC 5001769   |                |
| Total Accused Sales   | $ 38,107,855  | $ 44,844,665  | $ 39,844,543  | $ 47,974,715  | $ 170,771,778  |
| Adjusted Accused Sales | 0            | $ 14,948,222  | $ 39,844,543  | $ 47,974,715  | $ 102,767,480  |

> Accused sales for December 2007 through June 2008 have been estimated by eliminating first quarter
> sales and using one-third of second quarter sales plus all of the 3rd and 4th quarter sales

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
745

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 34

**Exhibit 4**

**334510 – Electro-medical and Electrotherapeutic Apparatus Manufacturing**
**2001-09 Annual Statement Studies**
**National - All Regions**
Source: RMA eStatement Studies

| INCOME DATA | 4/1/01 - 3/31/02 | 4/1/02 - 3/31/03 | 4/1/03 3/31/04 | 4/1/04 3/31/05 | 4/1/05 3/31/06 | 4/1/06 3/31/07 | 4/1/07 3/31/08 | Average |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| **Gross Profit** | 48.7 | 48.3 | 50.8 | 48.1 | 50.9 | 49.1 | 49.0 | 49.3 |
| **Operating Expenses** | 41.8 | 44.5 | 43.1 | 40.2 | 45.0 | 42.4 | 40.8 | 42.5 |
| **Operating Profit** | 6.8 | 3.9 | 7.8 | 7.9 | 5.8 | 6.7 | 8.1 | 6.7 |

This U.S. industry comprises establishments primarily engaged in manufacturing electro-medical and electrotherapeutic apparatus, such as magnetic resonance imaging equipment, medical ultrasound equipment, pacemakers, hearing aids, electrocardiographs, and electro-medical endoscopic equipment.

**IPRA, INC**

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Exhibit 21
746

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 35

## Appendix A
### *Professional Qualifications of Russell L. Parr, CFA, ASA*

**Mr. Parr** is President of IPRA, Inc. He is an expert in determining the value of intellectual property. His books have been published in English, Japanese, Korean, Italian, Chinese, Romanian and Russian.

Mr. Parr has completed complex consulting assignments involving the valuation and pricing of patents, trademarks, copyrights and other intangible assets. His opinions are used to accomplish licensing transactions, acquisitions, transfer pricing, litigation support, collateral-based financing, and joint ventures. Mr. Parr also has served as an expert witness regarding intellectual property infringement damages.

Mr. Parr also publishes three royalty rate resource books, which have been sold all over the world. These books are dedicated to reporting detailed information about the economic aspects of intellectual property transactions including licensing and joint ventures.

Past assignments have included the valuation of the Dr. Seuss copyrights and the patent portfolio of AT&T. Mr. Parr has also conducted valuations and royalty rate studies for pharmaceuticals, semiconductor process and product technology, agricultural formulations, automotive battery technology, biotechnology, camera technology, chemical formulations, communications technology, computer software, cosmetics, consumer and corporate trademarks, drug delivery systems, flowers, incinerator feed systems, lasers, medical instrument technology, motivational book copyrights.

### *Education*

- Masters Business Administration, Rutgers University, 1981;
- Bachelor of Science in Electrical Engineering, Rutgers University, 1976;
- Coursework toward Ph.D. in the International Business Management Program at Rutgers University.

### *Professional Designations and Honors*

- Chartered Financial Analyst (CFA) awarded by the CFA Institute
- Accredited Senior Appraiser (ASA) awarded by the American Society of Appraisers
- Rutgers Alumni Association – Class of '31 Award.
- Rutgers Alumni Association – Loyal Sons Award.

### *Professional Affiliations*

- Advisory Board Member to Innovation Asset Group, Inc. an early-stage company developing intellectual property management software
- Intangible Asset Valuation Standards Committee of the American Society of Appraisers - Member
- Licensing Executives Society – Member

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**IPRA**, INC

Exhibit 21
747

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 36

- Licensing Economics Review – Editorial Board
- The Licensing Journal – Advisory Board
- American Society of Appraisers – Member
- Chartered Financial Analysts Institute – Member
- Rutgers University Alumni Association, Past Board Director

## *Publications - Books*

Royalty Rates for Licensing Intellectual Property, author, John Wiley & Sons, Inc. Hoboken, New Jersey, 2007

Royalty Rates for Technology, Third Edition, Intellectual Property Research Associates, Yardley, Pennsylvania, 2003.

The Royalty Rate Report for Pharmaceuticals & Biotechnology, Sixth Edition, Intellectual Property Research Associates, Yardley, Pennsylvania, 2006.

Royalty Rates for Trademarks & Copyrights, Third Edition, Intellectual Property Research Associates, editor, Yardley, 2004.

Technology Licensing - Corporate Strategies for Maximizing Value, co-author, John Wiley & Sons, Hoboken, New Jersey, 1996. Translated into Chinese.

Intellectual Property: Valuation, Exploitation & Infringement Damages, co-author, John Wiley & Sons, Hoboken, New Jersey, 2005.

Valuation of Intellectual Property and Intangible Assets, Third Edition, annually supplemented, co-author, John Wiley & Sons, Hoboken, New Jersey, 2000.

Investing In Intangible Assets: Finding and Profiting From Hidden Corporate Value, author, John Wiley & Sons, Hoboken, New Jersey, 1991.

Intellectual Property: Licensing and Joint Venture Profit Strategies, Third Edition, annually supplemented, co-author, John Wiley & Sons, Hoboken, New Jersey, 2004.

Intellectual Property Infringement Damages: A Litigation Support Handbook, Second Edition, annually supplemented, author, John Wiley & Sons, Hoboken, New Jersey, 1999.

## *Publications - Articles*

Investment Theory For Royalty Rates, co-authored, les Nouvelles - The Journal of the Licensing Executive Society, December 1987, page 95.

Royalties - Fair Rates of Return, Patent World, July 1988, page 36.

IRS White Paper On Intercompany Pricing, co-authored, Trademark World, February 1989, page 28.

Brand Name Buying, Registered Representative, February 1990, page 46.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
748

Alfred E. Mann Foundation ᵒᵣ Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 37

The Inefficient Market for Intellectual Property: An Update on the Global Scene, The Journal of Proprietary Rights, February 1990, page 17.

Royalty Rate Economics, European Intellectual Property Review, April 1990, page 133.

No Name. No Gain, Personal Investor, May 1990, page 27.

An Economic Approach to Royalty Rate Determination Part I of III, co-authored, The Journal of Proprietary Rights, June 1990, page 19.

An Economic Approach to Royalty Rate Determination Part II of III, co-authored, The Journal of Proprietary Rights, August 1990, page 17.

How To Make Money By Investing In Innovative Leaders, Boardroom Reports, August 1, 1991, page 14.

An Economic Approach to Royalty Rate Determination Part III of III, co-authored, The Journal of Proprietary Rights, September 1990, page 17.

Determining Royalty Rates for Intellectual Property by Using a Discounted Cash Flow Analysis Pricing, Business & Tax Planning Quarterly, Fall 1990, page 23.

The Power of Trademarks in Mature Industries, Licensing Product Times, Fall Issue 1991, pg. 1.

The Future is Intangible: Licensing and Joint Venturing Will Create Higher Corporate Value, International Company and Commercial Law Review, page 313.

The New Focus of Acquisitions Is Intangible, Licensing Economics Review, Dec. 1991, pg. 19

Intangible Asset Investing: Basic Trend of '90s, Successful Innovator, March-April 1992, Vol. 1 No. 3, page 6.

Valuation Issues in Transfer Pricing, chapter co-author, Transfer Pricing Handbook, edited by Robert Feinschreiber, published by John Wiley & Sons, 1993.

The Doubled-Barreled Benefits of Acquiring a Brand, Mergers & Acquisitions, March-April 1993, page 36.

The Future Is Intangible, The TQM Magazine, March-April 1993, page 7.

Emergence of Intellectual Property Exploitation Strategies, The Licensing Journal, May 1993, page 10.

Quantitative Methods of Valuing Intellectual Property, chapter co-author, The New Role of Intellectual Property in Commercial Transactions, edited by Melvin Simensky and Lanning G. Bryer, published by John Wiley & Sons, 1994.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
749

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 38

Intellectual Property Takes Center Stage, Multimedia and Technology Licensing Law Report, July 1994, page 1.

Royalty Rates in General and on Average, The Journal of Technology Transfer, September 1995, Vol. 20, No. 2, page 22.

Damage Awards, The IP Litigator, November/December 1995, Volume 1, Number 1, page 23.

IP Leverage, Chapter Thirteen of the book titled From Ideas to Assets, edited by Bruce Berman and published by John Wiley & Sons, New York, 2002.

*Conferences Presentations*

IP Valuation – Patent Damages, presented at Suffolk University Law School, Boston, MA, October 25, 2007

Royalty Rates In and Out of Litigation, presented at the Law Seminars International conference titled Complex Intellectual Property Licensing, Philadelphia, Pennsylvania, May 19, 2005.

Valuation of Patents Using the Relief from Royalty Approach, presented at the National Association of Certified Valuation Analysts Twleve Annual Consultants' Conference, Philadelphia, Pennsylvania, June 2, 2005.

Recent Royalty Rate Trends in Technology Licensing, presented to the Licensing Executives Society Annual Conference, San Diego, California, Illinois, September 24, 2003.

Calculating Royalty Rates, presented to the Licensing Executives Society Annual Conference, San Diego, California, Illinois, September 23, 2003.

Royalty Rate Derivation Methods, presented to the Licensing Executives Society Annual Conference, Chicago, Illinois, October 2002.

Royalty Rates for Technology, presented to the Licensing Executives Society Chicago Chapter, Chicago, Illinois, February 26, 2002.

Valuation and Royalty Rate Methods for Pharma and Biotech, presented at the Strategic Research Institute conference titled Pharma Biotech: Intellectual Property and Business Development, Crowne Plaza Hotel, San Francisco, California, April 23, 2001.

Patent Valuation and Royalty Rate Development, presented at the 2000 Licensing Executives Society Conference, Toronto, Ontario, Sheraton Centre, September 11, 2000

Intellectual Property Valuation Issues and Strategies, presented at the Singapore-WIPO Joint Training Course for Asian and Pacific Region on Intellectual Property and Technopreneurship Development, November 16, 1999, Hotel Rendezvous, Singapore, Jointly sponsored by World Intellectual Property Organization and the Government of Singapore.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
750

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas ano ... ...chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 39

Intellectual Property Valuation presented at the 10th Annual Cyberspace Licensing in the Electronic Age conference, sponsored by Glasser LegalWorks, Marriott Marquis, New York City, November 8, 1999.

Methods for the Valuation of Intellectual Property, presented at Seminario Internaional sobre Valorization de la Propiedad Intelectual, November 19 and 20, 1998, Sheraton Hotel, Lima Peru, sponsored by INDECOPI of Peru and the World Intellectual Property Organization, of the United Nations.

Methods for the Valuation of Intellectual Property, presented at Seminario Internaional sobre Valorization de la Propiedad Intelectual, November 19 and 20, 1998, Sheraton Hotel, Lima Peru, sponsored by INDECOPI of Peru and the World Intellectual Property Organization, of the United Nations.

Valuing Intellectual Property: What's it Worth? presented at the American Conference Institute's conference titled Intellectual Property in Business Transactions, The Park Lane Hotel, New York City, January 30, 1997.

Economic Factors for Intellectual Property Portfolio Management presented at the Licensing Executives Society E4 Committee Winter Conference titled Portfolio Management Strategies, Crystal Gateway Marriott, Crystal City, Virginia, December 12, 1996.

Basic Intellectual Property Valuation for Licensing Executives presented at the 1996 Licensing Executives Society Conference, El Conquistador Resort, Fajardo, Puerto Rico, September 30, 1996.

Intellectual Property Valuation and Licensing, presented to the Office of Corporate Relations and Technology Transfer of Rutgers University, co-hosted with Michael J. Lennon of Kenyon & Kenyon, Piscataway, New Jersey, June 26, 1996.

Establishing Royalty Rates for Business Transactions, presented at the conference titled The Basics of Licensing and Licensing Law, sponsored by The Licensing Journal, Kent Press, The University Club, New York, New York, March 27, 1996.

Computation of Damages, presented at the conference titled The Basics of Intellectual Property Litigation, sponsored by The IP Litigator, Kent Press, The University Club, New York, New York, March 28, 1996.

Intellectual Property Valuation, presented at the American Intellectual Property Law Association, 19th Mid-Winter Institute - The Law of Computer Related Technology IV, La Quinta Resort Hotel, Palm Springs, California, January 26, 1996.

A Conflicted Global Economy, presented at the 1995 Licensing Executives Society Annual Conference, Marriott's Orlando World Conference Center, Orlando Florida, October 24, 1995.

Technology Licensing Strategies, presented at the 1995 Licensing Executives Society Annual Conference, Marriott's Orlando World Conference Center, Orlando Florida, October 25, 1995.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
751

Alfred E. Mann Foundation ьог Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 40

Panel Discussion on Valuing Preclinical Trial Biodiagnostic Technology, presented at the 1995
Licensing Executives Society Annual Conference, Marriott's Orlando World Conference Center,
Orlando Florida, October 26, 1995.

Valuation of Intellectual Property, presented at the First Annual Licensing Seminar of the New
Jersey Intellectual Property Law Association, Woodbridge Hilton, Iselin, New Jersey, October
19, 1995.

Intellectual Property Valuation, presented at the Advanced Licensing Institute of the Franklin
Pierce Law Center, Concord, New Hampshire, July 26, 1995.

New Trends in Intellectual Property, presented at the Intellectual Property Conference, Cooper
Union, New York, New York, April 27, 1995

Intellectual Property Infringement Damages, presented at the American Society of Appraisers,
Philadelphia Chapter, Business Valuation Conference, Sheraton of Bucks County, Fairless Hills,
Pennsylvania, April 21, 1995.

Technology, Royalty Rates & Investment Risk, presented at the 1994 Licensing Executives
Society Annual Conference, Hilton Waikoloa Village, Waikoloa, Hawaii, October 19, 1994.

Quantifying and Valuing Royalties for Intellectual Property presented at the annual conference of
The Intellectual Property Institute for Corporate Counsel at Le Meridien Hotel, Chicago, Illinois,
September 26, 1994.

Royalty Rate Negotiations, presented to the New Jersey Entrepreneurial Network, Princeton, New
Jersey, June 1, 1994.

Valuing Intellectual Property presented at the American Society of Appraisers conference titled
Current Topics in Business Valuation '94 at The Warwick Hotel, New York City on May 17,
1994.

Valuation of Intellectual Property Rights presented at the Fourth Annual American Law Institute-
American Bar Association Course of Study titled Trademarks, Copyrights, and Unfair
Competition for the General Practitioner, Stouffer Concourse Hotel, Washington, DC, April 15,
1994.

Technology Royalty Rates presented at the Association of Federal Technology Transfer
Executives at the Los Angeles Airport Marriott, January 26, 1994.

The Wall Street Perspective - Brand Values presented at the conference titled Brands sponsored
by Strategic Research Institute at The Grand Hyatt Hotel, New York, New York, November 10-
11, 1993.

Quantifying and Valuing Royalties for Intellectual Property presented at the annual conference of
The Intellectual Property Institute for Corporate Counsel at the Hyatt Regency, San Francisco,
September, 30, 1993.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
752

Alfred E. Mann Foundation ιοι Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 41

The New Role of Intellectual Property in Commercial Transactions presented as part of the Executive MBA Seminar Series at the Leonard N. Stern School of Business, New York University, New York City, March 26, 1993 and June 21, 1993.

Royalty Rates in Licensing & Litigation presented to the New Jersey Intellectual Property Law Association at the Forrestal Center Marriott Hotel, Princeton, NJ on January 14, 1993.

Technology Valuation presented at the conference titled Appraising Intellectual Property, sponsored by the American Society of Appraisers at Hyatt Regency at Reunion, Dallas, Texas, January 11, 1993.

Valuation and Royalty Rate Determination presented at the conference titled Licensing Opportunities in the Pharmaceutical and Biotechnology Industries sponsored by The Institute for International Research, Park Hyatt Hotel, Washington DC, December 2, 1992.

Hidden Corporate Assets and Royalties, presented at the Third Annual Invention Convention, The Pasadena Convention Center, Pasadena Ca., September 5, 1992.

Co-Chairman of the Conference titled Strategies for Intellectual Property Valuation, Exploitation and Underwriting sponsored by the Institute for International Research presented at the Park Lane Hotel, New York on May 18-19, 1992.

Valuation of Technology presented at the conference titled Joint Ventures and Other Cooperative Business Arrangements sponsored by Prentice Hall Law & Business and presented at the Loews-Summit Hotel on October 30-31, 1990.

Valuation of Technology presented at the conference titled Joint Ventures and Other Cooperative Business Arrangements sponsored by Prentice Hall Law & Business and presented at the Four Seasons Clift Hotel on November 9-10, 1991.

Advanced Valuation of Intellectual Property presented at the International Conference of the American Society of Appraisers in Washington DC on June 15, 1987.

***Court Testimony, 1991 to Present***

**Case:** John Wiley & Sons, Inc. v. Fred W. McLafferty et al No. 13 143 Y 01321 05
American Arbitration Association
**Issue:** Breach of Contract
**Client:** John Wiley & Sons

**Case:** Finjan Software, Ltd. v. Secure Computing Corporation, Cyberguard Corporation, and Webwasher AG., Civil Action No. 06-369-GMS United States District Court for the District of Delaware
**Issue:** Infringement damages regarding proactive scanning network malware protection
**Client:** Finjan

**Case:** Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., Civil Action No. 06-2120 (Wexler, J., Tomlinson, M.) United States District Court Eastern District of New York
**Issue:** False advertising regarding Lactinol™ skin therapy product

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
753

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 42

**Client:** Pedinol

**Case:**  US Phillips Corporation v. International Norcent Technology, et al., No. 06-CV-01366
ER (PLAX), United States District Court Central District of California, Western Division
**Issue:**  Infringement damages regarding DVD players
**Client:** International Norcent

**Case:**  Smith & Nephew, Inc. and John O. Hayhurst, MD v. Arthrex, Inc., Civil Case No. CV04
0029 SI, United States District Court District of Oregon
**Issue:**  Infringement damages regarding shoulder anchors used in surgery
**Client:** Arthrex, Inc.

**Case:**  Monsanto, Inc. v. Bayer Crop Science Civil Action No. 4:00CV01915 ERW, United
States District Court for the Eastern District of Missouri
**Issue:**  Infringement damages regarding agricultural-genetic patented invention.
**Client:** Bayer Crop Science

**Case:**  Freedom Wireless, Inc. v. Boston Communications Group, Inc. et al, No. 00-CV-12234
EFH, United States District Court for the District Massachusetts
**Issue:**  Infringement damages regarding prepaid wireless phone services
**Client:** Plaintiff

**Case:**  PharmaStem Therapeutics, Inc. v. ViaCell, Inc., et al Civil Action No. 02-148-GMS,
United States District Court for the District of Delaware
**Issue:**  Infringement damages regarding cord blood collection and storage
**Client:** Plaintiff

**Case:**  Tulip Computers International B.V. v. Dell Computer Corp. Civil Action No. 00-981-
Jordan United States District Court for the District of Delaware
**Issue:**  Infringement damages regarding personal computer Form Factor.
**Client:** Plaintiff

**Case:**  Honeywell International v. Hamilton Sundstrand, Inc. Civil Action No. 99-309-GMS
(Sleet), United States District Court for District of Delaware.
**Issue:**  Infringement damages regarding auxiliary power unit engine technology.
**Client:** Plaintiff

**Case:**  BioNumerik Pharmaceuticals, Inc. v. M. Gopal Nair, American Arbitration Association,
No. AAA 70 181 0030900, Austin, Texas.
**Issue:**  Damages to intellectual property and business value from failure to perform contracted
obligations.
**Client:** Plaintiff

**Case:**  Plant Genetics Systems v. DeKalb ., Civil Action No. 3:96CV02015, United States
District Court for Connecticut, East Hartford.
**Issue:**  Infringement damages regarding glufosinate resistant (Liberty herbicide) corn seeds.
**Client:** Plaintiff

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
754

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 43

**Case:** Plant Genetics Systems v. Novartis, Civil Action No. 96-459, United States District Court
for the District of Delaware, Judge Farnan.
**Issue:** Infringement damages regarding agricultural-genetic patented invention.
**Client:** Plaintiff

**Case:** Pocklington Foods, Inc. v. Her Majesty the Queen in Right of the Province of Alberta as
Represented by the Provincial Treasurer of Alberta, Court of Queens, Bench of Alberta,
Judicial District of Alberta.
**Issue:** Appropriate methods for valuing expropriated trademarks.
**Client:** Plaintiff

**Case:** CFMT, Inc. and CFM Technologies, Inc. v. Steag Microtech, Inc. Civil Action No. 95-
442 (McKelvie), United States District Court for the District of Delaware.
**Issue:** Infringement damages regarding semiconductor manufacturing equipment patent.
**Client:** Plaintiff.

