1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| 11 | ALFRED E. MANN FOUNDATION FOR | ) | Case No. CV 07-8108 FMO (SHx) |
| 12 | SCIENTIFIC RESEARCH, | ) | |
| | Plaintiff, | ) | |
| 13 | | ) | **ORDER Re: CROSS-MOTIONS FOR** |
| | v. | ) | **SUMMARY JUDGMENT** |
| 14 | | ) | |
| | COCHLEAR CORPORATION, et al., | ) | |
| 15 | | ) | |
| | Defendants. | ) | |
| 16 | | ) | |

17         Having reviewed and considered all the briefing filed with respect to the parties' cross-

18    motions for summary judgment, and the oral argument presented to the court on August 29, 2013,

19    the court orders as follows.

20                        **INTRODUCTION**[1]

21         On December 13, 2007, plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF"

22    or "plaintiff") initiated this patent infringement suit against defendants Cochlear Corporation and

23    Cochlear, Ltd. (collectively, "Cochlear" or "defendants").  On March 3, 2009, defendants filed a

24    motion to dismiss for lack of standing.  On June 19, 2009, the court entered judgment dismissing

25    AMF's Complaint for lack of standing.  AMF appealed and the Federal Circuit reversed the

26

27    ─────────────────────

28         [1]  The parties are familiar with the factual and procedural background of the case.  The court
      repeats the facts here and throughout only as necessary.

1  decision of the district court.  (See Mandate of Federal Circuit Re: Notice of Appeal to Federal

2  Circuit of Appeals, filed June 24, 2010).[2]

3      On September 30, 2010, AMF filed its First Amended Complaint, asserting several patents.

4  Cochlear asserted affirmative defenses as well as counterclaims against AMF for declaratory

5  judgment of non-infringement, invalidity, and unenforceability.  (See Cochlear's Answer and

6  Counterclaims, filed October 12, 2010).

7      AMF presently asserts two patents, U.S. Patent No. 5,609,616, entitled "Physician's Testing

8  System and Method for Testing Implantable Cochlear Stimulator" ("the '616 patent"), and U.S.

9  Patent No. 5,938,691, entitled "Multichannel Implantable Cochlear Stimulator" ("the '691 patent"),

10  (collectively, "the patents-in-suit").  (See [Proposed] Final Pretrial Conference Order (Document

11  No. 336), lodged December 3, 2013, at 4).  The '691 patent is generally directed to an implantable,

12  multichannel cochlear implant, and the '616 patent is generally directed to a method and system

13  for testing such implant.  (See Order Re: Parties' Objections to the Special Master's Report on

14  Claim Construction, filed June 18, 2012 ("Claim Construction Order"), at 1).  The claimed invention

15  includes an implantable cochlear stimulator ("ICS"), a wearable processor ("WP"), and a

16  physician's tester for testing the ICS.  (Id.).

17      The court, with the consent of the parties, appointed a Special Master to oversee the claim

18  construction process.  (See Claim Construction Order at 1).  The Special Master conducted a

19  Markman[3] hearing on May 3, 2011, and issued a Report and Recommendation on Claim

20  Construction ("R&R"), on November 8, 2011.[4]  After considering the parties' objections to the R&R,

21  the court issued its Claim Construction Order on June 18, 2012.

22

---

23   [2] On August 26, 2010, AMF filed a motion to join Advanced Bionics, LLC ("Advanced Bionics").
    Cochlear filed a notice of non-opposition, and AMF's motion was granted.  On December 3, 2013,
24   the parties lodged a [Proposed] Final Pretrial Conference Order, formally realigning Advanced
25   Bionics as a plaintiff.

26   [3] Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd,
    517 U.S. 370, 116 S. Ct. 1384 (1996).

27
    [4] The Special Master also provided the parties' agreed upon claim constructions.  (See R&R
28   at 2-8).

The case was transferred to the undersigned on January 18, 2013.  On July 22, 2013, the parties filed cross-motions for summary judgment (AMF's at Document No. 251; Cochlear's at Document No. 243).  The cross-motions were accompanied by:  (1) Joint Brief Re Summary Judgment Motions ("Joint Br."); (2) Statement of Uncontroverted Facts ("SUF"); and (3) Joint Evidentiary Appendix ("JA").  On September 5, 2013, pursuant to the Court's Order of August 29, 2013, AMF and Cochlear each filed a supplemental brief (respectively, "AMF Supp." and "Cochlear Supp.").  On September 12, 2013, AMF and Cochlear each filed a Reply brief (respectively, "AMF Reply" and "Cochlear Reply").

Although the parties' briefing involves claims 6-9 and 14 of the '691 patent, and claims 1, 10, and 12 of the '616 patent, (see Joint Br. at 27-28 & n. 11; JA79 & JA83; SUF #D55), the parties' pretrial filings indicate that AMF is only asserting claims 6 and 7 of the '691 patent, and claims 1 and 10 of the '616 patent.  (See [Proposed] Final Pretrial Conference Order, lodged December 3, 2013, at 4).  Therefore, the court's ruling will be limited to those presently asserted patent claims.

AMF moves for summary judgment on the following:  (1) Cochlear's affirmative defense of inequitable conduct fails because Cochlear cannot prove specific intent to deceive by clear and convincing evidence; (2) Cochlear cannot establish by clear and convincing evidence that the means-plus-function claims of the '616 and '691 patents are indefinite; and (3) the accused instrumentalities, (see Joint Br. at 14 n. 4), infringe claim 10 of the '616 patent, and Cochlear induces such infringement.  Cochlear seeks summary judgment as to the following: (1) claims 6-9 and 14 of the '691 patent and claims 1 and 12 of the '616 patent are invalid as indefinite under 35 U.S.C. § 112, ¶¶ 2 & 6;[5] and (2) claim 10 of the '616 patent is not and has not been infringed by Cochlear.

/ / /

/ / /

---

[5]  However, for the reasons stated, the court's ruling on the parties' cross-motions concerning definiteness/indefiniteness will only address claims 6 and 7 of the '691 patent, and claim 1 of the '616 patent.

**STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).   Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict."   Id.

Where the moving party bears the burden of proof on the claim at trial, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."   Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (quotations and citations omitted); see also Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor."); Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).   A party that bears the burden of proof has the burden of establishing a prima facie case on its motion for summary judgment.   See UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Indus. of U.S. and Can., AFL-CIO v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).

If the moving party does not bear the burden of proof at trial, it has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment.   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.   SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).   If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested.   Celotex,

477 U.S. at 324, 106 S.Ct. at 2553.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.

A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial."[6] Anderson, 477 U.S. at 256, 106 S.Ct. at 2514.  A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.  SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).  If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party.  Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206 (1992).  However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact).  "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

/ / /

/ / /

/ / /

---

[6] "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion."  Local Rule 56-3.

1        **DISCUSSION**

2    I.    INEQUITABLE CONDUCT.

3            Cochlear alleges that the '616 and '619 patents are not enforceable because AMF's patent

4    attorney, Bryant Gold ("Gold"), intentionally failed to disclose a technical reference – the

5    McDermott 1989 IEEE article (JA317-26) ("the McDermott article") – to the U.S. Patent and

6    Trademark Office ("PTO") during the prosecution of those patents.  (See Cochlear's Answer and

7    Counterclaims at ¶¶ 11-28).[7]  AMF asserts that Cochlear's affirmative defense of inequitable

8    conduct fails because Cochlear cannot prove specific intent to deceive by clear and convincing

9    evidence.  (AMF's Notice of Motion for Summary Judgment at 1).

10           "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars

11   enforcement of a patent."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285

12   (Fed. Cir. 2011) (en banc).  "To prove inequitable conduct, the challenger must show by clear and

13   convincing evidence that the patent applicant (1) misrepresented or omitted information material

14   to patentability, and (2) did so with specific intent to mislead or deceive the PTO."  In re

15   Rosuvastatin Calcium Patent Litig. v. Aurobindo Pharma Ltd., 703 F.3d 511, 519 (Fed. Cir. 2012).

16   Materiality and intent are separate and independent requirements.  See Therasense, 649 F.3d at

17   1290 ("A district court should not use a 'sliding scale,' where a weak showing of intent may be

18   found sufficient based on a strong showing of materiality, and vice versa.").  Here, AMF relies on

19   the intent prong of the inequitable conduct analysis to support its summary judgment motion.  (See

20   Joint Br. at 1-2, 6-7).

21           "To prevail on a claim of inequitable conduct, the accused infringer must prove that the

22   patentee acted with the specific intent to deceive the PTO."  Therasense, 649 F.3d at 1290.  This

23   means that the accused infringer must prove "by clear and convincing evidence that [1] the

24   _____

25        [7]  In the parties' [Proposed] Final Pretrial Conference Order, Cochlear indicates that it plans
     to pursue its inequitable conduct counterclaim and affirmative defense as to the '616 patent, but
26   is silent as to the '691 patent.  (See [Proposed] Final Pretrial Conference Order, lodged December
     3, 2013, at 13, 29).  However, because Cochlear did not affirmatively indicate that it is abandoning
27   its inequitable conduct counterclaim and affirmative defense as to the '691 patent, (see, generally,
     Cochlear's Memorandum of Contentions of Fact and Law, filed November 26, 2013, at 61), the
28   court will address both patents here.

