DANIEL JOHNSON, JR. (SBN 57409)
DANIEL GRUNFELD (SBN 128494)
MICHAEL J. LYONS (SBN 202284)
JASON E. GETTLEMAN (SBN 269733)
MORGAN, LEWIS & BOCKIUS LLP
3000 El Camino Real, Suite 7000
Palo Alto, CA  94306-2122
Tel:    650.843.4000
Fax:    650.843.4001
Email:  djjohnson@morganlewis.com
Email:  dgrunfeld@morganlewis.com
Email:  mlyons@morganlewis.com
Email:  jgettleman@morganlewis.com

Attorneys for Plaintiff
ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Alfred E. Mann Foundation for Scientific Research,<br><br>                Plaintiff,<br><br>      vs.<br><br>Cochlear Corporation, et al.,<br><br>                Defendants. | Case No. 2:07-cv-08108-FMO-SH<br><br>Hon. Fernando M. Olguin<br><br>**PLAINTIFF ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH'S TRIAL BRIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>*[L.R. Civ. 16-4]*<br><br>Pretrial Conference: January 9, 2014<br>Trial Date:         January 13, 2014<br>Time:            9:00 a.m.<br>Courtroom:     22, 5th Floor |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1

## TABLE OF CONTENTS

2                                                                          **Page**

3

I.   ISSUES RAISED IN DEFENDANTS' MEMORANDUM OF
     CONTENTIONS OF FACT AND LAW ........................................................ 1
4

     A.   Prosecution History Estoppel ................................................................ 1
5

          1.   Whether the Foundation is Permitted to Argue
6              Infringement of Claim 10 of the '616 Patent Under the
7              Doctrine of Equivalence ............................................................ 1
8
          2.   Whether the Foundation is Permitted to Argue the
9              Antenna System in the Accused Products is Equivalent to
10             the Claim Limitations of the '691 Patent ................................ 3
11

     B.   Indefiniteness ........................................................................................ 5
12

     C.   Scope of Inducement and Contributory Infringement ......................... 5
13

     D.   Inequitable Conduct .............................................................................. 7
14

          1.   Evidentiary Standard for Finding Inequitable Conduct ............ 7
15

          2.   Persons Accused of Inequitable Conduct ................................. 7
16

17   E.   Laches .................................................................................................... 8

18   F.   Equitable Estoppel .............................................................................. 10
19
     G.   Marking under 35 U.S.C. § 287 .......................................................... 10
20

II.  LATER-IDENTIFIED LEGAL ISSUES ................................................... 12
21

     A.   Scope of the Prior Art ......................................................................... 12
22

     B.   Scope of Direct Infringement Arguments ........................................... 14
23

     C.   Failure to Meet-and-Confer in Good Faith ......................................... 15

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

i

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,

960 F.2d 1020 (Fed. Cir. 1992) (*en banc*) .................................................. 8, 9, 10

*Abbott Labs. v. Syntron Bioresearch Inc.*,

No. 98–CV–2359, 2001 WL 34082555 (S.D. Cal. 2001) ................................ 14

*ATD Corp. v. Lydall, Inc.*,

159 F.3d 534 (Fed. Cir. 1998) ........................................................................ 13

*Church & Dwight Co., Inc. v. Abbott Labs.*,

2008 WL 5416383 (D. N.J. 2008) ..................................................................... 9

*Crown Packaging Tech. Inc. v. Rexam Beverage Can Co.*,

599 F.3d 1308 (Fed. Cir. 2009) ...................................................................... 11

*Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc.*,

305 F.3d 1303 (Fed. Cir. 2002) ........................................................................ 4

*Eaton Corp. v. Appliance Valves Corp.*,

790 F.2d 874 (Fed. Cir. 1986) ........................................................................ 13

*Exergen Corp. v. Wal-Mart Stores, Inc.*,

575 F.3d 1312 (Fed. Cir. 2009) ........................................................................ 8

*Funai Elec. Co. Ltd. v. Daewoo Electronics Corp.*,

616 F.3d 1357 (Fed. Cir. 2010) ............................................................... 3, 4, 11

*Hottel Corp. v. Seaman Corp.*,

833 F.2d 1570 (Fed. Cir. 1987) ...................................................................... 10

*Innogenetics, N.V. v. Abbott Labs.*,

512 F.3d 1363 (Fed. Cir. 2008) ...................................................................... 12

*James River Corp. of Virginia v. Hallmark Cards, Inc.*,

915 F. Supp. 968 (E.D. Wis. 1996) ................................................................... 9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

ii

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1

## TABLE OF AUTHORITIES
(continued)

2

**Page**

*Meyers v. Brooks Shoe, Inc.*,

    912 F.2d 1459 (Fed. Cir. 1990) .................................................................. 9, 10

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*,

    731 F.3d 1239 (Fed. Cir. 2013) ......................................................................... 7

*Oracle America, Inc. v. Google Inc.*,

    No. C 10-03561 WHA, 2011 WL 5576228 (N.D. Cal. 2011) ......................... 11

*Primos, Inc. v. Hunter's Specialties, Inc.*,

    451 F.3d 841 (Fed. Cir. 2006) ......................................................................... 13

*Riles v. Shell Exploration and Production Co.*,

    298 F.3d 1302 (Fed. Cir. 2002) ......................................................................... 4

*Salazar v. Procter & Gamble Co.*,

    414 F.3d 1342 (Fed. Cir. 2005) ......................................................................... 2

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.*,

    346 F.3d 1057 (Fed. Cir. 2003) ......................................................................... 9

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,

    308 F.3d 1193,1219 (Fed. Cir. 2002) ............................................................. 11

*Therasense, Inc. v. Becton, Dickson & Co.*,

    649 F.3d 1276 (Fed. Cir. 2011) (*en banc*) ........................................................ 7

*Transocean Deepwater Drilling, Inc. v. Maersk Drilling, USA, Inc.*,

    699 F.3d 1340 (Fed. Cir. 2012) ....................................................................... 12

*Woods v. DeAngelo Marine Exhaust, Inc.*,

    692 F.3d 1272 (Fed. Cir. 2012) ....................................................................... 13

**STATUTES**

35 U.S.C. § 112 ¶ 6 ............................................................................................ 1, 3

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

iii

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

# TABLE OF AUTHORITIES
(continued)

**Page**

35 U.S.C. § 282 ........................................................................................ 12, 13, 14

35 U.S.C. § 287 ................................................................................................ 10, 11

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

iv

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1   Pursuant to Local Rule 16-10, Plaintiff Alfred E. Mann Foundation for

2   Scientific Research ("the Foundation") submits the following Trial Brief.

3   **I.     ISSUES RAISED IN DEFENDANTS' MEMORANDUM OF**

4   **        CONTENTIONS OF FACT AND LAW**

5       **A.     Prosecution History Estoppel**

6          1.     Whether the Foundation is Permitted to Argue Infringement of

7              Claim 10 of the '616 Patent Under the Doctrine of Equivalence[1]

8       In their Memorandum of Contentions of Fact and Law ("MCFL"), the

9   Cochlear Defendants allege that prosecution history estoppel bars the Foundation

10  from presenting evidence and argument of infringement of claim 10 of the '616

11  patent under the doctrine of equivalence.  Dkt. No. 310, Defendants' MCFL at 48,

12  56.  Specifically, the Cochlear Defendants allege the Foundation should be barred,

13  as a matter of law, from arguing that displaying impedance is equivalent to

14  displaying voltage under the doctrine of equivalents.  *Id*. at 56.

15      The Cochlear Defendants' arguments concerning prosecution history

16  estoppel of the "displaying" limitation is makeweight.  The Foundation is not

17  estopped from arguing infringement under the doctrine of equivalents because the

18  Foundation never amended the relevant claim language and never attempted to

19  distinguish its invention from the prior art by limiting the claims to "measuring of

20  electrode voltage for external display."  Instead, the Foundation argued that claim

21  10 should be allowed over pacemaker prior art because the claimed invention,

22  unlike the pacemaker prior art, monitored electrodes in real time and at the same

23  time as stimulation of the electrode.  Ex. 1 at 13 ('616 File History, Remarks to

24  Amendment A, Rec'd March 21, 1996).  In other words, the Foundation argued that

25  the claimed invention differed from the pacemaker prior art because it allowed for

26  

27  ───────────

[1] This argument by the Cochlear Defendants only relates to the assertion of
equivalents under the doctrine of equivalents, and has no effect on the Foundation's
right to argue structural equivalents under 35 U.S.C. § 112 ¶ 6.

28  

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1    sending signals to a physician's tester as part of a feedback signal as opposed to

2    merely downloading histograms as in the pacemaker prior art. *Id.* Only the

3    **displaying capability** and not the nature of **what was actually to be displayed** was

4    material to the Foundation's argument and amendment.

5        The Cochlear Defendants contend, incorrectly, that the "displaying" step of

6    claim 10 of the '616 patent requires "displaying the processed status indicating

7    signals including the measured voltage." MCFL at 3. There is nothing in Judge

8    King's claim construction order or the file history of the Foundation's patents

9    supporting the Cochlear Defendants' view that "displaying the processed status-

10   indicating signals" is limited to displaying voltage. In fact, during prosecution, the

11   Foundation explained that "many of the functions carried out by the ICS, *e.g.*,

12   measuring a voltage, measuring a current, <u>determining an electrode impedance</u>, are

13   carried out simultaneously with the application of the stimulating signal to the

14   output electrodes." Ex. 1 at 12 ('616 File History, Remarks to Amendment A,

15   Rec'd March 21, 1996) (emphasis added). Likewise, the Foundation's patents

16   clearly show a physician's tester displaying impedance values. *See, e.g.*, Ex. 2, Fig.

17   6 ("Z(A), Z(B), Z(bipolar)"), Table 7 ('616 patent).

18        Moreover, the Cochlear Defendants' argument that the "displaying"

19   limitation requires displaying voltage, and that the Examiner allowed the claims on

20   this basis[2], was rejected by Judge King. Dkt. No. 212, Civil Minutes at 3 ("We

21   disagree…the Patent Examiner did not emphasize the measuring and displaying of

22   the electrode voltage *in voltage form*. Rather, the Patent Examiner focused on the

23

24 [2] Despite the Cochlear Defendants' assertions, it is well understood that statements in an Examiner's Notice of Allowance cannot give rise to disavowal of claim scope, and, as such, the Foundation's literal infringement argument as to the "displaying" step is not precluded. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347-48 (Fed. Cir. 2005) ("Because such statements do not amount to a clear disavowal of claim scope by the applicant, this court vacates the portion of the district court's claim construction excluding nylon from falling within the scope of the 'elastic' element.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

2

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1     fact that this invention, as opposed to a pacemaker, allowed for a *display* of the data

2     measurements that are taken in real time.").  Judge King recognized that "AMF

3     stated that its invention was novel because rather than downloading histogram data

4     that has accumulated in the invention over a period of time (the technology

5     employed in an implantable pacemaker), its invention deals with a physician's

6     tester that measures signals in real time, which are 'sent back to the physician's

7     tester as part of a feedback signal' where they are 'displayed or otherwise

8     processed.'" *Id*.

9         Finally, even if the Court found that a *presumption* of estoppel arose, there

10    would still not be estoppel *in this case* because the purported amendments are only

11    tangentially related to the equivalents at issue.  *See Funai Elec. Co. Ltd. v. Daewoo*

12    *Electronics Corp.*, 616 F.3d 1357, 1369 (Fed. Cir. 2010).

13         As such, the Cochlear Defendants' prosecution history estoppel argument is

14    meritless and should be rejected.

15               2.        Whether the Foundation is Permitted to Argue the Antenna

16                     System in the Accused Products is Equivalent to the Claim

17                     Limitations of the '691 Patent[3]

18         The Cochlear Defendants also alleged that prosecution history estoppel bars

19    the Foundation from relying on the doctrine of equivalents to argue that a cochlear

20    implant having one antenna infringes the '691 patent because it is equivalent to a

21    cochlear implant having two antennae.  Dkt. No. 310, Defendants' MCFL at 48-49,

22    56-57.  Again, the Cochlear Defendants' arguments are meritless.

23         The Foundation is not estopped from arguing infringement under the doctrine

24    of equivalents because the Foundation never amended its claims, and has not

25    attempted to distinguish its invention from the prior art, *i.e.*, U.S. Patent No.

26

27    [3] This argument by the Cochlear Defendants only relates to the assertion of
equivalents under the doctrine of equivalents, and has no effect on the Foundation's

28    right to argue structural equivalents under 35 U.S.C. § 112 ¶ 6.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

3

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1   4,947,844 ("McDermott Patent"), as requiring two antennas.  Instead, the

2   Foundation simply commented in the Background of the Specification that the '844

3   patent which discloses "simultaneous transmission of the telemetry signal and

4   reception of the input carrier signal" will lead to undesirable results when done in a

5   system "as described" by the McDermott Patent.  Ex. 3 at 2:60-61 ('691 Patent).

6   This statement neither disavows a single antenna implant nor suggests that a system

7   that is not "as described" in the McDermott patent could not successfully use a

8   single antenna.  *Id.*  Indeed, the '691 patents specifically describes and encourages

9   using a single antenna in cochlear implant systems.  Specifically, the Foundation's

10  patent encourages the use of a single "antenna 20 for transmitting and receiving

11  electromagnetic energy." *Id.* at 4:32-34.  Accordingly, the single sentence

12  misinterpreted by the Cochlear Defendants does not give rise to prosecution history

13  estoppel. *See Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc.*,

14  305 F.3d 1303, 1316 (Fed. Cir. 2002); *Riles v. Shell Exploration and Production*

15  *Co.*, 298 F.3d 1302, 1310 (Fed. Cir. 2002).

16          Moreover, there can be no dispute that the Cochlear Defendants have known

17  that the Foundation alleged infringement under the doctrine of equivalents with

18  regard to the "receiving" and "transmission" means limitations of the asserted

19  claims, and their assertions to the contrary in Defendants' MCFL misstates the

20  history of discovery in this case.  *See, e.g.*, Ex. 4 at 1 (November 30, 2012

21  Supplemental Expert Report of John Choma, Ph.D.) ("I have provided opinions as

22  to infringement of certain claim elements under the Doctrine of Equivalents or

23  under the "Equivalents Thereof" literal infringement standard for means-plus-

24  function claims").

25          Finally, even if the Court found that a presumption of estoppel arose, there

26  would still not be estoppel in this case because the purported amendments are only

27  tangentially related to the equivalents at issue.  *See Funai Elec. Co. Ltd. v. Daewoo*

28  *Electronics Corp.*, 616 F.3d 1357, 1369 (Fed. Cir. 2010).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

4

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

**B.    Indefiniteness**

In its MCFL, the Cochlear Defendants allege that the Asserted Claims are invalid as indefinite.  Dkt. No. 310, Defendants' MCFL at 50.  The Court has now ruled that the microprocessors at issue in the '616 and '691 patents are programmed, thus requiring adequate disclosure of an algorithm.  Dkt. No. 352, Order Re: Cross-Motions for Summary Judgment at 30-31, 35.

The Court further ruled that resolution of the question, whether an algorithm is disclosed, requires "a complete record developed through trial," because the parties have put forth conflicting expert opinion as to what one of ordinary skill in the art would have understood the asserted patents to disclose with respect to algorithms.  *Id.* at 34-35.

The Cochlear Defendants will not be able to show by clear and convincing evidence that one of ordinary skill in the art would not have understood the structures (and their algorithms) disclosed in the asserted patents.  However, the Foundation's expert, Dr. Young, will show that the specifications of the '616 patent and '691 patent adequately disclose algorithms to perform the functions associated with the "external processor means . . ." limitation of claim 1 of the '616 patent and the "means for generating data indicative of the audio signal" limitation of claims 6 and 7 of the '691 patent, respectively.  *See, e.g.*, Joint Appendix for Summary Judgment 483-515 (Young Decl.) at ¶¶ 32-38, ¶¶ 39-51.

**C.    Scope of Inducement and Contributory Infringement**

The Cochlear Defendants have known for years that the Foundation alleged contributory infringement and inducement of all the asserted claims, and their assertions to the contrary misstate the history of pleadings and discovery in this case.  *See* Dkt. No. 310, Defendants' MCFL, at 45, 57.

On August 18, 2008, the Foundation stated in its Counterclaims-in-Reply that the Cochlear Defendants were "infringing the '691 patent, either directly, contributorily, or by inducing others to infringe."  Dkt. No. 49, Reply and

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

5

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

DB2/ 24552680.6

1   Counterclaims in response to Cochlear's Answer and Counterclaims ¶ 21.

2   Consistent with this pleading, the Foundation amended its interrogatory answer on

3   November 13, 2008 to state:

4        in addition to claim 10 of the '616 patent, sales and offers for sale in

5        the United States of various devices relating to cochlear implants and

6        the importation of the devices into the United States coupled with the

7        use of the devices in the United States by clinics, clinicians and

8        doctors infringes at least claims 1 and 12 of the '616 patent, and

9        claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 14 of the '691 patent.

10   Ex. 5 at 9 (Defendant Cochlear Ltd.'s First Set of Interrogatories to Plaintiff Alfred

11   E. Mann Foundation for Scientific Research and Plaintiff's Objections and Second

12   Supplemental Response to Same).  Contrary to the Cochlear Defendants' reading,

13   this does not limit the Foundation to only "direct" infringement.  Indeed, the

14   discussion of third party actors ("clinics, clinicians and doctors") in the response,

15   and "devices relating to" cochlear implant systems makes clear that inducement and

16   contributory infringement are asserted.  Read in context with the Foundation's

17   pleadings, the Cochlear Defendants knew that the Foundation was asserting

18   contributory and induced infringement.

19        Moreover, this was confirmed again in 2010, in the Foundation's First

20   Amended Complaint, and subsequent reply that states the Cochlear Defendants are

21   "infringing the '616 patent, either directly, contributorily or by inducing others" and

22   "infringing the '691 patent, either directly, contributorily or by inducing others to

23   infringe." Dkt. No. 146, ¶ 22; Dkt. No. 168, ¶ 21.

24        If the Cochlear Defendants wanted to challenge whether this issue should be

25   presented at trial, they should have filed a summary judgment motion.  Having

26   failed to do so, they should not now be heard to belatedly seek summary judgment

27   in this pleading.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

6

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

### D. Inequitable Conduct

#### 1. Evidentiary Standard for Finding Inequitable Conduct

The parties agree that an inequitable conduct determination requires a finding: (1) a misrepresentation to the Patent and Trademark Office; (2) that the misrepresentation was material; and (3) that the misrepresentation was made with an intent to deceive. However, the Cochlear Defendants assert that the second element need only be shown by a preponderance of the evidence. *See* Dkt. No. 310, Defendants' MCFL, at 12. This is incorrect; the proper evidentiary standard is clear and convincing evidence for all three prongs.

The Court correctly identified this standard in its recent ruling on summary judgment. *See* Dkt. No. 352, Order Re: Cross-Motions for Summary Judgment, at 6-7 (*citing Therasense, Inc. v. Becton, Dickson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (*en banc*); *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372 (Fed. Cir. 2012)). Several other citations also support the Court's conclusion that the proper evidentiary standard is "clear and convincing." *See Therasense*, 649 F.3d at 1287 ("[t]he accused infringer must prove both elements—intent and materiality—by clear and convincing evidence"); *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.,* 731 F.3d 1239, 1244 fn. 2 (Fed. Cir. Sept. 24, 2013). The Cochlear Defendants' suggestion of a different evidentiary standard is incorrect.

#### 2. Persons Accused of Inequitable Conduct

The Cochlear Defendants revealed for the first time on January 2, 2014, that it was accusing not only the Foundation's patent attorney, Mr. Gold, of inequitable conduct, but also as yet unspecified inventors. *See, e.g.*, Dkt. No. 355, Ex. E, Jan. 2, 2014 Meet and Confer Tr. at 72-77. The Cochlear Defendants' only basis for this position is that the pleadings alleged "that the McDermott article was known to the named inventors and/or their attorneys." *Id.* at 71:8-9. But allegations of inequitable conduct must specifically identify the individuals so accused. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1329 (Fed. Cir. 2009) (the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

7

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

pleading "'Exergen, its agents and/or attorneys'…fails to name the specific individual associated with the filing or prosecution … who both knew of the material information and deliberately withheld or misrepresented it.")

Indeed, the summary judgment motions and the Court's recent order address only Mr. Gold and provide no hint that someone else has been accused. Likewise, the only person specifically identified in Cochlear's interrogatory responses is Mr. Gold.  *See* Ex. 6 at 35-37 (Defendant Cochlear Americas and Cochlear Ltd.'s Third Amended Response to Plaintiff's First Set of interrogatories).  To obscure this improper expansion of its claim, the Cochlear Defendants argue that "it's not that we're accusing [Dr.] Schulman individually or Mr. Gold individually.  We're accusing them as a group."  Dkt. No. 355, Ex. E, Jan. 2, 2014 Meet and Confer Tr. at 76.  But only individuals, not groups or entities, can commit inequitable conduct. *See Exergen Corp.*, 575 F.3d at 1329 ("Each *individual* associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO]…the duty applies only to individuals, not organizations").

This eleventh hour accusation, without evidentiary or legal support, not only risks substantial prejudice to the Foundation's case, but also unjustifiably tarnishing the reputations of the inventors.  Accordingly, the Court should limit the Cochlear Defendants' claims of inequitable conduct to the actions of Mr. Gold.

### E.   Laches

In its Memorandum of Contentions of Fact and Law, the Cochlear Defendants assert a defense of laches, which they claim bars, in part, the Foundation's claims for damages.  Contrary to Cochlear's assertions, the six-year presumption of laches does not apply.  *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1036 (Fed. Cir. 1992) (*en banc*).  The evidence adduced at trial will show that, contrary to Defendants' assertions, simple knowledge or awareness that Cochlear products had some undescribed "telemetry" features is not tantamount to knowledge that the Cochlear products infringe.  The Foundation did

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

8

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

not confirm that the Cochlear products infringe until considerably later.  Moreover, during the years between 2003 and filing suit, the Foundation was involved in negotiations and litigation that implicated the asserted patents, and others.  *See, e.g.*, *Church & Dwight Co., Inc. v. Abbott Labs.*, 2008 WL 5416383, *7-*10 (D. N.J. 2008).

The Cochlear Defendants also will not be able to show the elements of evidentiary or economic prejudice.  Economic prejudice requires showing a nexus between the economic loss and the delay.  Mere increased damages for infringement are not sufficient.  *Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1463 (Fed. Cir. 1990), *overruled on other grounds*, *Aukerman*, 960 F.2d at 1038.  The evidence will also show that the Cochlear Defendants did not stop producing products, or change their products in ways relevant to the asserted patents, after this suit was filed, which shows a lack of economic prejudice.  *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1066-67 (Fed. Cir. 2003); *James River Corp. of Virginia v. Hallmark Cards, Inc.*, 915 F. Supp. 968, 978 (E.D. Wis. 1996).  For evidentiary prejudice, even if the Cochlear Defendants demonstrate that evidence was lost during the alleged delay, they cannot demonstrate that this evidence would have affected their ability to present a full and fair defense.  *See Aukerman*, 960 F.2d at 1033; *James River*, 915 F. Supp. at 980.

Additionally, in order to avoid bifurcating the issues further, the Cochlear Defendants have argued that evidence of laches and estoppel will overlap entirely with their defenses to willfulness and inducement.  *See* Dkt. No. 354 Order Re: Motions in Limine pp. 12-13.  This precludes any, or at least most, evidence of evidentiary prejudice.

### F.    Equitable Estoppel

For both the Cochlear Defendants' defenses of laches and estoppel, the Cochlear Defendants' must show economic or evidentiary prejudice.  *See A.C. Aukerman,* 960 F.2d at 1028, 1036.  For the reasons stated above, they cannot do

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

9

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

so.

The Cochlear Defendants will not be able to show that they reasonably relied on the Foundation's alleged silence, or that the Foundation had intentionally misled the Cochlear Defendants.  The Cochlear Defendants can adduce no evidence amounting to bad faith on the part of the Foundation, particularly where, as here, the Foundation's letter to Cochlear discussed licensing negotiations, not filing a lawsuit.  *See* July 21, 2003 Schulman letter to O'Mahony; *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573-74 (Fed. Cir. 1987); *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1464 (Fed. Cir. 1990) ("[W]e do not believe that a suggestion of infringement coupled with an offer to license followed by silence would suffice to establish equitable estoppel.").

The Cochlear Defendants have no evidence to support their defense of estoppel with respect to the '691 patent.  The letter from Dr. Joseph Schulman, sent July 21, 2003, and Cochlear's response, sent in October of the same year, do not make any mention of the '691 patent, thus they cannot support the Cochlear Defendants' claims of estoppel with respect to the '691 patent.  *See* July 21, 2003 Schulman letter to O'Mahony; October 1, 2003 O'Mahony letter to Schulman.

### G.     Marking under 35 U.S.C. § 287

The Cochlear Defendants have repeatedly asserted that the Foundation's recovery is limited by an alleged failure to ensure that its licensee, Advanced Bionics, has marked products that practiced the patents.  The Cochlear Defendants, however, have never submitted any evidence at all, either in pre-trial filings, or in their expert reports, that any Foundation or Advanced Bionics product practices the asserted patents.  Indeed, the Cochlear Defendants have even refused to state whether they intend to argue that Advanced Bionics' products practice the asserted patents, and incorrectly maintain that it is the Foundation's burden to show that it practices the asserted patents.  This is clearly incorrect under the law, and the Cochlear Defendants should not be allowed to argue that the Foundation's damages

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

10

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

are limited by a failure to mark.

Pursuant to 35 U.S.C. §287(a), a patentee has a duty to mark the products that substantially embody patents asserted in litigation.  A patentee that does not mark a patented article is not entitled to damages prior to providing actual notice. *See Crown Packaging Tech. Inc. v. Rexam Beverage Can Co.*, 599 F.3d 1308, 1316 (Fed. Cir. 2009).  Where there is no product to mark, however, the marking requirement of Section 287(a) does not apply.  *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193,1219 (Fed. Cir. 2002) (no requirement "where there are no products to mark" because the patentee does not sell or license the patented product); *see also Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010) (no marking requirement where patentee had stopped selling products that practiced the asserted patent); *Oracle America, Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5576228, *3 (N.D. Cal. 2011) (denying summary judgment where defendant has not shown that allegedly practicing products were made, sold, used or imported into the U.S. prior to relevant date).

Here, the Cochlear Defendants have not even attempted to show that the marking statute applies.  They have presented no evidence to that effect, and no such contention appears in their expert reports or pretrial filings.  Indeed, the Cochlear Defendants even refused to stipulate that Advanced Bionics has sold products that practice the patents.  For the Cochlear Defendants to then shift the burden to the Foundation to show that its damages are not limited by 35 U.S.C. § 287(a), without making any showing that the statute even applies, would be manifestly unfair and contrary to the law.

To the extent that the Cochlear Defendants assert that the testimony of the Foundation's expert, Cate Elsten, hinges on proof that Advanced Bionics' products use the asserted patents, they are incorrect.  The hypothetical negotiation inquiry examines what the patentee and the infringer would have done at the time slightly before the infringer began infringing activity.  *See Transocean Deepwater Drilling,*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

11

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1   *Inc. v. Maersk Drilling, USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012) (citing

2   *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc)).

3   Likewise, the actions of Advanced Bionics and the Foundation in entering into a

4   license reflected their respective understandings at the time with respect to the

5   patents that would be used by Advanced Bionics.  Upon entering into the license,

6   Advanced Bionics presumably placed sufficient value on the Foundation's

7   diagnostic telemetry patents to enter into the license.  Whether Advanced Bionics'

8   products practiced each and every limitation of one of the patents' claim is a

9   separate and distinct question from the value of the license.

10  **II.   LATER-IDENTIFIED LEGAL ISSUES**

11        **A.   Scope of the Prior Art**

12        At the January 2, 2014 Meet and Confer, the Cochlear Defendants refused to

13  confirm the scope of the prior art at issue, despite the requirement that, at a

14  minimum, such prior art references be identified 30 days before trial.  *See* 35 U.S.C.

15  § 282; Dkt. No. 355, Ex. E, Jan. 2, 2014 Meet and Confer Tr. at 130-134.

16  Moreover, they refused to identify any specific reference they might seek to

17  introduce.  *Id.* at 158.  In short, the Cochlear Defendants have raised the prospect of

18  relying at trial on prior art that was neither relied-upon by their experts nor

19  disclosed in their Section 282 notice.  They should be limited to the prior art not

20  only relied upon by their expert, but also disclosed in their Section 282 Notice, filed

21  on December 13, 2013.  *See* Ex. 9 (Defendants' Section 282 Notice of Prior Art);

22  *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1375-76 (Fed. Cir. 2008)

23  (affirming exclusion of prior art disclosed on the last day of discovery, not

24  identified in a expert report, earlier in discovery, or at the final pretrial conference,

25  and where defendant raised on "the eve of trial, when [defendant] sought to amend

26  the district court's jury instructions to include the Cha patent in the [instructions]

27  specific to anticipation.").

28        Section 282 and the Federal Rules of Civil Procedure preclude additional

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

12

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1    prior art from being admitted at this stage.  The Federal Circuit has stated that the

2    rule of disclosure 30 days before trial in Section 282 "imposes only a minimum

3    limit on the duty to disclose prior art references." *Woods v. DeAngelo Marine*

4    *Exhaust, Inc.*, 692 F.3d 1272, 1281 (Fed. Cir. 2012).  In fact, "[t]he district court,

5    by local rule or by court order, may require such production at an earlier date." *Id.*

6    Indeed, courts have excluded evidence produced even before the thirty-day period.

7    *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 551 (Fed. Cir. 1998).

8         In *Woods*, as here, where no patent local rule applied, the Federal Circuit

9    noted that "contention interrogatories serve an important purpose in enabling a

10    party to discover facts related to its opponent's contentions." *Id.* at 1282.

11    Similarly, "[t]he purpose of § 282, like that of the Federal Rules, is to prevent

12    unfair and prejudicial surprise by the production of unexpected and unprepared-for

13    prior art references at trial." *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874,

14    879 (Fed. Cir. 1986); *see also Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d

15    841, 851 (Fed. Cir. 2006) (affirming exclusion of alleged prior art device for lack of

16    diligence in not discovering and producing it until after the close of fact discovery

17    and three months before trial).

18         Here, the Foundation would be prejudiced if the Cochlear Defendants were

19    permitted to raise new prior art at this late date because, among other reasons, the

20    Foundation has agreed to a date of priority for purposes of this case for both

21    patents, that is reflected in the agreed jury instructions.  This priority date

22    agreement was expressly made in reliance on an established scope of the prior art

23    that would be the subject of the trial.  Moreover, the Foundation is further

24    prejudiced by not knowing, even now on the eve of trial, what reference the

25    Cochlear Defendants intend to assert.  Thus, it is doubly difficult to dispute

26    inadmissibility, which may hinge on availability to the Cochlear Defendants earlier

27    in this litigation, or prepare to defend against any such art at trial.  *See Abbott Labs.*

28    *v. Syntron Bioresearch Inc.*, No. 98–CV–2359, 2001 WL 34082555, at *3 (S.D.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

13

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1   Cal. 2001) (excluding where references were available to defendants during

2   discovery).

3   　　　　The Cochlear Defendants' contention interrogatories, as well as their expert,

4   Dr. Loeb, rely on eight references in supporting their invalidity opinions.  *See* Ex.

5   10 at 7, 17-18 (Nov. 25, 2012 Loeb Report); Ex. 7 at 24-26, 49 (Jan. 19, 2009 Loeb

6   Report) (including three additional references not relied-upon in his later report);

7   Ex. 6 at 30-31 (omitting U.S. Pat. No. 4,612,934 from list, but including chart for

8   same at Exhibit D).  The Cochlear Defendants' Section 282 Notice, filed on

9   December 13, 2013, included these eight references, plus others that were

10   previously identified in Dr. Loeb's "materials reviewed" but not relied-upon by him

11   for his invalidity opinions.  Ex. 7 at 3-4 (Jan. 19, 2009 Loeb Report).  The Cochlear

12   Defendants should be limited at trial to only those references Loeb actually relied

13   upon.

14   　　　　**B.　　Scope of Direct Infringement Arguments**

15   　　　　The Cochlear Defendants acknowledged that the Foundation was alleging

16   direct infringement of Claim 10 of the '616 Patent in their MCFL. *See* Dkt. No.

17   310, Defendants' MCFL at 1 ("Claim 1: Claims 1 and 10 of U.S. Patent No.

18   5,609,616 ("the '616 patent") are directly infringed.").  The Cochlear Defendants

19   did not attempt to allege that these claims were waived or unsupported by

20   discovery. *Cf. id.* at 45-46, 57 (suggesting that plaintiffs are prohibited from

21   alleging theories of inducement, contributory infringement and willfulness).  Yet in

22   crafting the proposed jury instructions, the Cochlear Defendants for the first time

23   suggest that the Foundation is limited to claiming only indirect infringement of

24   claim 10. *See* Dkt. No. 367, First Amended Joint Disputed Jury Instructions at 17.

25   　　　　By failing to raise this issue either in its motions *in limine* or its MCFL, the

26   Cochlear Defendants have waived the issue.  Moreover, the Cochlear Defendants

27   do not allege that the Foundation failed to plead direct infringement of Claim 10 of

28   the '616 patent, only that "the Foundation has only provided discovery on the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

14

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

indirect infringement of claim 10 of the '616 patent." *Id*.  In other words, this is yet another late attempt at summary judgment, which the Court should not entertain. Additionally, the Cochlear Defendants' assertion is incorrect – the evidence presented will show that in order to train and support clinicians, the Cochlear Defendants directly perform the accused method. *See, e.g.,* Ex. 8 at 21:11-12 (Dep. of Ginger Stickney) ("when you have the representative of the company come out, they do what we really call an integrity test.")

### C.    Failure to Meet-and-Confer in Good Faith

During the meet and confer, the Cochlear Defendants refused to stipulate to numerous proposed facts that they admitted were accurate and that were not disputed anywhere in the record.  *See* Dkt. No. 360-2, Joint Meet and Confer Index Re: Pretrial Conference Order; Dkt. No. 360-4, Exhibit 2 – Text of Disputed Stipulated Facts. Many of these facts are highly relevant, and would materially simplify the case for the jury.  As such, the Foundation requests the Court take judicial notice of these disputed facts.  The most relevant are highlighted below.

- Proposed Facts 36d and 36e: The Cochlear Defendants do not dispute that all the accused products were sold or offered for sale in the United States, yet they have refused to so stipulate.

- Proposed Facts 68 through 71: Cochlear has never disputed that the claim language contained in these stipulations cover the accused products. Stipulating to such facts would substantially simplify the issues for the jury and reduce the complexity of the case.

- Proposed Facts 81, 82, 82, 84, 85, 86 and 87: These facts contain descriptions of Cochlear products taken verbatim from the Cochlear Defendants' FDA Filings. Neither Cochlear nor its experts have ever disputed the accuracy of the filings.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24552680.6

15

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

1    Dated:      January 6, 2014          Respectfully submitted,

2                         MORGAN, LEWIS & BOCKIUS LLP

3

4                         By  /s/ Michael J. Lyons

5                            Michael J. Lyons
                           Attorneys for Plaintiff

6                            Alfred E. Mann Foundation for
                           Scientific Research

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

16

PLAINTIFF'S TRIAL BRIEF;
CASE NO. 2:07-CV-08108-FMO-SH

DB2/ 24552680.6

# EXHIBIT 1

a physician or other medical personnel, but that otherwise stimulates cardiac tissue using relatively large currents in order to maintain a prescribed cardiac rhythm.  The pacemaker, when stimulating, and for a short blanking period thereafter, ceases all other activity so that the large stimulating current and artifacts associated with depolarized cardiac tissue do not damage or otherwise interfere with the normal operation of the pacemaker circuits.

The cochlear stimulator, in contrast, is not self-contained.  Implanted and external circuitry are required.  The implant portion, or ICS (implantable cochlear stimulator), must remain inductively coupled at all times with an external headpiece connected to an external processor so that power and data signals can be coupled into the ICS, thereby empowering and enabling the ICS to perform its intended function. The stimulating signals themselves comprise very tiny currents applied to selected pairs of electrodes on multiple channels. Significantly, many of the functions carried out by the ICS, e.g., measuring a voltage, measuring a current, determining an electrode impedance, are carried out simultaneously with the application of the stimulating signal to the output electrodes.

By way of the present amendment, some of the key differences between a pacemaker and a cochlear stimulator have been added to the independent claims to clearly limit the claimed invention to something other than a pacemaker.  In claims 1, 21 and 24, for example, the claim expressly relates to a "physician's tester" for use with a "multichannel cochlear stimulating system" (Claim 1), or an "implantable cochlear stimulator (ICS)" (Claim 21), or a "cochlear stimulation system" (Claim 24).  Further, in claim 12 (a method claim), the claimed method is restricted to a method of testing an

Ser. No. 08/447,157          - 12 -

AMF800569

581.169
2:07-cv-08108-FMO-SH

implantable tissue stimulating system that requires,
<u>inter alia</u>, <u>monitoring</u> at least one pair of the
multiplicity of electrodes <u>at the same time</u> the
<u>stimulation signals are applied</u> thereto.   Such
simultaneous application of the stimulating signal to the
electrode at the same time the electrode is monitored is
not done in the pacemaker art.  In fact, the pacemaker
art teaches away from doing anything at the electrodes at
the same time that a stimulating signal is applied
thereto.   This same requirement --of monitoring one pair
of the ICS electrodes, e.g., to measure a voltage
thereon, at the same time a stimulation signal is applied
thereto, is likewise included in independent Claims 1 and
21.

Beyond the differences indicated above, it is
noted that van Arragon et al. deals with downloading
histogram data that has been accumulated in the implant
device (the pacemaker) over a period of time.
Hafelfinger et al. relates to programmable implanted
circuitry that measures a moving average of lead
impedance, which measurement may be downloaded through a
conventional telemetry circuit.  The present invention,
in contrast, deals with a physician's tester (or method
of using such a tester) that specifies certain parameters
for the stimulating signal, e.g., the peak amplitude
current, sends command information to the ICS causing it
to assume such specified parameters, as well as to make a
measurement of a selected parameter in the ICS, e.g., the
voltage across a selected pair of electrodes, or across a
current sense resistor, as the specified stimulating
signal is applied to the output terminals.  The sensed
parameter is sent back to the physician's tester as part
of a feedback signal were it is displayed or otherwise
processed.  Such action thereby provides, in effect, a
"snapshot", in real time, of the selected parameter at

Ser. No. 08/447,157        - 13 -

AMF800570

# EXHIBIT 2

US005609616A

# United States Patent [19]

## Schulman et al.

[11] **Patent Number:** **5,609,616**

[45] **Date of Patent:** **Mar. 11, 1997**

[54] **PHYSICIAN'S TESTING SYSTEM AND METHOD FOR TESTING IMPLANTABLE COCHLEAR STIMULATOR**

[75] Inventors: **Joseph H. Schulman**, Santa Clarita; **John C. Gord**, Venice; **Primoz Strojnik**, Granada Hills; **David I. Whitmoyer**, Los Angeles, all of Calif.

[73] Assignee: **Alfred E. Mann Foundation for Scientific Research**, Sylman, Calif.

[21] Appl. No.: **447,157**

[22] Filed: **May 25, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 23,584, Feb. 26, 1993, which is a continuation of Ser. No. 752,069, Aug. 29, 1991, abandoned, which is a continuation-in-part of Ser. No. 411,563, Sep. 22, 1989, abandoned.

[51] Int. Cl.⁶ ................................................... A61N 1/36
[52] U.S. Cl. .................................................... 607/56
[58] Field of Search ........................ 607/27–32, 59–60, 607/56, 57

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 31,031 | 9/1982 | Kissiah, Jr. | 179/107 R |
| Re. 32,947 | 6/1989 | Dormer et al. | 128/420.6 |
| 3,449,768 | 6/1969 | Doyle | 3/1 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 4106178 | 10/1978 | Australia . |
| 2823798 | 9/1979 | Germany . |

#### OTHER PUBLICATIONS

Gheewala, et al., "A CMOS Implantable Multielectrode Auditory Stimuatlr for the Deaf", *IEEE Journal of Solid State Circuits*, 10:6, pp. 472–479 (Dec. 1975).

Clark, et al., "A Multiple–Electrode Hearing Prosthesis for Cochlear Implantation in Deaf Patients", *Med. Progr. Technol.*, 5:127–140 (1977).

Forster, "Theoretical Design and Implementation of a Transcutaneous, Multichannel Stimulator for Neural Prosthesis Applications", *J. Biomed. Engng.*, 3:107–120 (Apr. 1981).

Hochmair & Hochmair–Desoyer, "An implanted auditory eight channel stimulator for the deaf," *Med. & Biol. Eng. & Comput.* 19:141–148 (1981).

Loeb, G., "The Functional Replacement of the Ear," *Scientific American*, 252(2):104–111 (1985).

(List continued on next page.)

*Primary Examiner*—William E. Kamm
*Attorney, Agent, or Firm*—Fitch, Even, Tabin & Flannery

[57] **ABSTRACT**

A physician's tester provides for physician monitoring and control of an implantable human tissue stimulator system, such as an implantable cochlear stimulator (ICS) system. During normal operation, the tissue stimulator system includes an implantable stimulator and a wearable processor (WP). The physician's tester is designed around a microprocessor, and is basically a modification of the WP. The tester provides control over the selection of voltages and currents to be measured and the presetting of parameters in the implantable stimulator during testing of the implanted stimulator and/or a patient's response to data transmitted by the WP/tester to the implanted stimulator. The physician's testor is portable and utilizes telemetry coupling with the implanted stimulator to provide communication between the tester and stimulator for the monitoring, control and measurement of the stimulator parameters. The tester resides in a portable housing having a control panel and a visual display. The control panel allows the physician to manually set various parameter levels. The visual display provides alpha numeric data for viewing. Various devices, such as additional displays and/or a printer, may be coupled to the tester through a display port and/or an infrared serial output port in order to permit a print out of the displayed data or other information.

**14 Claims, 15 Drawing Sheets**



**5,609,616**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,662,758 | 5/1972 | Glover | 128/419 |
| 3,667,477 | 6/1972 | Susset et al. | 128/419 E |
| 3,727,616 | 4/1973 | Lenzkes | 128/422 |
| 3,751,605 | 8/1973 | Michelson | 179/107 R |
| 3,751,651 | 8/1973 | Pomella et al. | |
| 3,752,939 | 8/1973 | Bartz | 179/107 R |
| 3,818,149 | 6/1974 | Stearns et al. | 179/107 FD |
| 3,989,904 | 11/1976 | Rohrer et al. | 179/107 FD |
| 4,019,518 | 4/1977 | Maurer et al. | 128/419 R |
| 4,025,721 | 5/1977 | Graupe et al. | 179/1 P |
| 4,025,723 | 5/1977 | Blackledge | 179/1 VL |
| 4,026,300 | 5/1977 | De Luca et al. | 128/418 |
| 4,063,048 | 12/1977 | Kissiah, Jr. | 179/107 R |
| 4,207,441 | 6/1980 | Ricard et al. | 179/107 R |
| 4,232,679 | 11/1980 | Schulman | 128/419 |
| 4,267,410 | 5/1981 | Forster et al. | 179/107 BC |
| 4,284,856 | 8/1981 | Hochmair et al. | 179/107 E |
| 4,357,497 | 11/1982 | Hochmair et al. | 179/107 E |
| 4,400,590 | 8/1983 | Michelsen | 179/107 FD |
| 4,405,831 | 9/1983 | Michelsen | 179/1 P |
| 4,408,608 | 10/1983 | Daly et al. | 128/421 |
| 4,419,995 | 12/1983 | Hochmair et al. | 128/419 R |
| 4,424,812 | 1/1984 | Lesnick | 128/419 PG |
| 4,428,377 | 1/1984 | Zollner et al. | 128/419 R |
| 4,441,202 | 4/1984 | Tong et al. | 381/68 |
| 4,441,210 | 4/1984 | Hochmair et al. | 455/41 |
| 4,462,406 | 7/1984 | De Cote, Jr. | 128/419 PG |
| 4,513,743 | 4/1985 | van Arragon et al. | 607/27 |
| 4,515,158 | 5/1985 | Patrick et al. | 128/419 R |
| 4,532,930 | 8/1985 | Crosby et al. | 128/419 |
| 4,550,732 | 11/1985 | Batty, Jr. et al. | 128/419 PG |
| 4,573,481 | 3/1986 | Bullara | 128/784 |
| 4,590,946 | 5/1986 | Loeb | 128/642 |
| 4,592,359 | 6/1986 | Galbraith | 128/419 R |
| 4,592,360 | 6/1986 | Lesnick | 128/419 PG |
| 4,593,696 | 6/1986 | Hochmair et al. | 128/419 R |
| 4,611,598 | 9/1986 | Hortmann et al. | 128/419 R |
| 4,612,934 | 9/1986 | Borkan | 128/421 |
| 4,616,655 | 10/1986 | Weinberg et al. | 128/419 P |
| 4,648,403 | 3/1987 | Van Compernolle | 128/419 R |
| 4,679,560 | 7/1987 | Galbraith | 128/419 R |
| 4,686,765 | 8/1987 | Byers et al. | 29/858 |
| 4,696,287 | 9/1987 | Hortmann et at. | 128/1 R |
| 4,726,378 | 2/1988 | Kaplan | 128/419 R |
| 4,729,366 | 3/1988 | Schaefer | 128/1.6 |
| 4,809,697 | 3/1989 | Causey, III et al. | 607/30 |
| 4,819,647 | 4/1989 | Byers et al. | 128/642 |
| 4,837,049 | 6/1989 | Byers et al. | 427/96 |
| 4,847,617 | 7/1989 | Silvian | 340/870.1 |
| 4,850,962 | 7/1989 | Schaefer | 600/25 |
| 4,918,745 | 4/1990 | Hutchison | 455/41 |
| 4,920,979 | 5/1990 | Bullara | 128/784 |
| 4,931,795 | 6/1990 | Gord | 341/135 |
| 4,932,405 | 6/1990 | Peeters | 128/419 R |
| 4,947,844 | 8/1990 | McDermott | 128/421 |
| 4,961,434 | 10/1990 | Stypulkowski | 128/784 |
| 4,969,468 | 11/1990 | Byers et al. | 128/642 |
| 4,988,333 | 1/1991 | Engebretson et al. | 600/25 |
| 4,990,845 | 2/1991 | Gord | 323/312 |
| 4,991,582 | 2/1991 | Byers et al. | 128/419 P |
| 5,003,975 | 4/1991 | Hafelfinger et al. | 607/27 |
| 5,058,584 | 10/1991 | Bourgeois | 128/421 |
| 5,070,535 | 12/1991 | Hochmair et al. | 455/41 |
| 5,095,904 | 3/1992 | Seligman et al. | 128/420.6 |
| 5,123,419 | 6/1992 | Platt et al. | 607/27 |

## OTHER PUBLICATIONS

Loeb, et al., "Design and fabrication of an experimental cochlear prosthesis," *Med. & Biol. Eng. & Comput.* 21:241–254 (1983).

Mecklenburg & Brimacombe, "An overview of the Nucleus cochlear implant program," *Seminars in Hearing* 6(1):41–51 (1985).

Millar, et al., "Speech processing for cochlear implant prosthesis," *J. Speech & Hearing Research* 27:280–296 (1984).

Herndon, Matthew, "Psychoacoustics and speech processing for a modiolar auditory prosthesis," *Dissertation Stanford Univ. Dept. EE* (Table of Contents only)(Jun. 1981).

Soma, Mani, "Design and fabrication of an implantable multichannel neural stimulator," *Dissertation–Stanford Unviv. Dept. EE* (May 1980).



*FIG. 1*



*FIG. 2*



FIG. 3

## FIG. 4

```
+---------------------------+---------------------------+
|                           |                           |
|                           |                           |
|        FIGURE  4-D        |        FIGURE  4-H        |
|                           |                           |
|                           |                           |
+---------------------------+---------------------------+
|                           |                           |
|                           |                           |
|        FIGURE  4-C        |        FIGURE  4-G        |
|                           |                           |
|                           |                           |
+---------------------------+---------------------------+
|                           |                           |
|                           |                           |
|        FIGURE  4-B        |        FIGURE  4-F        |
|                           |                           |
|                           |                           |
+---------------------------+---------------------------+
|                           |                           |
|                           |                           |
|        FIGURE  4-A        |        FIGURE  4-E        |
|                           |                           |
|                           |                           |
+---------------------------+---------------------------+
```

FIG. 4-A



FIG. 4-B

**U.S. Patent**          Mar. 11, 1997          Sheet 7 of 15          5,609,616



FIG. 4-C



FIG. 4-D



FIG. 4-E



FIG. 4-F

**U.S. Patent**          Mar. 11, 1997          Sheet 11 of 15          5,609,616



FIG. 4-G



FIG. 4-H

**U.S. Patent**          Mar. 11, 1997          Sheet 13 of 15          5,609,616

## FIG. 5A



LONG DATA FRAME FOR MULTIPLE CHIP OPERATION

| MASTER | SLAVE 1 | SLAVE 2 | SLAVE 3 | | SLAVE n |

## FIG. 5B



FIG. 6

PHYSICIAN'S TESTER



*FIG. 7*

5,609,616

1

## PHYSICIAN'S TESTING SYSTEM AND METHOD FOR TESTING IMPLANTABLE COCHLEAR STIMULATOR

### RELATED APPLICATIONS

This application is a continuation of application Ser. No. 08/023,584, filed Feb. 26, 1993, entitled IMPROVED HUMAN TISSUE STIMULATOR; which is a continuation of application Ser. No. 07/752,069, filed Aug. 29, 1991, now abandoned; which is a continuation-in-part of patent application Ser. No. 07/411,563, filed Sep. 22, 1989, also abandoned.

### BACKGROUND

The present invention relates to improvements in human tissue stimulators and more particularly to a human tissue stimulating system which in a preferred form comprises an audio responsive system for artificially stimulating the cochlea to improve the hearing of the hearing impaired.

U.S. Pat. No. 4,400,590 issued Aug. 23, 1983 for "Apparatus for Multi-Channel Cochlear Implant Hearing Aid System" describes and illustrates a multi-channel intra-cochlear electrode and system for electrically stimulating predetermined locations of the auditory nerve within the cochlea of the ear. The electrode comprises a plurality of exposed electrode pairs spaced along and embedded in a resilient curved base for implantation in accordance with the method of surgical implantation described in U.S. Pat. No. 3,751,615 issued Aug. 7, 1973 for "Method of Inducing Hearing." The hearing aid system described in the '590 patent receives audio signals at a signal processor located outside the body of a hearing impaired patient. The processor converts the audio signals into analog data signals which are transmitted by a cable connection through the patient's skin to the implanted multi-channel intra-cochlear electrode. The analog signals are applied to selected ones of the plurality of exposed electrode pairs included in the intra-cochlear electrode to electrically stimulate predetermined locations of the auditory nerve within the cochlea of the ear where the intra-cochlear electrode is positioned.

The cochlea stimulating system described in the '590 patent is limited in the number of channels of information, the speed of transfer of stimulating signals to the cochlea and the fidelity of the signals. Also, the cable connection through the skin of the patient to the intra-cochlear electrode is undesired in that it interferes with the freedom of movement of the patient and represents a possible source of infection.

U.S. Pat. No. 4,532,930, issued Aug. 6, 1985 for "Cochlear Implant System For an Auditory Prosthesis" describes and illustrates a multiple electrode system. While multiple electrodes are employed to stimulate hearing the system only operates with a single pulsatile output stimulating a single electrode channel at any given time. Such a sequential system is limited in speed of operation and does not provide for analog operation where continuous stimulating signals controllable in amplitude are simultaneously applied to a number of electrode channels. Further, the system is subject to charge imbalance with misprogramming or circuit fault and inefficient use of electrical power. Moreover, once the stimulator unit is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,592,359, issued Jun. 3, 1986 for "Multi-Channel Implantable Neural Stimulator" describes a cochlear implant system having 4 current sources and 4

2

current sinks per channel controlled by series switches to provide 16 different circuits for supplying 16 levels of 2 polarities to each output channel. In a pulsatile mode, the system provides for simultaneous update (amplitude control) and output to all channels. However, the system does not permit simultaneous analog update and output on all channels and the electrode pairs for each channel are not electrically isolated from all other electrode pairs whereby undesired current leakage may occur. Further, once the stimulator is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,947,844, issued Aug. 14, 1990 for "Receiver/Stimulator For Hearing Prosthesis" describes and illustrates a multiple channel electrode system. The system includes an implanted receiver/stimulator connected to an implanted electrode array. The receiver/stimulator includes an electrode stimulating current control characterized in that current is delivered to each electrode or to each bipolar pair of electrodes in a series of short electrical pulses, each elemental pulse being separated from the next by an interval of zero current which has a longer duration than an elemental pulse. The waveform of the stimulus current comprises a series of pulses of one polarity followed by an equal number of pulses of an opposite polarity whereby the sum of all the electrical charge transferred through each electrode is approximately zero at the end of a stimulating current waveform. In this way, elemental current pulses applied to each electrode on each pair of electrodes which are stimulating are preferably delivered cyclically such that elemental pulses delivered to one electrode are interleaved in time with those delivered to any other electrodes. This enables the use of a single current source in the receiver/stimulator. The use of a single current source limits the operation of the receiver/stimulator in that the single current source must be switched to serve all output channels in a sequential manner. Simultaneous operation is not possible. Further, the number of channels cannot be greater than 3 or 4 without greatly reducing the duty cycle of the stimulating current waveform in each channel. Not only does the stimulus effectiveness in each channel suffer in such a situation, but the time required to complete the switching cycle for the single current source lengthens in direct proportion to the number of channels. Further, this system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

The system described in the 844 patent also includes in the implanted receiver/stimulator a transmitter for telemetering one electrode voltage, measured during stimulation, to an external receiver for monitoring and analysis as an indicator of proper operation of the implanted stimulator. The transmitter comprises an oscillator operating at a frequency of about 1 MHz. The output of the oscillator is coupled to the implant's receiving coil and demodulated to recover the selected voltage waveforms. Unfortunately, such a telemetry system is not only limited to the monitoring of one voltage, but the simultaneous transmission of the telemetry signal and reception of the input carrier signal as described will result in undesired modulation and possible loss of input data.

Accordingly, there is a continuing need for an improved multi-channel tissue stimulator system particularly useful as a cochlear stimulator system and which is characterized (i) by a high operating speed in analog and pulsatile operation, (ii) freedom from charge imbalance, (iii) complete isolation of its electrode pairs for each channel, and (iv) the externally

5,609,616

3

controllable monitoring and selective control a plurality of operating parameters and power supply to and currents and voltages developed within the implanted stimulator unit of the system to optimize system operation and power efficiency. The present invention satisfies such needs.

## SUMMARY OF INVENTION

A preferred embodiment of the present invention comprises a cochlea stimulating system including an externally wearable signal receiver and processor (WP) and an implanted cochlea stimulator (ICS). The receiver, which may comprise a headpiece adjacent the ear of a patient, receives audio signals and transmits the audio signals to the WP. The WP receives and processes the audio signal and includes means for generating data indicative of the audio signals for transmission to the ICS.

The ICS includes means for receiving transmissions from the WP as well as a processor for processing such transmissions to sequentially update and simultaneously or sequentially generate and apply stimulation signals to a plurality of cochlea stimulating channels each having capacitor coupled electrodes implanted within the cochlea of the patient. The processor includes means responsive control signals from the WP for selectively monitoring one or more of the electrodes and voltages within the processor and for generating ICS status indicating signals. The ICS status indicating signals are telemetered back to the WP which includes means for receiving and processing the ICS status indicating signals. For example, such means may include means for controlling the power level of transmissions to the ICS.

The processor in the ICS also includes means for selectively controlling the pulse widths of the stimulation signals, the frequency at which stimulating signals are applied to selected electrodes, and means for generating a plurality of voltages for powering different components in the ICS and for selectively receiving and responding to analog and pulsatile input data signals from the WP.

Preferably, each channel in the ICS includes (i) a current source and floating current transfer device with switching capacitors for supplying stimulating signals to the capacitor coupled electrodes which are independent and isolated from the stimulating signals supplied to the output of all other channels, (ii) means for selectively driving the electrodes as unipolar or bipolar electrodes and (iii) means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a block diagram of a basic form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 2 is a more detailed block diagram of the ICS of FIG. 1 and associated circuitry for receiving and transmitting signals from and to the WP.

FIG. 3 is block diagram of second form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 4 illustrates the arrangement of FIGS. 4-A through 4-H.

FIGS. 4-A through 4-H show respective portions of a detailed block/schematic diagram of the ICS.

4

FIG. 5A depicts a long data frame useful in multiple chip configurations for the stimulating system, the long data frame comprising a series of n+1 data frames, the first frame being designated as a master frame and the subsequent frames being designated as slave frames 1 through n. The number of data frames comprising the long data frame corresponds to the number of chips included in the system.

FIG. 5B is a block diagram of multiple chip system for the ICS of FIG. 2 or FIGS. 4A–4H.

FIG. 6 is a diagrammatic representation of a physician's tester useful with the cochlea system of FIG. 1.

FIG. 7 is a block diagram of the cochlear system of FIG. 1 with the WP replaced by the physician's tester.

## DETAILED DESCRIPTION OF INVENTION

The preferred forms of the present invention are implemented using CMOS technology. In development of the invention, however, a prototype was developed using standard, off-the-shelf electrical components which when connected functioned in accord with the general principles and features set forth in the preferred forms of the system, including CMOS integrated circuits and chips. Thus, in duplicating the systems hereinafter described, one may either utilize conventional off-the-shelf electrical components or develop the systems utilizing techniques well known in CMOS technology, whichever is desired.

As illustrated in FIG. 1, the basic system according to a preferred embodiment of the present invention basically comprises an externally wearable system 10 and an implantable cochlear stimulator (ICS) 12. The external system 10 comprises a headpiece 14 and an externally wearable processor (WP) 16. The headpiece may be worn behind the ear of a hearing impaired person and comprises a conventional microphone 18 and an antenna 20 for transmitting and receiving electromagnetic energy preferably in the form of radio frequency signals. Such coupling can be restricted to magnetic field only by an electrostatic shield around the coils comprising the antenna 20. In addition, signals from the ICS to the WP on one carrier frequency and from the WP to the ICS on another frequency can be transferred via a single coaxial cable between the headpiece 14 and the WP 16. This can be accomplished by having tuned inductor-capacitor filters for each frequency at each end of the coaxial cable.

The WP 16, powered by a battery 38, is adapted to receive audio signals received by the microphone 18 and to transmit such signals to a conventional audio front end 22 which features automatic gain control (AGC). The audio signals processed by the audio front end 22 are transmitted to a bank of filters 24 for filtering and for generation of a plurality of parallel audio signals. The audio signals are processed by a multiplexer 26 and converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30. The filter bank may also be implemented as a group of digital filters, for example in a digital signal processor integrated circuit. In this case the signal flow would be from the audio front end and AGC 22, through an anti-aliasing filter, to an analog to digital converter, then into a digital filter bank 24 and the general processing of microprocessor 30.

The output of the microprocessor 30 is coupled through a custom gate array 32 that converts data from the microprocessor into a serial bit stream going to a data transmitter 34. The gate array 32 also converts data from a telemetry

5,609,616

5

receiver 36 and the microprocessor 30 to control the power level of and data generated by the data transmitter 34.

As illustrated in FIG. 1, the ICS 12 includes a receiver 40 for receiving data transmissions from the wearable system 10 and a telemetry transmitter 42 for transmitting ICS status indicating and measured signals from the ICS 12 to the wearable system 10 for processing thereby. For example, power level indicating signals transmitted by the telemetry transmitter 42 are received by the telemetry transmitter 36 and processed in the microprocessor 30 and gate array 32 to generate signals controlling the power level of the transmissions from the transmitter 34 to the ICS 12, thereby providing a closed-loop system for optimizing the power levels of the transmission from the wearable system 10 to the ICS 12 and hence conserving the battery 38 and optimizing the voltages generated within the system 10.

In addition to receiver 40 and transmitter 42, the ICS 12 includes a regulator 44 for receiving a power signal from the receiver 40 to energize a processor 46. Data signals from the receiver 40 are also transmitted to the processor 46 for processing to generate stimulation signals applied to one or more of a plurality of capacitor coupled electrodes in an intra-cochlear electrode 48.

Generally speaking, in response to control or data signals from the WP16 the processor 46 selectively monitors voltages of the electrodes and associated circuitry in the processor and generates ICS status indicating and measured signals. For example, the processor 46 monitors the voltage applied to the regulator 44, the impedance of the electrodes and other voltages within the processor to generate the status indicating signals which are sent as data to the telemetry transmitter 42 for transmission to the wearable system 10.

More particularly, in the cochlea stimulating system shown in FIG. 1, the signals transmitted to the ICS 12 from the wearable system 10 include electrical power components. Such power components are processed within the receiver 40 through the series regulator 44 to generate a voltage signal which powers the processor 46. The processor 46 selectively monitors the voltage applied to the series regulator and generates a status indicating signal relative to such voltage which is transmitted by the telemetry transmitter 42 and received by the telemetry receiver 36. As previously stated, such information is utilized in the microprocessor 30 and gate array 32 of the WP 16 to control the power level of the transmissions from the data transmitter 34 to the ICS 12.

More specifically as to the ICS 12 and the embodiment thereof illustrated in FIG. 2, power and data are sent through a main coil 50 to the receiver 40 comprising a power rectifier which filters out DC power for the regulator 44 and a detector which demodulates the data for transmission to a data decoder 52. The regulator 44 in conjunction with a voltage reference 54 and voltage regulator error amplifier 56 produces a precise 14 volts for powering the balance of the processor 46. More particularly, the 14 volts powers a voltage downconverter 58 which generates three additional voltages, 10.5, 7.0 and 3.5 volts. The three voltages are used to power various other circuits, including the output circuits of the processor 46.

The voltage used to provide charge to the outputs applied to the electrodes 48 is transferred to eight different storage capacitors 60, one of which is illustrated in FIG. 2. There is one storage capacitor for each of eight isolated bipolar channels. The output of each storage capacitor is controlled by a current source FET 62 for that channel. Each FET current is determined by an exponential D to A converter 64

6

and current reference 65, such as the D to A converter described in U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as the present invention.

The output of the current sources 62 are connected to the electrodes 48 and an indifferent electrode 49 through a switch matrix 66. The output of the electrode switch matrix 66 is capacitor coupled to each of 16 electrodes. The following table lists the output currents available to the electrodes:

| Constant Current Amplitude Steps (µA) | | | | |
|---|---|---|---|---|
| 2500 | 425.7 | 72.49 | 12.34 | 2.102 |
| 2417 | 411.7 | 70.11 | 11.94 | 2.033 |
| 2338 | 398.2 | 67.81 | 11.54 | 1.966 |
| 2261 | 385.1 | 65.58 | 11.16 | 1.901 |
| 2187 | 372.4 | 63.43 | 10.80 | 1.839 |
| 2115 | 360.2 | 61.34 | 10.44 | 1.779 |
| 2046 | 348.4 | 59.33 | 10.10 | 1.720 |
| 1978 | 336.9 | 57.38 | 9.772 | 1.664 |
| 1913 | 325.9 | 55.49 | 9.451 | 1.609 |
| 1850 | 315.2 | 53.67 | 9.140 | 1.556 |
| 1790 | 304.8 | 51.91 | 8.840 | 1.505 |
| 1731 | 294.8 | 50.20 | 8.549 | 1.455 |
| 1674 | 285.1 | 48.55 | 8.269 | 1.408 |
| 1619 | 275.7 | 46.96 | 7.997 | 1.361 |
| 1566 | 266.7 | 45.42 | 7.734 | 1.317 |
| 1514 | 257.9 | 43.92 | 7.480 | 1.273 |
| 1465 | 249.4 | 42.48 | 7.234 | 1.232 |
| 1416 | 241.2 | 41.08 | 6.997 | 1.191 |
| 1370 | 233.3 | 39.73 | 6.767 | 1.152 |
| 1325 | 225.6 | 38.43 | 6.545 | 1.114 |
| 1281 | 218.2 | 37.17 | 6.330 | 1.077 |
| 1239 | 211.1 | 35.95 | 6.122 | 1.042 |
| 1198 | 204.1 | 34.76 | 5.921 | 1.008 |
| 1159 | 197.4 | 33.62 | 5.726 | 0.975 |
| 1121 | 190.9 | 32.52 | 5.538 | 0.000 |
| 1084 | 184.7 | 31.45 | 5.356 | |
| 1049 | 178.6 | 30.42 | 5.180 | |
| 1014 | 172.7 | 29.42 | 5.010 | |
| 981.2 | 167.1 | 28.45 | 4.845 | |
| 949.0 | 161.6 | 27.52 | 4.686 | |
| 917.8 | 156.3 | 26.61 | 4.532 | |
| 887.6 | 151.1 | 25.74 | 4.383 | |
| 858.5 | 146.2 | 24.89 | 4.239 | |
| 830.0 | 141.3 | 24.07 | 4.100 | |
| 803.0 | 136.7 | 23.28 | 3.965 | |
| 776.6 | 132.2 | 22.52 | 3.835 | |
| 751.1 | 127.9 | 21.78 | 3.709 | |
| 726.4 | 123.7 | 21.06 | 3.587 | |
| 702.6 | 119.6 | 20.37 | 3.469 | |
| 679.5 | 115.7 | 19.70 | 3.355 | |
| 657.2 | 111.9 | 19.05 | 3.245 | |
| 635.6 | 108.2 | 18.43 | 3.138 | |
| 614.7 | 104.6 | 17.82 | 3.035 | |
| 594.5 | 101.2 | 17.24 | 2.936 | |
| 575.0 | 97.92 | 16.67 | 2.839 | |
| 556.1 | 94.70 | 16.12 | 2.746 | |
| 537.8 | 91.59 | 15.59 | 2.656 | |
| 520.2 | 88.58 | 15.08 | 2.568 | |
| 503.1 | 85.67 | 14.58 | 2.484 | |
| 486.5 | 82.86 | 14.11 | 2.402 | |
| 470.6 | 80.13 | 13.64 | 2.324 | |
| 455.1 | 77.50 | 13.19 | 2.247 | |
| 440.1 | 74.96 | 12.76 | 2.173 | |

Under control of a voltage controlled oscillator 70 and its loop filter 72, the serial output from the data decoder 52 drives a serial to parallel converter 68. The parallel output of the serial-to-parallel converter 68 provides channel amplitude data to an amplitude data latch 74 and program command data to a command latch 76. More particularly, the serial data from the data decoder 52 is analyzed by bit and word error checking counters 78. The amplitude data from the amplitude data latch 74 determines the output of the exponential D to A converter 64. In that regard, the analog value of the output from the D to A converter 64 is generated

5,609,616

7

in a current mirror which is then transferred via an analog multiplexer **80** to the capacitively-coupled output electrodes **48**. The sequence of operation of the multiplexer **80** is controlled by the output of a word strobe generator **79** which is driven by command latch **76**. It should be noted that the command latch **76** cannot function unless an initialization circuit **82** and the bit error checking circuit **78** permit data to be transferred to a command decoder **84**.

The command decoder **84** controls all the other specific functions such as the electrode switching matrix **66** via an output mode register **86** and output control logic **88**, and a pulse width control **90** which also controls the output via the output control logic **88**. As with the command latch, the pulse width control **90** and the output control logic **88** cannot function unless the initialization circuit **82** is properly initialized. To be enabled, the initialization circuit **82** must detect the correct initial digital code. When the initialization circuit **82** is not enabled, the electrode switching matrix **66** cannot turn on.

In addition to the other functions of the command decoder **84**, it also controls the setting of indifferent electrode switches **92** which are used for monitoring the current flowing through the indifferent electrode and therefore through any or all 16 electrodes in a unipolar configuration. With the appropriate output channel configuration in the unipolar state, the indifferent electrode switches permit multi-polar operation.

As illustrated more clearly in FIG. 2, the ICS back telemetry system described briefly relative to FIG. 1, consists of a signal multiplexer (MUX) **94** programmed by the command decoder **84** to monitor various voltages throughout the processor **46** and ICS **12**. The output of the multiplexer **94** is amplified through a series of telemetry gain stages **96** which are connected to an A to D converter **98**. Power to the gain stages **96** can be turned on and off by the command decoder **84** to conserve energy when not in use.

The A to D converter **98** may be a single-slope type which functions by comparing the output of the gain stages **96** with a voltage ramp. The slope of the ramp is set by a current reference **100**. The output of the A to D converter **98** and a telemetry control logic **102** is a train of bits that controls a telemetry modulator switch **104**. The telemetry modulator switch **104** modulates the telemetry transmitter **42** which energizes a telemetry coil **106**.

As previously indicated, the back telemetry system included in the cochlear stimulating system of the present invention provides means for minimizing power consumption of the system. As previously noted, the WP **16** is powered by the battery **38**. To increase the battery life or to allow a smaller battery to be used, the radio frequency transmitted from the WP **16** via the antenna **20** to the ICS **12** is rectified in the receiver **40** and applied to the regulator **44**. It is important that the output voltage of the regulator **44** be held constant, in this case, 14 volts. It is also important that the voltage regulator which has the 14 volt output must have somewhat more than 14 volts available as an input. Any additional voltage is lost as heat and will reduce the life of battery **38**. In the present invention, the regulator input voltage (DC) is optimized by controlling the RF power transmitted by the wearable system **10** and received by the ICS **12**. As previously indicated, the data transmitter **34** is powered by the battery **38**, preferably a 6 volt 0.5 amp-hour battery. The power control is affected through a conventional switching regulator included in the gate array **32** whose output voltage may be varied based upon the duty cycle of a switching transistor or multiple switching transistors in the

8

switching regulator. The output of the power control circuit powers the transmitter **34** and by varying its output voltage can vary the transmitter power. The transmitter may run at 49 MHz and be 100% amplitude modulated by a digital signal. The digital signal comes from the gate array **32**. The signals transmitted by the transmitter **34** are received at the ICS **12** and rectified as previously described. The rectified power noted as "DC" in FIG. 2 is applied to the regulator **44** which may be of conventional design including a junction type depletion-mode FET to hold the output voltage of the regulator **44** constant as the input voltage changes. In practice, the input voltage can vary from 14 volts up to 20 volts or more. To maintain best efficiency, it is desired that the DC voltage be only slightly greater than the output voltage of the series regulator **44**, perhaps on the order of 14.2 to 15 volts. However, as the antenna **20** is moved or as the circuit loads change, the DC voltage may start to change. One purpose of the back telemetry system is to allow the DC voltage to be automatically maintained at the lowest voltage consistent with normal operation. To accomplish this, under control of the command decoder **84**, the multiplexer **94** monitors the DC voltage. The desired output of the multiplexer **94** is applied to the conventional A to D converter **98**. As previously described, the output of the A to D converter, telemetry control logic **102** and telemetry modulator switch **104**, FM modulates the telemetry transmitter **42** which may comprise a 10.7 MHz oscillator. The output of the oscillator is coupled back through the skin to the headpiece **14** and antenna **20** to the telemetry receiver **36**. The output of the receiver **36** is applied to the gate array **32** including a conventional serial to parallel converter. The parallel data output from the serial to parallel converter is processed in the microprocessor **30** to adjust the power level in the power control circuit of the data transmitter **34** to maintain the value of the DC voltage slightly greater than the desired output voltage of the series regulator **44**.

As just described, the command decoder **84** controls the monitoring of the value of the DC voltage to provide the desired voltage control. Similarly, the command decoder **84** may select particular channels to be monitored and the impedance of the various electrodes to be determined in the same manner as the DC voltage was monitored and as above described. In such cases, the ICS status indicating signals generated in the processor **46** and telemetered to the WP **16** may be utilized within the microprocessor **30** to provide indications of the operating status of the ICS **12**.

In still other instances, to save power the command decoder **84** may function to cause a powering down of various subsystems within the processor **46**. With the circuitry of FIG. 2, power may be restored in approximately 20 msec. on appropriate output from the command decoder. Similarly, the microprocessor can go into a hibernation state which consumes less than 10 milliwatts. The hibernation state terminates whenever additional commands are received from the command decoder **84**.

In the ICS **12** illustrated in FIG. 2, the current sources **62** are floating. Such "floating" of the current sources may be as described in United States patent application Ser. No. 428,179, filed Dec. 18, 1989, and assigned to the same assignee as the present invention, and may be implemented with an FET that is not directly tied to a power supply. This may be implemented using two identically sized transistors, one being a reference transistor upon which an input current is impressed to generate a voltage difference thereacross which is a predetermined gate voltage for the second or output transistor which is floating with respect to all power supplies. The predetermined gate voltage is that voltage

5,609,616

**9**

which when applied to the output transistor will produce the same current value as the input current. The importance of such floating current sources in the ICS **12** is to enable the ICS **12** to stimulate pairs of electrodes independent of the current flow in other pairs of electrodes and independent from the main power supply. This allows for the exact control of current in each output stage with no direct current path back to the main power supply or to any other output stage. This eliminates any concern of undesired currents flowing between any of the output stages.

The processor **46** included in the ICS **12** includes means (**88** and **90**) for selectively controlling the pulse width of the stimulation signals applied to the electrode **48**. Such means preferably comprises a timing circuit capable of turning the stimulus current of a particular channel on and off with a time resolution of approximately one microsecond. Such means is preferably controlled by a command signal separate from the signals which set the current to each stimulus channel; the command signal controls the duration of current stimulus while the previously described signals control the stimulus current in each channel.

Further, the processor **46** included in the ICS **12** includes means for selectively controlling the frequency at which stimulating signals are applied to select ones of the electrodes. This is preferably accomplished by providing a signal frame (or set of signals to the multiplicity of electrodes) of varying length. The use of short frames allows a subset of channels to be refreshed or updated more often than would be possible if all channels were always updated by a fixed, long frame. Such reduced frame length may be implemented either as a frame length encoded in the frame data or (in the preferred implementation) as a unique end of frame signal.

In the processor **46**, the voltage downconverter **58** generates three voltages of different value for powering different components in the ICS **12**. The voltage downconverter may comprise a set of capacitors and switches so arranged to connect the capacitors alternately in series across the high voltage from the regulator **44** input and then in parallel to provide a lower voltage supply (3.5 volts in the preferred implementation). The storage or supply capacitors **60** may be charged to various multiples of the 3.5 volt supply by connecting their associated transfer capacitors to the appropriate points in the downconverter when the downconverter capacitors are connected in series.

The ICS **12** includes means for selectively receiving and responding to analog and/or pulsatile input data from the WP **16**. Preferably, this is accomplished by using the stimulus current control signals to provide continuous analog control of stimulus and using a separate command signal to selectively control the "on" or "off" status of a given channel. The stimulus parameters of each channel are controlled independently of all other channels by means of separate signals within the data frame and separate configuration commands for each channel encoded in the command signal.

Further, the ICS **12** is capable of selectively stimulating the electrodes in a unipolar and/or bipolar configuration. This is accomplished by providing a set of command signals which affect separate bits for each channel in the output mode register **86**. Via the output control logic **88**, these bits independently configure the switches for each channel in the electrode switching matrix **66**. The switches allow the current source FET **62** and storage capacitors **60** to be connected to pairs of electrodes (bipolar mode) or, alternatively, to individual electrodes and the indifferent electrode **49** via the indifferent electrode switches **92**.

**10**

While FIG. 2 illustrates a basic ICS, FIGS. 3 and 4A–4H illustrate a preferred form of the ICS. FIG. 3 is a more general block diagram illustration of the system which is represented in greater detail in FIGS. 4A–4H. The majority of the active circuitry of the ICS may be imbedded in a custom chip which with other active and passive circuitry comprising the ICS may be supported on a substrate. The ICS illustrated in FIGS. 3 and 4A–4H comprises a receiver **200** for receiving an input signal generated in the WP **16** and transmitted by the headpiece **14**. Preferably, such input is a Manchester-encoded data stream comprising an amplitude-modulated RF signal consisting of a serial sequence of 83 bits representing 9 words of 9 bits each plus a parity bit and an end-of-frame marker. A frame is defined as one such bit sequence and such frames are sent sequentially from the WP to the ICS. The first 8 words of each frame contain the digital amplitude and polarity information for output channels **1** through **8** in that order. The 9th word contains command information for the control of ICS configuration and functionality. The receiver **200** separates the incoming RF signal into a power signal transmitted to a power supply section **202** and data which is transmitted into a data recovery section **201**. In the power supply section, power signals are generated for the ICS and, via a downconverter **203**, are transformed into the voltage levels which provide power for the eight output stages indicated by numbers **212-1** through **212-8**, one of which will be described in greater detail hereinafter.

The data signal extracted by the receiver **200** and transmitted to the data recovery section **201** is further processed within the data recovery section to provide input signals to an initialization and status control section **204**, a polarity and amplitude control section **205**, a command decoder section **206**, and to a multiple chip control **214**. The initialization and status control section **204** receives power from the power supply section **202** and establishes the control conditions of the other sections of the ICS upon system startup and upon detection of a system operating error by the status control section. The polarity and amplitude control section **205** determines the polarity of the output currents generated in the various output stages **212-1** through **212-8** and generates signals which are further processed in a log D-A converter section **207** to control the magnitude of current signals supplied by the outputs of the various output stages. In the command decoder section **206**, the data signals are processed and decoded to form signals which (1) via an output mode register **208** control the status of the output stages as either unipolar or bipolar, (2) via a pulse width control **209** control the width of the output pulses supplied by the output stages when such stages are in a pulsatile mode and (3) via a refresh voltage logic **210** control the power applied to the output stages. In addition, the ICS includes a back telemetry section **211** which in response to signals from the command decoder **206** generates and transmits back to the WP status indicating and power control signals. The status signals indicate the status of the various elements within the ICS and voltages generated therein. The power control signals control the power of the transmitted signals and effect a power conservation by control of the level of the signals from the WP and by control of the refresh voltages from the downconverter **203** to the various output channels.

Still further, the illustrated ICS includes a multiple chip control section **214**. Section **214** enables the chip included in the ICS to act as a "master" having the capacity to drive a plurality of identical "slave" chips mounted on the substrate thereby effecting a multiplication of the number of output stages.

5,609,616

11

FIGS. 4A–4H, organized as set forth in FIG. 4, show details of the various system sections illustrated in FIG. 3, with subsections of the sections bearing the same numbers as set forth in FIG. 3 and with letters to denote the specific subsections, e.g., 201A, 201B, 201C and 201D are subsections of the data recovery section 201. The following detailed description of the sections and subsections comprising the system will begin with the receiver 200 and will continue through a description of the output stages 212-1 through 212-8 and multiple chip control 214 and will be followed by a description of the operation of the system comprising the described sections. Details of the frame structure, data word structure, and/or the transmission rate for the input signal from the WP and data signal extracted therefrom will be included in the description of the operation of the system.

STRUCTURE

Receiver 200

The receiver 200 illustrated in FIG. 4A is a conventional AM detector containing capacitors which implement a parallel resonant tuned circuit in conjunction with a main coil 50 followed by series connected power rectification and data detection diodes and energy storage capacitors to generate signals PDATA, NDATA, RAWDC, ZEROV and TANKV. PDATA and NDATA are differential signals generated across the data detection diodes and convey demodulated data to the data recovery section 201. RAWDC is DC voltage generated across the energy storage capacitors and is delivered to the input of a series regulator 202A in the power supply section 202. ZEROV is the reference voltage against which all other voltages are measured in the ICS. TANKV is derived from RAWDC via a resistive divider network in the receiver 200 and, as will be described in greater detail hereinafter, via a telemetry multiplexer 211B in back telemetry section 211 provides one of the power control signals which is an input to the back telemetry section 211.

Data Recovery 201

The data recovery section comprises four subsections: a data conditioner 201A, a clock decoder 201B, a serial to parallel converter 201C and a word strobe generator 201D. All analog and digital circuitry in the data recovery section 201 is of conventional design.

Within data conditioner 201A, the signals PDATA and NDATA from the receiver 200 provide the two inputs to an analog comparator. The output from the comparator is the signal MANDATA, which is the recovered version of the Manchester-encoded serial data stream transmitted by the WP. MANDATA is distributed to clock decoder 201B, serial to parallel converter 201C, as well as downconverter clock 203A to be discussed hereinafter.

In addition, within data conditioner 201A, the signal MANDATA is applied to the gate of a MOSFET switch which allows an on-chip capacitor to be charged in a pulsatile manner. A constant-current discharge path in parallel with the on-chip capacitor reduces the voltage to zero in the absence of the signal MANDATA. The voltage across the on-chip capacitor is buffered by three inverters to become the carrier detect signal, CARDET. CARDET is distributed to clock decoder 201B and to an initialization subsection 204B of the initialization and status control section 204.

In the clock decoder subsection 201B, the signal MANDATA is applied to an edge-detector circuit comprised of an XOR gate with an RC delay circuit preceding one of the inputs. Output pulses from the edge detector are the primary input to a phase-lock loop (PLL) circuit of conventional design which, by locking to the MANDATA pulse edges,

12

generates the data clock signals CLKPH1 and CLKPH2. The clock signals comprise a two-phase non-overlapping clock system at a frequency of 1.1 MHz with a CLKPH1 pulse asserted during the first half of each bit time and a CLKPH2 pulse during the second half. Signals CLKPH1 and CLKPH2 are sent to the serial to parallel converter 201C, word strobe generator 201D, pulse width control 209 and an A/D converter 211C in back telemetry section 211.

Further, within clock decoder 201B, the timing of pulse edges in the signal MANDATA is compared to those of the local clock VCO in the PLL. In particular, a unique pulse with non-standard edge timing sent by the WP to mark an end-of-frame is sensed by a circuit of conventional design comprised of a D-type flip-flop and an XOR gate. This unique pulse results in the generation of the frame clock signal, PFRMCLK which is sent to serial to parallel converter 201C.

Additional circuitry of conventional design in the clock decoder 201B, comprising logic gates and binary counters, is used to generate a signal PLLLOCK. PLLLOCK is asserted so long as the PLL is locked to the signal MANDATA, CARDET is asserted, and, as will be described relative to a powerbad detector 204A in initialization and status control section 204, POWERBAD is negated. The signal PLLLOCK is sent to serial to parallel converter 201C and to parity error detector and initialization subsections 204C and 204B of section 204.

Serial to parallel converter 201C comprises logic gates, latches, D type flip-flops, counters and a shift register all of conventional design. Under control of the signal CLKPH1 and a signal DCENABLE from multiple chip control section 214, the serial data bits represented in the signal MANDATA are shifted into a 9-bit serial-in, parallel-out shift register. The first stage output of the shift register generates a serial bit stream signal SERDATA. The 9 outputs of the register are the source of the signal bus DATA (1–9) which is sent solely to a polarity and amplitude data latch 205A in section 205 and to a command latch 206A in command decoder 206.

In addition, within serial to parallel converter 201C, the signal PFRMCLK is gated with the clock signal CLKPH2 to generate a signal FRMCLK sent to pulse width control section 209 and a refresh voltage logic section 210.

Further, within serial to parallel converter 201C, the signal CLKPH1 is connected to the clock input of a 4-bit binary up-counter which is reset by FRMCLK. The counter and succeeding decoders and latches provide the signals XFERB and XFERC solely to an analog multiplexer 207C included in the log D-A converter section 207. Also, the bit 4 output of the counter is gated with CLKPH1 and CLKPH2 to produce the signal WORDTRCLK (word transfer clock) which provides a reset pulse to the counter as well as being sent to word strobe generator 201D, down converter clock 203A and a polarity and amplitude data latch 205A. The counter is also decoded to generate the signal AMPSYNC which is sent solely to pulse width control 209.

Word strobe generator 201D comprises logic gates, D type flip-flops and a 9-stage Johnson counter of conventional design. The signal WORDTRCLK provides the clock input to the Johnson counter. Signals CLKPH1, CLKPH2, FRMCLK and the output from stage 9 of the Johnson counter are combined to provide the reset signal for the counter. Outputs from the first 8 stages of the counter provide the 8-bit signal bus WSTRB (1–8) with each line asserted during the appropriate word time during the data frame. WSTRB (1–8) is sent to analog multiplexer 207C, pulse width control 209 and back telemetry section 211. In addition, the output from stage 9 of the Johnson counter provides the signal

5,609,616

| 13 | 14 |

WORD9CLK which is sent to command latch 206A and command decoder 206B.

Power Supply 202

As depicted in FIG. 4A, the power supply section 202 includes the series regulator 202A which includes a series regulating element such as a depletion-mode FET. In conjunction with a conventional voltage reference 202C and a conventional voltage regulator error amplifier 202B, the series regulator produces a precise negative 14 volts (NEG14) with respect to ZEROV for powering the balance of the ICS. The gate of the series regulating element in the regulator 202A is controlled by a signal REGCONT output from an operational amplifier located in a regulator error amplifier 202B, having as its inputs the output VREF of the voltage reference 202C and an attenuated version of NEG14, i.e., TAP14. The voltage reference 202C includes an off chip zener diode which is powered by the NEG14 line. The precision reference voltage VREF is generated across this zener diode.

Downconverter Section 203

As represented in FIGS. 4A and 4B, the downconverter section 203 comprises a downconverter clock 203A and a voltage downconverter 203B.

The downconverter clock 203A has as its inputs NEG14 and ZEROV from regulator 202A, MANDATA from data conditioner 201A, POWERBAD from powerbad detector 204A and WORDTRCLK from serial to parallel converter 201C and comprises two toggle flip-flops and a two-pole FET selector switch of conventional design. The two toggle flip-flops receive and divide by a factor of four, the signal MANDATA. During startup, since MANDATA is pulsing at 550 KHz, the resulting signal from the toggle flip-flop is a 137.5 KHz signal which is applied to one input of the two-pole FET switch. The other input to the two-pole switch is WORDTRCLK and the state of the switch is controlled by POWERBAD. Since, as will be described, POWERBAD is asserted during ICS startup, the 137.5 KHz signal is delivered as DOWNCLOCK during startup to the voltage down converter 203B whereas a level-shifted version of WORDTRCLK is sent out as DOWNCLOCK during normal ICS operation.

The voltage downconverter 203B comprises conventional logic gates and off-chip capacitors. It receives DC power (NEG14 and ZEROV) from series regulator 202A and a squarewave output signal DOWNCLOCK from the downconverter clock 203A. The squarewave is converted into a two-phase non-overlapping pair of clock signals in a conventional cross-connected logic gate and inverter circuit in the downconverter 203B. The two-phase clock signals drive a set of FET switches which establish the pattern of connections between and among a group of four off-chip capacitors 203-1 through -4.

During phase 1 of the clock signals, the four capacitors are connected in series across the −14 volt supply and each charges to a final value of −3.5 volts. At that time, output voltages of −3.5, −7.0, −10.5 and −14 volts are made available on outputs from the voltage downconverter 203B to each of the eight output stages 212-1 through 212-8 in the ICS, and, in particular, to each of the refresh voltage control subsections 212A included in such output stages.

During phase 2 of the clock signals, the four capacitors are connected in parallel and deliver charge to an off-chip storage capacitor 203-5 which is the source of the −3.5 volt logic supply. Also during phase 2, as a natural result of the parallel connection, the voltages on the four capacitors are equalized in preparation for the return to the series arrangement of the next phase 1.

Initialization and Status Control Section 204

The initialization and status control section 204 consists of digital circuitry and an analog comparator of conventional design to detect errors and to set the internal conditions of system circuitry on system startup and upon error detection by this section. Section 204 is made up of three subsections: a powerbad detector 204A, an initialization subsection 204B, and a parity error detector 204C.

The powerbad detector 204A comprises an analog comparator having the −3.5 volt output from the voltage downconverter 203B presented to one of its inputs. The other input to the comparator is the reference voltage, VREF, coming from power supply section 202. The comparator operates on the −3.5 volts and VREF to generate an output POWERBAD which is asserted when the −3.5 volt supply is below normal operating potential, such as during startup. Thus, during the initial phase of startup, the POWERBAD signal is asserted. The signal POWERBAD is used to force a known logic condition on circuitry within initialization subsection 204B and is also sent to the downconverter clock 203A and to the data recovery section 201 for the same purpose. For example, while POWERBAD is asserted, the output stages 212-1 through 212-8 are disabled. This is accomplished by POWERBAD resetting a flip-flop within 204B to negate a signal OUTENABLE, the assertion of which is required to enable any of the output stages. Then, upon negation of POWERBAD, assertion of CARDET from data conditioner 201A, PLLLOCK from clock decoder 201B and CONNECT from command decoder 206B, the flip-flop is set and OUTENABLE is asserted to enable the output stages 212.

Similarly, and as will be described again hereinafter, the assertion of a signal PALARM from parity error detector 204C will result in a disabling of the output stages 212 via a negation of Outenable. In this regard, parity error check is made at the end of each frame to assure that the total number of "ones" in the data stream to the ICS is even. The parity error detector 204C comprises a combination of logic gates and flip-flops of conventional design and is based on a D type flip-flop which is clocked by the serial bit data stream SERDATA from signal to parallel converter 201C. The state of the flip-flop at the end of the frame indicates whether the received number of one bits was odd or even. The resulting state of the D type flip-flop is then transferred to a holding flip-flop whose output generates the parity error signal PALARM which is connected to the initialization subsection 204B.

Initialization subsection 204B comprises a combination of logic gates of conventional design and receives input signals CARDET from clock decoder 201B; PALARM from parity error detector 204C; DISCON, CONNECT, and ALLZERO from command decoder 206B, PLLLOCK from clock decoder 201B and POWERBAD from POWERBAD detector 204A. CARDET, PALARM, PLLLOCK and POW-ERBAD have been described. The manner in which such input signals DISCON, CONNECT and ALLZERO are generated will be described hereinafter relative to section 206. Output signals generated by the initialization subsection 204B are CARON, OUTENABLE, RESETERR, and SYSRESET. In subsection 204B, the signal CONNECT sets a latch flip-flop to assert the output signal OUTENABLE at pulse width control 209. Input signals DISCON and ALLZ-

5,609,616

**15**

ERO are combined in logic gates within subsection **204B** to generate the output RESETERR which goes from **204B** to parity error detector **204C** to reset the parity error detector flip-flop. Signals PALARM, DISCON, ALLZERO, PLLLOCK and POWERBAD are combined in logic gates within **204B** such that when any of these signals indicate a problem, a disconnect command output signal SYSRESET is generated and functions as a general reset signal for all the circuitry in the ICS. In this regard, SYSRESET, when asserted will reset the ICS circuitry to its initial state ready for restart in response to system startup data from the WP. Signals CARDET and PLLLOCK asserted and signals POWERBAD and PALARM not asserted combine in gates in **204B** to generate the output signal CARON. CARON goes off-chip to turn on the back telemetry carrier signal, at a telemetry transmitter **211E** of the back telemetry section **211**. As will be described hereinafter, the absence of the back telemetry carrier signal is detected in the WP as an indication of a system defect in the ICS. The WP will initiate a restart of the ICS and will continue in that mode until the back telemetry carrier signal is again detected.

Polarity and Amplitude Data Latch Section **205**

The polarity and amplitude data latch section **205** comprises amplitude data latch **205A** and a zero current control **205B**. The latch **205A** consists of a conventional 9-bit latch which receives data bit inputs from a 9-bit bus DATA **(1–9)** from the serial to parallel converter **201C** in addition to WORDTRCLK also generated in **201C**. WORDTRCLK causes the input data bits DATA **(1–9)** to be latched and then held until replaced by a new set of incoming data. Output from the 9-bit latch consists of an 8-bit wide data bus signal AMPDATA **(1–8)** and a 9th bit defining a single line POLARITY which goes directly to output stages **212-1** through **212-8**. AMPDATA **(1–8)** goes from latch **205A** to the zero current control **205B** and to the logarithmic D-A converter in section **207**, and as described more specifically hereinafter, to the internal subsection **207B**.

The zero current control **205B** comprises logic gates of conventional design. The signal bus AMPDATA **(1–8)** from amplitude data latch **205A** is decoded in an 8 input gate such that the output of the gate is asserted only when all 8 bits are at logic 0. This corresponds to a requested output current amplitude of zero. The signal POLARITY from the latch **205A** is combined with AMPDATA **(1–8)** to generate two (2) complimentary output signals ZERO and SHORT. SHORT is asserted when AMPDATA **(1–8)** is all zeroes and POLAR-ITY is 1 and, conversely, ZERO is asserted when AMP-DATA **(1–8)** is all zeroes and POLARITY is 0 (zero).

Command Decoder **206**

The command decoder section **206** comprises digital logic circuitry of conventional design and consists of two subsec-tions: command latch **206A** and command decoder **206B**. The command latch **206A** is similar to latch **205A** discussed above in that it is a 9-bit latch with input data coming from the 9-bit bus DATA **(1–9)** from serial to parallel converter **201C**. In command latch **206A**, DATA **(1–9)** is caused to be latched by signal WRD9CLK from the word strobe genera-tor **201D** to develop a 9-bit bus WORD9 **(1–9)** output which is maintained until replaced by a new ninth word command. WORD9 **(1–9)** connects directly to the command decoder **206B** which consists of logic gates to decode the various functions from the 9-bit combinations on the output bus. The

**16**

following table depicts the content of WORD9 and the outputs generated by the various function codes contained in bits **6–8** of WORD9.

TABLE 1

| 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|
| Function code | | | Value C  B  A | | | Channel number | | |

| Function Code | Outputs | Description |
|---|---|---|
| 000 | ALLZERO, DISCON, CONNECT | global control |
| 001 | FUNC2 | output control |
| 011 | FUNC4 | normal back telemetry read |
| 100 | FUNC5 | inverted back telemetry read |
| 110 | FUNC7 | refresh voltage control |
| 111 | FUNC8 | output pulse width control |

In addition, command decoder **206B** receives input sig-nals RFMAIN from refresh voltage logic **210**, PFMAIN from pulse width control **209** and WORD9CLK and WSTRB1 from the word strobe generator **201D**. Output signals from **206B** which exit the command decoder **206** consist of logic gate output signals CONNECT, DISCON, ALLZERO, FUNC2, FUNC4, FUNC5, FUNC7 and FUNC8.

As previously described, the signals CONNECT, DIS-CON and ALLZERO exiting the command decoder **206** provide inputs into the initialization section **204**. FUNC2 through FUNC8 are function decodes which provide inputs to the various sections which they control on a command basis. The signal FUNC2 is the primary enabling signal going from the command decoder to the output mode register **208**. Signals FUNC4 and FUNC5 are connected directly to the back telemetry section **211** (telemetry func-tion decoder **211A** and A/D converter **211C**) to control its function. FUNC7 is directly and solely connected to the refresh voltage logic **210** to provide enabling for the refresh voltage control portion. FUNC8 is connected directly and solely to pulse width control **209** to enable that function to take place.

Logarithmic D/A Converter **207**

The logarithmic D/A converter section **207** consists of conventional analog and digital circuitry, with the exception of a logarithmic D/A converter subsection **207B** which is the subject of U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as this invention. The loga-rithmic D/A converter **207** consists of three subsections: a current reference generator **207A**, the logarithmic D/A con-verter subsection **207B**, and an analog multiplexer **207C**. The current reference generator **207A** receives a voltage input VREF from the voltage reference **202C** and utilizes that reference voltage to generate reference output current signals ADIREF and IREF. ADIREF is a fixed current supply to A/D converter **211C** while IREF provides the input current to the logarithmic D/A converter **207B** which includes multiplicative stages of current mirrors controlled by the 8-bit data bus AMPDATA **(1–8)** from the data latch **205A**. Output signals from the logarithmic D/A converter subsection **207B** are control voltages IPOSCON and INEG-CON connected to the analog multiplexer subsection **207C**. The multiplexer is controlled by signals XFERB and XFERC from the serial to parallel converter **201C** and an 8-bit bus signal WSTRB **(1–8)** from the word strobe gen-erator **201D**. Outputs from the analog multiplexer are dis-tributed to, and control, each of the current sources **212B** in

5,609,616

**17**

the eight output circuits 212-1 through 212-8 as signals IPOS (1–8) and INEG (1–8). Thus, the output current from each of the eight output stages 212-1 through 212-8 are controlled individually, separately and sequentially.

Output Mode Register 208

The output mode register 208 contains 24 transparent latches of conventional design arranged in 3 banks of 8 latches each. The 8 latches in the first bank give rise to an 8-bit bus AMONO (1–8) and likewise the remaining 2 banks generate bus signals BMONO (1–8) and DRC (1–8). AMONO(1), BMONO(1) and DRC(1) connect to output stage 212-1 and the rest of the bus signals are distributed to the other 7 output stages in a like manner.

Only upon assertion of function code signal FUNC2 from the command decoder 206B can the bit pattern in the latches of the register 208 be modified. More particularly, under control of pulse signal WSTRB1 from word strobe generator 201D, the low-order 3 bits of the 9-bit bus signal WORD9 (1–9) from the command latch 206A are decoded in a conventional 3-to-8 decoder. The decoder has each of its 8 output lines connected to selectively enabling one latch in the same position in each of the three banks comprising the register 208 to effect a selective modification of the bit pattern in the register according to the pattern of the low order 3 bits. The middle 3 bits of WORD9 (1–9) are each connected to a single one of the 3 banks and enable the data inputs to all 8 latches in each of the three banks comprising 208. The high-order 3 bits in WORD9 (1–9) are not used in section 208.

Pulse Width Control Section 209

The pulse width control section 209 comprises logic gates, latches, D type flip-flops, counters and decoders of conventional design. The signals FUNC8 from command decoder 206B in conjunction with FRMCLK, CLKPH1 and CLKPH2 enables the operation of this section and causes the contents of two sequential 9th words to be latched from the bus signal WORD9 (1–9) into one of two buffers under control of a bit 5 in the first WORD9. The contents of the two WORD9 commands are diagrammed below:

TABLE 2

| WORD9 | | | | | | | |
|---|---|---|---|---|---|---|---|
| First WORD9 | 8 7 6 | 5 | 9 3 | 2 1 0 | | | |
| | 1 1 1 | E | F F | C C C | | | |
| Second WORD9 | 8 | 7 | 6 5 4 3 2 1 0 | | | | |
| | X | D | N N N N N N | | | | |

| | |
|---|---|
| E | EDGE CONTROL BUFFER NUMBER [0,1] |
| FF | EDGE EXECUTION FRAME NUMBER [00,01,10,11] |
| CCC | CHANNEL NUMBER [000–111 = CH1–CH8] |
| X | DON'T CARE |
| D | DIRECTION OF EDGE [O=ON TO OFF, 1=OFF TO ON] |
| NNNNNNN | COUNT TO OCCURRENCE OF EDGE [0–84] |

As depicted in Table 2, requested stimulus output pulse edges will occur at the bit time specified in second WORD9 bits 0–6 above, during the frame time according to the command specified in the first WORD9 bits 3 and 4. This is accomplished by using such data bits to preset two down-counters which are decremented by the signal CLKPH1 from the clock decoder 201B and FRMCLK from the serial to parallel converter 201C respectively. Channel select bits

**18**

0–2 in the first WORD9 are latched and decoded to allow the passing of edge information only to the requested output channel as represented in the 8-bit signal bus PWC (1–8). The signal OUTENABLE from initialization 204B is gated with all bits of PWC (1–8) and must be asserted to enable any PWC (1–8) line to be asserted. Assertion of at least one PWC line is required for any stimulation signal to occur (see Table 6 herein).

Refresh Voltage Logic Section 210

Refresh voltage logic 210 comprises logic gates and latches of conventional design. The signal bus WORD9 (1–9) is gated into 8 pairs of such latches. The outputs from each one of each pair of latches is represented as one line in each of the two output bus signals RV0 (1–8) and RV1 (1–8) which are sent to a refresh voltage control 212A included in each of the output stages in section 212.

Since at least 16 bits are required to establish 4 possible refresh voltage levels across 8 channels, the refresh system is controlled by 2 consecutive 9th word commands of 9 bits each. The format of these 2 command words is shown below:

TABLE 3

| Word9 | | | | | |
|---|---|---|---|---|---|
| First WORD9 | 8 7 6 | 5 | 4 3 | 2 1 | 0 |
| | 1 1 0 | stage 1/2 select | stage 1/2 RV | stage 3 RV | stage 4 RV |
| Second WORD9 | 8 | 7 6 | 5 4 | 3 2 | 1 0 |
| | stage 4 RV | stage 5 RV | stage 6 RV | stage 7 RV | stage 8 RV |

As depicted in Table 3 above, the first WORD9 consists of the function code for refresh voltage control (110 in bits 8–6), a stage 1 or 2 select code (bit 5: 1=stage 1, 0=stage 2) which determines whether stage 1 or stage 2 will be updated at this time, the stage 1 or 2 refresh voltage level code RV (bits 3 and 4), the stage 3 refresh level code (bits 1 and 2) and the high-order bit of the refresh level code for stage 4. The second WORD9 also consists of 9 bits with bit 8 representing the low-order bit of the refresh level code for stage 4 and the remaining 8 bits representing the 2-bit refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two separate double WORD9 refresh voltage commands. The 2-bit RV codes and the refresh voltage levels associated with them are shown below:

| Code | | refresh |
|---|---|---|
| RV1 | RV0 | voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

Backtelemetry Section 211

The backtelemetry section 211 comprises telemetry function decoder 211A, a telemetry multiplexer 211B, an A/D converter 211C, a telemetry modulator 211D and a telemetry transmitter 211E.

5,609,616

## 19

Decoder 211A comprises logic gates, latches and decoders of conventional design receiving as inputs WSTRB (1–8), WORD9 (1–9), FUNC4 and FUNC5. Within decoder 211A signals WSTRB8 and WSTRB1 are combined to create signal WSTRB9 which is asserted from the end of WSTRB8 until the beginning of WSTRB1 and sent to the A/D converter 211C and telemetry modulator 211D. Signals FUNC4 and FUNC5 are the primary activation signals for decoder 211A and cause the 6 low-order bits in the input bus signal WORD9 (1–9) to be latched, decoded and gated to control output signals applied to: indifferent electrode switch 212D (IECLOSE); bus MUXCTRL (1–23); and lines identified as VRTPWR, RLOCTRL and RHICTRL (to telemetry multiplexer 211B), ADPWR, and SH2X1, SH2X3, SH2X10 and SH1X10 (to A/D converter 211C) to control functions in subsections 211B and 211C as shown in the tables below:

### TABLE 4A

| Six low order bits WORD9 | | Output Signal | Description of Function |
|---|---|---|---|
| 543 | 210 | from 211A | Activated in MUX 211B |
| 001 | 000 | MUXCTRL1 | VOUTA1 vs VOUTB1 |
| 001 | 001 | MUXCTRL2 | VOUTA2 vs VOUTB2 |
| 001 | 010 | MUXCTRL3 | VOUTA3 vs VOUTB3 |
| 001 | 011 | MUXCTRL4 | VOUTA4 vs VOUTB4 |
| 001 | 100 | MUXCTRL5 | VOUTA5 vs VOUTB5 |
| 001 | 101 | MUXCTRL6 | VOUTA6 vs VOUTB6 |
| 001 | 110 | MUXCTRL7 | VOUTA7 vs VOUTB7 |
| 001 | 111 | MUXCTRL8 | VOUTA8 vs VOUTB8 |
| 010 | 000 | MUXCTRL9 | ICP1 vs NRV1 |
| 010 | 001 | MUXCTRL10 | ICP2 vs NRV2 |
| 010 | 010 | MUXCTRL11 | ICP3 vs NRV3 |
| 010 | 011 | MUXCTRL12 | ICP4 vs NRV4 |
| 010 | 100 | MUXCTRL13 | ICP5 vs NRV5 |
| 010 | 101 | MUXCTRL14 | ICP6 vs NRV6 |
| 010 | 110 | MUXCTRL15 | ICP7 vs NRV7 |
| 010 | 111 | MUXCTRL16 | ICP8 vs NRV8 |
| 011 | XXX | RLOCTRL | Output current monitor, high range |
| 100 | XXX | RHICTRL | Output current monitor, low range |
| 101 | 000 | MUXCTRL17 | ZEROV vs ZEROV |
| 101 | 001 | MUXCTRL18 | ZEROV vs 3.5 |
| 101 | 010 | MUXCTRL19 | ZEROV vs VREF |
| 101 | 011 | MUXCTRL20 | EXTP vs EXTN |
| 101 | 100 | MUXCTRL21 | ZEROV vs TAP14 |
| 101 | 101 | MUXCTRL22 | NEG14 vs TANKV |
| 101 | 110 | MUXCTRL23 | ZEROV vs VRTV (int. voltage) |
| 101 | 111 | | no operation |

### TABLE 4B

| Six low order bits WORD9 | | Output Signal | Description of Function Activat- |
|---|---|---|---|
| 543 | 210 | from 211A | ed in A/D Converter 211C |
| 111 | 000 | SH2X1 | set gain to x1 (default) |
| 111 | 001 | SH2X1, 3 | set gain to x3 |
| 111 | 010 | SH2X1, 10 | set gain to x10 |
| 111 | 011 | | no operation |
| 111 | 100 | SH1X10, SH2X1 | set gain to x10 (redundant) |
| 111 | 101 | SH1X10, SH2X3 | set gain to x30 |
| 111 | 110 | SH1X10, SH2X10 | set gain to x100 |
| 111 | 111 | | no operation |

## 20

### TABLE 4C

| Six Low Order Bits | | Description of Function Activated in 211B, C, D | | |
|---|---|---|---|---|
| 543 | 210 | IECLOSE | VRTPWR | ADPWR |
| 110 | 000 | open | off | off |
| 110 | 001 | open | off | on |
| 110 | 010 invalid state | | | |
| 110 | 011 | open | on | on |
| 110 | 100 | closed | off | off |
| 110 | 101 | closed | off | on |
| 110 | 110 invalid state | | | |
| 110 | 111 | closed | on | on |

The telemetry multiplexer subsection (telemetry MUX 211B) comprises 25 level shifters connected to 25 pairs of transmission-gates of conventional design which allow one and only one pair of MUX input signals to be connected to the pair of output lines, MUXOUT+ and MUXOUT−. This pair of output lines convey the differential signal to be measured and are connected to the A/D converter 211C.

A/D converter 211C comprises logic gates, level shifters, transmission-gates, switched capacitor amplifiers and comparators of conventional design arranged in 2 stages. The first stage has a default gain of 1 and can be changed to a gain of 10 by signal SH1X10. The second stage has selectable gains of 1, 3 or 10 as set by signals SH2X1, SH2X3 and SH2X10, respectively. Signal ADPWR from decoder 211A is used to turn on operating power to the amplifiers and the comparator in subsection 211C only when back telemetry has been requested by the WP WORD9 commands. This manner of operation is power-conservative.

In addition, in the converter 211C signals FUNC4 and FUNC5 are connected to the set and reset inputs of a flip-flop which has as its Q output a signal NORMPOL. Assertion of FUNC4 results in NORMPOL true and assertion of FUNC5 causes negation of NORMPOL. Within the converter 211C, NORMPOL is used to direct the converter to take a normal or inverted sample of the signal presented to it via the telemetry MUX 211B In addition, NORMPOL is sent to the telemetry modulator 211D.

Further, in converter 211C, the signals WSTRB (1–8) from the word strobe generator 201D and WSTRB9 from telemetry function decoder 211A are combined in logic gates and level shifters to generate a multiphase clock for controlling switch timing in a switched capacitor amplifier circuit which samples, holds and conditions the voltage to be measured. A reference level for the samples is established by signal VREF.

More particularly, the voltage sample is delivered to a single-slope A/D converter of conventional design which comprises a comparator along with a ramp generator. The ramp generator uses the fixed current ADIREF to charge an on-chip capacitor. The comparator senses equality of the ramp voltage and the sample voltage, terminating the conversion cycle and causing the contents of a 6-bit counter driven by the signal CLKPH1 to be latched. The 6-bit latch output is the bus signal ADCOUNT (1–6) which is sent to telemetry modulator 211D.

Subsection 211D comprises 7 tri-state buffers of conventional design. The 7 buffers are connected to the output line DATAOUT and represent the 6 bits resulting from the A/D conversion plus a 7th bit which indicates polarity. The 7 bits are placed on the common output line DATAOUT in a sequence controlled by WSTRB (2–8) following a logic 1 sent during the WSTRB1 on-time and preceding a logic 0

5,609,616

**21**

sent during the WSTRB9 on-time. Thus, 9 bits are conveyed to a conventional off-chip telemetry transmitter 211E and thence to the WP in synchrony with one full data frame sent to the ICS by the WP. As previously described, the transmitter 211E is enabled for such transmission by the signal CARON from initialization 204B.

Output Stages 212 - 1 through 8

Output stages 1–8, section 212 (1–8), comprise 8 identical circuits. The table below summarizes the electrical connections to the output stages 1–8 comprising single lines connected to all 8 stages in parallel as well as 8-line buses with an individual line connected to each of output stages 1–8.

TABLE 5

SUMMARY OF CONNECTIONS TO OUTPUT STAGES 1 THROUGH 8

| Single lines connected to all eight stages in parallel: | 8 Line buses with 1 line connected to each output stage 1 through 8: |
|---|---|
| ZeroV | RV0 (1–8) |
| –14 V | RV1 (1–8) |
| –10.5 V | IPOS (1–8) |
| –7 V | INEG (1–8) |
| DCLKPH1 | PWC (1–8) |
| DCLKPH2 | AMONO (1–8) |
| ZERO | BMONO (1–8) |
| SHORT | DRC (1–8) |
| POLARITY | OUTA (1–8) |
| INDCOM | OUTB (1–8) |
| | VOUTA (1–8) |
| | VOUTB (1–8) |
| | ICP (1–8) |
| | NRV (1–8) |

Output stage 1 will be discussed below as representative of all 8 stages. Output stage 1, section 212-1, comprises a refresh voltage control 212A, a current source 212B, an electrode switching matrix 212C and an indifferent electrode switch 212D. The refresh voltage control 212A comprises a conventional switching matrix, like the matrix 212C, in addition to level shifters connected to input circuitry to distribute two different logic levels defined by –3.5 and –14 volts within the refresh voltage control 212A and to the circuits that communicate with the refresh voltage control. As indicated, inputs to the refresh voltage control 212A include the 4 power supply voltage levels (–14 V, –10.5 V, –7.0 V, –3.5 V) along with signals DCLKPH1 and DCLKPH2 from the downconverter 203B. Signals RV1 and RV0 from the refresh control logic 210 provide a 2-bit code to logic gates connected to an intermediate charge storage device for the output stage 1, comprising "flying" capacitor CF1. Signals RV0 and RV1 operate on the logic gates to select one of the four power supply voltages to charge CF1 during assertion of signal DCLKPH1. During assertion of signal DCLKPH2, capacitor CF1 is disconnected from the selected power supply voltage and is connected in parallel with and transfers charge to a capacitor CRV1 via lines PRV1 and NRV1. Such switched capacitor circuitry impresses the voltage of CF1 on storage capacitor CRV1. CRV1 then functions as a floating power source for output stage 1. In this regard, it is the use of the intermediate charge storage device, CF1, alternately connected to the power supply voltages and to CRV1 of output stage 1, that provides electrical isolation for the output stage 1.

As previously described with respect to Refresh Voltage Logic Section 210, more than 9 bits are required to specify which one of the four refresh voltages is to be selected for each of the 8 isolated output stages. Therefore, two ninth-word commands are issued by the WP in two frames in sequence, processed in the ICS, and produce two WORD9

**22**

commands from command latch 206A. To control the refresh voltage for Stage 1, the first WORD9 command consists of the refresh voltage function control 110 in bits 8–6, a stage 1 select code 1 in bits 5, a stage 1 refresh voltage level code in bits 3 and 4, a stage 3 refresh level code in bits 1 and 2 and a high-order bit of the refresh level code for stage 4. The second WORD9 command includes the refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two 2-word refresh voltage commands. The 2-bit refresh voltage level codes for stage 1 in bits 3 and 4 of the first WORD9 (RV1 and RV0) and the refresh levels associated therewith are shown below:

| Code | | refresh |
|---|---|---|
| RV1 | RV0 | voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

The refresh voltage control 212A has a pair of input latches to hold the 2-bit level codes. The latches are always reset to the 00 (–14 volt) state at startup by the startup reset signal SYSRESET from the initialization section 204B and remain in that condition unless overwritten by a refresh voltage command. Thus, the highest available source voltage is automatically selected for all channels. However, the source voltage can be reduced on a channel-by-channel basis as indicated by back-telemetry data related to the power required for each channel. Such reduction of the source voltage will minimize power dissipation in the current source 212B in the affected output stage and thereby reduce power dissipation in the ICS 12.

Within current source 212B, power signal NRV1 from refresh voltage control 212A is connected to the source of a conventional MOSFET device comprising the current source. Connected to the drain of the MOSFET device is the output line –IN1 which connects to the electrode switching matrix 212C and is one line of the signal bus ICP (1–8) connected to the telemetry MUX 211B Similarly, signal NRV1 is one line of the signal bus NRV (1–8) also connected to subsection 211B.

The gate-to-source voltage of the MOSFET device is controlled by signals IPOS1 and INEG1 respectively from analog multiplexer 207C, with such signals being applied to the device through transmission gates in the analog multiplexer controlled by signals XFERB and XFERC from converter 201C. The gate-to-source voltage so applied in a periodic manner is stored in a capacitor associated with the gate of the MOSFET device and remains operative between the refresh episodes. The refresh episodes are sequentially distributed across all 8 output stages in a non-overlapping manner so that only one current source 212B is connected via multiplexer 207C to the ICS circuitry at any time. The seven non-selected current sources are isolated from each other and the rest of the ICS circuitry by the off-resistance of the transmission gates in multiplexer 207C.

Electrode switching matrix 212C is the final subsection leading to the output coupling capacitors CA1 and CB1 which are connected to the stimulating electrodes. The circuitry in this subsection comprises logic gates, transmission gates, latches and level shifters of conventional design. Electrical isolation of the output stage is maintained in the switching matrix 212C since the various control signals for

5,609,616

**23**

the matrix are applied to the gates of MOSFET devices which comprise the transmission gates and which directly control the functions described hereinafter.

In particular, two transmission gates are connected between the signal lines +IN1 and –IN1 upon their entry into the matrix 212C. One of the transmission gates is of low on-resistance and is latched by the signal SHORT from the zero current control 205B. The other transmission gate is a high on-resistance device which is turned on by the signal DRC1 from the output mode register 208.

Signals +IN1 and –IN1 are connected to outputs OUTA1, OUTB1, VOUTA1, VOUTB1 and INDCOM via 10 transmission gates in the matrix 212C. The transmission gates are controlled by logic gates driven by input signals AMONO1 and BMONO1 from the output mode register 208, PWC1 from pulse width control 209 and POLARITY from amplitude data latch 205A. The connection patterns are shown in the table below.

**24**

Multiple Chip Control 214

In the preferred embodiments thus far described, the ICS comprises a single chip. However, multiple chips of the same or similar circuitry may be usefully employed in a human tissue stimulator. In such an embodiment, a circuit 214 at the input of each chip permits the interconnection of several chips into one functional unit by making one of the chips a master device which receives data and clock signals and then distributes such signals to all the slave chips. In this manner a large number of chips may be connected together forming a system with a large number of output channels, e.g., 16 monopolar channels times the number of chips. Such an embodiment, for example, with two chips, one master and one slave, provides twice the number of channels and requires twice the number of words per frame. In such an embodiment, a total of 18 words per frame instead of the basic 9 words per frame is required since the two chips are in series.

TABLE 6

| INPUT SIGNALS | | | | CONNECTION | | | PATTERN | | DESCRIPTION |
| | | | | CON-NECT TO | CON-NECT TO | CON-NECT TO | CON-NECT TO | CON-NECT TO | OF CONNECTION |
| AMONO1 | BMONO1 | PWC1 | POLARITY | OUTA1 | OUTB1 | INDCOM | VOUTA1 | VOUTB1 | PATTERN |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 1 | 1 | +IN1 | –IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR NORMAL |
| 0 | 0 | 1 | 0 | –IN1 | +IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR INVERT |
| 1 | 0 | 1 | 1 | +IN | NONE | –IN | OUTA1 | INDCOM | MONOA NORMAL |
| 1 | 0 | 1 | 0 | –IN | NONE | +IN | OUTA1 | INDCOM | MONOA INVERT |
| 0 | 1 | 1 | 1 | NONE | +IN1 | –IN | OUTB1 | INDCOM | MONOB NORMAL |
| 0 | 1 | 1 | 0 | NONE | –IN1 | +IN | OUTB1 | INDCOM | MONOB INVERT |
| 1 | 1 | X | X | NONE | NONE | NONE | OUTA1 | OUTB1 | DISCONNECT |
| X | X | 0 | X | NONE | NONE | NONE | X | X | DISCONNECT |

Please note that selection of any monopolar mode will eliminate the electrical isolation of that particular output stage via the common connection to INDCOM.

Bus signals VOUTA (1–8) and VOUTB (1–8) from the matrix 212C, ICP (1–8) from current source 212B and NRV (1–8) from refresh voltage control 212A are all connected to the telemetry multiplexer 211B as previously described. Output line INDCOM from the matrix 212C is connected to the indifferent electrode switch 212D.

Within the switch 212D, the signals OUTENABLE from initialization 204B and IECLOSE, RLOCTRL and RHIC-TRL from telemetry function decoder 211A control the connection between INDCOM and the indifferent electrode via line INDELEC. Assertion of OUTENABLE and IECLOSE activates a transmission gate within the switch 212D which then connects INDCOM directly to INDELEC. Further, assertion of RLOCTRL or RHICTRL from telemetry function decoder 211A places off-chip resistor RLO or RHI, respectively, in a series connection between INDCOM and INDELEC. Stimulus current flowing through the selected resistor generates the voltage output signal ILO or IHI with respect to INDELEC. Such signal is proportional to stimulus current in the monopolar mode and is sent to telemetry MUX 211B.

FIG. 5A depicts a long data frame for multiple chip operation including n+1 standard frames per long frame, where n is the number of slave chips and 1 represents the frame associated with the master chip. Note that each standard frame included in the long frame comprises an end of frame pulse (depicted in black) and that the long frame is terminated in a unique marker that signals the end of the long frame. Thus in multiple chip operation, the format of the data transmission is extended by one level. A set of data consists of bits, words, and standard frames embedded in a long frame. As in the regular operation of an ICS previously described, one word consists of 9 bits and one frame consists of 9 words. However, one long frame consists of as many frames as there are chips participating in the multiple chip operation. The beginning (or end) of a long frame is defined by a long frame pulse that has a duration of two regular frame pulses.

An example of multiple chip system is set forth in FIG. 5B having a master chip and n slave chips. Each chip includes a multiple chip control circuit (214, 214-S1 to 214-Sn). As shown in FIG. 4E, chip control 214 has inputs PFRMCLK from the clock decoder 201B, RFMAIN from refresh voltage logic 210, PFMAIN from the pulse width control 209, a preset master/slave input M/S ("1" for the master chip and "0" for all slave chips) and open input leads DIN and ECLK. The control 214 outputs going off-chip include PFRMCLK (for connection to each of the slave chips ECLK of the slave chips) and DCENABLE (for a control signal applied to the serial to parallel converter 201C). The chip control 214 in

5,609,616

25

each slave chip includes the same input and output lines. However, each line ECLK is connected to receive the signal PFRMCLK from the master chip, each line PFRMCLK is open and each line DIN is connected to DCENABLE of the preceding chip.

Basically each chip control includes a conventional gate flip-flop. In the chip control 214, the gated flip-flop is preset by M/S=1 and changes state to develop the control signal DCENABLE upon receipt of PFRMCLK (indicative of the long frame marker when in multiple mode operation and indicative of standard end of frame pulse during regular single chip operation). As previously discussed, DCEN-ABLE enables operation of 201C to develop DATA (1–9) from MANDATA and hence the processing of input data from the WP by the ICS. In multiple chip operation, as depicted in FIG. 5B, DCENABLE from chip control 214 is applied to input DIN of chip control 214-S1. This effects a preset of the flip-flop in 214-S1, which will change state to develop a control signal DCENABLE for output to the chip control 214-S2 at its DIN input upon receipt of the next PFRMCLK at the ECLK input of 214-S1. DCENABLE developed within 214-S1 is applied to the serial to parallel converter 201C in the ICS of the Slave 1 chip to enable processing of data from the WP by that ICS. This process is repeated in sequence for each slave chip. From slave n chip, DCENABLE is fed back to the DIN input of the master chip to complete the ring.

Thus, in the multiple chip operation, the flip-flops in each chip control are ganged together such that the output DCEN-ABLE of the master chip feeds into the DIN input of the next slave flip-flop and the DCENABLE output of the next slave chip feeds into the DIN input of the following slave flip-flop and so on until the DCENABLE of the last chip feeds into DIN input of the master chip flip-flop. In this way, the flip-flops form a ring-type shift register.

The multiple chip operation also allows for short frames and short-long frames. With an early application of a long frame pulse or marker, the long frame can be shortened. Further, when WORD9 commands requiring more than one frame for loading and execution are in process, the frame pulse may be inhibited as a clock pulse for the flip-flops until the WORD9 command is fully executed.

Having described each section and subsection of the ICS of FIGS. 4A–4-I, the following is a description of the general operation of the ICS.

SYSTEM OPERATION

(a) Power Supply

The ICS has no internal power source and, therefore, is completely dependent for power from an outside source, that is, power radiated by the antenna connected to the wearable processor WP. The magnetic portion of that radiated field is received by the ICS and converted into two types of signals. One is the power supply for the balance of the implantable system and the second is the data stream which contains the commands which control the behavior of the ICS. The data stream coming from WP is a 50% duty cycle amplitude-modulated signal. The modulated carrier is converted to RAWDC power in receiver 200. The DC power, RAWDC, is passed to series regulator 202A and its associated circuitry to generate a regulated negative 14 volts, NEG14, which is the primary power supply for the ICS. The primary power is further operated on to create various voltage levels for the balance of the circuitry. The principal derived power supply is the output from the downconverter 203B, which is the −3.5 volt line, used to power much of the logic circuitry

26

within the ICS. Also derived are −7 volts, −10.5 volts, and the original −14 volts, which are supplied to the output circuits, of which there are 8. Each output circuit utilizes one of 4 different levels of refresh voltages, which can be selected according to requirements for stimulation output of a given channel in the ICS. In addition, the −14 volt supply is used to power much of the ICS analog circuitry to provide rail to rail operation, where the rails are defined by the −14 V line and the ZEROV line. ZEROV is common to all the circuitry, except for the isolated output stages, and is the logic true or logic one level for all the logic circuitry. The zero or false logic level is −3.5 V or −14 V, depending on the power supply for a particular logic section.

The signals TANKV from receiver 200 and TAP14 from regulator 202A are resistively-divided representations of RAWDC and NEG14, respectively. As indicated at telemetry MUX 211B, TANKV and TAP14 are applied to the back telemetry system so that closed loop control of the incoming DC power to the ICS can be maintained. In particular, during startup, the microprocessor in the WP sets the transmit power to a level sufficient to insure proper operation of the ICS (see FIG. 1 and related text). Then, during operation of the ICS, TANKV and TAP14 are telemetered back to the WP for processing. Depending upon the magnitude of the difference between TANKV and TAP14, that is the voltage drop across the series regulator 202A, the transmit power of WP can be reduced by operation of the microprocessor. Preferably, the power transmitted to the ICS is just sufficient for normal operation, thereby conserving power drawn from the WP and its batteries.

(b) Initialization

As previously described, the WP startup procedure comprises transmission of a data stream of alternating ones and zeros. Simultaneously, the series regulator 202A output NEG14 ramps from 0 to −14 volts with respect to ZEROV and the receiver develops outputs PDATA and NDATA at half the standard bit transmission rate (550 KHz) to data conditioner 201A. Within 201A, PDATA and NDATA result in the signal MANDATA which is transmitted to downconverter clock 203A, clock decoder 201B and serial to parallel converter 201C. Within downconverter clock 203A, MAN-DATA is divided by four in passing through two toggle flip-flops. The resulting 137.5 KHz signal is applied to one input to a two-pole FET selector switch, the other input comprising WORDTRCLK from serial to parallel converter 201C. The state of the switch is controlled by POWERBAD, which is asserted during system startup to cause the switch to transmit the 137.5 KHz signal. Thus the 137.5 KHz signal is selected as the clock signal for the voltage downconverter 203B during startup operation of the ICS whereas a level-shifted version (−3.5 to −14 V) of WORDTRCLK (122 KHz) from converter 201C is selected during normal operation of the ICS (DOWNCLOCK).

Also during initial startup, the powerbad detector 204A asserts POWERBAD from just after the start of transmission until the −3.5 volt power supply reaches about −3.3 volts. As previously described, POWERBAD drives the reset of logic circuitry in many parts of the ICS and also forces the output stages 212 to be off so that no stimulus can be presented until proper functioning of the ICS is determined. This is accomplished by POWERBAD resetting a flip-flop within 204B to OUTENABLE, the assertion of which is required to enable the output stages 212. Then, upon a negation of POWER-BAD, assertion of CARDET from clock decoder 201B and assertion of CONNECT and PLLLOCK from command decoder 206B, the flip-flop is set and OUTENABLE is asserted to enable the output stages 212. Similarly, the

5,609,616

27

assertion of PALARM from parity error detector **204C** results in a disabling of the output stages **212** via a negation of OUTENABLE.

In addition, during power-up of the ICS, the carrier of the back telemetry transmitter section **211** is turned on and the turning on of that carrier is sensed by the WP and indicates normal operation of the ICS. Such turning on of the carrier is accomplished by assertion of CARON from **204B**. As previously described, CARON is generated only when signals CARDET and PLLLOCK asserted and signal POW-ERBAD and PALARM not asserted are combined in gates in **204B** to indicate proper operation of the ICS. From **204B**, CARON goes off chip to turn on the back telemetry carrier signal at a telemetry transmitter **211E** of the back telemetry section **211**, the back telemetry section being off-chip. If at any time any of the signals CARDET, PLLLOCK, POW-ERBAD or PALARM changes to a different state indicative of a problem condition, CARON will be negated and the back telemetry carrier will be turned off. Thus, if at any time the WP no longer detects the back telemetry carrier from the ICS, we assume that improper operation is in progress. The microprocessor in the WP halts data transmission and begins the above described startup procedure which should then result in detection of the back telemetry carrier from the ICS.

Following this initial handshake between the WP and the ICS, a series of patient-specific parameters which have been embedded in the WP via a clinician's programmer will be sent into the ICS. Once all such parameters are set up, the electrode outputs will be connected and stimulation will commence. This is accomplished via a WORD9 command to assert the command line CONNECT from the command decoder **206B** followed by assertion of the OUTENABLE line from the initialization section, **204B**. Assertion of OUTENABLE will enable an output from Pulse Width Control **209** [PWC (**1–8**)] which in matrix **212C** will con-nect the electrode outputs (see table 6 herein). Conversely, the WP can force a global disconnect of all of the outputs at any time by sending in the WORD9 command which asserts the command line DISCON from the command decoder **206B**. Of course, in the event of catastrophic failure of the stimulation circuitry, the user can disable the ICS simply by moving the headpiece away from the ICS.

If a parity error is detected by the parity error detector **204C** the detector asserts line PALARM to the initialization section **204**. Section **204** then issues the system reset signal SYSRESET to force the ICS system into its restart condition and turn off the back telemetry carrier, signaling the WP that a serious error has occurred. A new startup sequence will then ensue under control of the startup procedure of the WP.

(c) Data Recovery

The pair of data signals, PDATA and NDATA, coming from receiver **200** are squared up in the data conditioner **201A** to generate the signal MANDATA. The signal MAN-DATA represents the recovered data signal from the Manchester-encoded stream transmitted by the WP to the ICS and, therefore, represents the primary data signal input into the ICS to control its function. In addition, the presence of modulated carrier is used to create the carrier detect signal CARDET. CARDET is connected to the clock decoder **201B** to indicate the presence of carrier and therefore is one of the requisites for normal operation of the ICS. Since MAN-DATA is a Manchester-encoded signal, it comprises a clock and data. The clock information is extracted from MAN-DATA in the clock decoder **201B** The clock information is then expressed as 2 signals: CLKPH1 and CLKPH2, used to control the clocking of the serial data into a register in serial to parallel converter **201C**. In the converter **201C** the nature of the signal is converted from serial to parallel.

28

As previously discussed, data sent to the ICS by the WP is in the form of a serial bit stream organized within a frame, which consists of 9, 9 bit words, that is 81 bits, plus a parity bit and a frame-ending marker. The 9 bit data words, which make up the data portion of the frame, comprise 8 amplitude and polarity data words for the eight output channels in sequence **1** through **8**, and a 9th word containing special commands which control housekeeping and certain other functions of the ICS.

In clock decoder **201B**, the signal PFRMCLK is derived from the frame ending pulse. PFRMCLK signals the end of one data frame and, therefore, the beginning of the next.

In the converter **201C**, WORDTRCLK is generated at the end of each 9 bit word transmitted and causes those specific 9 bits, DATA (**1–9**), to be latched in the amplitude data latch **205A** for amplitude and polarity control. The signal WORD9CLK is used to cause latching of the 9th word coming in so that those 9 bits are directed to the command latch **206A** and will remain in that latch until the next 9th word time. Thus, the amplitude data latch **205A** is updated 8 times during the normal frame, with data for any particular channel being available only for the transmit time of the next word, when it is then replaced by the new data.

On the other hand, command latch **206A** retains the 9th word command information for at least one complete frame time, that is, until the next 9th word occurs. Of course, the succeeding 9th word command could be the same command sent again, in which case the functionality requested by that command would simply be maintained for another frame or, potentially for additional frames for an unlimited period of time.

Note that at times when use of the 9th word command is not required, the frame can be shortened by sending the frame-ending marker after any word of the amplitude data information. The sequence of the data is amplitude and polarity data for channel 1, followed by **2** through **8**, and this sequence can be terminated at the end of any word by a frame ending marker. This manner of operation is known as short cycling, and allows the frame to be shortened for more rapid update of low number channels but, of course, without 9th word commands. Such short cycle operation will allow higher frequency waveforms to be represented on such low-order channels at the expense of less-frequent updates on the higher order channels and the absence of 9th word command information. Under short cycling conditions, the amplitude and polarity information for channels not addressed, as well as 9th word commands not overwritten, will simply maintain their previous setting until written again at some future time.

(d) Amplitude and Polarity Control

In the normal full frame sequence, amplitude and polarity data, that is 9 binary bits each for 8 different channels, is received in sequence for channels **1** through **8**. The first amplitude and polarity data word received is latched as noted above, and then presented to the logarithmic D to A converter **207B** during the second word transmit time. Thus, the update of amplitude and polarity information for a given channel lags that channel's transmit time by one word time. In addition, since the data queue is only one word deep, the amplitude and polarity information sent, for example for channel 1, has to be operated on and completed during the channel **2** transmit time. During that time, the logarithmic D to A converter **207B** uses the 8 bits of amplitude information to operate on the reference current IREF from the current reference generator **207A** to generate the two current reference voltages IPOSCON and INEGCON, which are passed to the analog multiplexer **207C** as signals IPOS and INEG. IPOS

5,609,616

29

and INEG are the gate-to-source voltage which will be impressed on the current source **212B** in the appropriate output signal channel under the control of the signal WSTRB appropriate for that particular channel. The signals WSTRB (**1–8**) arise from the word strobe generator **201D**, and are a sequence of pulses which are active in the appropriate word time for each channel in sequence **1** through **8**. The current source **212B** in each of the 8 individual isolated output channels, stores its appropriate gate-to-source voltage on capacitance associated with the MOSFET, maintaining control at the commanded level until updated in the next frame. Each of the 8 current sources is a unidirectional current-controlling device which controls output current drawn from the refresh voltage capacitor, e.g., labeled CRV1 in FIG. 4-C.

Each current source **212B** is only connected to the logic circuitry during its signal transfer time. The refresh voltage capacitor CRV1 is only connected during its transfer time. Thus, for the balance of the time of operation, each output channel is electrically isolated from all other channels and also from the logic circuitry.

Since the MOSFET comprising current source **212B** is unidirectional, the switching network **212C** is placed after the current source in order to control the direction of stimulus current. This aspect is controlled by the signal POLARITY from latch **205A**, which for bipolar operation directs the electrode switching matrix **212C** to connect output A1 and output B1 for the first channel, for example, directly to the lines +IN1 and −IN1 for normal polarity, or to −IN1 and +IN1 for reverse polarity. In this way the direction of current flow between the electrodes can be controlled to be in either direction, even though the actual current source is a unidirectional device. For monopolar operation, as opposed to bipolar operation as described above, the electrode switching matrix **212C**, along with the indifferent electrode switch **212D**, is configured to allow the output to be generated between output A1 and the indifferent electrode or output B1 and the indifferent electrode with either direction of current flow being possible. The selection of bipolar or monopolar style of output in the matrix **212C** is under control of the buses AMONO (**1–8**) and BMONO (**1–8**) from output mode register **208**. In this regard, AMONO (**1–8**) and BMONO (**1–8**) each have one representative line going to each of the eight output channels (see Table 6).

In addition, there is a capability for placing a discharge resistor across each pair of outputs. Such function is under control of the discharge resistor control bus lines DRC1–8. Assertion of a DRC line to a particular output by the output mode register **208** will place a 150K resistance across the output terminals to discharge the output coupling capacitors. Alternatively, or in addition, a low resistance connection in **212C** can be placed across the output terminals to more rapidly discharge the output coupling capacitors in response to the signal SHORT from the zero current control **205B**. Further, the output current can be forced to zero by assertion of the signal ZERO from zero current control **205B**. In this regard, the signal ZERO causes all output switches in the switching matrix **212C** to be in an off or high impedance state.

An additional output mode (MULTIPOLAR MODE) involves using a pair of output channels to generate a bipolar output using any pair of electrodes in the electrode array. To accomplish this, two channels are programmed by the output mode register **208** to assume a monopolar mode. This causes one side of each of the selected channels to be connected together and to the indifferent electrode. Then, unlike the

30

normal monopolar mode, a WORD9 command from WP is sent to the ICS to disconnect the indifferent electrode via IECLOSE. Thus, by programming one of the channels as a source and the other as a sink, current can be driven through any selected pair of electrodes with complete control over amplitude and polarity.

(e) Pulse Width Control

The amplitude and polarity control described above is typical of the analog operation of the ICS. An additional mode of operation is provided by the ICS in which the described amplitude and polarity control is still in operation, but the outputs to one or more channels, controlled individually, can be turned on and off in order to create pulses of controlled amplitude and controlled duration. This is the pulsatile mode of operation. Pulsatile operation is under the control of pulse width control **209**. Pulse width control is via a sequence of 9th word commands (WORD9), the first of which results in the assertion of the line FUNC8, which enables the pulse width control **209**. The first such command also contains information about the placement of pulse edges within the next succeeding frame, and the rest of the command is issued in a series of 9th words which must not be interrupted by any other 9th word command. Therefore, a feedback signal to prevent other 9th word commands from interfering is sent back from the pulse width control **209** to the command decoder **206**, that signal being PFMAIN.

In the control **209**, bits of the first of the pulse width commands and succeeding ones are loaded into the pulse width control registers. The bits are used to preset down-counters, driven by the internal system clock, to control the appearance of the on and off times for the channel which is being controlled. Therefore, on a channel by channel basis, the amplitude of the pulse can be controlled in the usual way by the amplitude and polarity information sent in for that channel, and the turning on and off of the output is controlled by the pulse width control **209** in conjunction with the electrode switching matrix.

In addition to the channel by channel control of outputs being either on or off via the pulse width control **209**, there is also a global control which can enable or disable all outputs from all channels simultaneously, that is via the signal OUTENABLE from the initialization section **204B**. The global signal OUTENABLE can be controlled by the outputs, CONNECT and DISCON, from the command decoder **206B**. That is, the line can be driven by a 9th word command to connect or disconnect all the outputs. In addition, the global output control, OUTENABLE, can be negated by the initialization section **204B** when circuitry in that section detects conditions of improper operation. Furthermore, during startup of the ICS, all outputs are disconnected until normal operation is in progress, at which time OUTENABLE is asserted and stimulation will begin.

(f) Refresh Voltage Control

The isolated power supply voltages for the stimulus currents from each of the 8 output channels is provided by charge stored on the refresh capacitors, CRV1 through 8. Selection of the appropriate voltage level for each of the 8 output stages is a decision made by the WP based on information telemetered back to it from the ICS about the voltage requirements for proper output drive of that individual channel. This is an important power conservation feature of the ICS which seeks to minimize the potential difference and, therefore, the power dissipation in the current source **212B**.

Any one of four different power supply voltage levels are selectable for each of the output channels, independently, and those voltages are −3.5, −7.0, −10.5, 10.5, and −14. Refresh voltage control on a channel by channel basis is effected by two sequential 9th word commands which are decoded in the command decoder **206B** and result in asser-

5,609,616

**31**

tion of the signal FUNC7 line going to refresh voltage logic **210**. This requires 2 full frames to implement, that is two 9th words must be transmitted in sequence to achieve such control. The command decoder **206B** must be prevented from operating on a different 9th word during the sequence, hence the line RFMAIN from refresh voltage logic **210** is applied to the command decoder to lock it into the refresh voltage sequence for two frames. Refresh voltage logic **210** provides 2 bits RV0 and RV1 which define the four possible power supply voltage levels for each of the 8 output channels via the lines RV0 (**1** to **8**) and RV1 (**1** to **8**) connected to refresh voltage control **212A**. The control bits, two for each channel, are latched into their respective refresh voltage control so that (1) one of four possible power supply voltage levels is selected for each associated channel, e.g., −3.5 for channel **1**, −10.5 for channel **2**, −14 for channel **3**, −7 for channel **4**, and so on, and (2) the selected power supply levels are maintained until changed by a new refresh voltage command. During startup, all 8 output channels are automatically commanded to use the −14 volt refresh, which provides for the maximum output power. As the system continues to run and, as described hereinafter at (g) "Back Telemetry", as information is fed back via telemetry to the WP, logic within the microprocessor of the WP can then cause a reduction in the power supply voltage for each channel to a level most appropriate for the stimulation requirements for that channel, thereby enhancing the power conservation within the ICS.

(g) Back Telemetry

Function codes FUNC4 and FUNC5 from the command decoder **206B** enable the function of the back telemetry section **211** which is to report back to the WP the state of various voltages within the ICS. As previously indicated, some of the functions of the telemetry section are of a housekeeping nature. For example, the measurement and transmission back of the voltage TANKV provides an index or status indication of the RAWDC voltage generated in the ICS in response to data from the WP. In addition, the power supply voltages ZEROV, −3.5 volts and TAP14 are available for transmission back to the WP as indicators of proper power supply function and for feedback control of the WP and the power transmitted therefrom to the ICS.

Also, the back telemetry can be commanded to measure and send back the value of the voltage reference, VREF, to indicate proper operation and, since this voltage is highly stabilized, to provide a system calibration point. In addition, stimulus output voltages can be measured via the lines OUTA (**1** through **8**), and OUTB (**1** though **8**), when the ICS is in the bipolar mode.

In the monopolar mode, the output voltage can be measured between either output A and the indifferent electrode, or output B and the indifferent electrode, whichever is appropriate. Additionally, in the monopolar mode, the current sampling resistors RLO or RHI can be placed in series with the stimulus circuit, and the resulting voltage drop across the resistors measured and transmitted back to the WP as an index of stimulus current. Thus, in the monopolar mode, both the stimulus voltage and current can be measured and, thereby, the impedance of the electrode and the tissue-electrode interface can be measured and transmitted back to the WP. The WP is able to use this information in its microprocessor to choose the appropriate refresh voltage for each channel in the manner heretofore described at (f) Refresh Voltage Control.

As indicated in FIG. 4-E, following the telemetry multiplexer **211B** which selects the signal to be measured and transmitted back to the WP, inputs are generated for the analog to digital converter section **211**. The analog to digital converter is of a unipolar type. But, at least some of the signals which are to be measured have unknown polarity

**32**

at the time of measurement. Therefore, the capability is provided to make measurements in a normal mode or an inverted mode, depending on the state of the function lines, FUNC4 and FUNC5. If FUNC4 is asserted at the converter **211C** and the resulting ADCOUNT is zero, this indicates either that the measured signal is zero or of a polarity opposite to the setting of the converter. To determine which is the case, FUNC5 is asserted to switch the converter to the inverted mode. If ADCOUNT now registers other than zero, this indicates that the measured signal was of an opposite polarity to the normal setting of the converter. If ADCOUNT remains zero, this indicates that the measured signal was in fact zero.

In addition, the amplitude of some of the voltages to be measured is unknown at the time of measurement. Therefore provision is made for a stepwise gain selection prior to analog to digital conversion under control of SH2X1, SH2X3, SH2X10 and SH1X10. For example, if SH2X1 is asserted and ADCOUNT is a series of 1's, the input is out of range of the converter and the gain should be reduced until ADCOUNT reads less than 111111.

Thus, if the measurement is taken and is judged by the WP to be of the wrong polarity or wrong gain setting, correction can be sent back from the WP to make another measurement using the correct parameters as deduced from the first reading. The 6 bit parallel output bus from the A to D converter is connected to the telemetry modulator multiplexer which converts this parallel set of bits into a serial bit stream which is then applied to the back telemetry transmitter.

PHYSICIAN'S TESTER

As described herein most clearly under the heading "SYSTEM OPERATION", the system of the present invention provides for feedback and microprocessor control of various power levels and measurement of different voltages and currents within the ICS in response to commands and data changes transmitted by the WP in response to data telemetered back to the WP in the form of status indicating and measurement signals. The present invention also contemplates physician control over the selection of voltages and currents to be measured and the presetting of parameters in the ICS during testing of the ICS and/or a patient's response to data transmitted by the WP to the ICS.

Basically such physician control is embodied in a portable tester utilizing telemetry coupling to the implanted ICS, thereby providing communication between the tester and ICS for the monitoring, control and measurement of the ICS parameters. In this regard, the tester as shown in FIG. 6 comprises a modification of the previously described WP embodied in a portable housing **300** having a control panel **302** and a visual display **304** providing alpha numeric data for viewing and appropriate action by the physician. A block diagram of the circuitry embodied in the tester is depicted in FIG. 7 in combination with the ICS **12** of FIG. 1—all previously described components bearing the same numerals as in FIG. 1.

The tester monitors the performance parameters of the ICS **12** by detecting the back telemetry signal of the ICS in an interrogation protocol for the microprocessor. The tester places the received signal into a self contained memory storage section.

Physician interaction with the ICS is exercised by the use of the control panel **302** which contains electronic circuitry for conversion of the back telemetry signal into directly

5,609,616

**33**

readable information which is read out on the LCD display **304**. Commands are provided to the implanted stimulator through a control of the microprocessor **30** and the commands generated thereby. The physician's tester additionally can provide a print out of both the displayed data and information and the executed commands.

As illustrated, the physician's tester is basically a modification of the WP **16**. The Physician's Tester microprocessor **30** has both a display port and an infrared serial output port. The display port drives display **304** while the infrared port can drive a separate infrared display, a printer for recording the displayed information or a separate IR transducer for generating infrared light signals for transmission to an IR receiver for separate processing of the information from the ICS. Panel knob **306**, **308**, and **310** control potentiometers, the position of which are read by the microprocessor **30** to control the commands generated thereby and hence the parameters measured and displayed by the ICS and Physician's Tester combination. In particular, such manual control results in changes in the commands transmitted by the WP to the ICS to control the measurement of the ICS parameters in the same manner as previously described for the system of FIGS. 4-A through 4-I.

Table 7 describes typical parameter settings for the control knobs **306**, **308**, and **310**.

TABLE 7

| Control Knob 306 | |
|---|---|
| Position 1 = | Ground (0 Volts) |
| Position 2 = | 14.0 Volts |
| Position 3 = | 3.5 Volts |
| Position 4 = | Reference Voltage |
| Position 5 = | Coil Voltage |

| Control Knob 308 | |
|---|---|
| Position 1 = | Impedance of Monopolar A configured channel |
| Position 2 = | Impedance of Monopolar B configured channel |
| Position 3 = | Impedance of Bipolar configured channel |
| Position 4 = | Voltage of Monopolar A configured channel |
| Position 5 = | Voltage of Monopolar B configured channel |
| Position 6 = | Voltage of Bipolar configured channel |
| Position 7 = | Voltage of Pass FET |
| Position 8 = | 1 KHz output current Monopolar A configured channel |
| Position 9 = | 1 KHz output current Monopolar B configured channel |
| Position 10 = | 1 KHz output current Bipolar configured channel |

| Control Knob 310 Volume Control (Peak Output Current) | |
|---|---|
| Position 1 = | 0 μA |
| Position 2 = | 0.5 μA |
| Position 3 = | 1.0 μA |
| Position 4 = | 10 μA |
| Position 5 = | 100 μA |
| Position 6 = | 1000 μA |
| Position 7 = | 2500 μA |

**Extended System Operation and Applications**

While preferred forms of the human tissue stimulator of the present invention embodied in cochlear stimulating systems have been described in detail hereinabove, it should be appreciated that various changes and modifications may be made in the described systems without departing from the spirit of the present invention.

For example, while the outputs of the preferred embodiments have been described as stimulating tissue, the DC and squarewave outputs of the ICS under control of the pulse width control **209** may be utilized to power other implanted devices. For some such AC applications, a larger capacitor CA1 and/or CB1 may be required for each or some of the

**34**

ICS output channels. Conversely, for strictly DC applications, no output capacitors are necessary.

Further, while the ICS status signal-generating features for the preferred embodiment include the measurement and telemetry functions described in subsection (g) hereinabove, similar measurements and telemetry back to the WP may be provided by the ICS for other implanted devices connected to an electrode pair of the ICS. This permits a wide range of applications since the back telemetry feature can sample and measure any external voltage within its amplitude and frequency range and provide 6 bit resolution. Any external device which can generate an appropriate voltage related to its function can utilize this feature.

Moreover, with the ICS as previously described with respect to FIGS. 4-A through 4-I, the output electrode pairs for the separate channels of the ICS are simultaneously available to power another implanted device or stimulate tissue and to sense variable voltage conditions therebetween.

In view of the foregoing and other additions and changes which may be made in the illustrated embodiments, the present invention is to be limited in scope only by the terms of the following claims.

We claim:

1. A physician's testing system for testing a multichannel cochlear stimulating system, comprising a physician's tester, an external headpiece/transmitter, and an implanted cochlear stimulator (ICS),

the external headpiece/transmitter having transmitting means for transmitting data-containing signals to the ICS;

the ICS comprising: (a) receiving means for receiving the data-containing signals, (b) processor means for processing the data-containing signals to generate stimulation signals, (c) a plurality of tissue-stimulating electrodes for receiving the stimulation signals, (d) monitor means in the processor means and responsive to the data-containing signals for (1) selectively monitoring at least one pair of the tissue-stimulating electrodes as one of the stimulation signals is applied thereto to measure a voltage associated with said pair of electrodes, and (2) generating stimulator status-indicating signals, and (e) telemetry means for transmitting the stimulator status-indicating signals to the external headpiece/transmitter means; and

the physician's tester comprising:

external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes;

user-controllable means connected to the external processor means for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means, said user-controllable means including manual means for specifying a peak output current for the stimulation signals to be applied to the at least one pair of tissue-stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

2. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having a parallel output port coupled thereto through which information derived from the status-indicating signals may be coupled to a remote site.

5,609,616

**35**

**3**. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having a printer port coupled thereto through which information derived from the status-indicating signals may be sent.

**4**. The physician's testing system of claim **1** wherein the manual means of the user-controllable means of the physician's tester further includes means for specifying a particular pair of the plurality of tissue-stimulating electrodes at which the monitor means of the ICS is to measure a voltage.

**5**. The physician's testing system of claim **4** wherein the external-processor means includes means for computing an impedance measurement based on the voltage measured by the monitor means of the ICS and the peak output current specified by the manual means of the user-controllable means.

**6**. The physician's testing system of claim **4** wherein the ICS includes a current-sensing resistor within the ICS through which a current associated with a stimulating signal applied to a select pair of the tissue-stimulating electrodes must pass, and wherein said monitor means within said ICS includes means for measuring a voltage across said current-sensing resistor, which voltage provides a measure of a stimulating current flowing through the select pair of electrodes, and wherein the external-processor means of the physician's tester includes means for computing an impedance measurement based on the voltage and current measured by the monitor means of the ICS.

**7**. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having an RS232 output port coupled thereto through which information derived from the status-indicating signals may be sent to a remote site.

**8**. The physician's testing system of claim **1** wherein the manual means for specifying the peak output current, included as part of the user-controllable means of the physician's tester, comprises a manual switch having means for selecting one of at least seven separate peak output current settings.

**9**. The physician's testing system of claim **8** wherein the at least seven separate peak output current settings of the manual switch include 0, 0.5, 1.0, 10, 100, 1000 and 2500 μa.

**10**. A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes;

selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter;

receiving and processing the status-indicating signals to produce processed status-indicating signals which con-

**36**

vey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and

displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known.

**11**. The method of claim **10** further including printing the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be preserved on a printed record.

**12**. A system for testing an implantable cochlear stimulator (ICS) comprising a portable physician's tester and the ICS,

the ICS comprising (a) receiver means for receiving data-containing signals, (b) processor means for processing the received data-containing signals to generate stimulation signals, the stimulation signals having a peak output current associated therewith prescribed by the data-containing signals, (c) a multiplicity of tissue-stimulating electrodes; (d) means for applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes, (e) monitor means in the processor and responsive to the data-containing signals received by the receiver means for (1) monitoring a selected pair of the multiplicity of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and (2) generating stimulator status-indicating signals, said stimulator status-indicating signals including the voltage measured at the selected pair of electrodes by the monitor means as one of the stimulation signals is applied thereto, and (f) telemetry means for transmitting the stimulator-status indicating signals to an external receiver;

the portable physician's tester comprising:

user-controllable means for selectively generating the data-containing signals, said user-controllable means including manual means for manually specifying a peak output current to be included in the data-containing signals;

external transmitter means for transmitting the data-containing signals to the receiver means of the ICS;

external receiver means for receiving the status-indicating signals transmitted by the telemetry means of the ICS;

external processor means for processing the received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue-stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

**13**. The system for testing of claim **12** wherein the portable physician's tester further includes a signal port coupled to the external processor means through which the information derived from the status-indicating signals may be sent for further processing at a location removed from the external processor means.

**14**. The system for testing of claim **12** wherein the manual means of the user-controllable means of the portable physician's tester further includes means for manually specifying a particular pair of the plurality of tissue-stimulating electrodes at which the monitor means of the ICS is to measure a voltage.

\* \* \* \* \*

# EXHIBIT 3

US005938691A

# United States Patent [19]

Schulman et al.

[11] Patent Number: 5,938,691

[45] Date of Patent: Aug. 17, 1999

[54] **MULTICHANNEL IMPLANTABLE COCHLEAR STIMULATOR**

[75] Inventors: **Joseph H. Schulman**, Santa Clarita; **John C. Gord**, Venice; **Primoz Strojnik**, Granada Hills; **David I. Whitmoyer**, Los Angeles; **James H. Wolfe**, Canyon Country, all of Calif.

[73] Assignee: **Alfred E. Mann Foundation**, Sylmar, Calif.

[21] Appl. No.: **09/103,264**

[22] Filed: **Jun. 23, 1998**

**Related U.S. Application Data**

[62] Division of application No. 08/450,041, May 25, 1995, Pat. No. 5,776,172, which is a continuation of application No. 08/322,065, Oct. 12, 1994, Pat. No. 5,531,774, which is a continuation-in-part of application No. 08/023,584, Feb. 26, 1993, Pat. No. 5,603,726, which is a continuation of application No. 07/752,069, Aug. 29, 1991, abandoned, which is a continuation-in-part of application No. 07/411,563, Sep. 22, 1989, abandoned.

[51] **Int. Cl.⁶** .............................. **A61N 1/36**; A61F 2/18; H04R 25/00

[52] **U.S. Cl.** ......................... **607/57**; 607/55

[58] **Field of Search** ........................... 607/55–57

[56] **References Cited**

U.S. PATENT DOCUMENTS

4,532,930  8/1985  Crosby et al. ............................. 607/57

4,592,359  6/1986  Galbraith .................................... 607/57
4,947,844  8/1990  McDermott ................................ 607/57

*Primary Examiner*—William E. Kamm
*Assistant Examiner*—Carl H. Layno
*Attorney, Agent, or Firm*—Alfred E. Mann Foundation

[57] **ABSTRACT**

A cochlea stimulation system includes a patient wearable system comprising an externally wearable signal processor (WP) and a headpiece in electronic communication with an implanted cochlear stimulator (ICS). The ICS comprises eight output stages each having two electrically isolated capacitor-coupled electrodes, designated "A" and "B", circuits for monitoring the voltages on these electrodes, and circuits for transmitting status information to and receiving control information from the WP. Based upon information received from the WP, a processor within the ICS can control both the frequency and the widths of the output stimulation pulses applied to the electrodes and may select which electrodes to monitor. The ICS receives power and data signals telemetrically through the skin from the WP. To save power, the ICS may be "powered down" by the WP based upon the absence of audio information or "powered up" if audio is present. The WP communicates with the headpiece over a co-axial cable using one frequency for transmitting signals and a second different frequency for receiving signals.

**15 Claims, 15 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3

Fig. 4

FIGURE 4—D

FIGURE 4—H

FIGURE 4—C

FIGURE 4—G

FIGURE 4—B

FIGURE 4—F

FIGURE 4—A

FIGURE 4—E



Fig. 4—A



Fig. 4—B



Fig. 4−C

**U.S. Patent**          Aug. 17, 1999          Sheet 8 of 15          **5,938,691**



Fig. 4-D



Fig. 4—E



Fig.  4—F



Fig. 4—G



Fig. 4—H

**U.S. Patent**          Aug. 17, 1999          Sheet 13 of 15          **5,938,691**

Fig. 5A

LONG DATA FRAME FOR MULTIPLE CHIP OPERATION







Fig. 6

PHYSICIAN'S TESTER

**U.S. Patent**     Aug. 17, 1999     Sheet 15 of 15     **5,938,691**



Fig. 7

5,938,691

1

## MULTICHANNEL IMPLANTABLE COCHLEAR STIMULATOR

### RELATED APPLICATIONS

This application is a divisional application of application Ser. No. 08/450,041, filed May 25, 1995, now U.S. Pat. No. 5,776,172; which is a continuation of application Ser. No. 08/322,065, filed Oct. 12, 1994, now U.S. Pat. No. 5,531,774; which is a continuation-in-part of application Ser. 08/023,584, filed Feb. 26, 1993, now U.S. Pat. No. 5,603,726; which is a continuation of application Ser. No. 07/752,069, filed Aug. 29, 1991, now abandoned; which is a continuation-in-part of patent application Ser. No. 07/411,563, filed Sep. 22, 1989, also abandoned.

### BACKGROUND

The present invention relates to improvements in human tissue stimulators and more particularly to a human tissue stimulating system which in a preferred form comprises an audio responsive system for artificially stimulating the cochlea to improve the hearing of the hearing impaired.

U.S. Pat. No. 4,400,590 issued Aug. 23, 1983 for "Apparatus for Multi-Channel Cochlear Implant Hearing Aid System" describes and illustrates a multi-channel intra-cochlear electrode and system for electrically stimulating predetermined locations of the auditory nerve within the cochlea of the ear. The electrode comprises a plurality of exposed electrode pairs spaced along and embedded in a resilient curved base for implantation in accordance with the method of surgical implantation described in U.S. Pat. No. 3,751,615 issued Aug. 7, 1973 for "Method of Inducing Hearing." The hearing aid system described in the '590 patent receives audio signals at a signal processor located outside the body of a hearing impaired patient. The processor converts the audio signals into analog data signals which are transmitted by a cable connection through the patient's skin to the implanted multi-channel intra-cochlear electrode. The analog signals are applied to selected ones of the plurality of exposed electrode pairs included in the intra-cochlear electrode to electrically stimulate predetermined locations of the auditory nerve within the cochlea of the ear where the intra-cochlear electrode is positioned.

The cochlea stimulating system described in the '590 patent is limited in the number of channels of information, the speed of transfer of stimulating signals to the cochlea and the fidelity of the signals. Also, the cable connection through the skin of the patient to the intra-cochlear electrode is undesired in that it interferes with the freedom of movement of the patient and represents a possible source of infection.

U.S. Pat. No. 4,532,930, issued Aug. 6, 1985 for "Cochlear Implant System For an Auditory Prosthesis" describes and illustrates a multiple electrode system. While multiple electrodes are employed to stimulate hearing the system only operates with a single pulsatile output stimulating a single electrode channel at any given time. Such a sequential system is limited in speed of operation and does not provide for analog operation where continuous stimulating signals controllable in amplitude are simultaneously applied to a number of electrode channels. Further, the system is subject to charge imbalance with misprogramming or circuit fault and inefficient use of electrical power. Moreover, once the stimulator unit is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued use.

U.S. Pat. No. 4,592,359, issued Jun. 3, 1986 for "Multi-Channel Implantable Neural Stimulator" describes a

2

cochlear implant system having 4 current sources and 4 current sinks per channel controlled by series switches to provide 16 different circuits for supplying 16 levels of 2 polarities to each output channel. In a pulsatile mode, the system provides for simultaneous update (amplitude control) and output to all channels. However, the system does not permit simultaneous analog update and output on all channels and the electrode pairs for each channel are not electrically isolated from all other electrode pairs whereby undesired current leakage may occur. Further, once the stimulator is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,947,844, issued Aug. 14, 1990 for "Receiver/Stimulator For Hearing Prosthesis" describes and illustrates a multiple channel electrode system. The system includes an implanted receiver/stimulator connected to an implanted electrode array. The receiver/stimulator includes an electrode stimulating current control characterized in that current is delivered to each electrode or to each bipolar pair of electrodes in a series of short electrical pulses, each elemental pulse being separated from the next by an interval of zero current which has a longer duration than an elemental pulse. The waveform of the stimulus current comprises a series of pulses of one polarity followed by an equal number of pulses of an opposite polarity whereby the sum of all the electrical charge transferred through each electrode is approximately zero at the end of a stimulating current waveform. In this way, elemental current pulses applied to each electrode on each pair of electrodes which are stimulating are preferably delivered cyclically such that elemental pulses delivered to one electrode are interleaved in time with those delivered to any other electrodes. This enables the use of a single current source in the receiver/stimulator. The use of a single current source limits the operation of the receiver/stimulator in that the single current source must be switched to serve all output channels in a sequential manner. Simultaneous operation is not possible. Further, the number of channels cannot be greater than 3 or 4 without greatly reducing the duty cycle of the stimulating current waveform in each channel. Not only does the stimulus effectiveness in each channel suffer in such a situation, but the time required to complete the switching cycle for the single current source lengthens in direct proportion to the number of channels. Further, this system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

The system described in the 844 patent also includes in the implanted receiver/stimulator a transmitter for telemetering one electrode voltage, measured during stimulation, to an external receiver for monitoring and analysis as an indicator of proper operation of the implanted stimulator. The transmitter comprises an oscillator operating at a frequency of about 1 MHz. The output of the oscillator is coupled to the implant's receiving coil and demodulated to recover the selected voltage waveforms. Unfortunately, such a telemetry system is not only limited to the monitoring of one voltage, but the simultaneous transmission of the telemetry signal and reception of the input carrier signal as described will result in undesired modulation and possible loss of input data.

Accordingly, there is a continuing need for an improved multi-channel tissue stimulator system particularly useful as a cochlear stimulator system and which is characterized (i) by a high operating speed in analog and pulsatile operation, (ii) freedom from charge imbalance, (iii) complete isolation

5,938,691

**3**

of its electrode pairs for each channel, and (iv) the externally controllable monitoring and selective control a plurality of operating parameters and power supply to or currents and voltages developed within the implanted stimulator unit of the system to optimize system operation and power efficiency. The present invention satisfies such needs.

SUMMARY OF INVENTION

A preferred embodiment of the present invention comprises a cochlea stimulating system including an externally wearable signal receiver and processor (WP) and an implanted cochlea stimulator (ICS). The receiver, which may comprise a headpiece adjacent the ear of a patient, receives audio signals and transmits the audio signals to the WP. The WP receives and processes the audio signal and includes means for generating data indicative of the audio signals for transmission to the ICS.

The ICS includes means for receiving transmissions from the WP as well as a processor for processing such transmissions to sequentially update and simultaneously or sequentially generate and apply stimulation signals to a plurality of cochlea stimulating channels each having capacitor coupled electrodes implanted within the cochlea of the patient. The processor includes means responsive control signals from the WP for selectively monitoring one or more of the electrodes and voltages within the processor and for generating ICS status indicating signals. The ICS status indicating signals are telemetered back to the WP which includes means for receiving and processing the ICS status indicating signals. For example, such means may include means for controlling the power level of transmissions to the ICS.

The processor in the ICS also includes means for selectively controlling the pulse widths of the stimulation signals, the frequency at which stimulating signals are applied to selected electrodes, and means for generating a plurality of voltages for powering different components in the ICS and for selectively receiving and responding to analog and pulsatile input data signals from the WP.

Preferably, each channel in the ICS includes (i) a current source and floating current transfer device with switching capacitors for supplying stimulating signals to the capacitor coupled electrodes which are independent and isolated from the stimulating signals supplied to the output of all other channels, (ii) means for selectively driving the electrodes as unipolar or bipolar electrodes and (iii) means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

BRIEF DESCRIPTION OF DRAWINGS

FIG. **1** is a block diagram of a basic form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. **2** is a more detailed block diagram of the ICS of FIG. **1** and associated circuitry for receiving and transmitting signals from and to the WP.

FIG. **3** is block diagram of second form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. **4** is a block diagram of the layout of the system components and circuitry comprising the detailed showing of the ICS in FIGS. **4A–4H**.

FIG. **5A** depicts a long data frame useful in multiple chip configurations for the stimulating system, the long frame comprising a series of n+1 data frames, the first frame being

**4**

designated as a master frame and the subsequent frames being designated as slave frames **1** through n. The number of data frames comprising the long data frame corresponds to the number of chips included in the system.

FIG. **5B** is a block diagram of multiple chip system for the ICS of FIG. **2** or FIGS. **4A–4H**.

FIG. **6** is a diagrammatic representation of a physician's tester useful with the cochlear system of FIG. **1**.

FIG. **7** is a block diagram of the cochlear system of FIG. **1** with the WP replaced by the physician's tester.

DETAILED DESCRIPTION OF INVENTION

The preferred forms of the present invention are implemented using CMOS technology. In development of the invention, however, a prototype was developed using standard, off-the-shelf electrical components which when connected functioned in accord with the general principles and features set forth in the preferred forms of the system, including CMOS integrated circuits and chips. Thus, in duplicating the systems hereinafter described, one may either utilize conventional off-the-shelf electrical components or develop the systems utilizing techniques well known in CMOS technology, whichever is desired.

As illustrated in FIG. **1**, the basic system according to a preferred embodiment of the present invention basically comprises an externally wearable system **10** and an implantable cochlear stimulator (ICS) **12**. The external system **10** comprises a headpiece **14** and an externally wearable processor (WP) **16**. The headpiece may be worn behind the ear of a hearing impaired person and comprises a conventional microphone **18** and an antenna **20** for transmitting and receiving electromagnetic energy preferably in the form of radio frequency signals. Such coupling can be restricted to magnetic field only by an electrostatic shield around the coils comprising the antenna **20**. In addition, signals from the ICS to the WP on one carrier frequency and from the WP to the ICS on another frequency can be transferred via a single coaxial cable between the headpiece **14** and the WP **16**. This can be accomplished by having tuned inductor-capacitor filters for each frequency at each end of the coaxial cable.

The WP **16**, powered by a battery **38**, is adapted to receive audio signals received by the microphone **18** and to transmit such signals to a conventional audio front end **22** which features automatic gain control (AGC). The audio signals processed by the audio front end **22** are transmitted to a bank of filters **24** for filtering and for generation of a plurality of parallel audio signals. The audio signals are processed by a multiplexer **26** and converted to a series of digital signals by an A to D converter **28** for application to a microprocessor **30**. The filter bank may also be implemented as a group of digital filters, for example in a digital signal processor integrated circuit. In this case the signal flow would be from the audio front end and AGC **22**, through an anti-aliasing filter, to an analog to digital converter, then into a digital filter bank **24** and the general processing of microprocessor **30**.

The output of the microprocessor **30** is coupled through a custom gate array **32** that converts data from the microprocessor into a serial bit stream going to a data transmitter **34**. The gate array **32** also converts data from a telemetry receiver **36** and the microprocessor **30** to control the power level of data generated by the data transmitter **34**.

As illustrated in FIG. **1**, the ICS **12** includes a receiver **40** for receiving data transmissions from the wearable system **10** and a telemetry transmitter **42** for transmitting ICS status

5,938,691

**5**

indicating and measured signals from the ICS 12 to the wearable system 10 for processing thereby. For example, power level indicating signals transmitted by the telemetry transmitter 42 are received by the telemetry transmitter 36 and processed in the microprocessor 30 and gate array 32 to generate signals controlling the power level of the transmissions from the transmitter 34 to the ICS 12, thereby providing a closed-loop system for optimizing the power levels of the transmission from the wearable system 10 to the ICS 12 and hence conserving the battery 38 and optimizing the voltages generated within the system 10.

In addition to the receiver 40 and transmitter 42, the ICS 12 includes a regulator 44 for receiving a power signal from the receiver 40 to energize a processor 46. Data signals from the receiver 40 are also transmitted to the processor 46 for processing to generate stimulation signals applied to one or more of a plurality of capacitor coupled electrodes in an intra-cochlear electrode 48.

Generally speaking, in response to control or data signals from the WP 16 the processor 46 selectively monitors voltages of the electrodes and associated circuitry in the processor and generates ICS status indicating and measured signals. For example, the processor 46 monitors the voltage applied to the regulator 44, the impedance of the electrodes and other voltages within the processor to generate the status indicating signals which are sent as data to the telemetry transmitter 42 for transmission to the wearable system 10.

More particularly, in the cochlea stimulating system shown in FIG. 1, the signals transmitted to the ICS 12 from the wearable system 10 include electrical power components. Such power components are processed within the receiver 40 through the series regulator 44 to generate a voltage signal which powers the processor 46. The processor 46 selectively monitors the voltage applied to the series regulator and generates a status indicating signal relative to such voltage which is transmitted by the telemetry transmitter 42 and received by the telemetry receiver 36. As previously stated, such information is utilized in the microprocessor 30 and gate array 32 of the WP 16 to control the power level of the transmissions from the data transmitter 34 to the ICS 12.

More specifically as to the ICS 12 and the embodiment thereof illustrated in FIG. 2, power and data are sent through a main coil 50 to the receiver 40 comprising a power rectifier which filters out DC power for the regulator 44 and a detector which demodulates the data for transmission to a data decoder 52. The regulator 44 in conjunction with a voltage reference 54 and voltage regulator error amplifier 56 produces a precise 14 volts for powering the balance of the processor 46. More particularly, the 14 volts powers a voltage downconverter 58 which generates three additional voltages, 10.5, 7.0 and 3.5 volts. The three voltages are used to power various other circuits, including the output circuits of the processor 46.

The voltage used to provide charge to the outputs applied to the electrodes 48 is transferred to eight different storage capacitors 60, one of which is illustrated in FIG. 2. There is one storage capacitor for each of eight isolated bipolar channels. The output of each storage capacitor is controlled by a current source FET 62 for that channel. Each FET current is determined by an exponential D to A converter 64 and current reference 65, such as the D to A converter described in U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as the present invention.

The output of the current sources 62 are connected to the electrodes 48 and an indifferent electrode 49 through a

**6**

switch matrix 66. The output of the electrode switch matrix 66 is capacitor coupled to each of 16 electrodes. The following table lists the output currents available to the electrodes:

| Constant Current Amplitude Steps (μA) | | | | |
|---|---|---|---|---|
| 2500 | 470.6 | 88.58 | 16.67 | 3.138 |
| 2417 | 455.1 | 85.67 | 16.12 | 3.035 |
| 2338 | 440.1 | 82.86 | 15.59 | 2.936 |
| 2261 | 425.7 | 80.13 | 15.08 | 2.839 |
| 2187 | 411.7 | 77.50 | 14.58 | 2.746 |
| 2115 | 398.2 | 74.96 | 14.11 | 2.656 |
| 2046 | 385.1 | 72.49 | 13.64 | 2.568 |
| 1978 | 372.4 | 70.11 | 13.19 | 2.484 |
| 1913 | 360.2 | 67.81 | 12.76 | 2.402 |
| 1850 | 348.4 | 65.58 | 12.34 | 2.324 |
| 1790 | 336.9 | 63.43 | 11.94 | 2.247 |
| 1731 | 325.7 | 61.34 | 11.54 | 2.173 |
| 1674 | 315.2 | 59.33 | 11.16 | 2.102 |
| 1619 | 304.8 | 57.38 | 10.80 | 2.033 |
| 1566 | 294.8 | 55.49 | 10.44 | 1.966 |
| 1514 | 285.1 | 53.67 | 10.10 | 1.901 |
| 1465 | 275.7 | 51.91 | 9.772 | 1.839 |
| 1416 | 266.7 | 50.20 | 9.451 | 1.779 |
| 1370 | 257.9 | 48.55 | 9.140 | 1.720 |
| 1325 | 249.4 | 46.96 | 8.840 | 1.664 |
| 1281 | 241.2 | 45.42 | 8.549 | 1.609 |
| 1239 | 233.3 | 43.92 | 8.269 | 1.556 |
| 1198 | 225.6 | 42.48 | 7.997 | 1.505 |
| 1159 | 218.2 | 41.08 | 7.734 | 1.455 |
| 1121 | 211.1 | 39.73 | 7.480 | 1.408 |
| 1084 | 204.1 | 38.43 | 7.234 | 1.361 |
| 1049 | 197.4 | 37.17 | 6.997 | 1.317 |
| 1014 | 190.9 | 35.95 | 6.767 | 1.273 |
| 981.2 | 184.7 | 34.76 | 6.545 | 1.232 |
| 949.0 | 178.6 | 33.62 | 6.330 | 1.191 |
| 917.8 | 172.7 | 32.52 | 6.122 | 1.152 |
| 887.6 | 167.1 | 31.45 | 5.921 | 1.114 |
| 858.5 | 161.6 | 30.42 | 5.726 | 1.077 |
| 830.3 | 156.3 | 29.42 | 5.538 | 1.042 |
| 803.0 | 151.1 | 28.45 | 5.356 | 1.008 |
| 776.6 | 146.2 | 27.52 | 5.180 | 0.975 |
| 751.1 | 141.3 | 26.61 | 5.010 | 0.000 |
| 726.4 | 136.7 | 25.74 | 4.845 | |
| 702.6 | 132.2 | 24.89 | 4.686 | |
| 679.5 | 127.9 | 24.07 | 4.532 | |
| 657.2 | 123.7 | 23.28 | 4.383 | |
| 635.6 | 119.6 | 22.52 | 4.239 | |
| 614.7 | 115.7 | 21.78 | 4.100 | |
| 594.5 | 111.9 | 21.06 | 3.965 | |
| 575.0 | 108.2 | 20.37 | 3.835 | |
| 556.1 | 104.6 | 19.70 | 3.709 | |
| 537.8 | 101.2 | 19.05 | 3.587 | |
| 520.2 | 97.92 | 18.43 | 3.469 | |
| 503.1 | 94.70 | 17.82 | 3.355 | |
| 486.5 | 91.59 | 17.24 | 3.245 | |

Under control of a voltage controlled oscillator 70 and its loop filter 72, the serial output from the data decoder 52 drives a serial to parallel converter 68. The parallel output of the serial-to-parallel converter 68 provides channel amplitude data to an amplitude data latch 74 and program command data to a command latch 76. More particularly, the serial data from the data decoder 52 is analyzed by bit and word error checking counters 78. The amplitude data from the amplitude data latch 74 determines the output of the exponential D to A converter 64. In that regard, the analog value of the output from the D to A converter 64 is generated in a current mirror which is then transferred via an analog multiplexer 80 to the capacitively-coupled output electrodes 48. The sequence of operation of the multiplexer 80 is controlled by the output of a word strobe generator 79 which is driven by command latch 76. It should be noted that the command latch 76 cannot function unless an initialization circuit 82 and the bit error checking circuit 78 permit data to be transferred to a command decoder 84.

5,938,691

7

The command decoder **84** controls all the other specific functions such as the electrode switching matrix **66** via an output mode register **86** and output control logic **88**, and a pulse width control **90** which also controls the output via the output control logic **88**. As with the command latch, the pulse width control **90** and the output control logic **88** cannot function unless the initialization circuit **82** is properly initialized. To be enabled, the initialization circuit **82** must detect the correct initial digital code. When the initialization circuit **82** is not enabled, the electrode switching matrix **66** cannot turn on.

In addition to the other functions of the command decoder **84**, it also controls the setting of indifferent electrode switches **92** which are used for monitoring the current flowing through the indifferent electrode and therefore through any or all 16 electrodes in a unipolar configuration. With the appropriate output channel configuration in the unipolar state, the indifferent electrode switches permit multi-polar operation.

As illustrated more clearly in FIG. **2**, the ICS back telemetry system described briefly relative to FIG. **1**, consists of a signal multiplexer (MUX) **94** programmed by the command decoder **84** to monitor various voltages throughout the processor **46** and ICS **12**. The output of the multiplexer **94** is amplified through a series of telemetry gain stages **96** which are connected to an A to D converter **98**. Power to the gain stages **96** can be turned on and off by the command decoder **84** to conserve energy when not in use.

The A to D converter **98** may be a single-slope type which functions by comparing the output of the gain stages **96** with a voltage ramp. The slope of the ramp is set by a current reference **100**. The output of the A to D converter **98** and a telemetry control logic **102** is a train of bits that controls a telemetry modulator switch **104**. The telemetry modulator switch **104** modulates the telemetry transmitter **42** which energizes a telemetry coil **106**.

As previously indicated, the back telemetry system included in the cochlear stimulating system of the present invention provides means for minimizing power consumption of the system. As previously noted, the WP **16** is powered by the battery **38**. To increase the battery life or to allow a smaller battery to be used, the radio frequency transmitted from the WP **16** via the antenna **20** to the ICS **12** is rectified in the receiver **40** and applied to the regulator **44**. It is important that the output voltage of the regulator **44** be held constant, in this case, 14 volts. It is also important that the voltage regulator which has the 14 volt output must have somewhat more than 14 volts available as an input. Any additional voltage is lost as heat and will reduce the life of battery **38**. In the present invention, the regulator input voltage (DC) is optimized by controlling the RF power transmitted by the wearable system **10** and received by the ICS **12**. As previously indicated, the data transmitter **34** is powered by the battery **38**, preferably a 6 volt 0.5 amp-hour battery. The power control is affected through a conventional switching regulator included in the gate array **32** whose output voltage may be varied based upon the duty cycle of a switching transistor or multiple switching transistors in the switching regulator. The output of the power control circuit powers the transmitter **34** and by varying its output voltage can vary the transmitter power. The transmitter may run at 49 MHz and be 100% amplitude modulated by a digital signal. The digital signal comes from the gate array **32**. The signals transmitted by the transmitter **34** are received at the ICS **12** and rectified as previously described. The rectified power noted as "DC" in FIG. **2** is applied to the regulator **44** which may be of conventional design including a junction

8

type depletion-mode FET to hold the output voltage of the regulator **44** constant as the input voltage changes. In practice, the input voltage can vary from 14 volts up to 20 volts or more. To maintain best efficiency, it is desired that the DC voltage be only slightly greater than the output voltage of the series regulator **44**, perhaps on the order of 14.2 to 15 volts. However, as the antenna **20** is moved or as the circuit loads change, the DC voltage may start to change. One purpose of the back telemetry system is to allow the DC voltage to be automatically maintained at the lowest voltage consistent with normal operation. To accomplish this, under control of the command decoder **84**, the multiplexer **94** monitors the DC voltage. The desired output of the multiplexer **94** is applied to the conventional A to D converter **98**. As previously described, the output of the A to D converter, telemetry control logic **102** and telemetry modulator switch **104**, FM modulates the telemetry transmitter **42** which may comprise a 10.7 MHz oscillator. The output of the oscillator is coupled back through the skin to the headpiece **14** and antenna **20** to the telemetry receiver **36**. The output of the receiver **36** is applied to the gate array **32** including a conventional serial to parallel converter. The parallel data output from the serial to parallel converter is processed in the microprocessor **30** to adjust the power level in the power control circuit of the data transmitter **34** to maintain the value of the DC voltage slightly greater than the desired output voltage of the series regulator **44**.

As just described, the command decoder **84** controls the monitoring of the value of the DC voltage to provide the desired voltage control. Similarly, the command decoder **84** may select particular channels to be monitored and the impedance of the various electrodes to be determined in the same manner as the DC voltage was monitored and as above described. In such cases, the ICS status indicating signals generated in the processor **46** and telemetered to the WP **16** may be utilized within the microprocessor **30** to provide indications of the operating status of the ICS **12**.

In still other instances, to save power the command decoder **84** may function to cause a powering down of various subsystems within the processor **46**. With the circuitry of FIG. **2**, power may be restored in approximately 20 msec. on appropriate output from the command decoder. Similarly, the microprocessor can go into a hibernation state which consumes less than 10 milliwatts. The hibernation state terminates whenever additional commands are received from the command decoder **84**.

In the ICS **12** illustrated in FIG. **2**, the current sources **62** are floating. Such "floating" of the current sources may be as described in U.S. patent application Ser. No. 428,179, filed Dec. 18, 1989, and assigned to the same assignee as the present invention, and may be implemented with an FET that is not directly tied to a power supply. This may be implemented using two identically sized transistors, one being a reference transistor upon which an input current is impressed to generate a voltage difference thereacross which is a predetermined gate voltage for the second or output transistor which is floating with respect to all power supplies. The predetermined gate voltage is that voltage which when applied to the output transistor will produce the same current value as the input current. The importance of such floating current sources in the ICS **12** is to enable the ICS **12** to stimulate pairs of electrodes independent of the current flow in other pairs of electrodes and independent from the main power supply. This allows for the exact control of current in each output stage with no direct current path back to the main power supply or to any other output stage. This eliminates any concern of undesired currents flowing between any of the output stages.

5,938,691

9

The processor **46** included in the ICS **12** includes means (**88** and **90**) for selectively controlling the pulse width of the stimulation signals applied to the electrode **48**. Such means preferably comprises a timing circuit capable of turning the stimulus current of a particular channel on and off with a time resolution of approximately one microsecond. Such means is preferably controlled by a command signal separate from the signals which set the current to each stimulus channel; the command signal controls the duration of current stimulus while the previously described signals control the stimulus current in each channel.

Further, the processor **46** included in the ICS **12** includes means for selectively controlling the frequency at which stimulating signals are applied to select ones of the electrodes. This is preferably accomplished by providing a signal frame (or set of signals to the multiplicity of electrodes) of varying length. The use of short frames allows a subset of channels to be refreshed or updated more often than would be possible if all channels were always updated by a fixed, long frame. Such reduced frame length may be implemented either as a frame length encoded in the frame data or (in the preferred implementation) as a unique end of frame signal.

In the processor **46**, the voltage downconverter **58** generates three voltages of different value for powering different components in the ICS **12**. The voltage downconverter may comprise a set of capacitors and switches so arranged to connect the capacitors alternately in series across the high voltage from the regulator **44** input and then in parallel to provide a lower voltage supply (3.5 volts in the preferred implementation). The storage or supply capacitors **60** may be charged to various multiples of the 3.5 volt supply by connecting their associated transfer capacitors to the appropriate points in the downconverter when the downconverter capacitors are connected in series.

The ICS **12** includes means for selectively receiving and responding to analog and/or pulsatile input data from the WP **16**. Preferably, this is accomplished by using the stimulus current control signals to provide continuous analog control of stimulus and using a separate command signal to selectively control the "on" or "off" status of a given channel. The stimulus parameters of each channel are controlled independently of all other channels by means of separate signals within the data frame and separate configuration commands for each channel encoded in the command signal.

Further, the ICS **12** is capable of selectively stimulating the electrodes in a unipolar and/or bipolar configuration. This is accomplished by providing a set of command signals which affect separate bits for each channel. Via the output mode register **86**. Via the output control logic **88**, these bits independently configure the switches for each channel in the electrode switching matrix **66**. The switches allow the current source FET **62** and storage capacitors **60** to be connected to pairs of electrodes (bipolar mode) or, alternatively, to individual electrodes and the indifferent electrode **49** via the indifferent electrode switches **92**.

While FIG. **2** illustrates a basic ICS, FIGS. **3** and **4A–4H** illustrate a preferred form of the ICS. FIG. **3** is a more general block diagram illustration of the system which is represented in greater detail in FIGS. **4A–4H**. The majority of the active circuitry of the ICS may be imbedded in a custom chip which with other active and passive circuitry comprising the ICS may be supported on a substrate. The ICS illustrated in FIGS. **3** and **4A–4H** comprises a receiver **200** for receiving an input signal generated in the WP **16** and transmitted by the headpiece **14**. Preferably, such input is a

10

Manchester-encoded data stream comprising an amplitude-modulated RF signal consisting of a serial sequence of 83 bits representing 9 words of 9 bits each plus a parity bit and an end-of-frame marker. A frame is defined as one such bit sequence and such frames are sent sequentially from the WP to the ICS. The first 8 words of each frame contain the digital amplitude and polarity information for output channels **1** through **8** in that order. The 9th word contains command information for the control of ICS configuration and functionality. The receiver **200** separates the incoming RF signal into a power signal transmitted to a power supply section **202** and data which is transmitted into a data recovery section **201**. In the power supply section, power signals are generated for the ICS and, via a downconverter **203**, are transformed into the voltage levels which provide power for the eight output stages indicated by numbers **212-1** through **212-8**, one of which will be described in greater detail hereinafter.

The data signal extracted by the receiver **200** and transmitted to the data recovery section **201** is further processed within the data recovery section to provide input signals to an initialization and status control section **204**, a polarity and amplitude control section **205**, a command decoder section **206**, and to a multiple chip control **214**. The initialization and status control section **204** receives power from the power supply section **202** and establishes the control conditions of the other sections of the ICS upon system startup and upon detection of a system operating error by the status control section. The polarity and amplitude control section **205** determines the polarity of the output currents generated in the various output stages **212-1** through **212-8** and generates signals which are further processed in a log D-A converter section **207** to control the magnitude of current signals supplied by the outputs of the various output stages. In the command decoder section **206**, the data signals are processed and decoded to form signals which (1) via an output mode register **208** control the status of the output stages as either unipolar or bipolar, (2) via a pulse width control **209** control the width of the output pulses supplied by the output stages when such stages are in a pulsatile mode and (3) via a refresh voltage logic **210** control the power applied to the output stages. In addition, the ICS includes a back telemetry section **211** which in response to signals from the command decoder **206** generates and transmits back to the WP status indicating and power control signals. The status signals indicate the status of the various elements within the ICS and voltages generated therein. The power control signals control the power of the transmitted signals and effect a power conservation by control of the level of the signals from the WP and by control of the refresh voltages from the downconverter **203** to the various output channels.

Still further, the illustrated ICS includes a multiple chip control section **214**. Section **214** enables the chip included in the ICS to act as a "master" having the capacity to drive a plurality of identical "slave" chips mounted on the substrate thereby effecting a multiplication of the number of output stages.

FIGS. **4A–4H**, organized as set forth in FIG. **4**, show details of the various system sections illustrated in FIG. **3**, with subsections of the sections bearing the same numbers as set forth in FIG. **3** and with letters to denote the specific subsections, e.g., **201A**, **201B**, **201C** and **201D** are subsections of the data recovery section **201**. The following detailed description of the sections and subsections comprising the system will begin with the receiver **200** and will continue through a description of the output stages **212-1** through **212-8** and multiple chip control **214** and will be

5,938,691

11

followed by a description of the operation of the system comprising the described sections. Details of the frame structure, data word structure, and/or the transmission rate for the input signal from the WP and data signal extracted therefrom will be included in the description of the operation of the system.

Structure

Receiver 200

The receiver 200 illustrated in FIG. 4A is a conventional AM detector containing capacitors which implement a parallel resonant tuned circuit in conjunction with a main coil 50 followed by series connected power rectification and data detection diodes and energy storage capacitors to generate signals PDATA, NDATA, RAWDC, ZEROV and TANKV. PDATA and NDATA are differential signals generated across the data detection diodes and convey demodulated data to the data recovery section 201. RAWDC is DC voltage generated across the energy storage capacitors and is delivered to the input of a series regulator 202A in the power supply section 202. ZEROV is the reference voltage against which all other voltages are measured in the ICS. TANKV is derived from RAWDC via a resistive divider network in the receiver 200 and, as will be described in greater detail hereinafter, via a telemetry multiplexor 211B in back telemetry section 211 provides one of the power control signals which is an input to the back telemetry section.

Data Recovery 201

The data recovery section comprises four subsections: a data conditioner 201A, a clock decoder 201B, a serial to parallel converter 201C and a word strobe generator 201D. All analog and digital circuitry in the data recovery section 201 is of conventional design.

Within data conditioner 201A, the signals PDATA and NDATA from the receiver 200 provide the two inputs to an analog comparator. The output from the comparator is the signal MANDATA, which is the recovered version of the Manchester-encoded serial data stream transmitted by the WP. MANDATA is distributed to clock decoder 201B, serial to parallel converter 201C, as well as downconverter clock 203A to be discussed hereinafter.

In addition, within data conditioner 201A, the signal MANDATA is applied to the gate of a MOSFET switch which allows an on-chip capacitor to be charged in a pulsatile manner. A constant-current discharge path in parallel with the on-chip capacitor reduces the voltage to zero in the absence of the signal MANDATA. The voltage across the on-chip capacitor is buffered by three inverters to become the carrier detect signal, CARDET. CARDET is distributed to clock decoder 201B and to an initialization subsection 204B of the initialization and status control section 204.

In the clock decoder subsection 201B, the signal MANDATA is applied to an edge-detector circuit comprised of an XOR gate with an RC delay circuit preceding one of the inputs. Output pulses from the edge detector are the primary input to a phase-lock loop (PLL) circuit of conventional design which, by locking to the MANDATA pulse edges, generates the data clock signals CLKPH1 and CLKPH2. The clock signals comprise a two-phase non-overlapping clock system at a frequency of 1.1 MHz with a CLKPH1 pulse asserted during the first half of each bit time and a CLKPH2 pulse during the second half. Signals CLKPH1 and CLKPH2 are sent to the serial to parallel converter 201C, word strobe generator 201D, pulse width control 209 and an A/D converter 211C in back telemetry section 211.

Further, within clock decoder 201B, the timing of pulse edges in the signal MANDATA is compared to those of the

12

local clock VCO in the PLL. In particular, a unique pulse with non-standard edge timing sent by the WP to mark an end-of-frame is sensed by a circuit of conventional design comprised of a D-type flip-flop and an XOR gate. This unique pulse results in the generation of the frame clock signal, PFRMCLK which is sent to serial to parallel converter 201C.

Additional circuitry of conventional design in the clock decoder 201B, comprising logic gates and binary counters, is used to generate a signal PLLLOCK. PLLLOCK is asserted so long as the PLL is locked to the signal MANDATA, CARDET is asserted, and, as will be described relative to a powerbad detector 204A in initialization and status control section 204, POWERBAD is negated. The signal PLLLOCK is sent to serial to parallel converter 201C and to parity error detector and initialization subsections 204C and 204B of section 204.

Serial to parallel converter 201C comprises logic gates, latches, D type flip-flops, counters and a shift register all of conventional design. Under control of the signal CLKPH1 and a signal DCENABLE from multiple chip control section 214, the serial data bits represented in the signal MANDATA are shifted into a 9-bit serial-in, parallel-out shift register. The first stage output of the shift register generates a serial bit stream signal SERDATA. The 9 outputs of the register are the source of the signal bus DATA (1–9) which is sent solely to polarity and amplitude data latch 205A in section 205 and to a command latch 206A in command decoder 206.

In addition, within serial to parallel converter 201C, the signal PFRMCLK is gated with the clock signal CLKPH2 to generate a signal FRMCLK sent to pulse width control section 209 and a refresh voltage logic section 210.

Further, within serial to parallel converter 201C, the signal CLKPH1 is connected to the clock input of a 4-bit binary up-counter which is reset by FRMCLK. The counter and succeeding decoders and latches provide the signals XFERB and XFERC solely to an analog multiplexer 207C included in the log D-A converter section 207. Also, the bit 4 output of the counter is gated with CLKPH1 and CLKPH2 to produce the signal WORDTRCLK (word transfer clock) which provides a reset pulse to the counter as well as being sent to word strobe generator 201D, down converter clock 203A and a polarity and amplitude data latch 205A. The counter is also decoded to generate the signal AMPSYNC which is sent solely to pulse width control 209.

Word strobe generator 201D comprises logic gates, D type flip-flops and a 9-stage Johnson counter of conventional design. The signal WORDTRCLK provides the clock input to the Johnson counter. Signals CLKPH1, CLKPH2, FRMCLK and the output from stage 9 of the Johnson counter are combined to provide the reset signal for the counter. Outputs from the first 8 stages of the counter provide the 8-bit signal bus WSTRB. (1–8) with each line asserted during the appropriate word time during the data frame. WSTRB (1–8) is sent to analog multiplexer 207C, pulse width control 209 and back telemetry section 211. In addition, the output from stage 9 of the Johnson counter provides the signal WORD9CLK which is sent to command latch 206A and command decoder 206B.

Power Supply 202

As depicted in FIG. 4A, the power supply section 202 includes the series regulator 202A which includes a series regulating element such as a depletion-mode FET. In conjunction with a conventional voltage reference 202C and a conventional voltage regulator error amplifier 202B, the series regulator produces a precise negative 14 volts (NEG14) with respect to ZEROV for powering the balance

5,938,691

13

of the ICS. The gate of the series regulating element in the regulator 202A is controlled by a signal REGCONT output from an operational amplifier located in a regulator error amplifier 202B, having as its inputs the output VREF of the voltage reference 202C and an attenuated version of NEG14, i.e., TAP14. The voltage reference 202C includes an off chip zener diode which is powered by the NEG14 line. The precision reference voltage VREF is generated across this zener diode.

Downconverter Section 203

As represented in FIGS. 4A and 4B, the downconverter section 203 comprises a downconverter clock 203A and a voltage downconverter 203B.

The downconverter clock 203A has as its inputs NEG14 and ZEROV from regulator 202A, MANDATA from data conditioner 201A, POWERBAD from powerbad detector 204A and WORDTRCLK from serial to parallel converter 201C and comprises two toggle flip-flops and a two-pole FET selector switch of conventional design. The two toggle flip-flops receive and divide by a factor of four, the signal MANDATA. During startup, since MANDATA is pulsing at 550 KHz, the resulting signal from the toggle flip-flop is a 137.5 KHz signal which is applied to one input of the two-pole FET switch. The other input to the two-pole switch is WORDTRCLK and the state of the switch is controlled by POWERBAD. Since, as will be described, POWERBAD is asserted during ICS startup, the 137.5 KHz signal is delivered as DOWNCLOCK during startup to the voltage down converter 203B whereas a level-shifted version of WORDTRCLK is sent out as DOWNCLOCK during normal ICS operation.

The voltage downconverter 203B comprises conventional logic gates and off-chip capacitors. It receives DC power (NEG14 and ZEROV) from series regulator 202A and a squarewave output signal DOWNCLOCK from the down-converter clock 203A. The squarewave is converted into a two-phase non-overlapping pair of clock signals in a conventional cross-connected logic gate and inverter circuit in the downconverter 203B. The two-phase clock signals drive a set of FET switches which establish the pattern of connections between and among a group of four off-chip capacitors 203-1 through -4.

During phase 1 of the clock signals, the four capacitors are connected in series across the −14 volt supply and each charges to a final value of −3.5 volts. At that time, output voltages of −3.5, −7.0, −10.5 and −14 volts are made available on outputs from the voltage downconverter 203B to each of the eight output stages 212-1 through 212-8 in the ICS, and, in particular, to each of the refresh voltage control subsections 212A included in such output stages.

During phase 2 of the clock signals, the four capacitors are connected in parallel and deliver charge to an off-chip storage capacitor 203-5 which is the source of the −3.5 volt logic supply. Also during phase 2, as a natural result of the parallel connection, the voltages on the four capacitors are equalized in preparation for the return to the series arrangement of the next phase 1.

Initialization and Status Control Section 204

The initialization and status control section 204 consists of digital circuitry and an analog comparator of conventional design to detect errors and to set the internal conditions of system circuitry on system startup and upon error detection by this section. Section 204 is made up of three subsections: a powerbad detector 204A, an initialization subsection 204B, and a parity error detector 204C.

The powerbad detector 204A comprises an analog comparator having the −3.5 volt output from the voltage down-

14

converter 203B presented to one of its inputs. The other input to the comparator is the reference voltage, VREF, coming from power supply section 202. The comparator operates on the −3.5 volts and VREF to generate an output POWERBAD which is asserted when the −3.5 volt supply is below normal operating potential, such as during startup. Thus, during the initial phase of startup, the POWERBAD signal is asserted. The signal POWERBAD is used to force a known logic condition on circuitry within initialization subsection 204B and is also sent to the downconverter clock 203A and to the data recovery section 201 for the same purpose. For example, while POWERBAD is asserted, the output stages 212-1 through 212-8 are disabled. This is accomplished by POWERBAD resetting a flip-flop within 204B to negate a signal OUTENABLE, the assertion of which is required to enable any of the output stages. Then, upon negation of POWERBAD, assertion of CARDET from data conditioner 201A, PLLLOCK from clock decoder 201B and CONNECT from command decoder 206B, the flip-flop is set and OUTENABLE is asserted to enable the output stages 212.

Similarly, and as will be described again hereinafter, the assertion of a signal PALARM from parity error detector 204C will result in a disabling of the output stages 212 via a negation of Outenable. In this regard, parity error check is made at the end of each frame to assure that the total number of "ones" in the data stream to the ICS is even. The parity error detector 204C comprises a combination of logic gates and flip-flops of conventional design and is based on a D type flip-flop which is clocked by the serial bit data stream SERDATA from signal to parallel converter 201C. The state of the flip-flop at the end of the frame indicates whether the received number of one bits was odd or even. The resulting state of the D type flip-flop is then transferred to a holding flip-flop whose output generates the parity error signal PALARM which is connected to the initialization subsection 204B.

Initialization subsection 204B comprises a combination of logic gates of conventional design and receives input signals CARDET from clock decoder 201B; PALARM from parity error detector 204C; DISCON, CONNECT, and ALLZERO from command decoder 206B, PLLLOCK from clock decoder 201B and POWERBAD from POWERBAD detector 204A. CARDET, PALARM, PLLLOCK and POW-ERBAD have been described. The manner in which such input signals DISCON, CONNECT and ALLZERO are generated will be described hereinafter relative to section 206. Output signals generated by the initialization subsection 204B are CARON, OUTENABLE, RESETERR, and SYSRESET. In subsection 204B, the signal CONNECT sets a latch flip-flop to assert the output signal OUTENABLE at pulse width control 209. Input signals DISCON and ALLZ-ERO are combined in logic gates within subsection 204B to generate the output RESETERR which goes from 204B to parity error detector 204C to reset the parity error detector flip-flop. Signals PALARM, DISCON, ALLZERO, PLLLOCK and POWERBAD are combined in logic gates within 204B such that when any of these signals indicate a problem, a disconnect command output signal SYSRESET is generated and functions as a general reset signal for all the circuitry in the ICS. In this regard, SYSRESET, when asserted will reset the ICS circuitry to its initial state ready for restart in response to system startup data from the WP. Signals CARDET and PLLLOCK asserted and signals POWERBAD and PALARM not asserted combine in gates in 204B to generate the output signal CARON. CARON goes off-chip to turn on the back telemetry carrier signal, at

5,938,691

**15**

a telemetry transmitter **211**E of the back telemetry section **211**. As will be described hereinafter, the absence of the back telemetry carrier signal is detected in the WP as an indication of a system defect in the ICS. The WP will initiate a restart of the ICS and will continue in that mode until the back telemetry carrier signal is again detected.

Polarity and Amplitude Data Latch Section **205**

The polarity and amplitude data latch section **205** comprises amplitude data latch **205**A and a zero current control **205**B. The latch **205**A consists of a conventional 9-bit latch which receives data bit inputs from a 9-bit bus DATA (**1–9**) from the serial to parallel converter **201**C in addition to WORDTRCLK also generated in **201**C. WORDTRCLK causes the input data bits DATA (**1–9**) to be latched and then held until replaced by a new set of incoming data. Output from the 9-bit latch consists of an 8-bit wide data bus signal AMPDATA (**1–8**) and a 9th bit defining a single line POLARITY which goes directly to output stages **212-1** through **212-8**. AMPDATA (**1–8**) goes from latch **205**A to the zero current control **205**B and to the logarithmic D-A converter in section **207**, and as described more specifically hereinafter, to the internal subsection **207**B.

The zero current control **205**B comprises logic gates of conventional design. The signal bus AMPDATA (**1–8**) from amplitude data latch **205**A is decoded in an 8 input gate such that the output of the gate is asserted only when all 8 bits are at logic 0. This corresponds to a requested output current amplitude of zero. The signal POLARITY from the latch **205**A is combined with AMPDATA (**1–8**) to generate two (2) complimentary output signals ZERO and SHORT. SHORT is asserted when AMPDATA (**1–8**) is all zeroes and POLARITY is 1 and, conversely, ZERO is asserted when AMP-DATA (**1–8**) is all zeroes and POLARITY is 0 (zero).

Command Decoder **206**

The command decoder section **206** comprises digital logic circuitry of conventional design and consists of two subsections: command latch **206**A and command decoder **206**B. The command latch **206**A is similar to latch **205**A discussed above in that it is a 9-bit latch with input data coming from the 9-bit bus DATA (**1–9**) from serial to parallel converter **201**C. In command latch **206**A, DATA (**1–9**) is caused to be latched by signal WRD9CLK from the word strobe generator **201**D to develop a 9-bit bus WORD9 (**1–9**) output which is maintained until replaced by a new ninth word command. WORD9 (**1–9**) connects directly to the command decoder **206**B which consists of logic gates to decode the various functions from the 9-bit combinations on the output bus. The following table depicts the content of WORD9 and the outputs generated by the various function codes contained in bits **6–8** of WORD9.

TABLE 1

| 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|
| Function code | | | Value C   B   A | | | Channel Number | | |



| Func. Code | Outputs | Description |
|---|---|---|
| 000 | ALLZERO, DISCON, CONNECT | global control |
| 001 | FUNC2 | output control |
| 011 | FUNC4 | normal back telemetry read |
| 100 | FUNC5 | inverted back telemetry read |

**16**

TABLE 1-continued

| 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|
| Function code | | | Value C   B   A | | | Channel Number | | |

| Func. Code | Outputs | Description |
|---|---|---|
| 110 | FUNC7 | refresh voltage control |
| 111 | FUNC8 | output pulse width control |

In addition, command decoder **206**B receives input signals RFMAIN from refresh voltage logic **210**, PFMAIN from pulse width control **209** and WORD9CLK and WSTRB1 from the word strobe generator **201**D. Output signals from **206**B which exit the command decoder **206** consist of logic gate output signals CONNECT, DISCON, ALLZERO, FUNC2, FUNC4, FUNC5, FUNC7 and FUNC8.

As previously described, the signals CONNECT, DISCON and ALLZERO exiting the command decoder **206** provide inputs into the initialization section **204**. FUNC2 through FUNC8 are function decodes which provide inputs to the various sections which they control on a command basis. The signal FUNC2 is the primary enabling signal going from the command decoder to the output mode register **208**. Signals FUNC4 and FUNC5 are connected directly to the back telemetry section **211** (telemetry function decoder **211**A and A/D converter **211**C) to control its function. FUNC7 is directly and solely connected to the refresh voltage logic **210** to provide enabling for the refresh voltage control portion. FUNC8 is connected directly and solely to pulse width control **209** to enable that function to take place.

Logarithmic D/A Converter **207**

The logarithmic D/A converter section **207** consists of conventional analog and digital circuitry, with the exception of a logarithmic D/A converter subsection **207**B which is the subject of U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as this invention. The logarithmic D/A converter **207** consists of three subsections: a current reference generator **207**A, the logarithmic D/A converter subsection **207**B, and an analog multiplexer **207**C. The current reference generator **207**A receives a voltage input VREF from the voltage reference **202**C and utilizes that reference voltage to generate reference output current signals ADIREF and IREF. ADIREF is a fixed current supply to A/D converter **211**C while IREF provides the input current to the logarithmic D/A converter **207**B which includes multiplicative stages of current mirrors controlled by the 8-bit data bus AMPDATA (**1–8**) from the data latch **205**A. Output signals from the logarithmic D/A converter subsection **207**B are control voltages IPOSCON and INEG-CON connected to the analog multiplexer subsection **207**C. The multiplexer is controlled by signals XFERB and XFERC from the serial to parallel converter **201**C and an 8-bit bus signal WSTRB (**1–8**) from the word strobe generator **201**D. Outputs from the analog multiplexer are distributed to, and control, each of the current sources **212**B in the eight output circuits **212-1** through **212-8** as signals IPOS (**1–8**) and INEG (**1–8**). Thus, the output current from each of the eight output stages **212-1** through **212-8** are controlled individually, separately and sequentially.

Output Mode Register **208**

The output mode register **208** contains 24 transparent latches of conventional design arranged in 3 banks of 8

5,938,691

17

latches each. The 8 latches in the first bank give rise to an 8-bit bus AMONO (1–8) and likewise the remaining 2 banks generate bus signals BMONO (1–8) and DRC (1–8). AMONO(1), BMONO(1) and DRC(1) connect to output stage 212-1 and the rest of the bus signals are distributed to the other 7 output stages in a like manner.

Only upon assertion of function code signal FUNC2 from command decoder 206B can the bit pattern in the latches of the register 208 be modified. More particularly, under control of pulse signal WSTRB1 from word strobe generator 201D, the low-order 3 bits of the 9-bit bus signal WORD9 (1–9) from the command latch 206A are decoded in a conventional 3-to-8 decoder. The decoder has each of its 8 output lines connected to and selectively enabling one latch in the same position in each of the three banks comprising the register 208 to effect a selective modification of the bit pattern in the register according to the pattern of the low order 3 bits. The middle 3 bits of WORD9 (1–9) are each connected to a single one of the 3 banks and enable the data inputs to all 8 latches in each of the three banks comprising 208. The high-order 3 bits in WORD9 (1–9) are not used in section 208.

Pulse Width Control Section 209

The pulse width control section 209 comprises logic gates, latches, D type flip-flops, counters and decoders of conventional design. The signals FUNC8 from command decoder 206B in conjunction with FRMCLK, CLKPH1 and CLKPH2 enables the operation of this section and causes the contents of two sequential 9th words to be latched from the bus signal WORD9 (1–9) into one of two buffers under control of a bit 5 in the first WORD9. The contents of the two WORD9 commands are diagrammed below:

TABLE 2

| | | WORD9 | | |
|---|---|---|---|---|
| First WORD9 | 876 | 5 | 43 | 210 |
| | 111 | E | FF | CCC |
| Second WORD9 | 8 | 7 | 6543210 | |
| | X | D | NNNNNNN | |

E—EDGE CONTROL BUFFER NUMBER [0,1]
FF—EDGE EXECUTION FRAME NUMBER [00,01,10,11]
CCC—CHANNEL NUMBER [000–111 = CH1–CH8]
X—DON'T CARE
D—DIRECTION OF EDGE [0 = ON TO OFF, 1 = OFF TO ON]
NNNNNNN—COUNT TO OCCURRENCE OF EDGE [0–84]

As depicted in Table 2, requested stimulus output pulse edges will occur at the bit time specified in second WORD9 bits 0–6 above, during the frame time according to the command specified in the first WORD9 bits 3 and 4. This is accomplished by using such data bits to preset two down-counters which are decremented by the signal CLKPH1 from the clock decoder 201B and FRMCLK from the serial to parallel converter 201C respectively. Channel select bits 0–2 in the first WORD9 are latched and decoded to allow the passing of edge information only to the requested output channel as represented in the 8-bit signal bus PWC (1–8). The signal OUTENABLE from initialization 204B is gated with all bits of PWC (1–8) and must be asserted to enable any PWC (1–8) line to be asserted. Assertion of at least one PWC line is required for any stimulation signal to occur (see Table 6 herein).

Refresh Voltage Logic Section 210

Refresh voltage logic 210 comprises logic gates and latches of conventional design. The signal bus WORD9

18

(1–9) is gated into 8 pairs of such latches. The outputs from each one of each pair of latches is represented as one line in each of the two output bus signals RV0 (1–8) and RV1 (1–8) which are sent to a refresh voltage control 212A included in each of the output stages in section 212.

Since at least 16 bits are required to establish 4 possible refresh voltage levels across 8 channels, the refresh system is controlled by 2 consecutive 9th word commands of 9 bits each. The format of these 2 command words is shown below:

TABLE 3

| | | | Word9 | | |
|---|---|---|---|---|---|
| First WORD9 | 876 | 5 | 43 | 21 | 0 |
| | 110 | stage 1/2 select | stage 1/2 RV | stage 3 RV | stage 4 RV |
| Second WORD9 | 8 | 76 | 54 | 32 | 10 |
| | stage 4 RV | stage 5 RV | stage 6 RV | stage 7 RV | stage 8 RV |

As depicted in Table 3 above, the first WORD9 consists of the function code for refresh voltage control (110 in bits 8–6), a stage 1 or 2 select code (bit 5: 1=stage 1, 0=stage 2) which determines whether stage 1 or stage 2 will be updated at this time, the stage 1 or 2 refresh voltage level code RV (bits 3 and 4), the stage 3 refresh level code (bits 1 and 2) and the high-order bit of the refresh level code for stage 4. The second WORD9 also consists of 9 bits with bit 8 representing the low-order bit of the refresh level code for stage 4 and the remaining 8 bits representing the 2-bit refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two separate double WORD9 refresh voltage commands. The 2-bit RV codes and the refresh voltage levels associated with them are shown below:

| | Code | |
|---|---|---|
| RV1 | RV0 | refresh voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

Backtelemetry Section 211

The backtelemetry section 211 comprises telemetry function decoder 211A, a telemetry multiplexer 211B, an A/D converter 211C, a telemetry modulator 211D and a telemetry transmitter 211E.

Decoder 211A comprises logic gates, latches and decoders of conventional design receiving as inputs WSTRB (1–8), WORD9 (1–9), FUNC4 and FUNC5. Within decoder 211A signals WSTRB8 and WSTRB1 are combined to create signal WSTRB9 which is asserted from the end of WSTRB8 until the beginning of WSTRB1 and sent to the A/D converter 211C and telemetry modulator 211D. Signals FUNC4 and FUNC5 are the primary activation signals for decoder 211A and cause the 6 low-order bits in the input bus signal WORD9 (1–9) to be latched, decoded and gated to control output signals applied to: indifferent electrode switch 212D (IECLOSE); bus MUXCTRL (1-23); and lines iden-

5,938,691

19

tified as VRTPWR, RLOCTRL and RHICTRL (to telemetry multiplexer 211B), ADPWR, and SH2X1, SH2X3, SH2X10 and SH1X10 (to A/D converter 211C) to control functions in subsections 211B and 211C as shown in the tables below:

### TABLE 4A

| Six low order bits | | |
|---|---|---|
| WORD9 543 210 | Output Signal from 211A | Description of Function Activated in MUX 211B |
| 001 000 | MUXCTRL1 | VOUTA1 vs VOUTB1 |
| 001 001 | MUXCTRL2 | VOUTA2 vs VOUTB2 |
| 001 010 | MUXCTRL3 | VOUTA3 vs VOUTB3 |
| 001 011 | MUXCTRL4 | VOUTA4 vs VOUTB4 |
| 001 100 | MUXCTRL5 | VOUTA5 vs VOUTB5 |
| 001 101 | MUXCTRL6 | VOUTA6 vs VOUTB6 |
| 001 110 | MUXCTRL7 | VOUTA7 vs VOUTB7 |
| 001 111 | MUXCTRL8 | VOUTA8 vs VOUTB8 |
| 010 000 | MUXCTRL9 | ICP1 vs NRV__1 |
| 010 001 | MUXCTRL10 | ICP2 vs NRV2 |
| 010 010 | MUXCTRL11 | ICP3 vs NRV3 |
| 010 011 | MUXCTRL12 | ICP4 vs NRV4 |
| 010 100 | MUXCTRL13 | ICP5 vs NRV5 |
| 010 101 | MUXCTRL14 | ICP6 vs NRV6 |
| 010 110 | MUXCTRL15 | ICP7 vs NRV7 |
| 010 111 | MUXCTRL16 | ICP8 vs NRV8 |
| 011 XXX | RLOCTRL | Output current monitor, high range |
| 100 XXX | RHICTRL | Output current monitor, low range |
| 101 000 | MUXCTRL17 | ZEROV vs ZEROV |
| 101 001 | MUXCTRL18 | ZEROV vs 3.5 |
| 101 010 | MUXCTRL19 | ZEROV vs VREF |
| 101 111 | MUXCTRL20 | EXTP vs EXTN |
| 101 100 | MUXCTRL21 | ZEROV vs TAP14 |
| 101 101 | MUXCTRL22 | NEG14 vs TANKV |
| 101 110 | MUXCTRL23 | ZEROV vs VRTV (int. voltage) |
| 101 111 | | no operation |

### TABLE 4B

| Six low order bits | | |
|---|---|---|
| WORD9 543 210 | Output Signal from 211A | Description of Function Activated in A/D Converter 211C |
| 111 000 | SH2 × 1 | set gain to × 1 (default) |
| 111 001 | SH2 × 1,3 | set gain to × 3 |
| 111 010 | SH2 × 1,10 | set gain to × 10 |
| 111 011 | | no operation |
| 111 100 | SH1 × 10,SH2 × 1 | set gain to × 10 (redundant) |
| 111 101 | SH1 × 10,SH2 × 3 | set gain to × 30 |
| 111 110 | SH1 × 10,SH2 × 10 | set gain to × 100 |
| 111 111 | | no operation |

### TABLE 4C

| Six Low Order Bits | Description of Function Activated in 211B,C,D | | |
|---|---|---|---|
| 543 210 | IECLOSE | VRTPWR | ADPWR |
| 110 000 | open | off | off |
| 110 001 | open | off | on |
| 110 010 invalid state | | | |
| 110 011 | open | on | on |
| 110 100 | closed | off | off |
| 110 101 | closed | off | on |
| 110 110 invalid state | | | |
| 110 111 | closed | on | on |

The telemetry multiplexer subsection (telemetry MUX 211B) comprises 25 level shifters connected to 25 pairs of transmission-gates of conventional design which allow one and only one pair of MUX input signals to be connected to the pair of output lines, MUXOUT+ and MUXOUT−. This

20

pair of output lines convey the differential signal to be measured and are connected to the A/D converter 211C.

A/D converter 211C comprises logic gates, level shifters, transmission-gates, switched capacitor amplifiers and comparators of conventional design arranged in 2 stages. The first stage has a default gain of 1 and can be changed to a gain of 10 by signal SH1X10. The second stage has selectable gains of 1, 3 or 10 as set by signals SH2X1, SH2X3 and SH2X10, respectively. Signal ADPWR from decoder 211A is used to turn on operating power to the amplifiers and the comparator in subsection 211C only when back telemetry has been requested by the WP WORD9 commands. This manner of operation is power-conservative.

In addition, in the converter 211C signals FUNC4 and FUNC5 are connected to the set and reset inputs of a flip-flop which has as its Q output a signal NORMPOL. Assertion of FUNC4 results in NORMPOL true and assertion of FUNC5 causes negation of NORMPOL. Within the converter 211C, NORMPOL is used to direct the converter to take a normal or inverted sample of the signal presented to it via the telemetry MUX 211B. In addition, NORMPOL is sent to the telemetry modulator 211D.

Further, in converter 211C, the signals WSTRB (1–8) from the word strobe generator 201D and WSTRB9 from telemetry function decoder 211A are combined in logic gates and level shifters to generate a multiphase clock for controlling switch timing in a switched capacitor amplifier circuit which samples, holds and conditions the voltage to be measured. A reference level for the samples is established by signal VREF.

More particularly, the voltage sample is delivered to a single-slope A/D converter of conventional design which comprises a comparator along with a ramp generator. The ramp generator uses the fixed current ADIREF to charge an on-chip capacitor. The comparator senses equality of the ramp voltage and the sample voltage, terminating the conversion cycle and causing the contents of a 6-bit counter driven by the signal CLKPH1 to be latched. The 6-bit latch output is the bus signal ADCOUNT (1–6) which is sent to telemetry modulator 211D.

Subsection 211D comprises 7 tri-state buffers of conventional design. The 7 buffers are connected to the output line DATAOUT and represent the 6 bits resulting from the A/D conversion plus a 7th bit which indicates polarity. The 7 bits are placed on the common output line DATAOUT in a sequence controlled by WSTRB (2–8) following a logic 1 sent during the WSTRB1 on-time and preceding a logic 0 sent during the WSTRB9 on-time. Thus, 9 bits are conveyed to a conventional off-chip telemetry transmitter 211E and thence to the WP in synchrony with one full data frame sent to the ICS by the WP. As previously described, the transmitter 211E is enabled for such transmission by the signal CARON from initialization 204B.

Output Stages 212—1 through 8

Output stages 1–8, section 212 (1–8), comprise 8 identical circuits. The table below summarizes the electrical connections to the output stages 1–8 comprising single lines connected to all 8 stages in parallel as well as 8-lines buses with an individual line connected to each of output stages 1–8.

5,938,691

21

### TABLE 5

#### SUMMARY OF CONNECTIONS TO OUTPUT STAGES 1 THROUGH 8

| Single lines connected to all eight stages in parallel: | 8 line buses with 1 line connected to each output stage 1 through 8: |
|---|---|
| Zero V | RV0 (1–8) |
| –14 V | RV1 (1–8) |
| –10.5 V | IPos (1–8) |
| –7 V | INEG (1–8) |
| DCLKPH1 | PWC (1–8) |
| DCLKPH2 | AMONO (1–8) |
| ZERO | BMONO (1–8) |
| SHORT | DRC (1–8) |
| POLARITY | OUTA (1–8) |
| INDCOM | OUTB (1–8) |
| | VOUTA (1–8) |
| | VOUTB (1–8) |
| | 1CP (1–8) |
| | NRV (1–8) |

Output stage 1 will be discussed below as representative of all 8 stages. Output stage 1, section 212-1, comprises a refresh voltage control 212A, a current source 212B, an electrode switching matrix 212C and an indifferent electrode switch 212D. The refresh voltage control 212A comprises a conventional switching matrix, like the matrix 212C, in addition to level shifters connected to input circuitry to distribute two different logic levels defined by –3.5 and –14 volts within the refresh voltage control 212A and to the circuits that communicate with the refresh voltage control. As indicated, inputs to the refresh voltage control 212A include the 4 power supply voltage levels (–14V, –10.5V, –7.0V, –3.5V) along with signals DCLKPH1 and DCLKPH2 from the downconverter 203B. Signals RV1 and RV0 from the refresh control logic 210 provide a 2-bit code to logic gates connected to an intermediate charge storage device for the output stage 1, comprising "flying" capacitor CF1. Signals RV0 and RV1 operate on the logic gates to select one of the four power supply voltages to charge CF1 during assertion of signal DCLKPH1. During assertion of signal DCLKPH2, capacitor CF1 is disconnected from the selected power supply voltage and is connected in parallel with and transfers charge to a capacitor CRV1 via lines PRV1 and NRV1. Such switched capacitor circuitry impresses the voltage of CF1 on storage capacitor CRV1. CRV1 then functions as a floating power source for output stage 1. In this regard, it is the use of the intermediate charge storage device, CF1, alternately connected to the power supply voltages and to CRV1 of output stage 1, that provides electrical isolation for the output stage 1.

As previously described with respect to Refresh Voltage Logic Section 210, more than 9 bits are required to specify which one of the four refresh voltages is to be selected for each of the 8 isolated output stages. Therefore, two ninth-word commands are issued by the WP in two frames in sequence, processed in the ICS, and produce two WORD9 commands from command latch 206A. To control the refresh voltage for Stage 1, the first WORD9 command consists of the refresh voltage function control 110 in bits 8–6, a stage 1 select code 1 in bit 5, a stage 1 refresh voltage level code in bits 3 and 4, a stage 3 refresh level code in bits 1 and 2 and a high-order bit of the refresh level code for stage 4. The second WORD9 command includes the refresh level codes for stages 5 through 8. Note that bits 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two 2-word refresh voltage commands. The

22

2-bit refresh voltage level codes for stage 1 in bits 3 and 4 of the first WORD9 (RV1 and RVO) and the refresh levels associated therewith are shown below:

| Code | | |
|---|---|---|
| RV1 | RV0 | refresh voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

The refresh voltage control 212A has a pair of input latches to hold the 2-bit level codes. The latches are always reset to the 00 (–14 volt) state at startup by the startup reset signal SYSRESET from the initialization section 204B and remain in that condition unless overwritten by a refresh voltage command. Thus, the highest available source voltage is automatically selected for all channels. However, the source voltage can be reduced on a channel-by-channel basis as indicated by back-telemetry data related to the power required for each channel. Such reduction of the source voltage will minimize power dissipation in the current source 212B in the affected output stage and thereby reduce power dissipation in the ICS 12.

Within current source 212B, power signal NRV1 from refresh voltage control 212A is connected to the source of a conventional MOSFET device comprising the current source. Connected to the drain of the MOSFET device is the output line –IN1 which connects to the electrode switching matrix 212C and is one line of the signal bus ICP (1–8) connected to the telemetry MUX 211B. Similarly, signal NRV1 is one line of the signal bus NRV (1–8) also connected to subsection 211B.

The gate-to-source voltage of the MOSFET device is controlled by signals IPOS1 and INEG1 respectively from analog multiplexer 207C, with such signals being applied to the device through transmission gates in the analog multiplexer controlled by signals XFERB and XFERC from converter 2D1C. The gate-to-source voltage so applied in a periodic manner is stored in a capacitor associated with the gate of the MOSFET device and remains operative between the refresh episodes. The refresh episodes are sequentially distributed across all 8 output stages in a non-overlapping manner so that only one current source 212B is connected via multiplexer 207C to the ICS circuitry at any time. The seven non-selected current sources are isolated from each other and the rest of the ICS circuitry by the off-resistance of the transmission gates in multiplexer 207C.

Electrode switching matrix 212C is the final subsection leading to the output coupling capacitors CA1 and CB1 which are connected to the stimulating electrodes. The circuitry in this subsection comprises logic gates, transmission gates, latches and level shifters of conventional design. Electrical isolation of the output stage is maintained in the switching matrix 212C since the various control signals for the matrix are applied only to the gates of MOSFET devices which comprise the transmission gates and which directly control the functions described hereinafter.

In particular, two transmission gates are connected between the signal lines +IN1 and –IN1 upon their entry into the matrix 212C. One of the transmission gates is of low on-resistance and is latched by the signal SHORT from the zero current control 205B. The other transmission gate is a high on-resistance device which is turned on by the signal DRC1 from the output mode register 208.

Signals +IN1 and –IN1 are connected to outputs OUTA1, OUTB1, VOUTA1, VOUTB1 and INDCOM via 10 trans-

5,938,691

23

mission gates in the matrix 212C. The transmission gates are controlled by logic gates driven by input signals AMONO1 and BMONO1 from the output mode register 208, PWC1 from pulse width control 209 and POLARITY from amplitude data latch 205A. The connection patterns are shown in the table below.

24

where n is the number of slave chips and 1 represents the frame associated with the master chip. Note that each standard frame included in the long frame comprises an end of frame pulse (depicted in black) and that the long frame is terminated in a unique marker that signals the end of the long frame. Thus in multiple chip operation, the format of

TABLE 6

| | | | CONNECTION | | | PATTERN | | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|
| | | | CONNECT TO | CONNECT TO | CONNECT TO | CONNECT TO | CONNECT TO | OF CONNECTION |
| INPUT SIGNALS | | | OUTA1 | OUTB1 | INDCOM | VOUTA1 | VOUTB1 | |
| AMONO1 | BMONO1 | PWC1 | POLARITY | | | | | PATTERN |
| 0 | 0 | 1 | 1 | +IN1 | −IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR NORMAL |
| 0 | 0 | 1 | 0 | −IN1 | +IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR INVERT |
| 1 | 0 | 1 | 1 | +IN | NONE | −IN | OUTA1 | INDCOM | MONOA NORMAL |
| 1 | 0 | 1 | 0 | −IN | NONE | +IN | OUTA1 | INDCOM | MONOA INVERT |
| 0 | 1 | 1 | 1 | NONE | +IN1 | −IN | OUTB1 | INDCOM | MONOB NORMAL |
| 0 | 1 | 1 | 0 | NONE | −IN1 | +IN | OUTB1 | INDCOM | MONOB INVERT |
| 1 | 1 | X | X | NONE | NONE | NONE | OUTA1 | OUTB1 | DISCONNECT |
| X | X | 0 | X | NONE | NONE | NONE | X | X | DISCONNECT |

Please note that selection of any monopolar mode will eliminate the electrical isolation of that particular output stage via the common connection to INDCOM.

Bus signals VOUTA (1–8) and VOUTB (1–8) from the matrix 212C, ICP (1–8) from current source 212B and NRV (1–8) from refresh voltage control 212A are all connected to the telemetry multiplexer 211B as previously described. Output line INDCOM from the matrix 212C is connected to the indifferent electrode switch 212D.

Within the switch 212D, the signals OUTENABLE from initialization 204B and IECLOSE, RLOCTRL and RHIC-TRL from telemetry function decoder 211A control the connection between INDCOM and the indifferent electrode via line INDELEC. Assertion of OUTENABLE and IECLOSE activates a transmission gate within the switch 212D which then connects INDCOM directly to INDELEC. Further, assertion of RLOCTRL or RHICTRL from telemetry function decoder 211A places off-chip resistor RLO or RHI, respectively, in a series connection between INDCOM and INDELEC. Stimulus current flowing through the selected resistor generates the voltage output signal ILO or IHI with respect to INDELEC. Such signal is proportional to stimulus current in the monopolar mode and is sent to telemetry MUX 211B.

Multiple Chip Control 214

In the preferred embodiments thus far described, the ICS comprises a single chip. However, multiple chips of the same or similar circuitry may be usefully employed in a human tissue stimulator. In such an embodiment, a circuit 214 at the input of each chip permits the interconnection of several chips into one functional unit by making one of the chips a master device which receives data and clock signals and then distributes such signals to all the slave chips. In this manner a large number of chips may be connected together forming a system with a large number of output channels, e.g., 16 monopolar channels times the number of chips. Such an embodiment, for example, with two chips, one master and one slave, provides twice the number of channels and requires twice the number of words per frame. In such an embodiment, a total of 18 words per frame instead of the basic 9 words per frame is required since the two chips are in series.

FIG. 5A depicts a long data frame for multiple chip operation including n+1 standard frames per long frame,

the data transmission is extended by one level. A set of data consists of bits, words, and standard frames embedded in a long frame. As in the regular operation of an ICS previously described, one word consists of 9 bits and one frame consists of 9 words. However, one long frame consists of as many frames as there are chips participating in the multiple chip operation. The beginning (or end) of a long frame is defined by a long frame pulse that has a duration of two regular frame pulses.

An example of multiple chip system is set forth in FIG. 5B having a master chip and n slave chips. Each chip includes a multiple chip control circuit (214, 214-S1 to 214-Sn). As shown in FIG. 4E, chip control 214 has inputs PFRMCLK from the clock decoder 201B, RFMAIN from refresh voltage logic 210, PFMAIN from the pulse width control 209, a preset master/slave input M/S ("1" for the master chip and "0" for all slave chips) and open input leads DIN and ECLK. The control 214 outputs going off-chip include PFRMCLK (for connection to each of the inputs ECLK of the slave chips) and DCENABLE (for a control signal applied to the serial to parallel converter 201C). The chip control 214 in each slave chip includes the same input and output lines. However, each line ECLK is connected to receive the signal PFRMCLK from the master chip, each line PFRMCLK is open and each line DIN is connected to DCENABLE of the preceding chip.

Basically each chip control includes a conventional gate flip-flop. In the chip control 214, the gated flip-flop is preset by M/S=1 and changes state to develop the control signal DCENABLE upon receipt of PFRMCLK (indicative of the long frame marker when in multiple mode operation and indicative of standard end of frame pulse during regular single chip operation). As previously discussed, DCEN-ABLE enables control of 201C to develop DATA (1–9) from MANDATA and hence the processing of input data from the WP by the ICS. In multiple chip operation, as depicted in FIG. 5B, DCENABLE from chip control 214 is applied to input DIN of chip control 214-S1. This effects a preset of the flip-flop in 214-S1, which will change state to develop a control signal DCENABLE for output to the chip control 214-S2 at its DIN input upon receipt of the next PFRMCLK at the ECLK input of 214-S1. DCENABLE developed within 214-S1 is applied to the serial to parallel converter 201C in the ICS of the Slave 1 chip to enable

5,938,691

25                                                      26

processing of data from the WP by that ICS. This process is repeated in sequence for each slave chip. From slave n chip, DCENABLE is fed back to the DIN input of the master chip to complete the ring.

Thus, in the multiple chip operation, the flip-flops in each chip control are ganged together such that the output DCEN-ABLE of the master chip feeds into the DIN input of the next slave flip-flop and the DCENABLE output of the next slave chip feeds into the DIN input of the following slave flip-flop and so on until the DCENABLE of the last chip feeds into DIN input of the master chip flip-flop. In this way, the flip-flops form a ring-type shift register.

The multiple chip operation also allows for short frames and short-long frames. With an early application of a long frame pulse or marker, the long frame can be shortened. Further, when WORD9 commands requiring more than one frame for loading and execution are in process, the frame pulse may be inhibited as a clock pulse for the flip-flops until the WORD9 command is fully executed.

Having described each section and subsection of the ICS of FIG. 4, the following is a description of the general operation of the ICS.

System Operation

(a) Power Supply

The ICS has no internal power source and, therefore, is completely dependent for power from an outside source, that is, power radiated by the antenna connected to the wearable processor WP. The magnetic portion of that radiated field is received by the ICS and converted into two types of signals. One is the power supply for the balance of the implantable system and the second is the data stream which contains the commands which control the behavior of the ICS. The data stream coming from WP is a 50% duty cycle amplitude-modulated signal. The modulated carrier is converted to RAWDC power in receiver 200. The DC power, RAWDC, is passed to series regulator 202A and its associated circuitry to generate a regulated negative 14 volts, NEG14, which is the primary power supply for the ICS. The primary power is further operated on to create various voltage levels for the balance of the circuitry. The principal derived power supply is the output from the downconverter 203B, which is the –3.5 volt line, used to power much of the logic circuitry within the ICS. Also derived are –7 volts, –10.5 volts, and the original –14 volts, which are supplied to the output circuits, of which there are 8. Each output circuit utilizes one of 4 different levels of refresh voltages, which can be selected according to requirements for stimulation output of a given channel in the ICS. In addition, the –14 volt supply is used to power much of the ICS analog circuitry to provide rail to rail operation, where the rails are defined by the –14V line and the ZEROV line. ZEROV is common to all the circuitry, except for the isolated output stages, and is the logic true or logic one level for all the logic circuitry. The zero or false logic level is –3.5V or –14V, depending on the power supply for a particular logic section.

The signals TANKV from receiver 200 and TAP14 from regulator 202A are resistively-divided representations of RAWDC and NEG14, respectively. As indicated at telemetry MUX 211B, TANKV and TAP14 are applied to the back telemetry system so that closed loop control of the incoming DC power to the ICS can be maintained. In particular, during startup, the microprocessor in the WP sets the transmit power to a level sufficient to insure proper operation of the ICS (see FIG. 1 and related text). Then, during operation of the ICS, TANKV and TAP14 are telemetered back to the WP for processing. Depending upon the magnitude of the difference between TANKV and TAP14, that is the voltage

drop across the series regulator 202A, the transmit power of WP can be reduced by operation of the microprocessor. Preferably, the power transmitted to the ICS is just sufficient for normal operation, thereby conserving power drawn from the WP and its batteries.

(b) Initialization

As previously described, the WP startup procedure comprises transmission of a data stream of alternating ones and zeros. Simultaneously, the series regulator 202A output NEG14 ramps from 0 to –14 volts with respect to ZEROV and the receiver develops outputs PDATA and NDATA at half the standard bit transmission rate (550 KHz) to data conditioner 201A. Within 201A, PDATA and NDATA result in the signal MANDATA which is transmitted to downconverter clock 203A, clock decoder 201B and serial to parallel converter 201C. Within downconverter clock 203A, MAN-DATA is divided by four in passing through two toggle flip-flops. The resulting 137.5 KHz signal is applied to one input to a two-pole FET selector switch, the other input comprising WORDTRCLK from serial to parallel converter 201C. The state of the switch is controlled by POWERBAD, which is asserted during system startup to cause the switch to transmit the 137.5 KHz signal. Thus the 137.5 KHz signal is selected as the clock signal for the voltage downconverter 203B during startup operation of the ICS whereas a level-shifted version (–3.5 to –14V) of WORDTRCLK (122 KHz) from converter 201C is selected during normal operation of the ICS (DOWNCLOCK).

Also during initial startup, the powerbad detector 204A asserts POWERBAD from just after the start of transmission until the –3.5 volt power supply reaches about –3.3 volts. As previously described, POWERBAD drives the reset of logic circuitry in many parts of the ICS and also forces the output stages 212 to be off so that no stimulus can be presented until proper functioning of the ICS is determined. This is accomplished by POWERBAD resetting a flip-flop within 204B to OUTENABLE, the assertion of which is required to enable the output stages 212. Then, upon a negation of POWERBAD, assertion of CARDET from clock decoder 201B and assertion of CONNECT and PLLLOCK from command decoder 206B, the flip-flop is set and OUTEN-ABLE is asserted to enable the output stages 212. Similarly, the assertion of PALARM from parity error detector 204C results in a disabling of the output stages 212 via a negation of OUTENABLE.

In addition, during power-up of the ICS, the carrier of the back telemetry transmitter section 211 is turned on and the turning on of that carrier is sensed by the WP and indicates normal operation of the ICS. Such turning on of the carrier is accomplished by assertion of CARON from 204B. As previously described, CARON is generated only when signals CARDET and PLLLOCK asserted and signal POW-ERBAD and PALARM not asserted are combined in gates in 204B to indicate proper operation of the ICS. From 204B, CARON goes off chip to turn on the back telemetry carrier signal at a telemetry transmitter 211E of the back telemetry section 211, the back telemetry section being off-chip. If at any time any of the signals CARDET, PLLLOCK, POW-ERBAD or PALARM changes to a different state indicative of a problem condition, CARON will be negated and the back telemetry carrier will be turned off. Thus, if at any time the WP no longer detects the back telemetry carrier from the ICS, we assume that improper operation is in progress. The microprocessor in the WP halts data transmission and begins the above described startup procedure which should then result in detection of the back telemetry carrier from the ICS.

Following this initial handshake between the WP and the ICS, a series of patient-specific parameters which have been

5,938,691

27

embedded in the WP via a clinician's programmer will be sent into the ICS. Once all such parameters are set up, the electrode outputs will be connected and stimulation will commence. This is accomplished via a WORD9 command to assert the command line CONNECT from the command decoder 206B followed by assertion of the OUTENABLE line from the initialization section, 204B. Assertion of OUTENABLE will enable an output from Pulse Width Control 209 [PWC (1–8)] which in matrix 212C will connect the electrode outputs (see table 6 herein). Conversely, the WP can force a global disconnect of all of the outputs at any time by sending in the WORD9 command which asserts the command line DISCON from the command decoder 206B. Of course, in the event of catastrophic failure of the stimulation circuitry, the user can disable the ICS simply by moving the headpiece away from the ICS.

If a parity error is detected by the parity error detector 204C the detector asserts line PALARM to the initialization section 204. Section 204 then issues the system reset signal SYSRESET to force the ICS system into its restart condition and turn off the back telemetry carrier, signaling the WP that a serious error has occurred. A new startup sequence will then ensue under control of the startup procedure of the WP.

(c) Data Recovery

The pair of data signals, PDATA and NDATA, coming from receiver 200 are squared up in the data converter 201A to generate the signal MANDATA. The signal MANDATA represents the recovered data signal from the Manchester-encoded stream transmitted by the WP to the ICS and, therefore, represents the primary data signal input into the ICS to control its function. In addition, the presence of modulated carrier is used to create the carrier detect signal CARDET. CARDET is connected to the clock decoder 201B to indicate the presence of carrier and therefore is one of the requisites for normal operation of the ICS. Since MANDATA is a Manchester-encoded signal, it comprises a clock and data. The clock information is extracted from MANDATA in the clock decoder 201B. The clock information is then expressed as 2 signals: CLKPH1 and CLKPH2, used to control the clocking of the serial data into a register in serial to parallel converter 201C. In the converter 201C the nature of the signal is converted from serial to parallel.

As previously discussed, data sent to the ICS by the WP is in the form of a serial bit stream organized within a frame, which consists of 9, 9 bit words, that is 81 bits, plus a parity bit and a frame-ending marker. The 9 bit data words, which make up the data portion of the frame, comprise 8 amplitude and polarity data words for the eight output channels in sequence 1 through 8, and a 9th word containing special commands which control housekeeping and certain other functions of the ICS.

In clock decoder 201B, the signal PFRMCLK is derived from the frame ending pulse. PFRMCLK signals the end of one data frame and, therefore, the beginning of the next.

In the converter 201C, WORDTRCLK is generated at the end of each 9 bit word transmitted and causes those specific 9 bits, DATA (1–9), to be latched into the amplitude data latch 205A for amplitude and polarity control. The signal WORD9CLK is used to cause latching of the 9th word coming in so that those 9 bits are directed to the command latch 206A and will remain in that latch until the next 9th word time. Thus, the amplitude data latch 205A is updated 8 times during the normal frame, with data for any particular channel being available only for the transmit time of the next word, when it is then replaced by the new data.

On the other hand, command latch 206A retains the 9th word command information for at least one complete frame

28

time, that is, until the next 9th word occurs. Of course, the succeeding 9th word command could be the same command sent again, in which case the functionality requested by that command would simply be maintained for another frame or, potentially for additional frames for an unlimited period of time.

Note that at times when use of the 9th word command is not required, the frame can be shortened by sending the frame-ending marker after any word of the amplitude data information. The sequence of the data is amplitude and polarity data for channel 1, followed by 2 through 8, and this sequence can be terminated at the end of any word by a frame ending marker. This manner of operation is known as short cycling, and allows the frame to be shortened for more rapid update of low number channels but, of course, without 9th word commands. Such short cycle operation will allow higher frequency waveforms to be represented on such low-order channels at the expense of less-frequent updates on the higher order channels and the absence of 9th word command information. Under short cycling conditions, the amplitude and polarity information for channels not addressed, as well as 9th word commands not overwritten, will simply-maintain their previous setting until written again at some future time.

(d) Amplitude and Polarity Control

In the normal full frame sequence, amplitude and polarity data, that is 9 binary bits each for 8 different channels, is received in sequence for channels 1 through 8. The first amplitude and polarity data word received is latched as noted above, and then presented to the logarithmic D to A converter 207B during the second word transmit time. Thus, the update of amplitude and polarity information for a given channel lags that channel's transmit time by one word time. In addition, since the data queue is only one word deep, the amplitude and polarity information sent, for example for channel 1, has to be operated on and completed during the channel 2 transmit time. During that time, the logarithmic D to A converter 207B uses the 8 bits of amplitude information to operate on the reference current IREF from the current reference generator 207A to generate the two current control voltages IPOSCON and INEGCON, which are passed to the analog multiplexer 207C as signals IPOS and INEG. IPOS and INEG are the gate-to-source voltage which will be impressed on the current source 212B in the appropriate output signal channel under the control of the signal WSTRB appropriate for that particular channel. The signals WSTRB (1–8) arise from the word strobe generator 201D, and are a sequence of pulses which are active in the appropriate word time for each channel in sequence 1 through 8. The current source 212B in each of the 8 individual isolated output channels, stores its appropriate gate-to-source voltage on capacitance associated with the MOSFET, maintaining control at the commanded level until updated in the next frame. Each of the 8 current sources is a unidirectional current-controlling device which controls output current drawn from the refresh voltage capacitorlabeled CRV in FIG. 4.

Each current source 212B is only connected to the logic circuitry during its signal transfer time. The refresh voltage capacitor CRV1 is only connected during its transfer time. Thus, for the balance of the time of operation, each output channel is electrically isolated from all other channels and also from the logic circuitry.

Since the MOSFET comprising current source 212B is unidirectional, the switching network 212C is placed after the current source in order to control the direction of stimulus current. This aspect is controlled by the signal

5,938,691

29

POLARITY from latch **205A**, which for bipolar operation directs the electrode switching matrix **212**C to connect output A1 and output B1 for the first channel, for example, directly to the lines +IN1 and −IN1 for normal polarity, or to −IN1 and +IN1 for reverse polarity. In this way the direction of current flow between the electrodes can be controlled to be in either direction, even though the actual current source is a unidirectional device. For monopolar operation, as opposed to bipolar operation as described above, the electrode switching matrix **212**C, along with the indifferent electrode switch **212**D, is configured to allow the output to be generated between output A1 and the indifferent electrode or output B1 and the indifferent electrode with either direction of current flow being possible. The selection of bipolar or monopolar style of output in the matrix **212**C is under control of the buses AMONO (**1**–**8**) and BMONO (**1**–**8**) from output mode register **208**. In this regard, AMONO (**1**–**8**) and BMONO (**1**–**8**) each have one representative line going to each of the eight output channels (see Table 6).

In addition, there is a capability for placing a discharge resistor across each pair of outputs. Such function is under control of the discharge resistor control bus lines DRC1–**8**. Assertion of a DRC line to a particular output by the output mode register **208** will place a 150K resistance across the output terminals to discharge the output coupling capacitors. Alternatively, or in addition, a low resistance connection in **212**C can be placed across the output terminals to more rapidly discharge the output coupling capacitors in response to the signal SHORT from the zero current control **205**B. Further, the output current can be forced to zero by assertion of the signal ZERO from zero current control **205**B. In this regard, the signal ZERO causes all output switches in the switching matrix **212**C to be in an off or high impedance state.

An additional output mode (MULTIPOLAR MODE) involves using a pair of output channels to generate a bipolar output using any pair of electrodes in the electrode array. To accomplish this, two channels are programmed by the output mode register **208** to assume a monopolar mode. This causes one side of each of the selected channels to be connected together and to the indifferent electrode. Then, unlike the normal monopolar mode, a WORD9 command from WP is sent to the ICS to disconnect the indifferent electrode via IECLOSE. Thus, by programming one of the channels as a source and the other as a sink, current can be driven through any selected pair of electrodes with complete control over amplitude and polarity.

(e) Pulse Width Control

The amplitude and polarity control described above is typical of the analog operation of the ICS. An additional mode of operation is provided by the ICS in which the described amplitude and polarity control is still in operation, but the outputs to one or more channels, controlled individually, can be turned on and off in order to create pulses of controlled amplitude and controlled duration. This is the pulsatile mode of operation. Pulsatile operation is under the control of pulse width control **209**. Pulse width control is via a sequence of 9th word commands (WORD9), the first of which results in the assertion of the line FUNC**8**, which enables the pulse width control **209**. The first such command also contains information about the placement of pulse edges within the next succeeding frame, and the rest of the command is issued in a series of 9th words which must not be interrupted by any other 9th word command. Therefore, a feedback signal to prevent other 9th word commands from interfering is sent back from the pulse

30

width control **209** to the command decoder **206**, that signal being PFMAIN.

In the control **209**, bits of the first of the pulse width commands and succeeding ones are loaded into the pulse width control registers. The bits are used to preset downcounters, driven by the internal system clock, to control the appearance of the on and off times for the channel which is being controlled. Therefore, on a channel by channel basis, the amplitude of the pulse can be controlled in the usual way by the amplitude and polarity information sent in for that channel, and the turning on and off of the output is controlled by the pulse width control **209** in conjunction with the electrode switching matrix.

In addition to the channel by channel control of outputs being either on or off via the pulse width control **209**, there is also a global control which can enable or disable all outputs from all channels simultaneously, that is via the signal OUTENABLE from the initialization section **204**B. The global signal OUTENABLE can be controlled by the outputs, CONNECT and DISCON, from the command decoder **206**B. That is, the line can be driven by a 9th word command to connect or disconnect all the outputs. In addition, the global output control, OUTENABLE, can be negated by the initialization section **204**B when circuitry in that section detects conditions of improper operation. Furthermore, during startup of the ICS, all outputs are disconnected until normal operation is in progress, at which time OUTENABLE is asserted and stimulation will begin.

(f) Refresh Voltage Control

The isolated power supply voltages for the stimulus currents from each of the 8 output channels is provided by charge stored on the refresh capacitors, CRV1 through **8**. Selection of the appropriate voltage level for each of the 8 output stages is a decision made by the WP based on information telemetered back to it from the ICS about the voltage requirements for proper output drive of that individual channel. This is an important power conservation feature of the ICS which seeks to minimize the potential difference and, therefore, the power dissipation in the current source **212**B.

Any one of four different power supply voltage levels are selectable for each of the output channels, independently, and those voltages are −3.5, −7.0, −10.5, and −14. Refresh voltage control on a channel by channel basis is effected by two sequential 9th word commands which are decoded in the command decoder **206**B and result in assertion of the signal FUNC**7** line going to refresh voltage logic **210**. This requires 2 full frames to implement, that is two 9th words must be transmitted in sequence to achieve such control. The command decoder **206**B must be prevented from operating on a different 9th word during the sequence, hence the line RFMAIN from refresh voltage logic **210** is applied to the command decoder to lock it into the refresh voltage sequence for two frames. Refresh voltage logic **210** provides 2 bits RV0 and RV1 which define the four possible power supply voltage levels for each of the 8 output channels via the lines RV0 (**1** to **8**) and RV1 (**1** to **8**) connected to refresh voltage control **212**A. The control bits, two for each channel, are latched into their respective refresh voltage control so that (1) one of the four possible power supply voltage levels is selected for each associated channel, e.g., −3.5 for channel **1**, −10.5 for channel **2**, −14 for channel **3**, −7 for channel **4**, and so on, and (2) the selected power supply levels are maintained until changed by a new refresh voltage command. During startup, all 8 output channels are automatically commanded to use the −14 volt refresh, which provides for the maximum output power. As the system continues to

5,938,691

31

run and, as described hereinafter at (g) "Back Telemetry", as information is fed back via telemetry to the WP, logic within the microprocessor of the WP can then cause a reduction in the power supply voltage for each channel to a level most appropriate for the stimulation requirements for that channel, thereby enhancing the power conservation within the ICS.

(a) Back Telemetry

Function codes FUNC4 and FUNC5 from the command decoder **206**B enable the function of the back telemetry section **211** which is to report back to the WP the state of various voltages within the ICS. As previously indicated, some of the functions of the telemetry section are of a housekeeping nature. For example, the measurement and transmission back of the voltage TANKV provides an index or status indication of the RAWDC voltage generated in the ICS in response to data from the WP. In addition, the power supply voltages ZEROV, −3.5 volts and TAP14 are available for transmission back to the WP as indicators of proper power supply function and for feedback control of the WP and the power transmitted therefrom to the ICS.

Also, the back telemetry can be commanded to measure and send back the value of the voltage reference, VREF, to indicate proper operation and, since this voltage is highly stabilized, to provide a system calibration point. In addition, stimulus output voltages can be measured via the lines OUTA (**1** through **8**), and OUTB (**1** though **8**), when the ICS is in the bipolar mode.

In the monopolar mode, the output voltage can be measured between either output A and the indifferent electrode, or output B and the indifferent electrode, whichever is appropriate. Additionally, in the monopolar mode, the current sampling resistors RLO or RHI can be placed in series with the stimulus circuit, and the resulting voltage drop across the resistors measured and transmitted back to the WP as an index of stimulus current. Thus, in the monopolar mode, both the stimulus voltage and current can be measured and, thereby, the impedance of the electrode and the tissue-electrode interface can be measured and transmitted back to the WP. The WP is able to use this information in its microprocessor to choose the appropriate refresh voltage for each channel in the manner heretofore described at (f) Refresh Voltage Control.

As indicated in FIG. **4**, following the telemetry multiplexer **211**B which selects the signal to be measured and transmitted back to the WP, inputs are generated for the analog to digital converter section **211**C. The analog to digital converter is of a unipolar type. But, at least some of the signals which are to be measured have unknown polarity at the time of measurement. Therefore, the capability is provided to make measurements in a normal mode or an inverted mode, depending on the state of the function lines, FUNC4 and FUNC5. If FUNC4 is asserted at the converter **211**C and the resulting ADCOUNT is zero, this indicates either that the measured signal is zero or of a polarity opposite to the setting of the converter. To determine which is the case, FUNC5 is asserted to switch the converter to the inverted mode. If ADCOUNT now registers other than zero, this indicates that the measured signal was of an opposite polarity to the normal setting of the converter. If ADCOUNT remains zero, this indicates that the measured signal was in fact zero.

In addition, the amplitude of some of the voltages to be measured is unknown at the time of measurement. Therefore provision is made for a stepwise gain selection prior to analog to digital conversion under control of SH2X1, SH2X3, SH2X10 and SH1X10. For example, if SH2X1 is

32

asserted and ADCOUNT is a series of 1's, the input is out of range of the converter and the gain should be reduced until ADCOUNT reads less than 111111.

Thus, if the measurement is taken and is judged by the WP to be of the wrong polarity or wrong gain setting, correction can be sent back from the WP to make another measurement using the correct parameters as deduced from the first reading. The 6 bit parallel output bus from the A to D converter is connected to the telemetry modulator multiplexer which converts this parallel set of bits into a serial bit stream which is then applied to the back telemetry transmitter.

Physician's Tester

As described herein most clearly under the heading "SYSTEM OPERATION", the system of the present invention provides for feedback and microprocessor control of various power levels and measurement of different voltages and currents within the ICS in response to commands and data changes transmitted by the WP in response to data telemetered back to the WP in the form of status indicating and measurement signals. The present invention also contemplates physician control over the selection of voltages and currents to be measured and the presetting of parameters in the ICS during testing of the ICS and/or a patient's response to data transmitted by the WP to the ICS.

Basically such physician control is embodied in a portable tester utilizing telemetry coupling to the implanted ICS, thereby providing communication between the tester and ICS for the monitoring, control and measurement of the ICS parameters. In this regard, the tester as shown in FIG. **6** comprises a modification of the previously described WP embodied in a portable housing **300** having a control panel **302** and a visual display **304** providing alpha numeric data for viewing and appropriate action by the physician. A block diagram of the circuitry embodied in the tester is depicted in FIG. **7** in combination with the ICS **12** of FIG. **1**—all previously described components bearing the same numerals as in FIG. **1**.

The tester monitors the performance parameters of the ICS **12** by detecting the back telemetry signal of the ICS in an interrogation protocol for the microprocessor. The tester places the received signal into a self contained memory storage section.

Physician interaction with the ICS is exercised by the use of the control panel **302** which contains electronic circuitry for conversion of the back telemetry signal into directly readable information which is read out on the LCD display **304**. Commands are provided to the implanted stimulator through a control of the microprocessor **30** and the commands generated thereby. The physician's tester additionally can provide a print out of both the displayed data and information and the executed commands.

As illustrated, the physician's tester is basically a modification of the WP **16**. The Physician's Tester microprocessor **30** has both a display port and an infrared serial output port. The display port drives display **304** while the infrared port can drive a separate infrared display, a printer for recording the displayed information or a separate IR transducer for generating infrared light signals for transmission to an IR receiver for separate processing of the information from the ICS. Panel knob **306**, **308**, and **310** control potentiometers, the position of which are read by the microprocessor **30** to control the commands generated thereby and hence the parameters measured and displayed by the ICS and Physician's Tester combination. In particular, such

5,938,691

33

manual control results in changes in the commands transmitted by the WP to the ICS to control the measurement of the ICS parameters in the same manner as previously described for the system of FIG. 4.

Table 7 describes typical parameter settings for the control knobs 306, 308, and 310.

TABLE 7

| Control Knob 306 | | |
|---|---|---|
| Position 1 | = | Ground (0 Volts) |
| Position 2 | = | 14.0 Volts |
| Position 3 | = | 3.5 Volts |
| Position 4 | = | Reference Voltage |
| Position 5 | = | Coil Voltage |
| Control Knob 308 | | |
| Position 1 | = | Impedance of Monopolar A configured channel |
| Position 2 | = | Impedance of Monopolar B configured channel |
| Position 3 | = | Impedance of Bipolar configured channel |
| Position 4 | = | Voltage of Monopolar A configured channel |
| Position 5 | = | Voltage of Monopolar B configured channel |
| Position 6 | = | Voltage of Bipolar configured channel |
| Position 7 | = | Voltage of Pass FET |
| Position 8 | = | 1 KHz output current Monopolar A configured channel |
| Position 9 | = | 1 KHz output current Monopolar B configured channel |
| Position 10 | = | 1 KHz output current Bipolar configured channel |
| Control Knob 310 | | |
| Volume Control (Peak Output Current) | | |
| Position 1 | = | 0 $\mu$A |
| Position 2 | = | 0.5 $\mu$A |
| Position 3 | = | 1.0 $\mu$A |
| Position 4 | = | 10 $\mu$A |
| Position 5 | = | 100 $\mu$A |
| Position 6 | = | 1000 $\mu$A |
| Position 7 | = | 2500 $\mu$A |

Extended System Operation and Applications

While preferred forms of the human tissue stimulator of the present invention embodied in cochlear stimulating systems have been described in detail hereinabove, it should be appreciated that various changes and modifications may be made in the described systems without departing from the spirit of the present invention.

For example, while the outputs of the preferred embodiments have been described as stimulating tissue, the DC and squarewave outputs of the ICS under control of the pulse width control 209 may be utilized to power other implanted devices. For some such AC applications, a larger capacitor CA1 and/or CB1 may be required for each or some of the ICS output channels. Conversely, for strictly DC applications, no output capacitors are necessary.

Further, while the ICS status signal-generating features for the preferred embodiment include the measurement and telemetry functions described in subsection (g) hereinabove, similar measurements and telemetry back to the WP may be provided by the ICS for other implanted devices connected to an electrode pair of the ICS. This permits a wide range of applications since the back telemetry feature can sample and measure any external voltage within its amplitude and frequency range and provide 6 bit resolution. Any external device which can generate an appropriate voltage related to its function can utilize this feature.

Moreover, with the ICS as previously described with respect to FIG. 4, the output electrode pairs for the separate

34

channels of the ICS are simultaneously available to power another implanted device or stimulate tissue and to sense variable voltage conditions therebetween.

In view of the foregoing and other additions and changes which may be made in the illustrated embodiments, the present invention is to be limited in scope only by the terms of the following claims.

We claim:

1. A cochlea stimulation system, comprising:

audio signal receiving means, including a headpiece coupled to a signal and energy coupling means, the headpiece having transmitting and receiving means and means for transferring data through the signal and energy coupling means at one frequency for data that originates from an implanted cochlea stimulator (ICS) and is sent to an externally wearable signal processor (WP); and at another frequency data and energy originate from the WP and are sent to the ICS;

said WP receives and processes audio signals received by the audio signal receiving means and includes means for generating data indicative of the audio signal;

means for transmitting the data to the ICS, the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the processor and for generating ICS status indicating signals,

means in the ICS for transmitting such ICS status indicating signals to the WP; and

means in the WP for receiving and processing the ICS status indicating signals.

2. The system of claim 1 wherein the means in the headpiece comprises tuned inductive capacitive filters.

3. The system of claim 1 including means for electrostatically shielding the coils in the headpiece and ICS so that only magnetic coupling occurs.

4. The system of claim 1 wherein stimulation signals are pulses and further including means in the processor for selectively controlling the pulse width of the stimulation signals.

5. The system of claim 1 further including means in the processor for selectively controlling the frequency at which stimulating signals are applied to selected ones of electrodes.

6. A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation pulses and for controlling the pulse width of the stimulation pulses,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation pulses,

means in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes

5,938,691

35

or voltages in the ICS and for generating ICS-status-indicating signals, and

means in the ICS for transmitting such ICS-status-indicating signals to the WP; and

means in the WP for receiving and processing the ICS-status-indicating signals.

**7**. The system of claim **6** further including

means for transmitting power signals from the WP to the ICS,

means in the ICS for processing the power signals and for generating power for the ICS, and

means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS.

**8**. The system of claim **7** further including means in the ICS and responsive to the power signals for generating a plurality of voltages for powering different components in the ICS.

**9**. A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

  means for receiving transmissions from the WP,

  a processor for processing such transmissions to generate stimulation signals,

  a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

  means for selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes,

  means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals,

  means for transmitting such ICS-status-indicating signals to the WP; and

means in the WP for receiving and processing the ICS-status-indicating signals.

**10**. The system of claim **9** further including means for isolating electrical signals on any pair of electrodes independent of electrical signals on any other pair of electrodes.

**11**. The system of claim **9** further including in the ICS means for selectively generating analog and pulsatile stimulating signals.

**12**. The system of claim **9** further including in the ICS means for selectively stimulating the electrodes as either unipolar or bipolar electrodes.

**13**. The system of claim **9** further including means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

36

**14**. A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

  means for receiving transmissions from the WP,

  processor means for processing such transmissions to generate stimulation signals,

  a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

  means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals therefrom, and

  means for transmitting such ICS status indicating signals to the WP;

means in the WP for receiving and processing the ICS status indicating signals;

means for transmitting power signals from the WP to the ICS;

means in the ICS for processing the power signals and generating power for the processor; and

means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS.

**15**. A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including

  means for receiving transmissions from the WP,

  processor means for processing such transmissions to generate stimulation signals,

  a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

  means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the processor and for generating ICS-status-indicating signals, and

  means for transmitting such ICS status indicating signals to the WP;

means in the WP for receiving and processing the ICS-status-indicating signals; and

means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

\* \* \* \* \*

# EXHIBIT 4

**SUPPLEMENTAL EXPERT REPORT OF JOHN CHOMA, PH.D.**


November 30, 2012

I am the same John Choma who previously provided two infringement reports on behalf of Alfred E. Mann Foundation for Scientific Research ("AMF") in 2009 in this litigation against Cochlear.  I have been asked to supplement my opinions and provide this document accordingly.

**INTRODUCTION**

I incorporate by reference into this document all of the reports and declarations in this case that I previously submitted, including my original infringement report submitted in January, 2009 and a March, 2009 supplemental infringement report.  This supplemental report does not change any of my previously-expressed opinions. Rather, I have been asked to submit this report to address several discrete issues including the impact of the court's claim construction order, which was not available at the time of my previous submission, and infringement by products about which Cochlear first provided information in 2011, known collectively as "Nucleus 5," that include implantable cochlear stimulators and wearable speech processors.[1]

The additional materials I have considered are listed in Appendix A.

As the court has construed the claims, I now refine certain of my infringement analysis in response to the Court's construction. For clarity, I have also provided additional explanation of my infringement analysis for those and other claim terms where appropriate.  Further, where appropriate, I have provided opinions as to infringement of certain claim elements under the Doctrine of Equivalents or under the "Equivalents Thereof" literal infringement standard for means-plus-function claims.  Attached as appendices B through E is an updated version of the detailed infringement charts provided with my initial report (corresponding respectively to Appendix H, I, F and G of my initial report). The charts indicate the Court's present construction for the claim terms.  My infringement analysis was done in accordance with that construction.

---

[1] I understand that the parties have agreed that infringement of the new Cochlear CI422 implant (a CI24RE 'stimulator/receiver' with a modified electrode array, COC 7000045) depends on a finding of infringement of the CI24RE.  My analysis of the CI24RE therefore applies to the CI422.

# EXHIBIT 5

1   CHARLES S. BARQUIST (SBN 133785)
    CBarquist@mofo.com
2   MORRISON & FOERSTER LLP
    555 West Fifth Street
3   Los Angeles, California  90013-1024
    Telephone: 213.892.5200
4   Facsimile:  213.892.5454

5   BRIAN G. BODINE
    Bbodine@merchantgould.com
6   KAUSTUV M. DAS
    kdas@merchantgould.com
7   MERCHANT & GOULD, P.C.
    701 Fifth Avenue, Suite 4100
8   Seattle, Washington  98104
    Telephone: 206.342.6200
9   Facsimile:  206.342.6201

10  PETER A. GERGELY
    Pgergely@merchantgould.com
11  MERCHANT & GOULD, P.C.
    1050 17th Street, Suite 1950
12  Denver, Colorado 80265-0100

13  Attorneys for Plaintiff
    ALFRED E. MANN FOUNDATION FOR
14  SCIENTIFIC RESEARCH

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 17 ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, | Case No. CV 07-08108 GHK (CTX) |
| 18                    Plaintiff, | **DEFENDANT COCHLEAR LTD.'S FIRST SET OF INTERROGATORIES TO PLAINTIFF ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH AND PLAINTIFF'S OBJECTIONS AND  SECOND SUPPLEMENTAL RESPONSE TO SAME** |
| 19       v. | |
| 20 COCHLEAR CORPORATION and COCHLEAR LTD., | |
| 21                    Defendants. | |
| 22 COCHLEAR AMERICAS and COCHLEAR LTD., | |
| 23 | |
| 24                    Counterclaimants, | |
| 25       v. | |
| 26 ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, | |
| 27                    Counterdefendant | |
| 28 | |

1

Pursuant to Federal Rules of Civil Procedure 26 and 33, plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF"), by and through its attorneys, submits these objections and second supplemental responses to Defendant Cochlear Ltd.'s First Set of Interrogatories to Plaintiff Alfred E. Mann Foundation for Scientific Research.

## I.     GENERAL OBJECTIONS

1.     AMF objects to these interrogatories to the extent that they seek information or documents that are subject to attorney-client privilege or any other applicable privilege, constitute attorney work product, or are otherwise immune from discovery under the Federal Rules of Civil Procedure.

2.     AMF objects to these interrogatories to the extent that they seek information that is unreasonably cumulative or duplicative, or that is obtainable from some other source that is more convenient, less expensive, less burdensome, or that Cochlear Ltd. has had an opportunity to seek from another source, or where the burden or expense to AMF of the proposed discovery outweighs its likely benefit to Cochlear Ltd., taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, the importance of the proposed discovery in resolving the issues, and the availability of the information to Cochlear Ltd. from other sources.

3.       AMF objects to these interrogatories to the extent that they seek information that is irrelevant and/or is not likely to lead to the discovery of admissible evidence.

4.       AMF objects to these interrogatories to the extent that they seek discovery of confidential or proprietary information. AMF will only furnish such information upon entry of a suitable protective order.

5.       Where AMF has opted to produce documents instead of responding to a given interrogatory, *see* Fed. R. Civ. P. 33(d), AMF will produce documents at a time and place and in a manner agreed to by the parties.

6.       AMF objects to these interrogatories and the Definitions and Instructions to the interrogatories to the extent that they seek to impose obligations beyond those required by the Federal Rules of Civil Procedure.

7.       AMF objects to these interrogatories to the extent that they purport to require AMF to provide materials or information not presently in AMF's possession, custody, or control.

8.       AMF objects to these interrogatories to the extent that they assume facts that are not in evidence or mischaracterize facts that are in evidence. By responding to these Interrogatories, AMF does not admit or agree with any explicit or implicit assumptions made in these interrogatories.

9.       AMF objects to Cochlear Ltd.'s definition of the term "AMF" to the extent that it is overly broad and to the extent that it attempts to impose an undue

3

burden on AMF.  AMF responds to these interrogatories based on information in its possession, custody and control.

10.     AMF objects to the definition of "Person" to the extent that it is overly broad and to the extent that it attempts to impose an undue burden on AMF.  AMF further objects to the definition of "Person" to the extent that it is vague and ambiguous because it contains undefined and vague terms such as "association," "any other organizations [sic] of individuals" and "other entities."

11.     AMF objects to the term "Another party" and "Third party" to the extent that those definitions are inconsistent with how "party" and "third party" are defined in the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 14.

12.     AMF objects to the term "Patents in suit" to the extent that it is vague, ambiguous, and overly broad.  The term is vague because it defines "Patents in suit" as meaning or referring to "any, some, or all of" the patents listed in AMF's complaint and Cochlear Ltd.'s Amended Answer and Counterclaims.

13.     AMF objects to the term "Prosecution History" to the extent that it is overly broad by inappropriately seeking materials protected under the attorney-client privilege and the work product doctrine.  AMF also objects to the definition of "Prosecution History" to the extent that it is vague and ambiguous.  AMF further objects to this definition to the extent that it attempts to impose an undue burden on AMF.

4

14.     AMF objects to the definition of "Prior art" to the extent that it is overly broad.  AMF further objects to the definition of "Prior art" to the extent that it is vague and ambiguous because it is not clear what Cochlear Ltd. is referring to when it states "described therein" and "encompassed thereby."  AMF further objects to this definition to the extent that it attempts to impose an undue burden on AMF.  AMF further objects to the definition of "Prior art" to the extent that the definition seek a legal conclusion.  AMF further objects to Cochlear Ltd.'s definition of "Prior art" as separate from "Alleged prior art," and expressly reserves its right to challenge the materiality of or applicability of a particular reference or act as prior art under 35 U.S.C. §§ 102 and/or 103 of any material that it identifies or produces in response to a discovery request that addresses "Prior art" and/or "Alleged prior art."

15.     AMF objects to the definition of "Alleged prior art" to the extent that it is overly broad.  AMF further objects to the definition of "Alleged prior art" to the extent that it is vague and ambiguous.  For example, it is not clear what Cochlear Ltd. means by the term "may not agree complies with 35 U.S.C. §§ 102 or 103."  Similarly, Cochlear Ltd. failed to define terms such as "knowledge of one of ordinary skill in the art."  AMF objects to the definition of "Alleged prior art" to the extent that it attempts to impose an undue burden on AMF.  AMF further objects to Cochlear Ltd.'s definition of "Prior art" as separate from "Alleged prior art," and expressly reserves its right to challenge the materiality of or applicability of a

5

particular reference or act as prior art under 35 U.S.C. §§ 102 and/or 103 of any material that it identifies or produces in response to a discovery request that addresses "Prior art" and/or "Alleged prior art."

16.    AMF objects to the definition of "Accused product" because the identification of "accused products" is premature.  Discovery in this case has just begun and Cochlear Ltd. has not yet produced information relating to the structure and functionality of its products.  AMF reserves the right to identify "accused products" after it has obtained sufficient discovery from the Cochlear defendants. AMF further objects to the definition of "Accused product" to the extent that it is too restrictive because, for example, it omits (or fails to mention) methods that may infringe one or more of AMF's patents.

17.    AMF objects to the terms "identify," "identification," and "identity" to the extent that these terms are overly broad and because they attempt to impose an undue burden on AMF.  AMF will interpret those terms as is reasonable under the Federal Rules of Civil Procedure.

18.    AMF objects to these interrogatories to the extent that they are premature.  Cochlear has been producing their documents on a rolling basis, numerous documents have yet to be produced, and investigation is on-going.  AMF reserves the right to supplement its responses to these interrogatories, if and when additional relevant information becomes available.

19.    AMF specifically incorporates each and every one of these General Objections into the responses, whether or not express reference is made therein to these General Objections.

## II.    OBJECTIONS AND SECOND SUPPLEMENTAL RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**  For each asserted claim and each accused product, specifically identify whether the basis for the alleged infringement of each asserted claim by each accused product is direct infringement, contributory infringement, or inducement of infringement, and specifically describe all acts forming the basis for the direct infringement, contributory infringement, or inducement of infringement, including the acts of the Cochlear defendants that allegedly contribute to, or induce, each direct infringement, identify all documents on which you rely to support your contention, and identify all persons, other than AMF's expert witness(es) and other than the Cochlear defendants, most knowledgeable about such facts with information or knowledge relevant to your contention, summarizing each person's knowledge.

**ORIGINAL RESPONSE:**  AMF incorporates its General Objections by reference as if set forth fully herein.  AMF further objects to this interrogatory to the extent that it seeks information that is covered by the attorney-client privilege and/or constitutes attorney work product.  AMF objects to this interrogatory to the extent that it attempts to require AMF to state all facts relating to the issues

addressed by this interrogatory before AMF has had an adequate opportunity to

obtain discovery from either of the Cochlear defendants. AMF objects to this

interrogatory to the extent it attempts to require AMF to identify persons who are

not known to AMF at this early stage of the case. AMF further objects to this

interrogatory to the extent it attempts to require AMF to identify acts that are not

known to AMF at this stage of discovery. AMF further objects to this interrogatory

to the extent that, including all discrete subparts, it constitutes more than a single

interrogatory. AMF objects to the terms "contributory infringement" and

"inducement of infringement" to the extent those terms call for a legal conclusion

and are subject to interpretation by the Court. AMF objects to the phrase "persons .

. . most knowledgeable about such facts with information or knowledge relevant" as

being ambiguous and vague. AMF interprets that phrase as "person . . . most

knowledgeable about such facts and/or with information or knowledge relevant . . .

." AMF objects to this interrogatory to the extent that it attempts to require AMF to

identify a person or persons "most knowledgeable" about AMF's contentions.

Subject to and without waiving its specific objections and General Objections,

AMF states that sales and offers for sale in the United States of various devices

relating to cochlear implants and the importation of the devices into the United

States coupled with the use of the devices in the United States by clinics, clinicians,

and doctors infringes at least claim 10 of the '616 patent. Through its acts, the

Cochlear defendants (either individually or collectively) infringe at least claim 10

8

of the '616 patent, either directly, by inducement of others, or contributorily. AMF reserves its rights to amend and/or supplement this response as it obtains additional discovery from the Cochlear defendants and from non-parties. AMF further states: see Claim Chart attached hereto.

**SUPPLEMENTAL RESPONSE:** AMF incorporates its General Objections and the specific objections set forth in its Original Response as if set forth fully herein. Subject to and without waiving its specific objections and General Objections, AMF states that, in addition to claim 10 of the '616 patent, sales and offers for sale in the United States of various devices relating to cochlear implants and the importation of the devices into the United States coupled with the use of the devices in the United States by clinics, clinicians, and doctors infringes at least claims 1 and 12 of the '616 patent, and claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 14 of the '691 patent. AMF further states: see claim chart relating to infringement of the '691 patent attached hereto. AMF reserves its rights to amend and/or supplement this response as it obtains additional discovery from the Cochlear defendants and from non-parties.

Dated: November 13, 2008          By: _____

Brian G. Bodine, Esq.
Kaustuv M. Das, Esq.
Peter A. Gergely, Esq.
Brett A. Hertzberg, Esq.
Charles S. Barquist, Esq.

Attorneys for Plaintiff
ALFRED E. MANN FOUNDATION
FOR SCIENTIFIC RESEARCH

9

# CERTIFICATION

I certify under penalty of perjury that the foregoing responses to interrogatories are true to the best of my knowledge, information, and belief.

Executed this /6 th day of November, 2008.

Lawrence A. Fischer
Chief Financial Officer
Alfred E. Mann Foundation for
Scientific Research

11

## CERTIFICATE OF SERVICE

I hereby certify that I caused the following document:

Defendant Cochlear Ltd.'s First Set of Interrogatories to Plaintiff Alfred E.

Mann Foundation for Scientific Research and Plaintiff's Objections and Second

Supplemental Response to Same to be served via e-mail and via Federal Express

November 13, 2008, to the below-named counsel.

Bruce G. Chapman, Esq.
Keith Douglas Fraser, Esq.
Manual C. Nelson, Esq.
John L. Paik, Esq.
CONNOLLY BOVE LODGE & HUTZ LLP
333 S Grand Avenue, Suite 2300
Los Angeles, California 90071
Tel:   213.787.2500
Fax:   213.687.0498

Attorneys for Defendants
Cochlear Corporation and Cochlear LTD.


Dated: November 13, 2008

Brian G. Bodine

11

Kayla Butcher
MERCHANT & GOULD P.C.
701 Fifth Ave
Suite 4100
SEATTLE, WA 98104



ActWgt: 1.0 LB
CAD: 2007257/INET8091
Account#: S *********

Delivery Address Bar Code

Ref #    50139.0005USZA
Invoice #
PO #
Dept #

SHIP TO:   (213) 789-2500        BILL SENDER
**B Chapman K Fraser M Nelson J Palik**
**Connolly Bove Lodge & Hutz LLP**
**333 S. Grand Ave**
**SUite 2300**
**Los Angeles, CA 90071**

TRK#   7971 1135 1321          FRI - 14NOV          A1
0201                          PRIORITY OVERNIGHT
                                     DSR

90071
CA-US
LAX

# WZ EMTA



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2008 FedEx

# EXHIBIT 6

1  Bruce G. Chapman (State Bar No. 164,258)
2  bchapman@cblh.com
   Manuel Nelson (State Bar No. 229,590)
3  mnelson@cblh.com
   John L. Paik (State Bar No. 216,024)
4  jpaik@cblh.com
5  Keith D. Fraser (State Bar No. 216,279)
   kfraser@cblh.com
6  **CONNOLLY BOVE LODGE & HUTZ LLP**
7  333 S. Grand Avenue, Suite 2300
   Los Angeles, California 90071
8  Telephone (213) 787-2500; Fax (213) 687-0498
9
10 Attorneys for Defendants and Counterclaimants
   COCHLEAR CORPORATION (n/k/a
11 COCHLEAR AMERICAS) and COCHLEAR
12 LTD.)

RECEIVED

JAN 20 2009

MERCHANT & GOULD

13              UNITED STATES DISTRICT COURT

14       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15

16 ALFRED E. MANN FOUNDATION )   Case No. **CV 07-08108 GHK (CTX)**
   FOR SCIENTIFIC RESEARCH,   )
17                            )
                Plaintiff,    )   **DEFENDANTS COCHLEAR**
18                            )   **AMERICAS AND COCHLEAR**
        v.                    )   **LTD.'S THIRD AMENDED**
19                            )   **RESPONSE TO PLAINTIFF'S**
   COCHLEAR CORPORATION and  )   **FIRST SET OF**
20 COCHLEAR LTD.,             )   **INTERROGATORIES**
                            )
21              Defendants.   )   **CONFIDENTIAL – ATTORNEYS'**
                            )   **EYES ONLY PURSUANT TO**
22 _____  )   **STIPULATED PROTECTIVE**
                            )   **ORDER**
23 AND RELATED               )
   COUNTERCLAIMS.            )
24

25

26

27

28

| U.S. Patent No. | Claim | Basis for Indefiniteness |
|---|---|---|
| | | reception of audio signals at the WP" to specific structure as required by 35 U.S.C. § 112, ¶ 6; the term "ICS-status-indicating signals" is indefinite. |

Further, the cochlear implant and related equipment disclosed in the written description of the AMF patents are so different from the implants and related equipment sold by defendants/counterclaimants that, should the claims in any of the AMF patents be construed to cover the products of defendants/counterclaimants, those claims would be invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112, ¶ 1.

Still further, the cochlear implants of the defendants/counterclaimants and/or related equipment have been developed from systems that are prior art, including but not limited to:

(1) U.S. Patent No. 4,532,930;

(2) U.S. Patent No. 4,947,844;

(3) McDermott, "An Advanced Multiple Channel Cochlear Implant", IEEE Transactions on Biomedical Engineering, Vol. 36:7, pp. 787-797 (July 1989);

(4) McDermott, Hugh Joseph, Thesis: "An Advanced Cochlear Implant Hearing Prosthesis for Profound to Total Deafness", University of Melbourne, dated June, 1988;

30

(5) McDermott, "A Custom LSI-CMOS Chip for a Cochlear Implant" Journal of Electrical and Electronics Engineering, Australia-IE Australia and IREE Australia, Vol. 4, No. 4, December 1984, 305-308;

(6) The LAURA Cochlear Prosthesis:  Development and Description, by Dr. Ir. S. Peeters et al., found at pp. 547-555 of Cochlear Implant: Current Situation, Proceedings of the International Cochlear Symposium, Duren, West Germany (Banfai, P. ed., September 7-12, 1987); and

(7) European Patent Application Publication 0259906.

Should the claims in any of the AMF patents be construed to cover any of the products of the defendants/counterclaimants, those claims would be invalid as anticipated and/or obvious in view of this prior art and other prior art, for example, as shown with regard to the asserted claims of the '616 and '691 patents in the charts enclosed herewith as Exhibits A-K.

Still further, the CIC3 implant system (Nucleus 24) that AMF accuses of infringement was conceived in the U.S. prior to the earliest priority date to which AMF is entitled, and diligently reduced to practice thereafter.  Specifically, Cochlear's U.S. engineer, James Heller, was familiar with the CIC3 design and the use of the telemetry for calculating impedance since 1990.  Furthermore, Cochlear's design of the CIC3 chip was implemented by a company then known as Avasem. Cochlear supplied a specification detailing the functionality of CIC3 to Avasem no later than August 1990.  Avasem arranged for Mitel Semiconductor in Canada to

31

manufacture the integrated circuit. Pursuant to Fed. R. Civ. P. 33(d), further information regarding CIC3 development can be ascertained from COC - 1000000 to COC-1010938. Should the claims in any of the AMF patents be construed to cover the CIC3 system, the claims would be invalid under 35 U.S.C. § 102(g).

Still further, claim 9 of the '691 patent is invalid for lack of enablement under 35 U.S.C. § 112, ¶ 1. A person of ordinary skill in the art would not be able to implement the shortened data word feature given the disclosure in the '691 patent. Indeed, AMF was not able to implement that feature. See e.g. testimony of J. Schulman, 12/02/2008.

This response shall be, and hereby is, supplemented by the report(s) of Cochlear's experts, which shall be incorporated herein by reference upon disclosures.

**INTERROGATORY NO. 3:**

Please state the factual basis for your assertion that damages, or at least a portion thereof, are barred for failure to give notice as required by 35 U.S.C. § 287(a).

**RESPONSE TO INTERROGATORY NO. 3:**

Defendants/counterclaimants object to this interrogatory as premature in view of the fact that discovery has just begun and defendants'/counterclaimants' analysis is continuing. Subject to this and the general objections, defendants/ counterclaimants respond as follows: Plaintiff/counterdefendant bears the burden of

pleading and proving notice under 35 U.S.C. § 287(a), and plaintiff/counterdefendant has not pled such notice.  Specifically, AMF licensed the patents-in-suit with no marking requirement in the license.  There is no evidence the '616 patent number was marked on any product or product packaging of the licensee, and there is no evidence the '691 patent number was ever identified in connection with any product of AMF's licensee.  <u>See e.g.</u> testimony of D. Hankin dated 12/16/2008.

**INTERROGATORY NO. 4:**

Please state the factual basis for your assertion that AMF's claims are barred by the doctrine of estoppel.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants/counterclaimants object to this interrogatory as premature in view of the fact that discovery has just begun and the analysis of defendants/counterclaimants is continuing.  Subject to this and the general objections, defendants/counterclaimants respond as follows:

On July 21, 2003, Joseph H. Schulman, PhD wrote on behalf of plaintiff/counterdefendant to Jack O'Mahoney on behalf of defendants/counterclaimants stating that "Nucleus cochlear implants [of defendants/counterclaimants] utilize features that may infringe our U.S. Patent 5,609,616."  On October 1, 2003, Mr. O'Mahoney responded to Dr. Schulman stating "the Nucleus implants do not infringe the patents."  Plaintiff/counterdefendant

DEFS' THIRD AMENDED RESPONSE TO FIRST SET INTERROGATORIES
**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

remained silent in the face of this denial of infringement, and

defendants/counterclaimants relied on this silence in introducing a new generation

product into the United States, namely the Nucleus® Freedom implant, in 2005.

**INTERROGATORY NO. 5:**

Please state the factual basis for your assertion that damages, or at least a

portion thereof, are barred by the doctrine of laches.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendants/counterclaimants object to this interrogatory as premature in view

of the fact that discovery has just begun and defendants'/counterclaimants' analysis

is continuing.  Subject to this and the general objections,

defendants/counterclaimants respond as follows:

Plaintiff/counterdefendant knew or should have known about any infringement

issues raised by the Nucleus® cochlear implants of the defendants/counterclaimants

prior to December 13, 2001.  Specifically, AMF officers P. Mobley and J. Schulman

learned of the telemetry feature in Cochlear's implant in the 1990s.  See e.g.

testimony of P. Mobley dated 11/20/2008 and testimony of J. Schulman dated

12/02/2008.  The telemetry feature is what led AMF to conclude that the patents-in-

suit were infringed.  See e.g. testimony of J. Schulman dated 12/17/2008.  Moreover,

Cochlear's use of telemetry was well known.  See e.g. testimony of J. Schulman

dated 12/17/08 and exhibits thereto.  Additionally, on July 21, 2003, Joseph H.

Schulman, PhD wrote on behalf of plaintiff/counterdefendant to Jack O'Mahoney on behalf of defendants/counterclaimants stating that defendants/counterclaimants "Nucleus cochlear implants [of defendants/counterclaimants] utilize features that may infringe our U.S. Patent 5,609,616." On October 1, 2003, Mr. O'Mahoney responded to Dr. Schulman stating "the Nucleus implants do not infringe the patents." Defendants/counterclaimants relied on this silence in introducing a new generation product into the United States, namely the Nucleus® Freedom implant, in 2005.

## INTERROGATORY NO. 6:

Please state the factual basis for your contention that the AMF patents are unenforceable because of inequitable conduct before the United States Patent & Trademark Office including but not limited to providing, for each of the Allegedly Withheld References and each of the AMF Patents, on a reference-by-reference, patent-by-patent, and claim element-by-claim element basis, the complete factual basis for your contention that (a) the Allegedly Withheld Reference was material, (b) persons associated with the prosecution of the AMF Patents intentionally withheld the reference with intent to deceive, and (c) the Allegedly Withheld References are not cumulative to references that were already before the examiner.

## RESPONSE TO INTERROGATORY NO. 6:

Defendants/counterclaimants object to this interrogatory as premature in view

35

of the fact that discovery has just begun and defendants'/counterclaimants' analysis is continuing.  Subject to this and the general objections, defendants/counterclaimants respond as follows:

During prosecution of each of the applications that matured into the AMF patents, the named inventors and, at least in some instances, their attorney failed to disclose the following prior art references:  U.S. Patent No. 3,942,535 ("the '535 reference"), issued to Joseph H. Schulman on March 9, 1976; U.S. Patent No. 4,082,097 ("the '097 reference"), issued to Alfred E. Mann and Joseph H. Schulman on April 4, 1978; U.S. Patent No. 4,197,850 ("the '850 reference"), issued to Joseph H. Schulman and Jozef I. Kie Sioe Tan on April 15, 1980; U.S. Patent No. 4,220,156 ("the '156 reference"), issued to Joseph H. Schulman and Wayne A. Morgan on September 2, 1980; and U.S. Patent No. 4,223,679 ("the '679 reference"), issued to Joseph H. Schulman, Brian M. Mann and Russell R. Beane on September 23, 1980. The '535 reference, the '097 reference, the '850 reference, the '156 reference and the '679 reference were known to at least Joseph H. Schulman (a named inventor on all of the AMF patents) at the time of the prosecution of each of the applications that matured into the AMF patents.  The '535 reference, the '097 reference, the '850 reference, the '156 reference and the '679 reference would have been material to the prosecution of each of the applications that matured into the AMF patents because each of the references discloses an implantable human tissue stimulator and the use of back telemetry, which is the subject matter of the AMF patents, and because the

references demonstrate the applicability of pacemaker prior art to the AMF patents and contradict statements made during the prosecution history of at least one of the applications that matured into the AMF patents, including statements that such prior art was not relevant. Moreover, the inventor and/or the attorneys never otherwise disclosed that at least one of the inventors was an expert in pacemaker technology. See e.g. testimony of B. Gold dated 12/18/08. The inventors and/or attorneys on the AMF patents failed to submit the '535 reference, the '097 reference, the '850 reference, the '156 reference and the '679 reference to the PTO during the prosecution of the applications that matured into the AMF patents with the intent to deceive the PTO.

During the prosecution of each of the applications that matured into U.S. Patent No. 5,531,774 ("the '774 patent"), U.S. Patent No. 5,609,616 ("the '616 patent"), U.S. Patent No. 5,603,726 ("the '726 patent"), U.S. Patent No. 5,776,172 ("the '172 patent"), and U.S. Patent No. 5,938,691 ("the '691 patent"), the named inventors and their attorney failed to disclose McDermott, "An Advanced Multiple Channel Cochlear Implant," IEEE Transactions on Biomedical Engineering, vol. 36:7, pp. 789-797 (July 1989) ("the McDermott article"). The McDermott article was known to the named inventors or their attorney at the time of the prosecution of each of the applications that matured into the '774, '616, '726, '172 and '691 patents. The McDermott article would have been material to the prosecution of each of the applications that matured into the '774, '616, '726, '172 and '691 patents because the

37

# EXHIBIT 7

# REPORT OF GERALD E. LOEB, M.D.

## INTRODUCTION

I have been asked by Connolly Bove Lodge & Hutz LLP, on behalf of Cochlear Ltd. and Cochlear Americas (collectively "Cochlear"), to review U.S. Patent No. 5,609,616 ("the '616 patent") and U.S. Patent No. 5,938,691 ("the '691 patent"), their file histories, and relevant prior art references, and to prepare the following report providing my opinion regarding the validity of the '616 and '691 patents. I understand that the '616 and '691 patents are the subject of a lawsuit between the Alfred E. Mann Foundation for Scientific Research ("AMF") and Cochlear.

The opinions expressed herein, as well as the bases for those opinions, are based on information currently available to me. I reserve the right to amend or supplement this report if new or additional information is made available to me. For example, I understand that, as of this writing, the Court has not construed the claims of the patents in suit. I reserve the right to amend or supplement this report when the Court provides its interpretations of claim terms.

## MY EDUCATION AND RELEVANT EXPERIENCE

I am Professor of Biomedical Engineering and Adjunct Professor of Neurology and Pharmacy at the University of Southern California. I am also President of Biomed Concepts, Inc., a consulting and prototyping company for medical electronics and Chairman of SynTouch LLC, a start-up company commercializing a novel tactile sensing technology that I invented.

I received a bachelor of arts in human biology (1969) and a medical degree (1972) from the Johns Hopkins University. I completed a year of surgical residency at the University of Arizona before joining the Laboratory of Neural Control of the National Institutes of Health as a Medical Officer.

During my 15 years at NIH (1973-1988), one of my duties was to be Project Officer for a series of contracts from the NIH Neural Prosthesis Program to the University of California at San Francisco and to Stanford University for the development of the first multichannel cochlear implants starting in 1976. I was closely involved in the technical development of the UCSF intracochlear electrode and four channel stimulator and in its subsequent reengineering to become

the CLARION cochlear implant at Advanced Bionics Corp., where I was Chief Scientist from 1994-1999.  Of the over 200 articles and 50 US patents that I have authored, approximately 27 articles and 11 patents specifically concern cochlear implants (see curriculum vitae provided). Much of the rest of my scientific and technical output has been in other related areas of neural prosthetic science and technology, including the sensorimotor and visual systems.  I am an invited lecturer at 5-10 scientific conferences per year, including international meetings in China, Germany, Netherlands, Taiwan, Korea and India within the past year.

I do not have a degree in engineering but I consider myself quite conversant with most principles and practice of engineering relevant to cochlear implants and other neural prosthetics. My knowledge of electronics, computers and biomedical engineering comes from my continuous involvement in the development and application of technology for electrophysiological research and clinical treatment, starting while I was an undergraduate at Johns Hopkins University in 1966. This period spans most of the history of neural prosthetics and biomedical engineering in general, providing a wealth of opportunities to learn by doing.  Consequently, I have been recognized as a Fellow of the American Institute for Medical and Biological Engineering (AIMBE), a Senior Member of the Institute of Electrical and Electronics Engineers (IEEE) and one of Medical Device & Diagnostic Industry Magazine's 100 Notable People in the Medical Device Industry.

Additional qualifications and my publications are set forth more fully in my curriculum vitae, which is provided in the Appendix to this report.


**PRIOR TESTIMONY**

I have not previously served as a testifying expert witness and have not provided a written expert report or oral testimony in any legal proceeding in the last four years.

**COMPENSATION**

I am being compensated at a rate of $400 per hour, plus reasonable expenses.  I have no financial interest in the outcome of the lawsuit between Cochlear and Alfred E. Mann Foundation for Scientific Research ("AMF").


**MATERIAL REVIEWED**

Prior to drafting and executing this report, I reviewed the '616 and '691 patents, along with their prosecution histories in the U.S. Patent and Trademark Office ("PTO").  I also reviewed infringement contentions from AMF, invalidity contentions from Cochlear, a stipulation dated October 17, 2008 memorializing the claim constructions that the parties were able to agree upon, a joint brief dated October 31, 2008 presenting interpretations of claim terms the parties were not able to agree upon, and a representation dated August 11, 2008 by AMF that no claims of the '616 patent are entitled to a filing date that is earlier than August 29, 1991.  I also reviewed various prior art references, including the following prior art discussed below and in the enclosed charts:

U.S. Patent No. 3,872,455 ("the '455 patent");

U.S. Patent No. 3,906,166 ("the '166 patent");

U.S. Patent No. 4,441,202 ("the '202 patent");

U.S. Patent No. 4,451,743 ("the '743 patent");

U.S. Patent No. 4,524,774 ("the '774 patent");

U.S. Patent No. 4,532,930 ("the '930 patent");

U.S. Patent No. 4,612,934 ("the '934 patent");

U.S. Patent No. 4,741,339 ("the '339 patent");

U.S. Patent No. 4,947,844 ("the '844 patent");

European Patent Application Publication No. 0259906 ("EP 259906");
Hugh McDermott's thesis entitled "An Advanced Cochlear Implant Hearing
Prosthesis for Profound To Total Deafness" ("McDermott's Thesis");

The article "An Advanced Multiple Channel Cochlear Implant" by Hugh
McDermott, in the IEEE Transactions on Biomedical Engineering, vol. 36:7, pp.
789-797 (July 1989) ("McDermott's 1989 article");

The article "Cochlear Implant for Simultaneous Multichannel Stimulation" by H. McDermott, in Annals of Otology, Rhinology & Laryngology, Vol. 96, No. 1, Part 2, Suppl. 128, pp. 67-69 (Jan.-Feb. 1987) ("McDermott's 1987 article");

The article "A Custom LSI CMOS Chip for a Cochlear Implant" by H. McDermott, in the Journal of Electrical and Electronics Engineering, Australia - IE Aust. & IREE Aust., Vol. 4, No. 4, pp. 305-309 (December 1984) ("McDermott's 1984 article");

The article "An Overview of the Nucleus Cochlear Implant Program" by Dianne J. Mecklenburg, and Judith A. Brimacombe, Seminars In Hearing, 641:41-51 (1985) ("Mecklenburg 1985");

The article "On the Integration of an Internal Human Conditioning System" by Willy M. C. Sansen, in the IEEE Journal of Solid-State Circuits, Vol. SC-17, No. 3, pp. 513-521 (June 1982) ("Sansen 1982");

The article "The LAURA Cochlear Prosthesis:  Development and Description" by Dr. Ir. S. Peeters et al., found at pp. 547-555 of Cochlear Implant: Current Situation. Proceedings of the International Cochlear Symposium, Duren, West Germany (Banfai, P. ed., September 7-12, 1987) ("Peeters 1987");

Chapter 8 entitled "Neural Prostheses" by Gerald E. Loeb, John McHardy, Ellen M. Kelliher, and S. Barry Brummer in Volume II of Biocompatibility in Clinical Practice (David F. Williams, ed., 1982) ("Loeb 1982");

The article "Design and Fabrication of an Experimental Cochlear Prosthesis" by Gerald E. Loeb et al., Med. & Biol. Eng. & Comput., 21:241-254 (1983) ("Loeb 1983");

The article "The Functional Replacement of the Ear" by Gerald E. Loeb, Scientific American, Vol. 252, No. 2, pp. 104-110 (Feb. 1985) ("Loeb 1985"); and

The article "Cochlear Prosthetics" by Gerald E. Loeb, Annu. Rev. Neruosci., 13:357-371 (1990) ("Loeb 1990").

## COCHLEAR IMPLANTS, SOUND PROCESSORS, AND PROGRAMMING SYSTEMS

The patents in suit are directed to cochlear implant systems.  A cochlear implant (CI) is an electronic device that is surgically implanted inside the head.  A CI provides a sense of sound to a person who has severe or profound sensorineural deafness.  A CI does not amplify sound (as does a hearing aid) because in most cases of sensorineural deafness, the hair cells of the cochlea that are required to detect sounds waves are largely absent.  Instead, a CI works by electrically stimulating the auditory nerve fibers that survive in the majority of cases of sensorineural deafness.  The neural

4

activity thus elicited in those stimulated auditory nerve fibers is interpreted as sound when that neural activity reaches the brain.

Most CIs include circuitry to receive signals transmitted across the skin (transcutaneous) via radio frequency magnetic fields.  The transmitted and received signals contain information representing stimulation signals.  Electronic circuits in the CI convert the received signals to stimulation signals.  The stimulation signals are delivered to the various locations inside the cochlea by an array of electrodes, or a multi-channel electrode.  The electrodes provide the electrical interface with the auditory nerve fibers to be electrically stimulated.

A CI is paired with an external system that generally includes a microphone, a sound processor (also referred to as a speech processor) and an RF transmitter.  The sound processor is a device that converts audio signals detected by a microphone into coded radio signals representative of stimulation signals that are transmitted to the CI.  The CI receives these coded signals, and converts them to electrical stimulation signals to be applied to the intra-cochlear electrodes.  The sound processor that is used on a daily basis by the recipient of the CI is designed to be small and portable so that it can be worn on the recipient like an article of clothing, hence the term "wearable processor" (WP).  Such a WP usually relies on a microprocessor to achieve the necessary small size and low power consumption.  Alternatively, the sound processor may be configured as a personal computer or other instrument, either completely replacing the WP or in series with the WP to make use of the radio frequency transmitter portion of the WP.  This configuration is often used when an audiologist is programming the functionality of the WP, in which case the external system is typically called a "clinician's programmer" (CP).  This configuration may also be used for monitoring the status of the CI or the patient's responses to stimulation, in which case the external system may be called a "physician's tester" (PT).

The sound processor is programmed with a sound processing strategy.  The sound processing strategy uses a specialized algorithm to convert the audio signals into coded signals representing the audio information detected by the microphone and corresponding stimulation signals to be applied to the auditory nerves inside the cochlea.

The sound processing strategy also must be adjusted or "mapped" to account for physiological differences of each implant recipient, such as the individual sensitivities to and the nature of the percepts induced by electrical stimuli applied to the intra-cochlear electrodes.  The mapping process is a large portion of the clinical programming activity described above for the CP.  The mapping process provides data that are used by the sound processor to compute stimulation signal levels that are appropriate for the implantee's sensitivities and responsiveness.  Typically during the mapping process, an audiologist identifies the stimulus intensity levels for each intracochlear electrode that achieve threshold and comfortable loudness of perceived sound.  The threshold levels correspond to the minimal amount of electrical stimulation required for a patient to perceive sound.  The comfort levels correspond to the upper limit of electrical stimulation judged by a patient to be comfortable.

The mapping, which has been done from the earliest days of sound processors, is usually accomplished by manually selecting the electrodes being stimulated, adjusting the stimulation levels, and obtaining either oral or visual feedback from the patient.  Sound processors are still mapped in this fashion today, although the process may be supplemented by physiological measurements, particularly in patients such as infants who may not provide clear feedback.

To summarize the basic operation of the cochlear implant and companion speech processor, the audio signal detected by a microphone is converted to a coded signal by a speech processing algorithm that takes into account the sensitivities and responsiveness of the particular implantee.  The coded signals are then transmitted to the implant, which converts the received coded signals into stimulation signals that are applied to the intra-cochlear electrodes.

In the art of neural prosthetics, back telemetry, or simply telemetry, generally refers to the capability of the prosthetic device, such as a cochlear implant, to transmit information from the implanted device to another device generally located outside the body.  This information is commonly transmitted transcutaneously via radio waves.  In CIs, back telemetry permits the electronic functioning of a CI to be monitored.  For example, back telemetry enables the impedances of the electrode-tissue interfaces and the voltage values at the electrodes to be

monitored.  Back telemetry also permits various operational signal values in the CI to be monitored. The monitored values can be used in various ways, and can be displayed in real time on an external monitoring and display system, or can be stored for later analysis.

## GENERAL DESCRIPTION OF THE PATENTS IN SUIT

The claims of the '691 patent are directed to cochlear implant systems with back telemetry. The systems include features such as (1) the use of different frequencies for the transmissions from the sound processor to the CI and for the back telemetry transmissions from the CI to the sound processor, (2) pulse width control of the stimulation signals (or pulses) applied to the stimulating electrodes, (3) frequency control of the stimulation signals applied to the stimulating electrodes, and (4) power control of the transmissions from the sound processor.

The claims of the '616 patent are directed to a tester and testing method for a cochlear implant system with back telemetry.

## MISCELLANEOUS CONSIDERATIONS

### Level of Ordinary Skill in the Art

I have been asked to opine on the level of skill of a hypothetical person in the art of cochlear implant systems as described in the '616 and '691 patents.  In my opinion, a person of ordinary skill, in the late 1980s or 1990, in the art of cochlear implant systems as described in the '616 and '691 patents would have an understanding of electrical engineering principles.  This understanding could come from formal or informal education, training, experience, or a combination thereof.  For example, a person of ordinary skill in the art of cochlear implant systems as described in the '616 and '691 patents would have education and experience equivalent to a bachelor's degree in electrical engineering, and three to five years of experience in cochlear implant systems.

**Invalidity**

I understand that a patent is invalid if every limitation is found, either expressly or inherently, in a single piece of prior art.  I understand that this type of invalidity sometimes is referred to as anticipation.

I understand that a patent also is invalid if the claimed invention would have been obvious at the time of the invention to one of ordinary skill in the art to which the invention pertains, in light of the scope and content of the prior art, the differences between the prior art and the particular claimed invention, the level of ordinary skill in the art, and any objective indication(s) of non-obviousness, such as commercial success, failure of others, or copying or tribute by others.  I understand that this type of invalidity is referred to as obviousness.

## INVALIDITY ANALYSIS OF CLAIMS 1, 10 AND 12 OF THE '616 PATENT

I have been asked to evaluate the validity of claims 1, 10 and 12 of the '616 patent.

**Some General Observations:**

Claims 1, 10 and 12 of '616 patent are directed to a subset of the material covered in the specification that is shared with the '691 patent, which is discussed separately below.  That subset concerns the process of testing the behavior of the parts of a cochlear prosthetic system that are specific to the patient, namely the implantable cochlear stimulator (ICS) and the externally wearable signal processor (WP).  Claims 1 and 12 are directed to a testing apparatus, while claim 10 is directed to a method of testing.

As described in Crosby et al.'s U.S. Patent No. 4,532,930, and common to any multichannel cochlear prosthesis (e.g. LAURA described by Peeters et al., 1987), the fitting of a cochlear implant involves the measurement and setting of a number of parameters by a subsystem known as a clinician's programmer (CP).  A CP typically allows a clinician to set stimulation parameters using manual controls.  The '616 patent briefly mentions in passing a CP (col. 27, lines 24-27).  The '616 patent, under the heading PHYSICIAN'S TESTER (col. 32, line 33 and following), describes a portable device that is separate from the CP, that can be used to perform a subset of these tasks

without requiring the CP and the WP. As described in TABLE 7 in the '616 patent, that subset of tasks includes measurements and settings that are specific to the ICS and intracochlear electrodes and not those that involve the patient's WP, which must still be configured by the CP. The relationship of the physician's tester (referred to as PT herein) to the rest of the cochlear prosthetic system is illustrated in Figure 1 below that I created:

# Cochlear Prosthetic System



*Figure 1: Crosby et al.'s '930 patent and many other references describe the basic configuration of the typical cochlear prosthetic system (black arrows) in which a CP establishes bidirectional communication with a WP and is used to set signal processing and stimulation parameters in the WP and ICS. Various items of prior art as discussed herein describe the addition of back-telemetry functions (leftward grey arrows) whereby status information such as electrode voltage can be measured and relayed back. The use of such status information in the CP by a clinician to help narrow the appropriate settings of various parameters during programming is immediately apparent to one of ordinary skill in the art. The '616 patent describes a PT that can make use of the same bidirectional communication channels to query and display the status information and to temporarily set certain parameters in the ICS. However, in the cochlear implant system described in the '616 patent, a CP is still required to set the parameters that are stored in the WP.*

AMF appears to contend that claims 1, 10 and 12 are applicable to a broad range of testing and programming subsystems, including a CP. The relevant prior art regarding CPs (e.g. Crosby and LAURA) clearly teaches manually setting stimulation parameters for a CP. Back-telemetry is mentioned by Peeters et al. (1987), and is described in detail in McDermott's thesis, articles and '844 patent. McDermott's '844 patent focuses on a novel ICS with back telemetry, and, although not expressly described, one of ordinary skill in the art would have understood that a WP and CP were inherently essential parts of cochlear prosthetic system described therein. McDermott's thesis and 1989 article describe an external receiver and display system for receiving, demodulating

(processing) and displaying CI stimulation electrode voltage waveforms sent by FM telemetry from the ICS (Fig. 4).  Thus, McDermott's thesis and 1989 article clearly disclose a tester for, and a method of testing, a CI system using telemetry.  McDermott's description of Initial Patient Results in his 1989 article (p. 796) inherently requires that a CP such as described in Crosby '930 was used to manually set stimulation parameters in the WP.  McDermott's thesis provides an even more detailed description of a CI system that includes telemetry, and a tester for, and a method of testing, the CI system using telemetry.

Borkan's U.S. Patent No. 4,612,934 (and much other prior art related to pacemakers and spinal cord stimulators) specifically describes a portable PT (Borkan Figs. 22, 23 and related text) for use with neural stimulation systems including auditory prostheses (col. 25, line 1 - col. 26, l. 18).  The implanted stimulator in Borkan's '934 patent includes back telemetry (col. 21, lines 21-37).  Borkan also specifically describes the basic WP – ICS – electrode configuration of a cochlear implant system (Fig. 29 and related text).

EP 259906 and the 1987 Peeters et al. article (collectively "LAURA references") similarly describe the basic WP – ICS – electrode configuration of a cochlear implant system that includes back telemetry.  The LAURA references also disclose using the back telemetry to measure ICS or electrode voltages and for full control of implanted circuitry (EP 259906, col. 4, lines 51-55; 1987 Peeters et al. article, p. 551).  The LAURA WP is designed to be connected to a computer via a RS232 interface to facilitate testing the patient and programming the WP (1987 Peeters et al. article, p. 553).

**Observations Regarding Certain Claim Limitations:**

I incorporate the comments in the enclosed charts, and supplement those comments with additional observations here.

Claims 1 and 12 of the '616 patent respectively recite a "physician's tester" and "portable physician's tester."  I understand that AMF interprets these recitations to mean "a device used for testing" and "a portable device used for testing," respectively.  Tab 1 of October 31, 2008 Joint Appendix Submitted With Joint Claim Construction Brief (hereinafter referred to as "Tab 1 of

October 31, 2008 Joint Appendix"), at p. 19.  I understand that Cochlear interprets both of these recitations to mean "a portable testing device, separate from a programming system."  *Id.*

McDermott's thesis and 1989 article each describe a testing system that is separate from a CP.  Borkan's '934 patent also describes a separate tester (Figs. 22, 23 and related text).  Crosby et al.'s '930 patent and the LAURA references describe prior art CP systems.  The '930 patent describes the CP as a "conventional off-the-shelf microcomputer system" (col. 43, ll. 57-58), which, by the late 1980s, included portable computers.  As I indicated above, it would be immediately apparent to one of ordinary skill in the art to use the information provided by the back telemetry described in each of Borkan's '934 patent and McDermott's thesis, '844 patent and articles (hereinafter collectively referred to as the "McDermott references") in the CP systems to test and help select various parameters during programming.


Claims 1 and 12 of the '616 patent respectively recite an ICS with "receiving means for receiving the data-containing signals" and "receiver means for receiving data-containing signals."  I understand that AMF interprets the recitation from claim 1 to mean "an antenna and a receiver" and the recitation from claim 12 to mean "a receiver."  Tab 1 of October 31, 2008 Joint Appendix", at p. 3.  I understand that Cochlear interprets both recitations to mean "a receiver connected to main coil/antenna, which is separate from the telemetry coil/antenna."  *Id.*

The prior art discussed herein clearly describes CIs with receiving circuitry and (at least) one antenna.  The LAURA references, and Borkan's '934 patent (e.g., Fig. 24) describe implementations with two implanted antenna, one to receive transmissions from the WP, and another for back telemetry transmissions.  My 1985 article also showed multiple implanted antennas.  It would have been obvious to one of ordinary skill in the art to use separate receiving and back telemetry antennae in the implants of the McDermott references, and Crosby et al.'s '930 patent.

Claims 1 and 12 of the '616 patent respectively recite an ICS with

| '616 patent, claim 1 | '616 patent, claim 12 |
|---|---|
| processor means for processing the data-containing signals to generate stimulation signals | processor means for processing the received data-containing signals to generate stimulation signals |

I understand that AMF interprets both recitations to mean "a processor".  Tab 1 of October 31,

2008 Joint Appendix, at pp. 6-9.  I understand that Cochlear interprets both recitations to mean the

circuitry of Figures 2 and 4A-H of the '616 patent that perform the recited functions:

> "a regulator, voltage reference, voltage regulator error amplifier, data decoder, VCO, loop
>
> filter, bit and word counters, initialization, serial to parallel converter, data amplitude latch,
>
> command latch, word strobe generator, D/A current reference, exponential D/A converter,
>
> analog mux, voltage down-converter, eight storage/refresh capacitors, and eight current
>
> source FETs" as shown in Figure 2 or "series regulator, voltage error amplifier, voltage
>
> reference, down converter clock, voltage downconverter (including off-chip capacitors),
>
> powerbad detector, initialization, parity error detector, multiple chip control, data
>
> conditioner; clock decoder; serial to parallel converter; word strobe generator; polarity and
>
> amplitude data latch; command latch; command decoder; current reference generator;
>
> logarithmic D to A converter; analog multiplexer; eight refresh voltage controls; eight
>
> switching transfer capacitors; eight refresh voltage capacitors; eight current sources; and
>
> refresh voltage logic" as shown in Figures 4A-H.

Tab 1 of October 31, 2008 Joint Appendix, at pp. 6-9.

It is not clear to me whether AMF's interpretation ("processor") is intended to mean a

microprocessor, or merely any circuitry that can process the signal received from the WP to

generate an appropriate stimulation signal.  Borkan's '934 patent describes an implant with a

microprocessor (item 500 in Fig. 16 and related text and Figures).  Sansen's 1982 article describes

in implantable stimulator, including a hearing stimulator, with a microprocessor (Fig. 1).  All of the

remaining relevant prior art (e.g., each of the McDermott references, Crosby et al.'s '930 patent, the

LAURA references) has digital circuitry that can process the signal received from the WP to

generate an appropriate stimulation signal.

12

With respect to Cochlear's interpretation, the particular implementations of "processing means" shown in Figure 2 and 4A-H of the '616 patent appear to be particular design choices. The "voltage downconverter" of Figures 2 and 4A-H corresponds to a DC-to-DC converter, which was well known in the art (for example, U.S. Patent No. 4,451,743). Switching capacitor circuits were similarly well-known (for example, the '743 patent). If Cochlear's products were found to satisfy Cochlear's interpretation, that would imply that the products have, equivalently, the list of components reflected in Cochlear's interpretation of the subject claim terms (including, e.g., eight refresh capacitors; eight current sources, etc.). If Cochlear's products are deemed to satisfy Cochlear's interpretation of these claim terms, then any of the prior art, i.e., Borkan's '934 patent each of the McDermott references, Crosby et al.'s '930 patent, and the LAURA references, would similarly suggest or satisfy Cochlear's interpretation and therefore disclose these elements of the claims.

Claims 1, 10 and 12 of the '616 patent recite the following:

| '616 patent, claim 1 | '616 patent, claim 10 | '616 patent, claim 12 |
|---|---|---|
| tissue-stimulating electrodes for receiving the stimulation signals | tissue-stimulating electrodes | tissue-stimulating electrodes |

I understand that AMF interprets these recitations to mean "electrodes used in stimulating tissue", and that Cochlear interprets these recitations to mean "electrodes implanted within the cochlea (intra-cochlear electrodes) for stimulating tissue." Tab 1 of October 31, 2008 Joint Appendix, at pp. 10-11.

The relevant prior art that disclose CIs (e.g., each of the McDermott and LAURA references, Borkan's '934 patent, and Crosby et al.'s '930 patent), disclose more than one intracochlear electrode for stimulating tissue.

Claim 10 of the '616 patent recites "applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes." I understand that Cochlear interprets this recitation to mean "capacitively coupling the stimulation signals through switches" (Tab 1 of

October 31, 2008 Joint Appendix, at p. 11) while AMF believes that this recitation has a customary and ordinary meaning to one of ordinary skill in the art, although I have not been advised what is that customary and ordinary meaning to AMF. The Borkan '934 patent (Fig. 20, items 614), and the LAURA references (e.g., Peeters et al.) each disclose the use of coupling capacitors and switches to apply the stimulation signals to intracochlear electrodes of the CI. The McDermott references disclose the use of coupling capacitors and an approach to avoid their use. It would have been obvious to one of ordinary skill in the art to use coupling capacitors in the CI of Crosby et al.'s '930 patent.

Claim 12 of the '616 patent recites "means for applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes." I understand that AMF interprets this recitation to mean "a switch or switches" whereas Cochlear interprets this recitation to mean "a command decoder, output mode register, pulse width control comprising two downcounters, eight electrode switching matrices, eight coupling capacitors CA, and eight coupling capacitors CB" consistent with the particular implementation disclosed by Figures 4A-H of the '616 patent. Tab 1 of October 31, 2008 Joint Appendix, at p. 11. All of the relevant prior art discloses switches for applying stimulation signals. Borkan's '934 patent discloses a microprocessor, electrode polarity decoder, pulse width controller, electrode switches and coupling capacitors (Figs. 16, 19, 20, and related text). McDermott's '844 patent, thesis and 1984 and 1989 articles each discloses a decoder, electrode selector, delay and duration counters, output switches and capacitor coupling. The LAURA references disclose a pulse generator, mode selector, coupling capacitors, and switches. Crosby et al.'s '930 patent discloses everything except coupling capacitors, and, as I have mentioned, it would have been obvious to one of ordinary skill in the art to use coupling capacitors in the CI of Crosby et al.'s '930 patent.

14

Claims 1, 10 and 12 of the '616 patent recite the following:

| '616 patent, claim 1 | '616 patent, claim 10 | '616 patent, claim 12 |
|---|---|---|
| monitor means in the processor means and responsive to the data-containing signals for<br><br>(1) selectively monitoring at least one pair of the tissue-stimulating electrodes as one of the stimulation signals is applied thereto to measure a voltage associated with said pair of electrodes, and | selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto; | monitor means in the processor and responsive to the data-containing signals received by the receiver means for<br>(1) monitoring a selected pair of the multiplicity of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and |
| (2) generating stimulator status-indicating signals | generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator | (2) generating stimulator status-indicating signals, said stimulator status-indicating signals including the voltage measured at the selected pair of electrodes by the monitor means as one of the stimulation signals is applied thereto |

I understand that AMF interprets the above recitations of claims 1 and 12 to require a structure of "a decoder and a signal multiplexer." Tab 1 of October 31, 2008 Joint Appendix, at pp. 14-16. I understand that Cochlear interprets the recitations of claims 1 and 12 to require a structure of "a word strobe generator, command latch, command decoder, polarity and amplitude data latch, output mode register, pulse width control including two downcounters, eight electrode switching matrices, conductive signal paths, telemetry function decoder, telemetry multiplexer, A/D converter and telemetry modulator" (*Id.*) which corresponds to the implementation of Figures 4A-H of the '616 patent.

As for AMF's interpretation, Borkan's '934 patent discloses a microprocessor (decoder) and a multiplexer (Figs. 16, 17). Electrode voltage may be monitored and telemetered back to the external programmer/tester (Figs. 16, 17, 20). McDermott's '844 patent discloses data demodulator and decoder and an electrode selector (serving as a multiplexer) that is connected to the telemetry transmitter, thus permitting electrode voltages to be measured. McDermott's 1989 article and thesis each discloses a data receiver (which includes circuitry corresponding to a decoder) and a voltage monitor (corresponding to multiplexer) in the CI. The LAURA references disclose an input

monitor and mode controller (corresponding to decoder) and an output controller and stimulation signal controller (corresponding to multiplexer).  It would have been obvious to one of ordinary skill in the art to incorporate back-telemetry function of the McDermott references into the Crosby et al. '930 patent.

With respect to Cochlear's interpretation, the particular implementations of "monitor means" shown in Figures 4A-H of the '616 patent appear to be design choices.  If Cochlear's products were found to satisfy Cochlear's interpretation, that would imply that the products have, equivalently, the list of components reflected in Cochlear's interpretation of the subject claim.  If Cochlear's products are deemed to satisfy Cochlear's interpretation of these claim terms, then any of the prior art, i.e., Borkan's '934 patent each of the McDermott references, Crosby et al.'s '930 patent, and the LAURA references, would similarly suggest or satisfy Cochlear's interpretation and therefore disclose these elements of the claims.

With respect to the functional language recited above, Borkan's '934 patent, each of the McDermott references, and the LAURA references, each discloses monitoring the voltages of stimulating electrodes, and back telemetering data corresponding to the measured voltages.  To the extent that there is any distinction between monitoring one electrode at a time, and monitoring the voltage (difference) between two electrodes, one of ordinary skill in the art understands that a voltage measurement inherently measures the potential difference between two points.  If the voltage at a stimulating electrode is measured while stimulating in a mode called common ground, all of the non-stimulated electrodes will be at ground, a typical reference point for a voltage measurement.  One of ordinary skill in the art would understand that such a voltage measurement would be between at least two electrodes.

Claims 1, 10 and 12 of the '616 patent recite the following:

| '616 patent, claim 1 | '616 patent, claim 10 | '616 patent, claim 12 |
|---|---|---|
| telemetry means for transmitting the stimulator status-indicating signals to the external headpiece/ transmitter means | transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter | telemetry means for transmitting the stimulator-status indicating signals to an external receiver |

16

I understand that AMF interprets the above recitations of claims 1 and 12 to mean "a transmitter and an antenna," while Cochlear interprets the recitations to mean "telemetry transmitter connected to a telemetry antenna/coil that is separate from the receiving or main coil in the ICS." Tab 1 of October 31, 2008 Joint Appendix, at p. 17.  I understand that Cochlear interprets the recitation of claim 10 consistent with the description of the '616 patent to mean "transmitting the stimulator status-indicating signals using a telemetry coil that is separate from the main receiving coil" (Tab 1 of October 31, 2008 Joint Appendix, at p. 17) while AMF believes that this recitation has a customary and ordinary meaning to one of ordinary skill in the art, although I have not been advised what is that customary and ordinary meaning to AMF.

The prior art discussed herein describes CIs with back telemetry circuitry and (at least) one antenna.  The LAURA references, and Borkan's '934 patent (e.g., Fig. 24) and Sansen (1982) describe implementations with two implanted antennas, one to receive transmissions from the WP, and another for back telemetry transmissions.  My 1985 article also showed multiple implanted antennas, each operating at a different radio frequency.  It would have been obvious to one of ordinary skill in the art to use separate receiving and back telemetry antennas in CIs of each of the McDermott references, and Crosby et al.'s '930 patent.

I note that claim 10 recites an "external receiver coupled to the external transmitter" Assuming "coupled" is interpreted to mean some form of electrical or magnetic connection, then McDermott's thesis and 1989 article show the WP coupled to the implant, which in turn is coupled to the receiver and display monitor, so that the WP is coupled via the implant to the receiver and display monitor.  Borkan's '934 patent illustrates a transceiver (Fig. 23) in which the functions of external receiver and external transmitter are integrated in a single external subsystem and further illustrates the configuration of a typical cochlear implant system (Fig. 29). It would have been obvious to one of ordinary skill in the art to combine different embodiments (e.g., Figs. 23 and 29) in Borkan's '934 patent to obtain such a configuration for a physician's tester or clinician's programmer. Peeters (1987) describes enhancements of the LAURA system in which telemetry for feedback has been added to the implant, implying to one of ordinary skill in the art that there would

17

be a receiver of that telemetry in the external subsystem that was transmitting inward power and

data to the implanted electronics.    Similarly, it would have been obvious to one of ordinary skill in

the art to use the transmitting coil of the speech processors of the McDermott thesis, 1989 article

and (and implicitly required by the '844 patent) to serve as a receiving coil for the back telemetry

signal, and to provide the signal to CP rather than an oscilloscope set-up.  It also would have been

obvious to one of ordinary skill in the art that the configuration described in the LAURA references

could be realized by using the transmitting coil of the speech processor to serve as a receiving coil

for the back telemetry signal, and to provide the signal to CP.  It would also be obvious to one of

ordinary skill in the art optionally to use physically separate antenna coils for the external receiving

and transmitting functions but to couple them through a common power supply and digital signal

processor in the WP or CP to provide the intended function of "feedback" whereby data from the

back-telemetry link informs the programming or operation of the WP.

Claims 1, 10 and 12 of the '616 patent recite the following in connection with the

physician's tester:

| '616 patent claim 1 | '616 patent claim 10 | '616 patent claim 12 |
|---|---|---|
| external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes | receiving and processing the status-indicating signals to produce processed status-indicating signals which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator | external receiver means for receiving the status-indicating signals transmitted by the telemetry means of the ICS;<br><br>external processor means for processing the received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue stimulating electrodes |

I understand that the parties agree that the recitations above of claims 1 and 12 correspond

to the structure of an "antenna", "receiver", and "microprocessor".  October 17, 2008 Stipulation,

¶¶ 2(a), 2(c), 2(d).

Borkan's '934 patent discloses a tester with a transceiver coil, demodulator, and

microprocessor (Figs. 22, 23 and related text).  McDermott's thesis and 1989 article each discloses

a monitor receiving probe (corresponding to an antenna), voltage monitor receiver and demodulator, as well as a speech processor with a microprocessor, and it is implicitly suggested that a CP with its processor was  used to program the speech processor.  The LAURA references disclose a cochlear implant system with back telemetry, and a WP with an RS232 interface to connect to a computer, including a CP.  It would have been obvious to one of ordinary skill in the art that back telemetry signal could be used by the CP to provide information about the operation of the CI.  Crosby et al.'s '930 patent discloses a CP which included a computer.  It would have been obvious to one of ordinary skill in the art to modify the prior art CP of Crosby et al's '930 patent to make use of the back telemetry signal of the LAURA and McDermott references.

    With respect to the functional recitations of the claim terms, Borkan's '934 patent, and McDermott's thesis and 1989 article each discloses receiving back telemetry transmissions of CI stimulating electrode voltage measurements, and processing such received transmissions to generate displayable measurement results.  McDermott's '844 patent describes telemetering stimulating electrode voltage measurements for monitoring and analysis (col. 8, ll. 13-24).  One of ordinary skill in the art would understand that the back telemetry signal must be processed to be able to perform any analysis of the measured voltages described in the '844 patent.  As I indicated above, it would have been obvious to one of ordinary skill in the art that the back telemetry signal in the LAURA references could be used by the CP to provide information about the operation of the CI.  Similarly, as I indicated above, it would have been obvious to one of ordinary skill in the art to modify the prior art CP of Crosby et al's '930 patent to make use of the back telemetry signal of the LAURA and McDermott references.

    I note that claim 1 recites "external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom…"  Again, assuming "coupled" is interpreted to mean some form of electrical or magnetic connection, then McDermott's thesis and 1989 article show the WP coupled to the implant, which in turn is coupled to the receiver and display monitor, so that the WP is coupled via the implant to the receiver and display monitor.  Borkan's '934 patent illustrates a

transceiver (Fig. 23) in which the functions of external receiver and external transmitter are
integrated in a single external subsystem and further illustrates the configuration of a typical
cochlear implant system (Fig. 29). It would have been obvious to one of ordinary skill in the art to
combine different embodiments (e.g., Figs. 23 and 29) in Borkan's '934 patent to obtain such a
configuration for a physician's tester or clinician's programmer. Peeters (1987) describes
enhancements of the LAURA system in which telemetry for feedback has been added to the
implant, implying to one of ordinary skill in the art that there would be a receiver of that telemetry
in the external subsystem that was transmitting inward power and data to the implanted electronics.
Similarly, it would have been obvious to one of ordinary skill in the art to use the transmitting coil
of the speech processors of the McDermott thesis, 1989 article and (and implicitly required by the
'844 patent) to serve as a receiving coil for the back telemetry signal, and to provide the signal to
CP rather than an oscilloscope set-up.  It also would have been obvious to one of ordinary skill in
the art that the configuration described in the LAURA references could be realized by using the
transmitting coil of the speech processor to serve as a receiving coil for the back telemetry signal,
and to provide the signal to CP.  It would also be obvious to one of ordinary skill in the art
optionally to use physically separate antenna coils for the external receiving and transmitting
functions but to couple them through a common power supply and digital signal processor in the
WP or CP to provide the intended function of "feedback" whereby data from the back-telemetry
link (i.e. "to derive information therefrom") informs the programming or operation of the WP.

Claims 1, 10 and 12 of the '616 patent contain the following recitations regarding an
external transmitter:

| '616 patent claim 1 | '616 patent claim 10 | '616 patent claim 12 |
|---|---|---|
| transmitting means for transmitting data-containing signals to the ICS | transmitting data-containing signals to an implanted stimulator from an external transmitter | external transmitter means for transmitting the data-containing signals to the receiver means of the ICS |

I understand that AMF interprets the recitation of claim 1 to mean "an antenna and a
transmitter" and the recitation of claim 12 to mean "a transmitter." Tab 1 of October 31, 2008 Joint
Appendix, at p. 2.  I understand that Cochlear interprets both of the recitations to mean "an antenna,

data transmitter and custom gate array comprising a switching regulator and a switching transistor or multiple switching transistors in the switching regulator." *Id.*

With respect to AMF's interpretation, all of the relevant prior art (i.e., Borkan's '934 patent, the McDermott and LAURA references, and Crosby et al.'s '930 patent) expressly or implicitly discloses a WP with an antenna and a transmitter to transmit data-containing signals to companion ICS.

With respect to Cochlear's interpretation, if Cochlear's products were found to satisfy Cochlear's interpretation, that would imply that the products have, equivalently, the components reflected in Cochlear's interpretation of the subject claim (including, e.g., a custom gate array). If Cochlear's products are deemed to satisfy Cochlear's interpretation of these claim terms, then any of the prior art, i.e., Borkan's '934 patent each of the McDermott references, Crosby et al.'s '930 patent, and the LAURA references, would similarly suggest or satisfy Cochlear's interpretation and therefore disclose these elements of the claims.

Claims 1, 10 and 12 of the '616 patent contain the following recitations regarding an external transmitter:

| '616 patent claim 1 | '616 patent claim 10 | '616 patent claim 12 |
|---|---|---|
| user-controllable means connected to the external processor means for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means, | selectively controlling the data-containing signals as they are thus transmitted; | user-controllable means<br><br>for selectively generating the data-containing signals, |
| said user-controllable means including manual means for specifying a peak output current for the stimulation signals to be applied to the at least one pair of tissue-stimulating electrodes; and | | said user-controllable means including manual means for manually specifying a peak output current to be included in the data-containing signals; |

I understand that AMF interprets the recitation "user controllable means ..." to correspond to a structure of "one or more controls" and the recitation "manual means ..." to correspond to a structure of "one or more manual controls." Tab 1 of October 31, 2008 Joint Appendix, at pp. 20-

21.  I understand that Cochlear interprets the recitation "user controllable means ..." to correspond to a structure of "three rotary knobs (306, 308, 310), potentiometers coupled to the rotary control knobs, and a microprocessor coupled to the potentiometers" and the recitation "manual means ..." to correspond to a structure of a "rotary control knob adjustable to different positions corresponding to peak output currents."  *Id.*

Borkan's '934 patent describes a programmer/tester with a manual keypad that can set stimulus levels (Figs. 22, 23).  Crosby et al.'s '930 patent describes a diagnostic and programming unit (a CP) which includes manually adjustable knobs, sliders or other manually operated controls to set stimulus levels (col. 12, ll. 33-39).  McDermott's thesis and 1989 article describe the setting of threshold and comfort stimulation levels during programming, which implicitly required manually setting those levels.  The LAURA references describe a programming mode that permits any waveform to be set on any electrode (1987 Peeters et al., p. 552), which again implicitly requires manually setting the stimulation level.  At a minimum, it would be obvious to one of ordinary skill in the art to use a CP such as that disclosed in Crosby et al.'s '930 patent to program the CI systems of the McDermott references, and the LAURA references.  The '930 patent includes manual controls.  All of these prior art references satisfy the interpretations urged by AMF.

With respect to Cochlear's interpretation, if Cochlear's products were found to satisfy Cochlear's interpretation, that would imply that the products have, equivalently, the components reflected in Cochlear's interpretation of the subject claim (including, e.g., rotary control knobs connected to potentiometers).  If Cochlear's products are deemed to satisfy Cochlear's interpretation of these claim terms, then any of the prior art, i.e., Borkan's '934 patent each of the McDermott references, Crosby et al.'s '930 patent, and the LAURA references, would similarly suggest or satisfy Cochlear's interpretation and therefore disclose these elements of the claims.

With respect to the functional selectively "generating" and "controlling" the data-containing signals, Borkan's '934 patent discloses using the programmer/tester to generate and control the stimulating signals to be applied at the electrodes.  Similarly, the CP disclosed in Crosby et al.'s

22

'930 patent generates and controls the stimulating signals to be applied at the stimulating electrodes.

Claims 1, 10 and 12 of the '616 patent contain the following recitations regarding displaying information:

| '616 patent claim 1 | '616 patent claim 10 | '616 patent claim 12 |
|---|---|---|
| display means for displaying the information derived from the status-indicating signals. | displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known. | display means for displaying the information derived from the status-indicating signals. |

I understand that AMF interprets the structure of the "display means" recited in claims 1 and 12 to correspond to "a display". Tab 1 of October 31, 2008 Joint Appendix, at p. 22. I understand that Cochlear interprets the structure to correspond to "a microprocessor with a display port and a display." *Id.*

With respect to functional language, I understand that Cochlear interprets "information derived from the status-indicating signals" recited in claims 1 and 12 to mean "processed information indicative of the status of the ICS, including the voltage measure across a pair of intra-cochlear electrodes" and that AMF believes that such recitations have a customary and ordinary meaning to one of ordinary skill in the art. *Id.*, at p. 21. I understand that Cochlear interprets "the results of the measurements made within the implanted stimulator" recited in claim 10 to mean "the voltage measured across two intra-cochlear electrodes at the time of stimulation" and that AMF believes that such recitation has a customary and ordinary meaning to one of ordinary skill in the art. *Id.*

Borkan's '934 patent discloses an external programmer/tester that includes a microprocessor, and a bus and bus control to connect the microprocessor to a display incorporated into the programmer (item 714), and an external CRT (item 720). The '934 patent further describes that impedance, or any other data or waveform can be displayed (col. 25, lines 5-8, 53-56).

Inasmuch as the '934 patent describes back telemetering electrode voltages (Figs. 16, 17, 20), one of ordinary skill in the art would understand that the voltages measured at stimulating electrodes could be displayed.

McDermott's thesis and 1989 article each expressly describes that any electrode voltage waveform may be telemetered to an external voltage monitor receiver and demodulator, and the waveform displayed on a display.

McDermott's '844 patent indicates that the electrode voltage is back telemetered for monitoring and analysis. Although the '844 patent does not expressly disclose a display, or displaying a measured voltage, one of ordinary skill in the art would understand that the back telemetered electrode voltage could be displayed.

The LAURA references explain that the CI electrode voltage is measured and telemetered back. The WP has an RS232 interface to connect to a computer, and the computer is used to test the WP-CI system. One of ordinary skill in the art would understand the LAURA references to suggest that the back telemetered voltage could be displayed on the programming system computer.

One of ordinary skill in the art would have been motivated to modify the CP of Crosby et al.'s '930 patent to make use of the back telemetered electrode voltages provided by Borkan's '934 patent, the McDermott references, and the LAURA references, and display the back telemetered electrode voltages on the computer screen of the CP.

### Summary of Opinion re Invalidity of '616 patent

Based upon my review of the relevant prior art, it is my opinion that claims 1, 10 and 12 of the '616 patent are invalid. Depending upon which, if any, of the interpretations proposed by the parties is adopted, the following summarizes my opinion.

Borkan's '934 patent anticipates claims 1, 10 and 12 of the '616 patent. Alternatively, Borkan's '934 patent, alone or combined with the knowledge of one of ordinary skill in the art, renders obvious claims 1, 10 and 12 of the '616 patent. Additionally, Borkan's '934 patent, combined with Crosby et al.'s '930 patent or with either McDermott's thesis or 1989 article, render

24

obvious claims 1, 10 and 12 of the '616 patent.  Additionally, Borkan's '934 patent, combined with Crosby et al.'s '930 patent (e.g., CP) and with either McDermott's thesis or 1989 article, render obvious claims 1, 10 and 12 of the '616 patent.

McDermott's thesis or 1989 article, alone or combined with the knowledge of one of ordinary skill in the art, renders obvious claims 1 and 12 of the '616 patent.  Additionally, McDermott's thesis or 1989 article, combined with the LAURA references, or Borkan's '934 patent or Sansen (1982) render obvious claims 1 and 12 of the '616 patent.  Additionally, McDermott's thesis or 1989 article, combined with Crosby et al.'s '930 patent render obvious claims 1 and 12 of the '616 patent.  Additionally, McDermott's thesis or 1989 article, combined with Crosby et al.'s '930 patent and, alternatively, with either the LAURA references, or Borkan's '934 patent or Sansen (1982), render obvious claims 1 and 12 of the '616 patent.

McDermott's thesis or 1989 article anticipates claim 10 of the '616 patent.  Alternatively, McDermott's thesis or 1989 article, alone or combined with the knowledge of one of ordinary skill, renders obvious claim 10 of the '616 patent.  Additionally, McDermott's thesis or 1989 article, combined with the LAURA references, or Borkan's '934 patent or Sansen (1982) render obvious claim 10 of the '616 patent.  Additionally, McDermott's thesis or 1989 article, combined with Crosby et al.'s '930 patent (e.g., CP), render obvious claim 10 of the '616 patent.  Additionally, McDermott's thesis or 1989 article, combined with Crosby et al.'s '930 patent and, alternatively, with either the LAURA references, or Borkan's '934 patent or Sansen (1982), render obvious claim 10 of the '616 patent.

McDermott's '844 patent, combined with Borkan's '934 patent, or Crosby et al.'s '930 patent, render obvious claims 1, 10 and 12 of the '616 patent.

The LAURA references, alone or combined with the knowledge of one of ordinary skill in the art render obvious claims 1, 10 and 12 of the '616 patent.  Additionally, the LAURA references, combined with Borkan's '934 patent, or Crosby et al.'s '930 patent or McDermott's thesis or 1989 article render obvious claims 1, 10 and 12 of the '616 patent.

Crosby et al.'s '930 patent (e.g., at least CP), combined with McDermott's thesis or 1989 article or '844 patent render obvious claims 1, 10 and 12 of the '616 patent. Additionally, Crosby et al.'s '930 patent, combined with Borkan's '934 patent or the LAURA references render obvious claims 1, 10 and 12 of the '616 patent. Additionally, Crosby et al.'s '930 patent, combined with McDermott's thesis or 1989 article or '844 patent and with Borkan's '934 patent or the LAURA references render obvious claims 1, 10 and 12 of the '616 patent.

## INVALIDITY ANALYSIS OF CLAIMS 1-9 AND 14 OF THE '691 PATENT

I have been asked to evaluate the validity of claims 1-9 and 14 of the '691 patent.

**Some General Observations:**

The abstract and claims of this patent are directed to a subset of the material covered in the specification that is shared with US Patent No. 5,609,616, which is discussed separately above. The claims are directed to various combinations of specific features of the electronic circuitry. An expanded version of my system diagram introduced above is shown below. The function and design of features present in the '691 patent are discussed in the context of common practices at the time in both electronic circuit design and cochlear prosthetic systems.

# Cochlear Prosthetic System



*Figure 2.*

The subject claims of the '691 patent are directed to features such as (1) the use of different frequencies for the transmissions from the sound processor to the CI and for the back telemetry transmissions from the CI to the sound processor, (2) pulse width control of the stimulation signals (or pulses) applied to the stimulating electrodes, (3) frequency control of the stimulation signals

**<u>Summary of Opinion re Invalidity of '691 patent</u>**

Based upon my review of the relevant prior art, it is my opinion that claims 1-9 and 14 of the '691 patent are invalid.  Depending upon which, if any, of the interpretations proposed by the parties is adopted, the following summarizes my opinion.

McDermott's thesis or 1984 or 1987 article or '844 patent or Borkan's '934 patent or the LAURA references, combined with Crosby et al.'s '930 patent (at least, e.g., co-ax cable, L-C filter), render obvious claims 1, 2, 4 and 5 of the '691 patent.

McDermott's thesis or 1984 or 1987 article or '844 patent, combined with Borkan's '934 patent or the LAURA references, and with Crosby et al.'s '930 patent (at least, e.g., co-ax cable, L-C filter), render obvious claims 1, 2, 4 and 5 of the '691 patent.


McDermott's thesis or 1984 or 1987 article or '844 patent or Borkan's '934 patent or the LAURA references, combined with Crosby et al.'s '930 patent (at least, e.g., co-ax cable, L-C filter), and with Fuller et al.'s U.S. Patent No. 3,872,455 (e.g., shield), render obvious claim 3 of the '691 patent.

McDermott's thesis or 1984 or 1987 article or '844 patent, combined with Borkan's '934 patent or the LAURA references, with Crosby et al.'s '930 patent (at least, e.g., co-ax cable, L-C filter), and with Fuller et al.'s U.S. Patent No. 3,872,455 (e.g., shield), render obvious claim 3 of the '691 patent.


Borkan's '934 patent and the LAURA reference (Peeters et al. 1987) anticipate claims 6 and 9 of the '691 patent.

McDermott's thesis or 1984 or 1987 article or '844 patent or Borkan's '934 patent or the LAURA references, render obvious claims 6 and 9 of the '691 patent.

# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4

 5   ALFRED E. MANN FOUNDATION FOR )
     SCIENTIFIC RESEARCH,          )
 6                                 )
                  Plaintiff,       )
 7                                 )
        vs.                        )   Case No.
 8                                 )   CV-07-08108 GHK (CTX)
     COCHLEAR CORPORATION and      )
 9   COCHLEAR, LTD.,               )   Volume I
                                   )
10                Defendants.      )
     _____)
11   COCHLEAR AMERICAS and         )
     COCHLEAR, LTD.,               )
12                                 )
              Counter-Claimants,   )
13                                 )
        vs.                        )
14                                 )
     ALFRED E. MANN FOUNDATION FOR )
15   SCIENTIFIC RESEARCH,          )
                                   )
16            Counter-Defendant.   )
     _____)
17

18

19             VIDEOTAPED DEPOSITION OF

20          GINGER STICKNEY, Ph.D., F.A.A.A.

21             Los Angeles, California

22           Tuesday, December 24, 2013

23

24   Reported by:  Marceline F. Noble
                   CSR No. 3024
25   NDS Job No.:  159474
```

1

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4

5    ALFRED E. MANN FOUNDATION FOR )
     SCIENTIFIC RESEARCH,           )
6                                    )
                    Plaintiff,       )
7                                    )
        vs.                          )  Case No.
8                                    )  CV-07-08108 GHK (CTX)
     COCHLEAR CORPORATION and        )
9    COCHLEAR, LTD.,                 )  Volume I
                                     )
10                  Defendants.      )
     _____)
11   COCHLEAR AMERICAS and           )
     COCHLEAR, LTD.,                 )
12                                   )
             Counter-Claimants,      )
13                                   )
        vs.                          )
14                                   )
     ALFRED E. MANN FOUNDATION FOR )
15   SCIENTIFIC RESEARCH,            )
                                     )
16           Counter-Defendant.      )
     _____)
17

18

19               VIDEOTAPED DEPOSITION OF GINGER

20       STICKNEY, Ph.D., F.A.A.A., taken on behalf of the

21       Defendants, at 333 South Hope Street, 43rd Floor,

22       Los Angeles, California, beginning at 8:11 a.m.

23       and ending at 12:03 p.m., on Tuesday, December

24       24, 2013, before Marceline F. Noble, Certified

25       Shorthand Reporter Number 3024.

                                                              2

```
 1      APPEARANCES OF COUNSEL:

 2


 3      For the Plaintiff/Counter-Defendant:

 4          MORGAN, LEWIS & BOCKIUS, LLP
            BY:  DANIEL GRUNFELD, ESQ.
 5          300 South Grand Avenue
            22nd Floor
 6          Los Angeles, California  90071
            (213) 612-2500
 7          dgrunfeld@morganlewis.com

 8


 9      For the Defendants/Counter-Claimants:

10          SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
            BY:  DARREN M. FRANKLIN, ESQ.
11          333 South Hope Street
            43rd Floor
12          Los Angeles, California  90071
            (213) 620-1780
13          dfranklin@sheppardmullin.com

14


15      Also Present:

16          JOHN PETROVICH

17          TONY BRUNO, THE VIDEOGRAPHER

18

19

20

21

22

23

24

25
                                                              3
```

```
 1                          INDEX

 2

 3    WITNESS

 4    GINGER STICKNEY, Ph.D., F.A.A.A.

 5    EXAMINATION                              PAGE

 6         BY MR. FRANKLIN                        5

 7

 8

 9

10                       EXHIBITS

11    MARKED            DESCRIPTION            PAGE

12    Exhibit 3009  Notice of Deposition of      10
                    Dr. Ginger Stickney, Ph.D.,
13                  F.A.A.A.

14    Exhibit 3010  Curriculum vitae             11

15    Exhibit 3011  Plaintiff's Alfred E. Mann   20
                    Foundation for Scientific
16                  Research's Witness List

17    Exhibit 3012  Handwritten drawing          45

18    Exhibit 3013  Handwritten drawing          58

19    Exhibit 3014  Declaration of Ginger Stickney, 133
                    Ph.D., F.A.A.A.
20

21

22               INSTRUCTION NOT TO ANSWER

23                      (None)

24

25

                                                   4
```

```
 1                    LOS ANGELES, CALIFORNIA;

 2              TUESDAY, DECEMBER 24, 2013; 8:11 A.M.

 3

 4

 5              THE VIDEOGRAPHER:  One moment.

 6              Good morning.  This begins videotape 1 in

 7      the deposition of Ginger Stickney, Volume 1, in

 8      the matter of Alfred E. Mann Foundation for

 9      Scientific Research versus Cochlear Americas, et

10      al., in the United States District Court, Central

11      District of California, Case No. CV 07-08108 FMO

12      (SH). (Sic)

13              Today is December 24th, 2013.

14              The time is 8:11 a.m.

15              Today's deposition is being held at

16      333 South Hope Street, 43rd floor, Los Angeles,

17      California, and was made at the request for

18      counsel for the defense.

19              My name is Tony Bruno, I'm a legal

20      video -- videographer here along with the court

21      reporter Marceline Noble on behalf of Network

22      Deposition Services.

23              Would counsel please introduce themselves

24      for the record.

25              MR. FRANKLIN:  Sure.  My name is Darren
```

                                                              5

 1    statement for the record?

 2              MR. GRUNFELD:  Yes.  At the bottom of

 3    page 2 -- apologize.  Top of page 5, second

 4    paragraph, I guess the first full paragraph

 5    indicates Dr. Ginger Stickney and both the extent

 6    of the time that she's expected to testify and

 7    the general information upon which she will be

 8    testifying.

 9              So you have more than sufficient

10    information to go ahead and ask your questions in

11    this deposition especially considering you have

12    four hours to do so.

13              Please go ahead.

14    BY MR. FRANKLIN:

15         Q.  Miss -- Dr. Stickney, if you can turn to

16    page 5 of the witness list.

17         A.  Uh-huh.

18         Q.  Do you anticipate providing testimony

19    about your duties and experience as an -- as an

20    audiologist at the trial of this matter?

21         A.  Uh-huh.  I do.  Yes.

22         Q.  Do you anticipate providing testimony

23    about the features, functionality and operation

24    of the accused Cochlear Corporation devices?

25         A.  Yes.

                                                    21

# EXHIBIT 9

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   BRUCE G. CHAPMAN, Cal. Bar No. 164258
3  bchapman@sheppardmullin.com
   SCOTT R. MILLER, Cal. Bar No. 112656
4  smiller@sheppardmullin.com
   LAURA M. BURSON, Cal. Bar No. 204459
5  lburson@sheppardmullin.com
   MANUEL C NELSON, Cal. Bar No. 229590
6  mnelson@sheppardmullin.com
   DENNIS J. SMITH, Cal. Bar No. 233842
7  dsmith2@sheppardmullin.com
   333 South Hope Street, 43rd Floor
8  Los Angeles, California 90071-1422
   Telephone:  213.620.1780
9  Facsimile:  213.620.1398

10 Attorneys for Defendants and
   Counterclaimants COCHLEAR LTD. and
11 COCHLEAR AMERICAS

12              UNITED STATES DISTRICT COURT

13        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

15 ALFRED MANN FOUNDATION FOR        Case No. CV 07-08108 FMO (SHx)
   SCIENTIFIC RESEARCH,
16                                    **DEFENDANTS COCHLEAR LTD.**
              Plaintiff,              **AND COCHLEAR AMERICAS' 35**
17                                    **U.S.C. § 282 NOTICE**
        v.
18
   COCHLEAR CORPORATION (n/k/a
19 COCHLEAR AMERICAS),
   COCHLEAR LTD., and ADVANCED        Trial Date:  January 13, 2014
20 BIONICS, LLC,,                     Time:        9:00 a.m.
                                      Place:       Hon. Fernando M. Olguin
21            Defendants.                          Crtrm. 22, Fifth Floor

22
   AND RELATED COUNTERCLAIMS.
23

24

25

26

27

28

SMRH:414229382.2                    -1-

1         Cochlear Ltd. and Cochlear Americas ("Cochlear") hereby serves a

2  notice pursuant to 35 U.S.C. § 282. *See* Attachments A and B. Cochlear also

3  incorporates by reference the information set forth in Cochlear's trial exhibits,

4  witness list, as well as information in Cochlear's discovery, including interrogatory

5  responses and the deposition testimony given in this case.

6

7  Dated:  December 13, 2013

8                  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

9

10              By

11                     DENNIS J. SMITH

12          Attorneys for Defendants and Counterclaimants

13             COCHLEAR LTD. and COCHLEAR

                   AMERICAS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A
## PATENTS

| Country | Patent No./ Published Application No. | Issue Date/ Publication Date | Inventor(s) |
|---------|--------------------------------------|------------------------------|-------------|
| U.S. | 3,872,455 | March 18, 1975 | Charles H. Fuller, Carl E. Herring |
| U.S. | 3,906,166 | Sept. 16, 1975 | Martin Cooper, Richard W. Dronsuth, Albert J. Mikulski, Charles N. Lynk Jr., James J. Mikulski, John F. Michell, Roy A. Richardson, John H. Sangster |
| U.S. | 4,267,410 | May 12, 1981 | Ian C. Forster, James F. Patrick, Yit C. Tong, Raymond C. Black, Graeme M. Clark |
| U.S. | 4,441,202 | April 3, 1984 | Yit C. Tong, Peter M. Seligman, Graeme M. Clark, James F. Patrick, John B. Millar |
| U.S. | 4,451,743 | May 29, 1984 | Fuminori Suzuki, Singo Ichikawa |
| U.S. | 4,524,774 | June 25, 1985 | Jürgen Hildebrandt |
| U.S. | 4,532,930 | Aug. 6, 1985 | Peter A. Crosby, Christopher N. Daly, David K. Money, James F. Patrick, Peter M. |

| Country | Patent No./ Published Application No. | Issue Date/ Publication Date | Inventor(s) |
|---|---|---|---|
| | | | Seligman, Janusz A. Kuzma |
| U.S. | 4,612,934 | Sept. 23, 1986 | William N. Borkan |
| U.S. | 4,741,339 | May 3, 1988 | James M. Harrison, Peter M. Seligman |
| U.S. | 4,947,844 | Aug. 14, 1990 | Hugh J. McDermott |
| E.P. | 0259906 | March 16, 1988 | Stefaan Peeters, William A.S. Bosiers, Jacques Kinsbergen |

## PUBLICATIONS OR OTHER EVIDENCE

| Identification | Date | Page Numbers |
|---|---|---|
| "Cochlear Implant for Simultaneous Multichannel Stimulation," by Hugh McDermott, Annals of Otology, Rhinology & Laryngology | Jan.-Feb. 1987 | Vol. 96, No. 1, Part 2, Suppl. 128, pp. 67-69 |
| "A Custom LSI CMOS Chip for a Cochlear Implant," by Hugh McDermott, Journal of Electrical and Electronics Engineering, Australia - IE Aust. & IREE Aust. | Dec. 1984 | Vol. 4, No. 4, pp. 305-309 |
| "The LAURA Cochlear Prosthesis: Development and Description," by Dr. Ir. S. Peeters et al., Cochlear Implant: Current Situation. Proceedings of the International Cochlear Symposium, Düren, West | Sept. 7-12, 1987 | pp. 547-555 |

| Identification | Date | Page Numbers |
|---|---|---|
| Germany | | |
| "An Advanced Multiple Channel Cochlear Implant," by Hugh McDermott - IEEE Transactions on Biomedical Engineering | July 1989 | Vol. 36, No. 7, pp. 789-797 |
| "An Advanced Cochlear Implant Hearing Prosthesis for Profound To Total Deafness," Hugh McDermott's thesis, University of Melbourne Special Collections | June 1988 | (COC-0120396 to COC-0120589) |
| "An Overview of the Nucleus Cochlear Implant Program" by Dianne J. Mecklenburg, and Judith A. Brimacombe, Seminars In Hearing | Feb. 1985 | Vol. 6, No. 1, pp. 41-51 |
| "On the Integration of an Internal Human Conditioning System," by Willy M. C. Sansen, in the IEEE Journal of Solid-State Circuits | June 1982 | Vol. SC-17, No. 3, pp. 513-521 |
| "Neural Prostheses," by Gerald E. Loeb, *et al.*, Biocompatibility in Clinical Practice | 1982 | Volume II, Ch. 8 |
| "Design and Fabrication of an Experimental Cochlear Prosthesis" by Gerald E. Loeb *et al.*, Med. & Biol. Eng. & Comput. | 1983 | Vol. 21, pp. 241-254 |
| "The Functional Replacement of the Ear" by Gerald E. Loeb, Scientific American | Feb. 1985 | Vol. 252, No. 2, pp. 104-110 |
| "Cochlear Prosthetics" by Gerald E. Loeb, | 1990 | Vol. 13, pp. 357- |

| Identification | Date | Page Numbers |
|---|---|---|
| Annu. Rev. Neurosci. | | 371 |

### PERSONS

| Name | Address/Contact Information |
|---|---|
| Gold, Bryant R | 15657 Cathedral Way, Ramona, CA 95065; Telephone Number: Unknown |
| Goorevich, Michael | Cochlear Ltd., 1 University Ave, Macquarie Park NSW 2109, Australia; Telephone Number: +612 9428 6555 |
| Loeb, Gerald E., M.D., Professor | University of Southern California, Denney Research Building B6, MC1111, 1042 Downey Way, Los Angeles, CA 90089; Telephone Number: (213) 821-5311 |
| Nygard, Tony | Cochlear Ltd., 1 University Ave, Macquarie Park NSW 2109, Australia; Telephone Number: +612 9428 6555 |
| Patrick, James F. | Cochlear Ltd., 1 University Ave, Macquarie Park NSW 2109, Australia; Telephone Number: +612 9428 6555 |
| Rodrigues, Victor | Cochlear Ltd. 1 University Ave, Macquarie Park NSW 2109, Australia; Telephone Number: +612 9428 6555 |
| Schulman, Joseph H. | 16050 Comet Way, Canyon Country, CA 91387; Telephone Number: Unknown |
| Simone, Cathy | 1 University Ave, Macquarie Park NSW 2109, Australia; Telephone Number: |

| | |
|---|---|
| | +612 9428 6555 |
| Stevenson, Robert L. Ph.D. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT B

## Cochlear's Initial Disclosures

1 | Bruce G. Chapman (State Bar No. 164,258)
2 | bchapman@cblh.com
  | Manuel C. Nelson (State Bar No. 229,590)
3 | mnelson@cblh.com
4 | John L. Paik (State Bar No. 216,024)
  | jpaik@cblh.com
5 | Keith D. Fraser (State Bar No. 216,279)
6 | kfraser@cblh.com
  | **CONNOLLY BOVE LODGE & HUTZ LLP**
7 | 333 S. Grand Avenue, Suite 2300
8 | Los Angeles, California 90071
  | Telephone (213) 787-2500; Fax (213) 687-0498
9 |
10 | Attorneys for Defendants and Counterclaimants
   | COCHLEAR LTD. and COCHLEAR AMERICAS
11 |
12 |           UNITED STATES DISTRICT COURT
13 |     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
14 |
15 | ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,
16 |                           Plaintiff,
17 |        v.
18 | COCHLEAR CORPORATION (n/k/a COCHLEAR AMERICAS) and
19 | COCHLEAR LTD.,
20 |                           Defendants.
21 |
   | COCHLEAR AMERICAS and
22 | COCHLEAR LTD.,
23 |                           Counterclaimants,
   |        v.
24 | ALFRED E. MANN FOUNDATION
25 | FOR SCIENTIFIC RESEARCH,
26 |                           Counterdefendant.
27 |
28 |

Case No. **CV 07-08108 GHK (CTX)**

**INITIAL DISCLOSURES OF DEFENDANTS COCHLEAR LTD. AND COCHLEAR AMERICAS PURSUANT TO RULE 26(a)(1)(A) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

COCHLEAR'S INITIAL DISCLOSURES

Defendants Cochlear Ltd. and Cochlear Americas (collectively "Cochlear" unless otherwise noted), by undersigned counsel, make the following initial disclosures pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure ("FRCP"). These disclosures are based upon information reasonably available to Cochlear as of this date. Cochlear's investigation is ongoing, and discovery in this case has only just begun. Cochlear reserves the right to supplement these disclosures if necessary. By making these disclosures, Cochlear does not represent that it is identifying every document, thing or witness possibly relevant to this lawsuit. Additionally, Cochlear's disclosures are made subject to, and without in any way waiving, the right to object (1) on the grounds of privilege, work product, authentication, competency, relevance, materiality, hearsay, undue burden, or any other objection supported by law or fact, or to the use of any such information for any purpose, in whole or in part, in any subsequent proceeding in this action or in any other action, and (2) on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.

**FRCP 26(a)(1)(A)(i)**

At this time, after conducting such inquiry and investigation as is reasonable under the circumstances, Cochlear believes that the following individuals are likely to have discoverable information that Cochlear may use to support its claims or defenses. The following list is limited to those persons that Cochlear is specifically aware of at this time.

| Name | Last Known Address | Subject(s) Including |
|------|--------------------|----------------------|
| Acimovic, R. | Yugoslavia (?) | Prior art. |
| Bahdra, N. | Cleveland, OH | Prior art. |
| Bajd, Tadej | Yugoslavia (?) | Prior art. |
| Barreras, Sr., Francisco Jose | Miami, FL | Prior art. |
| Bartz, Melvin C. | Newport Beach, CA | Prior art. |
| Batty, Jr., John R. | Miami, FL | Prior art. |

1

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Beane, Russell R. | Sepulveda, CA | Prior art. |
| Beazell, James W. | Rancho Palos Verdes, CA | Prior art. |
| Bennett, Robert M. | Ham Lake, MN | Prior art. |
| Bernard, Richard A. | Norwalk, CT | Prior art. |
| Blackledge, Vernon O. | Scottsdale, AZ | Prior art. |
| Bliley, Paul D. | McMinnville, OR | Prior art. |
| Borkan, William N. | 3364 NE 167th St., N. Miami Beach, FL  33160 | Prior art. |
| Bosiers, Wim | Belgium | Prior art. History and development of cochlear implants. |
| Botros, Andrew | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming. Nucleus 24 cochlear implant system diagnosis and programming. Nucleus Freedom cochlear implant system diagnosis and programming. |
| Bourgeois, Ivan | Verviers, Belgium | Prior art. |
| Brinker, Jeffrey A. | Washington Hospital Center, 110 Irving St., N.W., Washington DC 20010 | Prior art. |
| Buchowski, Roman | Wheeling, Illinois | Prior art. |
| Buckett, James | Cleveland, OH | Prior art. |
| Bullara, Leo A. | Glendora, CA | Prior art. |
| Bullock, Theodore H. | Los Angeles, CA | Prior art. |
| Byers, Charles L. | Vacaville, CA | Prior art. |
| Cameron, David B. | McMinnville, OR | Prior art. |
| Cameron, Tracy | University of Alberta, Edmonton, Alberta, T6G252 Canada | Prior art. |

2

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Carter, Paul | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 implant system testing. Nucleus 24 implant system testing. Nucleus Freedom implant system testing. |
| Casey, D. E. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Causey, G. Donald | Chevy Chase, MD | Prior art. |
| Causey, III, James D. | Simi Valley, CA | Prior art. |
| Chouard, Claude-Henri | Paris, France | Prior art. |
| Chu, Morgan | 1800 Avenue of the Stars Suite 900 Los Angeles, CA 90067 | Laches. Estoppel. |
| Citron, Paul | New Brighton, MN | Prior art. |
| Clark, Professor Graeme | The Centre for Clinical Neuroscience and Neurological Research St. Vincent's Hospital P.O. Box 2900, Melbourne VIC 3065, Australia | History and development of cochlear implant systems. |
| Criley, J. Michael | Boston, MA or Torrance CA | Prior art. |
| Crosby, Peter A. | Drummoyne, Australia | Prior art. |
| Cryer, Adrian | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 24 cochlear implant. Nucleus Freedom cochlear implant. |
| Daly, Christopher | 95 Cheryl Crescent Newport NSW 2106 Australia | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |

3

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Davis, Ross | Kennebec Valley Medical Center, Augusta, ME | Prior art. |
| de Paep, Dr. K. | Privé Praktijk Grote Baan 290 Melsele 9120 Belgium | Prior art. History and development of cochlear implants. |
| DeCote, Jr., Robert | Miami Beach, FL | Prior art. |
| DeLuca, Carlo J. | Newton, MA | Prior art. |
| Denniston, III, Rollin H. | Anoka, MN | Prior art. |
| Dewancker, J. | Belgium | Prior art. History and development of cochlear implants. |
| Dormer, Kenneth J. | Edmond, OK | Prior art. |
| Doyle, James H. | Garden Grove, CA | Prior art. |
| Duffin, Edwin G. | New Brighton, MN | Prior art. |
| Duggan, Stephen R. | 4180 120th Street West, Rosemount, MN 55068 | Prior art. |
| Duncan, James L. | Alpharetta, GA | Prior art. |
| Echarri, Robert | Miami, FL | Prior art. |
| Engebretson, A. Maynard | Ladue, MO | Prior art. |
| Faltys, Michael A. | Northridge, CA | Prior art. History and development of cochlear implants. Scope, noninfringement, invalidity, unenforceability of the patents in suit. |
| Fenner, Hans | Stuttgart, Germany | Prior art. |
| Fishbein, Michael C. | Boston, MA or Torrance CA | Prior art. |
| Fong, M. M. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Fountain, Glen H. | Silver Spring, MD | Prior art. |
| Fredrickson, John | Clayton, MO | Prior art. |
| Gacanin, Franjo | Yugoslavia (?) | Prior art. |

4

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Galbraith, Douglas C. | Stanford, CA | Prior art. |
| Gheewala, Tushar R. | Stanford, CA | Prior art. |
| Gibson, Peter | Cochlear Limited<br>14 Mars Road<br>PO Box 629<br>Lane Cove NSW 2066<br>Australia<br>Phone: 61 2 9428 6555 | Prior art.<br>History and development of cochlear implant systems.<br>Nucleus 24 cochlear implant.<br>Nucleus Freedom cochlear implant. |
| Gilmore, L. Donald | Wellesly Hills, MA | Prior art. |
| Glover, Eugene G. | Minneapolis, MN | Prior art. |
| Goorevich, Michael | Cochlear Limited<br>14 Mars Road<br>PO Box 629<br>Lane Cove NSW 2066<br>Australia<br>Phone: 61 2 9428 6555 | Nucleus 24 speech processors.<br>Nucleus Freedom speech processors.<br>Nucleus 24 cochlear implant system diagnosis and programming.<br>Nucleus Freedom cochlear implant system diagnosis and programming. |
| Gord, John C. | Los Angeles, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Graupe, Daniel | Fort Collins, CO | Prior art. |
| Gray, R. F. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Hafelfinger, Werner | Valencia, CA | Prior art. |
| Hartlaub, Jerome T. | New Brighton, MN | Prior art. |
| Hashem, James F. | Malden, MA | Prior art. |
| Hepp, Dennis G. | Coon Rapids, MN | Prior art. |
| Herndon, Matthew Kent | Stanford, CA | Prior art. |
| Hildebrandt, Jurgen | Munich, Germany | Prior art. |
| Hirose, Frank M. | Boston, MA or Torrance CA | Prior art. |

5

| Name | Last Known Address | Subject(s) Including |
|------|--------------------|-----------------------|
| Hochmair, Erwin S. | Jaunerstr 27, A-1130, Vienna, Austria | Prior art. |
| Hochmair, Ingeborg J. | Jaunerstr 27, A-1130, Vienna, Austria | Prior art. |
| Hoffmann, Christian | Munich, Germany | Prior art. |
| Hortmann, Guenter | Neckartenzlingen, Germany | Prior art. |
| Hutchison, Steve | Kirkwood, MO | Prior art. |
| Janssen, Jan | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. Laches. Estoppel. |
| Jelnikar, T. | Yugoslavia (?) | Prior art. |
| Jirak, Thomas L. | Plymouth, MN | Prior art. |
| Jones, W. Kinzy | Pembroke Pines, FL | Prior art. |
| Joris, Philip | Departement Neurowetenschappen Afdeling Neurofysiologie O&N II Herestraat 49 - bus 01021 BE-3000  Leuven Belgium | Prior art. History and development of cochlear implants. |
| Kaplan, Morton R. | Santa Barbara, CA | Prior art. |
| Kie Sioe Tan, Jozef I. | Sylmar, CA | Prior art. |
| Kilgore, K. L. | Cleveland, OH | Prior art. |
| King, Murray P. | Simi Valley, CA | Prior art. |
| Kinsbergen, Jacques | Belgium | Prior art. History and development of cochlear implants. |
| Kissiah, Jr., Adam M. | 155 E. Brandy La., Merritt Island, FL 32952 | Prior art. |
| Kitchin, David A. | Seabrook, MD | Prior art. |
| Klun, B. | Yugoslavia (?) | Prior art. |
| Kocsis, Louis L. | Elmhurst, Illinois | Prior art. |

6

| Name | Last Known Address | Subject(s) Including |
|------|--------------------|----------------------|
| Kralj, Alojz | Yugoslavia (?) | Prior art. |
| Kunick, Klaus | Stuttgart, Germany | Prior art. |
| Lauro, Luciano | Ivrea, Italy | Prior art. |
| Lee, Jr., David G. | Columbia, MD | Prior art. |
| Lekholm, Anders | Bromma, Sweden | Prior art. |
| Lenzkes, Herbert H. | Pomona, CA | Prior art. |
| Lesnick, Alan F. | Miami, FL | Prior art. |
| Loeb, Gerald E. | Queens University, Biomedical Engineering Unit, Kingston, Ontario, K7L3N6 Canada | Prior art. |
| MacLeod, Patrick | Chatenay-Malabry, France | Prior art. |
| Mann, Alfred E. | Los Angeles, CA | Prior art. |
| Mann, Brian M. | 12079 Beaufait, Northridge, CA 91326 | Prior art. |
| Markowitz, Harold T. | Ham Lake, MN | Prior art. |
| Maurer, Donald D. | Anoka, MN | Prior art. |
| McDermott, Dr. Hugh | The University of Melbourne 384-388 Albert Street East Melbourne VIC 3002 Australia | Prior art. History and development of cochlear implant systems. |
| McDonald, Ray S. | St. Paul, MN | Prior art. |
| Meador, John | 1117 Red Bud Trail, Austin, TX 78746 | Prior art. |
| Melen, Roger D. | Stanford, CA | Prior art. |
| Mensink, Kornelis A. | Brummen, Netherlands | Prior art. |
| Merzenich, Michael M. | San Francisco, CA | Prior art. |
| Michelson, Robin P. | Redwood City, CA | Prior art. |
| Mirowski, Mieczyslaw | Owings Mills, MD | Prior art. |

7

| Name | Last Known Address | Subject(s) Including |
|------|-------------------|---------------------|
| Moeneclaey, Liliane | Department Vg. Morfologie Middelheimcampus G.U.114 Groenenborgerlaan 171 2020 Antwerpen Belgium | Prior art. History and development of cochlear implants. |
| Moore, George P | Los Angeles, CA | Prior art. |
| Moore, Robert F. | Oxnard, CA | Prior art. |
| Morgan, Wayne A. | Granada Hills, CA | Prior art. |
| Mower, Morton M. | Baltimore, MD | Prior art. |
| Mumford, Van E. | Miami, FL | Prior art. |
| Murphy, Tony | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 24 cochlear implant. Nucleus Freedom cochlear implant. |
| Nagler, Robert | Chomedey, Quebec, CA | Prior art. |
| Nanes, Mario | Mount Sinai Medical Center, Miami Beach, FL | Prior art. |
| Nedungadi, Ashok P. | Lake Oswego, OR | Prior art. |
| Neumann, Robert A. | Blaine, MN | Prior art. |
| Nygard, Tony | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |
| Offeciers, Prof. Dr. Erwin | Sint-Augustinus Ziekenhuis Oosterveldlaan 24 2610 Wilrijk Belgium | Prior art. History and development of cochlear implants. |
| Ohara, Yuichi | Tokyo, Japan | Prior art. |

8

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Patrick, Dr. Jim | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |
| Peck, Raymond A. | Queens University, Biomedical Engineering Unit, Kingston, Ontario, K7L3N6 Canada | Prior art. |
| Peckham, Hunter | Cleveland, OH | Prior art. |
| Peeters, Prof. Dr. Stefaan | 3WIN nv Galileilaan 18 2845 Niel Belgium | Prior art. History and development of cochlear implants. |
| Perkel, Donald H | Los Angeles, CA | Prior art. |
| Pihlar, B. | Yugoslavia (?) | Prior art. |
| Platia, Edward V. | Washington Hospital Center, 110 Irving St., N.W., Washington DC 20010 | Prior art. |
| Pless, Benjamin | Menlo Park, CA | Prior art. |
| Pomella, Piero | Ivrea, Italy | Prior art. |
| Pourmehdi, Soheyl | Cleveland, OH | Prior art. |
| Rebscher, Stephen J. | San Francisco, CA | Prior art. |
| Renger, Herman L. | 2790 Stokes Canyon Road, Calabasas, CA 91302 | Prior art. |
| Ricard, Claude F. F. | Aix en Provence, France | Prior art. |
| Richard, Gordon L. | Minco, OK | Prior art. |
| Roberts, Dr. Chris | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Laches. Estoppel. |

9

| **Name** | **Last Known Address** | **Subject(s) Including** |
|---|---|---|
| Rodrigues, Victor | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming. Nucleus 24 cochlear implant system diagnosis and programming. Nucleus Freedom cochlear implant system diagnosis and programming. |
| Rohrer, John S. | Tempe, AZ | Prior art. |
| Roline, Glenn M. | Anoka, MN | Prior art. |
| Rostami, Ali | Santa Monica, CA | Prior art. |
| Rottier, Riaan | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 implant system testing. Nucleus 24 implant system testing. Nucleus Freedom implant system testing. |
| Rozman, J. | Yugoslavia (?) | Prior art. |
| Rueter, John C. | Shoreview, MN | Prior art. |
| Ryan, John G. | San Jose, CA | Prior art. |
| Sansen, Willy | Afdeling ESAT - MICAS, Micro-elektronica en Sensoren Kasteelpark Arenberg 10 - bus 2443, 3001 Heverlee, Belgium | Prior art. History and development of cochlear implants. |
| Sarada, Thyagaraj | Norwalk, CT | Prior art. |
| Sasmor, Louis | Miami, FL | Prior art. |
| Satchwell, Bruce R. | West Pennant Hills, AU | Prior art. |
| Schaefer, Donald W. | Belleville, WI | Prior art. |
| Schindler, R. A. | Department of Otolaryngology, University of California, San Francisco, CA 94143 | Prior art. |
| Schloss, Harold C. | Los Angeles, CA | Prior art. |
| Schroeppel, Edward A. | Miramar, FL | Prior art. |

10

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Schulman, Joseph H. | Los Angeles, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit.<br>Laches.<br>Estoppel. |
| Sega, Janez | Yugoslavia (?) | Prior art. |
| Segundo, José P. | Los Angeles, CA | Prior art. |
| Seligman, Dr. Peter | Cochlear Limited<br>Level 1, 174 Victoria Parade<br>East Melbourne, Vic 3002<br>Australia<br>Phone: 61 2 9428 6555 | Prior art.<br>History and development of cochlear implant systems.<br>Nucleus 22 cochlear implant system.<br>Nucleus 24 cochlear implant system.<br>Nucleus Freedom cochlear implant system. |
| Sholder, Jason A. | 21037 Cantara St., Canoga Park, CA 91304 | Prior art. |
| Silvian, Sergiu | Pasadena, CA | Prior art. |
| Simic, V. | Yugoslavia (?) | Prior art. |
| Simone, Cathy | Cochlear Limited<br>14 Mars Road<br>PO Box 629<br>Lane Cove NSW 2066<br>Australia<br>Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming.<br>Nucleus 24 cochlear implant system diagnosis and programming.<br>Nucleus Freedom cochlear implant system diagnosis and programming. |
| Slocum, Chester D. | Miami, FL | Prior art. |
| Smith, Bobby L. | Cedar, MN | Prior art. |
| Smith, Brian | Cleveland, OH | Prior art. |
| Snell, Jeffery D. | 17135 Bircher St., Granada Hills, CA 91344 | Prior art. |
| Soma, Mani | Stanford, CA | Prior art. |

11

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Somers, Dr. Thomas | AZ Sint-Augustinus Oosterveldlaan 24 Wilrijk 2610 Belgium | Prior art. History and development of cochlear implants. |
| Sorenson, Paul D. | Blaine, MN | Prior art. |
| Southwood, Robert | Cochlear Limited 14 Mars Road PO Box 629 Lane Cove NSW 2066 Australia Phone: 61 2 9428 6555 | Nucleus 22 cochlear implant system diagnosis and programming. Nucleus 24 cochlear implant system diagnosis and programming. Nucleus Freedom cochlear implant system. |
| Stage, T.G. | Cleveland, OH | Prior art. |
| Stanic, U. | Yugoslavia (?) | Prior art. |
| Stearns, William P. | Scottsdale, AZ | Prior art. |
| Stefancic, M. | Yugoslavia (?) | Prior art. |
| Strojnik, Primoz | Granada Hills, CA | Prior art. History and development of cochlear implants. Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Stypulkowski, Paul H. | St. Paul, MN | Prior art. |
| Susset, Jacques G. | Montreal, Quebec, CA | Prior art. |
| Tan, Kie S. | Boston, MA or Torrance CA | Prior art. |
| Thompson, David L. | Fridley, MN | Prior art. |
| Troyk, Philip R. | Illinois Institute for Technology, Chicago, IL 60616 | Prior art. |
| Turk, Rajko | Yugoslavia (?) | Prior art. |
| Ursic, I. | Yugoslavia (?) | Prior art. |
| Valencic, V. | Yugoslavia (?) | Prior art. |
| Van Arragon, Gerrit W. | Dieren, NL | Prior art. |

12

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| Van Baelen, Erika | Cochlear Technology Centre Mechelen Campus Schalienhoevedreef 20 I B-2800 Mechelen Belgium Phone: 32 15 36 2803 | Nucleus Freedom speech processors. |
| Van Camp, Prof. K. | Belgium | Prior art. History and development of cochlear implants. |
| Van Compernolle, Dirk S. | Palo Alto, CA | Prior art. |
| Van Dan Honert, Chris | Cochlear Americas 400 Inverness Parkway Suite 400 Englewood Colorado 80112 USA Phone: 303-790-9010 | Prior art. History and development of cochlear implant systems. Nucleus 22 cochlear implant system. Nucleus 24 cochlear implant system. Nucleus Freedom cochlear implant system. |
| Van Durme, Marianne | Belgium | Prior art. History and development of cochlear implants. |
| Van Paemel, M. | Belgium | Prior art. History and development of cochlear implants. |
| Vavken, E. | Yugoslavia (?) | Prior art. |
| Vodovnik, Lojze | Yugoslavia (?) | Prior art. |
| Voelkel, Andy | Venice, CA | Prior art. History and development of cochlear implants. Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Wang, Xintao | Houston, TX | Prior art. |
| Weinberg, Alvin H. | Miami, FL | Prior art. |

13

| Name | Last Known Address | Subject(s) Including |
|---|---|---|
| West, Ron | Australia<br>Email:<br>Ronewest@aol.com | Prior art.<br>History and development of cochlear implant systems.<br>Nucleus 22 cochlear implant system.<br>Nucleus 24 cochlear implant system. |
| White, Robert L. | Stanford, CA | Prior art. |
| Whitmoyer, David I. | Los Angeles, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Wittkampf, Frederik H. M. | Brummen, Netherlands | Prior art. |
| Wolfe, James H. | Canyon Country, CA | Prior art.<br>History and development of cochlear implants.<br>Scope, noninfringement, invalidity, and/or unenforceability of the patents in suit. |
| Zollner, Manfred | Munich, Germany | Prior art. |
| Zwicker, Eberhard | Icking, Germany | Prior art. |

Any contact with the above-named people employed or formerly employed by Cochlear Limited, Cochlear Americas, or Cochlear Technology Centre should be made through counsel for Cochlear.

Cochlear reserves the right to supplement these disclosures after additional investigation and discovery, including the right to supplement these disclosures with the addition of expert witnesses. Cochlear also reserves the right to identify and call as witnesses additional persons about whom Cochlear may learn during the course of its investigation and the discovery in this case, including third party discovery. Cochlear believes that there may be employees or former employees of the plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF") or third parties who

have discoverable information that Cochlear may use to support its claims or defenses.

### FRCP 26(a)(1)(A)(ii)

Pursuant to FRCP 26(a)(1)(A)(ii), Cochlear hereby describes the categories of documents, electronically stored information, and/or tangible things that are in the possession, custody or control of Cochlear or Cochlear's counsel and that Cochlear may use to support its claims or defenses.  Cochlear reserves the right to supplement this disclosure after further investigation and discovery.

In making these disclosures, Cochlear does not waive any applicable privileges or protection, including attorney client privilege or work product.  Additionally, Cochlear reserves the right to appropriately designate for protection any document, electronically stored information, and/or tangible thing under any future protective order entered in this case, and such document, electronically stored information, and/or tangible thing will be produced only as consistent with and subject to such designations and protections.  Further, in response to any discovery request under FRCP 34, Cochlear reserves the right to produce information in the manner in which it is kept in the ordinary course of business where the information is maintained by Cochlear, including Australia.  Finally, by providing this disclosure, Cochlear is not representing that any particular such document, electronically stored information, and/or tangible thing exists or is presently within Cochlear's possession, custody or control.

- Prosecution histories of U.S. Patent Nos. 5,603,726, 5,609,616, 5,569,307, 5,531,774, 5,776,172, 5,938,691, 5,522,865, 5,876,425, and U.S. Patent Appl. Ser. Nos. 07/411,563 and 07/752,069 (located at the offices of Cochlear's counsel).
- Prior art references, articles, publications, patents, and patent applications (located at the offices of Cochlear's counsel).

- Correspondence between Cochlear and AMF, or their respective representatives, regarding the patents in suit (located at Cochlear Ltd. in Australia).
- To the extent they exist, one sample of each Nucleus 22 cochlear implant, Nucleus 24 cochlear implant, and Nucleus Freedom cochlear implant, and speech processors used with such implants (located at Cochlear Ltd. in Australia).
- To the extent they exist, one sample of each Nucleus 22 diagnosis and programming system, Nucleus 24 diagnosis and programming system, and Nucleus Freedom diagnosis and programming system (located at Cochlear Ltd. in Australia).
- To the extent they exist, one sample of each Nucleus 22 testing system, Nucleus 24 testing system and Nucleus Freedom testing system (located at Cochlear Ltd. in Australia).
- Schematics or diagrams sufficient to show the electrical configurations of the Nucleus 22, Nucleus 24, and Nucleus Freedom cochlear implants, speech processors used with such implants, and diagnosis, programming and testing systems used with such cochlear implant and speech processor systems (located at Cochlear Ltd. in Australia).
- Technical documents, including operating and training manuals and specifications, sufficient to show the operation and function of the Nucleus 22, Nucleus 24, and Nucleus Freedom cochlear implants, speech processors used with such implants, and diagnosis and programming used with, and testing performed on, such cochlear implant and speech processor systems (located at Cochlear Ltd. in Australia).
- Design history records showing the research, design, and development of the Nucleus 22 product line (located at Cochlear Ltd. in Australia).

1    • Design history records showing the research, design, and development
2    of the Nucleus 24 product line (located at Cochlear Ltd. in Australia).
3    **FRCP 26(a)(1)(A)(iii)**
4    This section is not applicable, as the recovery of attorneys' fees and costs
5    sought by Cochlear under 35 U.S.C. § 285 are not damages.
6    **FRCP 26(a)(1)(A)(iv)**
7    Cochlear is not aware of any insurance agreement under which an insurance
8    business may be liable to satisfy all or part of a possible judgment in this case or to
9    indemnify or reimburse for payments made to satisfy the judgment.
10
11   DATED:  April 23, 2008                    Connolly Bove Lodge & Hutz LLP
12
13
14                                            By: _____
15                                               Bruce G. Chapman
                                                 Manuel Nelson
16                                               Attorneys for Defendants and
                                                 Counterclaimants Cochlear Corporation
17                                               and Cochlear Ltd.
18
19
20
21
22
23
24
25
26
27
28

17

## CERTIFICATE OF SERVICE

I, Dori Dellisanti, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. My business address is Connolly Bove Lodge & Hutz LLP, 333 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

On April 23, 2008, I served the foregoing documents described as: **INITIAL DISCLOSURES OF DEFENDANTS COCHLEAR LTD. AND COCHLEAR AMERICAS PURSUANT TO RULE 26(A)(1)(A) OF THE FEDERAL RULES OF CIVIL PROCEDURE** on the following person in this action by placing a true copy thereof enclosed in sealed envelope addressed as follows:

| | |
|---|---|
| **VIA U.S. MAIL:**<br><br>Charles S. Barquist, Esq.<br>Morrison & Foerster LLp<br>555 W. Fifth St.,<br>Los Angeles, CA 90013-1024 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel: (213) 892-5200<br>Email: cbarquist@mofo.com |
| **VIA U.S. MAIL:**<br><br>Brian G. Bodin, Esq.<br>Brett A. Hertzberg, Esq.<br>Merchant & Gould, P.C.<br>701 Fifth Ave., Suite 4100<br>Seattle, WA 98104 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel: (206) 342-6200<br>Email: bbodine@merchantgould.com<br>        bhertzberg@merchantgould.com |
| **VIA U.S. MAIL:**<br><br>Peter A. Gergely, Esq.<br>Merchant & Gould, P.C.<br>1050 17th St., Suite 1950<br>Denver, CO 80265-0100 | Attorneys for Plaintiff Alfred E. Mann Foundation for Scientific Research<br><br>Tel: (303) 357-1670<br>Email: pgergely@merchantgould.com |

[X] **BY MAIL** I am readily familiar with the firm's practice regarding collection and processing of correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal

cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY PERSONAL SERVICE**:  I caused such envelope to be delivered by hand to the addressee(s) as stated above.

[ ] **BY E-Mail**  I caused such document(s) to be served via e-mail to the foregoing firms.

[X] **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on April 23, 2008 at Los Angeles, California.

_____Dori Dellisanti_____
      Name

               Signature

CERTIFICATE OF SERVICE

I, Dori Dellisanti, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause.  My business address is Sheppard Mullin Richter & Hampton LLP, 333 South Hope Street, 43rd Floor, Los Angeles, California 90071.

On December 13, 2013, I served the foregoing documents described as: **DEFENDANTS COCHLEAR LTD. AND COCHLEAR AMERICAS' 35 U.S.C. § 282 NOTICE** on the following person in this action by placing a true copy thereof enclosed in sealed envelope addressed as follows:

| | |
|---|---|
| Dan Grunfeld<br>MORGAN LEWIS & BOCKIUS LLP<br>300 S. Grand Avenue, 22nd Floor<br>Los Angeles, CA 90071-3132 | Attorneys for Plaintiff and Counterdefendant Alfred E. Mann Foundation for Scientific Research<br><br>Tel:  (213) 612-2500<br>Fax:  (213) 612-2501<br>Email:  dgrunfeld@morganlewis.com |
| Todd Malynn<br>FELDMAN GALE, P.A.<br>880 W. First Street, Suite 315<br>Los Angeles, CA 90012 | Attorneys for Defendant, Advanced Bionics, LLC<br><br>Tel:  (213) 625-5992<br>Fax:  (213) 624-5993<br>Email:  tmalynn@FeldmanGale.com |

☒ **BY MAIL:**  I am readily familiar with the firm's practice regarding collection and processing of correspondence for mailing.  Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE:**  I caused such envelope to be delivered by hand to the addressee(s) as stated above.

☐ **FEDERAL EXPRESS:**  I am readily familiar with the office practice of Sheppard Mullin Richter & Hampton LLP for collecting and processing correspondence for overnight delivery by Federal Express. Such practice is that when correspondence for overnight delivery by Federal Express is deposited with the Sheppard Mullin Richter & Hampton LLP personnel responsible for delivering correspondence to Federal Express, such correspondence is delivered to a Federal Express location or to an authorized courier or driver authorized by Federal Express to receive documents or deposited at a facility regularly maintained by Federal Express for receipt of documents on the same day in the ordinary course of business.

1
☐ **BY E-MAIL:** I emailed this Notice to the email addresses listed above and/or based on General Order 10-07, I caused the document(s) to be sent to the

2
person(s) at the e-mail address(es) indicated above through the Court's Electronic Filing System (ECF).

3
☒ **FEDERAL:** I declare that I am employed in the office of a member of the bar

4
of this court at whose direction the service was made.

I hereby declare under penalty of perjury that the foregoing is true and correct.

5
Executed on December 13, 2013 at Los Angeles, California.

6

7
Dori Dellisanti
Name                                        Signature

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 10

## REPORT OF GERALD E. LOEB, M.D.

### INTRODUCTION

I have been retained by Sheppard Mullin Richter & Hampton, LLP, on behalf of Cochlear Ltd. and Cochlear Americas (collectively "Cochlear").  On January 19, 2009, I submitted a report in connection with a lawsuit between Cochlear and the Alfred E. Mann Foundation for Scientific Research ("AMF") regarding U.S. Patent No. 5,609,616 ("the '616 patent") and U.S. Patent No. 5,938,691 ("the '691 patent" collectively "patents in suit").  On May 3, 2009, I submitted a declaration in connection with the lawsuit.  On October 13, 2009, I submitted a supplemental report addressing certain assertions made in a declaration submitted by Professor John Choma.

I have been informed that on November 3, 2011, Special Master Gale R. Peterson issued the Special Master's Report And Recommendation On Claim Construction ("R&R") in which Special Master Peterson provided certain recommendations concerning the construction of certain terms of the patents in suit.  I have also been informed that on June 18, 2012, the Honorable George H. King issued an Order that generally adopted Special Master Peterson's recommendations ("Claim Construction Order").  Lastly, I have been informed that on May 3, 2011, in AMF's Claim Construction Letter to Special Master, AMF notified Special Master Peterson that AMF is no longer asserting claims 1-5 of the '691 patent.  I have been asked to further supplement my previous reports and declaration in light of the findings in the R&R, the Claim Construction Order, and the fact that AMF is no longer asserting claims 1-5 of the '691 patent.

The opinions expressed herein, as well as the bases for those opinions, are based on information currently available to me.  I reserve the right to amend or supplement this report if new or additional information is made available to me.

### MY EDUCATION AND RELEVANT EXPERIENCE

I provided my education and relevant experience in my initial report and May 3, 2009 declaration.

Additional qualifications and my publications are set forth more fully in my curriculum vitae, a current version of which is provided in the Appendix to this report.

Claim 1 of the '616 patent is invalid under 35 U.S.C. Section 103 as obvious over the
McDermott '844 patent when combined with the knowledge of a person ordinarily skilled in the art
and/or one or more other prior art references.  My opinions regarding the invalidity of claim 1 of
the '616 patent based on the McDermott '844 patent are set forth in detail in **Exhibit A**.  (*See* pp. 1-
31.)

Claim 1 of the '616 patent is invalid under 35 U.S.C. Section 103 as obvious over the 1989
McDermott Article when combined with the knowledge of a person ordinarily skilled in the art
and/or one or more other prior art references.  My opinions regarding the invalidity of claim 1 of
the '616 patent based on the 1989 McDermott Article are set forth in detail in **Exhibit B**.  (*See*
pp. 1-33.)

Claim 1 of the '616 patent is invalid under 35 U.S.C. Section 102 as anticipated by the
McDermott Thesis, or alternatively, under 35 U.S.C. Section 103 as obvious over the McDermott
Thesis when combined with the knowledge of a person ordinarily skilled in the art and/or one or
more other prior art references.  My opinions regarding the invalidity of claim 1 of the '616 patent
based on the McDermott Thesis are set forth in detail in **Exhibit C**.  (*See* pp. 1-32.)

Claim 1 of the '616 patent is invalid under 35 U.S.C. Section 103 as obvious over the
Borkan '934 patent when combined with the knowledge of a person ordinarily skilled in the art
and/or one or more other prior art references.  My opinions regarding the invalidity of claim 1 of
the '616 patent based on the Borkan '934 patent are set forth in detail in **Exhibit D**.  (*See* pp. 1-49.)

Claim 1 of the '616 patent is invalid under 35 U.S.C. Section 103 as obvious over the
Crosby '930 patent when combined with the knowledge of a person ordinarily skilled in the art
and/or one or more other prior art references.  My opinions regarding the invalidity of claim 1 of
the '616 patent based on the Crosby '930 patent are set forth in detail in **Exhibit E**.  (*See* pp. 1-52.)

Claim 1 of the '616 patent is invalid under 35 U.S.C. Section 103 as obvious over the
LAURA references when combined with the knowledge of a person ordinarily skilled in the art
and/or one or more other prior art references.  My opinions regarding the invalidity of claim 1 of
the '616 patent based on the LAURA references are set forth in detail in **Exhibit F**.  (*See* pp. 1-59.)

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation pulses and for controlling the pulse width of the stimulation pulses,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation pulses,

means in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals, and

means in the ICS for transmitting such ICS-status-indicating signals to the WP; and

means in the WP for receiving and processing the ICS-status-indicating signals.

Claim 6 of the '691 patent is invalid under 35 U.S.C. Section 103 as obvious over the 1984 McDermott Article when combined with the knowledge of a person ordinarily skilled in the art and/or one or more other prior art references.  My opinions regarding the invalidity of claim 6 of the '691 patent based on the 1984 McDermott Article are set forth in detail in **Exhibit G**.  (*See* pp. 1-40.)

Claim 6 of the '691 patent is invalid under 35 U.S.C. Section 102 as anticipated by the McDermott Thesis, or alternatively, under 35 U.S.C. Section 103 as obvious over the McDermott Thesis when combined with the knowledge of a person ordinarily skilled in the art and/or one or more other prior art references.  My opinions regarding the invalidity of claim 6 of the '691 patent based on the McDermott Thesis are set forth in detail in **Exhibit H**.  (*See* pp. 1-31.)

Claim 6 of the '691 patent is invalid under 35 U.S.C. Section 102 as anticipated by the Borkan '934 patent, or alternatively, under 35 U.S.C. Section 103 as obvious over the Borkan '934 patent when combined with the knowledge of a person ordinarily skilled in the art and/or one or

more other prior art references.  My opinions regarding the invalidity of claim 6 of the '691 patent based on the Borkan '934 patent are set forth in detail in **Exhibit I**.  (*See* pp. 1-40.)

Claim 6 of the '691 patent is invalid under 35 U.S.C. Section 103 as obvious over the Crosby '930 patent when combined with the knowledge of a person ordinarily skilled in the art and/or one or more other prior art references.  My opinions regarding the invalidity of claim 6 of the '691 patent based on the Crosby '930 patent are set forth in detail in **Exhibit J**.  (*See* pp. 1-43.)

**Claim 7 of the '961 patent**

7. The system of claim 6 further including

means for transmitting power signals from the WP to the ICS,

means in the ICS for processing the power signals and for generating power for the ICS, and

means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS.

Claim 7 of the '691 patent is invalid under 35 U.S.C. Section 103 as obvious over the 1984 McDermott Article when combined with the knowledge of a person ordinarily skilled in the art and/or one or more other prior art references.  My opinions regarding the invalidity of claim 7 of the '691 patent based on the 1984 McDermott Article are set forth in detail in **Exhibit G**.  (*See* pp. 41-52.)

Claim 7 of the '691 patent is invalid under 35 U.S.C. Section 103 as obvious over the McDermott Thesis when combined with the knowledge of a person ordinarily skilled in the art and/or one or more other prior art references.  My opinions regarding the invalidity of claim 7 of the '691 patent based on the McDermott Thesis are set forth in detail in **Exhibit H**.  (*See* pp. 32-40.)

Claim 7 of the '691 patent is invalid under 35 U.S.C. Section 103 as obvious over the Borkan '934 patent when combined with the knowledge of a person ordinarily skilled in the art and/or one or more other prior art references.  My opinions regarding the invalidity of claim 7 of the '691 patent based on the Borkan '934 patent are set forth in detail in **Exhibit I**.  (*See* pp. 41-44.)