DANIEL JOHNSON, JR. (SBN 57409)
DANIEL GRUNFELD (SBN 128494)
MICHAEL J. LYONS (SBN 202284)
JASON E. GETTLEMAN (SBN 269733)
MORGAN, LEWIS & BOCKIUS LLP
3000 El Camino Real, Suite 7000
Palo Alto, CA 94306-2122
Tel:   650.843.4000
Fax:   650.843.4001
Email: djjohnson@morganlewis.com
Email: dgrunfeld@morganlewis.com
Email: mlyons@morganlewis.com
Email: jgettleman@morganlewis.com

Attorneys for Plaintiff
ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Alfred E. Mann Foundation for Scientific Research,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Cochlear Corporation, et al.,<br><br>                    Defendants. | Case No. 2:07-cv-08108-FMO-SH<br><br>**PLAINTIFF'S WITNESS LIST FOR BENCH TRIAL**<br><br>Jury Trial Date:  January 14, 2014<br>Time:                  9:00 a.m.<br>Courtroom:        22, 5th Floor<br>Judge:               Hon. Fernando M.<br>                          Olguin |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608955.1

PLAINTIFF'S WITNESS LIST FOR
BENCH TRIAL
2:07-CV-08108-FMO-SH

1    Plaintiff Alfred E. Mann Foundation for Scientific Research (the

2    "Foundation") hereby submits the following witness list for the bench trial:

3       1.    Joseph Schulman by written declaration. Mr. Schulman's declaration

4    is attached hereto as **Exhibit 1**.

5       2.    Dr. Darrin Young by written declaration. Dr. Young's declaration is

6    attached hereto as **Exhibit 2**.

7       3.    David Hankin by written declaration. Mr. Hankin's declaration is filed

8    at Dkt. 403.

9       4.    Bryant Gold by deposition designation. The relevant excerpt from Mr.

10   Gold's deposition testimony has been lodged under Dkt. 404-1.

11      5.    Dr. Gerald Loeb by deposition designation. The relevant excerpt from

12   Dr. Loeb's deposition transcript has been lodged under Dkt. 404-2. The

13   Foundation reserves the right to call Dr. Loeb at trial as an adverse witness.

14      6.    Dr. Robert Stevenson by deposition designation. The relevant excerpt

15   from Dr. Stevenson's deposition transcript has been lodged under Dkt. 404 -3. The

16   Foundation reserves the right to call Dr. Stevenson at trial as an adverse witness.

17      7.    Tony Nygard by deposition designation. The relevant excerpt from

18   Mr. Nygard's deposition transcript has been lodged under Dkt. 404-4. The

19   Foundation reserves the right to call Mr. Nygard at trial as an adverse witness.

20      8.    James Findlay Patrick by deposition designation. The relevant excerpt

21   from Mr. Patrick's deposition testimony has been lodged under Dkt. 404-5. The

22   Foundation reserves the right to call Mr. Patrick at trial as an adverse witness.

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO
DB2/ 24608955.1

2

PLAINTIFF'S WITNESS LIST FOR
BENCH TRIAL
2:07-CV-08108-FMO-SH

1  Dated:       January 13, 2014          Respectfully submitted,

2                                         MORGAN, LEWIS & BOCKIUS LLP

3

4                                         By  /s/ Daniel Grunfeld
                                              Daniel Grunfeld
5                                             Attorneys for Plaintiff
                                              Alfred E. Mann Foundation for
6                                             Scientific Research

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608955.1

3

PLAINTIFF'S WITNESS LIST FOR
BENCH TRIAL
2:07-CV-08108-FMO-SH

# EXHIBIT 1

DANIEL JOHNSON, JR. (SBN 57409)
DANIEL GRUNFELD (SBN 128494)
MICHAEL J. LYONS (SBN 202284)
JASON E. GETTLEMAN (SBN 269733)
MORGAN, LEWIS & BOCKIUS LLP
3000 El Camino Real, Suite 7000
Palo Alto, CA 94306-2122
Tel:   650.843.4000
Fax:   650.843.4001
Email: djjohnson@morganlewis.com
Email: dgrunfeld@morganlewis.com
Email: mlyons@morganlewis.com
Email: jgettleman@morganlewis.com

Attorneys for Plaintiff
ALFRED E. MANN FOUNDATION FOR
SCIENTIFIC RESEARCH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Alfred E. Mann Foundation for Scientific Research, <br><br> Plaintiff, <br><br> vs. <br><br> Cochlear Corporation, et al., <br><br> Defendants. | Case No. 2:07-cv-08108-FMO-SH <br><br> **DECLARATION OF DR. JOSEPH SCHULMAN, PH. D., RE ISSUES TRIED TO THE COURT** <br><br> **JURY TRIAL DEMANDED** <br><br><br> Trial Date:    January 14, 2014 <br> Time:    9:00 a.m. <br> Courtroom:    22, 5th Floor |

///

///

///

///

///

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

DB2/ 24608143.3

I, Joseph Schulman, declare:

1.      I have personal knowledge of the facts set forth herein, and if called upon to testify, I could and would competently testify to the statements made herein.  I submit this declaration in support of Plaintiff Alfred E. Mann Foundation for Scientific Research (the "Foundation").