**Case:** The Procter & Gamble Company v. Paragon Trade Brands, Inc., C.A. No. 94-16-LON,
United States District Court for the District of Delaware, Wilmington, Delaware.
**Issue:** Infringement damages regarding disposable infant diaper patents.
**Client:** Defendant

**Case:** Ensco Inc. v. Komar Industries, No. LR-C-93-159, United States District Court, Eastern
District of Arkansas, Western Division, Little Rock, Arkansas.
**Issue:** Infringement damages regarding incinerator conveyor system.
**Client:** Plaintiff

**Case:** Gardner v. Ford Motor Company, United States District Court, District of Washington,
Seattle, Washington.
**Issue:** Infringement damages regarding exhaust gas recovery system for automobiles and trucks.
**Client:** Plaintiff

**Case:** GNB Technologies, Inc. v. Exide Corporation, C.A. No. 88-407, United States District
Court, District of Delaware, Wilmington, Delaware, Roderick P. McKelvie presiding.
**Issue:** Infringement damages regarding automotive battery terminal configuration.
**Client:** Defendant

**Case:** In Re IA Holdings, Delaware County Court of Common Pleas, No. 86-14981, Media,
Pennsylvania, Edward S. Lawhorne presiding.
**Issue:** Valuation of public company shares for dissenting shareholder lawsuit.
**Client:** Delaware County Court, Media, Pennsylvania

**Case:** Warner Lambert v. American Safety Razor, Civil Action No. 91-11, United States
District Court, District of Delaware, Wilmington, Delaware, Joseph J, Farnan, Jr.
presiding.
**Issue:** Infringement damages regarding placement of polyox strip on razor blade cartridges.
**Client:** Defendant

**Case:** Wojick v. Wojick, Family Law Matter, No. 92-FA-836797, Cheyenne, Wyoming.
**Issue:** Valuation of closely held business, Cheyenne Outfitters, for divorce proceedings.

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
755

Alfred E. Mann Foundation ᵢₒᵣ Scientific Research v. Cochlear Americas and ᴄᴏchlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 44

**Client:** Husband and wife.

***Deposition Testimony, 1991 to Present***

**Case:** <u>Freedom Wireless, Inc. v. Cingular Wireless LLC et al.</u> Case No.. 2:06-CV-00505-TJW-CE
United States District Court for the Eastern District of Texas Marshall Division
**Issue:** Infringement damages regarding real-time prepaid wireless service monitoring
**Client:** Freedom Wireless

**Case:** <u>ZymoGenetics, Inc. v. Bristol-Myers Squibb, Inc.</u> Civil Action No. 06-CV-0500
United States District Court for the District of Delaware
**Issue:** Infringement damages regarding ORENCIA®
**Client:** ZymoGenetics, Inc.

**Case:** <u>John Wiley & Sons, Inc. v. Fred W. McLafferty et al</u> No. 13 143 Y 01321 05
American Arbitration Association
**Issue:** Breach of Contract
**Client:** John Wiley & Sons

**Case:** <u>GTX Corporation v. Kofax Image Products, Inc., Nuance Communications, Inc., and
Canon USA, Inc.,</u> Civil Action No. 6:06-CV-244 (LED) United States District Court for
the
**Issue:** Infringement damages regarding de-skewing scanner software
**Client:** GTX Corporation

**Case:** <u>Domain Assets, LLC v, Petters Group Worldwide, LLC</u> File No. 06-4379 (PAM/JSM)
United States District Court for the District of Minnesota
**Issue:** Breach of Contract
**Client:** Domain Assets, LLC

**Case:** <u>Finjan Software, Ltd. v. Secure Computing Corporation, Cyberguard Corporation, and
Webwasher AG.,</u> Civil Action No. 06-369-GMS United States District Court for the
District of Delaware
**Issue:** Infringement damages regarding proactive scanning network malware protection
**Client:** Finjan

**Case:** <u>Pedinol Pharmacal, Inc. v, Rising Pharmaceuticals, Inc.,</u> Civil Action No. 06-2120
(Wexler, J., Tomlinson, M.) United States District Court Eastern District of New York
**Issue:** False advertising regarding Lactinol™ skin therapy product
**Client:** Pedinol

**Case:** <u>US Phillips Corporation v. International Norcent Technology, et al.,</u> No. 06-CV-01366
ER (PLAX), United States District Court Central District of California, Western Division
**Issue:** Infringement damages regarding DVD players
**Client:** International Norcent

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, ɪɴᴄ

Exhibit 21
756

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 45

**Case:** Schindler Elevator Corporation, and Inventio AG, v Otis Elevator Company, Civil Action No. 06-CV-05377 (RCC), United States District Court District for the Southern District of New York
**Issue:** Infringement damages regarding elevator systems
**Client:** Schindler

**Case:** NEBL, Inc. and Jeffrey Dann, MD v. American Medical Systems, Inc., Civil Case No. 04-CV-12482 RGS, United States District Court District of Massachusetts
**Issue:** Infringement damages regarding urinary incontinence
**Client:** NEBL, Inc.

**Case:** Smith & Nephew, Inc. and John O. Hayhurst, MD v. Arthrex, Inc., Civil Case No. CV04 0029 SI, United States District Court District of Oregon
**Issue:** Infringement damages regarding shoulder anchors used in surgery
**Client:** Arthrex, Inc.

**Case:** Procter & Gamble v. The United States, Civil Case No. 1:05cv355 United States District Court District for the Southern District of Ohio Western Division
**Issue:** Value of technology given as a charitable donation
**Client:** Procter & Gamble

**Case:** Paul Cozza v. Network Associates, Inc., Civil Action No. 02-11135 RGS, United States District Court District of Massachusetts
**Issue:** Anti-virus software invention
**Client:** Network Associates, Inc.

**Case:** Lear Corporation v. Harness, Dickey & Pierce, PLC et al, Case, No. 03-054226-CK, State of Michigan, Circuit Court fo the County of Oakland
**Issue:** Attorney Malpractice – loss of patent rights for interior automtive dorr manufacturing process
**Client:** Plaintiff

**Case:** Cedars-Sinai Medical Center et al v. Mitchell, Silberberg & Knupp, Case, No. BC 297823, Superior Court for the State of California for the County of Los Angeles
**Issue:** Attorney Malpractice – loss of patent rights for laser eye surgery invention
**Client:** Plaintiff

**Case:** Wesleyan Company v. US Army, ASBCA No. 53896, Armed Services Board of Contract Appeals
**Issue:** Taking of technology regarding On-The-Move Soldier Hydration System
**Client:** Plaintiff

**Case:** Freedom Wireless, Inc. v. Boston Communications Group, Inc. et al, No. 00-CV-12234 EFH, United States District Court for the District Massachusetts
**Issue:** Infringement damages regarding prepaid wireless phone services
**Client:** Plaintiff

**Case:** Edwards LifeSciences v. Sulzer Carbomedics, Inc. Civil Action No. 02-508-SLR United States District Court for the District of Delaware

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
757

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 46

**Issue:** Infringement damages regarding heart value ring repair products
**Client:** Plaintiff

**Case:** Novamedix Ltd. v. Kinetic Concepts, Inc. Civil Action No. SA-92-CA-0177 United
States District Court for the Western District of Texas San Antonio Division
**Issue:** Infringement damages regarding compression therapy foot pump for DVT prevention
**Client:** Defendant

**Case:** PharmaStem Therapeutics, Inc. v. ViaCell, Inc., et al Civil Action No. 02-148-GMS,
United States District Court for the District of Delaware
**Issue:** Infringement damages regarding cord blood collection and storage
**Client:** Plaintiff

**Case:** Tulip Computers International B.V. v. Dell Computer Corp. Civil Action No. 00-981-
Jordan United States District Court for the District of Delaware
**Issue:** Infringement damages regarding personal computer Form Factor.
**Client:** Plaintiff

**Case:** Monsanto, Inc. v. Aventis CropScience, NV Civil Action No. 4:00CV01915 ERW,
United States District Court for the Eastern District of Missouri
**Issue:** Infringement damages regarding agricultural-genetic patented invention.
**Client:** Defendant

**Case:** Edwards LifeSciences Corp and Edwards Lifesciences LLC v. Medtronic, Inc. Civil
Action No. 00-621-SLR, United States District Court of Delaware
**Issue:** Infringement damages regarding patented technology used in artificial heart valves
**Client:** Plaintiff

**Case:** Dr. George S. Allen. v. Howmedica Leibinger, Inc. et al, Civil Action No. 98-613 (JIF),
United States District Court of Delaware
**Issue:** Misrepresentation of patent position regarding surgical imaging systems and markers.
**Client:** Plaintiff

**Case:** Revlon Consumer Products Corp. v. The Estee Lauder Companies, Inc. et al, Civ. No.
00-CIV-5930 (RMB), United States District Court Southern District of New York
**Issue:** Infringement damages regarding patented technology used in makeup foundations.
**Client:** Defendant

**Case:** Honeywell International, Inc. v. Hamilton Sunstrand Corporation, Civil Action No. 99-
309 (GMS), United States District Court for the District of Delaware.
**Issue:** Infringement damages patented technology used in jet aircraft auxiliary power units.
**Client:** Plaintiff

**Case:** Nova Biomedical Corporation v. iStat Corporation., Civil Action No. 95-11396-RGS,
United States District Court District Court of Massachusetts.
**Issue:** Infringement damages regarding patented blood gas medical instrument.
**Client:** Plaintiff

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
758

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 47

**Case:**  Plant Genetics Systems v. DeKalb ., Civil Action No. 3:96CV02015, United States District Court for Connecticut, East Hartford.
**Issue:**  Infringement damages regarding glufosinate resistant (Liberty herbicide) corn seeds.
**Client:** Plaintiff

**Case:**  Crystal Semiconductor Corporation v. Opti, Inc. and TriTech Microelectronics, Inc., Civil Action No. 97-CA-026-SS, United States District Court for the Western District of Texas, Austin Division.
**Issue:**  Noise reduction technology used in PC audio analog to digital converters.
**Client:** Defendant

**Case:**  American Online, Inc. v. AT&T Corp., Case No. 98-1821-A, United States District Court for the Eastern District of Virginia.
**Issue:**  Trademark infringement.
**Client:** Defendant

**Case:**  Fort James Corporation v. Sweetheart Cup Company, Inc., Civil Action No. 97-C-1221, United States District Court for the Eastern District of Wisconsin.
**Issue:**  Infringement of paper plate manufacturing technology.
**Client:** Plaintiff

**Case:**  Plant Genetics Systems v. Novartis, Civil Action No. 96-459, United States District Court for the District of Delaware, Judge Farnan.
**Issue:**  Infringement damages regarding agricultural-genetic patented invention.
**Client:** Plaintiff

**Case:**  Evans Medical Ltd., Medeva Plc., and SmithKline Beecham v. American Cyanamid Company, 96 Civ. 3529 (WCC), United States District Court for the Southern District of New York.
**Issue:**  Infringement damages regarding pertusis antigene (69k) patent.
**Client:** Defendant

**Case:**  Plant Genetics Systems v. Ciba Seeds and Mycogen Plant Science Inc., Civil Action No. 1:95CV00741, United States District Court for the Middle District of North Carolina, Durham Division.
**Issue:**  Infringement damages regarding agricultural-genetic patented invention.
**Client:** Plaintiff

**Case:**  Gerald L. Terwilliger v. York International, United States District Court, District of Richmond Virginia.
**Issue:**  Employee compensation for patented invention
**Client:** Plaintiff.

**Case:**  Thiokol Corporation v. Alliant Techsystems, Inc. and Hercules Inc., Case No. 95-706 (JJF), United States District Court, District of Delaware
**Issue:**  Infringement damages regarding rocket motor insulation.
**Client:** Defendant.

**Case:**  Nova Biomedical Corporation v. Mallinckrodt Sensor Systems, Inc., Case No. 94-12288-PBS, United States District Court, District of Massachusetts

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
759

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 48

**Issue:** Infringement damages regarding blood gas medical instrument.
**Client:** Plaintiff.

**Case:** <u>Mobil Oil Corporation v. Exxon Corporation</u>, Case No. 96-1603-A, United States District
Court for the Eastern District of Virginia, Alexandria Division
**Issue:** Infringement damages regarding plastic film resins.
**Client:** Plaintiff.

**Case:** <u>Logan Farms v. Pravel et al.</u>, Harris County Court, Houston Texas
**Issue:** Patent attorney malpractice
**Client:** Plaintiff.

**Case:** <u>CFMT, Inc. and CFM Technologies, Inc. v. Steag Microtech, Inc.</u> Civil Action No. 95-
442    (McKelvy), United States District Court for the District of Delaware.
**Issue:** Infringement damages regarding semiconductor manufacturing equipment patent.
**Client:** Plaintiff.

**Case:** <u>Chemtron, Inc. v. Diversey US Holdings, Inc. et al.</u>, Civil Action No. 95-1722-A, United
States District Court, Eastern District of Virginia, Alexandria Division.
**Issue:** Infringement damages regarding detergent dispensing system for institutional warewash.
**Client:** Plaintiff.

**Case:** <u>Gilbarco, Inc. v. Octel Communications Corp.</u>, Case No.  C-94-20780-JW, United States
District Court, Northern District of California, San Jose Division.
**Issue:** Infringement damages regarding voice information processing patents.
**Client:** Plaintiff.

**Case:** <u>The Procter & Gamble Company v. Paragon Trade Brands, Inc.</u>, C.A.  No.  94-16-LON,
United States District Court for the District of Delaware, Wilmington, Delaware.
**Issue:** Infringement damages regarding disposable infant diaper patents.
**Client:** Defendant

**Case:** <u>Ensco Inc. v. Komar Industries</u>, No.  LR-C-93-159, United States District Court, Eastern
District of Arkansas, Western Division, Little Rock, Arkansas.
**Issue:** Infringement damages regarding incinerator conveyor system.
**Client:** Plaintiff

**Case:** <u>GNB Technologies, Inc. v. Exide Corporation</u>, C.A. No. 88-407, United States District
Court, District of Delaware, Wilmington, Delaware, Roderick P. McKelvy presiding.
**Issue:** Infringement damages regarding automotive battery terminal configuration.
**Client:** Defendant
**Case:** <u>Allied Materials and Equipment Company, Inc. v. Pappa Geppetto's Toys Victoria, Ltd.</u>,
Case No. 92-2030-0, United States District Court, District of Kansas.
**Issue:** Infringement damages regarding copyright toy - *The Squish.*
**Client:** Defendant

**Case:** <u>Kinetic Concepts, Inc. v. Support Systems International, Inc.</u>, Civil Action No.  SA-91-
CA-0927, United States District Court, Western District of Texas.
**Issue:** Infringement damages regarding hospital bed therapeutic systems

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
760

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and ...chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 49


**Client:** Plaintiff

**Case:**    <u>Pfizer, Inc. v. Astra</u>
**Issue:**   Infringement damages associated with trademark suffix - XL.
**Client:** Plaintiff

**Case:**    <u>Susan M. Maxwell v. K Mart Corp., Melville Corp., Morse Shoe Inc. and Shopko, Inc.</u>,
             Civil Action No.  4-93-525, United States District Court, District of Minnesota.
**Issue:**   Infringement damages regarding system to tie together pairs of shoes for rack display.
**Client:** Defendant

**Case:**    <u>Davis-Lynch, Inc. v. William Norvell</u>
**Issue:**   Damages regarding failure to obtain foreign patents for well-drilling equipment.
Client:  Plaintiff

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
761

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 50

## Appendix B

### Information Reviewed

Conference call with Tony Nygard of Cochear Ltd. and Bruce Chapman of Connooly Bove et al, March 3, 2009.