1  applicant knew of the reference, [2] knew it was material, and [3] made a deliberate decision to

2  withhold it." Id. at 1290; 1st Media, LLC v. Elec. Arts, Inc., 694 F.3d 1367, 1372 (Fed. Cir. 2012)

3  ("A failure of proof on any element precludes a finding of inequitable conduct."). "[T]he materiality

4  required to establish inequitable conduct is but-for materiality." Therasense, 649 F.3d at 1291.

5  A non-disclosed reference is material "if the PTO would not have allowed a claim had it been

6  aware of the undisclosed prior art."[8] Id. A non-disclosed reference that is cumulative of prior art

7  properly before the patent examiner is not material. See, e.g., id. at 1294; Fujitsu Ltd. v. Tellabs

8  Operations, Inc., 2012 WL 3133548, *2 (N.D. Ill. 2012). While "[a] district court may infer intent

9  from indirect and circumstantial evidence," the court "may not infer intent solely from materiality."

10  Therasense, 649 F.3d at 1290.

11      "Proving that the applicant knew of a reference, should have known of its materiality, and

12  decided not to submit it to the PTO does not prove specific intent to deceive." Therasense, 649

13  F.3d at 1290; see also 1st Media, 694 F.3d at 1374 ("Moreover, [a] finding that the

14  misrepresentation or omission amounts to gross negligence or negligence under a 'should have

15  known' standard does not satisfy this intent requirement.") (internal quotation marks omitted)

16  (alteration in original). "[T]o meet the clear and convincing evidence standard, the specific intent

17  to deceive must be the single most reasonable inference able to be drawn from the evidence."

18  Therasense, 649 F.3d at 1290 (internal quotation marks omitted). "[W]hen there are multiple

19  reasonable inferences that may be drawn, intent to deceive cannot be found." Id.

20      Cochlear bears the ultimate burden of proof on its inequitable conduct defense. See

21  Therasense, 649 F.3d at 1290; Rosuvastatin Calcium Patent Litig., 703 F.3d at 519. However,

22  as the moving party, AMF bears the initial burden of coming forward with sufficient evidence to

23  demonstrate that there is no genuine issue of material fact that would preclude summary

24  judgment. See Vivid Techs., Inc. v. American Science & Eng'g, Inc., 200 F.3d 795, 806-07 (Fed.

25

26      [8]  While the clear-and-convincing-evidence standard applies to the inequitable conduct
27  defense, the preponderance-of-the-evidence standard applies to the issue of whether the PTO
    would have issued the patent "but for" the failure to disclose. See Therasense, 649 F.3 at 1291-
28  92.

1   Cir. 1999) ("When the moving party does not have the burden of proof on the issue that is the

2   subject of the summary judgment motion (the patentee bears the burden of proving infringement)

3   the movant nonetheless bears the initial burden of coming forward with sufficient evidence to

4   demonstrate that there is no material issue of fact that would preclude summary judgment, and

5   that it is entitled to judgment as a matter of law.").

6       As to the first specific intent factor under Therasense, concerning whether the patent

7   applicant knew of the reference at issue, Cochlear has put forth sufficient evidence to raise a

8   genuine issue of material fact as to whether Gold knew of the McDermott article.  (See Joint Br.

9   at 5).  As Cochlear points out, AMF admits "that the McDermott article was known to the named

10  inventors and/or their attorneys of record during the prosecution of the '616 and/or the '691

11  patents." (AMF's Reply and Counterclaims-in-Reply to Cochlear Americas and Cochlear Limited's

12  Counterclaims, at ¶ 18; Joint Br. at 5 (Cochlear discussing AMF's admission)).   AMF failed to

13  address its own admission in opposing Cochlear's argument.  (See, generally, Joint Br. at 6-7);

14  see also Silva v. U.S. Bancorp, 2011 WL 7096576, *3 (C.D. Cal. 2011) (ruling that plaintiff's failure

15  to respond in his opposition brief to defendants' argument in motion to dismiss amounted to a

16  concession that his claim should be dismissed); Tatum v. Schwartz, 2007 WL 419463, *3 (E.D.

17  Cal. 2007) (explaining that a party "tacitly concede[d] [a] claim by failing to address defendants'

18  argument in her opposition").

19      Moreover, AMF's patent attorney, Gold, testified that he was aware of the McDermott article

20  at least as early as January 6, 1995.  (See JA395-441 (Gold Dep. Tr.) at 28:14-16; SUF #P2).

21  Gold testified that he knew of the McDermott article before the '616 patent issued.[9]  (See JA395-

22  _____

23      [9]  AMF cites 1st Media, LLC, 694 F.3d at 1372 and Kimberly-Clark Worldwide, Inc. v. First
    Quality Baby Products, LLC, 2012 WL 5931790, *5 (E.D. Wis. Nov. 27, 2012) to argue that

24  Cochlear cannot prove by clear and convincing evidence that Gold had a recollection of the
    McDermott article "during the relevant timeframe" because Gold testified he could not recall if he

25  was still aware of the McDermott article "more than a year later during the period Cochlear argues
    the McDermott article became material."  (See Joint Br. at 1-2).  However, those cases are

26  distinguishable.  In 1st Media, the inventor testified that he could not recall whether he had
    reviewed the information at issue.  694 F.3d at 1375.  Similarly, in Kimberly-Clark Worldwide, one

27  of the named inventors and the plaintiff's patent attorney lacked recollection about the disclosures
    at issue.  2012 WL 5931790, at *5.  Here, by contrast, Gold had a specific recollection that he

28

441 (Gold Dep. Tr.) at 28:21-23, at 35:9-16 (Gold testifying that "I think we concluded earlier that at certainly some point in the prosecution I was aware of it," when asked why the McDermott article was not cited during the prosecution of the '616 patent)).  In addition, because the '691 patent issued on August 17, 1999, Gold knew of the McDermott article before the '691 patent issued as well.[10]   Therefore, the court finds that a genuine issue of material fact exists as to whether Gold knew of the McDermott article.

As to the second factor concerning whether the patent applicant knew that the reference in question was material, Cochlear has put forth sufficient evidence to raise a genuine issue of material fact as to whether Gold knew that the McDermott article was material.  (See Joint Br. at 4-6).  In an office action dated May 7, 1996, the PTO patent examiner explained that certain claims of the application corresponding to the '616 patent "are allowable over the prior art of record since the prior art does not show or suggest the measuring of the electrode voltage for external display." (JA191-316 (Certified Prosecution History for U.S. Patent No. 5,606,616) at JA301; see also Joint Br. at 5-6).  Gold understood that Figure 4 in the McDermott article disclosed "monitoring of voltage for external display." (See JA395-441 (Gold Dep. Tr.) at 34:20-35:8; see also Joint Br. at 5-6).  Gold understood that the McDermott patent,[11] which was before the PTO and which Gold

---

knew of the McDermott article at least as early as January 6, 1995, before either of the two patents-in-suit issued.  (See JA395-441 (Gold Dep. Tr.) at 28:14-16; SUF #P2).

[10]   With regard to the '691 patent, AMF failed to address the second and third factors of the intent prong of the inequitable conduct analysis.  (See, generally, Joint Br. at 1-2, 6-7).  AMF addressed only the first factor concerning whether Gold knew of the McDermott article, (see Joint Br. at 1-2), and the Gold testimony cited by AMF applies only to the '616 patent.  (See Joint Br. at 1-2; JA2643-67 (Gold Dep. Tr.) at 35:9-42:10).  In any event, Cochlear presented sufficient evidence showing that a genuine issue of material fact exists as to whether Gold knew of the McDermott article before the '691 patent issued.  (Joint Br. at 5; see also AMF's Reply and Counterclaims-in-Reply to Cochlear Americas and Cochlear Limited's Counterclaims, filed November 3, 2010, at ¶ 18).

[11]   When asked, during oral argument, to identify which references the McDermott article would have been cumulative of, AMF specified the Borkan '934 patent (identified as U.S. Patent No. 4,612,934 in the list of patent documents in the '616 patent) and the McDermott patent (identified as U.S. Patent No. 4,947,844 in the list of patent documents in both the '616 and '691 patents). The Borkan '934 patent is not on the list of disclosed patents in the '691 patent.  (See, generally, '691 patent).  AMF failed to address either reference in its summary judgment motion.  (See,

1    identified as cumulative of the McDermott article, did not disclose "the display of the measurable

2    voltage." (See JA2643-67 (Gold Dep. Tr.) at 38:6-42:4 (Gold ultimately testifying that the

3    McDermott patent does not refer explicitly to a display); see also Joint Br. at 5-6).

4         AMF appears to argue that Gold would have thought that the McDermott article was not

5    material. (See Joint Br. at 2). According to AMF, Gold testified that he would not have disclosed

6    the McDermott article to the PTO because it was cumulative of other technical references and

7    patents already disclosed to the PTO. (Joint Br. at 2 (citing JA2652-59 (Gold Dep. Tr.) at

8    35:9-42:10)). However, that is not an entirely accurate characterization of Gold's testimony.