2.      After receiving my Ph.D. in 1969, I began work at Pacesetter Systems developing pacemaker technology, working with Al Mann.  I worked at Pacesetter through 1985, when the company was sold. In 1985, my title was Vice-President of Research and Development.

3.      In 1985, Mr. Mann asked me to help start the Foundation.  I accepted his offer and worked at the Foundation until 2007.

4.      Throughout my tenure at the Foundation, I was in charge of day to day operations and personally participated in developing many of the technologies the Foundation has licensed and patented.

5.      My initial title at the Foundation was "Vice President of Research." For at least the last 10 years of my time at the Foundation, my title was "President."

6.      The Foundation was founded to help bring basic research in medicine into the marketplace and create products to fill unmet and poorly-met needs.  The Foundation sought to work on products and to solve problems that were considered too risky, too expensive, and too long term for the general medical device market. Towards that goal, the Foundation was dedicated to providing significant improvements to the health, security and quality of life for people suffering from debilitating medical conditions.

7.      To further its mission, the Foundation sought to keep overhead costs as low as possible and to devote the majority of its resources to research and development.  Licensing and selling its technology was a critical source of funding for the Foundation, and the proceeds the Foundation received from these activities

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

2

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

1  were invested back into research and development at the Foundation.

2     8.   One of the first projects undertaken by the Foundation was

3  development of cochlear implant technology. We also developed a device to

4  monitor pressure increases in the brain due to trauma, a long-term blood glucose

5  sensor, an advanced neurostimulator, a microstimulator powered and controlled by

6  radio frequencies that can be used to treat sleep apnea, shoulder subluxation and

7  post-stroke upper limb hemiplegia, a battery powered microstimulator implant used

8  to treat migraine headaches, an implantable myoelectric sensor that can be used to

9  control prosthetic limbs, and an implantable drug delivery system.

10    9.   Advanced Bionics was founded as a separate corporation in

11  approximately 1993 and used the Foundation's cochlear implant technology,

12  including U.S. Patent No. 5,609,616 (the "'616 patent") and U.S. Patent No.

13  5,938,691 (the "'691 patent").

14    10.   After that time, the Foundation gradually reduced its involvement with

15  Advanced Bionics and reduced the amount of resources it devoted to research in the

16  cochlear implant field.  The Foundation then shifted its focus to work more

17  extensively on so-called "Bion" technology.

18    11.   The Bion is a wireless, implantable microstimulator, about the size of a

19  grain of rice, intended for use in stroke patients.  It has the potential to restore use

20  of paralyzed limbs within hours of initially being implanted.  It is one of the

21  flagship projects for the Foundation and has been in development since the

22  Foundation was founded in 1985.

23    12.   The Foundation has worked on developing two versions of the Bion:

24  the Radiofrequency ("RF") Bion and the Battery Bion.

25    13.   The RF Bion system includes a strap worn around the arm containing a

26  battery that powers the implanted Bion stimulator via induction.  The first human

27  implantation of the RF Bion was performed in 2000.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

3

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

14.     The development of the Battery Bion proved to be extremely challenging and costly.  The Battery Bion system has an internal battery and does not require a strap worn around the arm for use. Research and development efforts for the Battery Bion required significant expenditures, including additional scientists on staff and under contract with expertise in digital integrated circuit design, multiple chip runs for testing, further developments in chip miniaturization and construction of a battery factory for production.

15.     The Battery Bion project required a significant investment from the Foundation over the years.  From 2001 to 2004, a very significant portion of the Foundation's resources were devoted to the effort to develop the Battery Bion. Budgetary constraints forced the Foundation to reduce funding for the Battery Bion, as well as for other projects, travel, and overhead.

16.     Another project the Foundation worked on during the same time period was development of a blood glucose sensor. Unlike competing models, this sensor could stay stable for 2 years without needing calibration.

17.     The Foundation also worked to develop an insulin pump between the years of 1995 to 2001. There were two versions: an implantable model and an external model. These pumps helped eliminate the need for diabetics to keep hypodermic needles with insulin with them, as the pumps would replace the function of the pancreas and regulate dispersal of insulin into the blood stream.

18.     The technology for the glucose sensor, external insulin pump and implantable insulin pump was sold to Medtronic in 2001.