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| 2002 Cochlear Annual Report | COC-5000000 | COC-5000069 |
| 2003 Cochlear Annual Report | COC-5000070 | COC-5000141 |
| 2004 Cochlear Annual Report | COC-5000142 | COC-5000225 |
| 2005 Cochlear Annual Report | COC-5000226 | COC-5000316 |
| 2006 Cochlear Annual Report | COC-5000317 | COC-5000427 |
| 2007 Cochlear Annual Report | COC-5000428 | COC-5000536 |
| 06/30/2002 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000537 | COC-5000561 |
| 06/30/2003 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000562 | COC-5000587 |
| 06/30/2004 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000588 | COC-5000614 |
| 06/30/2005 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000615 | COC-5000641 |
| 06/30/2006 Cochlear Americas Annual Financial Report | COC-5000642 | COC-5000674 |
| 06/30/2007 Cochlear Americas Annual Financial Report | COC-5000675 | COC-5000703 |
| Cochlear Americas Sales Spreadsheet for F03 Q1 | COC-5000704 | COC-5000759 |
| Cochlear Americas Sales Spreadsheet for F03 Q2 | COC-5000760 | COC-5000813 |
| Cochlear Americas Sales Spreadsheet for F03 Q3 | COC-5000814 | COC-5000863 |
| Cochlear Americas Sales Spreadsheet for F03 Q4 | COC-5000864 | COC-5000916 |
| Cochlear Americas Sales Spreadsheet for F04 Q1 | COC-5000917 | COC-5000960 |
| Cochlear Americas Sales Spreadsheet for F04 Q2 | COC-5000961 | COC-5001005 |
| Cochlear Americas Sales Spreadsheet for F04 Q3 | COC-5001006 | COC-5001045 |
| Cochlear Americas Sales Spreadsheet for F04 Q4 | COC-5001046 | COC-5001091 |
| Cochlear Americas Sales Spreadsheet for F05 Q1 | COC-5001092 | COC-5001132 |
| Cochlear Americas Sales Spreadsheet for F05 Q2 | COC-5001133 | COC-5001173 |
| Cochlear Americas Sales Spreadsheet for F05 Q3 | COC-5001174 | COC-5001215 |
| Cochlear Americas Sales Spreadsheet for F05 Q4 | COC-5001216 | COC-5001263 |
| Cochlear Americas Sales Spreadsheet for F06 Q1 | COC-5001264 | COC-5001307 |
| Cochlear Americas Sales Spreadsheet for F06 Q2 | COC-5001308 | COC-5001352 |
| Cochlear Americas Sales Spreadsheet for F06 Q3 | COC-5001353 | COC-5001400 |
| Cochlear Americas Sales Spreadsheet for F06 Q4 | COC-5001401 | COC-5001441 |
| Cochlear Americas Sales Spreadsheet for F07 Q1 | COC-5001442 | COC-5001480 |
| Cochlear Americas Sales Spreadsheet for F07 Q2 | COC-5001481 | COC-5001517 |
| Cochlear Americas Sales Spreadsheet for F07 Q3 | COC-5001518 | COC-5001557 |
| Cochlear Americas Sales Spreadsheet for F07 Q4 | COC-5001558 | COC-5001598 |
| Cochlear Americas Sales Spreadsheet for F08 Q1 | COC-5001599 | COC-5001650 |
| Cochlear Americas Sales Spreadsheet for F08 Q2 | COC-5001651 | COC-5001695 |
| Cochlear Americas Sales Spreadsheet for F08 Q3 | COC-5001696 | COC-5001748 |
| Cochlear Americas Sales Spreadsheet for F08 Q4 | COC-5001749 | COC-5001792 |
| Cochlear Americas Sales Spreadsheet for F02 Dec | COC-5001793 | COC-5001813 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
762

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 51

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Cochlear Americas Sales Spreadsheet for F02 Q3 | COC-5001814 | COC-5001845 |
| Cochlear Americas Sales Spreadsheet for F02 Q4 | COC-5001846 | COC-5001885 |
| 2008 Cochlear Annual Report | COC-5001886 | COC-5001994 |
| Cochlear Americas - Summary Information from audited Annual Reports | COC-5001995 | COC-5001998 |
| Cochlear Americas - Reconciliation of Cost of Sale from Sales Cube to Annual Reports | COC-5001999 | COC-5002005 |
| Cochlear Americas - Reconciliation of Cost of Sale from Sales Cube to Annual Reports | COC-5002006 | COC-5002009 |
| 1996 Cochlear Limited Annual Report | COC-5002010 | COC-5002068 |
| 1997 Cochlear Annual Report | COC-5002069 | COC-5002128 |
| 1998 Cochlear Annual Report | COC-5002129 | COC-5002188 |
| 1999 Cochlear Annual Report | COC-5002189 | COC-5002252 |
| 2000 Cochlear Annual Report | COC-5002253 | COC-5002318 |
| 2001 Cochlear Annual Report | COC-5002319 | COC-5002386 |
| Cochlear Ltd<br>Royalties Paid to The Commonwealth & University of Melbourne from Start of Cochlear | COC-5002387 | COC-5002387 |
| N22, N24 and Freedom (Sys 4) R&D Tax Concession D&D Actuals (Financial Years 95 – 07) | COC-5002388 | COC-5002388 |
| Cross-License Agreement effective May 1, 2002, by and between Cochlear, Ltd. and Advanced Bionics Corporation | COC-5002389 | COC-5002394 |
| IHPS Technology Licence Agreement made June 30, 2008 between Hearworks Pty Limited, Hearing CRC Limited and The University of Melbourne and Cochlear Limited | COC-5002395 | COC-5002416 |
| Design and Production Services Agreement made as of September 19, 1990 by and between Cochlear Pty Ltd and Avasem Corporation | COC-5002417 | COC-5002426 |
| Agreement No. DA 10406 made June 3, 1981 between The Commonwealth of Australia and Nucleus Ltd | COC-5002427 | COC-5002435 |
| Agreement No. DA 10407 made June 23, 1981 between The Commonwealth of Australia and Nucleus Ltd | COC-5002436 | COC-5002444 |
| Agreement No. DA 10409 made May 3, 1983 between The Commonwealth of Australia and Nucleus Ltd | COC-5002445 | COC-5002455 |
| Assignment Deed dated April 17, 1989 between Cochlear Pty. Limited, Cochlear Corporation, The University of Melbourne, and The Commonwealth of Australia | COC-5002456 | COC-5002481 |
| Deed dated April 17, 1989 between Cochlear Pty. Limited, The University of Melbourne, and The Commonwealth of Australia | COC-5002482 | COC-5002484 |
| Deed of Novation dated August 22, 1985 between The Commonwealth of Australia, The University of Melbourne, Nucleus Limited, and Cochlear Pty. Limited | COC-5002485 | COC-5002495 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
763

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 52

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Exhibit A to the Manufacturing Sub-Licence Deed dated April 17, 1989<br>Licence Agreement dated December 10, 1982 between The University of Melbourne, The Commonwealth of Australia, and Nucleus Limited | COC-5002496 | COC-5002512 |
| Exhibit B to the Manufacturing Sub-License Deed dated April 17, 1989<br>Deed of Novation dated August 22, 1985 between The University of Melbourne, The Commonwealth of Australia, and Cochlear Pty. Limited | COC-5002513 | COC-5002523 |
| Manufacturing Sub-Licence Deed dated April 17, 1989 between Cochlear Pty. Limited, Cochlear Corporation, The University of Melbourne, and The Commonwealth of Australia | COC-5002524 | COC-5002535 |
| Deed between Cochlear Limited and Commonwealth of Australia represented by the Department of Industry, Science and Resources (undated) | COC-5002536 | COC-5002543 |
| Deed dated April 20, 2000 between Cochlear Limited and Commonwealth of Australia represented by the Department of Industry, Science and Resources | COC-5002544 | COC-5002551 |
| Deed of Variation dated November 8, 2001 between Commonwealth of Australia and Cochlear Limited (to Deed dated April 20, 2000) | COC-5002552 | COC-5002556 |
| Agreement of Co-Operation signed March 7, 2008 between Cochlear Limited and K.U.Leuven | COC-5002557 | COC-5002579 |
| Exhibit A to the Assignment Deed dated April 17, 1989<br>Licence Agreement dated December 10, 1982 between The University of Melbourne, The Commonwealth of Australia, and Nucleus Limited | COC-5002580 | COC-5002596 |
| Exhibit B to the Assignment Deed dated April 17, 1989<br>Deed of Novation dated August 22, 1985 between The University of Melbourne, The Commonwealth of Australia, and Cochlear Pty. Limited | COC-5002597 | COC-5002607 |
| Licence Agreement dated December 10, 1982 between The University of Melbourne, The Commonwealth of Australia, and Nucleus Limited | COC-5002608 | COC-5002623 |
| Bionic Ear University of Melbourne Subcontract dated February 19, 1982 between Nucleus Limited and The University of Melbourne (to DA10407 of June 23,1981) | COC-5002624 | COC-5002645 |
| Addendum to Licence Agreement dated December 16, 1982 between The University of Melbourne, The Commonwealth of Australia, and Cochlear Pty Limited | COC-5002646 | COC-5002651 |
| N22, N24 and Freedom (Sys 4) R&D Tax Concession D&D Actuals Exc Implants (Financial Years 95 – 08) | COC-5002652 | COC-5002652 |
| N22, N24 and Freedom (Sys 4) R&D Tax Concession D&D Actuals Inc Implants (Financial Years 95 – 08) | COC-5002653 | COC-5002653 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
764

Alfred E. Mann Foundation ...or Scientific Research v. Cochlear Americas and ...ochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 53

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Deposition transcript of 30(b)(6) deposition witness Lawrence Allen Fischer dated December 17, 2008 designated as ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |
| Exhibit 1099 – Alfred Mann Foundation Cochlear Royalties Analysis of Royalty Account as of 9/30/08; 1 page | N/A | N/A |
| Exhibit 1100 – Advanced Bionics Stockholders' Representative Trustees of the Bionics Trust dated September 4, 2007; 42 pages | N/A | N/A |
| Exhibit 1101 – Information Statement Concerning the Merger of Advanced Bionics Corporation with Claude Acquisition Corp.; 84 pages | N/A | N/A |
| Exhibit 1102 –Alfred E. Mann Foundation for Scientific Research General Ledger Detail History for Advanced Bionics Royalty Payment | AMF045193 | AMF045193 |
| Exhibit 1103 – 1990 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045345 | AMF045363 |
| Exhibit 1104 – 1991 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045364 | AMF045383 |
| Exhibit 1105 –1992 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045384 | AMF045395 |
| Exhibit 1106 –1993 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045396 | AMF045413 |
| Exhibit 1107 –1994 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045414 | AMF045431 |
| Exhibit 1108 – 1995 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045432 | AMF045452 |
| Exhibit 1109 – 1996 Form 990-PF for Alfred E. Mann Foundation for Scientific Research | AMF045453 | AMF045469 |
| Exhibit 1110 – 1997 Form 990-PF for Alfred E. Mann Foundation for Scientific Research; 23 pages | N/A | N/A |
| Exhibit 1111 – 1998 Form 990-PF for Alfred E. Mann Foundation for Scientific Research; 27 pages | N/A | N/A |
| Exhibit 1112 – 1999 Form 990 for Alfred E. Mann Foundation for Scientific Research; 33 pages | N/A | N/A |
| Exhibit 1113 – 2000 Form 990 for Alfred E. Mann Foundation for Scientific Research; 41 pages | N/A | N/A |
| Exhibit 1114 – 2001 Form 990 for Alfred E. Mann Foundation for Scientific Research; 59 pages | N/A | N/A |
| Exhibit 1115 –2002 Form 990 for Alfred E. Mann Foundation for Scientific Research; 55 pages | N/A | N/A |
| Exhibit 1116 – 2003 Form 990 for Alfred E. Mann Foundation for Scientific Research; 56 pages | N/A | N/A |
| Exhibit 1117 – 2004 Form 990 for Alfred E. Mann Foundation for Scientific Research; 47 pages | N/A | N/A |
| Exhibit 1118 – 2005 Form 990 for Alfred E. Mann Foundation for Scientific Research; 78 pages | N/A | N/A |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
765

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 54

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Exhibit 1119 – 2006 Form 990 for Alfred E. Mann Foundation for Scientific Research; 85 pages | N/A | N/A |
| Exhibit 1120 – 2007 Form 990 for Alfred E. Mann Foundation for Scientific Research; 72 pages | AMF045489 | AMF045560 |
| Exhibit 1121 – Alfred E. Mann Foundation for Scientific Research and Subsidiary Financial Statements, March 31, 2008 | AMF045653 | AMF045661 |
| Deposition transcript of Jeffrey Greiner dated December 16, 2008 designated as ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |
| Exhibit 1085 – Memorandum dated February 19, 1999 to Jeff Greiner from Al Mann | AB00340 | AB00341 |
| Exhibit 1086 – Cochlear Implant Field License Agreement made and effective on April 15, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AB00001 | AB00016 |
| Exhibit 1087 – Cochlear Implant Field License Agreement made and effective on May 18, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AB00049 | AB00065 |
| Exhibit 1088 – First Amendment to License Agreements agreed to on October 11, 2001 between The Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AB00066 | AB00069 |
| Exhibit 1089 – Letter dated April 16, 2003 to Joseph Schulman, Ph.D. from Jesse Jenner | AB00342 | AB00342 |
| Exhibit 1090 – Letter dated July 24, 2003 to Malcolm Romano from Bryant R. Gold | AB00346 | AB00346 |
| Exhibit 1091 – Cochlear Technology License and Royalty Agreement entered as of January 1, 2004, by and between The Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AB00297 | AB00318 |
| Exhibit 1092 – Letter dated August 11, 2004 to Jeffrey Greiner from Malcolm Romano | AB00347 | AB00347 |
| Exhibit 1093 – Advanced Bionics payments to Alfred E. Mann Foundation for Royalty payments from 1999-2008 | AB00070 | AB00071 |
| Exhibit 1094 – Cochlear Patent Assignment, Execution Version made and entered January 3, 2008 by and between Boston Scientific Neuromodulation Corporation and Advanced Bionics, LLC | AB00230 | AB00250 |
| Exhibit 1095 – Company-Seller Auditory IP Cross-License Agreement, Execution Version dated as of January 3, 2008, between Boston Scientific Neuromodulation Corporation and Advanced Bionics, LLC | AB00251 | AB00275 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
766

Alfred E. Mann Foundation ... Scientific Research v. Cochlear Americas and ...chlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 55

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Exhibit 1096 – RF Bion Technology Field License Agreement made effective on April 15, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AB00017 | AB00032 |
| Exhibit 1097 – Battery-Powered Bion Technology Field License Agreement made and effective on April 15, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AB00033 | AB0048 |
| Exhibit 1098 –License, Royalty and Manufacturing Agreement Battery Powered Bion Devices and Services entered into as of January 1, 2004, by and between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AMF045276 | AMF045304 |
| Deposition transcript 30(b)(6) deposition witness David Lee Hankin dated December 17, 2008 designated as ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |
| Exhibit 1122 – Foundation Payroll | AMF019403 | AMF019403 |
| Exhibit 1123 – Advanced Bionics Employee List | AMF019404 | AMF019404 |
| Exhibit 1124 – Exclusive License Agreement for Cochlear Products made and effective December 30, 1988 by and between the Regents of the University of California and Pacesetter Infusion, Ltd., doing business as MiniMed Technologies | AMF029301 | AMF029330 |
| Exhibit 1125 – Platinum Series User Reference Binder for the Clarion Behind-The-Ear (BTE) Sound Processor | AMF045669 | AMF045706 |
| Previously Marked Exhibit 1001 – United States Patent 5,609,616 | N/A | N/A |
| Previously Marked Exhibit 1002 – United States Patent 5,938,691 | N/A | N/A |
| Previously Marked Exhibit 1071 – Letter dated July 21, 2003 to Jack O'Mahony from Joseph H. Schulman, Ph.D. | AMF004044 | AMF004044 |
| Previously Marked Exhibit 1072 – Letter dated October 1, 2003 to Joseph H. Schulman, Ph.D. from Jack O'Mahony | AMF000009 | AMF000009 |
| Deposition transcript of 30(b)(6) deposition witness Alfred E. Mann dated December 10, 2008 designated as ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |
| Exhibit 1082 – Amended Notice of Videotaped 30(b)(6) Deposition to Plaintiff Alfred E. Mann Foundation for Scientific Research | N/A | N/A |
| Exhibit 1083 – AMF Board of Directors web site | N/A | N/A |
| Exhibit 1084 – Letter dated May 21, 1987 to Edward Maker from Alfred E. Mann | AMF023085 | AMF023086 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
767

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 56

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Letter dated July 21, 2003 from Joseph H. Schulman, PhD, President of AMF to Ingeborg Hochmair-Desoyer of MED-EL regarding infringement of U.S. Patent No. 5,609,616 | AB00344 | AB00344 |
| Cochlear Implant Field License Agreement made and effective on May 18, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AMF018352 | AMF018368 |
| Battery-Powered Bion Technology Field License Agreement made and effective on May 18, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AMF045214 | AMF045230 |
| RF Bion Technology Field License Agreement made effective on May 18, 1999 between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AMF045233 | AMF045248 |
| Cochlear Technology License and Royalty Agreement entered as of January 1, 2004, by and between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AMF045254 | AMF045275 |
| License, Royalty and Manufacturing Agreement RF Bion Devices and Services entered into as of January 1, 2004, by and between the Alfred E. Mann Foundation for Scientific Research and Advanced Bionics Corporation | AMF045305 | AMF045334 |
| Alfred E. Mann Foundation for Scientific Research Financial Statements and Independent Auditor's Report Years Ended March 31, 2005, 2004 and 2003 | AMF045607 | AMF045620 |
| Citi Company Flash dated February 12, 2008 for Cochlear Ltd. | COC-3000850 | COC-3000944 |
| Deposition transcript of Theresa Adkins dated December 30, 2008 designated as CONFIDENTIAL under the terms of the Protective Order | N/A | N/A |
| Previously Marked Exhibit 47 – Custom Sound EP (EP5) Product Marketing Specification, E11664MS | COC-2087888 | COC-2087895 |
| Deposition transcript of David Kelsall, M.D. dated December 10, 2008 | N/A | N/A |
| Deposition transcript of Tony Nygard dated October 1, 2008 designated as CONFIDENTIAL under the terms of the Protective Order | N/A | N/A |
| Exhibit 1 – Amended Notice of Videotaped 30(b)(6) Deposition to Cochlear Ltd. and Cochlear Americas | N/A | N/A |
| Exhibit 2 – Second Amended Answer to Complaint and Counterclaims | N/A | N/A |
| Exhibit 3 – SP5 Electrical Functional Specification Document Number: N43504DD | COC-2026366 | COC-2026537 |
| Exhibit 4 – Custom Sound User Manual | COC-2083636 | COC-2083700 |
| Exhibit 5 – CIC4 Electrical Design Specification E10069DD, Issue 4, dated February 22, 2006 | COC-2086758 | COC-2086858 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
768

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 57

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Exhibit 6 – Nucleus 24 and Nucleus Freedom, Screen Shot of Custom Sound 1.3 (Training Mode) | N/A | N/A |
| Exhibit 7 – CI24R Functional Specification dated June 29, 1999, I10466 – Rev C | COC-2012990 | COC-2013019 |
| Exhibit 8 – CIC3 Receiver Stimulator IC Detailed Specification dated May 31, 1996, I10085 – Rev E | COC-2085496 | COC-2085570 |
| Exhibit 9 – CI24RE Implant Electrical Specification | COC-2077260 | COC-2077322 |
| Exhibit 10 – SP12-BTE Equivalence Description, E12120AE | COC-2083778 | COC-2083788 |
| Exhibit 11 – SP12 BTE Main Module Drawing (U22253H-) | COC-2085811 | COC-2085811 |
| Exhibit 12 – CIC3 Receiver Stimulator IC Functional Specification, Document Number: I10085 (Revision 6) dated April 19, 1995 | COC-2085696 | COC-2085719 |
| Exhibit 13 – CPL100B6 Schematic | COC-2085571 | COC-2085695 |
| Exhibit 14 – SP5 Speech Processor Drawing (U00D59H-) | COC-2085727 | COC-2085727 |
| Exhibit 15 – Cochlear Americas – Summary Information from Audited Annual Reports, Schedules 1 – 2 | COC-5001995 | COC-5001998 |
| Exhibit 16 – Cochlear Americas – Reconciliation of Cost of Sale from Sales Cube to Annual Reports, Schedule 3 | COC-5001999 | COC-5002005 |
| Exhibit 17 – Cochlear Americas - Reconciliation of Cost of Sale from Sales Cube to Annual Reports | COC-5002006 | COC-5002009 |
| Exhibit 18 – Cochlear Americas Sales Spreadsheet for F07 Q1 | COC-5001442 | COC-5001480 |
| Exhibit 19 – Cochlear Americas Sales Spreadsheet for F07 Q2 | COC-5001481 | COC-5001517 |
| Exhibit 20 – Cochlear Americas Sales Spreadsheet for F07 Q3 | COC-5001518 | COC-5001557 |
| Exhibit 21 – Cochlear Americas Sales Spreadsheet for F07 Q4 | COC-5001558 | COC-5001598 |
| Exhibit 22 – 06/30/2007 Cochlear Americas Annual Financial Report | COC-5000675 | COC-5000703 |
| Exhibit 23 – 2007 Cochlear Annual Report | COC-5000428 | COC-5000536 |
| Exhibit 24 – 06/30/2002 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000537 | COC-5000561 |
| Exhibit 25 – 06/30/2003 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000562 | COC-5000587 |
| Exhibit 26 – 06/30/2004 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000588 | COC-5000614 |
| Exhibit 27 – 06/30/2005 Cochlear Americas (Wholly Owned by Cochlear Limited) Annual Financial Report | COC-5000615 | COC-5000641 |
| Exhibit 28 – 06/30/2006 Cochlear Americas Annual Financial Report | COC-5000642 | COC-5000674 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
769