9    When asked why he did not cite the McDermott article to the PTO during the prosecution of the

10   '616 patent, Gold testified that he is "sure [the McDermott article] was considered," and that "[i]t

11   could have been that even with that disclosure, it was merely cumulative to what was already

12   disclosed in the many references that were cited." (JA2643-67 (Gold Dep. Tr.) at 35:9-36:1). That

13   Gold failed to disclose the McDermott article because it could have been cumulative of the

14   references cited to the PTO is not the same as Gold testifying that he did not disclose the

15   McDermott article because he affirmatively believed it was cumulative of the references of record.

16   When asked again, after a deposition break, why the McDermott article was not cited to the PTO,

17   Gold testified that "[i]t is merely cumulative of the references that are cited." (Id. at 37:22-38:4).

18        Similarly, Gold was asked twice which references the McDermott article is cumulative of.

19   Before the deposition break, Gold testified that he could not identify a reference that was cited to

20   the PTO that the McDermott was cumulative of "without doing hours of reviewing all of those

21   patents that were cited there, hours of research." (See JA2643-67 (Gold Dep. Tr.) at 36:2-6).

22   After about a seven-minute break, (see id. at 37:7-11), however, Gold testified that "[t]his article

23   by Hugh McDermott is basically the same thing that's disclosed in his patent [subsequently

24   identified as Exhibit 1150, the McDermott patent] that was cited to the patent office." (Id. at 38:6-

25   10). Under the circumstances, Gold's testimony raises credibility issues germane to whether Gold

26   knew that the McDermott article was material. See, e.g., Aventis Pharma S.A. v. Hospira, Inc.,

27   _____

28   generally, Joint Br. at 1-2 (instead generally referring to "other technical references and patents")).

675 F.3d 1324, 1335-36 (Fed. Cir. 2012) (finding specific intent to deceive in part due to lack of credibility of the testimony of the named inventor).

As to the third factor concerning whether the patent applicant made a deliberate decision to withhold the reference in question, Cochlear has put forth sufficient evidence to raise a genuine issue of material fact as to whether Gold made a deliberate decision not to cite the McDermott article to the PTO.  (See Joint Br. at 5-6).  When asked whether a decision was made during the prosecution of the '616 patent to not cite the McDermott article, Gold testified, "I don't recall specifically making that decision," that "[a]gain, our practice would have been to review all of the prior art we were aware of which included this, as we have shown," and that "so based on our practice, yes, I would say it would have been made not to cite it." (JA395-441 (Gold Dep. Tr.) at 37:13-21).  AMF failed to address this deposition testimony.[12]  (See, generally, Joint Br. at 1-2, 6-7); see also Silva, 2011 WL 7096576, at *3; Tatum, 2007 WL 419463, at *3.  Cochlear also put forth evidence that Gold selectively disclosed the McDermott article, i.e., that Gold disclosed the McDermott article when it was "irrelevant" but failed to disclose it when it was "highly relevant." (Joint Br. at 6); see also Aventis, 675 F.3d at 1335-36 (affirming the district court's inequitable conduct determination where affirmative conduct by the patent applicants showed selective disclosure of material information).  Therefore, there is a genuine issue of material fact as to whether Gold made a deliberate decision to withhold the McDermott article from the PTO.

Finally, AMF, relying on Fujitsu Ltd., 2012 WL 3133548, at *3, argues that courts grant summary judgment of no inequitable conduct even if the specific intent to deceive is one reasonable inference as opposed to the single most reasonable inference. (Joint Br. at 1).  AMF's argument is unpersuasive.  In Fujitsu, the court found that, although intent to deceive the PTO was one reasonable inference from the evidence, "other reasonable inferences can be drawn from this evidence, including the inference that the inventors believed (perhaps erroneously) that the

---

[12]  AMF argues that Cochlear's technical expert, Dr. Loeb, worked with Gold and found him "very competent and trustworthy."  (Joint Br. at 1 n. 1 (citing JA2708-09 (Loeb 2009 Dep. at 46:20-47:3)).  However, AMF failed to cite to any authority to show the relevance of this argument to an inequitable conduct analysis.

1  Sugaya reference was cumulative of Patent '092, or that the inventors simply erred by forgetting

2  to include the Sugaya reference." Fujitsu, 2012 WL 3133548, at *3.  Here, as discussed above,

3  AMF failed to put forth evidence to support other reasonable inferences.  (See, generally, Joint

4  Br. at 1-2, 6-7).  Rather, through the deposition testimony of Gold, AMF provided one explanation

5  to dispute Cochlear's affirmative defense of inequitable conduct, i.e., assuming Gold was aware

6  of the McDermott article, Gold would not have cited it because it was cumulative to other technical

7  references and patents already disclosed to the PTO.  (See id. at 1-2).  However, it is undisputed

8  that Gold was aware of the McDermott article.  (AMF's Reply and Counterclaims-in-Reply to

9  Cochlear Americas and Cochlear Limited's Counterclaims, filed November 3, 2010, at ¶ 18;

10  JA395-441 (Gold Dep. Tr.) at 28:14-16; SUF #P2).  And there are credibility issues concerning

11  Gold's cumulativeness testimony for the reasons discussed above.  (Compare JA2643-67 (Gold

12  Dep. Tr.) at 35:9-42:10 with id. at 37:22-38:4; compare id. at 36:2-6 with id. at 37:7-11; see, e.g.,

13  Aventis, 675 F.3d at 1335-36; see also Vivid Techs., 200 F.3d at 806-07.

14      In sum, taking the facts in the light most favorable to Cochlear, as the court must on AMF's

15  motion for summary judgment, see Barlow, 943 F.2d at 1134, the court finds that there are

16  genuine issues of material fact as to whether Gold failed to disclose the McDermott article with

17  specific intent to deceive the PTO.  There are genuine issues of material fact as to whether Gold

18  knew of the McDermott article, whether he knew that the article was material, and whether Gold

19  made a deliberate decision to withhold the McDermott article from the PTO.  The arguments and

20  evidence AMF presented on its summary judgment motion, in light of the arguments and evidence

21  advanced by Cochlear, do not lead to multiple reasonable inferences such that intent to deceive

22  cannot be found under Therasense as a matter of law.  Therefore, the court denies AMF's motion

23  for summary judgment on Cochlear's affirmative defense of inequitable conduct.

24  / / /

25  / / /

26  / / /

27

28

1    II.    INFRINGEMENT/NON-INFRINGEMENT OF CLAIM 10 OF THE '616 PATENT.

2            AMF moves for summary judgment that the accused instrumentalities,[13] (see Joint Br. at

3    14 n. 4), infringe claim 10 of the '616 patent, and that Cochlear induces such infringement.  (See

4    Joint Br. at 14-23).  Cochlear cross-moves for summary judgment that claim 10 of the '616 patent

5    is not and has not been infringed by Cochlear.  (See id. at 32-39).[14]

6            Summary judgment of infringement or non-infringement is a two-step analysis.  "First, the

7    claims of the patent must be construed to determine their scope.  Second, a determination must

8    be made as to whether the properly construed claims read on the accused device."  Pitney Bowes,

9    Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted);

10   Carroll Touch, Inc. v. Electro Mechanical Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993).  The first

11   step of claim construction is a question of law; the second step is a question of fact.  See, e.g.,

12   Pitney Bowes, 182 F.3d at 1304.

13           "Infringement is assessed by comparing the accused device to the claims; the accused

14   device infringes if it incorporates every limitation of a claim, either literally or under the doctrine

15   of equivalents.  If, however, even one claim limitation is missing or not met, there is no literal

16   infringement."  MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005)

17   (quotation marks and brackets omitted); Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1317

18   (Fed. Cir. 2009) ("To infringe a method claim, a person must have practiced all steps of the

19   claimed method."); Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993) ("A method

20   claim is directly infringed only by one practicing the patented method.").

21

22           [13]  The accused implantable cochlear stimulators include all models in the CI24M, CI24R
23   (Nucleus 24), CI24RE, CI422 (Nucleus Freedom) and CI500 (Nucleus 5) families. The accused
     wearable processors include all models in the SP5, SP12 and SP15/CP800 families. The accused
24   software includes WinDPS and CustomSound. The court will collectively refer to these as the
25   "accused instrumentalities" or "accused products."

26           [14] Cochlear attempts to present an infringement versus invalidity dilemma as to claim 10 of the
     '616 patent. (See Joint Br. at 33). However, invalidity and infringement are separate issues to be
27   tried separately. See, e.g., Pandrol, USA v. Airboss Ry Prods., Inc., 320 F.3d 1354, 1364 (Fed.
     Cir. 2003) ("patent infringement and patent validity are treated as separate issues"); accord Lift-U
28   v. Ricon Corp., 2012 WL 5303301, *4 (N.D. Cal. 2012).

1    "A finding of infringement under the doctrine of equivalents requires a showing that the

2    difference between the claimed invention and the accused product was insubstantial.  One way

3    of doing so is by showing on a limitation by limitation basis that the accused product performs

4    substantially the same function in substantially the same way with substantially the same result

5    as each claim limitation of the patented product."  Crown Packaging Tech., Inc. v. Rexam Bev.

6    Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009) (citing Graver Tank & Mfg. Co. v. Linde Air Prods.