19.     During my tenure as President of the Foundation, I was under constant pressure to keep overhead costs low.  In addition to the normal financial stresses that any company has, the Foundation was under particular financial pressure because it did not have a regular, predictable revenue stream, instead relying on licensing deals, such as the sale of the glucose monitor and insulin pump to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

4

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

1   Medtronic, to cover operating expenses for several years.

2       20.    Financial stress was especially high during active development of the

3   Battery Bion. Research and development costs exceeded my original expectations

4   and chip development for test implants was very expensive.  To compensate for this

5   expense, the Foundation limited its involvement with new projects, cut staff trips

6   and reduced funding for staff wishing to attend conferences.

7       21.    Because of the financial stress the Foundation was under in particular,

8   and the uncertainty and long time scale of litigation in general, a law suit was the

9   last choice for enforcing any of the Foundation's patent rights, and my preference

10  and the Foundation's would have decidedly been to settle any potential

11  infringement matters with a negotiated license.

12      22.    In my December 17, 2008 deposition, Cochlear suggested that I knew

13  as of 1994 that Cochlear products would have back telemetry – I did not.

14      23.    In 1994, I attended a conference on cochlear implants in Melbourne,

15  Australia.

16      24.    At that conference Hugh McDermott presented an article that

17  discussed a wearable headpiece processor for the next generation of the Cochlear

18  Corporation's Nucleus cochlear implant system.

19      25.    I did not learn, from that presentation or any other at the conference, as

20  described in the Foundation's patents, that Cochlear's products would necessarily

21  incorporate a back telemetry system, or any of the technical details of a system that

22  Cochlear Corporation or Cochlear Limited would ultimately implement into their

23  products.

24      26.    Sometime in 1998, I learned that Cochlear Corporation had a cochlear

25  implant and speech processor that included some form of telemetry features. This

26  device was called the Nucleus 24.  The details of Cochlear's back telemetry

27  features were unknown to me.  For example, I did not know whether the Nucleus 24

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

5

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

1  device and testing system monitored a pair of electrodes, or how a physician or

2  audiologist used the Cochlear system.

3       27.     Cochlear's implants and processors are not available to test. The

4  publically available material I reviewed from Cochlear, such as marketing material,

5  and conference presentations, did not reveal the technical workings of their device

6  sufficient for me to reach any conclusion on whether the device used diagnostic

7  telemetry features similar to the Foundation's patents.

8       28.     In 2003, I had a meeting at the House Ear Institute.  There, I obtained

9  literature on the fitting system for Cochlear's Nucleus 24 product.  A review of this

10  literature by myself and others at the Foundation showed details of the Nucleus 24

11  product and how its telemetry features were used and programmed.

12      29.     On July 21, 2003, I sent a letter to Jack O'Mahony, CEO and President

13  of Cochlear Limited, asking Cochlear Limited to license the '616 patent.  It has

14  been marked as PTX-1071.  In that letter I stated that Cochlear's Nucleus 24

15  Implant may infringe the '616 patent, providing them notice of infringement for the

16  '616 patent.  I also stated a desire to reach a license rather than undertake legal

17  action.  I believed that a negotiated license would be preferable for the Foundation,

18  and more consistent with its goals and mission.  In all negotiations with Cochlear,

19  the hope was to settle the issue as a business matter rather than resort to the Courts.

20  At the time, the Foundation did not have sufficient information to determine

21  whether Cochlear's products infringed the '691 patent.

22      30.     Two months after I sent my letter to Mr. O'Mahony, I received his

23  reply on October 7, 2003.  That letter has been marked as PTX-65.  I did not hear

24  anything further from Cochlear with respect to my letter.  I was never contacted by

25  Mr. O'Mahony, or by any other individuals at Cochlear Limited regarding the

26  letter.

27      31.     Shortly after receiving the October 7, 2003 reply from Mr. O'Mahony,

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

6

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

1   Advanced Bionics entered into negotiations with Boston Scientific for Boston

2   Scientific to acquire Advanced Bionics.  The Foundation, as a shareholder of

3   Advanced Bionics, and a licensor of patent and other intellectual property rights to

4   Advanced Bionics, was involved in these negotiations.  The deal closed in summer

5   2004.

6          32.     During my tenure at the Foundation, I followed new products and

7   developments in the industry, however, my awareness came from public sources.

8   In general, I was not aware of plans by the Cochlear Defendants to release new

9   products until they were publicly announced.  I never intended to convey to the

10  Cochlear Defendants that I agreed with their assessment that the Foundation's

11  patents were not infringed, nor did I ever intend to induce the Cochlear Defendants

12  to introduce new lines of products based on the perception that the Cochlear

13  Defendants did not infringe the Foundation's patents.

14         33.     I understand that the Cochlear Defendants claim prejudice from my

15  memory fading.

16         34.     At my deposition, I was not able to recall every contribution to the

17  development of the '616 and '691 patents made by Primoz Strojnik. These

18  contributions would have been made many years ago, in the early to mid 1990s.