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 58

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Deposition transcript of James Findlay Patrick, BA, ME dated December 18, 2008 designated as CONFIDENTIAL ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |
| Exhibit 48 – Declaration of James F. Patrick executed October 29, 2008 | N/A | N/A |
| Exhibit 49 – Internal Cochlear Memorandum dated April 27, 1990 to Jim Patrick, MSH, CND, CMD, MF, RBM, TN, RGJ, and NJI from Andrew Evans Regarding Trip Report – RVEEH, Melbourne – 24 April, 1990 | COC-1009446 | COC-1009448 |
| Exhibit 50 – Letter dated January 30, 1987 to Professor G. M. Clark from Jim Patrick | COC-1001395 | COC-1001396 |
| Exhibit 51 – Memorandum dated February 26, 1988 to Jim Patrick from Peter Seligman | COC-1009356 | COC-1009356 |
| Exhibit 52 – The article "The Development of the Nucleus Freedom Cochlear Implant System," by James F. Patrick, et al., in Trends in Amplification, Vol. 10, No. 4, December 2006, pp.175-200 | AMF004658 | AMF004684 |
| Exhibit 53 – Minutes of International Clinical and R&D Meeting, Sydney, February 3 – 7, 1992 – 2nd Draft | COC-1008724 | COC-1008749 |
| Exhibit 54 – CPL R&D Meeting Notes dated June 21, 1991 | COC-1004595 | COC-1004603 |
| Exhibit 55 – Cochlear Pty Limited SP5 Speech Processor Product Marketing Specification dated May 28, 1991 | COC-1001287 | COC-1001335 |
| Exhibit 56 – Fax dated October 15, 1992 with Notes to M. S. Hirshorn, M. Lehnhardt, D. K. Money, and J. Patrick from R. E. West Regarding Meeting with Professor Clark | COC-1001465 | COC-1001471 |
| Exhibit 57 – Letter dated February 28, 1991 to Chris Daly from Hugh McDermott and Colette McKay | COC-1001521 | COC-1001525 |
| Exhibit 58 – Memorandum dated June 23, 1989 to Hugh McDermott from Jim Patrick | COC-1001437 | COC-1001439 |
| Exhibit 59 – Document entitled, "Advanced Programming" | COC-1006043 | COC-1006060 |
| Exhibit 60 – Meeting with the Food and Drug Administration Notes, March 24, 1994 | COC-2034366 | COC-2034394 |
| Exhibit 61 – Minutes of International Clinical and R&D Meeting, Sydney, February 3 – 7, 1992 – 1st Draft Only | COC-1008750 | COC-1008754 |
| Exhibit 62 – Nucleus 24 Cochlear Implant System Pre-Market Approval Application, Volume 13, Attachments 17-18n, October 31, 1997 | COC-2028637 | COC-2028650 |
| Exhibit 63 – Nucleus 24 Cochlear Implant System Pre-Market Approval Application, Volume 14, Attachments 18o & 18p, October 31, 1997 | COC-2008639 | COC-2008750 |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
770

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 59

| DOCUMENT DESCRIPTION | BEG. BATES | END BATES |
|---|---|---|
| Exhibit 64 – Nucleus System 4 Cochlear Implant System Investigational Testing Authorization Application, October 28, 2004, Cochlear Americas, Volume 3 of 3 | COC-2070422 | COC-2070780 |
| Exhibit 65 – Letter dated October 1, 2003 to Dr. Joseph H. Schulman, PhD from Jack O'Mahoney | COC-2087810 | COC-2087810 |
| Deposition transcript of Scott Rinehart dated December 9, 2008 | N/A | N/A |
| Deposition transcript of Christopher van den Honert dated December 8, 2008 designated as CONFIDENTIAL ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |
| Exhibit 29 – PMA P840024 and P890027 – Nucleus 22 Cochlear Implant System for Adults and Children, PMA P970051, Nucleus 24 Cochlear Implant System, Supplement: Crystal Integrity System, April 16, 2001 | COC-2010823 | COC-2011249 |
| Exhibit 30 – Nucleus News, "Neural Response Telemetry (NRT), Part One," by Carolyn J. Brown, Ph.D. | COC-2006224 | COC-2006225 |
| Exhibit 31 – The article "The Development of the Nucleus Freedom Cochlear Implant System," by James F. Patrick, et al., in Trends in Amplification, Vol. 10, No. 4, December 2006, pp.175-200 | AMF004658 | AMF004684 |
| Exhibit 32 – Cochlear PowerPoint slides "Online Training and Education" | AMF004807 | AMF004871 |
| Exhibit 33 – Transcription of "Overview of Neural Response Telemetry 3.0 – Clinical Applications," presented by Anne Beiter, Director of Education and Training for Cochlear Americas | AMF045707 | AMF045713 |
| Exhibit 34 – Using a Streamlined Programming Method | AMF004787 | AMF004789 |
| Exhibit 35 – Obtaining Impedance Measurements | AMF004772 | AMF004773 |
| Deposition transcript of Joseph H. Schulman dated December 2, 2008 designated as CONFIDENTIAL ATTORNEYS' EYES ONLY under the terms of the Protective Order | N/A | N/A |

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
771

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 60

CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
772

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 61

## Appendix C

## Royalty Rates & License Fees for Medical Device Technology

The focus of this appendix is the compensation terms in license agreements for medical device technology. Specially discussed are royalty rates and up-front license fees.

The information used in this appendix is available in the book, Royalty Rates for Technology, 4th Edition. The chart below summarizes royalty rates for the 101 medical device license agreements reported in the referenced book. Not included in the data reported in this appendix are compensation terms for patent litigation settlements, compensation based on per units royalties and royalty rates based on profit margins. The royalty rates presented in this appendix, range from 0.50% to 20% of sales. They are grouped by rate and then graphed by the frequency of their appearance.



Royalty rates above 10% are rare. In fact, only 8 of the 101 deals represented in the above graph involved royalty rates above 10%. A cumulative analysis of the charted information provides the following insight:

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
773

Alfred E. Mann Foundation for Scientific Research v. Cochlear Americas and Cochlear Ltd.
Expert Damages Opinion of Russell L. Parr
Page 62

| | |
|---|---|
| 34.7% of royalty rates are 3% or less, | 73.3% of royalty rates are 7% or less, |
| 41.6% of royalty rates are 4% or less, | 79.2% of royalty rates are 8% or less, |
| 58.4% of royalty rates are 5% or less, | 82.2% of royalty rates are 9% or less, and |
| 66.3% of royalty rates are 6% or less, | 92.1% of royalty rates are 10% or less |

License fees were found to be part of license agreement compensation terms but not often. Only 19 of the 101 license transactions included an up-front license fees as graphed below:

## Distribution of Up-Front License Fees



- $50,000 - $250,000 (21%)
- $300,000 - $400,000 (26%)
- $500,000 - $600,000 (11%)
- $1,300,000 - $2,000,000 (16%)
- $2,000,000 - $2,500,000 (16%)
- $5,000,000 - $7,500,000 (11%)

Cash payments dominated the character of up-front license fees, with the majority of cash payments being $600,000 or less. Only four of the license transactions included any transfers of stock as part of the licensing compensation.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IPRA, INC

Exhibit 21
774

# STEVENSON REPORT

Exhibit 21

775

## REBUTTAL REPORT OF ROBERT L. STEVENSON, PH.D.

### INTRODUCTION

I have been retained by Connolly Bove Lodge & Hutz LLP ("CBLH"), on behalf of Cochlear Ltd. and Cochlear Americas (collectively "Cochlear"). I understand that U.S. Patent No. 5,609,616 ("the '616 patent") and U.S. Patent No. 5,938,691 ("the '691 patent") are the subject of a lawsuit between the Alfred E. Mann Foundation for Scientific Research ("AMF") and Cochlear. I have been asked to review a January 19, 2009 Expert Witness Report of John Choma, Ph.D. With Respect to Infringement of the Claims of United States Patent No. 5,609,616 and United States Patent No. 5,938,691 ("Professor Choma's Expert Report"), and to prepare the following report providing my opinion regarding whether any claim of the '616 patent or '691 patent evaluated by Professor Choma is infringed by the particular cochlear implants, speech processors, and/or programming systems identified by Professor Choma.

The opinions expressed herein, as well as the bases for those opinions, are based on information currently available to me. I reserve the right to amend or supplement this report if new or additional information is made available to me. The facts set forth in this report are based on my personal review and analysis of the patents in suit, Professor Choma's Report, documents describing the accused products, and the accused products, as specifically identified below, and I would competently testify as to these facts if called upon to do so.

1

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
776

## MY EDUCATION, EXPERIENCE, PRIOR TESTIMONY AND COMPENSATION

My education and experience, prior testimony, and compensation were provided in
a previous report dated January 19, 2009 that I prepared in connection with the lawsuit
referenced above, and which can be consulted for that information.

## MATERIAL REVIEWED

Prior to drafting and executing this report, in addition to the material I reviewed in
preparation for my earlier report, I reviewed Professor Choma's Report, including the
documents cited therein, Cochlear documents bates numbered COC-2085495 to COC-
2091520, and documents printed from hard-drives (labeled COC-6000000 and COC-
6000001).  I also inspected various cochlear implants, sound processors, interface cards,
and other hardware, and various discs with software, including Custom Sound Suite 2.0,
SP5 and SP12, at the offices of CBLH.  I also had conversations with various Cochlear
personnel, including Tony Nygard, Andrew Botros, Leigh Davey, and Brett Swanson.

## GENERAL DESCRIPTION OF THE PATENTS IN SUIT

The claims of the '691 patent are directed to cochlear implant systems with back
telemetry, including, among other things, (1) the use of different frequencies for the
transmissions from the sound processor to the cochlear implant and for the back telemetry
transmissions from the cochlear implant to the sound processor, (2) pulse width control of
the stimulation signals (or pulses) applied to the stimulating electrodes of the cochlear
implant, (3) frequency control of the stimulation signals applied to the stimulating
electrodes of the cochlear implant, and (4) power control of the transmissions from the
sound processor to the cochlear implant.

2

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
777

The claims of the '616 patent are directed to a tester and testing method for a cochlear implant system including, among other things, back telemetry.

## GENERAL DESCRIPTION OF COCHLEAR'S PRODUCTS

The Cochlear implants involved in this lawsuit can be grouped according to the custom ASIC used in the implants.  There are two such ASICs in the accused implants, one designated CIC3 and the other designated CIC4.

The custom chip designated as CIC3 (Cochlear Implant Chip 3) is found in the implants designated as CI24M and CI24R, which are known as Nucleus 24 implants.  For the purposes of the issues in this lawsuit, the CI24M and CI24R are the same.  The CI24R repackaged the electrical circuitry of the CI24M implant into a smaller package.  The CI24R uses the same extra-cochlear electrodes as the CI24M, and can use the same intra-cochlear electrode array as the CI24M, or a curly intracochlear electrode array (called Contour or Contour Advanced).

The custom chip designated as CIC4 (Cochlear Implant Chip 4) is found in the implants designated as CI24RE, which are known as Nucleus Freedom implants.  The CI24RE is sold with straight or curly intracochlear electrode arrays, similar to the Nucleus 24 line of implants.  The CI24RE packaging is the same as that of the CI24R.

The Cochlear speech processors involved in this lawsuit are SP5 (Speech Processor 5, commercially known as the SPrint speech processor), and the SP12 (Speech Processor 12, commercially known as the Freedom speech processor).  The SP5 can be used with the Nucleus 24 line of implants (CI24M and CI24R).  The Nucleus Freedom Speech Processor (SP12) can be used with the Nucleus Freedom implants (CI24RE) and

3

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
778

is backward compatible (i.e., can be used) with the Nucleus 24 implants (CI24M and CI24R).

The speech processors are programmed with an algorithm to process the sound detected by a microphone.  The sound processing converts the audio signals into signals representing the audio information detected by the microphone and corresponding signals to be applied to the intracochlea electrodes to stimulate the auditory nerves inside the cochlea.  The sound processing strategy is adjusted to account for the individual differences of each implant recipient, such as the recipient's sensitivities to electrical stimulation applied to the intra-cochlear electrodes.  Data gathered during this adjustment process are used to further program (i.e., "map") the sound processor to compute signal values corresponding to stimulation signals that are appropriate for the implant recipient's individual sensitivities.  This individual adjustment is frequently called "mapping".

Two of Cochlear's programming systems are at issue in this lawsuit.  Cochlear's WinDPS (Windows based Diagnostic and Programming System) and Custom Sound. WinDPS can be used to program the Sprint (SP5) speech processor.  Custom Sound can be used to program both the Sprint (SP5) speech processor and the Nucleus Freedom (SP12) speech processor.

As indicated above, each implant uses an intracochlear electrode array, which comprises 22 separate electrodes.  Each implant also has two extra-cochlear electrodes. The implant receives information from the speech processor, and in response to the received information, generates stimulation signals that are delivered to at least one intracochlear electrode.  The implant also has back telemetry capability, which can be implemented to communicate binary or voltage information from the implant for use by the programming system.

4

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
779

## MISCELLANEOUS CONSIDERATIONS

### Means plus function limitations

I have been advised that a claim limitation written in a "means-plus-function" form encompasses the structure disclosed in the specification for performing the recited function, and any equivalent structure.

### Legal principles regarding infringement

I have been advised that, in general, a two-step process is used to determine whether a patent claim is infringed by an accused device or method. The first step is to construe the meaning of claim terms. This step is frequently referred to as claim construction. Claim construction is a matter of law for the Court. I have been advised that, at this time, the Court has not yet issued a claim construction ruling in this case. For the purpose of this report, I have been asked to assume certain claim constructions, in some instances alternative claim constructions, proposed by AMF or Cochlear.

I have been advised that the second step of an infringement analysis is to compare the asserted patent claim (as construed) with the accused device or method. I have been advised that, to infringe a claim of a patent, an accused device or method must satisfy every claim limitation. I understand that, to infringe a dependent claim, an accused device or method must satisfy every claim limitation of the dependent claim, and every limitation of the claim or claims upon which the dependent claim depends.

I have been advised that, to literally infringe a claim of a patent, an accused device or method must satisfy every claim limitation exactly. For limitations interpreted to be in a "means-plus-function", an accused device may literally satisfy that limitation if it performs

5

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
780

the identical function, while using structure or acts that are identical or equivalent to those

described in the specification that perform the recited function.


## CLAIMS 6-9 AND 14 OF THE '691 PATENT

According to Professor Choma's report, claims 6-9 and 14 of the '691 patent are

infringed by Cochlear's implants and processors.  I respectfully disagree with Professor

Choma.

Independent claims 6, 9 and 14 and dependent claims 7-8 of the '691 patent recite

as follows:

6.    A cochlea stimulation system, comprising:
audio signal receiving means;
an externally wearable signal processor (WP) for receiving and processing
the audio signals received by the audio signal receiving means and including
means for generating data indicative of the audio signal;
means for transmitting the data to an implanted cochlea stimulator (ICS), the
ICS including:
means for receiving transmissions from the WP,
processor means for processing such transmissions to generate stimulation
pulses and for controlling the pulse width of the stimulation pulses,
a plurality of electrically isolated capacitor-coupled cochlea stimulating
electrodes for receiving the stimulation pulses,
means in the ICS responsive to data from the WP for selectively monitoring
at least one of the electrodes or voltages in the ICS and for generating ICS-status-
indicating signals, and
means in the ICS for transmitting such ICS-status-indicating signals to the
WP; and
means in the WP for receiving and processing the ICS-status-indicating
signals.

7.    The system of claim 6 further including
means for transmitting power signals from the WP to the ICS,
means in the ICS for processing the power signals and for generating power
for the ICS, and
means in the WP responsive to at least a portion of the status indicating
signals for controlling the power level of transmissions to the ICS.

8.    The system of claim 7 further including means in the ICS and
responsive to the power signals for generating a plurality of voltages for powering
different components in the ICS.

6

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
781

9.    A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

a processor for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means for selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes,

means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals,

means for transmitting such ICS-status-indicating signals to the WP; and

means in the WP for receiving and processing the ICS-status-indicating signals.

14.    A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals therefrom, and

means for transmitting such ICS status indicating signals to the WP;

means in the WP for receiving and processing the ICS status indicating signals;

means for transmitting power signals from the WP to the ICS;

means in the ICS for processing the power signals and generating power for the processor; and

means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS.

7

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
782

As some limitations or variants thereof appear in multiple claims, I will address similar limitations together.

Claims 6, 9 and 14 of the '691 patent each recite as follows:

| Claim 6 of '691 patent | Claim 9 of '691 patent | Claim 14 of '691 patent |
|---|---|---|
| ... the ICS including: | ... the ICS including: | ... the ICS including: |
| means for receiving transmissions from the WP .... | means for receiving transmissions from the WP .... | means for receiving transmissions from the WP .... |

I have been asked to assume that the structure in the implantable cochlear stimulator (ICS) that performs the function of "receiving transmissions from the WP" corresponds to a receiver connected to main coil/antenna, which is separate from a telemetry coil/antenna, and equivalents. Assuming this proposed construction of separate receiving and back telemetry coils/antennae in the ICS, Cochlear's implants do not have separate receiving and back telemetry coils/antennae. Specifically, the Nucleus 24 implants (CI24M and CI24RE) do not have separate receiving and back telemetry coils/antennae, but rather have only one antenna for receiving and transmitting. See, e.g., Hybrid Assembly, CI24R, S01015H- (Schematic), COC-2085720; Final Assembly, CI24M, S16232H- (Schematic), COC-2085721; CIC3 Receiver Stimulator IC Functional Specification, Document Number I10085 (Revision 6, April 19, 1995) (COC-2085696 - COC-2085719), at COC-2085700; CIC3 Receiver Stimulator IC Detailed Specification, Document I10085 - Rev E, May 31, 1996 (COC-2085496 - COC-2085570), at COC-2085508; CIC3 Receiver Stimulator IC Functional Specification, Document Number I10085 (Revision 6, April 19, 1995) (COC-2090113 - COC-2090136), at COC-2090117; CIC3 Receiver Stimulator IC Detailed Specification, Document I10085 - Rev E, May 31, 1996 (COC-2090137 - COC-2090211), at COC-2090149.

8

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
783

Similarly, the Nucleus Freedom implants (CI24RE) do not have separate receiving and back telemetry coils/antennae, but rather have only one antenna for receiving and transmitting. See, e.g., CIC4 Electrical Design specification, Document E10069DD, Issue 4, Feb. 22, 2006 (COC-2086758 - COC-2086858) at COC-2086832; CIC4 Cochlear Implant IC Functional Specification, Document I10401, Rev. N, December 18, 2000 (produced in Hard Drive COC-6000001), § 4, Fig. 1 (this document was cited by Professor Choma).

Based on the above, it is my opinion that Cochlear's Nucleus 24 implants and Nucleus Freedom implants have only a single coil/antenna for receiving and transmitting signals, and do not have separate receiving and back telemetry coils/antennae.

Additionally, it is my opinion that a single antenna for receiving and transmitting is not equivalent to an antenna for receiving and a separate antenna for transmitting. The '691 patent discusses a prior art cochlear implant system described in U.S. Patent No. 4,947,844, which made use of a single antenna for receiving and transmitting. The '691 patent criticized such system for using a single antenna for receiving and transmitting:

> The system described in the 844 patent also includes in the implanted receiver/stimulator a transmitter for telemetering one electrode voltage, measured during stimulation, to an external receiver for monitoring and analysis as an indicator of proper operation of the implanted stimulator. The transmitter comprises an oscillator operating at a frequency of about 1 MHz. The output of the oscillator is coupled to the implant's receiving coil and demodulated to recover the selected voltage waveforms. Unfortunately, such a telemetry system is not only limited to the monitoring of one voltage, but the ***simultaneous transmission of the telemetry***

9

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
784

> *signal and reception of the input carrier signal as described will result in*
>
> *undesired modulation and possible loss of input data.*

'691 patent, col. 2, ll. 49-62.  Thus, the '691 patent explains that a single antenna as used in the accused products does not facilitate simultaneous reception and transmission.  This drawback of a single antenna can be overcome by using two different antenna systems. That is the approach used in the patents in suit.