7    Co., 339 U.S. 605, 608, 70 S. Ct. 854 (1950); Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,

8    520 U.S. 17, 39-40, 117 S. Ct. 1040 (1997)); see also Festo Corp. v. Shoketsu Kinzoku Kogyo

9    Kabushiki Co., 535 U.S. 722, at 732, 734-37 (2002) (explaining that prosecution history estoppel

10   limits the range of equivalents).  "[A] patentee must . . . provide particularized testimony and

11   linking argument as to the 'insubstantiality of the differences' between the claimed invention and

12   the accused device or process, or with respect to the function, way, result test when such

13   evidence is presented to support a finding of infringement under the doctrine of equivalents.  Such

14   evidence must be presented on a limitation-by-limitation basis.  Generalized testimony as to the

15   overall similarity between the claims and the accused infringer's product or process will not

16   suffice."  Tex. Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1567 (Fed. Cir.

17   1996).  This rule applies in the summary judgment context.  Network Commerce, Inc. v. Microsoft

18   Corp., 422 F.3d 1353, 1363 (Fed. Cir. 2005).

19       A finding of indirect infringement by inducement requires a predicate finding of direct

20   infringement.  See Global-Tech Appliances, Inc. v. SEB S.A., 131 S.Ct. 2060, 2068 (2011)

21   (holding that induced infringement under § 271(b) requires knowledge that the induced acts

22   constitute patent infringement); Akamai Techs., Inc. v. Limelight Networks, Inc., 692 F.3d 1301,

23   1316 (Fed. Cir. 2012) (per curiam) ("[T]his court on numerous occasions recited the familiar and

24   uncontroversial proposition that one of the elements of induced infringement is proof that there has

25   been direct infringement.").  Moreover, "inducement requires that the alleged infringer knowingly

26   induced infringement and possessed specific intent to encourage another's infringement."

27   Akamai, 692 F.3d at 1308 (quoting DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1306 (Fed. Cir.

28   2006) (Section III.B only en banc)).  "The mere knowledge of possible infringement by others does

1  not amount to inducement; specific intent and action to induce infringement must be proven." DSU

2  Med., 471 F.3d at 1305 (internal quotation marks omitted).

3          Here, the first step of claim construction has been completed.[15]  (See Claim Construction

4  Order; R&R).  Thus, the court must determine whether the accused instrumentalities infringe claim

5  10 of the '616 patent.

6          A.       Direct Infringement/Non-Infringement of Claim 10 of the '616 Patent.

7          "Summary judgment on the issue of infringement is proper when no reasonable jury could

8  find that every limitation recited in a properly construed claim either is or is not found in the

9  accused device either literally or under the doctrine of equivalents." PC Connector Solutions LLC

10 v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005); Pitney Bowes, 182 F.3d at 1304

11 ("[S]ummary judgment of non-infringement can only be granted if, after viewing the alleged facts

12 in the light most favorable to the non-movant, there is no genuine issue whether the accused

13 device is encompassed by the claims.").  The patentee, here AMF, has the burden of proving

14 infringement by a preponderance of the evidence. See Kegel Co. v. AMF Bowling, 127 F.3d 1420,

15 1425 (Fed. Cir. 1997).  This means that AMF must prove that it is more likely than not that each

16 and every limitation of claim 10 of the '616 patent is found in the accused instrumentalities.  See,

17 e.g., Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991).

18         Claim 10 of the '616 patent states as follows, with bolded language showing disputed claim

19 limitations germane to the parties' cross-motions of summary judgment and underlined language

20 showing claim limitations for which the parties have agreed upon constructions:

21                 10. A method of testing an implantable tissue stimulating system

22                 comprising:

23

24                 transmitting data-containing signals to an implanted stimulator from an

25                 external transmitter;

26

27   _____

28   [15]  At oral argument, the parties confirmed that they do not require additional claim construction
     as to claim 10 of the '616 patent.

**selectively controlling the data-containing signals as they are thus transmitted;**

receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes;

**selectively monitoring the at least one pair of the multiplicity of electrodes to measure a _voltage associated therewith_ _at the same time the stimulation signals are applied thereto_;**

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter;

receiving and processing the status-indicating signals to produce processed status-indicating signals which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and

**displaying the processed status-indicating signals, whereby the
status of the implanted stimulator, including the results of <u>the
measurements made within the implanted stimulator</u>, may be
made known.**

'616 patent, col. 35:42-66 (claim 10).  The parties' dispute focuses on the presence or absence
of the bolded claim language shown above.  (<u>See</u> Joint Br. at 24, 34-38, 39-46).

### 1.   "selectively controlling . . ." Limitation.

Regarding the limitation of "selectively controlling the data-containing signals as they are
thus transmitted," the parties agree that "selectively controlling the data-containing signals as they
are thus transmitted" means adjusting the data-containing signals which contain data used to set
the stimulation signals.  (<u>See</u> R&R at 8).

AMF argues that "the adjustment of the RF [radio frequency] bursts of data (i.e.,
data-containing signals) travelling from the WP to the ICS happens as a result of the audiologist
initiating an electrode impedance test or by selecting which electrodes to test for impedance, either
directly or as a result of the mapping process," and that "[t]his selection controls the content of
signals transmitted from the WP to the implant for the purpose of instructing the ICS how to
stimulate the electrodes."  (Joint Br. at 19 (citing to expert declarations); JA483-515 (Declaration
of Dr. Darrin J. Young ("Dr. Young") in Support of Plaintiff's Motion for Summary Judgment
("Young Decl.") at ¶ 60).  AMF's expert, Dr. Young, testified that the fact that the data cannot be
changed once it is imposed on the carrier frequency means that the device does not selectively
control the data-containing signals as they are thus transmitted.  (<u>See</u> JA170-190 (Young Dep.
Tr.) at 70:25-71:24).

Cochlear asserts that AMF cannot prove that the accused instrumentalities selectively
control data-containing signals as they are transmitted.  (<u>See</u> Joint Br. at 34).  Cochlear has put
forth evidence that the accused products cannot change the data after it is imposed on the carrier

frequency,[16] (see JA1-6 (Declaration of Tony Nygard ("Mr. Nygard")) ("Nygard Decl.") at ¶¶ 10-11), and that there is no adjustment of data travelling from the WP to the ICS.  (See Joint Br. at 34).  Specifically, Cochlear has put forth evidence that certain speech processors impose data on the carrier signal but the data cannot be adjusted when travelling from the WP to the ICS.  (See JA1-6 (Nygard Decl.) at ¶¶ 10-11; JA369-72 (Second Declaration of Tony Nygard) ("Second Nygard Decl.") at ¶ 8).

However, Dr. Young states that because the accused products allow selection of the electrode to be tested, the disputed claim limitation is satisfied.  (See Joint Br. at 40 (citing to JA483-515 (Young Decl.) at ¶ 60)).  In addition, Dr. Young testified that "selectively controlling the data-containing signals as they are thus transmitted" means that a user can select number of electrodes that the user wants to stimulate inside the ear.  (See Joint Br. at 40 (citing to JA2961-3013 (Young Dep. Tr.) at 156:7-23)).

Under the circumstances, there is a genuine issue of material fact as to whether the accused instrumentalities satisfy the limitation of "selectively controlling the data-containing signals as they are thus transmitted" contained in claim 10 of the '616 patent.  See Armco, Inc. v. Cyclops Corp., 791 F.2d 147, 151 (Fed. Cir. 1986) ("Because there was evidence on both sides as to whether the alloys were supplied to NAA and Lockheed for the purposes of refining them and finding what was necessary to complete the invention, the district court erred in resolving disputed issues of material fact in favor of Cyclops.  Where, as here, there are genuinely disputed issues of material fact, summary judgment simply cannot be utilized as the tool for deciding those issues.").

/ / /

---

[16] AMF argues that Dr. Young's testimony, relied on by Cochlear, relates to the validity of claim 10 of the '616 patent, not infringement.  (Joint Br. at 40).  However, AMF failed to put forth any authority calling Cochlear's argument into question.  (See, generally, id. at 39-41).  Moreover, "[b]ecause the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses."  Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001).  In any event, the court does not solely rely on Dr. Young's testimony to resolve AMF's motion for summary judgment of infringement.

2.     **"selectively monitoring . . ." Limitation.**

As to the limitation of "selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto" contained in claim 10 of the '616 patent, the parties agree that "voltage associated therewith" means voltage across a pair of electrodes.  (See R&R at 8).  The parties also agree that "at the same time the stimulation signals are applied thereto" means the measurement of the voltage is made at the same time the stimulation signal is applied.  (See id.).

AMF argues that "[t]he accused ICS products all include circuitry that facilitates the monitoring of at least two electrodes to measure a voltage associated with the electrodes," that the "[e]lectrodes for stimulation are selectively determined based on the content of the data-containing signals received from the WP, which indicate the electrodes for monitoring," and that "[f]or all of the accused Cochlear implants, the measurement of the voltage is made at the same time the stimulation signal is applied."[17]  (Joint Br. at 20 (citing to JA483-515 (Young Decl.) at ¶¶ 68-71)).