19  Even had this lawsuit been filed in 2003, shortly after the Foundation sent the letter

20  to Cochlear, it is unlikely that I would have remembered any further details beyond

21  what I can still recall today, as those events occurred at least 8 years before 2003.

22         35.     At my deposition, I did not initially recall when I had met Hugh

23  McDermott.  References to the 1994 conference refreshed my memory as to some,

24  but not all, of the details of that meeting. I recall meeting Mr. McDermott briefly

25  and in passing, but no more.  Even had the suit been filed in 2003, it is unlikely that

26  ///

27  ///

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

7

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

1    I would have remembered further details, as the meeting had happened nearly 10

2    years prior.

3        36.    At my deposition, I was not able to recall details from several meetings

4    in the 1980's.  Even had the suit been filed in 2003, it is unlikely that I would have

5    remembered further details, because those meeting took place up to 20 years before

6    2003.

7        I declare under penalty of perjury under the laws of the United States of

8    America that the foregoing is true and correct.

9        Executed this 13th day of January, 2014, in Los Angeles, CA.

10

11

12    By: _Joseph H Schulman_____

13         Joseph Schulman

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24608143.3

8

DECL. OF JOSEPH SCHULMAN RE
ISSUES TRIED TO COURT
2:07-CV-08108-FMO-SH

# EXHIBIT 2

1  DANIEL JOHNSON, JR. (SBN 57409)
   DANIEL GRUNFELD (SBN 128494)
2  MICHAEL J. LYONS (SBN 202284)
   JASON E. GETTLEMAN (SBN 269733)
3  MORGAN, LEWIS & BOCKIUS LLP
   3000 El Camino Real, Suite 7000
4  Palo Alto, CA  94306-2122
   Tel:   650.843.4000
5  Fax:   650.843.4001
   Email:  djjohnson@morganlewis.com
6  Email:  dgrunfeld@morganlewis.com
   Email:  mlyons@morganlewis.com
7  Email:  jgettleman@morganlewis.com

8  Attorneys for Plaintiff and Counterdefendant
   ALFRED E. MANN FOUNDATION FOR SCIENTIFIC
9  RESEARCH

10

11                    UNITED STATES DISTRICT COURT
12       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14  ALFRED E. MANN FOUNDATION          Case No. 2:07-cv-08108-FMO-SH
    FOR SCIENTIFIC RESEARCH,
15                                      **DECLARATION OF DR. DARRIN
                   Plaintiff,           J. YOUNG IN OPPOSITION TO
16                                      COCHLEAR DEFENDANTS'
           vs.                          INDEFINITENESS CLAIM**
17
    COCHLEAR CORPORATION, et al.,      Judge:  Hon. Fernando M. Olguin
18                                      Trial:  January 13, 2014
                   Defendants.          Time:   9:00 a.m.
19                                      Place:  Ctrm 22, 5th Floor

20
           I, Dr. Darrin J. Young, declare and state as follows:
21
           1.    I make this declaration based on personal knowledge and, if called to
22
    testify in this matter, I could and would testify competently to the matters stated
23
    herein.
24
           2.    I have been retained as an expert by IMS Expert Services on behalf of
25
    the Alfred E. Mann Foundation for Scientific Research ("AMF").  I have been
26
    asked to provide this Declaration in Alfred Mann Foundation for Scientific
27
    Research v. Cochlear Corporation (nka Cochlear Americas) and Cochlear Ltd.,
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4                         1                    CASE NO. 2:07-cv-08108-FMO-SH
                                 YOUNG DECLARATION

1  Civil Action No. 07-CV-08108, pending in the United States District Court for the

2  Central District of California.

3          3.      In arriving at my opinions, I reviewed the following documents among

4  others:

5                  (a)     The Court's Order on Claim Construction, June 18, 2012.

6                  (b)     Special Master's Report & Recommendation on Claim

7  Construction, Nov. 3, 2011 ("R&R").

8                  (c)     U.S. Patent No. 5,609,616 ("the '616 Patent")

9                  (d)     U.S. Patent No. 5,938,691 ("the '691 Patent")

10                 (e)     "Comparative Studies of Speech Processing Strategies for

11  Cochlear Implants," 98 Laryngoscope 1069, 1071 October 1988, Wilson, B.F, et.

12  al.

13                 (f)     SP12 Firmware Architecture (COC-2083809-COC2083824)

14                 (g)     Cochlear Philips Champ-LP Manual for the Champ-LP R1 and

15  R1A, February 2, 2006 (printed from COC-6000000 Hard Drive)

16                 (h)     SP12 Supervisor Firmware Detailed Design Description, Doc.

17  No. E11952DD, March 16, 2005 (COC-2089812 to COC-2089870)

18                 (i)     SP12 Main Module BTE Hardware Design Description, Doc.