When using a single antenna system, a different approach must used.  One approach is to use the single antenna to receive during one time interval and to transmit during a separate time interval, a concept known as time multiplexing.  Time multiplexing is completely different than simultaneously transmitting and receiving.  The accused Cochlear implants use a single antenna and time multiplexing to receive signals and transmit back telemetry signals during separate time intervals.

Additionally, to facilitate simultaneous reception and transmission, the '691 patent describes a system that uses two different frequencies, one for signals transmitted from the speech processor to the implant, and another for the back telemetry signals transmitted from the implant to the speech processor.  To accommodate different carrier transmission frequencies, the '691 patent describes using two different coils/antennae in the implant.  The accused Cochlear products make use of a single frequency (5 MHz). Thus, the single antenna, single frequency, time multiplexing system in the accused Cochlear implants use a completely different structure to perform a completely different function in a completely different way than the two antenna, two frequency system which is capable of simultaneously transmitting and receiving, as described in the '691 patent. The two systems are not equivalent.

10

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
785

Consequently, Cochlear's Nucleus 24 implants (CI24R and CI24M) and Nucleus Freedom implants (CI24RE) do not satisfy the "means" in the ICS for receiving transmissions from the WP recited in claims 6, 9 and 14 of the '691 patent.

Claim 14 of the '691 patent recites as follows:

### Claim 14 of '691 patent
... the ICS including:

...

processor means for processing such transmissions to generate stimulation signals ....

I have been asked to assume that the structure in the implantable cochlear stimulator (ICS) that performs the function of "processing such transmissions to generate stimulation signals" corresponds to a regulator, voltage reference, voltage regulator error amplifier, data decoder, VCO, loop filter, bit and word counters, initialization, serial to parallel converter, data amplitude latch, command latch, word strobe generator, D/A current reference, exponential D/A converter, analog mux, voltage down-converter, eight storage/refresh capacitors, and eight current source FETs, as shown in Figure 2 of the '691 patent or a series regulator, voltage error amplifier, voltage reference, down converter clock, voltage downconverter (including 5 off-chip capacitors), powerbad detector, initialization, parity error detector, multiple chip control, data conditioner, clock decoder, serial to parallel converter, word strobe generator, polarity and amplitude data latch, command latch, command decoder, current reference generator, logarithmic D to A converter, analog multiplexer, eight refresh voltage controls, eight switching transfer capacitors, eight refresh voltage capacitors, eight current sources, and refresh voltage logic, as shown in Figure 4 of the '691 patent, and equivalents, which I understand is the structural interpretation for this limitation proposed by Cochlear.

11

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
786

I note that the first alternative structure includes a voltage regulator, and a separate voltage downconverter that converts the regulated voltage to several lower voltages. A voltage from the downconverter is transferred to a storage/refresh capacitor which is used in cooperation with a current source in each of the eight independent and isolated output stages to generate stimulation signals, as illustrated in Figure 2.

I note that the second alternative structure also includes a voltage regulator and a separate voltage downconverter that converts the regulated voltage to several lower voltages. A voltage from the downconverter is applied or transferred to one of eight switching transfer capacitors, and that voltage in turn is applied or transferred to one of eight refresh voltage capacitors, each one of which is used in cooperation with a current source in each of the eight independent and isolated output stages to generate stimulation signals, as illustrated in Figure 4 (which combines Figures 4A-4H). Refresh voltage logic is coupled to the voltage downconverter and controls the value of the voltage from the voltage downconverter that is applied to the switching transfer capacitors. The multiple chip control enables multiple chip embodiments in a master-slave arrangement, and provides enabling or initialization signals in single chip embodiments. '691 patent, col. 12, ll. 20-28; co. 24, ll. 50-59.

Turning to the Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and the Nucleus Freedom implants (CI24RE implants with CIC4 chips), I am unable to find a voltage downconverter coupled to eight storage/refresh capacitors, or eight current source FETs used with the eight storage/refresh capacitors in eight independent isolated output stages to generate the stimulation signals, as illustrated in Figure 2 of the '691 patent.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
787

Similarly, I am unable to find in the Nucleus 24 or Nucleus Freedom implants a voltage downconverter coupled to eight switching transfer capacitors, eight refresh voltage capacitors, eight current source FETs used with the eight refresh capacitors in eight independent isolated output stages to generate the stimulation signals, refresh voltage logic coupled to the voltage downconverter, or a multiple chip control, as illustrated in Figure 4 of the '691 patent.

Additionally, it is my opinion that the accused products do not have equivalent structures. One of the significant differences is that the alleged invention uses the voltage downconverter to vary and optimize the effective voltage supply available to each of the output stages, and each of the output stages has its own current source, and its own storage capacitor which serves as an independent power source for that output stage, permitting simultaneous and independent stimulation of multiple electrode pairs. The accused products do not have a similarly variable voltage supply available at the output stages, a separate storage capacitor for each output stage serving as an independent power source or an independent current source for each output stage, and thus cannot provide simultaneous and independent stimulation of multiple electrode pairs. Additionally, the accused products do not have any multiple chip capability.

For at least these reasons, the Nucleus 24 and Nucleus Freedom implants do not have structures that are equivalent to the alternative structures illustrated in Figure 2 and Figure 4 A-H. Thus, the Nucleus 24 and Nucleus Freedom implants do not satisfy the ICS processor "means" recited in claim 14 of the '691 patent.

13

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
788

Claim 9 of the '691 patent recites as follows:

<u>Claim 9 of '691 patent</u>

... the ICS including:

...

a processor for processing such transmissions to
generate stimulation signals ....

I have been asked to assume that the recited "processor for processing such
transmissions to generate stimulation signals" corresponds to a regulator, voltage
reference, voltage regulator error amplifier, data decoder, VCO, loop filter, bit and word
counters, initialization, serial to parallel converter, data amplitude latch, command latch,
word strobe generator, D/A current reference, exponential D/A converter, analog mux,
voltage down-converter, eight storage/refresh capacitors, and eight current source FETs,
as shown in Figure 2 of the '691 patent or a series regulator, voltage error amplifier,
voltage reference, down converter clock, voltage downconverter (including 5 off-chip
capacitors), powerbad detector, initialization, parity error detector, multiple chip control,
data conditioner, clock decoder, serial to parallel converter, word strobe generator, polarity
and amplitude data latch, command latch, command decoder, current reference
generator, logarithmic D to A converter, analog multiplexer, eight refresh voltage controls,
eight switching transfer capacitors, eight refresh voltage capacitors, eight current sources,
and refresh voltage logic, as shown in Figure 4 of the '691 patent, which I understand is
the interpretation for this limitation proposed by Cochlear.

As these two alternative constructions I have been asked to assume are the same
as the alternative assumed structural "means" in the implantable cochlear stimulator (ICS)
that perform the function "processing such transmissions to generate stimulation signals"
recited in claim 14 of the '691 patent and analyzed above, the analysis here also is the
same, and I refer the reader to that analysis.  For at least the reasons given there, the

14
Contains or Refers to Material Designated as
Confidential or Attorneys' Eyes Only

Exhibit 21
789

Nucleus 24 and Nucleus Freedom implants do not have structures that are equivalent to the alternative structures illustrated in Figure 2 and Figure 4 A-H. Thus, the Nucleus 24 and Nucleus Freedom implants do not satisfy the ICS processor recited in claim 9 of the '691 patent.

Claim 6 of the '691 patent recites as follows:

### Claim 6 of '691 patent

... the ICS including:

...

processor means for processing such transmissions to generate stimulation pulses and for controlling the pulse width of the stimulation pulses ....

I have been asked to assume that the structure in the implantable cochlear stimulator (ICS) that performs the function of "processing such transmissions to generate stimulation pulses and for controlling the pulse width of the stimulation pulses" corresponds to a regulator, voltage reference, voltage regulator error amplifier, data decoder, VCO, loop filter, bit and word counters, initialization, serial to parallel converter, data amplitude latch, command latch, word strobe generator, D/A current reference, exponential D/A converter, analog mux, voltage down-converter, eight storage/refresh capacitors, and eight current source FETs (as previously discussed above) plus a pulse width control (comprising two downcounters) and eight electrode switching matrices, as shown in Figure 2 of the '691 patent, or a series regulator, voltage error amplifier, voltage reference, down converter clock, voltage downconverter (including 5 off-chip capacitors), powerbad detector, initialization, parity error detector, multiple chip control, data conditioner, clock decoder, serial to parallel converter, word strobe generator, polarity and amplitude data latch, command latch, command decoder, current reference generator, logarithmic D to A converter, analog multiplexer, eight refresh voltage controls, eight

15

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21

790

switching transfer capacitors, eight refresh voltage capacitors, eight current sources, and refresh voltage logic (as previously discussed above) plus a pulse width control (comprising two downcounters) and eight electrode switching matrices, as shown in Figure 4 of the '691 patent.

These two alternative constructions I have been asked to assume are the same as the alternative assumed structural "means" in the implantable cochlear stimulator (ICS) that perform the function "processing such transmissions to generate stimulation signals" recited in claim 14 of the '691 patent, plus a pulse width control (comprising two downcounters) and eight electrode switching matrices. The addition of pulse width control (comprising two downcounters) and eight electrode switching matrices does not alter the noninfringement analysis of the remaining structure from claim 14.

Consequently, the analysis is the same as the analysis above regarding the two alternative assumed structural means in the implantable cochlear stimulator (ICS) that perform the function "processing such transmissions to generate stimulation signals" recited in claim 14 of the '691 patent, and I again refer the reader to that analysis. For at least the reasons given there, the Nucleus 24 and Nucleus Freedom implants do not satisfy the ICS processor "means" recited in claim 6 of the '691 patent.

Claims 6, 9 and 14 of the '691 patent each recite as follows:

| Claim 6 of '691 patent | Claim 9 of '691 patent | Claim 14 of '691 patent |
|---|---|---|
| ... the ICS including: ... | ... the ICS including: ... | ... the ICS including: ... |
| a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation pulses .... | a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals .... | a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals .... |

16

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
791

I understand that the parties agree that "plurality", as recited in claims 1 and 12 of the '616 patent and claims 1, 6, 9 and 14 of the '691 patent, means "more than one."

I have been asked to first assume that the limitation "a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals" means more than one electrode used in stimulating the cochlea that are (a) isolated from (i) the current flow in other electrodes, or (ii) other ICS circuitry; and (b) coupled with a capacitor, which is the construction proposed by AMF.

Cochlear's Nucleus 24 implants (CIC24R and CIC24M with the CIC3 chip) have 22 intra-cochlear electrodes that are not capacitor coupled, and two extra-cochlear electrodes that are capacitor coupled. See, e.g., Hybrid Assembly, CI24R, S01015H- (Schematic), COC-2085720; Final Assembly, CI24M, S16232H- (Schematic), COC-2085721. Because only the two extra-cochlear electrodes are capacitor coupled, the subject limitation cannot be satisfied unless "more than one electrode used in stimulating the cochlea" is an extra-cochlear electrode. Professor Choma seems to agree that this requirement cannot be satisfied unless the Nucleus 24 implants are used in a particular "monopolar" mode. See, e.g., CIC3 Receiver Stimulator IC Detailed Specification, I10085 - Rev E, May 31, 1996 (COC-2085496 - COC-2085570), p. COC-2085501; CIC3 Receiver Stimulator IC Functional Specification, Document Number I10085 (Revision 6, April 19, 1995) (COC-2085696 - COC-2085719), p. COC-2085705. In most monopolar modes available in the Nucleus 24 implants, only one extra-cochlea electrode is "used in stimulating the cochlea." See, e.g., CIC3 Receiver Stimulator IC Detailed Specification, I10085 - Rev E, May 31, 1996 (COC-2085496 - COC-2085570), p. COC-2085531-2085532. While Professor Choma has pointed to testimony that unspecified monopolar modes may be a preferred or

17

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
792

recommended mode of operation, I am not aware that Professor Choma has pointed to
any evidence of any actual use of any particular monopolar mode.

Perhaps more importantly, in all modes including monopolar mode, the active
electrode, the reference electrode, and all of the non-selected intra-cochlea electrodes are
shorted circuited together to VDD between stimulation frames and during a portion of each
stimulation frame (the inter-stimulus gap).  See CI24M Functional Specification, Document
No. I10372AE (COC-2090212 - COC-2090237), p. COC-2090223; CI24R Functional
Specification, Document I10466AG, May 17, 2005 (COC-2090238 - COC-2090267), p.
COC-2090253.  Thus, the Nucleus 24 implants do not have electrodes used in stimulating
the cochlea that are "isolated from (i) the current flow in other electrodes or (ii) other ICS
circuitry."  Additionally, a structure that periodically shorts electrodes together and to a
common voltage supply is substantially different structurally and functionally from a
structure in which the electrodes are "isolated from (i) the current flow in other electrodes
or (ii) other ICS circuitry."

For at least the above-identified reasons, the Nucleus 24 implants do not have
"more than one electrode used in stimulating the cochlea that are (a) isolated from (i) the
current flow in other electrodes, or (ii) other ICS circuitry; and (b) coupled with a
capacitor."

Turning to Cochlear's Nucleus Freedom implants (CI24RE with CIC4 chip), these
implants also have 22 intra-cochlear electrodes that are not capacitor coupled, and two
extra-cochlear electrodes that are capacitor coupled.  See, e.g., CI24RE (Discreet Diode)
ELECTRONIC ASSEMBLY, Document No. U22118H- (COC-2085801); CI24RE Implant
Electrical Specification, Document E10527RD, Feb. 22, 2006 (COC-2085739 - COC-
2085800), p. COC-2085800; CIC4 Electrical Design specification, E10069DD, Issue 4,

Feb. 22, 2006 (COC-2086758 - COC-2086858), p. COC-2086832. Professor Choma again appears to agree that the requirement of "more than one electrode used in stimulating the cochlea that are ... coupled with a capacitor" cannot be satisfied unless the Nucleus Freedom implants are used in a particular "monopolar" mode.

In many monopolar modes available for the Nucleus Freedom implants, only one extra-cochlea electrode is "used in stimulating the cochlea." See, e.g., CI24RE Implant Electrical Specification, Document E10527RD, Feb. 22, 2006 (COC-2085739 - COC-2085800), p. COC-2085746; CIC4 Electrical Design specification, E10069DD, Issue 4, Feb. 22, 2006 (COC-2086758 - COC-2086858), p. COC-2086779. While Professor Choma has pointed to testimony that unspecified monopolar modes may be a preferred or recommended mode of operation, I am not aware that Professor Choma has pointed to any evidence of any actual use of any particular monopolar mode.

Again, perhaps more importantly, in all modes including monopolar mode, the active electrode, the reference electrode, and all of the non-selected intra-cochlea electrodes are shorted circuited together to VDD_OS (which is connected to VDD at all times except during NRT) between stimulation frames and during a portion of each stimulation frame (the inter-stimulus gap). See, e.g., CI24RE Implant Electrical Specification, Document E10527RD, Feb. 22, 2006 (COC-2085739 - COC-2085800), p. COC-2085746; CIC4 Electrical Design specification, E10069DD, Issue 4, Feb. 22, 2006 (COC-2086758 - COC-2086858), p COC-2086779; CIC4 Cochlear Implant IC Functional Specification, Document I10401, Rev. N, December 18, 2000 (produced in Hard Drive COC-6000001), § 4.3.4 (this document was cited by Professor Choma).

Perhaps most notably, all of the electrodes in the Nucleus Freedom implants are connected together via five mega-ohm (5 MΩ) resistors. See, e.g., CI24RE Implant

19

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
794

Electrical Specification, Document E10527RD, Feb. 22, 2006 (COC-2085739 - COC-2085800), p. COC-2085767; CIC4 Electrical Design specification, E10069DD, Issue 4, Feb. 22, 2006 (COC-2086758 - COC-2086858), pp. COC-2086799, COC-2086845; see also See Cochlear document W44012ED CIC4 ASIC Design Documents (COC-2085821 - COC-2086757), section Documentation of the Block of Output Switches (COC-2085850 - COC2085875), p. COC-2085860 (5 meg resistor rfloat); see also in same document W44012ED pp. COC-2086748, COC-2086749).  Thus, the Nucleus Freedom implants do not have electrodes used in stimulating the cochlea that are "isolated from (i) the current flow in other electrodes or (ii) other ICS circuitry."  Additionally, a structure that periodically shorts electrodes together and to a common voltage supply is substantially different structurally and functionally from a structure in which the electrodes are "isolated from (i) the current flow in other electrodes or (ii) other ICS circuitry."  Furthermore, a structure in which all of the electrodes are connected together via a resistor is substantially different structurally and functionally from a structure in which the electrodes are "isolated from (i) the current flow in other electrodes or (ii) other ICS circuitry."

For at least the above-identified reasons, the Nucleus Freedom implants do not satisfy the requirement of "more than one electrode used in stimulating the cochlea that are (a) isolated from (i) the current flow in other electrodes, or (ii) other ICS circuitry; and (b) coupled with a capacitor."

I also have been asked to assume, alternatively, that the same limitation, i.e., "a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals" means more than one electrode implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue that are directly connected to a capacitor and electrically isolated from the power supplies, from logic circuitry and from

20

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
795

other channels within the implanted cochlear stimulator (ICS) tissue-stimulating electrodes.  This alternative interpretation was proposed by Cochlear.

All of the analysis above regarding the proposed interpretation from Professor Choma applies here as well, and is incorporated herein.  Additionally, as discussed above, the Nucleus 24 implants and the Nucleus Freedom implants do not have any intra-cochlear electrodes that are directly connected to a coupling capacitor.  For all of the previous reasons and these additional reasons, the Nucleus 24 implants and Nucleus Freedom implants do satisfy the requirement of "more than one electrode implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue that are directly connected to a capacitor and electrically isolated from the power supplies, from logic circuitry and from other channels within the implanted cochlear stimulator (ICS) tissue-stimulating electrodes."  Specifically, a structure in which the intra-cochlear electrodes are not directly connected to a capacitor and are periodically electrically shorted together and to a common power supply is substantially different structurally and functionally from a structure that requires "more than one electrode implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue that are directly connected to a capacitor and electrically isolated from the power supplies, from logic circuitry and from other channels within the implanted cochlear stimulator (ICS) tissue-stimulating electrodes."  Furthermore, a structure in which all of the electrodes are connected together via a resistor is substantially different structurally and functionally from a structure that requires "more than one electrode implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue that are directly connected to a capacitor and electrically isolated from the power supplies, from logic circuitry and from other channels within the implanted cochlear stimulator (ICS) tissue-stimulating electrodes."

21

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
796

Claim 9 of the '691 patent recites as follows:

**Claim 9 of '691 patent**

... the ICS including:

...

means for selectively controlling the frequency at which
stimulating signals are applied to selected ones of the
electrodes ....

I have been asked to first assume that the structure corresponding to the "means
for selectively controlling the frequency at which stimulating signals are applied to selected
ones of the electrodes" is a part of a processor that can process signal frames of varying
length, which I understand is AMF's proposed construction.

Proceeding with that assumption, I note that "a part of a processor that can process
signal frames of varying length" does not necessarily perform the claimed function of
"selectively controlling the frequency at which stimulation signals are applied to selected
ones of the electrodes."  In fact, the "signal frames of varying length" to which Professor
Choma refers are generated by the external speech processor, not the implanted cochlear
stimulator (ICS).  Assuming a signal frame of a particular length transmitted by the speech
processor provides some form of selective control of the stimulation frequency, the
function of "selectively controlling" the stimulation frequency is performed in the external
speech processor, not the implant.  In my opinion, the Nucleus 24 implants (CI24R and
CI24M implants with CIC3 chips) and the Nucleus Freedom implants (CI24RE implants
with CIC4 chips) neither select nor control the stimulation frequency.  The selection and
control of the stimulation frequency takes place in the speech processor.  The Nucleus 24
and Nucleus Freedom implants merely respond to the signals transmitted by their
companion speech processors.  Thus, regardless of the structural interpretation of this
claim limitation, the Nucleus 24 and Nucleus Freedom implants do not satisfy the claimed

22

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
797

function of "selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes."