Cochlear, in its opposition to AMF's infringement summary judgment motion and on its non-infringement summary judgment motion, argues that AMF cannot prove that the accused instrumentalities satisfy the disputed claim limitation of "selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto" contained in claim 10 of the '616 patent.  (See Joint Br. at 34-36).  Cochlear argues that satisfaction of this claim limitation is based on whether the accused

---

[17]   AMF, despite having the burden of proof, does not explain how including circuitry that "facilitates" monitoring is the same as actually monitoring at least one pair of electrodes.  (See, generally, Joint Br. at 20); Laitram, 939 F.2d at 1535 ("To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent.   The patentee bears the burden of proving infringement by a preponderance of the evidence.") (internal citation omitted); see also Meyers v. Brooks Shoe, Inc., 912 F.2d 1459, 1461 (Fed. Cir. 1990), overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020 (Fed. Cir. 1992) ("[W]here the moving party has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense.").  Therefore, the court cannot find that the accused products satisfy the disputed claim limitation on AMF's summary judgment motion.

instrumentalities measure an electrode voltage with respect to a ground reference that is at a patient's body potential, (see Joint Br. at 34-35), based on the testimony of AMF's expert, Dr. Young, that measurement of an electrode voltage with respect to ground reference that is a patient's body potential does not meet the requirements of claim 10 of the '616 patent.  (See JA170-190 (Young Dep. Tr.) at 106:7-11).

However, as AMF counters, Cochlear has failed to show how AMF's infringement argument and Dr. Young's infringement opinion as to this claim limitation turns on whether the accused instrumentalities measure an electrode voltage with respect to ground reference, system ground, or body potential. (See, generally, Joint Br. at 34-35 (citing JA1-6 (Nygard Decl.) at ¶¶ 12-14), 41-42 (AMF's rebuttal)).  The terms ground reference, system ground, or body potential do not appear in the claim limitation.  (See '616 patent, col. 35:42-66 (claim 10)).  Cochlear relies on the declaration of Mr. Nygard, but the declaration fails to show how AMF's infringement argument and Dr. Young's infringement opinion preclude satisfaction of this claim limitation.[18]  (See, generally, Joint Br. at 34-35 (citing JA1-6 (Nygard Decl.) at ¶¶ 12-14)); see Vivid Techs., 200 F.3d at 807; Nissan Fire, 210 F.3d at 1106.  Moreover, AMF has put forth sufficient evidence that the documents relied on by Mr. Nygard refer to the technical term "VCC," and not to "system ground" or "ground reference."[19]  (See Joint Br. at 41-42).  Finally, Cochlear has not shown that even if it

---

[18]  Cochlear argues that Dr. Young's Declaration in Response to Defendants' Opening MSJ Brief and the Declarations of Tony Nygard and Robert J. Stevenson, Ph.D. in support of Cochlear's Motion for Summary Judgment ("Young Response Decl.") (JA520-26 at JA521-22) is a "sham" as to the monitoring step of claim 10 of the '616 patent.  (See Joint Br. at 47-48).  Cochlear argues that "Dr. Young testimony says that measurement of a single electrode with reference to ground at body potential does not infringe, yet – while admitting in his declaration that the voltage of 'an electrode' is measured with respect to the Vdd ground reference[.]" (Id. at 48).  Cochlear cites to Wikipedia's entry for "ground" to explain its common usage, and AMF objects to Cochlear's citation to Wikpedia on multiple grounds.  (Id.).  In any event, because the court does not rely on the Young Response Decl. on the issue raised by Cochlear, it is not necessary to address Cochlear's argument that the Young Response Decl. is a sham.

[19]  The court is unable to discern the relationship among these terms based on the record before the court.  See also Manchak v. N-Viro Energy Sys., 876 F. Supp. 1123, 1129 (C.D. Cal. 1994) ("Not only does the Court lack the expertise to evaluate the credibility of Plaintiff's counter arguments, but more importantly, to do so would be to act as a finder of fact.").

were true that the accused products measure an electrode voltage with respect to a ground reference that is at a patient's body potential, that the disputed claim limitation is not satisfied in the way claimed by AMF.  (See, generally, Joint Br. at 34-35).

Under the circumstances, the court finds that a genuine issue of material fact exists as to whether the accused instrumentalities satisfy the limitation of "selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto" contained in claim 10 of the '616 patent.  See Armco, 791 F.2d at 151; see also Sri Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116 (Fed. Cir. 1985) ("Because . . . infringement is itself a fact issue, a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate.") (internal citation omitted).

### 3.     "displaying . . ." Limitation.

As to the limitation of "displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known," contained in claim 10 of the '616 patent, the court previously concluded that "the results of the measurements made within the implanted stimulator" requires no construction as it is not a separate limitation on the claim term of which it is a part. (Claim Construction Order at 25).  Regarding the "whereby" clause in the last claim limitation, the court previously ruled that "the disputed language requires no construction, as the whereby clause – making known 'the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator' – merely provides a more illustrative expression of the 'displaying the status-indicating signals' limitation.  It provides no additional restrictions to the claim's already-existing requirement that the signals obtained by the testing of the implanted stimulator must be displayed for view by the physician."  (Id. at 2).

AMF argues that the claim limitation does not require that the actual "voltage value" be displayed.  (Joint Br. at 21-22).  According to AMF, if the claim limitation does require that the actual "voltage value" be displayed, the fact that the accused instrumentalities (WinDPS and

1   Custom Sound Software) display measured electrode impedance would satisfy this claim limitation

2   under the doctrine of equivalents.  (Id.).

3        In any event, there is conflicting evidence as to whether the digital signals produced by the

4   accused processors are displayed, (compare JA1-6 (Nygard Decl.) at ¶¶ 15-16 with JA483-515

5   (Young Decl.) at ¶¶ 78, 79, 81, 82); whether impedance is a signal produced in accused speech

6   processors, (compare JA1-6 (Nygard Decl.) at ¶¶ 15-16 with JA483-515 (Young Decl.) at ¶¶ 78,

7   79, 81, 82); and whether the impedance that is optionally displayed by the accused software is the

8   same as the voltage measurement made in the implant or whether the voltage measurement can

9   be determined from the display of impedance.  (Compare JA1-6 (Nygard Decl.) at ¶ 18 with

10  JA483-515 (Young Decl.) at ¶¶ 79, 81, 82).

11       Under the circumstances, there is a genuine issue of material fact as to whether the

12  accused instrumentalities satisfy the limitation of "displaying the processed status-indicating

13  signals, whereby the status of the implanted stimulator, including the results of the measurements

14  made within the implanted stimulator, may be made known" contained in claim 10 of the '616

15  patent because of conflicting expert testimony.[20]  See, e.g., Green Edge Enters., LLC v. Rubber

16  Mulch etc., LLC, 620 F.3d 1287, 1298 (Fed. Cir. 2010) (upholding denial of summary judgment

17  where parties had produced conflicting evidence requiring resolution by a jury); Ethyl Corp. v.

18  Borden, Inc., 427 F.2d 206, 210 (3d Cir. 1970) (District courts not permitted to resolve "disputed

19  and relevant factual issues on conflicting affidavits of qualified experts."); Air Turbine Technology,

20  Inc. v. Atlas Copco AB, 295 F.Supp.2d 1334, 1338-39 (S.D. Fla. 2003) (denying summary

21  judgment because each party's experts' conflicting testimony created a genuine issue of material

22  fact as to infringement).

23  / / /

24  / / /

25  / / /

26

27  _____

28       [20] Based on the court's ruling, the court need not decide the prosecution history estoppel issue raised by Cochlear at this juncture.  (See Joint Br. at 38-39).

4.      **Conclusion**.

In sum, there are genuine issues of material fact as to whether the accused instrumentalities specified by AMF satisfy each limitation of claim 10 of the '616 patent.[21] Therefore, the court denies AMF's motion for summary judgment of infringement and denies Cochlear's cross-motion for summary judgment of non-infringement.  See Meyers, 912 F.2d at 1461 ("The district court cannot engage in fact-finding on a motion for summary judgment.  If there is a real dispute about a material fact or factual inference, summary judgment is inappropriate; the factual dispute should be reserved for trial.") (internal citation omitted); Cable Electric Products, Inc. v. Genmark, Inc., 770 F.2d 1015, 1020 (Fed. Cir. 1985) ("[T]he circumstances appropriate to summary judgment are those in which a district court is able to conclude that, with regard to any factual issues material to granting judgment as a matter of law, no genuine dispute exists."); see also Helifix, Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1347 (Fed. Cir. 2000) (finding genuine issue of material fact where witness's testimony found to be conflicting); Elantech Devices Corp. v. Synaptics, Inc., 2008 WL 2008627, *6 (N.D. Cal. 2008) ("If expert testimony is required to resolve the summary judgment motion, conflicting expert testimony can create a genuine issue of material fact, compelling the court to deny the motion.").

B.      Inducement.

There is a genuine dispute of material fact as to whether Cochlear induces infringement of claim 10 of the '616 patent for at least two reasons.

First, there can be no infringement by inducement in the absence of a finding of direct infringement.  See Akamai , 692 F.3d at 1316; accord Interwoven, Inc. v. Vertical Computer Sys., 2013 WL 3786633, *6 (N.D. Cal. 2013).  As discussed above, there is a genuine dispute of material fact as to whether there is direct infringement of claim 10 of the '616 patent.

Second, the accused infringer must have possessed the "specific intent to encourage another's infringement."  Akamai, 692 F.3d at 1308.  Here, Cochlear has put forth sufficient

---

[21]   The court does not rely on the Declaration of Ginger Stickney ("Stickney Decl.) (JA516-19) in finding that a genuine issue of material fact exists.  Thus, it is unnecessary to address Cochlear's untimely witness disclosure argument.  (See Joint Br. at 23-24).