19  No. S50632DD, Jan. 7, 2005 (printed from COC-6000000 Hard Drive)

20                 (j)     Functional Design Description Power Management

21  Optimization, Doc. No. E11986DD, Aug. 30, 2006 (COC-2089505-2089539).

22         4.      I am a Utah Science Technology and Research (USTAR) associate

23  professor in the Department of Electrical and Computer Engineering (ECE) at the

24  University of Utah in Salt Lake City, Utah. I currently also serve as an associate

25  chair of the ECE Department. Prior to joining the University of Utah in 2009, I was

26  a professor in the Department of Electrical Engineering and Computer Science at

27  Case Western Reserve University in Cleveland, Ohio, between 1999 and 2009. I

28  have taught graduate and undergraduate courses in electronic circuit design and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

2
YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

1  analysis and electrical interface design for microelectronic systems with a specialty
2  in microelectro-mechanical systems (MEMS).

3      5.      I earned my Bachelor of Science degree with honors, Master of
4  Science degree, and Ph.D. degree from the Department of Electrical Engineering
5  and Computer Sciences at University of California at Berkeley in 1991, 1993, and
6  1999, respectively. I pioneered the research work in MEMS high-Q tunable
7  capacitors and on-chip 3-D coil inductors and their application in low phase noise
8  radio-frequency (RF) voltage-controlled oscillators for wireless communications.

9      6.      Between 1991 and 1993, I worked at Hewlett-Packard Laboratories in
10  Palo Alto, California, where I designed a shared memory system for a DSP-based
11  multiprocessor architecture. Between 1997 and 1998, I worked at Rockwell
12  Semiconductor Systems in Newport Beach, California, where I designed silicon
13  bipolar RF analog circuits for cellular telephony applications. I also worked at
14  Lawrence Livermore National Laboratory as a visiting researcher developing the
15  design and fabrication process for three-dimensional RF MEMS coil inductors for
16  wireless communication applications.

17      7.      I currently lead a world-class research team to develop advanced
18  wireless microsystem technologies for biomedical implants, navigation, industrial
19  sensing and consumer electronics applications at the University of Utah. I have
20  demonstrated a number of the-state-of-the-art biomedical implantable devices and
21  systems including implantable middle ear microphones, implantable EMG sensors,
22  and implantable physiological sensors. My research work on implantable middle
23  ear microphone was covered by a number of large media outlets in 2012, including
24  Discovery News, IEEE Spectrum, EE Times, CNET, Wired Magazine, CNET,
25  Investors' Business Daily, Hearing News Watch, The Engineer - London, The Salt
26  Lake Tribune and FOX13 News.

27      8.      I have received research supports from the U.S. Army Research
28  Office, U.S. Defense Advanced Research Project Agency, National Science

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

3

YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

1    Foundation, National Institutes of Health, NASA, and U.S. Department of Veterans

2    Affairs. I have authored and co-authored over 100 technical papers in international

3    journals and conferences and have delivered over 50 presentations at international

4    conferences, university seminars and short courses. I have published six book

5    chapters.

6           9.    I served as an Associate Editor for the IEEE Journal of Solid-State

7    Circuits between 2006 and 2011. I currently serve as the chair of the MEMS

8    committee under the IEEE Electron Devices Society. I also served as a technical

9    program committee member and session chair for a number of international

10   conferences.

11          10.    I have served as a proposal reviewer for the National Science

12   Foundation and San Francisco State University. I also served as manuscript

13   reviewer for a number of international journals, including IEEE Journal of

14   MicroElectroMechanical Systems, IEEE Transactions on Electron Devices, IEEE

15   Electron Devices Letter, IEEE Sensors Journal, Journal of Micromechanics and

16   Microengineering, IEEE Transaction on Biomedical Engineering, IEEE Transaction

17   on Biomedical Circuits and Systems, Sensors & Actuators: A. Physical, IEEE

18   Transactions on Microwave Theory and Techniques, Journal of Micromechanics,

19   Journal of Microelectronics Engineering, and Journal of Biosensors.

20          11.    I have received a number of honors, including Recognition and

21   Appreciation of Valued Services and Contributions as IEEE EDS Micro-

22   ElectroMechanical-Systems Chair-2011, Nomination for 2003 Carl F. Wittke

23   Award at Case Western Reserve University for Excellence in Undergraduate

24   Teaching, Bachelor of Science degree with honors in EECS Department at U.C.

25   Berkeley-1991, and Scholastic All American Collegiate Award-1988.

26       DISCLOSURE OF ALGORITHM – GENERALLY

27          12.    The microprocessors disclosed and claimed in the '616 and '691

28   patents are members of a technological family of circuits known to those of skill in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

4

YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

1   the art as digital signal processors ("DSPs"), which are specialized

2   microprocessors. A DSP performs certain well-known steps, including encoding

3   amplitude, frequency or phase information on digital data. This process is generally

4   known as signal modulation.