Second, I have been asked to assume the structure that performs the "means for selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes" corresponds to the entire ICS except for back-telemetry circuitry, that is the "means for receiving" structure plus the "processor means" structure discussed above in connection with the '691 patent, plus the "means for applying" structure discussed below in connection with the '616 patent.  I refer the reader to my discussions of those structures contained elsewhere in this report.  As I explained in my discussions of those structures, the Nucleus 24 and Nucleus Freedom implants do not satisfy the "means for receiving" structure, or the "processor means" structure, or the "means for applying" structure.  Consequently, based on the assumed structure, it is my opinion that the Nucleus 24 and Nucleus Freedom do not satisfy the "means for selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes."

Claims 6, 9 and 14 of the '691 patent each recite as follows:

| Claim 6 of '691 patent | Claim 9 of '691 patent | Claim 14 of '691 patent |
|---|---|---|
| ... the ICS including: ... | ... the ICS including: ... | ... the ICS including: ... |
| means in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals .... | means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals .... | means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals therefrom .... |

The recited "means" must perform the function of selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals in response to "data" from the WP.  The "data" recited in this limitation appears to refer to the

23

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
798

"data indicative of the audio signal" recited in earlier limitations (e.g., "means for generating data indicative of the audio signal"; "means for transmitting the data to an implanted cochlea stimulator (ICS)").  Functionally, the Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and Nucleus Freedom implants (CI24RE implants with CIC4 chips) do not selectively monitor any electrode or voltage in response to data indicative of the audio signal sent by the speech processor.

I have also been asked to assume that the structural "means" in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signal includes a telemetry function decoder, telemetry multiplexer, A/D converter and telemetry modulator.  The accused Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and Nucleus Freedom implants (CI24RE implants with CIC4 chips) do not use an A/D converter.  That is because the back telemetry systems used in the accused products do not transmit a digitized value as an ICS status indicating signal, and instead transmit time information using pulse position modulation techniques.  See, e.g., CIC3 Receiver Stimulator IC Detailed Specification, I10085 - Rev E, May 31, 1996 (COC-2085496 - COC-2085570), p. COC-2085504, COC-2085559 - COC2085560; CI24M Functional Specification, Document No. I10372AE (COC-2090212 - COC-2090237), pp. COC-2090227, COC-2090230; CI24R Functional Specification, Document I10466AG, May 17, 2005 (COC-2090238 - COC-2090267), pp. COC-2090257, COC-2090260; CI24RE Implant Electrical Specification, Document E10527RD, Feb. 22, 2006 (COC-2085739 - COC-2085800), pp. COC-2085761, COC-2085757, COC-2085759; CIC4 Built-in Testability Features (COC-2086721 - COC-2086746), p. COC-2086741; CIC4 Electrical Design specification,

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21

E10069DD, Issue 4, Feb. 22, 2006 (COC-2086758 - COC-2086858), pp. COC-2086792,
COC-2086794, COC-2086801.

Additionally, there is no equivalence between an A/D converter and the pulse
position modulation circuitry used by the accused products. The pulse position
modulation circuitry generally includes a ramp generator and sampling circuitry connected
to a comparator which triggers a pulse generation circuit.

The relevant details about CIC3 voltage back telemetry can be found in the
document entitled CIC3 Receiver Stimulator IC Detailed Specification, Document I10085 -
Rev E, May 31, 1996 (COC-2090137 - COC-2090211), at COC-2090198 - COC-2090204
(quoted below), and the schematics referenced therein (which are found at COC-2085632
- COC-2085638).

In the CIC3 the function of the telemetry block is to generate two RF pulses
separated by a time interval linearly proportional to a sampled internal voltage. The RF
pulses are generated by driving a step to an external capacitor that is connected to a
tuned LC circuit. To sample and return a voltage value (voltage mode), a single voltage is
sampled during the frame and transmitted at the end of the second stimulation phase. The
carrier time out (CTO) signal both triggers the sending of the first RF pulse and a voltage
measurement circuit that generates a delay in proportion to the sampled voltage. At the
end of the delay the second RF pulse is generated. It is also possible to sample and
transmit an amplified differential signal (EAP mode) of two sense electrodes.

The telemetry controller (TC.SCH) consists of five blocks:

- Input multiplexer (TM.SCH) [COC-2085634]
- Telemetry converter (TEL.SCH) [COC-2085635]
- Receiver blank monostable (TRB.SCH) [COC-2085636]
- Internal oscillator (TIO.SCH) [COC-2085637]
- Timing control (TT.SCH) [COC-2085638]

25

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
800

The first three blocks performs the basic telemetry operation. The input multiplexer
selects the voltage to be sampled by the telemetry converter. The telemetry converter
samples the voltage and generates the appropriate delay. The Receiver blank circuit is
blanking the Data receiver during telemetry transmission. The Internal oscillator is a
programmable ramp oscillator and the Timing control generates the control signals for the

For CIC4, all voltage telemetry is produced using Pulse Width Modulation (PWM)
techniques.   First, a voltage is measured by a Voltage Amplifier either on an electrode or
internal to the CIC4 ASIC.  See Cochlear document W44012ED CIC4 ASIC Design
Documents (COC-2085821 - COC-2086757), section 8, vtel_amp (COC-2086067 - COC-
2086094).  This amplifier has four programmable gains, 1, 0.5, 0.2 and 0.1.  At an
appropriate time that voltage is compared with that of a voltage ramp.  The voltage ramp is
calibrated so that it rises in value from zero volts to two volts over a period of 38.4us.  See
Cochlear document W44012ED CIC4 ASIC Design Documents (COC-2085821 - COC-
2086757), section 11, PWM (COC-2086135 - COC-2086170).  Once that comparison
starts, the output of the PWM goes high and turns on an output driver switch.  See
Cochlear document W44012ED CIC4 ASIC Design Documents (COC-2085821 - COC-
2086757), section 5, Pad Cells, (COC-2085967 - COC-2085992), p. COC-2085986.  The
transition from low to high is capacitively coupled to the implant transmitter coil causing it
to ring and to emit a single pulse.  Once the PWM ramp equals the sampled voltage the
output of the PWM goes low and turns off the telemetry output driver.  This transition is
again capacitively coupled to the implant transmitter coil causing it to ring and to emit a
single pulse.  See, e.g., CIC4 Electrical Design Specification, Feb. 22, 2006, Document
E10069DD, (COC-2086758 - COC-20868580), pp. COC-2086832, COC-2086833.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
801

For example when a voltage of 1V is measured by the voltage amplifier (gain set to 1) the output of this amplifier (1V) is then applied to the PWM which then samples and holds the voltage.  Then at a time determined by internal CIC4 circuitry comparison begins and the output of the PWM goes high and a pulse is emitted from the implant.  The output of the PWM goes low when the sampled voltage equals that of the ramp voltage.  In this case the ramp voltage will equal 1 volt 19.2us after the beginning of conversion and the output of the PWM will go low and another pulse is emitted.  Knowing the gain and the ramp interval the voltage represented by the pulse interval can be determined.

Thus, the accused products do not have an A/D converter.  Additionally, the pulse position modulation circuitry performs a different function (conversion of amplitude to a time value, rather than to a digital value) in a different way (amplitude divided into time increments, rather than digitized) and achieves a different result (two pulses a variable time apart, rather than a variable number of pulses within a fixed time interval).  Thus, the accused products do not structurally satisfy the required "means" in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS status-indicating signals of claims 6, 9 and 14 of the '691 patent.

Claims 6, 9 and 14 of the '691 patent each recite as follows:

| Claim 6 of '691 patent | Claim 9 of '691 patent | Claim 14 of '691 patent |
|---|---|---|
| ... the ICS including:  ... | ... the ICS including:  ... | ... the ICS including:  ... |
| means in the ICS for transmitting such ICS-status-indicating signals to the WP .... | means for transmitting such ICS-status-indicating signals to the WP .... | means for transmitting such ICS status indicating signals to the WP .... |

I have been asked to assume that the structural means in the ICS for transmitting ICS-status-indicating signals to the external wearable processor is a telemetry transmitter

27

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
802

connected to a telemetry antenna/coil that is separate from the receiving or main coil in the ICS, which is the construction proposed by Cochlear.

I discussed above the fact that Cochlear's accused implants do not have separate receiving and back telemetry coils/antennae. Specifically, the Nucleus 24 implants (CI24M and CI24RE) do not have separate receiving and back telemetry coils/antennae, but rather have only one antenna for receiving and transmitting. See, e.g., Hybrid Assembly, CI24R, S01015H- (Schematic), COC-2085720; Final Assembly, CI24M, S16232H- (Schematic), COC-2085721; CIC3 Receiver Stimulator IC Functional Specification, Document I10085 (Revision 6, April 19, 1995) (COC-2085696 - COC-2085719), at COC-2085700; CIC3 Receiver Stimulator IC Detailed Specification, Document I10085 - Rev E, May 31, 1996 (COC-2085496 - COC-2085570), at COC-2085508; CIC3 Receiver Stimulator IC Functional Specification, Document I10085 (Revision 6, April 19, 1995) (COC-2090113 - COC-2090136), at COC-2090117; CIC3 Receiver Stimulator IC Detailed Specification, Document I10085 - Rev E, May 31, 1996 (COC-2090137 - COC-2090211), at COC-2090149.

Similarly, the Nucleus Freedom implants (CI24RE) do not have separate receiving and back telemetry coils/antennae, but rather have only one antenna for receiving and transmitting. See, e.g., CIC4 Electrical Design specification, Document E10069DD, Issue 4, Feb. 22, 2006 (COC-2086758 - COC-2086858) at COC-2086832; CIC4 Cochlear Implant IC Functional Specification, Document I10401, Rev. N, December 18, 2000 (produced in Hard Drive COC-6000001), § 4, Fig. 1 (this document was cited by Professor Choma).

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
803

Based on the above, it is my opinion that Cochlear's implants have only a single coil/antenna for receiving and transmitting signals, and do not have separate receiving and back telemetry coils/antennae.

Additionally, as I discussed above, the single antenna, single frequency, time multiplexing system in the accused Cochlear implants use a completely different structure to perform a completely different function in a completely different way than the two antenna, two frequency system which is capable of simultaneously transmitting and receiving, as described in the '691 patent.  The two systems are not equivalent.  I refer the reader to the discussion above regarding the means for receiving transmissions from the WP.

Consequently, Cochlear's Nucleus 24 implants (CI24R and CI24M) and Nucleus Freedom implants (CI24RE) do not satisfy the "means" in the ICS for transmitting ICS status indicating signals to the WP as recited in claims 6, 9 and 14 of the '691 patent.

Claims 7 and 14 of the '691 patent each recite as follows:

| Claim 7 of '691 patent | Claim 14 of '691 patent |
| --- | --- |
| ... means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS. | ... means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS. |

In my opinion, the SP5 (SPrint speech processor) and SP12 (Nucleus Freedom speech processor) do not have "means ... responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS."

Professor Choma cites SP5 Electrical Specification, N43504DD, October 13, 1997 (COC-2026366 – COC-2026536, which is the same as COC2090877-COC-2091047) as evidencing that the SP5 is responsive to at least a portion of the status indicating signals

29

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
804

for controlling the power level of transmissions to the ICS.  Specifically, that document

states the following:

### 4.3.4.2 RF Output Power

The design of the SP5 has included the ability to vary the output power of the RF
Transmitter. This has been done so that the RF power can be optimised for the
given circumstances of the Implantee (eg: type of Implant, depth of implantation
and maximum stimulation currents required). This allows a reliable link to be
established without excessive power being unnecessarily used, which ultimately
increases the rundown time of the batteries.

Telemetry sequences may be used to automatically optimise the Output
Power setting  ( by adjusting the transmitter voltage VTX) for CI24M implants
by measuring and reporting the Implant internal supply voltages under
different stimulation conditions.

The Output Power can be directly varied by adjusting the power supply voltage, $V_{TX}$
, used to drive to the Transmitter (refer to *Figure 4-25*). This is achieved by using
the values in two Analog IC Registers, VTX_T and VTX_OFF. The 5-bit Trim
Register **VTX_T** provides 32 levels of $V_{TX}$ between approximately 2.2 V and  3.7 V
(ie: normal $V_{DD}$). This corresponds to approximately 50 mV per step. The E²PROM
Register **VTX_OFF** is a 5-bit register used to store a factory calibrated offset for the
$V_{TX}$ voltage. The value that gives $V_{TX}$ = 2.4 V should be written into the VTX_OFF
Register at the time of manufacture. Thereafter, the desired $V_{TX}$ can be achieved by
writing the 5-bit value to the VTX_T Trim register using the following formula:

$$VTX\_T = (V_{TX}(desired) - 2.4 \text{ V}) / 50 \text{ mV}  +  VTX\_OFF$$
$$\text{for}   VTX\_T \text{ and } VTX\_OFF = 0 .. 31$$

To enable the $V_{TX}$  Supply regulator to track the high transients loads drawn by the
Transmitter, a fast time constant linear regulator is used. However, if the
Transmitter suddenly draws a high current before the regulatory has fully stabilised
(< 100msec), then a power supply transient may occur which could assert
RESET_L (a system reset). Accordingly, the Analog IC Control Register B, CTLB,
includes a **SOFT** bit  which enables a "soft" power-up of the transmitter voltage.
This bit is set after turning the SP5 on or whenever a new value is written to the
VTX_T register. The SOFT must then be reset, after a delay of at least 100 ms, so
that the regulator can track the transient loads again. If this bit is not reset, the $V_{TX}$
voltage may not be correctly regulated, and if the bit is reset within 100 ms, a
system reset may occur.

COC-2026460; COC-2090971.  The document expressly indicates that VTX_OFF is set

during manufacturing at the factory.  The only issue what value is stored as VTX_T and

how is that value determined.

30

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
805

The SP5 Electrical Functional Specification (COC-2090877-1047) describes the SP5 circuitry (COC-2085727). The section of the manual quoted by Dr. Choma, Section 4.3.4.2, describes that the hardware is capable of varying the output power of the transmissions from the SP5. The power can be varied by changing the Configuration registers VTX_T (register $31, COC-2090900) and VTX_OFF (register $17, COC-2090901). The intention, as described in the electrical specification, of the designers is that the VTX_OFF is determined during initial calibration in order to give a nominal offset of 2.4V (COC-2090971). Thus VTX_T could be used adjust the power output of the transmitter. The fact that the power can be adjusted in the hardware however is insufficient to show the necessary functionality of "responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS." In order to understand how the power is controlled, if at all, is determined by the SP5 software.

Based upon my review of source code for Custom Sound, and my conversations with Cochlear personnel, including Andrew Botros and Tony Nygard, VTX_T is set at a fixed value during programming, which value is neither changed during programming nor dependent upon any voltage measurement made by the implant. I understand from conversations with Mr. Botros and Mr. Nygard that the original design was able to provide a variable transmitter voltage for power optimization. This is reflected in the indented portion quoted above which states "Telemetry sequences may be used to automatically optimise the Output Power setting (by adjusting the transmitter voltage VTX) for CI24M implants by measuring and reporting the Implant internal supply voltages under different stimulation conditions." However, I understand that this feature was never implemented,

31

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
806

and the SP5 transmitter voltage cannot be modified in any way.  This is confirmed by the relevant source code.

Before moving to the analysis of the code, during conversations with Cochlear personnel, including Dr. Swanson, we discussed which code corresponded to commercial SP5 source code. The build scripts are Python files, named Build_*.py:

Build_clinical.py builds the "clinical" software, i.e. all the software that is needed in a clinic for the product. This script in turn calls:

Build_boot_comms.py         - builds communications module for the SP5 to talk to Custom Sound

Build_supervisor.py         - builds supervisor module

Build_psycho.py         - builds psychophysics module (T&C level and electrode impedance measurements when connected to Custom Sound)

Build_strategy.py         - builds sound processing modules (SPEAK, CIS, ACE)

So the product software comprises only the source files that are listed in the above build scripts.

I also learned from Dr. Swanson which code for the commercial SP12 corresponds to code for the 4 DSPs and the 8051 microcontroller in the SP12.  The build scripts for the DSP software (in directory DSP) are:

ace.py         - builds SPEAK, CIS, ACE sound processing module for SP12 processor

pace.py         - builds PACE sound processing module for SP12 processor

hybridace.py         - builds SPEAK, CIS, ACE sound processing module for Hybrid processor

hybridpace.py         - builds PACE sound processing module for Hybrid processor

psychophysics.py         - builds psychophysics module used when connected to Custom Sound

32

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
807

In each of these scripts, the object files are listed as *.cho files. There are 4 lists, one for each DSP.  Each object file has a one-to-one correspondence with a source file *.cha of the same name.

The build script for the 8051 microcontroller software (in directory Supervisor) is:

supervisor.py        - builds supervisor module (same for SP12 and Hybrid processor)

In this script, the object files are listed as *.obj files.  Each object file has a one-to-one correspondence with a source file *.asm of the same name.

Each SPrint map (i.e. program) has a location named vtx_adjust, which ultimately specifies the RF transmit voltage.  It resides in non-volatile memory (NVM), referred to as "E" memory in the source.  It is defined in the source file locale.spa, which is used by the SP5 processor.  The comments document that vtx_adjust is stored in the "static data" section:

"All remaining E data must be static; i.e. the values must not change.  Any change in this section will be detected when the E checksum is checked, and treated as memory corruption."

In other words, the vtx_adjust value is specified by the clinical software when the map is created and loaded into the SPrint, and its value never changes after that.

The source file progset.spa (located in SPrint Supervisor 0600\0600\Supv) contains the routine Set_up_and_load_program, which is called when the program is first loaded on power up, or when the P button is pressed to change programs.  It calls Check_transmit_voltage, which reads vtx_adjust from NVM, and then if the value is different to the previous map, it calls Adjust_Vtx.

The source file vtxadj.spa (located in SPrint Supervisor 0600\0600\Analog) contains the routine Adjust_Vtx, which writes the new value to the appropriate Analog IC control register VTX_T via the relationship VTX_T = vtx_adjust + VTX_OFF.  This routine

33

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
808

waits 100 milliseconds after it changes the transmit voltage, to allow time for the voltage regulator to stabilize.

The software that sets vtx_adjust is the clinical software (i.e. WinDPS or Custom Sound), which writes the parameter vtx_adjust in the SP5 non-volatile memory. The clinical software source code explicitly sets vtx_adjust to a constant value. The Custom Sound source file "Persistence Model/Map Compiler/SprintMapCompiler.pas" contains the statement "SprintParameters.transmitVoltage_mV := 3400;", which is directly used in the calculation of vtx_adjust.

Custom Sound source code file "Persistence Model/Map Compiler/DIL/SPL/allinone/sprintcom/sp5strat.cpp" contains the function SP5Strategy::ComposeUserInterface, which composes the binary image for the SP5 non-volatile memory. Specifically, the function has the line:

```
        module.SetData("vtx_adjust",  &transmitvoltage);
```

and the nested function:

```
    INT minvolt =  2400; //mV
    INT maxvolt =  3400; //mV
    INT minsp5int = 0  ;
    INT maxsp5int = 20;

      SP5DInt transmitvoltage =
      (
        minsp5int +
        ( (param.transmitVoltage_mV.Get() - minvolt)* (maxsp5int - minsp5int)
+(maxvolt-minvolt)/2)
        / (maxvolt - minvolt)
      );
```

Simplifying: transmitvoltage = (transmitVoltage_mV - 2400)/50 + 1/2.  The 1/2 is simply for rounding errors (transmitvoltage is an integer).  This leaves:

transmitvoltage = (transmitVoltage_mV - 2400)/50

34

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
809

Thus, there is a 1-to-1 correspondence between transmitVoltage_mV (which is hard-coded as 3400 in the Custom Sound source file "Persistence Model/Map Compiler/SprintMapCompiler.pas") and the vtx_adjust register value.  This ultimately limits vtx_adjust to a single value for all patients using an SP5 speech processors.