1    evidence to raise a genuine issue of material fact that it did not possess the requisite specific

2    intent.  (See Joint Br. at 23-25).  Specifically, Cochlear put forth evidence showing that Cochlear

3    believed it was practicing an invention in the public domain.  (See JA369-72 (Second Nygard

4    Decl.) at ¶¶ 17-19); see also Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc., 554 F.3d 1010,

5    1025 (Fed. Cir. 2009) (explaining that although "practicing the prior art" may be a defense to

6    patent infringement, a defendant's belief that it can freely practice inventions found in the public

7    domain may support a jury's finding that the intent required for induced infringement was lacking).

8    AMF concedes that the credibility of Cochlear's belief should be put the jury.  (Joint Br. at 26)

9    (citing Kinetic Concepts, 554 F.3d at 1024-35).

10       Taking the facts in the light most favorable to Cochlear, as the court must on AMF's motion

11   for summary judgment, see Barlow, 943 F.2d at 1134, the court finds that there are genuine issues

12   of material fact as to whether Cochlear induces infringement of claim 10 of the '616 patent.

13   Therefore, the court denies AMF's motion for summary judgment that Cochlear induces

14   infringement of claim 10 of the '616 patent.

15   III.   DEFINITENESS/INDEFINITENESS OF MEANS-PLUS-FUNCTION CLAIMS OF THE '616

16          AND '691 PATENTS.

17       AMF asserts that Cochlear cannot establish by clear and convincing evidence that means-

18   plus-function claims of the '616 and '691 patents are indefinite.  (See AMF's Notice of Motion for

19   Summary Judgment at 1; Joint Br. at 7-10).  Cochlear contends that claims 6-9 and 14 of the '691

20   patent and claims 1 and 12 of the '616 patent are invalid as indefinite under 35 U.S.C. § 112, ¶¶

21   2 (indefiniteness) & 6 (means-plus-function claim language).  (See Cochlear's Notice of Motion

22   for Summary Judgment at 1-2; Joint Br. at 27-30).[22]  The parties' pretrial filings indicate that AMF

23   

24   ───────────────

     [22]  Since this suit was filed in 2007, Congress passed the Leahy-Smith America Invents Act,
25   Pub.L. No. 112–29, 125 Stat. 284 (2011), which changed the internal organization of 35 U.S.C.
     § 112.  Thus, when the case arose, 35 U.S.C. § 112(b) & (f) were designated as 35 U.S.C. §
26   112(2) & (6), respectively.  The court will respectively use these designations interchangeably.
         Section 112(b), formerly 112(2), requires that "[t]he specification shall conclude with one
27   or more claims particularly pointing out and distinctly claiming the subject matter which the
     inventor or a joint inventor regards as the invention."  Section 112(f), formerly 112(6), requires that
28   "[a]n element in a claim for a combination may be expressed as a means or step for performing

is only asserting claims 6 and 7 of the '691 patent and claims 1 and 10 of the '616 patent.  (See [Proposed] Final Pretrial Conference Order, lodged December 3, 2013, at 4).  Therefore, the court's ruling on definiteness/indefiniteness here will only address claims 6 and 7 of the '691 patent and claim 1 of the '616 patent.

A patent is presumed to be valid.  35 U.S.C. § 282.  A party challenging the validity of a patent must prove invalidity by clear and convincing evidence.  See Intel Corp. v. VIA Techs., 319 F.3d 1357, 1366 (Fed. Cir. 2003) ("Any fact critical to a holding on indefiniteness, moreover, must be proven by the challenger by clear and convincing evidence.").

Whether a claim is indefinite or definite is a question of law.  See Exxon Res. & Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001).  The indefiniteness or definiteness analysis requires a determination of whether one skilled in the art would understand the bounds of the claim when read in light of the specification.  See Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Determining whether a claim is definite requires an analysis of whether one skilled in the art would understand the bounds of the claim when read in light of the specification . . . . If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.") (internal quotation marks omitted); see also  Source Search Tech. LLC v. Lending Tree, LLC, 588 F.3d 1063, 1076-77 (Fed. Cir. 2009) ("[T]his court measures indefiniteness according to an objective measure that recognizes artisans of ordinary skill are not mindless 'automatons.'"); In re Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc) (A patent applicant who employs means-plus-function language "must set forth in the specification an adequate disclosure showing what is meant by that language.  If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.").

_____

a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

1    "If the meaning of the claim is discernible, even though the task may be formidable and the

2    conclusion may be one over which reasonable persons will disagree, we have held the claim

3    sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon, 265 F.3d at 1375; see also

4    Verve, LLC v. Crane Cams, Inc., 311 F.3d 1116, 1120 (Fed. Cir. 2002) ("It may of course occur

5    that persons experienced in a technologic field will have divergent opinions as to the meaning of

6    a term, particularly as narrow distinctions are drawn by the parties or warranted by the technology.

7    . . . But the fact that the parties disagree about claim scope does not of itself render the claim

8    invalid.").   A claim that can be construed but not meaningfully applied may be invalid for

9    indefiniteness. See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1371 (Fed.

10   Cir. 2008) ("In and of itself, a reduction of the meaning of a claim term into words is not dispositive

11   of whether the term is definite.  And if reasonable efforts at claim construction result in a definition

12   that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of

13   the claim, the claim is insolubly ambiguous and invalid for indefiniteness.") (internal citation

14   omitted).

15          Here, because the issues appear to be fact-specific and turn on conflicting expert opinion,

16   the resolution of the parties' cross-motions for summary judgment will require a complete record

17   developed through trial.[23]   See BJ Servs. Co. v. Halliburton Energy Servs., 338 F.3d 1368, 1372

18   _____

19          [23]   The parties appear to disagree as to the definition of one of ordinary skill in the art.
     (Compare Joint Br. at 7-14 with 27-32); see AllVoice Computing PLC v. Nuance Commc'ns., Inc.,
20   504 F.3d 1236, 1240 (Fed. Cir. 2007) ("Before reviewing the bounds of the claim in light of the
     specification, the analysis requires attention to the level of skill assigned to a person of ordinary
21   skill in the art."); Telcordia Techs., Inc. v. Cisco Sys., 612 F.3d 1365, 1377 (Fed. Cir. 2010) (stating
     that "claim definiteness depends on the skill level of an ordinary artisan").  AMF's expert opined
22   that a person of ordinary skill in the art would have, at the time the subject patent applications
     were filed, the equivalent of a baccalaureate degree in electrical engineering from an accredited
23   or otherwise duly recognized institution of higher learning, and one to five years of experience in
     designing, testing, and evaluating analog and digital electronic circuits and systems.  (JA483-515
24   (Young Decl.) at ¶ 21).  Dr. Young disagrees with Cochlear's experts that the person of ordinary
     skill needs the equivalent of three to five years of experience in cochlear implant systems.  (Id.).
25   Cochlear's expert opined that for the purposes of his declaration, apparently on the indefiniteness
     issue, he accepted the level of ordinary skill in the art described by Dr. Young.  (See JA373-379
26   (Second Declaration of Robert L. Stevenson, Ph.D. ("Second Stevenson Decl.")), at ¶ 3).  If the
     parties cannot reach an agreement as to definition as the level of ordinary skill in the art, the court
27   will resolve this issue prior to trial.

28

1  (Fed. Cir. 2003) ("definiteness, too, is amenable to resolution by the jury where the issues are

2  factual in nature"); see also Honeywell Int'l, Inc. v. ITC, 341 F.3d 1332, 1342 (Fed. Cir. 2003)

3  (affirming finding of indefiniteness reached after trial in case involving process for manufacturing

4  synthetic yarn, where "the testing results will necessarily fall within or outside the claim scope

5  depending on the sample preparation method chosen," and "competitors trying to practice the

6  invention or to design around it would be unable to discern the bounds of the invention");

7  Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1252 (Fed. Cir. 2008) (affirming

8  indefiniteness finding after full factual record, because the functional claim term "fragile gel" was

9  ambiguous as to whether it read on the prior art).

10       A.    Waiver.

11       As an initial matter, AMF argues that Cochlear waived its indefiniteness defense by failing

12  to raise the issue of whether a disclosed algorithm is required during the claim construction

13  proceedings and that the court's construction of the disputed means-plus-function limitations is

14  dispositive.  (See Joint Br. at 13-14; AMF Supp. at 1-3).  However, Cochlear reserved its

15  indefiniteness defense, argued in its claim construction brief that the corresponding

16  microprocessor structure in dispute is not sufficiently disclosed, and filed a motion on

17  indefiniteness before the case was dismissed for lack of standing. (See, e.g., Stipulation to Clarify

18  Certain Claim Construction, filed October 17, 2008 (Document No. 52), at ¶ 4; Integrated Joint

19  Brief on Claim Construction, filed October 31, 2008 (Document No. 59), at 7; Cochlear's Motion

20  for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 112, filed May 22, 2009 (Document

21  106); Order re: Parties Motions for Partial Summary Judgment, filed June 11, 2009 (Document No.

22  119) (denying Cochlear's motion for partial summary judgment as moot where Cochlear's motion

23  to dismiss was granted)).