5        13.    Further to this point, the patents specifically disclose an embodiment

6   of the WP that includes a DSP integrated circuit:

7              The filter bank may also be implemented as a group of

8              digital filters, for example in a digital signal processor

9              integrated circuit. In this case the signal flow would be

10             from the audio front end and AGC 22, through an anti-

11             aliasing filter, to an analog to digital converter, then into a

12             digital filter bank 24 and the general processing of

13             microprocessor 30.

14   '691 Patent, col. 4, lines 52-58; '616 Patent, col. 4, lines 57-63.

15        DISCLOSURE OF ALGORITHM – CLAIM 6 OF THE '691 PATENT

16       14.    Claims 6 of the '691 patent, and dependent Claim 7, contains a

17   limitation that the WP include "means for generating data indicative of the audio

18   signal." The Court has endorsed the Special Master's understanding that the

19   structure, or means, associated with this function is "a microprocessor." R&R at 28.

20   The corresponding function is "generating data indicative of the audio signal."

21   R&R at 26.

22       15.    As described below, one of ordinary skill in the art would understand

23   the steps (or algorithm) performed by the microprocessor in the '691 patent to be:

24   (1) receiving digital data from the analog to digital converter and (2) using a

25   logarithmic conversion function to format the received data to be encoded on an

26   amplitude modulated signal.

27       16.    One of ordinary skill in the art would understand that the DSP

28   (microprocessor in the WP in the '691 patent) encodes the digital data from the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

5

YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

1    analog to digital ("A to D") converter with amplitude information for use in

2    generating an amplitude modulated signal, in other words, a signal encoded with

3    amplitude data. That is because 1) the '691 patent discloses that the WP generates

4    "analog and pulsatile input data signals." '691 Patent, col. 3, lines 38-39; 2) the

5    "input signal generated in the WP" is preferably in the form of a "encoded data

6    stream comprising an amplitude-modulated RF signal consisting of a serial

7    sequence of 83 bits representing 9 words of 9 bits each plus a parity bit and an end-

8    of-frame marker." '691 patent, column 10, lines 1-4; 3) "the first 8 words of each

9    frame contain the digital amplitude ... information for output channels 1 through 8

10   in that order;" '691 patent, column 10, lines 6-8; and 4) encoding a digital signal

11   with amplitude data is one of the functions performed by a DSP ("The output of the

12   microprocessor 30 is coupled through a custom gate array 32 that converts data

13   from the microprocessor into a serial bit stream going to a data transmitter" '691

14   Patent, col. 4 ln. 59-61).

15       17.    Further, the '691 patent explains that the ICS utilizes "an exponential

16   D to A converter 64" ('691 patent at 5:62, 6:58) to convert the received amplitude

17   data for stimulation from digital to analog form. Accordingly, the DSP of the

18   wearable processor must perform the inverse function, i.e., it must encode a

19   digitized signal using a logarithmic algorithm. As I explained in my deposition, that

20   algorithm is implemented with a simple logarithmic lookup table. I know of no

21   other way to implement such a logarithmic algorithm in a DSP. Young Dep. at

22   40:10-43:11.

23       18.    I understand that for purposes of analyzing the scope of the prior art in

24   this case, the parties have agreed that the priority date is August 29 1991. Prior to

25   that date, logarithmic speech processing algorithms for generating pulsatile input

26   data signals for cochlear implants as I described above were well known in the art

27   and this further supports my understanding of the logarithmic algorithm disclosed

28   in the '691 patent.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

6
YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

1    19.    I have also analyzed the scope of the prior art assuming a priority date

2    of September 22, 1989, the date of filing of the original application.  Prior to that

3    date, logarithmic speech processing algorithms for generating pulsatile input data

4    signals for cochlear implants as I described above were well known in the art

5    confirms my understanding of the logarithmic algorithm disclosed in the '691

6    patent.

7    20.    As an example, in "Comparative Studies of Speech Processing

8    Strategies for Cochlear Implants," 98 Laryngoscope 1069, 1071 October 1988,

9    Wilson, B.F, et. al., the authors describe the generation of pulsatile input data

10   signals from a wearable processor to a cochlear implant through application of the

11   following logarithm speech shaping algorithm used for programming the "post-

12   processor," which is a microprocessor:

13           Next, a post-processor is programmed to scan the RMS

14           [root-mean-square] outputs on a periodic basis. The

15           output of a filter bank channel is coded for stimulation of

16           its assigned electrode(s) only if the RMS [root-mean-

17           square] energy is above a preset noise threshold. The

18           amplitudes of the pulses delivered to the selected channels

19           are calculated with a logarithmic mapping law of the

20           form: pulse amplitude = A x log (RMS level) p+ k, where

21           the parameters A and k are determined for each channel

22           on the basis of threshold and most comfortable loudness

23           level measurements.