Thus, the VTX value is initialized every time the Speech Processors is powered on or changes program (i.e. like when you log onto Windows on your computer). This value is the value that was stored as part of the "map" by the programming system.

To summarize, each SPrint program contains a value that specifies the RF transmit voltage.  This value is specified by the clinical software (running on the PC) when the map is created to be 3.4 Volts.  The transmit voltage is not varied during stand-alone operation of a map.  Additionally, I understand from conversations with Cochlear personnel, including Andrew Botros, that, in the relevant discussions here, Custom Sound evolved from WinDPS, and WinDPS was the same as Custom Sound in terms of the features discussed herein.

Moving to the SP 12 Freedom speech processor, the RF power level for transmissions to the implant is set via two registers in the supervisor code: REG_PwmMsb and REG_PwmLsb.  The only times these two registers are modified in stand-alone mode are in the files PowerComp_bte.asm and GUI_CheckEvents.asm (both found in Firmware 1.4.4.0\1.4.4\Supervisor\Source).

In GUI_CheckEvents.asm, these registers are being saved and re-loaded so that they are not changed during a map load, but they are otherwise unmodified.

PowerComp_bte.asm adjusts the RF power level based on the supply voltage level of the SP12 speech processor.  As the batteries in the SP12 speech processor are used,

35

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
810

the supply voltage they provide gradually goes down. The purpose of this code is to adjust the RF duty cycle (power level) based on the measured supply voltage within the speech processor so that a constant amount of power is transmitted to the implant.  There is no telemetry sent or received during the execution of this code.  A summary of what the code is doing is provided in section 6.1.3 (Battery Supply Compensation) of Document E11952DD, SP12 Supervisor Firmware Detailed Design Description (COC-2089812 - COC-2089870), pp. COC-2089846 - COC-2089847.

This code/algorithm has two inputs, the speech processor supply voltage (bAveragedBattVoltLevel) and the power level at 3.3V (C_SUP_POWER_LEVEL). C_SUP_POWER_LEVEL is set in the clinic either manually or via a power optimization algorithm carried out in the fitting software.  This power optimization algorithm is described in Document E11986DD, Functional Design Description Power Management Optimization (COC-2089505 - COC-2089539) and makes use of telemetry from the implant.  However, the code is not included in the firmware, it is only executed in the fitting software and can never run in stand-alone mode.  Section 1.1 of E11986DD states the following:

> "The purpose of this document is further to directly detail the design input for the implementation of the power optimisation algorithm in the CDI environment. Other derived requirements are allocated to further component requirement documents as applicable. Note that CDI is considered part of the clinical software."

COC-2089507.  (CDI stands for Cochlear device interface, COC-2089508)

Specifically, during programming (mapping) of the SP12, the clinical software selects an optimal power level based on the patient's implant characteristics and stimulus requirements, and some of this data is obtained via implant telemetry (electrode impedances and implant supply voltages).  The optimal power setting is based on implant parameters (e.g., how much supply voltage is needed to accommodate the required current at particular electrode impedances) and the implant supply voltage (e.g., how

36

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
811

much voltage can the processor induce within the implant based on the power setting and

other factors, such as skin flap thickness).  The power level determination is performed by

the clinical software (i.e. Custom Sound). When the SP12 raises the power level in normal

use due to a decrease in the SP12 battery voltage, no data via implant telemetry is

obtained or considered.  Document E11986DD Power Management - Optimisation,

August 30, 2006 (COC-2089505 - COC-2089539), pp. COC-2089523 - COC-2089524;

see also Freedom Power Optimisation Summary, Document E12664DD, May 31, 2005

(COC-2089540 - COC-2089555).


Below is a brief description of the SP12 power control from the hardware

perspective.


In the clinic, the software power level, PL, required to ensure the recipient's implant

is in compliance is determined, hereafter referred to as PLopt (power level- optimised). To

arrive at the PLopt, several measurements of the recipient related parameters are taken

via telemetry requests to the implant; the measurements are then used to predict the

PLopt. For detailed descriptions of the determination of PLopt, see E11986DD Issue 3,

Power Management - Optimisation - Functional Design Description.


Then, when the Freedom system is used in standalone, the software power level is

stepped up as the regulated supply voltage is dropped, to maintain the same amount of

power delivered to the implant to keep the implant in compliance. To do this, the sound

processor takes voltage measurements at CHAMP's V_Vbatt terminal at regular intervals.

This V_Vbatt together with PLopt are used to determine what the PL needs to be

37
CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
812

increased to, to keep the output power of the Freedom coil constant. In the Battery Module, when the battery voltage VBATT is higher than the LDO regulator IC's preset voltage of 3.3V, the output of the LDO, VDD_REG, is equal to the preset voltage. When VBATT is lower than the preset voltage, VDD_REG will track VBATT. VDD_REG of the Battery Module connects to VDD_CHAMP of the Main Module via a bayonet connector. VDD_CHAMP is connected directly to VDD_RF which is the supply to the Freedom Coil via a Witco connector. VDD_CHAMP is resistively divided to bring the voltage range close to the maximum range of CHAMP's ADC maximum voltage (1.3V nominal). Also a low-pass filter with a 3dB cut-off frequency of 218Hz is present at CHAMP_LP's V_Vbatt terminal.  See, e.g., SP12 Main Module BTE Hardware Design Description, Document S50632DD (printed from COC-6000000 Hard Drive); U22253H-, SP12 BTE Battery Pack Schematic (COC-2085814).

Based on the measurement of the supply voltage to the Freedom coil via measurement at V_Vbatt, the software power level, PL, is converted to the corresponding PWM, which adjusts the duty cycle of the RF_data digital signal from CHAMP_LP to the RFIC of the Freedom coil. The RFIC takes in RF_data and level translates it to its supply level, rejecting duty cycles corresponding to pulses 20ns+-5ns.  See, e.g., Functional Description and Electrical Requirement Specification for RF IC V1C, Document E11560RD (printed from COC-6000000 Hard Drive); SP12 Active Coil (Document U22257H-) Schematic, P2 (COC-2085816).

Thus, neither the SP5 (SPrint speech processor) nor the SP12 (Nucleus Freedom speech processor) functionally satisfy the limitation "means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of

38

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
813

transmissions to the ICS," i.e., they do not control the power level of transmissions to the ICS in response to a portion of the status indicating signals.

Additionally, I have been asked to assume that the structural means "responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS" is a switching regulator whose voltage can be varied, as proposed by AMF. I note that such structure would not normally perform the function of being "responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS."

Professor Choma admitted that he did not find, in the SP12 (Nucleus Freedom) speech processor, a switching regulator corresponding to the means "responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS." That is because the SP12 (Nucleus Freedom) speech processor does not use a "switching regulator" "for controlling the power level of transmissions to the ICS." Instead, it uses a linear regulator to power the RF transmitter. See, e.g., SP12 BTE Battery Pack, U22254H- (schematic), COC-2085814 (VBATT connected to IC NCP561, which is a linear regulator (see any widely available data sheet on line), outputting regulated VDD_Reg which is provided to pin 11 of an 11-pin bayonet connector); SP12 BTE Main Module, U22253H- (schematic), COC-2085811 (connector pin 11 renamed VDD Champ and VDD RF (power rails), which is provided via pin 3 of a 4-pin connector to the RF coil); SP12 Active Coil - P2 COC-2085816 (VDD provided by pin 3 of 4-pin connector to RFIC chip, which drives the LC circuit); SP12 Active Coil (Electrical Design Description), Document S50656DD, March 3, 2004 (printed from hard drive COC-600000, file name S50656DD.doc), § 2.1.1 (providing overview of RF IC functionality).

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
814

Consequently, for the reasons provided above, the SP5 (SPrint) and SP12 (Nucleus Freedom) speech processors do not satisfy the "means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS".

For all of the reasons indicated above, the accused products do not infringe claims 6, 7, 9 and 14 of the '691 patent. Additionally, because claim 8 depends upon claim 7 which in turn depends upon claim 6, the accused products do not infringe claim 8 of the '691 patent for the same reasons they do not infringe claims 6 and 7 of the '691 patent.

## CLAIMS 1, 10 AND 12 OF THE '616 PATENT

According to Professor Choma's report, claims 1, 10 and 12 of the '616 patent are infringed by Cochlear's implants and processors. I respectfully disagree with Professor Choma.

Independent claims 1, 10 and 12 of the '616 patent recite as follows:

> 1.      A physician's testing system for testing a multichannel cochlear stimulating system, comprising
> a physician's tester, an external headpiece/transmitter, and an implanted cochlear stimulator (ICS),
> the external headpiece/transmitter having transmitting means for transmitting data-containing signals to the ICS;
>
> the ICS comprising:
> (a) receiving means for receiving the data-containing signals,
> (b) processor means for processing the data-containing signals to generate stimulation signals,
> (c) a plurality of tissue-stimulating electrodes for receiving the stimulation signals,
> (d) monitor means in the processor means and responsive to the data-containing signals for (1) selectively monitoring at least one pair of the tissue-stimulating electrodes as one of the stimulation signals is applied thereto to measure a voltage associated with said pair of electrodes, and (2) generating stimulator status-indicating signals, and

40

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
815

(e) telemetry means for transmitting the stimulator status-indicating signals to the external headpiece/transmitter means; and

the physician's tester comprising:
external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes;
user-controllable means connected to the external processor means for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means, said user-controllable means including manual means for specifying a peak output current for the stimulation signals to be applied to the at least one pair of tissue-stimulating electrodes; and
display means for displaying the information derived from the status-indicating signals.


10. A method of testing an implantable tissue stimulating system comprising:
transmitting data-containing signals to an implanted stimulator from an external transmitter;
selectively controlling the data-containing signals as they are thus transmitted;
receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;
processing the data-containing signals within the implanted stimulator to generate stimulation signals;
applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes;
selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;
transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter;
receiving and processing the status-indicating signals to produce processed status-indicating signals which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and
displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known.

41

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
816

12. A system for testing an implantable cochlear stimulator (ICS) comprising a portable physician's tester and the ICS,

the ICS comprising

(a) receiver means for receiving data-containing signals,

(b) processor means for processing the received data-containing signals to generate stimulation signals, the stimulation signals having a peak output current associated therewith prescribed by the data-containing signals,

(c) a multiplicity of tissue-stimulating electrodes;

(d) means for applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes,

(e) monitor means in the processor and responsive to the data-containing signals received by the receiver means for (1) monitoring a selected pair of the multiplicity of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and (2) generating stimulator status-indicating signals, said stimulator status-indicating signals including the voltage measured at the selected pair of electrodes by the monitor means as one of the stimulation signals is applied thereto, and

(f) telemetry means for transmitting the stimulator-status indicating signals to an external receiver;

the portable physician's tester comprising:

user-controllable means for selectively generating the data-containing signals, said user-controllable means including manual means for manually specifying a peak output current to be included in the data-containing signals;

external transmitter means for transmitting the data-containing signals to the receiver means of the ICS;

external receiver means for receiving the status-indicating signals transmitted by the telemetry means of the ICS;

external processor means for processing the received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

As claims 1 and 12 are apparatus claims with some similar limitations, and claim 10 is a method claim, I will address claim 10 separately.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
817

Claims 1 and 12 of the '616 patent each recite as follows:

| Claim 1 of '616 patent | Claim 12 of '616 patent |
|---|---|
| ... the ICS comprising: | ... the ICS comprising |
| (a) receiving means for receiving the data-containing signals .... | (a) receiver means for receiving data-containing signals .... |

I have been asked to assume that the structural means in the ICS for performing the function of "receiving data-containing signals" corresponds to a receiver connected to main coil/antenna, which is separate from a telemetry coil/antenna, and equivalents.

This proposed construction is the same as the proposed construction of the ICS "means for receiving" recited in claims 6, 9 and 14 of the '691 patent and analyzed above, and I refer the reader to my earlier analysis. Based upon that analysis, it is my opinion that the accused Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and the Nucleus Freedom implants (CI24RE with CIC4 chips) do not satisfy the receiver or receiving structural "means" in the ICS for receiving data-containing signals from the WP recited in claims 1 and 12 of the '616 patent.

Claims 1 and 12 of the '616 patent each recite as follows:

| Claim 1 of '616 patent | Claim 12 of '616 patent |
|---|---|
| ... the ICS comprising: ... | ... the ICS comprising ... |
| (b) processor means for processing the data-containing signals to generate stimulation signals .... | (b) processor means for processing the received data-containing signals to generate stimulation signals .... |

I have been asked to assume that the structure of the recited "processor means" for performing the recited functions corresponds to a regulator, voltage reference, voltage regulator error amplifier, data decoder, VCO, loop filter, bit and word counters, initialization, serial to parallel converter, data amplitude latch, command latch, word strobe generator, D/A current reference, exponential D/A converter, analog mux, voltage down-

43

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
818

converter, eight storage/refresh capacitors, and eight current source FETs, as shown in Figure 2 of the '616 patent or a series regulator, voltage error amplifier, voltage reference, down converter clock, voltage downconverter (including 5 off-chip capacitors), powerbad detector, initialization, parity error detector, multiple chip control, data conditioner, clock decoder, serial to parallel converter, word strobe generator, polarity and amplitude data latch, command latch, command decoder, current reference generator, logarithmic D to A converter, analog multiplexer, eight refresh voltage controls, eight switching transfer capacitors, eight refresh voltage capacitors, eight current sources, and refresh voltage logic, as shown in Figure 4 of the '616 patent, and equivalents, which I understand is the structural interpretation for this limitation proposed by Cochlear.

As these two alternative constructions I have been asked to assume are the same as the alternative assumed structural means in the ICS that perform the function "processing such transmissions to generate stimulation signals" recited in claim 14 of the '691 patent, the analysis also is the same, and I refer the reader to that analysis.

Based upon that analysis, it is my opinion that the accused Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and the Nucleus Freedom implants (CI24RE with CIC4 chips) do not satisfy the processor structural "means" in the ICS for processing received data-containing signals to generate stimulation signals as recited in claims 1 and 12 of the '616 patent.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
819

Claim 12 of the '616 patent recites as follows:

**Claim 12 of '616 patent**

... the ICS comprising ...

(d) means for applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes ....

I have been asked to assume that the structural "means" for performing the function of "applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes" corresponds to a command decoder, output mode register, pulse width control comprising two downcounters, eight electrode switching matrices, eight coupling capacitors CA, and eight coupling capacitors CB (or a total of 16 coupling capacitors), and the equivalents thereof. I have also been asked to assume that "tissue stimulating electrodes" are electrodes implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue.

Assuming this proposed construction, Cochlear's implants do not satisfy this limitation. Specifically, only the extra-cochlear electrodes in the Nucleus 24 implants (CI24M and CI24RE implants with CIC3 chips) and the Nucleus Freedom implants (CI24RE with CIC4 chips) have coupling capacitors. The intracochlear electrodes do not have coupling capacitors. See, e.g., Hybrid Assembly, CI24R, S01015H- (Schematic), COC-2085720; Final Assembly, CI24M, S16232H- (Schematic), COC-2085721; CI24RE (Discreet Diode) ELECTRONIC ASSEMBLY, Document No. U22118H- (Schematic), COC-2085801. Thus, the accused products do not have the structure required by the subject limitation.

Since the "tissue stimulating electrodes" are assumed to be electrodes implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue, then the requirement that stimulation signal be applied to "pairs" of tissue stimulating electrodes means that the

45

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
820

stimulation signal must be applied to pairs of intra-cochlear electrodes, which is the so-called bipolar mode of stimulation.

The accused products have only a singe current source to drive all of the tissue stimulating electrodes, rather than separate current sources for each channel formed of a pair of tissue stimulating electrodes.  The single current source in the accused products is connected directly to a pair of tissue stimulating electrodes, rather than through coupling capacitors.  Thus, the accused products use a completely different structure (single current source coupled through switches to different electrode pairs, rather than multiple current sources coupled through capacitors to different electrode pairs) ) to achieve a different result ((i) bi-directional current flow rather than DC blocking, and (ii) sequential stimulation of electrode pairs rather than simultaneous stimulation of multiple electrode pairs).  Thus, the accused products do not have the equivalent structure to that required by the subject limitation.

Furthermore, the '616 patent discusses a prior art cochlear implant system described in U.S. Patent No. 4,947,844, which made use of stimulating electrodes without coupling capacitors as the accused products do.  The '616 patent criticized the lack of coupling capacitors:

> ... [T]his system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

'616 patent, col. 2, ll. 43-47.  This confirms that the accused products do not have the equivalent structure to that required by the subject limitation.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
821

Claims 1 and 12 of the '616 patent each recite as follows:

| Claim 1 of '616 patent | Claim 12 of '616 patent |
|---|---|
| ... the ICS comprising: ... | ... the ICS comprising ... |
| (d) monitor means in the processor means and responsive to the data-containing signals for | (e) monitor means in the processor and responsive to the data-containing signals received by the receiver means for |
| (1) selectively monitoring at least one pair of the tissue-stimulating electrodes as one of the stimulation signals is applied thereto to measure a voltage associated with said pair of electrodes, and | (1) monitoring a selected pair of the multiplicity of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and |
| (2) generating stimulator status-indicating signals .... | (2) generating stimulator status-indicating signals, said stimulator status-indicating signals including the voltage measured at the selected pair of electrodes by the monitor means as one of the stimulation signals is applied thereto .... |

Claim 12 recites monitoring a pair of "the multiplicity of electrodes". The
"electrodes" in claim 12 are "tissue stimulating electrodes".

Both claims 1 and 12 require monitoring a pair of stimulating electrodes "as one of
the stimulation signals is applied" to measure a voltage. I note that Professor Choma
evaluates some portions of Custom Sound in connection with the '616 patent. For
completeness, I note that the software application designated Custom Sound EP (which is
part of the Custom Sound suite of applications) allows a user to receive information about
the electrical response of the auditory nerve (the neural response) to electrical stimulation
(referred to as neural response telemetry, or "NRT"). The neural response is monitored
*after* the stimulation signal has been complete, not "as" the stimulation signal is applied.
For example, when I used Custom Sound EP (in training mode), the product did not permit
me to eliminate the delay between the end of the stimulation and the beginning of the
monitoring when performing NRT. Thus, the "NRT" functionality provided by Custom
Sound EP does not satisfy at least the temporal requirements of these claims.

47

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
822

I have been asked to assume that the structural "means" responsive to the data-containing signals for monitoring a pair of the tissue-stimulating electrodes as a stimulation signals is applied thereto to measure a voltage associated with the pair of electrodes and for generating stimulator status-indicating signals includes a telemetry function decoder, telemetry multiplexer, A/D converter and telemetry modulator.

The accused Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and Nucleus Freedom implants (CI24RE implants with CIC4 chips) do not use an A/D converter.  As I explained above in the discussion of the "means" responsive to data from the WP for selectively monitoring one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals recited in claims 6, 9 and 14 of the '691 patent, the accused products do not use an A/D converter because the back telemetry systems used in the accused products do not transmit a digitized value as a stimulator status indicating signal, and instead transmit time information using pulse position modulation techniques.  I refer the reader to my earlier discussion of the "means" responsive to data from the WP for selectively monitoring one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals recited in claims 6, 9 and 14 of the '691 patent. The analysis here is the same as that earlier analysis.  Thus, the accused products do not structurally satisfy the "monitor means" in the ICS for monitoring a pair of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and generating stimulator status-indicating signals required by claims 1 and 12 of the '616 patent.