24       Also, in general, parties may raise indefiniteness issues after claim construction.  See, e.g.,

25  Source Search Tech., 588 F.3d at 1068 (summary judgment motion of indefiniteness brought and

26  considered after claim construction); see also Star Scientific, 537 F.3d at 1371 ("In and of itself,

27  a reduction of the meaning of a claim term into words is not dispositive of whether the term is

28  definite.  And if reasonable efforts at claim construction result in a definition that does not provide

1  sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is

2  insolubly ambiguous and invalid for indefiniteness.") (internal citation omitted).  Moreover, because

3  Cochlear is not challenging the claim constructions of the disputed means-plus-function limitations,

4  (see, generally, Joint Br. at 10-13, 27-30; Cochlear Reply at 1-2), the cases cited by AMF in

5  support of its waiver and judicial estoppel argument are inapposite.  (See Cochlear Supp. at 1-3);

6  see, e.g., Absolute Software, Inc. v. Stealth Signal, Inc., 659 F.3d 1121, 1131-32 (Fed. Cir. 2011)

7  (defendant attempting to appeal a claim construction it never objected to); New Hampshire v.

8  Maine, 532 U.S. 742, 749-51, 121 S.Ct. 1808, 1814-15 (2001) (involving change in litigation

9  position); Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1345-46 (Fed. Cir.

10  2001) (same); Northern Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1290 (Fed. Cir.

11  2000) ("We note at the outset that we look with 'extreme disfavor' on appeals that allege error in

12  claim constructions that were advocated below by the very party now challenging them.").

13      On this record, the court cannot find that Cochlear waived its indefiniteness defense and

14  will resolve the issue on the merits.  See, e.g., ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509,

15  517 (Fed. Cir. 2012) (albeit in a different context, stating that "when the arguments with respect

16  to indefiniteness are not being raised for the first time on appeal, we do not readily find a waiver").

17      B.      Definiteness/Indefiniteness of Claims 6 and 7 of the '691 Patent.

18      Claims 6 and 7 of the '691 patent contain a "means for generating data indicative of the

19  audio signal" limitation.[24]  This claim limitation has been determined to be a means-plus-function

20  element, and the structure for performing the function has been determined to be a

21  "microprocessor."  (R&R at 28).

22          1.      **Whether Algorithm Required**.

23      The parties dispute whether the microprocessor structure corresponding to the "means for

24  generating data indicative of the audio signal" requires the disclosure of a corresponding

25

26

27

28      [24]  Claim 7 of the '691 patent depends on claim 6 and therefore incorporates the "means for generating data indicative of the audio signal" by reference.

1    algorithm.[25] (See Joint Br. at 10, 30).  In particular, AMF asserts that disclosure of an algorithm

2    is not required because the microprocessor corresponding to the recited "means for generating

3    data indicative of the audio signal" limitation is a special purpose microprocessor that is not

4    generally programmable, or is an application specific integrated circuit designed to perform

5    specific functions.  (See Joint Br. at 7, 30).  Cochlear contends that the question is whether the

6    structure corresponding to the "means for generating data indicative of the audio signal" is

7    programmable; if so, the disclosure of a corresponding algorithm is required.  (Id. at 10).

8         Here, the Special Master construed "means for generating data indicative of the audio

9    signal" and found that "the only structure in the signal flow between the microphone and the data

10   transmitter that corresponds to the function of 'generating data indicative of the audio signal,' is

11   the microprocessor 30," as discussed at '691 patent, col. 4:43-52.  (R&R at 26-27).[26]  The Special

12   Master explained that "[t]he microprocessor takes those [audio] signals and generates data that

13   is then sent to the ICS by the data transmitter 34."  (Id. at 28 (citing '691 patent, col. 4:59-61)).

14   The Special Master did not indicate whether the microprocessor is a special purpose

15   microprocessor that is not programmable, or an application specific integrated circuit designed to

16   perform specific functions.  (See, generally, id. at 25-28).  Nor did the Special Master say anything

17

18

19

20   ─────────────────

21        [25] AMF argues that the "microprocessors" disclosed in the specifications of the '691 and '616
     patents are not general purpose computers or microprocessors.  (See Joint Br. at 7).  The Federal
22   Circuit has noted that if a function can be performed by "any general purpose computer without
     special programming," then "it [is] not necessary to disclose more structure than the general
23   purpose processor that performs those functions."  In re Katz Interactive Call Processing Patent
     Litig., 639 F.3d 1303, 1316 (Fed. Cir. 2011).  Also, "a means-plus-function claim element for which
24   the only disclosed structure is a general purpose computer is invalid if the specification fails to
     disclose an algorithm for performing the claimed function."  Net MoneyIN, Inc. v. VeriSign, Inc.,
25   545 F.3d 1359, 1367 (Fed. Cir. 2008).  Therefore, AMF's argument that the disclosed
     microprocessors are not general purpose computers or microprocessors does not dispose of the
26   issue.

27
          [26] Neither party objected.  (See, generally, AMF's Objections, filed December 19, 2011
28   (Document No. 204); Cochlear's Objections, filed December 19, 2011 (Document No. 203)).

1    about a corresponding algorithm for performing the function of generating data indicative of the

2    audio signal.[27]  (See, generally, id.).

3         AMF argues that "[e]ven a layman would know that given the power and mobility

4    requirements of the wearable processor, one would not use a general purpose computer or

5    general purpose microprocessor (such as might be used in a laptop or office computer), but an

6    [application specific integrated circuit ("ASIC")] that includes a DSP.  This is especially evident to

7    a person of ordinary skill in the art."  (AMF Supp. at 5).  However, the specification of the '691

8    patent does not appear to indicate that the microprocessor corresponding to the recited "means

9    for generating data indicative of the audio signal" limitation is a special purpose microprocessor

10   that is not programmable, or an ASIC designed to perform specific functions.  See, e.g., '691

11   patent, col. 4:57-58 ("The audio signals are processed by a multiplexer 26 and converted to a

12   series of digital signals by an A to D converter 28 for application to a microprocessor 30.  The filter

13   bank may also be implemented as a group of digital filters, for example in a digital signal processor

14   integrated circuit. In this case the signal flow would be from the audio front end and AGC 22,

15   through an anti-aliasing filter, to an analog to digital converter, then into a digital filter bank 24 and

16   the general processing of microprocessor 30.") (emphasis added); id. at col. 4:59-64 ("The output

17   of the microprocessor 30 is coupled through a custom gate array 32 that converts data from the

18   microprocessor into a serial bit stream going to a data transmitter 34.  The gate array 32 also

19   converts data from a telemetry receiver 36 and the microprocessor 30 to control the power level

20   of and data generated by the data transmitter 34.") (emphasis added); id. at col. 5:2-11 ("For

21   example, power level indicating signals transmitted by the telemetry transmitter 42 are received

22   by the telemetry transmitter 36 and processed in the microprocessor 30 and gate array 32 to

23   generate signals controlling the power level of the transmissions from the transmitter 34 to the ICS

24   12, thereby providing a closed-loop system for optimizing the power levels of the transmission

25

26        ―――――――――

27   [27] However, the Special Master was appointed solely "to consider arguments of the parties re:
     claim construction, and to provide the Court with his report and recommendation re: the
     construction of the disputed claim terms."  (See Order re: Joint Status Report Regarding

28   Appointment of Special Master, filed April 6, 2011).

1   from the wearable system 10 to the ICS 12 and hence conserving the battery 38 and optimizing

2   the voltages generated Within the system 10.") (emphasis added); id. at col. 8:22-26 ("The parallel

3   data output from the serial to parallel converter is processed in the microprocessor 30 to adjust

4   the power level in the power control circuit of the data transmitter 34 to maintain the value of the

5   DC voltage slightly greater than the desired output voltage of the series regulator 44.") (emphasis

6   added); col. 8:33-36 ("In such cases, the ICS status indicating signals generated in the processor

7   46 and telemetered to the WP 16 may be utilized within the microprocessor 30 to provide

8   indications of the operating status of the ICS 12.") (emphasis added); col. 8:42-45 ("Similarly, the

9   microprocessor can go into a hibernation state which consumes less than 10 milliwatts. The

10  hibernation state terminates Whenever additional commands are received from the command

11  decoder 84.").

12        AMF relies on Dr. Young, who opined that one of skill in the art would recognize that "the

13  microprocessors disclosed and claimed in the '616 and '691 patents" are not general purpose

14  computers or microprocessors but rather ASICs.  (See id. at 7 (citing JA483-515 (Young Decl.)

15  at ¶¶ 22, 26-31, 42); JA483-515 (Young Decl.) at ¶¶ 22, 25 (relying in part on the specification of

16  the '691 patent)).  However, Dr. Young did not establish that the ASIC is not programmable; to the

17  contrary, Dr. Young declared that "[m]ost ASICs have limited, if any, programmability on the part

18  of the user," and that "[m]ost ASICs are programmed at the factory through special purpose

19  processing."[28]  (See JA483-515 (Young Decl.) at ¶ 26).  Cochlear's expert states that regardless

20  of how "microprocessor" is characterized, the microprocessor cannot perform a specialized

21  function without being programmed with an appropriate algorithm for the task.  (See Joint Br. at

22  11 & JA373-379 (Second Stevenson Decl.) at ¶ 6).

23

24

25

---

26        [28]  AMF argues that its patents require a DSP that "need not be programmable."  (AMF Supp.