24   21.    Since this algorithm was in a published paper that was part of the

25   speech processing literature prior to September 22, 1989, this further supports my

26   conclusion that on of skill in the art would have appreciated that the algorithm used

27   by the microprocessor in the WP of the '691 Patent to generate data indicative of

28   the audio signal is the logarithm algorithm that I have described.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

7

YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

22.   The Cochlear Defendant's documents I reviewed also indicate that a person of ordinary skill in the art would appreciate that specialized algorithms that fit the surrounding structures must be implemented in a DSP. *See, e.g.,* TX 169 at 5 ("the micro-controller is not suitable for processing audio. Processing audio is done by the DSPs."); TX 233 Table 4.10 (ADC Gain settings are on an exponential scale); TX 1287 at 55 ("The microC has a two-way link to all running DSPs. The watchdog timer for the DSP runs over this link, and also a number of commands are defined"); TX 1288 at 33 ("Derived requirements" i.e., "the speech processor, hardware, shall produce an RF signal to the implant with a PWM factor that has a range of 0-50% through a 10-bit value"); TX 1290 at 3 (discussing the necessity for a low power DSP corresponding to the low power ASIC and algorithms implemented in the Champ LP);

23.   Cochlear's technical documents also reveal that a logarithmic conversion function is well know to persons with ordinary skill in the art. *See, e.g.,* TX 748 at 33-34 ("From the input dynamic range one may calculate the base level by inverting the equation $D = 20\log(M/B)$").

24.   To the extent the Cochlear Defendants argue that there is no disclosure of an algorithm used by a microprocessor for the claim term "generating data indicative of the audio signals" in claims 6 of the '691 patent, I disagree. The '691 patent describes encoding algorithms implemented by the microprocessor of the WP that generate amplitude information used to transmit the data to the ICS. Such algorithms include imposition of a logarithmic function on the data.

DISCLOSURE OF ALGORITHM – CLAIM 1 OF THE '616 PATENT

25.   Claim 1 of the '616 Patent contains the limitation "external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes." The parties agreed that the structure that performs

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

8
YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

this function is an "an antenna, receiver, and microprocessor." The Court acknowledged this agreement and interpreted the function as "receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes." R&R at 3-4.

26.     More than a microprocessor is disclosed to perform this function — the parties specifically agreed that the function is performed by the combination of an "antenna, receiver, and microprocessor" working together.

27.     The function performed by a microprocessor is "processing the status indicating signals."

28.     The "the physician's tester is basically a modification of the WP 16" and discloses the same microprocessor 30 that is in the WP in the '691 patent. '616 patent, col. 33, lines 7-10 & Figs. 1 & 7.

29.     As a result of "processing," the microprocessor in the physician's tester "derive[s] information" from the "status-indicating signals" that are telemetered from the cochlear implant to the WP.  As shown in Figure 6 and in the tables, such derived information includes impedance.  By displaying impedance, the '616 patent discloses that Ohm's law has been applied to the measured voltage and current values.

30.     In other words, one algorithm disclosed by the patent for microprocessor 30 includes the steps of (1) accepting from the receiver signals representative of measured voltage, (2) applying Ohm's law to convert the measured voltage or voltage and current into an impedance value.

31.     A simple example of an implementation of this algorithm is described in the patent. In describing the physician's tester claimed in the '616 patent, the inventors stated that the "present invention also contemplates physician control over the selection of the voltages and currents to be measured." '616 Patent, col. 32, lines 41-43. The '616 Patent also discloses that the position of the controls for the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

9

YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

physician's tester "are read by the microprocessor 30 to control the commands generated thereby and hence the parameters measured and displayed by the ICS and Physician's Tester combination." '616 Patent, col. 33, lines 15-18. One of the controls of the physician's tester has an impedance setting. '616 Patent, col. 33, Table 7 ("Control Knob 308 — Position 1 = Impedance of Monopolar A configured channel.") & Figure 6 (see control setting selecting "Z," which is the traditional mathematical symbol for impedance and numeric display). By selecting the impedance setting, one of ordinary skill in the art would understand that the physician's tester would be instructing the microprocessor to make an impedance calculation. This would be done by either 1) measuring voltage and current; or 2) measuring voltage only, since the stimulus current would be known based on one of the seven pre-set current levels shown in Table 7 of the '616 patent; and then 3) making an impedance calculation.

32.    In order to obtain an impedance calculation, the microprocessor calculates impedance as the ratio of voltage to current. This calculation is no different from a commercially available ohmmeter, which literally measures voltage, and displays voltage to current ratio as indicative of the impedance.

33.    This is also the same way impedance is calculated in the Cochlear Defendants' device. *See, e.g.,* TX 1288 at ("Electrode impedances are calculated from the applied stimulation current and the measured electrode voltage at the end of a stimulation pulse using Ohm's law.")