48

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
823

Claims 1 and 12 of the '616 patent each recite as follows:

| Claim 1 of '616 patent | Claim 12 of '616 patent |
| --- | --- |
| ... the ICS comprising: ... | ... the ICS comprising ... |
| (e) telemetry means for transmitting the stimulator status-indicating signals to the external headpiece/transmitter means .... | (f) telemetry means for transmitting the stimulator-status indicating [sic] signals to an external receiver .... |

I have been asked to assume that the structural telemetry "means" in the ICS for transmitting stimulator status-indicating signals to an external headpiece/transmitter (or receiver) is a telemetry transmitter connected to a telemetry antenna/coil that is separate from the receiving or main coil in the ICS, which is the construction proposed by Cochlear.

This proposed construction is the same as the proposed construction of the "means in the ICS" for transmitting ICS-status-indicating signals to the WP recited in claim 6 (and the similar recitations of claims 9 and 14) of the '691 patent and analyzed above, and I refer the reader to my earlier analysis. Based upon that analysis, it is my opinion that the accused Nucleus 24 implants (CI24R and CI24M implants with CIC3 chips) and the Nucleus Freedom implants (CI24RE with CIC4 chips) do not satisfy the structural telemetry "means" in the ICS for transmitting stimulator status-indicating signals to an external headpiece/transmitter or receiver required by claims 1 and 12 of the '616 patent.

Claims 1 and 12 of the '616 patent each recite as follows:

| Claim 1 of '616 patent | Claim 12 of '616 patent |
| --- | --- |
| the physician's tester comprising: ... | the portable physician's tester comprising: ... |
| user-controllable means | user-controllable means |
| connected to the external processor means | |
| for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means .... | for selectively generating the data-containing signals .... |

49

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
824

I understand Professor Choma's opinion to be that the structural "user controllable" means "connected to the external processor means for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means" recited in claim 1 of the '616 patent corresponds to "one or more controls connected to the external processor." I understand Professor Choma's opinion to be that the structural "user controllable" means "for selectively generating the data-containing signals" recited in claim 12 of the '616 patent corresponds to "one or more controls." I also understand Professor Choma's opinion to be that the "sliders" on the display screen of a computer running Custom Sound or WinDPS constitute "user controllable means" for selectively generating data-containing signals.

Turning first to the user controllable means "connected to" the external processor means (one or more controls "connected to" the external processor) required by claim 1 of the '616 patent, I note that, in Professor Choma's opinion, the SP5 speech processor (SPrint speech processor) and SP12 speech processor (Freedom speech processor) correspond to the claimed "external processor means." However, assuming Professor's Choma's constructions, neither the SP5 nor the SP12 is "connected" to the display screen "sliders." In fact, neither the SP5 nor the SP 12 is "connected" to the computer running the programming system. The SP5 and SP12 speech processors need to be connected to an interface, which in turn is connected to the computer running the programming system, which will include a graphical user interface. The display screen of the computer running the programming system is connected to the computer's CPU through a display driver. For WinDPS, see, e.g., DPS3 System Functional Description, Document N43311DD, July 7, 1997 (COC-2029133 - COC-2029145) p. COC-2029137 (cited by Professor Choma); WinDPS Clinical Software Suite, Document I50045, September 1998

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
825

(COC-2091244-COC-2091254) COC-2091247; R126 Software Requirements Specification, Document E10198RD, July 10, 2003 (COC-2088446 - COC-2088534) COC-2088507 (Figure 2).   For Custom Sound, see, e.g., System 4 Configuration for Clinical Use, Document E11850DD (COC-2089406 - COC-2089421), p. COC-2089413 - COC-2089416.  See also, e.g., System 4 Comparison to Nucleus System 3 and Submission Overview (COC-2083762 - COC-2083775), p. COC-2083771 (cited by Professor Choma).

Shifting focus to a functional requirement, the "user controllable means" (the "one or more controls") must perform the function of "selectively generating" the data-containing signals transmitted to the implant.  Professor Choma indicated that the "sliders" in Cochlear's programming systems running on a computer are the claimed "user controllable means" (the "one or more controls").  However, Professor Choma appears to have overlooked the functional requirement that the "sliders" selectively generate the data containing signals transmitted to the implant.  In my opinion, they do not.  The sliders in the Cochlear programming systems can be used to select a stimulation level that will be generated by the external speech processor, but neither the sliders themselves nor the programming system "generates" the data-containing signals sent to the implant.  The reason for this difference is readily apparent in the configuration of the claimed physician's tester.  In the '616 patent, the physician's tester has replaced the external speech processor to test the implant.  In the accused cochlear implant - speech processor - programming system, the programming system transmits signals, via a programming interface, to the speech processor, which are used by the speech processor to in turn generate the signals transmitted to the implant.  For WinDPS, see, e.g., DPS3 System Functional Description, Document N43311DD, July 7, 1997 (COC-2029133 - COC-2029145) p. COC-2029137 (cited by Professor Choma); WinDPS Clinical Software Suite,

51

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
826

Document I50045, September 1998 (COC-2091244-COC-2091254) COC-2091247; R126 Software Requirements Specification, Document E10198RD, July 10, 2003 (COC-2088446 - COC-2088534) COC-2088507.  For Custom Sound, see, e.g., System 4 Configuration for Clinical Use, Document E11850DD (COC-2089406 - COC-2089421), pp. COC-2089413 - COC-2089416.  See also, e.g., System 4 Comparison to Nucleus System 3 and Submission Overview (COC-2083762 - COC-2083775), p. COC-2083771 (cited by Professor Choma).

Consequently, in my opinion, the accused products do not satisfy the "user-controllable means" limitations of claims 1 or 12 of the '616 patent using Professor Choma's interpretations.

I have also been asked to assume that the structural "user-controllable means" recited in claims 1 and 12 of the '616 patent corresponds to the three rotary knobs, potentiometers coupled to the rotary control knobs, and a microprocessor coupled to the potentiometers, which I understand to be Cochlear's construction.  In my opinion, the accused products do not have such structure, or its equivalent.

Claims 1 and 12 of the '616 patent each recite as follows:

| Claim 1 of '616 patent | Claim 12 of '616 patent |
|---|---|
| the physician's tester comprising: ... | the portable physician's tester comprising: ... |
| display means for displaying the information derived from the status-indicating signals. | display means for displaying the information derived from the status-indicating signals. |

I understand that AMF's position is that "the information derived from the status indicating signals" should be interpreted to have a customary and ordinary meaning. Consistent with its ordinary meaning, I interpret "the information derived from the status indicating signals" to be the same information derived by the external processor when

52

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
827

processing the received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue stimulating electrodes.  Assuming for the moment that Cochlear's speech processors process received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue stimulating electrodes, the information derived therefrom is a voltage or binary value, **not** an impedance value.  However, Professor Choma points to the display of impedance as satisfying the claim requirement.  See, e.g., Appendix H to Professor Choma's Report, pp. 31-33; Appendix I to Professor Choma's Report, pp. 28-29.   I disagree.  Impedance is neither a voltage nor a binary value.  Thus, in my opinion, the display of a calculated impedance by the programming systems does not satisfy the required display of the information "derived" by the external processor from the status indicating signals required by claims 1 and 12 of the '616 patent.

Alternatively, I have been asked to assume that "information derived from the status-indicating signals" recited in claims 1 and 12 of the '616 patent means "processed information indicative of the status of the ICS, including the voltage measured across a pair of intra-cochlear electrodes," which I understand is Cochlear's proposed construction.  Under this alternative construction, my opinion remains the same:  the display of a calculated impedance by the programming systems does not display the voltage measured across a pair of electrodes required by claims 1 and 12 under Cochlear's proposed construction.

For the reasons given above, the accused Cochlear products lack all of the limitations in claims 1 and 12 of the '616 patent and therefore do no not infringe theses claims.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
828

Claim 10 of the '616 patent recites as follows:

### Claim 10 of '616 patent

... selectively controlling the data-containing signals as they are
thus transmitted ....

I understand that AMF's position is that "selectively controlling the data-containing

signals as they are thus transmitted" should be interpreted to have a customary and

ordinary meaning. Consistent with its ordinary meaning, "selectively controlling the data-

containing signals as they are thus transmitted" comprises selectively controlling the "data-

containing signals" as the data containing signals are transmitted.

Professor Choma refers to his analysis of "user controllable means for selectively

generating the data-containing signals" from claim12, which in turn refers to his analysis of

"user-controllable means connected to the external processor means for selectively

generating and controlling the data-containing signals transmitted by the transmitting

means of the external headpiece/transmitter means" of claim 1. The accused systems --

i.e., a programming system together with a speech processor -- select, control and

generate the data containing signals *before* they are transmitted, not as they are

transmitted. Thus, the accused Cochlear Custom Sound programming system together

with an SP5 (SPrint) speech processor, or the accused Cochlear Custom Sound

programming system together with an SP12 (Freedom) speech processor does not satisfy

this limitation. Furthermore, I have observed and used Cochlear's Custom Sound (in

training mode). When Custom Sound determines electrode impedances, the application

does not allow the user to vary the stimulation level. I understand from conversations with

Cochlear personnel, including Andrew Botros, that WinDPS similarly did not allow any

variation of the current level by the user when determining electrode impedances. Thus,

the accused products do not satisfy "selectively controlling the data-containing signals as

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
829

they are thus transmitted" required by claim 10 of the '616 patent under AMF's proposed construction.

I have also been asked to assume, alternatively, that the recited "selectively controlling the data-containing signals as they are thus transmitted" means "adjusting the signals setting the stimulation levels" which I understand is the construction proposed by Cochlear.  As I explained above, Cochlear's programming systems do not permit the user to adjust the signals setting the stimulation levels when determining electrode impedances.  Thus, in my opinion, the accused products do not satisfy "selectively controlling the data-containing signals as they are thus transmitted" required by claim 10 of the '616 patent under Cochlear's proposed construction.

Claim 10 of the '616 patent recites as follows:

### Claim 10 of '616 patent
... applying the stimulation signals to at least one pair of the
multiplicity of tissue stimulating electrodes ....

I note that, for this limitation of claim 10 of the '616 patent, Professor Choma refers to his analysis of "a plurality of tissue-stimulating electrodes for receiving the stimulation signals" from claim 1 of the '616 patent.  That analysis does not include any analysis of "applying" stimulation signals to the tissue stimulating electrodes.

I have been asked to assume that "tissue stimulating electrodes" means "electrodes implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue" and that "applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes" as recited in claim 10 of the '616 patent means "capacitively coupling the stimulation signals through switches to at least a pair of intracochlear electrodes."

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
830

The Nucleus 24 (CI24R and CI24M) and Nucleus Freedom (CI24RE) cochlear implants do not have capacitively coupled intracochlear electrodes and do not capacitively couple the stimulation signals to pairs of intracochlear electrodes. Additionally, as discussed above, the accused products use a completely different structure (directly connecting the intra-cochlear electrodes without coupling capacitors) to achieve a different result ((i) bi-directional current flow rather than DC blocking, and (ii) sequential stimulation of electrode pairs rather than simultaneous stimulation of multiple electrode pairs). Thus, the Nucleus 24 (CI24R and CI24M) and Nucleus Freedom (CI24RE) cochlear implants do not satisfy this limitation.

Additionally, as I indicated above, the '616 patent discusses a prior art cochlear implant system described in U.S. Patent No. 4,947,844, which made use of stimulating electrodes without coupling capacitors as done in the accused products. The '616 patent criticized such system for not using coupling capacitors:

> ... [T]his system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

'616 patent, col. 2, ll. 43-47. The patentee's criticism of the structure used in Nucleus 24 (CI24R and CI24M) and Nucleus Freedom (CI24RE) cochlear implants further confirms that the accused products do not satisfy this limitation.

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
831

Claim 10 of the '616 patent recites as follows:

<u>Claim 10 of '616 patent</u>

... selectively monitoring the at least one pair of the multiplicity of
electrodes to measure a voltage associated therewith at the same
time the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the
measurements made within the implanted stimulator ....

Claim 10 recites monitoring a pair of "the multiplicity of electrodes".  The antecedent

basis for "electrodes" recited in claim 10 is "tissue stimulating electrodes".

Claim 10 requires monitoring a pair of stimulating electrodes to measure a voltage

"at the same time the stimulation signals are applied thereto".  I understand that AMF's

position is that this language should be given its ordinary meaning.

I note that Professor Choma evaluates some portions of Custom Sound in

connection with the '616 patent.  For completeness, as I discussed earlier, I note that

Custom Sound EP allows a user to receive information about the electrical response of

the auditory nerve (the neural response) to electrical stimulation (referred to as neural

response telemetry, or "NRT").  The neural response is monitored **after** the stimulation

signal has been complete, not "as" the stimulation signal is applied.  For example, when I

used Custom Sound EP (in training mode), the product did not permit me to eliminate the

delay between the end of the stimulation and the beginning of the monitoring when

performing NRT.  Thus, the "NRT" functionality provided by Custom Sound EP cannot

"measure a voltage associated therewith at the same time the stimulation signals are

applied thereto" as required by claim 10 of the '616 patent.

I have been asked to assume, alternatively, that the monitoring a pair of stimulating

electrodes to measure a voltage "at the same time the stimulation signals are applied

thereto" should be interpreted to mean that "the measurement is made at the same time

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
832

the stimulation signal is applied to the intra-cochlear electrode", which I understand is
Cochlear's position.  My opinion is the same under this alternative proposed claim
interpretation.

Claim 10 of the '616 patent recites as follows:

### Claim 10 of '616 patent
... transmitting the stimulator status-indicating signals to an external
receiver coupled to the external transmitter ....

I have been asked to assume that "transmitting the stimulator status-indicating
signals to an external receiver coupled to the external transmitter" means "transmitting the
stimulator status-indicating signals using a telemetry coil that is separate from the main
receiving coil."

In connection with the "means in the ICS" for transmitting ICS-status-indicating
signals to the WP recited in claim 6 (and the similar recitations of claims 9 and 14) of the
'691 patent and analyzed above, I analyzed the fact that Cochlear's accused implants do
not have separate receiving and back telemetry coils/antennae, but rather only one
antenna for receiving and transmitting.  I refer the reader to that analysis.  Based on that
analysis, it is my opinion that Cochlear's implants have only a single coil/antenna for
receiving and transmitting signals, and do not have separate receiving and back telemetry
coils/antennae.

Claim 10 of the '616 patent recites as follows:

### Claim 10 of '616 patent
... displaying the processed status-indicating signals, whereby the
status of the implanted stimulator, including the results of the
measurements made within the implanted stimulator, may be made
known.....

58

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS
CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
833

I understand that AMF's position is that "the results of the measurements made within the implanted stimulator" should be interpreted to have a customary and ordinary meaning.  Consistent with its ordinary meaning, I interpret "the results of the measurements made within the implanted stimulator" to be the same information produced by the external processor when processing the received status-indicating signals to produce processed status-indicating signals which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator.

Assuming for the moment that Cochlear's speech processors process received status-indicating signals to produce processed status-indicating signals which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator, the measured value and the processed status-indicating signal is a voltage or binary value, **not** an impedance value.  However, Professor Choma points to the display of impedance as satisfying the claim requirement.  See, e.g., Appendix H to Professor Choma's Report, pp. 31-33; Appendix I to Professor Choma's Report, pp. 28-29.  I disagree.  Impedance is neither a voltage nor a binary value.  Thus, in my opinion, the display of a calculated impedance by the programming systems does not satisfy the required displaying of the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, as required by claim 10 of the '616 patent.

I have been asked, alternatively, to assume that "the results of the measurements made within the implanted stimulator" recited by claim 10 of the '616 patent means "the voltage measured across two intra-cochlear electrodes at the time of stimulation," which I

59

understand is the construction proposed by Cochlear. My opinion remains the same under this alternative proposed construction, namely, the display of a calculated impedance by the programming systems does not satisfy the requirement to display a voltage measured across two intra-cochlear electrodes at the time of stimulation. Thus, the accused products do not satisfy the subject limitation of claim 10.

For the foregoing reasons, Cochlear's accused products to not perform all of the steps of claim 10 off the '616 patent, and therefore do not infringe that claim.

### SUMMARY OF OPINION

In summary, as discussed above, it is my opinion that:

(1) Claims 6-9 and 14 of the '691 patent are not infringed by Cochlear's products assuming the claims are interpreted as proposed by Professor Choma and/or AMF.

(2) Claims 6-9 and 14 of the '691 patent are not infringed by Cochlear's products assuming the claims are interpreted as proposed by Cochlear.

(3) Claims 1, 10 and 12 of the '616 patent are not infringed by Cochlear's products assuming the claims are interpreted as proposed by Professor Choma and/or AMF.

(4) Claims 1, 10 and 12 of the '616 patent are not infringed by Cochlear's products assuming the claims are interpreted as proposed by Cochlear.

Dated: __3/11/09__

Robert L. Stevenson, Ph.D.

60

CONTAINS OR REFERS TO MATERIAL DESIGNATED AS CONFIDENTIAL OR ATTORNEYS' EYES ONLY

Exhibit 21
835

## CERTIFICATE OF SERVICE

I, Dori Dellisanti, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. My business address is Connolly Bove Lodge & Hutz LLP, 333 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

On March 11, 2009, I served the foregoing documents described as: **DEFENDANTS COCHLEAR AMERICAS AND COCHLEAR LTD.'S SECOND FED. R. CIV. P. 26(A)(2)(B) DISCLOSURES** on the following person in this action by placing a true copy thereof enclosed in sealed envelope addressed as follows:

| | |
|---|---|
| Charles S. Barquist, Esq.<br>Morrison & Foerster LLP<br>555 W. Fifth St.,<br>Los Angeles, CA 90013-1024 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel: (213) 892-5200<br>Email: cbarquist@mofo.com |
| Brian G. Bodine, Esq.<br>Kaustuv M. Das, Esq.<br>Merchant & Gould, P.C.<br>701 Fifth Ave., Suite 4100<br>Seattle, WA 98104 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel: (206) 342-6200<br>Email: bbodine@merchantgould.com<br>KDas@merchantgould.com |
| Peter A. Gergely, Esq.<br>Merchant & Gould, P.C.<br>1050 17th St., Suite 1950<br>Denver, CO 80265-0100 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel: (303) 357-1670<br>Email: pgergely@merchantgould.com |

[ ] **BY MAIL** I am readily familiar with the firm's practice regarding collection and processing of correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY PERSONAL SERVICE**: I caused such envelope to be delivered by hand to the addressee(s) as stated above.

[X] **FEDERAL EXPRESS**: I am readily familiar with the office practice of Connolly Bove Lodge & Hutz LLP for collecting and processing correspondence for overnight delivery by Federal Express. Such practice is that when correspondence for overnight delivery by Federal Express is deposited with the Connolly Bove Lodge & Hutz LLP personnel responsible fore delivering correspondence to Federal Express, such correspondence is delivered to a Federal Express location or to an authorized courier or driver authorized by Federal Express to receive documents or deposited at a facility regularly maintained by Federal Express for receipt of documents on the same day in the ordinary course of business.

3

DEFS' SECOND FRCP 26(a)(2)(B) DISCLOSURES

Exhibit 21
836

**[X] BY E-Mail**  Based upon a mutual agreement of the parties, I caused the document(s) to be sent to the person(s) at the e-mail address(es) indicated above.

**[X] FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2009, at Los Angeles, California.

Dori Dellisanti
Name

Signature

DEFS' SECOND FRCP 26(a)(2)(B) DISCLOSURES

4

Exhibit 21
837