27  at 6 (citing JA483-515 (Young Decl.) at ¶ 26)).  However, the cited declaration states, as
    discussed above, that most ASICs have limited user programmability but are nonetheless

28  programmed.  (See JA483-515 (Young Decl.) at ¶ 26).

1    Under the circumstances, the court finds that the disclosed microprocessor is programmed,

2  and therefore, an adequate disclosure of an algorithm is required.[29]  See, e.g., WMS Gaming Inc.

3  v. International Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function

4  claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out

5  an algorithm, the disclosed structure is not the general purpose computer, but rather the special

6  purpose computer programmed to perform the disclosed algorithm."); Aristocrat Techs. Austl. Pty

7  Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008) (same); Noah Sys., Inc. v. Intuit

8  Inc., 675 F.3d 1302, 1312 (Fed. Cir. 2012) ("In cases such as this one, involving a special purpose

9  computer-implemented means-plus-function limitation, this court has consistently required that the

10  structure disclosed in the specification be more than simply a general purpose computer or

11  microprocessor.  We require that the specification disclose an algorithm for performing the claimed

12  function.") (internal quotation marks, footnote, and citation omitted); see also Net MoneyIN, Inc.,

13  545 F.3d at 1367 ("To avoid purely functional claiming in cases involving computer-implemented

14  inventions, we have consistently required that the structure disclosed in the specification be more

15  than simply a general purpose computer or microprocessor.") (internal quotation marks omitted).

16  / / /

17  / / /

18  / / /

19

20

---

21    [29]  AMF relies on Levine v. Samsung Telecommunications Am., LLC, 2012 WL 383647, *19

22  (E.D. Tex. 2012) to argue that an algorithm is not required.  (See Joint Br. at 7; Cochlear Supp.
   at 4-7).  However, Levine dealt with "special- purpose hardware," and there is no analysis of

23  whether the structure in question was programmable.  See, generally, id. at *18-20.  Moreover,
   the court proceeded with an alternative analysis if an algorithm were required.  See id. at *19-20.

24  Also, Cochlear submitted several cases requiring an algorithm, which AMF did not address.  (See
   Cochlear Supp. at 5-7; see, generally, AMF Reply); see also Harris Corp. v. Ericsson, Inc., 417

25  F.3d 1241, 1245, 1253-54 (Fed. Cir. 2005) (requiring disclosure of algorithm corresponding to a

26  microprocessor in cellular communication equipment); Metrologic Instruments, Inc. v. Symbol
   Techs., Inc., 460 F.Supp.2d 571, 578, 624 (D.N.J. 2006) (requiring disclosure of algorithm

27  corresponding to a microprocessor in laser bar code reader); Ergo Licensing, LLC v. Carefusion
   303, Inc., 673 F.3d 1361, 1362, 1364 (Fed. Cir. 2012) (requiring disclosure of algorithm

28  corresponding to a microprocessor in medical infusion device).

2.   **Whether Algorithm Disclosed**.

The court must next decide whether the specification of the '691 patent adequately discloses an algorithm to perform the function associated with the "means for generating data indicative of the audio signal" limitation, or whether the limitation is indefinite. See Noah Sys., 675 F.3d at 1305.

"While it is undisputed that the question of whether a claim is indefinite is based on how the claim limitation would be understood by one of skill in the art, the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." Noah Sys., 675 F.3d at 1312 (internal quotation marks and citations omitted); see also Intel Corp., 319 F.3d at 1366 (holding that the internal circuitry of an electronic device need not be disclosed in the specification if one of ordinary skill in the art would understand how to build and modify the device); Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1341 (Fed. Cir. 2008) ("This court does not impose a lofty standard in its indefiniteness cases."); Telcordia Techs., Inc. v. Cisco Sys., 612 F.3d 1365, 1377 (Fed. Cir. 2010) (where defendant bears the burden of proving that an ordinary artisan would not understand the disclosure, finding that the trial record did not show that an ordinary artisan would not understand the link between the controller and the monitoring function). "The usage 'algorithm' in computer systems has broad meaning, for it encompasses in essence a series of instructions for the computer to follow, whether in mathematical formula, or a word description of the procedure to be implemented by a suitably programmed computer." Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1384 (Fed. Cir. 2011) (internal quotation marks and citation omitted); Ibormeith IP, LLC v. Mercedes-Benz USA, LLC, 732 F.3d 1376, 1379 (Fed. Cir. 2013) ("For a claim to be definite, a recited algorithm, or other type of structure for a section 112(f) claim limitation, need not be so particularized as to eliminate the need for any implementation choices by a skilled artisan; but it must be sufficiently defined to render the bounds of the claim – declared by section 112(f) to cover the particular structure and its equivalents – understandable by the implementer."); Finisar Corp., 523 F.3d at 1340 ("This court permits a patentee to express that algorithm in any understandable terms including as a mathematical

1   formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.")

2   (internal citation omitted).

3           Here, the parties have put forth conflicting expert opinion as to what one of ordinary skill

4   in the art would have understood the '691 patent to disclose with respect to an algorithm

5   corresponding to "means for generating data indicative of the audio signal" limitation.  (See Joint

6   Br. at 7-9, 11-13;  compare JA483-515 (Young Decl.) at ¶ 32-38 with JA373-379 (Second

7   Stevenson Decl.) at ¶¶ 5-11).  Indeed, AMF admits that the parties' respective experts have taken

8   contrary views on the underlying factual question of whether the '691 patent provides a sufficient

9   disclosure of an algorithm.  (See Joint Br. at 31).  Accordingly, the court is unable to decide at this

10  juncture whether the specification of the '691 patent adequately discloses an algorithm to perform

11  the function associated with the "means for generating data indicative of the audio signal," and

12  finds that resolution of the parties' cross-motions for summary judgment requires a complete

13  record developed through trial.  See Westerngeco L.L.C. v. ION Geophysical Corp., 876

14  F.Supp.2d 857, 871-72 (S.D. Tex. 2012) ("Although indefiniteness is a question of law, it requires

15  a factual determination as to what one skilled in the art would have understood by looking at the

16  patent.  The expert evidence addressing what one skilled in the art would have understood by

17  looking at this patent is in conflict.  Defendants have failed to prove, by clear and convincing

18  evidence, that such a person would not have understood the structure disclosed in the patent.  As

19  such, the determination of the factual question underlying this legal issue must be made by a

20  jury.") (internal citation omitted).

21          C.      Definiteness/Indefiniteness of Claim 1 of the '616 Patent.

22          Claim 1 of the '616 patent contains an "external processor means coupled to the

23  transmitting means of the external headpiece/transmitter for receiving and processing the

24  status-indicating signals to derive information therefrom regarding the operation of the implanted

25  stimulator and its plurality of tissue stimulating electrodes" limitation, which the parties agree is

26  performed by an antenna, receiver, and microprocessor without reciting an algorithm.  (See R&R

27  at 3-4; Joint Br. at 9).  The parties agree that the "external processor means . . ." limitation is a

28  means-plus-function limitation.  (See AMF Supp. at 7; Joint Br. at 27-29).

1    Because AMF's expert, Dr. Young, opined that one of skill in the art would recognize that

2    "the microprocessors disclosed and claimed in the '616 and '691 patents" are not general purpose

3    computers or microprocessors but rather ASICs, that "[m]ost ASICs have limited, if any,

4    programmability on the part of the user," and "[m]ost ASICs are programmed at the factory through

5    special purpose processing," (see JA483-515 (Young Decl.) at ¶¶ 22, 25, 26), the court finds that

6    the disclosed microprocessor is programmed.  Therefore, an adequate disclosure of an algorithm

7    is required.  See WMS Gaming, 184 F.3d at 1349; Aristocrat Techs., 521 F.3d at 1333; Noah Sys.,

8    675 F.3d at 1312.

9    Here, too, the parties have put forth conflicting expert opinion as to the adequacy of the

10   '616 patent's disclosure of an algorithm corresponding to the "external processor means . . ."

11   limitation.  (See Joint Br. at 9-10, 13; compare JA483-515 (Young Decl.) at ¶¶ 39-51 with JA28-32

12   (Declaration of Robert L. Stevenson, Ph.D.) at ¶¶ 5-11 & JA373-379 (Second Stevenson Decl.)

13   at ¶ 12-14).  Again, AMF admits that AMF's and Cochlear's respective experts have taken contrary

14   views on the underlying factual question of whether the '616 patent provides a sufficient disclosure

15   of an algorithm.  (See Joint Br. at 31).  Accordingly, the court is unable to decide at this juncture

16   whether the specification of the '616 patent adequately discloses an algorithm to perform the

17   function associated with the "external processor means . . ." limitation of claim 1 of the '616 patent.

18

19   D.    Conclusion.

20   For the reasons discussed above, the resolution of the parties' cross-motions for summary

21   judgment of definiteness/indefiniteness will require a complete factual record developed through

22   trial.  Therefore, the court denies AMF's and Cochlear's cross-motions for summary judgment of

23   definiteness and indefiniteness as to the means-plus-function limitations in dispute.

24                                    **CONCLUSION**

25   Based on the foregoing, IT IS ORDERED THAT the parties' cross-motions for summary

26   judgment **(Document Nos. 243 & 251)** are **denied**.

27   Dated this 3rd day of January, 2014.                          /s/
                                                          Fernando M. Olguin
28                                                      United States District Judge