34.    Impedance cannot be measured per se. It is always calculated based on the ratio of voltage to current. One of ordinary skill in the art would readily understand from the disclosure in the '616 patent that this the algorithm is implemented. The algorithm for calculating impedance is Ohm's law, which is famous and well known to a person of ordinary skill in the art. It was first described over a century ago as $Z = V \div I$, in other words, Z (impedance) equals V (voltage) divided by I (current). Therefore, one of ordinary skill in the art would readily

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

1   appreciate $Z = V \div I$ as the algorithm that is disclosed and would be used in the

2   microprocessor of the physician's tester of the '616 Patent to make an impedance

3   calculation to "derive information" from the status-indicating signals. The Cochlear

4   Defendant's expert witness Dr. Stevenson acknowledged that Ohm's law is used to

5   calculate impedance when the voltage and current are known. Stevenson 2009 Dep.

6   at 171:615. Cochlear's expert Dr. Loeb described the application of Ohm's law as

7   "straightforward." Loeb 2009 Dep. at 134:4-6. Indeed, Ohm's law is the first

8   concept I teach in introductory electrical engineering circuit analysis courses as

9   does Dr. Stevenson. Stevenson 2013 Dep. at 67:6-17.

10       35.    To the extent the Cochlear Defendants argue that there are numerous

11   ways of calculating impedance in a circuit, some of which can and others which do

12   not utilize Ohm's law, I disagree.  The Cochlear Defendants have never articulated

13   those ways and I know of no other way of calculating impedance that does not in

14   some way rely upon the ratio of voltage to current, which is the fundamental

15   concept of Ohm's law.

16       36.    To the extent the Cochlear Defendants take issue with my

17   characterization of the Ohm's law algorithm as a relatively simple task, I disagree.

18   For instance, even if the relative complexity or simplicity would depend in part

19   upon, among other things, the information being sought, and the desired or

20   tolerable reliability (e.g., accuracy) and stability of the results or information being

21   sought, such considerations, which would be necessary in any commercial design

22   of an electrical circuitry, would not change my opinion that the underlying

23   algorithm, namely, Ohm's law, remains unchanged and simple.

24       37.    To the extent the Cochlear Defendants argue that different algorithms

25   would be used by one of ordinary skill in the art if the current were to be assumed

26   and only voltage was measured by the implant and transmitted to the Physician's

27   Tester, or if both voltage and current were measured by the implant and transmitted

28   to the Physician's Tester, I disagree.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

38.    It is indisputable that the such "different algorithms" all have as their underlying basis Ohm's law, the very algorithm disclosed in the `616 patent.

39.    To the extent that the Cochlear Defendants argue that no particular or general approach to check compliance with acceptable impedance thresholds, or to check likely impedance range(s) is taught by the '616 patent, *i.e.*, that the '616 patent does teach display of impedance, but does not specify any of a number of ways of confirming compliance of operation of the electrodes, I do not agree. As I state above, Figure 6 and Table 7, together with the other passages from the '616 patent that I cite, clearly teach to one of ordinary skill in the art that it is an actual impedance reading, not, for example, a mere pass or fail indication, that is displayed to the user.

40.    To the extent the Cochlear Defendants argue that there is no disclosure of an algorithm used by a microprocessor for the claim term "processing status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes" in claim 1 of the '616 patent, I disagree.  The '616 patent discloses an algorithm implemented by the microprocessor which is based on the well-known Ohm's law.

41.    To the extent the Cochlear Defendants attempt to complicate the analysis of the issue by introducing the notion of impedance as a "complex quantity," I believe this is inappropriate under the circumstances.  Although impedance can be represented as $Z = R + jX$ where "R" is Resistance and "X" is Reactance, and "j" represents the square root of -1, one of ordinary skill in the art realizes that Ohm's law expresses the fundamental algorithm to calculate the impedance and that any contributions made by the additional components suggested by Dr. Stevenson would be negligable.  Specifically, given the stimulating frequencies utilized, the magnitude of the current and voltages at issue as well as the size of the electrodes, a person of skill in the art would still utilize the ratio of voltage to current and would further realize that any contribution to the calculation

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

12
YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH

1  of impedance by the reactance would be negligable. Regardless, because the '616

2  patent discloses Ohm's law as the algorithm used by the microprocessor to

3  "derive[s] information" from the "status-indicating signals" that are telemetered

4  from the cochlear implant to the WP, one of ordinary skill in the art would

5  understand this encompasses consideration of evern the negligable complex portion

6  of the impedance.

7

8      I further represent under the penalty of perjury under the laws of the United

9  States of America that the foregoing is true and correct.

10

11  Dated:  January, _13_ 201X4

                                            Darrin J. Young

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/ 24605055.4

13

YOUNG DECLARATION

CASE NO. 2:07-cv-08108-FMO-SH